

Daniel Richardson, M.D.
26508 Mandalay Court
Novi, MI 48374

The following represents my Rule 26 report in the matter of *Dunigan v Bronson Methodist Hospital*. It is based upon review of materials (enumerated later), my nearly thirty years of experience as an Emergency Medicine physician. I reserve the right to amend this report if additional information becomes available.

**SUMMARY OF EXPERIENCE**

I am a physician who became board-certified by the American Board of Emergency Medicine on June 2, 1994. I was re-certified in 2004 and 2014. I have practiced Emergency Medicine on a full-time basis for over twenty-five years.

I obtained by Bachelor of Science Degree from Michigan State University in 1985. I went on to earn my medical degree from Wayne State University in 1990. I performed a residency in Emergency Medicine at William Beaumont Hospital, which I completed in 1993. I went on to perform a fellowship in Geriatric Medicine at William Beaumont Hospital in 1998.

Since 1990, I have worked as an Emergency Medicine physician in the Department of Emergency Medicine in the William Beaumont Hospital Systems in Royal Oak, Michigan. I also serve as a Clinical Assistant Professor of Emergency Medicine at the Oakland University William Beaumont School of Medicine; I have served in this capacity since 2011. Since 2011, I have also served as an Adjunct Physician Instructor at the University of Michigan. At William Beaumont Hospital, I also serve as the Geriatric Emergency Medicine Fellowship Program Director (since 1999), a member of the clinical competency committee (since 2014), and a member of the Emergency Department Quality Assurance Committee (since 2017).

**CASE LIST DISCLOSURE**

The cases in which I have given testimony during the past four years are as follows:

Alicia Thompson v Spectrum Health: Kent County Circuit Court. 12-09750-NH.

**FEE SCHEDULE**

- Record Review: $300.00/hour

- Conferences: $300.00/hour

- Deposition: $400.00/hour

- Trial: $400.00/hour, minimum $2,000.00/day

SHRR\4200409.v1

**MATERIALS REVIEWED**

1. Plaintiff's Complaint

2. Medical records from Bronson Methodist Hospital from Mr. Dunigan's May 6, 2016 visit to the emergency room.

3. Postmortem Examination Report (Western Michigan University)

4. Expert Report for Plaintiff's Emergency Medicine Expert, Saul Levine, M.D.

5. Expert Report for Plaintiff's Internal Medicine, Pulmonary Medicine, and Critical Care Medicine Expert, Charles Landers, M.D.

6. Expert Report for Plaintiff's Cardiology Expert, Robert Stark, M.D.

7. Expert Report for Plaintiff's Pharmacology Toxicology Expert, Dennis Simpson, Ph.D.

8. Expert Report for Plaintiff's Pathology Expert, Werner Spitz, M.D.

**SUMMARY OF FACTS IN THE MATTER**

1. Mr. Dunigan presented to Bronson Methodist Hospital via ambulance at approximately 02:09 am on May 6, 2016. He complained of right flank and chest pain post fall.

2. Mr. Dunigan reported to the EMS team that he had fallen at 18:00 on May 5, 2016, and landed on his right chest. He complained of pain all day, and called EMS.

3. Mr. Dunigan was triaged at Bronson Methodist Hospital and again reported he had a "fall yesterday with right chest and flank pain."

4. He was taken into the ED and evaluated by an emergency department nurse, who recorded his vital signs. Mr. Dunigan's blood pressure was 101/60, his pulse was 113, his respirations were 16, and his pulse oximetry was 98% on room air. Mr. Dunigan quantified his pain as 9/10.

5. In the ED, Mr. Dunigan was evaluated by Wesley Rigot, M.D. Mr. Dunigan explained he fell getting off the bus on Thursday, May 5, 2016. He reported right flank pain and ongoing right chest pain. Dr. Rigot reported that Mr. Dunigan had recently been discharged from nearby Borgess Hospital, where he received dialysis. He planned on returning to Borgess that same day for dialysis.

6. Dr. Rigot performed a physical examination of Mr. Dunigan. He noted he was alert and oriented, was not in respiratory distress, and had no sensory defects. He did report that Mr. Dunigan exhibited some tenderness to his right lower ribcage.

7. Dr. Rigot ordered an X-Ray of Mr. Dunigan's chest. The X-Ray revealed no focal rib abnormality with mild pulmonary vascular congestion, and mild atelectasis in the right lung base.

visit, as he had just received dialysis, where, more likely than not, labs would have been drawn, and would go on to have dialysis later that day, where labs would likely be drawn.

