UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| GORDA DUNIGAN, as Personal Representative for the ESTATE OF JAMES DUNIGAN, Deceased,<br><br>Plaintiff,<br><br>v<br><br>BRONSON METHODIST HOSPITAL<br><br>Defendant. | CASE NO. 1:16-CV-01324<br><br>MAG. JUDGE ELLEN S. CARMODY<br><br>**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>*** oral argument requested *** |
| James J. Harrington, IV P65351<br>FIEGER, FIEGER, KENNEY & HARRINGTON, PC<br>19390 West 10 Mile Road<br>Southfield, MI 48075<br>(248) 355-5555 | John C. O'Loughlin P33343<br>Vanessa F. McCamant P68254<br>SMITH HAUGHEY RICE & ROEGGE<br>Attorney for Defendant<br>100 Monroe Center NW<br>Grand Rapids, MI 49503-2802<br>616-774-8000 |

**DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY DISPOSITION PURSUANT TO F.R.C.P. 56**

**I.      INTRODUCTION & RELEVANT PROCEDURAL HISTORY**

Plaintiff, Gorda Dunigan, on behalf of the Estate of Decedent James Dunigan ("Decedent Dunigan"), has alleged violation of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. §1395dd, by Defendant, Bronson Methodist Hospital ("Bronson"). Specifically, Plaintiff's Complaint and Frist Amended Complaint assert Bronson personnel purportedly failed to recognize Decedent Dunigan was suffering from an emergency medical condition requiring treatment and stabilization.

SHRR\4287397.v1

Bronson sought dismissal of Plaintiff's claim at the outset by way of a Rule 12(B)(6) Motion because Plaintiff failed to allege facts supporting the elements of an EMTALA claim:

1. Plaintiff does not cite evidence the Hospital had <u>actual knowledge</u> the patient was suffering from an emergency medical condition;

2. Plaintiff does not cite evidence the Hospital failed to provide an <u>appropriate medical screening examination</u>;

3. Plaintiff fails to cite evidence Hospital failed to <u>stabilize</u> the patient before discharging him; and

4. Plaintiff fails to cite evidence the alleged failures by the Hospital were due to an <u>improper motive</u> regarding the patient's sex, race, national origin, socioeconomic status, or insurance coverage. (*See* ECF No. 12).

Bronson's Motion pointed out, among other things, EMTALA does not create a federal cause of action for medical malpractice or for any negligence claim which may be made against Bronson's security officers for their interaction with Mr. Dunigan after he was evaluated in, and discharged from, the Emergency Department. (ECF No. 12)

At a Rule 16 Conference on January 31, 2017, Plaintiff's counsel advised the Court he would be amending the Complaint and adding a pendent claim for medical malpractice. Based in part upon this representation, the Court denied Bronson's Motion, *without prejudice* and without addressing any of the arguments, and allowed Plaintiff an opportunity to amend her Complaint. (ECF No. 23).

Plaintiff's First Amended Complaint added no significant factual allegations relating to the care in the emergency department and did not add a claim of alleged medical malpractice. The parties proceeded with extensive discovery, including the production of voluminous medical records, the depositions of Plaintiff and her family members, the depositions of every Bronson physician, nurse and medical assistant involved in Mr. Dunigan's care, the depositions of two Bronson security officers and two Kalamazoo Public Safety officers, and the depositions of five

of Plaintiff's experts: Dr. Saul Levine (Emergency Medicine), Dr. C. Dennis Simpson (Neuropsychopharmacology), Dr. Charles Landers (Pulmonary Medicine and Critical Care), Dr. Robert Stark (Cardiology) and Dr. Werner Spitz (Forensic Pathology).

Federal case law is clear - - in order to establish a viable EMTALA claim, a Plaintiff must *allege and prove*: (1) a hospital failed to provide an appropriate medical screening examination within the capability of the hospital's emergency department; (2) this failure was due to an improper motive held by hospital personnel regarding the patient's sex, race, national origin, socioeconomic status, or insurance possession; and, (3) *if* the hospital had actual knowledge the patient was suffering from an emergency medical condition, the hospital failed to stabilize the patient before discharging him or transferring him to another facility. 42 U.S.C. 1395dd(a).

