# In The Matter Of:
*Dunigan vs.*
*Officer Nugent, et al.*

*Wesley L. Rigot, M.D.*
*February 2, 2018*



The Power of Commitment™
**Bingham Farms/Southfield • Grand Rapids**
Detroit • Ann Arbor • Flint • Lansing • Jackson • Mt. Clemens • Saginaw • Troy



DEFENDANT'S EXHIBIT B

*Original File RIGOT_M.D._WESLEY L..txt*
*Min-U-Script® with Word Index*

Page 9

1  MR. HARRINGTON: It's okay. It's not a big
2  deal.
3  BY MR. HARRINGTON:
4  Q. At the time you provided treatment to Mr. Dunigan,
5  being May 6, 2016, you were practicing within the
6  field of emergency medicine; is that correct?
7  A. Yes.
8  Q. All right. Do you remember Mr. Dunigan at all?
9  A. Yes, I do.
10 Q. Okay. Do you have a memory outside of what you've
11   reviewed in the medical records? I mean -- and here's
12   what I'm getting at. In preparation of your
13   deposition today, I know that you reviewed some
14   medical records. However, prior to looking at those
15   medical records, looking back on Mr. Dunigan, did you
16   have an independent memory of who he was?
17 A. You mean from the day I treated him --
18 Q. Yes.
19 A. -- or from previous ER visits?
20 Q. Fair enough. From the day that you treated him on
21   May 6 of 2016.
22 A. Very well. I have a very good recollection of him.
23 Q. Okay. And do you also have a memory of having
24   provided him with medical treatment before May 6,
25   2016?

Page 10

1  A. That, I do not.
2  Q. Fair enough. What do you remember about the treatment
3    that you provided to Mr. Dunigan as of May 6, 2016,
4    independent of the medical records?
5  A. You mean in addition to what's in the medical records
6    or do you want me to walk through the case?
7  Q. No. What I'd like you to do is walk through what you
8    remember of the care and treatment that you provided
9    to Mr. Dunigan that is in your memory --
10 A. Oh.
11 Q. -- but independent of what's in the medical records.
12   Does that make sense to you?
13 A. It does.
14 Q. Okay. Thank you.
15 A. I mean, he was in Room 24, which is in the back of our
16   ER. He had come in by EMS, which I did not see him
17   come in by EMS.
18 Q. Can I hit pause real quick?
19 A. Absolutely.
20 Q. The only time that you recall seeing him, and correct
21   me if I'm wrong, is when he was in -- we'll call it --
22 A. Room 24.
23 Q. Room 24. You never saw him come in?
24 A. No.
25 Q. That's a true statement?

Page 11

1  A. That is a true statement.
2  Q. And I think it was around 4:00 that you were finished
3    treating with him, he went out to the waiting area?
4  A. I assume. I did not witness that.
5  Q. And that was kind of a setup to my next question. Did
6    you ever see him in the waiting area after you did
7    your reassessment of him?
8  A. I did not.
9  Q. Okay. I'm sorry, I kind of sidestepped real quick --
10 A. That's okay.
11 Q. -- but that helps out. Go ahead.
12 A. He was a gentleman who presented with a fall with an
13   injury to his right posterior rib cage and side rib
14   cage.
15 Q. On page 12, you wrote, Right-sided chest wall?
16 A. Yes. The indication would be kind of the lateral
17   aspect of the right ribs to the post- -- in the
18   posterior axillary line.
19 Q. I'm sorry, continue, Doctor.
20 A. Okay. This was a mechanical fall. He said he'd
21   fallen getting off the bus. I don't remember the
22   specifics of that, but I remember that that's what he
23   had told me, that it was a fall off the bus. I
24   remember he was alert. Did not seem to be affected by
25   any kind of drugs or alcohol. His mentation was --

Page 12

1    was appropriate and that he could interact with me,
2    follow commands, and cooperate for a physical exam.
3  Q. Do you recall what the pain level is that he reported
4    upon --
5  A. I do not.
6  Q. Okay. And in the medical records, did you review what
7    he reported as --
8  A. I did.
9    MR. WHITELAW: Just --
10   THE WITNESS: Oh, sorry. I've got to wait.
11   MR. HARRINGTON: You're good.
12   MR. WHITELAW: You're anticipating a little
13   bit. Everybody does that.
14   THE WITNESS: I apologize.
15   MR. HARRINGTON: You're fine, Doctor. No
16   worries.
17   THE WITNESS: Okay.
18   BY MR. HARRINGTON:
19 Q. In the chart, you saw that there was a pain
20   designation that he reported?
21 A. I did.
22 Q. And do you recall from reviewing the records what that
23   pain designation was?
24 A. Nine.
25 Q. Nine out of 10?

