# In The Matter Of:

*Dunigan vs.*
*Bronson Methodist Hospital*

*Charles Shoemaker*
*June 2, 2017*



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

**Bingham Farms/Southfield • Grand Rapids**
Detroit • Ann Arbor • Flint • Lansing • Jackson • Mt. Clemens • Saginaw • Troy

*Original File SHOEMAKER_CHARLES.txt*
*Min-U-Script® with Word Index*

**DEFENDANT'S EXHIBIT C**

Page 25

1  matter, correct?
2  A. Yes.
3  Q. Do you have any recollection of any interactions with
4     Mr. Dunigan prior to his discharge?
5  A. I had no interactions with him prior to his discharge.
6  Q. All interactions with him were after discharge, is
7     that correct?
8  A. That's correct.
9  Q. You have no idea, as of May 6, 2016, why he was at the
10    hospital?
11 A. Correct.
12 Q. When was your first interaction with Mr. Dunigan?
13 A. My first interaction with Mr. Dunigan was when Officer
14    Nugent and Zack went out to the lobby to ask the
15    gentleman to leave because he'd been there apparently
16    for several hours past his discharge time.
17 Q. Well, how did you get involved?
18 A. I went out there just to stand by.
19 Q. Because you were in the office?
20 A. I came back to the office. We were out doing patrol
21    and we were in the office, and I went out there with
22    Zack just to stand by to make sure everything was
23    going to be okay.
24 Q. When you went out to stand by to see if everything was
25    going to be okay, Nolan was still in the office

Page 26

1  monitoring the cameras, correct?
2  A. Correct, yes.
3  Q. It's good practice to have an officer monitoring the
4     cameras at all times?
5  A. There is somebody in the office all the time because
6     it's a dispatch office.
7  Q. You've monitored the cameras, correct?
8  A. Correct.
9  Q. How many cameras are there, approximately?
10 A. Off the top of my head, I couldn't tell you an exact
11    number. There's a lot of cameras.
12 Q. Nolan said about 300.
13 A. I don't have an exact number for you. If that's what
14    he said, I mean, I don't -- I would say close to that,
15    yes.
16 Q. Does that number seem reasonable?
17 A. Yes.
18 Q. All right. Was there something that brought your
19    attention to Mr. Dunigan that you felt it was
20    necessary for you to go out there?
21 A. As far as he had overstayed his discharge time,
22    Officer Nugent went out. I mean, as far as anything
23    specific, I just went out there just to stand by to
24    make sure everything was going to be all right. And
25    it's a common practice we do that, kind of back each

Page 27

1  other up.
2  Q. So you said "overstayed his discharge time." Is there
3     some type of document that says a person is only
4     allowed to stay in the hospital for a particular
5     amount of time?
6  A. I don't recall a specific document, security document
7     states that. It was just a -- generally, if someone
8     was hanging out past their discharge time, we would go
9     out and make contact with them, because in the past
10    we've had problems with people being disruptive in the
11    lobby that would not want to leave the hospital
12    grounds after discharge.
13 Q. Well, you've seen the videos on this case?
14 A. Yes.
15 Q. And there's a point in time where the officers wheel
16    out Mr. Dunigan --
17 A. Yes.
18 Q. -- to the outside, I guess, outside of the ER?
19 A. Mmm-hmm.
20 Q. Yes?
21 A. Yes.
22 Q. While he was in the waiting room, he wasn't being
23    disruptive, was he?
24 A. No.
25 Q. That's a correct statement?

Page 28

1  A. Yes.
2  Q. So why was he asked to leave?
3  A. As far as -- well, he was done being seen. He was
4     discharged. The practice was usually -- he was
5     homeless. Usually we ask people to leave after a
6     certain period of time after they've been discharged
7     to prevent people from hanging out all day in the
8     lobby.
9  Q. You understood, though, that he was waiting for the
10    bus?
11 A. Yes, and he was -- apparently the bus was -- he had
12    not left yet for the buses, and that's the reason why
13    he was asked to leave, because the buses were running
14    at that time.
15 Q. And had you observed Mr. Dunigan on, say, on video at
16    all prior to you going and addressing him?
17 A. No.
18 Q. When you went and addressed him, that was the first
19    time you had seen him, whether in person or on video,
20    to your memory?
21 A. Correct.
22 Q. Did you have a conversation with him when you went and
23    addressed him?
24 A. I don't recall the exact conversation. It was more or
25    less listening to Officer Nugent and Zack. And the




