# In The Matter Of:

*Dunigan vs.*
*Officer Nugent, et al.*

*Kimberly Gilbert-Shay*
*December 1, 2017*



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
A U.S. Legal Support Company

Bingham Farms/Southfield • Grand Rapids
Detroit • Ann Arbor • Flint • Lansing • Jackson • Mt. Clemens • Saginaw • Troy

*Original File GILBERT-SHAY_KIMBERLY.txt*
*Min-U-Script® with Word Index*



DEFENDANT'S EXHIBIT E

Page 9

1  A. No.
2  Q. Was there anything else that you heard Mr. Dunigan
3    say?
4  A. No.
5  Q. When he said take me to jail, can you describe in any
6    way as to how he said it? Did he tell it, did he
7    whisper it, did he say it in a normal conversation
8    tone? Describe in your words how he said it.
9  A. He must have said it loud enough that I could hear it
10   because he was kind of on the other side of the room
11   and I was at the triage desk. I don't recall anything
12   --
13 Q. You didn't do anything during your shift which I guess
14   started at around three a.m. until really after
15   Mr. Dunigan was escorted out of the hospital, did you
16   do anything to bring the security staff to be involved
17   with Mr. Dunigan?
18 A. No.
19 Q. Do you have any idea as to how the security staff went
20   over to Mr. Dunigan?
21 A. No.
22 Q. Was there anything that you saw from three a.m. until
23   the hospital staff -- I'm sorry -- from three a.m.
24   until the security staff addressed Mr. Dunigan that
25   caused you any concern with Mr. Dunigan? If you

Page 10

1   understand my question.
2  A. I understand. No.
3  Q. If there was something going on where he looked like
4    he was in some type of visible distress or let's just
5    say he didn't look right, as a nurse would you have
6    done anything knowing what you know about Mr. Dunigan
7    having already been discharged?
8  A. Can you --
9     MR. MCLOUGHLIN: Foundation, but go ahead.
10    BY MR. HARRINGTON:
11 Q. Do you want me to rephrase?
12 A. Yeah.
13 Q. Here's the scene. Nurse Watson gives you a little bit
14   of background on Mr. Dunigan.
15 A. But I didn't have any background.
16 Q. He just said --
17 A. He's been discharged and he's waiting for the bus.
18 Q. Right. That's what he tells you?
19 A. Right.
20 Q. So, in your mind you know at least that he's already
21   received some medical treatment, right?
22 A. Correct.
23 Q. So, if hypothetically you were to have seen something
24   going on with Mr. Dunigan that you conclude needed
25   further medical treatment, what would you do?

Page 11

1     MR. MCLOUGHLIN: Foundation, but go ahead.
2     THE WITNESS: Excuse me?
3     MR. MCLOUGHLIN: That's my objection. You
4    go ahead and answer.
5  A. What would I do? It depends on the situation. If he
6    asks for help and he asks to be seen again, certainly
7    I would have gotten involved.
8     BY MR. HARRINGTON:
9  Q. Hypothetically if there's a patient that you look over
10   and you see sitting in a chair and then they fall out
11   of the chair and they are just laying on the ground,
12   that's not somebody who is going to be asking for
13   help, you may conclude on your own that's somebody who
14   might need help.
15    If you saw something like that, what would
16   you do?
17 A. I may or may not conclude that to be honest. It just
18   depends on the situation.
19 Q. If you saw somebody who was sitting in a chair, say
20   they fall out of the chair and they are just laying on
21   the ground --
22 A. I mean are they conscious or unconscious?
23   Unfortunately these episodes happen a lot in emergency
24   rooms.
25 Q. What, that people are sitting in chairs and fall out

Page 12

1   of chairs?
2  A. Yeah.
3  Q. Okay. So, if they happen a lot, tell me some of the
4    things that you do when you see this.
5  A. It all depends on the situation.
6  Q. I know, but --
7  A. Do you want me to talk about Mr. Dunigan's case?
8  Q. I'd like you to talk about some of the situations
9    where you've seen patients that have been sitting in
10   chairs and then there's, you know, something going on
11   where you either get, you know, security involved or
12   you get a doctor involved.
13 A. Sure. If somebody was having a medical emergency like
14   they weren't breathing or they were unconscious, I
15   certainly would get involved. If somebody is throwing
16   themselves on the floor because they want to go back
17   quicker, sometimes in triage people get upset if they
18   have to wait and sometimes they'll do that.
19 Q. Okay. I'm not trying to put words in your mouth, but
20   what you'll do sometimes if you're working up at the
21   desk --
22 A. Assess the situation.
23 Q. You make a judgment call, and if it looks like
24   somebody is throwing a tantrum or a fit to be
25   difficult, that might lean towards bringing security?

**Page 13**

1 A. Correct.
2 Q. If you see somebody who appears to be having some type
3   of a medical condition that needs immediate medical
4   care, that would lean towards getting a physician
5   involved.
6 A. Sure.
7 Q. And as you sit here today you didn't see anything with
8   Mr. Dunigan that led you to believe that he needed any
9   involvement from either security or from a physician,
10  correct?
11 A. Correct.
12 Q. And as you sit here today, do you have any idea why
13  security went and addressed Mr. Dunigan?
14 A. **I think that security went and addressed Mr. Dunigan**
15  **because it was 6:00 in the morning and the buses were**
16  **running.**
17 Q. And you conclude that it was time for him to go?
18 A. I didn't conclude anything.
19 Q. Okay. And did you ever speak with any of the hospital
20  security staff about their interactions with
21  Mr. Dunigan?
22 A. No.
23 Q. Did you see them wheel Mr. Dunigan out of the hospital
24  in a wheelchair?
25 A. Yes.