### II. The Bronson ER team reasonably concluded Mr. Dunigan was not suffering from an emergency medical condition and discharged him in stable condition.

On examination, Mr. Dunigan was tender to palpation over the area on which he landed after the fall. Mr. Dunigan was monitored in the ED for approximately two hours after his arrival. During that time, his condition did not worsen – his vitals remained stable, and he did not ever complain of an increase of pain. Mr. Dunigan was agreeable with the discharge plan, and agreed to follow-up with his primary care physician within three days. He at no time requested any additional assistance or work-up.

I reserve the right to amend and supplement my findings and opinions in this report based on any additional information which may be provided to me hereafter. All of the opinions expressed herein are stated to a reasonable degree of medical certainty. Further, I base these conclusions not only on the records provided to me, but also on my education, training, and experience in the practice of Emergency Medicine.

Daniel Richardson, M.D.

SHRR\4200409.v1



DEFENDANT'S EXHIBIT A Sherwin

**Robert L. Sherwin, M.D., FACEP, FAAEM**
Sinai Grace Hospital
6701 West Outer Drive, L449
Detroit, MI 48235

The following represents my Rule 26 report in the matter of *Dunigan v Bronson Methodist Hospital*. It is based upon review of materials (enumerated later), my nearly fifteen years of experience as an Emergency Medicine physician. I reserve the right to amend this report if additional information becomes available.

**SUMMARY OF EXPERIENCE**

I am a physician who is board-certified by both the American Board of Emergency Medicine and the American Board of Internal Medicine. I have practiced Emergency Medicine on a full-time basis for over ten years.

I obtained my Bachelor of Science Degree from the University of Michigan in 1994. I went on to earn my medical degree from Wayne State University in 1998. I completed my internship year in Emergency Medicine at the New York University in 2000. I performed two years of my Emergency Medicine residency at the University of Michigan (2000-2002), and two years at Henry Ford Hospital (2003-2005). Between 2002 and 2003, I worked as a private hospitalist.

Since July 2010, I have served as the Director of Emergency and Critical Care Medicine at both Detroit Receiving Hospital and Sinai-Grace Hospital. Since August 2013, I have also worked as an Associate Professor at the Wayne State University, Department of Emergency Medicine. Since September 2011, I have also served as the Director of Research at the Wayne State University, Department of Emergency Medicine, Sinai Grace Hospital.

**CASE LIST DISCLOSURE**

I have not testified at deposition or trial in the past four years.

**FEE SCHEDULE**

- Record Review: $400.00 per hour
- Conferences: $400.00 per hour
- Deposition: $400.00 per hour - $1200 deposit to reserve date
- Trial: $3200.00 per day

**MATERIALS REVIEWED**

1. Plaintiff's Complaint

2. Medical records from Bronson Methodist Hospital from Mr. Dunigan's May 6, 2016 visit to the emergency room.

3. Postmortem Examination Report (Western Michigan University)

4. Expert Report for Plaintiff's Emergency Medicine Expert, Saul Levine, M.D.

5. Expert Report for Plaintiff's Internal Medicine, Pulmonary Medicine, and Critical Care Medicine Expert, Charles Landers, M.D.

6. Expert Report for Plaintiff's Cardiology Expert, Robert Stark, M.D.

7. Expert Report for Plaintiff's Pharmacology Toxicology Expert, Dennis Simpson, Ph.D.

8. Expert Report for Plaintiff's Pathology Expert, Werner Spitz, M.D.

**SUMMARY OF FACTS IN THE MATTER**

1. Mr. Dunigan presented to Bronson Methodist Hospital via ambulance at approximately 02:09 am on May 6, 2016. He complained of right flank and chest pain post fall.

2. Mr. Dunigan reported to the EMS team that he had fallen at 18:00 on May 5, 2016, and landed on his right chest. He complained of pain all day, and called EMS.

3. Mr. Dunigan was triaged at Bronson Methodist Hospital and again reported he had a "fall yesterday with right chest and flank pain."

4. He was taken into the ED and evaluated by an emergency department nurse, who recorded his vital signs. Mr. Dunigan's blood pressure was 101/60, his pulse was 113, his respirations were 16, and his pulse oximetry was 98% on room air. Mr. Dunigan quantified his pain as 9/10.