In this case, Plaintiff failed to properly allege both a medical screening violation or improper motive under EMTALA. Plaintiff remains without evidence to prove the elements of her alleged claim. Therefore, summary judgment is appropriate.

## II. STATEMENT OF FACTS

The undisputed facts are that Mr. Dunigan was provided with a medical screening examination consistent with that which Bronson Hospital would provide for any similarly situated emergency department patient. The medical care, attention, and treatment was not at all impacted by Mr. Dunigan's sex, race, national origin, socioeconomic status, or insurance status. Further, this screening examination did not reveal an emergency medical condition requiring further treatment or stabilization.

During his visit at Bronson, Mr. Dunigan encountered at least 7 members of Bronson Hospital's staff/personnel in some capacity, including:

SHRR\4287397.v1

- Wesley L. Rigot, M.D. (emergency room physician)
- Adrianne Kerstetter, RN (emergency department nurse)
- Dennis Watson, RN (emergency department nurse)
- Ryan Szumski, RN (emergency department nurse)
- Kim Gilbert-Shay, RN (triage nurse)
- Nolan Cattell (hospital security officer)
- Charles Shoemaker (hospital security officer)

Not one of the above individuals believed Mr. Dunigan was suffering from an emergency medical condition requiring additional medical attention, nor did any of these individuals have any motive or incentive to withhold such attention if it were thought necessary. Bronson sees tens-of-thousands of patients in its Emergency Department each year (96,217 in 2017) and no patient has ever been turned away based upon race, national origin, socioeconomic status or ability to pay.

### A. Treatment by Bronson Emergency Department Personnel

In the early hours of May 6, 2016, Decedent James Dunigan presented to Bronson with complaints of chest pain. (ECF No. 25, ¶ 15). Decedent Dunigan was evaluated by emergency room physician Wesley L. Rigot, M.D. at 2:30 a.m. (ECF No. 25, ¶ 17). He arrived in the ED around 2:13 a.m. with a complaint of "pt sts fell getting off the bus Thursday. Right flank pain." (**Exhibit A**, p. 13). His vitals were assessed, he had a normal blood pressure of 101/60, a normal pulse oximetry of 98%, and a normal Glasgow Coma Scale of 15/15. (**Exhibit A**, p. 15-16, 29-30). Dr. Rigot ordered a chest x-ray, which showed no fracture of the ribs or other findings of immediate concern. (**Exhibit A**, p. 20). Decedent Dunigan was discharged from the ED at 4:29 a.m. with a diagnosis of a "contusion of chest wall, right." (**Exhibit A**, p. 17). His condition at

SHRR\4287397.v1

discharge was "stable," and Decedent Dunigan agreed with and consented to the discharge plan. (**Exhibit A**, p. 17, 19).

Dr. Rigot was deposed and testified Mr. Dunigan's chief complaint was clearly a mechanical fall, with no indication the fall was related to syncope, and there was no loss of consciousness. (**Exhibit B**, p. 12, 21-22). Dr. Rigot obtained the chest x-ray with rib detail and, along with a radiologist, he read the films as revealing no evidence of a rib fracture or other acute injury. (**Exhibit B**, p. 23-24). There was mild vascular congestion, which was not of clinical significance. (**Exhibit B**, p. 40-41). The patient's blood sugar was only slightly elevated at 172 and required no treatment. (**Exhibit B**, p. 15). Nothing in the presentation suggested a cardiac problem. (**Exhibit B**, p. 40, 56, 62-63). Dr. Rigot did not order an EKG, cardiac testing, or other laboratory studies because they were not indicated by the presentation. (**Exhibit B**, p. 17-18, 39-40, 43-44).

Dr. Rigot explained Mr. Dunigan was appropriately screened given the condition for which he presented. (**Exhibit B**, p. 60). He also confirmed Mr. Dunigan was not treated differently than any other patient due to his race, economic status, social status, personal background, lifestyle or any other characteristic. (**Exhibit B**, p. 60). Dr. Rigot testified he is cognizant of and complied with the requirements of EMTALA in Mr. Dunigan's care. (**Exhibit B**, p. 31, 60).