Page 17

1  A.  Not from memory.
2  Q.  What about from when you had an opportunity to review
3      the chart?
4  A.  It was listed.
5  Q.  Did you ask Mr. Dunigan when he had last taken his
6      insulin?
7  A.  I did not.
8  Q.  What about when he had last eaten?
9  A.  I did not.
10 Q.  Did you do any type of cardiac workup on Mr. Dunigan?
11 A.  I did not.
12 Q.  A cardiac workup might include putting somebody on,
13     what, an EKG, possibly?
14 A.  A cardiac workup can mean many things.
15 Q.  Okay. What is an EKG?
16 A.  EKG traces the electrical activity through the heart.
17 Q.  Was he ever put on an EKG --
18 A.  I never ordered an EKG.
19 Q.  Let me just finish my --
20 A.  I'm sorry.
21 Q.  That's okay. That's okay.
22     Was he ever placed on an EKG monitor at all
23     during the May 6, 2016 presentation to Bronson
24     Hospital?
25 A.  Can I clarify?

Page 18

1  Q.  Yes.
2  A.  Do you mean was an EKG performed or was he put on a
3      cardiac monitor?
4  Q.  Was an EKG performed at all during his May 6, 2016
5      presentation?
6  A.  No.
7  Q.  Was he ever placed on a cardiac monitor at all during
8      his May 6, 2016 presentation?
9  A.  I do not recall.
10 Q.  If we wanted to find out if he was placed on a cardiac
11     monitor during the May 6, 2016 presentation at Bronson
12     Hospital, is there some record that we would look to
13     to determine whether or not that happened --
14 A.  I --
15 Q.  -- if you know?
16 A.  I do not know.
17 Q.  Would that be something that would be billed for?
18 A.  I do not know.
19 Q.  Okay.
20 A.  I have no dealings with billing. I guess I should
21     clarify. I don't direct -- I know that I get results
22     back from my billing, but I don't talk to them.
23 Q.  I understand. I understand.
24     If there's no indication in the chart that
25     he had cardiac monitoring on May 6, 2016, during that

Page 19

1  presentation, would you agree with me that it wasn't
2  performed?
3  A.  I do not agree.
4  Q.  Okay. Can you explain to me why?
5  A.  Sometimes things are not documented. I can't speak to
6      that.
7  Q.  But you have no memory of that ever happening, fair?
8  A.  Fair.
9  Q.  Do you recall any conversations with any of the
10     nursing staff regarding the care and treatment of
11     Mr. Dunigan in any way, shape, or form regarding the
12     May 6, 2016 presentation?
13 A.  I do not.
14 Q.  Do you have any understanding as to what, I guess -- I
15     don't know if a hospital policy would be -- let me
16     give you an example.
17     If you finished a reassessment of, say,
18     Mr. Dunigan around 4:00 and he's discharged and he's
19     in the waiting area, and let's just say,
20     hypothetically, he has a change of circumstance where
21     his medical condition deteriorates. You've already
22     discharged him. You're back in the ER. You don't
23     have any more contact with him.
24     If this is observed by any other hospital
25     personnel, whether it be security, nursing staff, do

Page 20

1  you know what the policy is within the hospital of
2  getting that individual back in to be seen? And I'm
3  presuming that -- and the assumption in this is that
4  somebody from the hospital does, in fact, see the
5  change in circumstances.
6      MR. O'LOUGHLIN: My objection is form and
7  foundation.
8      MR. HARRINGTON: Thank you.
9      THE WITNESS: Do I still answer?
10     MR. HARRINGTON: Yes. Please.
11     THE WITNESS: I don't know what the
12 hospital policy is.
13     BY MR. HARRINGTON:
14 Q.  Would you expect that if there was this change in
15     circumstance that somebody would require additional
16     treatment, that they would at least bring it to
17     possibly your attention since you had just seen the
18     patient?
19     MR. O'LOUGHLIN: Same objection.
20     THE WITNESS: If somebody feels there's a
21 need for him to be re-evaluated, we would do that. If
22 he had requested to check back in, we would do that.
23 We'd re-evaluate him.
24     BY MR. HARRINGTON:
25 Q.  And how would that work? If he had to be

**Page 21**

1 re-evaluated, would he have to go through the
2 re-admission process or what would happen?
3 A. He would have to check back in.
4 Q. What does that mean?
5 A. He would be re-registered, a separate visit.
6 Q. Did you ever see any videos, surveillance videos of
7 Mr. Dunigan?
8 A. I did not.
9 Q. When Mr. Dunigan fell, did you ask him at all what
10 caused him to fall, why he fell, anything like that?
11 A. No.
12    MR. WHITELAW: Still working with memory or
13 would you like him --
14    MR. HARRINGTON: Yeah, yeah, that would be
15 fine. Right now, memory. And if you need to use the
16 chart to refresh your memory, that's absolutely fine.
17    THE WITNESS: That he fell getting off the
18 bus. That's where I'd seen the chief complaint, that
19 he injured his ribs. And from what I remember, from
20 the fall from the bus.
21    BY MR. HARRINGTON:
22 Q. Did you ever explore whether or not he lost any
23 consciousness in the fall?
24 A. My usual --
25    THE WITNESS: How do I answer that?