CHARLES SHOEMAKER
June 2, 2017

Page 29

1    only thing he would say was, "Take me to jail."
2    That's the only thing that he would repeat back to us.
3  Q.  That's all you heard him say, ever, was, "Take me to
4    jail"?
5  A.  "Take me to jail," yeah.
6  Q.  Did that seem odd to you?
7  A.  Slightly.
8  Q.  As you're hearing that as a security officer, what's
9    going through your mind to why this individual is
10    wanting to go to jail?
11  A.  I mean, I have no idea why he'd want to go to jail. I
12    mean, that would just seem like an odd thing for
13    somebody to say, so ...
14  Q.  So in response to that, what did you do?
15  A.  Stood by while Officer Nugent and Zack talked to him.
16  Q.  Did you see him foaming from the mouth at all?
17  A.  No.
18  Q.  Was he slurring his words at all?
19  A.  No, he was just mumbling a lot.
20  Q.  When you say "mumbling" ...
21  A.  Like, "Take me to jail," and just kind of mumbling
22    under his breath a little bit. It was incoherent.
23  Q.  And that didn't concern you at all?
24  A.  I mean, from my observation, no. He was standing. He
25    was breathing fine. We deal with a lot of homeless

Page 30

1    people that are -- their condition is, they're
2    slightly slurred a lot, like constantly.
3  Q.  Who was taking the lead when they were addressing
4    Mr. Dunigan while he was in the ER waiting area east?
5  A.  At what point, when he's being evicted or --
6  Q.  No, when he's just being addressed, when you first go
7    out there.
8  A.  It would be Officer Nugent.
9  Q.  Okay. I'm going to show you Exhibit 14 that we had
10    marked in Officer Nolan Cattell's deposition.
11  A.  Mmm-hmm.
12  Q.  Do you see Exhibit 14?
13  A.  Correct.
14  Q.  Are you depicted in that photograph?
15  A.  I am leaning against a pillar.
16  Q.  You are the individual with his right arm stretched
17    out?
18  A.  Correct.
19  Q.  May I see that back, please?
20  A.  Sure.
21  Q.  And the image that we're seeing in Exhibit 14, where
22    you're leaning against, as you say, a pillar, this is
23    the time frame as to when you first address
24    Mr. Dunigan?
25  A.  As I recall, yes.

Page 31

1  Q.  Did any words come out of your mouth in this time
2    frame to Mr. Dunigan?
3  A.  Negative.
4  Q.  And prior to this time frame as to when you are here
5    as depicted in Exhibit 14, you had never seen him
6    prior?
7  A.  Correct.
8  Q.  Did you know whether or not he had received any type
9    of medical treatment whatsoever from Bronson?
10  A.  I had heard from Zack that he was discharged earlier
11    in the morning and they were letting him sit in the
12    lobby for several hours until the buses started
13    running, so I was told he was discharged.
14  Q.  Let me ask you this: As you're sitting there, what if
15    in your mind you say, "You know what? Something
16    doesn't seem right with this guy. I think he still
17    needs to be looked at medically"; if you thought that,
18    what would you do?
19  A.  If I thought that?
20        MR. O'LOUGHLIN: Form and foundation.
21  BY MR. HARRINGTON:
22  Q.  Yes, if you thought that.
23  A.  I would have notified the nurse at the desk that this
24    guy needs to be seen again.
25  Q.  And that's part of your responsibilities as a security

Page 32

1    officer?
2        MR. O'LOUGHLIN: Form and foundation.
3  BY MR. HARRINGTON:
4  Q.  Go ahead.
5  A.  Correct.
6  Q.  You said he was breathing fine --
7  A.  Yes.
8  Q.  -- maybe a minute or two ago.
9  A.  Yes.
10  Q.  At any time in your dealings with Mr. Dunigan, did you
11    notice a change in his breathing?
12  A.  I did not.
13  Q.  You've seen video?
14  A.  Of the police car, yes, when he was -- after he was
15    transported.
16  Q.  You've seen police car video?
17  A.  It was all over the news, yeah. It was on the news.
18    I've seen not the whole video, but I've seen as they
19    were transporting him to the jail.
20  Q.  And the video that you've seen --
21  A.  Yes.
22  Q.  -- also has audio?
23  A.  Yes.
24  Q.  And you've heard that breathing that he had?
25  A.  The snoring respirations, yes. He was not doing any