**Page 14**

1 Q. Did they go literally right in front of you?
2 A. **Well, yeah, because the doors are right in front of**
3   **me.**
4 Q. And as they were wheeling Mr. Dunigan out, did you
5   make any observations of Mr. Dunigan?
6 A. No.
7 Q. So, you don't know what type of condition he was in
8   when he was being wheeled out at that moment?
9 A. **No. He was talking. His speech was clear, he was**
10  **articulate.**
11 Q. And when you said his speech was clear, what was he
12  saying?
13 A. **Take me to jail.**
14 Q. Did he just say that over and over again?
15 A. Uh-huh.
16 Q. Yes?
17 A. Yes.
18 Q. How many times did you hear him say take me to jail?
19 A. I don't know.
20 Q. More than --
21 A. **More than once.**
22 Q. Can you give me a range of less than something? What
23  I'm getting at was this take me to jail, take me to
24  jail, take me to jail?
25 A. No, I would say he probably said it three times but

**Page 15**

1   I'm guessing.
2 Q. Did he say it when he was right in front of you, did
3   he say it when he was sitting in the chair over in the
4   waiting area?
5 A. **He said it over in the waiting area sitting in the**
6   **chair and then he said it again as he went out the**
7   **door.**
8 Q. Did you ever listen to any audio regarding this case?
9 A. No.
10 Q. Have you watched any video regarding this case?
11 A. Just what you showed me.
12 Q. And you are pointing to what your lawyer showed you?
13 A. Yes, I'm sorry.
14 Q. Did watching that video refresh your memory in any way
15  as to the events that occurred on May 6, 2015?
16 A. Not really.
17 Q. I'm sorry, 2016. Not really?
18 A. Not really.
19 Q. To be clear you didn't hear any audio from any source
20  between any exchange with Mr. Dunigan and any of the
21  officers?
22 A. No.
23 Q. That's a correct statement?
24 A. That's correct.
25 Q. When you heard Mr. Dunigan say take me to jail, you

**Page 16**

1   mentioned that you heard the officers say in response
2   we don't want to do that?
3 A. **Yeah, I thought I heard the officer talking to him in**
4   **a kind manner saying we don't want to do that.**
5 Q. At all times you heard the officer speaking to
6   Mr. Dunigan in a kind manner?
7 A. Yes.
8 Q. Did you ever hear any of the officers making a joke
9   like they wanted to dump Mr. Dunigan out of the
10  wheelchair?
11 A. No, absolutely not.
12 Q. It would surprise you if that did in fact happen?
13      MR. MCLOUGHLIN: Form and foundation.
14      BY MR. HARRINGTON:
15 Q. Go ahead.
16 A. Would it surprise me?
17 Q. Yeah.
18 A. Sure.
19 Q. Because that would be inappropriate?
20 A. Sure.
21      MR. MCLOUGHLIN: Form and foundation.
22      BY MR. HARRINGTON:
23 Q. Do you remember which officer said something to the
24  extent of we don't want to do that in response to take
25  me to jail?

Page 25

BY MR. HARRINGTON:
Q. I just ask you questions -- no problem. When you saw him walking around the waiting area, did you see him talking to anybody?
A. No, I don't believe that there was anybody else out there. Must have been a slow night.
Q. Did you ever see him go up to any other medical staff and ask for any help?
A. No.
Q. Was he walking without the assistance of a cane?
A. I think he did have a cane.
Q. But was he using the cane when he was walking or was he walking just fine without it?
A. I don't recall. I remember there being a cane but I don't remember if he was using it or not.
Q. This idea of him walking around in the waiting area, is this something you also saw on video?
A. No.
Q. Something you remembered?
A. I remembered because I remembered glancing over there and saw him walking around.
Q. And what was he doing when he was walking around?
A. He got up -- I don't remember, I just remember walking around.
Q. How far did he walk?

Page 26

A. How far did he walk?
Q. Yes.
A. I don't know.
Q. If we look at Exhibits 3 and 4, was he walking in the area that's visible within Exhibits 3 or 4?
A. From my vantage point?
Q. No, from -- you said you saw him walking in the waiting area, right?
A. Yes.
Q. And it was the waiting area that's depicted in Exhibits 3 and 4 to Miss Blair's deposition, correct?
A. Correct.
Q. And, so, when you saw him walking around, if we were to watch the security footage, it would capture that?
A. Yes, it should.
Q. And do you remember how long you saw him walking around?
A. No.
Q. But he wasn't causing any disturbance, was he?
A. None whatsoever.
Q. Didn't concern you in any way?
A. No.
Q. Did he appear to be under the influence of any type of narcotics or street drugs when you saw him?
A. I did not get close enough to be able to assess that.

Page 27

Q. There wasn't anything he was doing that led you to believe he was under the influence?
A. No.
MR. HARRINGTON: Okay. That's all I've got. Thank you.
MR. VANDER LAAN: No questions.
MR. MCLOUGHLIN: I will reserve my questions of this witness to the time of trial.
(The deposition was concluded at 1:51 p.m.
Signature of the witness was not requested by counsel for the respective parties hereto.)

Page 28

CERTIFICATE OF NOTARY
STATE OF MICHIGAN )
                   ) SS
COUNTY OF WAYNE)

  I, Nora Morrissy, certify that this deposition was taken before me on the date hereinbefore set forth; that the foregoing questions and answers were recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to, either party nor interested in the event of this cause.

Nora Morrissy, CSR-2642
Notary Public,
Wayne, County, Michigan.
My Commission expires: 9-13-19