5. In the ED, Mr. Dunigan was evaluated by Wesley Rigot, M.D. Mr. Dunigan explained he fell getting off the bus on Thursday, May 5, 2016. He reported right flank pain and ongoing right chest pain. Dr. Rigot reported that Mr. Dunigan had recently been discharged from nearby Borgess Hospital, where he received dialysis. He planned on returning to Borgess that same day for dialysis.

6. Dr. Rigot performed a physical examination of Mr. Dunigan. He noted he was alert and oriented, was not in respiratory distress, and had no sensory defects. He did report that Mr. Dunigan exhibited some tenderness to his right lower ribcage.

7. Dr. Rigot ordered an X-Ray of Mr. Dunigan's chest. The X-Ray revealed no focal rib abnormality with mild pulmonary vascular congestion, and mild atelectasis in the right lung base.

8. Dr. Rigot concluded Mr. Dunigan's complaints were consistent with a chest wall contusion. He advised him to follow-up with his primary care physician within three

days. Dr. Rigot discussed the discharge plan with Mr. Dunigan, who agreed to the treatment plan and discharge.

9. Mr. Dunigan was discharged to home at approximately 4:30 am with a diagnosis of "contusion, right front wall of thorax."

10. Mr. Dunigan never again presented for treatment at Bronson Methodist Hospital.

**PROFESSIONAL OPINIONS AND BASIS FOR THESE OPINIONS**

Considering the above facts, and based upon my knowledge of and experience in these matters, I offer the following opinions. As discovery progresses and more facts become known, these opinions may be amended.

### I. The Bronson ER team performed an appropriate medical screening

The Bronson ER team performed an appropriate examination of Mr. Dunigan, and properly concluded that nothing in his vital signs, physical examination, or radiology results warranted admission, as Mr. Dunigan was not suffering from an emergency medical condition.

### A. Mr. Dunigan reported to ED staff that he suffered a mechanical fall; the medical screening was adequate and addressed Mr. Dunigan's musculoskeletal complaints

Throughout his time in the Emergency Department, Mr. Dunigan reported that he suffered a fall while getting off of a bus the prior day, and landed on his right side. Mr. Dunigan reported that his side continued to hurt, and he therefore sought an evaluation at the Bronson emergency department. Mr. Duingan clearly explained that his pain on May 6, 2016 was from a clear etiology.

The medical screening examination performed by Dr. Rigot and the ED team was appropriate. As Mr. Dunigan complained of a mechanical fall, it was reasonable to order a Chest X-Ray to assess whether or not Mr. Dunigan had suffered a fracture during his fall. The X-Ray was interpreted as negative. The only thing visible on the X-Ray was some congestion, which would typically be seen in a dialysis patient. Therefore, no further work-up to assess an alternative etiology of his complaints was warranted.

### B. It was not necessary to draw labs, as Mr. Dunigan reported a cause of his complaints that was corroborated by physical exam, and because he had just had labs drawn at Borgess.

Mr. Dunigan relayed to the Bronson ED team that he was undergoing dialysis treatment three days per week at Borgess Hospital. He further stated he had recently received dialysis treatment at Borgess, and that he was scheduled to undergo dialysis at Borgess later that day on May 6, 2016.

It was entirely reasonable for the Bronson ED team not to draw any labs during Mr. Dunigan's visit, as he had just received dialysis, where, more likely than not, labs would have been drawn, and would go on to have dialysis later that day, where labs would likely be drawn.

3

**II. The Bronson ER team reasonably concluded Mr. Dunigan was not suffering from an emergency medical condition and discharged him in stable condition.**

Mr. Dunigan was monitored in the ED for approximately two hours after his arrival. During that time, his condition did not worsen – his vitals remained stable, and he did not ever complain of an increase of pain. Mr. Dunigan was agreeable with the discharge plan, and agreed to follow-up with his primary care physician within three days. He at no time requested any additional assistance or work-up.

I reserve the right to amend and supplement my findings and opinions in this report based on any additional information which may be provided to me hereafter. All of the opinions expressed herein are stated to a reasonable degree of medical certainty. Further, I base these conclusions not only on the records provided to me, but also on my education, training, and experience in the practice of Emergency Medicine.

Date:___01/25/2018                     Signed:___ _____

                                                                                         Robert Sherwin, M.D.