### B. Interactions with Bronson Security Personnel

Charles Shoemaker, a Bronson employed security officer, testified patients who have been discharged from Bronson are asked to leave the waiting room after a certain period "to prevent people from hanging out all day in the lobby." (**Exhibit C**, p 28). *See also*, **Exhibit D**, p 17. Mr. Shoemaker noted that Decedent Dunigan remained in the lobby after discharge to wait

-8-

for public buses to begin running. Once the buses began running, and Decedent Dunigan did not leave, he was asked by Bronson personnel to leave. *Id.* Mr. Shoemaker testified there was <u>nothing</u> about Decedent Dunigan's condition in the waiting room that indicated he was in "critical condition." Mr. Shoemaker testified:

> Q: Did you see him foaming at the mouth, "him" being Dunigan?
>
> A: No.
>
> Q: And at no time did you ever hear him have any problems breathing?
>
> A: No.
>
> Q: That's a correct statement?
>
> A: That's correct. (**Exhibit C**, p 42).

Mr. Shoemaker explained if he felt Mr. Dunigan required medical attention, he would have notified the nurse at the registration desk. (**Exhibit C**, pp 31-32, 35). Instead of requesting medical assistance, Decedent Dunigan repeatedly asked Bronson security personnel and Kalamazoo police officers to "take [him] to jail." (**Exhibit C**, p 29).

Kim Gilbert-Shay, RN, the Triage Nurse who can be seen sitting at the desk in the video obtained of Bronson's waiting room, explained Decedent Dunigan asked to be taken to jail several times, but did not request medical attention. (**Exhibit E**, p. 14-16). He was walking around the waiting area. (**Exhibit E**, p. 25). She did not observe him request help or see anything that caused her concern. (**Exhibit E**, p. 9-10, 25-26).

### C. Testimony of Plaintiff's Experts

Plaintiff's own experts do not support the claims alleged. Collectively, Plaintiff's experts acknowledge: (1) Mr. Dunigan underwent a medical screening; (2) Defendants were not acting with any improper motive, bias, or prejudice in conducting the medical screening; and, (3) Defendants did not detect or disregard an emergency medical condition. Plaintiff's experts

SHRR\4287397.v1

maintain Decedent Dunigan was suffering from an emergency medical condition, which the Defendants failed to recognize. Defendant Bronson disputes this, but even assuming it were true, same does not establish a claim under EMTALA. As explained below, if a condition goes unrecognized despite a medical screening, same *may* substantiate a medical malpractice claim pursuant to state law, but does not rise to the level of an EMTALA violation.

**Dr. Saul Levine, Plaintiff's emergency medicine expert**, acknowledged there is no evidence that any nurse or physician perceived Mr. Dunigan had a life-threatening or serious condition. (**Exhibit F**, p. 68-69). He testified as follows:

> Q. Other than the complaint of chest pain for which he presented and which was adequately addressed, and the note of dizziness that the nurse made in the record, are you aware of any evidence of any ongoing symptoms or problems indicating that Mr. Dunigan had an emergency medical condition in the emergency department?
> A. Before getting sent to the lobby?
> Q. Correct.
> A. No. (**Exhibit F**, p. 55).

Dr. Levine does not believe any other Bronson employee recognized Mr. Dunigan had an emergency medical condition or was seeking treatment for an emergency medical condition. He stated:

> Q. After Mr. Dunigan is wheeled into the emergency department, are you aware of any evidence indicating that any hospital employee recognized that he had an emergency medical condition?
> A. It does not appear they did. I think the nurse drove at it with her documentation, but no. (**Exhibit F**, p. 105-06, objection omitted).

With respect to "motive" Dr. Levine testified:

> Q. Let me ask this: Are you aware of -- based upon everything you've reviewed, are you aware of any evidence that Mr. Dunigan was treated the way he was at Bronson due to any improper motive, such as race, sex, political views, occupation, education, personal prejudice, socioeconomic status?
> A. No, sir. (**Exhibit F**, p. 119).