**Page 22**

1    MR. WHITELAW: Well, I can't tell you how
2 to answer. I can tell you that the question didn't
3 limit you to your memory, so if you want to --
4    THE WITNESS: Right. Right.
5    BY MR. HARRINGTON:
6 Q. Doctor, if you do need to look at the chart, please.
7 A. And this was listed as a mechanical fall everywhere.
8 There was no syncope or passing out or other preceding
9 symptoms.
10 Q. And "mechanical fall," like tripped over his feet
11 or --
12 A. Tripped, stumbled, yeah.
13    MR. WHITELAW: One at a time.
14    THE WITNESS: Oh, sorry.
15    BY MR. HARRINGTON:
16 Q. And syncope would have to do with something where,
17 say, he passes out, becomes lightheaded, something
18 like that?
19 A. Not lightheaded. Loss of consciousness.
20 Q. Okay. But everything -- and as you're looking through
21 the records, and you can correct me if I'm wrong, but
22 everything that you remember and that you've reviewed
23 was that this was a mechanical fall?
24 A. Correct. Everything that was presented to me that day
25 indicated a mechanical fall.

**Page 23**

1 Q. At the bottom of Exhibit 2, at page 12, there's a note
2 that says -- or part of your note that says, Patient
3 states, "I am bleeding from the inside." Do you see
4 that?
5 A. I do.
6 Q. Do you also recall him saying that?
7 A. I can't say that I do. I remember him stating
8 something along that lines. But to those specific
9 words, I did not recall.
10 Q. Okay. Looking back on this, when a patient like
11 Mr. Dunigan, who's presenting with the problems that
12 he's presenting with, says that "I'm bleeding from the
13 inside," what did you take that to mean?
14 A. That he thought he had damaged something in his chest
15 from the fall. That he was bleeding into his lungs or
16 chest.
17 Q. And as far as imaging goes, you ordered that a chest
18 x-ray be performed?
19 A. With rib detail.
20 Q. Okay. Now, you said "with rib detail." What does
21 that mean?
22 A. So it's additional x-rays. A regular chest will be
23 one or two views just looking anterior and posterior.
24 Q. Yes.
25 A. This actually moves his body so you can actually see

**Page 24**

1 better, visualize the lower ribs.
2 Q. Did you get the anterior and posterior view as well?
3 And if you need to look at the chart, you may.
4 A. Right. I think I do. This only included a one-view.
5 Q. And that was from the side?
6 A. From the front.
7 Q. From the front?
8 A. So front with three or four additional views of the
9 ribs.
10 Q. And what were the findings of the x-ray?
11 A. There was no rib fractures, there was no acute
12 injuries noted, and there was mild pulmonary vascular
13 congestion.
14 Q. And some edema?
15 A. Or atelectasis.
16 Q. Or edema?
17 A. Atelectasis or edema at the right base.
18 Q. I'm sorry?
19 A. At the right base.
20 Q. Did you look at the films personally?
21 A. I did.
22 Q. Did you speak with Dr. -- I believe it was Dr. Duhn,
23 D-u-h-n, who I think is the radiologist who
24 performed --
25 A. I did not. I'm sorry.

Page 29

1   MR. VANDER LAAN: Join.
2   THE WITNESS: I suppose if I put my mind to
3   it, maybe, but not off the top of my head.
4   BY MR. HARRINGTON:
5   Q.  So at the point of almost passing out, I guess, what,
6   limited control of motor function, like moving of the
7   arms, moving of the legs, those type of things?
8   A.  I suppose that would be part of it. Mental function
9   as well. Comprehension.
10  Q.  And assuming that what we're talking about were
11  present with Mr. Dunigan, they were not present when
12  you were treating him; is that fair?
13  A.  They were not.
14  Q.  If they were present when you were treating him, what
15  would you have done?
16  A.  I would have --
17  MR. O'LOUGHLIN: Form and foundation.
18  MR. WHITELAW: Object to form to the extent
19  you haven't really identified which among those
20  things.
21  MR. HARRINGTON: Right.
22  BY MR. HARRINGTON:
23  Q.  I mean almost passing out, inability to walk, foaming
24  from the mouth --
25  MR. O'LOUGHLIN: Same.

Page 30

1   BY MR. HARRINGTON:
2   Q.  -- those things, Doctor.
3   A.  I really would have to see the patient in front of me.
4   You know, to decide what I needed to do and what I
5   didn't need to do, I really would have to see the
6   patient. Anything else is speculation.
7   Q.  When did you first find out that Mr. Dunigan had
8   passed away?
9   A.  Days -- it was days later, almost a week, I came
10  across a resident who ran on the MSU1, Dr. Patel.
11  Q.  And you talked to him about this?
12  A.  He told me that he had looked in the chart, so he saw
13  that I was the attending.
14  Q.  And do you recall that conversation at all?
15  A.  Slightly.
16  Q.  Can you tell me about what you recall from that
17  conversation?
18  A.  That he just stated that he had gotten called to the
19  prison and that, you know, that guy passed away in
20  police custody.
21  Q.  Anything else?
22  A.  Not really.
23  Q.  Do you still work at Bronson at all --
24  A.  Yes.
25  Q.  -- currently?