 

CHARLES SHOEMAKER
June 2, 2017

### Page 33

1  of that in the lobby or out front.
2  Q.  Well, you were with him out front, right?
3  A.  Yes, correct.
4  Q.  Were you with him when he was loaded into the car?
5  A.  Yes.
6  Q.  And if you had heard any of those snoring
7     respirations, would that have caused you concern?
8  A.  Yes.
9       MR. O'LOUGHLIN:  Form and foundation.
10 BY MR. HARRINGTON:
11 Q.  If you had heard that, would you have said, "You know
12    what, this guy should be checked out"?
13 A.  Yes.
14 Q.  That would have been reasonable?
15      MR. O'LOUGHLIN:  Form and foundation.
16 A.  Correct.
17 BY MR. HARRINGTON:
18 Q.  To not do that would be unreasonable?
19      MR. O'LOUGHLIN:  Same.
20 A.  Correct.
21 BY MR. HARRINGTON:
22 Q.  You were with Mr. Dunigan when he was being loaded
23    into the police car, correct?
24 A.  Yes.
25 Q.  Did you assist in loading him into the police car?

### Page 34

1  A.  Yes.
2  Q.  What part of his body did you grab to help load him
3     into --
4  A.  I had his feet.  Art had his shoulders, and I believe
5     Nugent was next to me, too.  We had the feet in, and
6     then Art went around the driver's side and helped him
7     with getting him by the shoulders to sit him up.
8  Q.  Real quick, when you said "snoring respirations," in
9     any of your EMT training, what is that significant of?
10 A.  Respiratory failure, could lead up to -- trouble
11    breathing, I should say.
12 Q.  What about congestive heart failure?
13 A.  Possibly.  I mean, I'm not -- as an EMT, that would be
14    more in the realm -- I mean, yeah, it would be, it
15    would obviously cause some concern as far as
16    congestive heart failure.  That wouldn't, couldn't be
17    determined, usually, until we put him up on a monitor
18    to show the heart rhythm.  That would be a paramedic
19    issue, so ...
20 Q.  But you know what congestive heart failure is?
21 A.  Yup.
22 Q.  You know what it is in connection with your training
23    as an EMT?
24 A.  Yes.
25 Q.  And sometimes snoring respirations can be consistent

### Page 35

1  with somebody who's in congestive heart failure?
2  A.  Correct.
3  Q.  If none of those signs of this snoring respirations
4     were present when you were dealing with Mr. Dunigan as
5     depicted in Exhibit 14, and then they started to
6     develop when he was out by the car, that's a definite
7     change in his condition --
8       MR. O'LOUGHLIN:  Form and foundation.
9  BY MR. HARRINGTON:
10 Q.  -- yes?
11 A.  Correct.
12 Q.  And that is a change that would require medical
13    treatment?
14      MR. O'LOUGHLIN:  Same.
15 A.  Correct.
16 BY MR. HARRINGTON:
17 Q.  And if you saw that change, you would have gotten him
18    treatment?
19      MR. O'LOUGHLIN:  Same.
20 A.  Yes.
21 BY MR. HARRINGTON:
22 Q.  When you were addressing Mr. Dunigan outside of the
23    police vehicle, that was a Kalamazoo Public Safety
24    vehicle, correct?
25 A.  Correct.