DEFENDANT'S EXHIBIT A Commissaris

Randall L. Commissaris, Ph.D.
1202 Greenleaf Dr
Royal Oak, MI 48170

The following represents my Rule 26 report in the matter of *Dunigan v Bronson Methodist Hospital*. It is based upon review of materials (enumerated later) and my nearly thirty-six years of experience as a Pharmacologist and Toxicologist. I reserve the right to amend this report if additional information becomes available.

## SUMMARY OF EXPERIENCE

I obtained my Bachelors in Science in Biology and Psychology from Alma College in 1976. I went on to earn by Ph.D. in Pharmacology and Toxicology from Michigan State University in 1981. Since 1987, I have served as an Associate Professor in Pharmaceutical Sciences at the Eugene Applebaum College of Pharmacy and Health Sciences at Wayne State University, as well as an Associate Professor in Psychiatry and Behavioral Neurosciences at the Wayne State University School of Medicine. I have been engaged in the research and teaching of Pharmacology and Toxicology for almost thirty-six years.

## CASE LIST DISCLOSURE

The cases in which I have given testimony during the past four years are as follows:

*The Estate of Donna Harrington v Ashraf Mohamed, M.D.*: Wayne County Circuit Court; 2013

*Tucker v Covenant Medical Center*; 2014

*Carson v Goodman*; 2015

*Williamson v Bastow*; 2015

*Tim Brugger v Midland County Road Commission*; Midland County Circuit Court; 15-2403-NOB; 2016

*Saldana v Nathan Smith*; 2016

*Hull v Ramirez*; 2017

*Harvey v Colligan*; 2017

*Roe v Litynski*; 2017

## FEE SCHEDULE

- Record Review: $300.00/hour
- Conferences: $300.00/hour
- Deposition: $400.00/hour

RECEIVED JAN 22 2018 SMITH, HAUGHEY, RICE & ROEGGE

SHRR\4200411.v1

(1)

- Trial: $400.00/hour

**MATERIALS REVIEWED**

1. Plaintiff's Complaint
2. Postmortem Examination Report (Western Michigan University)
3. Expert Report for Plaintiff's Emergency Medicine Expert, Saul Levine, M.D.
4. Expert Report for Plaintiff's Internal Medicine, Pulmonary Medicine, and Critical Care Medicine Expert, Charles Landers, M.D.
5. Expert Report for Plaintiff's Cardiology Expert, Robert Stark, M.D.
6. Expert Report for Plaintiff's Pharmacology Toxicology Expert, Dennis Simpson, Ph.D.
7. Expert Report for Plaintiff's Pathology Expert, Werner Spitz, M.D.

**SUMMARY OF FACTS IN THE MATTER**

1. Mr. Dunigan had reportedly been discharged from the Bronson Methodist Hospital Emergency Department following a work-up for flank pain which developed after a fall.
2. He reportedly refused to leave the hospital, and was transported to the local jail. However, he was unresponsive upon arrival to the jail. He was pronounced dead at approximately 07:40 am.
3. Mr. Dunigan's remains were transported to the morgue on Friday, May 6, 2016 at 09:30 hours.
4. An autopsy was performed by Elizabeth A. Douglas, M.D., including an external examination, internal examination, and taking of samples including tissue samples, blood samples for postmortem drug screening, urine for postmortem drug screening, and vitreous fluid – the records indicate these samples were collected on May 7, 2016 at 08:50 am.
5. The blood, urine, and vitreous fluid samples were received by AIT Laboratories on May 10, 2016. The results of the analysis were reported on May 24, 2016.
6. The results of the femoral blood analysis, urinalysis, and vitreous electrolyte levels are discussed below.

**PROFESSIONAL OPINIONS AND BASIS FOR THESE OPINIONS**

Considering the above facts, and based upon my knowledge of and experience in these matters, I offer the following opinions. As discovery progresses and more facts become known, these opinions may be amended. Blood samples taken from a peripheral source, such as the femoral artery, reduce the risk of the post-mortem redistribution of blood products after a person dies.

2

Despite the accuracy of the femoral blood sample, it is difficult to know how much of a particular medication or drug Mr. Dunigan consumed prior to his death, as the timeframe during which Mr. Dunigan consumed the medications and drugs and/or the dosages would need to be known.