\* \* \*

-10-

SHRR\4287397.v1

> Q. I'm asking you for your knowledge, based upon your review of the materials and assuming that a required element of an EMTALA violation is that the hospital personnel did so for an improper motive, such as race, sex, political views, occupation, education, personal prejudice, socioeconomic status or the availability of insurance, you would not be able to say that any of those were factors in this case?
> A. I don't -- I don't believe that they were factors in this case. (**Exhibit F**, p. 137-38).

Dr. Levine also stated: "I don't think there's any evidence that hospital personnel had a malicious approach to this gentleman's care." (**Exhibit F**, p. 137).

**Dr. Robert Stark, Plaintiff's cardiology expert**, also acknowledged Decedent Dunigan received a screening examination and testified as follows:

> Q. Are you aware of any evidence indicating that any Bronson employee or police officer ever actually recognized that Mr. Dunigan had a serious medical condition?
> A. No, there was no evidence of that. (**Exhibit G**, p. 53).

He likewise testified there is no evidence Mr. Dunigan was unstable, asked for help, or complained of a medical problem after he was discharged to the waiting room as follows:

> Q. So are you aware of any evidence indicating that he was unstable at the time of discharge?
> A. No. (**Exhibit G**, p. 53).
>                             \* \* \*
> Q. If he was having a medical or physical problem, would you expect him to tell people about that if he wanted help?
> A. Yes.
> Q. Are you aware of any indication that Mr. Dunigan ever indicated that he wanted help or medical attention after the time he left the Emergency Department and went to the waiting room?
> A. There's no indication in the records that we have. (**Exhibit G**, p. 74-75).

**Dr. Charles Landers, plaintiff's expert in pulmonary medicine and critical care**, also conceded there is no evidence any Bronson employee (healthcare provider or security officer) determined Mr. Dunigan had an emergency medical condition, testifying as follows:

> Q. Assuming that the only theory of liability against Bronson, in this pending lawsuit, is for a violation of EMTALA. You have agreed that Bronson did not

> violate EMTALA at any point up until Mr. Dunigan was discharged from the emergency room department to the waiting room, true?
> A. Yeah. I think I said that before.
> Q. After that time you would agree that there was never another time when Mr. Dunigan presented to the emergency room department seeking medical care, true?
> A. True.
> Q. And you agree that based upon your review and everything you have seen in the case, no one from Bronson Hospital ever actually determined that Mr. Dunigan had a life-threatening emergency medical condition, true?
> A. Yes. There is nothing that says they thought that. No one asked him if he wanted to be seen again as far as I could tell.
> Q. And he never said he wanted to be seen again, true?
> A. Again, true. (**Exhibit H**, p. 135-36, objections omitted).

Dr. Landers agreed there was no EMTALA violation, stating:

> Q. Do you claim that EMTALA was in any way violated by Bronson Hospital up to the point that Mr. Dunigan was discharged from the emergency department and wheeled into the waiting room?
> A. No. (**Exhibit H**, p. 130).

**Dr. C. Dennis Simpson, Plaintiff's neuropsychopharmacology expert**, testified the drugs found in Mr. Dunigan's system at autopsy, either individually or combined, were not life-threatening and did not cause an emergency medical condition. (**Exhibit I**, p. 27-28). He has neither the qualifications nor the knowledge to comment on Mr. Dunigan's medical evaluation in the ED or whether any Bronson employee violated EMTALA. He stated as follows:

> Q. And you are not in a position to offer any opinion as to whether he, Mr. Dunigan, had an emergency medical condition?
> A. I have no idea. I just know he was brought to the emergency room and they obviously discharged him back out of the emergency room to the waiting room.
> Q. You are not in a position to criticize any of that decision-making?
> A. I don't even know what the decision-making was so I can't criticize anything, and even if I knew, I could not criticize it. (**Exhibit I**, p. 37).

He acknowledges Decedent Dunigan was seen in the emergency department when he presented:

Q. From anything you've seen, heard or read, are you aware of whether Mr. Dunigan ever asked for any medical attention after he was discharged from the emergency department?

A. I'm not aware of anything of that nature. Obviously when they took him back into the ER initially, he was being attended to. (**Exhibit I**, p. 44).