Page 31

1   Q.  As of May 6, 2016, did you ever have any
2   type of EMTALA training with the hospital?
3   A.  Not --
4   MR. O'LOUGHLIN: Form and foundation.
5   THE WITNESS: Not with the hospital.
6   BY MR. HARRINGTON:
7   Q.  Had you ever had any type of EMTALA training anywhere
8   prior to May 6, 2016?
9   A.  With my residency.
10  Q.  And do you have an understanding as to what EMTALA is?
11  A.  To an extent.
12  Q.  What is your -- I guess if you're able to do this, as
13  of May 6, 2016, what was your understanding as to, you
14  know, the hospital's obligation under EMTALA?
15  MR. O'LOUGHLIN: Form and foundation. Go
16  ahead.
17  THE WITNESS: Is to -- any patient that is
18  brought onto hospital property to the emergency room,
19  we're to do a medical screening exam and to provide
20  emergent care that is necessary.
21  BY MR. HARRINGTON:
22  Q.  Anything about discharging a patient --
23  A.  Not --
24  Q.  -- that you're aware of?
25  A.  Not that I'm aware of.

Page 32

1   Q.  And do you have an understanding as to whether or not
2   the requirements under EMTALA apply to other hospital
3   employees beyond physicians?
4   MR. O'LOUGHLIN: Form and foundation.
5   BY MR. HARRINGTON:
6   Q.  And if you know, you know. If you don't know, you
7   don't know. That's perfectly acceptable, Doctor.
8   MR. O'LOUGHLIN: Form and foundation.
9   THE WITNESS: I'm not aware.
10  BY MR. HARRINGTON:
11  Q.  And, I'm sorry, you said you received this training
12  in?
13  A.  Residency.
14  Q.  And where did you do your residency?
15  A.  Kalamazoo Center For Medical Studies, Kalamazoo,
16  Michigan.
17  Q.  But nobody from Bronson ever provided you with any
18  type of EMTALA orientation or training or anything
19  like that at the hospital?
20  MR. O'LOUGHLIN: Form and foundation.
21  THE WITNESS: No. I am actually a Bronson
22  contracted employee.
23  BY MR. HARRINGTON:
24  Q.  I understand. But you do medical services at Bronson?
25  A.  Correct.

Page 37

1  MR. O'LOUGHLIN: Dennis Watson was the male
2  nurse --
3  MR. HARRINGTON: That's right.
4  MR. O'LOUGHLIN: -- that wheeled
5  Mr. Dunigan to the waiting room.
6  BY MR. HARRINGTON:
7  Q. There is an individual who was also involved in the
8  care and treatment of Mr. Dunigan, who was Dennis
9  Watson, is seen on video wheeling Mr. Dunigan into the
10 waiting area. Did you ever speak with Mr. Watson at
11 all about Mr. Dunigan for any reason that you can
12 recall?
13 A. I have not.
14 Q. When was the last time you saw the x-rays of
15 Mr. Dunigan?
16 A. The physical x-rays?
17 Q. Yeah.
18 A. That day.
19 Q. You haven't seen them in the last month or two months,
20 six months, anything like that?
21 A. I have not. I have seen the reports, not the actual
22 physical x-rays.
23 Q. And why do you personally look at the x-rays yourself
24 as opposed to just simply relying on what the
25 radiologist says?

Page 38

1  MR. O'LOUGHLIN: Form and foundation.
2  THE WITNESS: Because sometimes, quite
3  frankly, I disagree.
4  BY MR. HARRINGTON:
5  Q. Explain.
6  A. In that there are sometimes that radiologists will
7  overcall things. I have one that will always say
8  atelectasis versus infiltrate on patients that is
9  clearly a viral syndrome and they have no symptoms of
10 pneumonia. Also, it is rare, and it is exceedingly
11 rare, on occasion a fracture is missed.
12 Q. And is part of that because you've got more of the
13 clinical picture of what's going on with the patient
14 than what the radiologist -- radiologist would have?
15 Because, really, all they get is a request for an
16 image and they call what they see and that's it?
17 A. It's just how I was trained, to actually look at the
18 x-rays yourself.
19 Q. And if you -- I'm sorry. You didn't use the word
20 "overread." What was the word you used, "over" --
21 MR. WHITELAW: He did say "overread."
22 MR. HARRINGTON: Oh, did he say "overread"?
23 MR. WHITELAW: Yeah. He said that
24 occasionally the radiologist "overread."
25 MR. HARRINGTON: I thought he used a