### Page 36

1  Q.  Was there an issue about having to wait for a second
2     vehicle that had a gate or a break between?
3  A.  Yes.  The hospital officer that was assigned to the
4     hospital that day, his cruiser did not have a cage for
5     prisoner transport, so he had to call for a second
6     unit to come that had a cage for transport.
7  Q.  And then when that vehicle came, who was driving that
8     vehicle?
9  A.  It was another -- I don't know his name.  It was
10    another public safety officer.  I don't recall the
11    name of the officer.
12 Q.  Do you know if it was Shafer?
13 A.  I couldn't tell you.  I don't recall his name.
14 Q.  And in preparation of your deposition today, did you
15    watch any of the videos?
16 A.  No.
17 Q.  But you have seen them?
18 A.  I have seen partial that was on WOTV.
19 Q.  And did you see the part that had the audio where it
20    said, "He was walking around, he's just playing the
21    game"?
22 A.  No.
23 Q.  Have you ever heard that?  Let me rephrase.
24      Do you remember anybody ever saying that at
25    or around the time that Mr. Dunigan was about to be



CHARLES SHOEMAKER
June 2, 2017

### Page 41

1  A. I don't recall who said that, but when I came back to
2     the office, they said, "He's been up walking around,
3     because he's been in the lobby for the past couple
4     hours, waiting for the buses," and he was still here,
5     so that's when Zack and Nugent went out there to talk
6     with him, and then I went out, so ...
7  Q. You told that to an officer who had just brought up
8     the new scout vehicle?
9  A. Okay.
10 Q. Yes?
11 A. Possibly.
12 Q. Is that true or not true?
13 A. Yes.
14 Q. So that officer would have no way to verify that
15    except to rely on what you were telling them?
16 A. Correct.
17 Q. The discussion about the warrant took place at the
18    scout vehicle, correct?
19        MR. O'LOUGHLIN: Form and foundation.
20 A. Correct.
21 BY MR. HARRINGTON:
22 Q. And it didn't take place in the hospital, correct?
23 A. No.
24 Q. That's a correct statement?
25 A. Correct.

### Page 42

1  Q. Did you see him foaming at the mouth, "him" being
2     Dunigan?
3  A. No.
4  Q. And at no time did you ever hear him have any problems
5     breathing?
6  A. No.
7  Q. That's a correct statement?
8  A. That's correct.
9  Q. Real quick, Exhibit 15 to Nolan's deposition, do you
10    see that?
11 A. Yes.
12 Q. Do you know who that individual is that's wheeling
13    Mr. Dunigan?
14 A. He's an ER nurse. I don't know him by name.
15 Q. I'm going to cue up some video feed right now.
16 A. Okay.
17        MR. HARRINGTON: I'm trying to think what
18    would be the easiest way to do this. I'd like him to
19    see this. Would it be possible for both of you to
20    come over to this side while I play some of this
21    video? I mean, I can sit over on your side, it
22    doesn't matter, but ...
23        MR. O'LOUGHLIN: You're welcome to come
24    over here and turn it around. We'll get a chair.
25

### Page 43

1  BY MR. HARRINGTON:
2  Q. You see the video on my screen, correct?
3  A. Yes.
4  Q. Okay. And this is the image of the scout car that
5     eventually Mr. Dunigan is placed into, correct?
6  A. Correct.
7  Q. And this is a Kalamazoo Public Safety vehicle,
8     correct?
9  A. Correct.
10        (Video played)
11 BY MR. HARRINGTON:
12 Q. Did you hear where somebody just said, "Come on,
13    Mr. Dunigan"?
14 A. Mmm-hmm.
15 Q. Yes?
16 A. Yes.
17 Q. Okay. So you can hear the audio to some extent on
18    this playback, correct?
19 A. Correct.
20        (Video played)
21 BY MR. HARRINGTON:
22 Q. Do you hear those snoring sounds, that breathing that
23    we had talked about?
24 A. Mmm-hmm.
25        MR. O'LOUGHLIN: Form and foundation.

### Page 44

1  BY MR. HARRINGTON:
2  Q. Yes?
3  A. Yes.
4  Q. You understand that to be Mr. Dunigan?
5  A. Yes.
6  Q. And that is while he is standing outside of the
7     vehicle, or at least outside of the vehicle --
8  A. Correct.
9  Q. -- where you would have been in the vicinity of?
10 A. Correct.
11 Q. And you did not hear that?
12 A. No.
13        (Video played)
14 BY MR. HARRINGTON:
15 Q. The part where it said "put one foot in front of the
16    other," you heard that?
17 A. Yes.
18 Q. Who said that?
19 A. I believe that's Nugent.
20 Q. That's who it sounded like?
21 A. Mmm-hmm.
22 Q. Yes?
23 A. Yes.
24        (Video played)
25