I. **Interpretation of Mr. Dunigan's Femoral Blood Sample Levels**

My interpretation of the medications/drugs found in Mr. Dunigan's femoral blood sample are as follows:

| FEMORAL BLOOD SAMPLE | | | |
|---|---|---|---|
| Drug | Amount Found | Therapeutic Range | Interpretation |
| Ephedrine | 141 ng/mL | 35-80 ng/mL | The amount of Ephedrine in Mr. Dunigan's blood was higher than the therapeutic range. |
| Benzoleconine (cocaine metabolite) | 1146 ng/mL | N/A | Based on the amount of cocaine metabolite in Mr. Dunigan's blood, I can estimate he had ingested cocaine within the last 3-4 days. However, Mr. Dunigan did not have any actual cocaine in his system at the time of death. |
| Hydrocodone | 50.2 ng/mL | 10-40 ng/mL | It is not possible to estimate when Mr. Dunigan ingested the hydrocodone product, as we do not know (1) the dosage of the hydrocodone product he took, or (2) when he last took the hydrocodone product. For instance, Mr. Dunigan could have consumed two 10 mg tablets within a few hours of his death. Alternatively, Mr. Dunigan could have consumed 5-10 tablets the day before his death which would have resulted in a similar concentration. |
| Gabapentin | 9.8 mg/mL | 2-20 | This is within the therapeutic range. |
| Diphenhydramine (Benadryl) | 346 ng/mL | 30-300 | This is slightly above the therapeutic range, which might have resulted in Mr. Dunigan appearing "slow" or "groggy," but this concentration would not result in overt toxicity. |

Notably, the combination of the Hydrocodone (Norco), Gabapentin, and Diphenhydramine (Benadryl) could produce a somnolent effect.

3

SHRR\4200411.v1

(3)

## II. Interpretation of Mr. Dunigan's Urinalysis Results

I also had the opportunity to review the urinalysis results obtained on May 6, 2016. Urinalysis results are not the best indicators of how much of a substance a person consumed, because urinalysis results are highly influenced by the concentration of urine in the body. Further, the concentration of a medication in an individual's urine does not reliably correlate with the degree of effect of the drug on the person.

| URINALYSIS | | |
|---|---|---|
| **Drug** | **Amount Found** | **Interpretation** |
| Benzoleconine (cocaine metabolites) | 6845 ng/mL | The presence of cocaine metabolites in Mr. Dunigan's urine indicates he ingested cocaine sometime within the 3-4 days prior to his death; the absence of cocaine itself in his urine and blood indicates he was not under the influence of cocaine at that time of his death. |
| Fentanyl Norfentanyl | 1.0 ng/mL 2.8 ng/mL | There was no measurable amount of Fentanyl in Mr. Dunigan's blood, it was only present in his urine, indicating it had been ingested sometime within the past several days before his death. The absence of Fentanyl in the blood indicates he was not under the influence of Fentanyl at the time. |
| Hydrocodone, Hydromorphone | 2354 ng/mL 119 ng/mL | The presence of hydrocodone in his urine is consistent with recent past use, used within the past 2-3 days. |

## III. Interpretation of Vitreous Electrolyte Levels

I then reviewed Mr. Dunigan's postmortem vitreous electrolyte levels.

| VITREOUS ELECTROLYTE EXAMINATION | | | |
|---|---|---|---|
| **Drug** | **Amount Found** | **Normal Range** | **Interpretation** |
| Sodium | 145 mmol/L | 139-140 mmol/L | This level is "slightly" elevated, but not problematic. |
| Potassium | 10.3 mmol/L | 4 mmol/L | The concentration of potassium in the vitreous fluid is consistent with reports regarding post-mortem changes in this electrolyte following death. |
| Glucose | 14 mg/dL | 100 mg/dL | Mr. Dunigan's glucose level appears somewhat low here. |

I reserve the right to amend and supplement my findings and opinions in this report based on any additional information which may be provided to me hereafter. All of the opinions expressed herein are stated to a reasonable degree of certainty. Further, I base these conclusions not only on the records provided to me, but also on my education, training, and experience in the practice of Pharmacology and Toxicology.

4

SHRR\4200411.v1



Dated: 19-JAN-2018

_____
Randall L. Commissaris, Ph.D.

5





John Kendall
5160 Falcon View SE
Kentwood, MI  49512

The following represents my Rule 26 report in the matter of *Dunigan v Bronson Methodist Hospital*. It is based upon review of materials (enumerated later) and my twenty-two years of experience as a founder and owner of DK Security in Grand Rapids, MI. I reserve the right to amend this report if additional information becomes available.