**Dr. Werner Spitz, Plaintiff's forensic pathology expert**, testified he does not see or evaluate patients in his practice and does not know enough about EMTALA to answer questions on the topic. (**Exhibit J**, p. 25-26). He concedes there is no evidence any Bronson employee recognized an emergency medical condition while Mr. Dunigan was at Bronson. (**Exhibit J**, p. 25, 58-59).

In summary, each of Plaintiff's experts concedes that Decedent Dunigan received a screening examination as required by EMTALA and the examination was no different than any other patient would receive due to improper motive or bias on the part of Bronson personnel.

### III. LAW AND ANALYSIS

#### A. <u>Standard for Summary Judgment</u>

Summary judgment is appropriate where the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant's burden may, however, be discharged by showing that there is an absence of evidence to support the nonmoving party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Romine v. St. Joseph Health Sys.*, 541 Fed. Appx. 614, 617 (6th Cir. 2013). While all reasonable inferences are to be construed in favor of the non-moving party, the non-movant must present some "specific facts" showing that there is a genuine issue for trial and may not simply rest upon the mere allegations of her pleading. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted); *Romine, supra* at 617. Moreover, the non-movant cannot respond to the evidence presented simply by claiming that a jury might choose to disregard it or might find it

unpersuasive. *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment is appropriate. *Id.* at 352. Indeed, the "mere existence of a scintilla of evidence" that supports the non-movant's position is insufficient to defeat a motion for summary judgment. *Tolton v. Am. Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995).

### B. The Legislative purpose behind EMTALA

Congress intended for EMTALA to prevent hospitals from disregarding patients who suffered from emergency medical conditions because they were indigent or lacked insurance to pay the medical bills. *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268 (6th Cir. 1990); *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir. 1990); *see also Elmhirst v McLaren*, 2017 WL 4535714 (W.D. Mich. 2017) attached as **Exhibit K**. Congress did not intend nor design EMTALA "to establish guidelines or standards for patient care, provide a suit for medical negligence, or substitute for a medical malpractice claim." *Estate of Lacko ex rel. Griswatch v. Mercy Hosp., Cadillac*, 829 F. Supp. 2d 543, 548 (E.D. Mich. 2011) (citing *Moses v. Providence Hosp. and Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009)).

EMTALA imposes two requirements upon hospitals that participate in Medicare and operate an "emergency department." 42 U.S.C. §1395dd; *see Moses*, 561 F.3d at 579. The first requirement is that all individuals who present to an emergency department and request treatment are provided an "appropriate medical screening examination ... to determine whether or not an emergency medical condition ... exists." *Moses*, 561 F.3d at 579 (quoting 42 U.S.C. § 1395dd(a)). The Sixth Circuit has interpreted the phrase "'appropriate medical screening' to mean a screening that the hospital would have offered to any paying patient, and the vague phrase 'emergency medical condition' to mean a condition within the actual knowledge of the

-14-

doctors on duty." *Cleland*, 917 F.2d at 268–69; *see also Romine v. St. Joseph Health Sys.*, 541 Fed.Appx. 614, 618 (6th Cir. 2013). The second requirement is that if "the hospital determines that the individual has an emergency medical condition," then the hospital must either: (1) provide further examination and treatment to stabilize the emergency medical condition with the available staff, or (2) provide for the individual's transfer to another medical facility. *Id.* (quoting 42 U.S.C. § 1395dd(b)).

### C. Appropriate Medical Screening Under § 1395dd(a)

With respect to the first requirement, the Sixth Circuit has explicitly held that "'appropriate' ... refer[s] to the motives with which the hospital acts," and therefore, in order to administer an inappropriate medical examination, the hospital must act with improper motive. *Cleland*, 917 F.2d at 272. Thus, in order to establish that an individual was not provided with an "appropriate medical screening," "a plaintiff must demonstrate an improper motive" on behalf of the hospital. *Romine*, 541 Fed.Appx. at 620. If a hospital acts in the same manner as it would have for the usual patient, then the screening provided is appropriate and "a plaintiff fails to establish a claim for violation of the screening requirement where there is no evidence of disparate treatment based on an improper motive." *Stringfellow v. Oakwood Hosp. & Med. Ctr.*, 409 F. Supp. 2d. 866, 870-71 (E.D. Mich. 2005) (granting motion to dismiss Plaintiff's screening claim for failure to allege substandard treatment or an improper motive).