Page 39

1  different term of art than "overread."
2  BY MR. HARRINGTON:
3  Q. But sometimes you feel that the -- well, whatever.
4  You know what I'm talking about when I say "overread"?
5  A. Correct. There's -- yeah, because there's a
6  difference in overread. I've made a decision on the
7  x-ray and the next day it's read to make sure I was
8  right versus a contemporaneous read, which we do at
9  Bronson, where the radiologists are reading them as
10 the patient is physically in the department.
11 Q. If you felt that the x-ray by Dr. Duhn was overread in
12 any way, would you have noted that in the chart?
13 MR. WHITELAW: Object to foundation.
14 THE WITNESS: It depends how much I
15 disagree or why I'm not acting -- if I'm not acting on
16 something, as I said, on other x-rays, not
17 specifically this one. If they said atelectasis
18 versus infiltrate, I would have to say why I'm not
19 putting the patient on an antibiotic, and it's because
20 of X, Y, and Z.
21 BY MR. HARRINGTON:
22 Q. Did you feel that the read done by Dr. Duhn was a fair
23 and reasonable read?
24 A. I do.
25 Q. If during the read -- I guess your read of the x-ray

Page 40

1  that was performed on Mr. Dunigan and you're actually
2  looking at the x-ray, if you thought that there was
3  some type of cardiac process going on with Mr. Dunigan
4  that required additional treatment, you would have
5  continued, you know, treating Mr. Dunigan? You
6  wouldn't have just discharged him?
7  A. What cardiac process?
8  Q. I don't know. I guess -- why don't I say this.
9  Something that would, you know, require continued
10 medical treatment.
11 A. I saw nothing that -- again, I'm assuming that this is
12 what you're getting at. Is that fair to do?
13 Q. You can.
14 MR. WHITELAW: You can explain what you
15 mean by your answer, and that may include that.
16 THE WITNESS: Because most cardiac things
17 don't show up on an x-ray. If you're looking for
18 congestive heart failure, he had no evidence,
19 clinically or on the x-ray, that he had congestive
20 heart failure. If he had pulmonary -- if he had a
21 pneumonia, if he had had pulmonary fluid and effusions
22 layering up and he was symptomatic with that, yes, I
23 would have addressed that.
24 BY MR. HARRINGTON:
25 Q. I mean, is pulmonary edema part of congestive heart

Page 41

1 failure? I mean, let me rephrase. That's a poor
2 question.
3     Can pulmonary edema be an indication that
4 somebody has -- maybe be in the early throes of
5 congestive heart failure?
6 A. The problem is in a dialysis patient, that frequently
7 you will see -- when they're getting ready to be
8 dialyzed, you will see mild vascular congestion, but
9 it doesn't mean that they are symptomatic from that,
10 in that he would not be emergently -- because the only
11 way to get fluid off of a dialysis patient is to
12 emergently dialyze them. He had no symptoms or signs
13 that he had any kind of respiratory issues in response
14 to that, and he was getting his dialysis the next day.
15     So he had no pleural effusions. There
16 wasn't a significant amount of fluid on the lungs. He
17 was not tachycardic. He was not hypoxic. You have to
18 put everything together when it's a dialysis patient.
19 Q. So I don't know if I'm clear on this. When was he
20 last dialyzed from when you saw him in the terms of
21 days or hours; do you know?
22     MR. O'LOUGHLIN: Form and foundation.
23     THE WITNESS: The only reason I know the
24 dates are from the record from the -- what do you call
25 those -- the expert witnesses. I had asked him when

Page 42

1 he had been dialyzed. And when I talked to him, it
2 had been twice this week.
3     BY MR. HARRINGTON:
4 Q. I'm sorry, you said something about expert witnesses.
5 What --
6     MR. WHITELAW: I provided a copy of the
7 expert reports that you had obtained from your
8 experts, Dr. Levine and the others. I can't remember
9 their names.
10     BY MR. HARRINGTON:
11 Q. So you read Dr. Levine's report?
12 A. Correct.
13 Q. You read Dr. Landers's report?
14 A. Is that the cardiologist?
15 Q. No.
16     MR. WHITELAW: I don't remember.
17     BY MR. HARRINGTON:
18 Q. He's critical care pulmonology.
19     MR. WHITELAW: Oh, I may not have provided
20 him all those. I may have just provided the ED
21 report. I don't remember. I'm sorry.
22     THE WITNESS: I don't remember that one. I
23 remember the pathologist, the ER, and the
24 cardiologist, I think. Those are the three I
25 remember.