**Summary of Experience**

I obtained my Bachelor of Science, Political Administration at Wayne State University and a Master of Public Administration, also at Wayne State University.  My professional history includes serving as Chief of Police for the City of Harbor Springs, Michigan from 1975 through 1979, servicing as Undersheriff for Grand Traverse County in Michigan from 1979 through 1981, serving as a US Marshal in the Western District of Michigan appointment by President Ronald Reagan from 1981 through 1984, and most recently the President and CEO of DK Security, the company that I founded and owned in 1995 and continues to the present day.

**Case List Disclosure**

I have not testified either at deposition or trial in the past four years.

**Fee Schedule:**

Document Review:  $125.00 per hour

Conference:  $125 per hour

Deposition:  To be determined

Trial:  To be determined

**Materials Reviewed:**

Bronson Surveillance Videos

Kalamazoo Department of Public Safety Videos

**Summary of Facts of the Matter**

1. Mr. Dunigan had reportedly been discharged from Bronson Methodist Hospital Emergency Department following a work-up for flank pain that developed following a fall.

2. Mr. Dunigan refused to leave the hospital and was transported to the local jail by the Kalamazoo Police Department.

SHRR\4199981.v1

3. Mr. Dunigan was unresponsive upon arrival at the local jail and pronounced dead at approximately 0740.

**Professional Opinions and Basis for These Opinions**

Based upon my review of the above material and my background, training and experience in providing and supervising the provision of security services, it is my opinion that the Bronson Hospital Security personnel acted completely in accordance with acceptable standards and procedures. There is no indication that the Bronson personnel ever mishandled or mistreated Mr. Dunigan during the encounter. There is no indication that Mr. Dunigan was in anyway injured by the Security Officers and no indication that Mr. Dunigan ever complained of any illness or injury or requested assistance or treatment for any illness or injury. It appears that Mr. Dunigan was properly considered a trespasser as of the time of the encounter and that he was properly removed from the premises. Based upon my review of the material provided, it also appears that the Bronson Security Officers appropriately requested the assistance of the Kalamazoo Public Safety Officers and that Mr. Dunigan was lawfully and properly placed under arrest.

2


DEFENDANT'S EXHIBIT
A
West

Daniel West, M.D.
1212 East Sherman Blvd.
Muskegon, MI  49444

Dr. West has not yet reviewed records or materials from this case, but is expected to provide opinions regarding Mr. Dunigan's condition at Bronson Methodist Hospital and his cause of death.  This report will be supplemented when he completes his review and may be further supplemented after Plaintiff's experts are deposed.  It is based upon Dr. West's of experience and expertise as a physician board certified in Internal Medicine and Cardiovascular Disease since 1989. The right to amend this report as additional information becomes available is reserved.

**Summary of Experience**

Daniel West, M.D. received Bachelor of Science at Michigan Technological University in 1980, his medical degree from Michigan State University in 1984 and performed post-graduate training that included an internship and residency in Internal Medicine at Butterworth Hospital in Grand Rapids, Michigan in 1987.  Dr. West then performed a fellowship in Cardiology at the University of Vermont in Burlington, completing that fellowship in 1989.  Dr. West was board certified in Internal Medicine in 1987 and in Internal Medicine Cardiovascular Disease in 1989.  Dr. West's areas of expertise include Adult Cardiology, Interventional Cardiology and Nuclear Cardiology and is currently in practice at West Shore Cardiology in Muskegon, Michigan.

**Case List Disclosure**

Dr. West has not testified at trial in the past four years.

Dr. West testified at deposition in the following cases:

    Fetter v Olson – Kent County:  16-08907-NH

    Beemer v Tavarone - Kent County: 14-006256-NH

    Aemmer v Munson - *Unknown*

**Fee Schedule:**

Document Review:  $400.00 per hour

Conference:  $400.00 per hour

Deposition:  $500.00 per hour

Trial:  $500.00 per hour

**Materials Reviewed:**

Dr. West has not yet reviewed any materials.

**Summary of Facts of the Matter**

Dr. West has not yet reviewed any materials related to this matter.

**Professional Opinions and Basis for These Opinions**

Dr. West is expected, following review of medical records and deposition testimony, to formulate his opinions as they relate to James Dunigan's cause of death.

2

SHRR\4217462.v1