In addition, if the defendant performs a screening and determines that there is no medical emergency, which turns out to be an incorrect diagnosis, <u>EMTALA does not apply</u>. *See Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 585 n. 1 (6th Cir. 2009) ("To the extent Plaintiff argues that the hospital's physicians were negligent in failing to recognize that [the patient] had an emergency medical condition, such an allegation is reserved for state malpractice law."); *see also Stringfellow v. Oakwood Hospital*, 409 F. Supp. 2d 866 (E.D. Mich) (holding that there was no EMTALA claim because the Plaintiff alleged a failure to diagnose, and that it

is not an EMTALA violation to perform a faulty screening and fail to diagnose a patient's medical condition).

The Eastern District of Michigan faced similar allegations in *Estate of Lacko, ex. rel. Griswatch v. Mercy Hospital* case. 829 F. Supp. 2d 543 (E.D. Mich 2011). In *Lacko*, the plaintiff failed to allege that the defendant hospital acted with an improper motive when personnel examined the decedent. *Id.* at 550. Plaintiff did identify the decedent was known by hospital personnel to be insured by Medicaid of Michigan, but provided only a one sentence conclusory allegation that the decedent received disparate treatment. *Id.* at 550-551. The *Lacko* Court held plaintiff's Complaint was clearly deficient, as there were no factual allegations that the decedent's treatment would have been different had the decedent not been on Medicaid. *Id.* In reaching this decision, the *Lacko* Court referenced the Sixth Circuit's decision in *Cleland*, as follows:

> There is not the slightest indication that <u>this outcome would have been any different for a patient of any other characteristic</u>. Had sex, race, national origin, financial condition, politics, social status, etc., been anything whatsoever, as far as can be gleaned from the Complaint, the outcome would have been the same. Under these circumstances, we hold that the <u>Complaint simply fails to allege any inappropriateness in the medical screening</u> in the sense required by the Act. *Cleland*, 917 F.2d at 271 (emphasis added).

The requirement that an EMTALA plaintiff demonstrate improper motive has been consistently upheld throughout the Sixth Circuit, as well as in other federal circuits. *See, e.g., Lacko ex rel. Griswatch v. Mercy Hosp.*, 829 F. Supp. 2d 543 (E.D. Mich. 2011); *Stringfellow v. Oakwood Hosp. & Med. Ctr.*, 409 F. Supp. 2d 866 (E.D. Mich. 2005); *Newsome v. Mann*, 105 F. Supp. 2d 610 (E.D. Ky. 2000); *Adams v. Grace Hosp.*, 962 F. Supp. 101 (E.D. Mich. 1997).

In this case, it is undisputed Decedent Dunigan was provided with a medical screening and said screening was not altered or impacted by any improper motive.

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation
SHRR\4287397.v1

### D. Stabilizing Emergency Medical Conditions Under § 1395dd(b)

With respect to the second requirement, §1395dd(b) states that if a "individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either": (1) the medical examination and treatment required to stabilize the emergency medical condition, or (2) "transfer of the individual to another medical facility." 42 U.S.C. §1395dd(b)(1). The requirement of a hospital to stabilize the medical condition under §1395dd(b) requires that the hospital have "actual knowledge" of the medical condition. *See Cleland*, 917 F.2d at 268; *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 786 (6th Cir. 2003) ("This court has long held that liability under section (b) requires actual knowledge of the condition."). Therefore, in order to effectively plead a claim for failure to stabilize under §1395dd(b), a plaintiff must allege sufficient facts to demonstrate a hospital had actual knowledge of the plaintiff's emergency medical condition. *See Johnson*, 325 F.3d at 787 (stating that section (c), the restricting-transfers-until-stabilized requirement, also requires actual knowledge of the emergency medical condition).

The EMTALA duty to stabilize is <u>only triggered</u> when it has been determined that the patient is suffering from an emergency medical condition. 42 U.S.C. §1395dd(b). In order to require stabilization, "the hospital physicians <u>must actually recognize</u> that the patient has an emergency medical condition; if they do not believe an emergency medical condition exists because they wrongly diagnose the patient, <u>EMTALA does not apply</u>." *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 585 (6th Cir. 2009).