Page 43

1     BY MR. HARRINGTON:
2 Q. Do you have any comments about Dr. Levine's report?
3     MR. O'LOUGHLIN: Form and foundation.
4     BY MR. HARRINGTON:
5 Q. And when I say "comments," you did read it, right?
6 A. I did.
7 Q. And did you form any opinions after having read
8 Dr. Levine's report?
9 A. That I disagreed.
10 Q. In what aspect?
11 A. In that he was not seeing the patient that I saw. You
12 know, he -- he has the pleasure of 20/20 hindsight
13 without actually seeing the patient. You know, he
14 didn't witness what I witnessed. He didn't see -- he
15 didn't ask the questions I asked. And that this was
16 in the setting of trauma. You know, I specifically
17 asked him about his dialysis.
18 Q. So one of the things that I'm learning from you,
19 Doctor, is that where you have somebody like
20 Mr. Dunigan, who is a dialysis patient and that
21 sometimes they read on an x-ray about, say, pleural
22 effusion or some type of edema, that it can be
23 difficult to distinguish if this is something related
24 to being -- I guess a timing of when they're being
25 dialyzed or if there's some other process going on; is

Page 44

1 that fair?
2 A. Yeah. In that you have to look at the whole clinical
3 presentation, because labs don't work. X-rays are not
4 always perfect and they don't deem when they need to
5 be dialyzed for pulmonary edema, CHF.
6 Q. Right. Sometimes it's kind of difficult in a patient
7 like Mr. Dunigan to determine whether or not this is
8 just a natural progression of his dialysis regimen or
9 is it something more significant, like somebody in the
10 early throes of CHF?
11 A. Correct.
12     MR. O'LOUGHLIN: Form and foundation.
13     BY MR. HARRINGTON:
14 Q. I'm sorry, go ahead.
15 A. Yeah, in that -- yes, it's -- wait. I guess I forgot
16 his question. Sorry.
17 Q. Sure. What I'm getting at is you've got somebody like
18 Mr. Dunigan, who you know is a dialysis patient, and
19 you've got an x-ray that shows some edema. And what
20 I'm getting at is sometimes it's difficult to
21 determine, you know, is this something from the -- I
22 guess his dialysis regimen, whether or not he's
23 compliant, you know, timing of the dialysis versus
24 somebody who might be in the early throes of
25 congestive heart failure? Sometimes -- what I'm

Dunigan vs.
Officer Nugent, et al.

Wesley L. Rigot, M.D.
February 2, 2018

Page 53

1  fistula. Do you remember seeing that?
2  A. In the records, what page are you talking about?
3  Q. Oh, you're going to make me look.
4  A. Uh-huh.
5  Q. Do you know what an AV fistula is?
6  A. It's for dialysis.
7  Q. It was sutured, I think. What does it mean if there's
8  a sutured AV fistula?
9  A. It's probably newer.
10    MR. HARRINGTON: You know what, Doctor, I'm
11  actually good. It's Friday. I don't have any more
12  questions.
13    MR. O'LOUGHLIN: I'll have a few.
14    MR. HARRINGTON: Okay.
15    MR. O'LOUGHLIN: Is it okay if I go ahead,
16  Allen?
17    MR. VANDER LAAN: Sure.
18    EXAMINATION
19    BY MR. O'LOUGHLIN:
20  Q. Dr. Rigot, my name is Jack O'Loughlin. I represent
21  Bronson Hospital. First of all, to be clear, you are
22  not now, nor were you at the time you saw Mr. Dunigan,
23  employed by Bronson Hospital, true?
24  A. True.
25  Q. Okay. And have you and I ever spoken before?

Page 54

1  A. Not to my knowledge.
2  Q. Okay. I want to go back to the x-ray, since you had a
3  lot of questions about that.
4  A. Mmm-hmm.
5  Q. The description under chest -- and this is a
6  description provided and dictated by Dr. Duhn,
7  D-u-h-n?
8  A. Correct.
9  Q. From your read of that, or from your memory of the
10  films, is there anything that indicates an acute,
11  life-threatening medical condition?
12  A. No.
13    MR. HARRINGTON: Objection to form and
14  foundation.
15    MR. WHITELAW: Did you get the answer?
16    THE WITNESS: No.
17    BY MR. O'LOUGHLIN:
18  Q. Dr. Duhn mentioned mild central pulmonary vascular
19  congestion, mild atelectasis or edema in the right
20  lung base, and small bilateral pleural effusions. Do
21  any of those findings indicate -- in the setting of
22  Mr. Dunigan indicate a serious or life-threatening
23  medical condition?
24    MR. HARRINGTON: Form. Foundation.
25    THE WITNESS: No.

Page 55

1    BY MR. O'LOUGHLIN:
2  Q. Let's go back to your actual report. And you may need
3  to refer to it, because I'm going to ask for some
4  specifics here.
5  A. Sure.
6  Q. There are sections in the report, and I see a section
7  headed Chief Complaint.
8  A. On my -- my report?
9  Q. It's in the ED record. I don't know if it's directly
10  from you. I have it above your --
11  A. Is that the one by Marian Lodes or --
12  Q. I have it above the HPI.
13  A. Oh, okay.
14  Q. History of Present Illness. And you and I may have
15  different formats, as we found. Depending on who
16  type -- who prints out this record, it can look
17  different.
18  A. Yeah, I see that. Fell off the -- just above HPI?
19  Q. Yes.
20  A. It says, Patient states fell getting off bus Thursday,
21  right flank pain.
22  Q. All right. And then under HPI, is that -- what does
23  that mean?
24  A. History of presenting illness.
25  Q. And is that something that you obtained?