In this case, it is undisputed Bronson Hospital personnel did not believe Decedent Dunigan was suffering from an emergency medical condition.

SHRR\4287397.v1

### E. Plaintiff fails to allege and cannot prove Bronson personnel failed to administer appropriate screening to Decedent Dunigan due to improper motive or bias

Plaintiff asks this Court to infer the medical screening examination was deficient because Decedent Dunigan passed away some hours later. This is the exact same argument that was made, and rejected, by the plaintiff in *Cleland*. This constitutes an unwarranted factual inference and legal conclusion in contravention of the pleading requirements under *Aschroft v. Iqbal*, 556 U.S. 662 (2009) and inconsistent with the elements of an EMTALA claim.

Plaintiff cannot produce evidence to survive a Motion for Summary Judgment as to the EMTALA screening requirement. Plaintiff has provided no evidence suggesting Bronson refused to screen Decedent Dunigan, or that the screening Bronson provided to Decedent Dunigan was inconsistent with regular screening procedures for similarly situated patients. *See Correa v. Hospital San Francisco*, 69 F.3d 1184, 1192-93 (1st Cir. 1995). Plaintiff also lacks any allegation or evidence supporting the medical examination/screening performed by Bronson was inappropriate due to some improper motive.

Plaintiff's experts acknowledge Decedent Dunigan was examined and do not contend he received disparate treatment due to his race, socioeconomic situation, or insurance status. Plaintiff's experts all agree there was no such ill motive or bias. Furthermore, Bronson security personnel testified Decedent Dunigan was removed from the waiting room, *after he had undergone evaluation in the ED*, because patients who have been discharged from Bronson are asked to leave the waiting room after a certain period "to prevent people from hanging out all day in the lobby." **(Exhibit C, p 28)**. The Bronson security personnel testified Decedent Dunigan was not in "critical condition" as far as they could tell. *See i.e.,* **Exhibit C, p 42**. Mr. Dunigan was not singled out because of bias or improper motive. Instead, he was asked to leave (a)

because security personnel had knowledge Decedent Dunigan had been discharged from the ED in stable condition, (b) security personnel agreed he was not suffering from an emergency condition in the waiting room, (c) Decedent Dunigan did not request further treatment, and (d) anyone who is discharged and lingers in the waiting room is asked to leave.

Even considering the facts in the light most favorable to Plaintiff, there is no evidence of failure to properly screen Decedent Dunigan in the ED or improper motive or bias.

F. **The duty to stabilize Decedent Dunigan was never triggered in this matter, as Bronson did not find the Decedent to be suffering from an emergency medical condition.**

Plaintiff suggests that because Decedent Dunigan later passed away, he was discharged in an unstable condition. Plaintiff has not presented any evidence to suggest, much less prove, Bronson personnel recognized an emergency medical condition requiring stabilization or that any failure to recognize same was the result of an improper motive or bias. Plaintiff's experts concede the eyewitnesses did not assess Decedent Dunigan as suffering from an emergency medical condition and that this conclusion was not reached as the result of any bias or prejudice. Accordingly, an alleged duty to stabilize or transfer the patient was not triggered.

Defendant's alleged failure to discover Decedent Dunigan's purported emergency medical condition sounds in *alleged* medical malpractice, which is relegated to state courts, was not alleged in Plaintiff's Complaint, and is *not* an EMTALA violation.

IV. **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests this honorable Court GRANT its Motion for Summary Judgment pursuant to Fed. R. Civ. Pro 56 and award all other relief this Court deems appropriate.

SHRR\4287397.v1

DATED: April 24, 2018                  /s/ John C. O'Loughlin
                                                John C. O'Loughlin P33343
                                                Vanessa F. McCamant P68254
                                                SMITH HAUGHEY RICE & ROEGGE
                                                Attorneys for Defendant
                                                100 Monroe Center NW
                                                Grand Rapids, MI 49503-2802
                                                616-774-8000

SMITH HAUGHEY RICE & ROEGGE, A Professional Corporation

SHRR 3933492v1
SHRR\4287397.v1