Page 56

1  A. Yes.
2  Q. And could you tell me what he gave as history of
3  presenting illness?
4  A. That he fell getting off the bus, injuring his right
5  flank, and he had pain on the right side of his chest.
6  Q. With that description and, again, from your record or
7  your memory, was that the type of complaint of chest
8  pain, for lack of a better term, that would, in your
9  mind, indicate any cardiac-type problem?
10  A. No.
11  Q. And below the HPI, you have a Review of Systems?
12  A. Correct.
13  Q. Could you say what the review of systems was positive
14  for?
15  A. Right-sided chest wall pain.
16  Q. And what was it negative for?
17  A. Nausea, vomiting, diarrhea, fever, chills, cough,
18  congestion, headache, neck pain, head injury.
19  Q. And after a few more pages, I see a heading that
20  starts Physical Exam, and then has vital signs.
21  A. Correct.
22  Q. What were his vital signs?
23  A. Blood pressure 101/60. Pulse of 90. Temperature
24  97.5. Respiratory rate 18. Height 1.753 meters.
25  Weight 74.4 kilograms. Pulse ox 98 percent. BMI

Page 57

1   24.21.
2   Q.  Are any of those vital signs abnormal?
3   A.  The only one is the blood pressure is slightly low on
4   the systolic.
5   Q.  Are any of those vital signs abnormal in a way which
6   would indicate any serious or life-threatening medical
7   condition?
8       MR. HARRINGTON: Form and foundation.
9       THE WITNESS: Not based on his clinical
10  presentation and physical exam.
11      BY MR. O'LOUGHLIN:
12  Q.  Also under Physical Exam, then you go through the
13  different areas. Could you describe what you found,
14  under Physical Exam, in relation to his respiratory
15  condition?
16  A.  There was -- I didn't find any distress. He was
17  breathing normally, as the respiratory rate indicates.
18  There was no crackles. There was no rubs. There was
19  no diminished breath sounds.
20  Q.  And you also have, towards the bottom at, least, of
21  this page, sections describing your impression of his
22  neurologic and psychiatric condition. What did those
23  reveal?
24  A.  That he was alert and oriented. He was appropriate in
25  interactions with me. He was able to follow commands.

Page 58

1   He had normal strength and no deficits. That was with
2   him sitting on the bed. And the other thing on
3   psychiatric, he did not seem to be under the influence
4   of any illicit substances, for lack of a better word.
5   Q.  Dr. Rigot, based upon your experience and training and
6   education, and your experience at Bronson Hospital,
7   did Mr. Dunigan receive the same evaluation and
8   treatment any other person presenting with his same
9   history and complaints would have received at Bronson
10  Hospital?
11      MR. HARRINGTON: Foundation and form.
12      THE WITNESS: Yes.
13      MR. HARRINGTON: Speculation.
14      THE WITNESS: Yes.
15      BY MR. O'LOUGHLIN:
16  Q.  I'm going to ask you some questions and give you some
17  definitions to consider in answering them.
18      THE WITNESS: My ringer went off.
19      MR. WHITELAW: Are you okay?
20      MR. O'LOUGHLIN: Doctor, if you need to
21  take a break or answer a page --
22      THE WITNESS: No, I'm good.
23      BY MR. O'LOUGHLIN:
24  Q.  All right. For the purposes of the next question, I'd
25  like you to assume that an emergency medical condition

Page 59

1   exists where the patient has severe symptoms such that
2   the absence of immediate medical attention could
3   reasonably be expected to result in placing the
4   patient's health in serious jeopardy or serious
5   impairment to bodily functions or serious dysfunction
6   of a bodily organ or part. Does that definition make
7   sense?
8   A.  Sure. This is a hypothetical situation?
9   Q.  Yes, it is. And using that definition, did
10  Mr. Dunigan, in your opinion, have an emergency
11  medical condition?
12      MR. HARRINGTON: Foundation and form. Go
13  ahead.
14      THE WITNESS: No.
15      BY MR. O'LOUGHLIN:
16  Q.  Okay. Another definition has to do with the word
17  "stabilize." If the definition is an emergency
18  department patient is stabilized when no material
19  deterioration of the condition is likely within a
20  reasonable medical probability to result from or occur
21  during or at the patient's release from the hospital,
22  was Mr. Dunigan stabilized when he was discharged?
23      MR. HARRINGTON: Foundation and form.
24  Speculation.
25      THE WITNESS: Yes. I guess I should

Page 60

1   clarify. When I discharged him.
2       MR. O'LOUGHLIN: Correct.
3       BY MR. O'LOUGHLIN:
4   Q.  Was, in your opinion, Mr. Dunigan appropriately
5   medically screened for the condition for which he
6   presented?
7       MR. HARRINGTON: Objection to form,
8   foundation, speculation.
9       THE WITNESS: For the history that he
10  provided, the past medical history provided, the
11  physical exam I found, and the imaging that I did,
12  yes.
13      BY MR. O'LOUGHLIN:
14  Q.  Was Mr. Dunigan treated any differently than any other
15  patient who might have presented with his same
16  complaints because of anything about his race,
17  economic status, social status, personal background,
18  lifestyle, or any other characteristic he presented
19  with?
20      MR. HARRINGTON: Objection as to form and
21  foundation.
22      THE WITNESS: No. The only thing would be
23  I'd actually think about other things based on his
24  cocaine abuse.
25      BY MR. O'LOUGHLIN:

**Page 61**

1 Q. What do you mean by that?
2 A. It's just that I wanted to make sure that he wasn't
3    under the influence when I talked to him.
4 Q. And did you make that determination?
5 A. I did.
6 Q. And what was your conclusion?
7 A. I didn't feel he was under the influence of any
8    illicit substance.
9 Q. Even with the benefit now of retrospect, Doctor, is
10   there any condition that you now see or look at and
11   think you should have suspected or should have treated
12   while he was in the emergency department?
13     MR. HARRINGTON: Objection to form. He
14   doesn't have all the videos, records, and all the
15   other depositions of what other people said.
16     BY MR. O'LOUGHLIN:
17 Q. While you saw him.
18 A. From what he presented with and what he -- what I
19   found in the time that I -- he was under my care,
20   yes -- I apologize. The question being again?
21 Q. Even with retrospect, do you believe that he should
22   have had any further testing or that you should have
23   suspected or treated some other condition?
24     MR. HARRINGTON: Same objection. Form and
25   foundation.

**Page 62**

1     THE WITNESS: No. I believe I
2   appropriately worked up his complaints, his medical
3   complaints for that day, his injuries, and physical
4   exam.
5     BY MR. O'LOUGHLIN:
6 Q. Okay. Back, briefly, to the chest pain, because
7   that's been referred to several times in the
8   complaint.
9 A. Mmm-hmm.
10 Q. There are patients who present to the emergency
11   department with complaints of chest pain that a
12   reasonable physician might think could be cardiac in
13   origin, in general?
14 A. In general, in the setting of trauma, not usually.
15 Q. And in attempting to determine whether a chest pain
16   complaint might be cardiac in origin, is one of the
17   things you do is palpate the area, palpate the chest?
18 A. Yes.
19 Q. And if that pain is reproducible with palpation, does
20   that make you think it's a cardiac event or some sort
21   of traumatic event?
22 A. It depends on the history. If someone says, "I fell
23   onto my chest and I can reproduce the pain," that
24   makes me think it is traumatic in nature.
25 Q. And was the pain reproducible in Mr. Dunigan's case?

**Page 63**

1     MR. HARRINGTON: Foundation. Form.
2     THE WITNESS: It was.
3     BY MR. O'LOUGHLIN:
4 Q. Are there other ancillary symptoms that might present
5   with a cardiac problem, such as shortness of breath,
6   diaphoresis or sweating, nausea, vomiting, that might
7   make a reasonable emergency medical physician lean
8   more toward a potential cardiac origin?
9 A. It depends on the context.
10 Q. In Mr. Dunigan's case, did he have any of those
11   ancillary symptoms?
12 A. Not to my knowledge. Not that he brought to my
13   attention.
14 Q. Based upon your experience and training and knowledge
15   of the requirements of EMTALA, do you believe that you
16   violated EMTALA in Mr. Dunigan's case?
17 A. I do not.
18     MR. O'LOUGHLIN: Thank you, Doctor. That's
19   all I have.
20     EXAMINATION
21     BY MR. VANDER LAAN:
22 Q. My name is Allen Vander Laan. I represent the two
23   Kalamazoo Department of Public Safety Officers who
24   took Mr. Dunigan to the jail.
25     When you discharged Mr. Dunigan, is it fair

**Page 64**

1   to say that you didn't think he was in need of any
2   further medical treatment from you?
3 A. I did not.
4 Q. And did you have any medical reason to believe that he
5   would leave the hospital and die within hours?
6 A. I did not.
7     MR. VANDER LAAN: All right. Thank you.
8   That's all I have.
9     RE-EXAMINATION
10     BY MR. HARRINGTON:
11 Q. Just real quick. In follow-up to what Mr. O'Loughlin
12   was asking you about, you don't have any information
13   about him being treated differently because of race --
14 A. Right.
15 Q. -- or ethnicity, anything like that? I mean, in
16   fairness to you, you haven't looked at any of the
17   deposition transcripts from the officers who thought
18   he was faking?
19 A. I did not see any of that.
20 Q. You didn't see any of the deposition transcripts from
21   the Bronson security staff or even the audio or video
22   from that transaction between the Bronson security
23   staff and the Kalamazoo police officers where they
24   were joking about dumping Mr. Dunigan from the
25   wheelchair onto the pavement?