# In the Matter Of:

# DUNIGAN vs BRONSON METHODIST HOSPITAL

# SAUL LEVINE, M.D.

February 27, 2018

*Prepared for you by*



US Legal Support
The Power of Commitment™

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy



DEFENDANT'S EXHIBIT F

Page 49

1   to the lobby by the order of Dr. Rigot, and so in a -- in
2   a sort of conventional, but not legal sense, the patient
3   was discharged at that point.
4       Q.  All right.  Thank you.
5           Did Dr. Rigot have any further contact with
6   Mr. Dunigan after Mr. Dunigan went to the waiting room?
7       A.  Not to my knowledge.
8       Q.  All right.  I'm going to go back to where I
9   thought I was, which is your opinions as to violations of
10  the standard of care by Dr. Rigot.  And if I understood
11  your testimony, that the consequences of Mr. Dunigan's
12  fall were appropriately addressed, but Dr. Rigot failed
13  to determine the cause of that fall?
14      A.  Correct.
15      Q.  What's your understanding of the cause of the
16  fall?
17      A.  Well, Mr. Dunigan stated that he, quote, just
18  didn't feel right.  And that he, quote, lost his balance.
19  And that he was, quote, dizzy.  So I don't know, other
20  than what like I said, was contemporaneously documented
21  by the nurse, that the patient was with complaints of
22  being unsteady and dizzy and weak.
23          I think your question was why did Mr. Dunigan
24  fall; right?
25      Q.  What's your understanding of why he fell?

Page 50

1       A.  I -- I --
2       Q.  Can you answer that?
3       A.  I can't say.  I don't know.  The --
4   unfortunately, he was discharged to the lobby and that
5   was not determined.  I think there was a reasonable
6   expectation to use the resources available to determine
7   the cause of the fall, including diagnostics and labs and
8   consultants, if need be.
9       Q.  Wasn't the history Mr. Dunigan gave that he
10  accidentally fell getting off a bus?
11      A.  The history was that he fell getting off a bus.
12      Q.  When did that fall occur?  Eight hours --
13      A.  Yeah.
14      Q.  Sorry.  Go ahead.
15      A.  I think the answer was it was several hours
16  prior to 9-1-1 being activated.
17      Q.  And didn't Dr. Rigot put in his history of
18  present illness that Mr. Dunigan stated that the pain
19  began after he accidentally fell getting off a bus, onto
20  cement?
21      A.  Let me open the record.
22          Yes, it does state that.
23      Q.  And didn't Dr. Rigot testify that what he
24  understood Mr. Dunigan had was a mechanical fall?
25      A.  He did testify to that.  That doesn't help

Page 51

1   explain why the nurses say he was dizzy and felt off
2   balance.
3       Q.  And did you understand that was historical
4   information or that he was dizzy or off balance while he
5   was in the emergency department?
6       A.  Well, the nurse, contemporaneous with the
7   patient's care, documented that he, quote, just didn't
8   feel right and that he was dizzy.  So you're asking a
9   histor- -- can you repeat your question, I'm sorry?
10      Q.  Was it your understanding that the nurse's note
11  that you referenced regarding dizziness was a current
12  complaint while he was in the emergency department or a
13  historical complaint?
14      A.  Well, that's a good question.  It's not
15  actually clear.  I mean, it's definitely historical,
16  because it says, "I just didn't feel right,"
17  quote/unquote.  But it also says his neuro symptoms are
18  dizziness.  So I guess the answer is both.
19      Q.  That's your understanding based upon your review
20  of this record?
21      A.  Yeah.
22      Q.  All right.  Good.
23          Doesn't what the patient states is, "I lost my
24  balance getting off the bus"?
25      A.  Where do you see that?  On the nursing notes?

Page 52

1   Yes.
2       Q.  Right above --
3       A.  Yeah.  Yeah.  "I lost my balance.  I just didn't
4   feel right."  You know, I think had the physician been
5   aware of this issue or had the physician known about
6   this, this is a cry for check my potassium.  Because as
7   Dr. Rigot's note points out, the patient is noncompliant
8   with dialysis.  And when somebody that's noncompliant
9   with dialysis is dizzy and didn't feel right, that's --
10  that's a cry for help for checking potassium and further
11  investigation.
12          Again, this gets at the cause of the fall, you
13  know, not the consequence, which was the unfortunate
14  focus of the care.
15      Q.  Okay.  And just to clarify that.  As far as what
16  Mr. Dunigan did present with, the chest or flank pain due
17  to the fall, that was adequately addressed by Dr. Rigot?
18      A.  The consequence of the fall and the injury to
19  the thorax, yes.  I think that was adequately addressed,
20  that part of it.
21      Q.  Okay.  And at the time Mr. Dunigan was in the
22  emergency department, other than that note of dizziness
23  that you find unclear, did you find any indication that
24  he was continuing to complain of any problem other than
25  the pain?

Page 53

1   A.   Well, not really, although "continuing to
2   complain" is a little bit loaded. Because he was
3   essentially evaluated, had an x-ray and was discharged.
4   So it doesn't -- you know, he only had one set of vitals.
5   And I mean, he had another later recheck, but, you know,
6   it's a fairly short ED visit. So I don't know that there
7   was ample opportunity to complain of things.
8        Although, you know, reviewing the video from the
9   lobby, it appears the patient had continued issues with
10  being off balance, dizzy and weak and so on.
11  Q.   Okay. Did you follow my question?
12  A.   Yes. Did I not answer it?
13  Q.   Did you see any evidence, aside from that one
14  nurse's note that you deemed unclear, as to whether it
15  was contemporaneous for history and note of dizziness?
16  Did you see any evidence that Mr. Dunigan presented any
17  other symptoms in the emergency department which would
18  indicate an emergency medical condition?
19       MR. HARRINGTON: Objection. Form. Foundation.
20       THE WITNESS: I think your question was did
21  he -- did he fall because he was dizzy or is there other
22  evidence besides that nursing note? And then your
23  question became was there any other emergency medical
24  condition that was evident? Is that -- am I
25  oversimplifying things?

Page 54

1        Maybe if you restate your question is better,
2   I'm sorry.
3   BY MR. O'LOUGHLIN:
4   Q.   Was there any evidence of ongoing problems or
5   symptoms in the emergency department, other than the
6   chest pain Mr. Dunigan complained of due to the fall and
7   that single note of dizziness, which to you was unclear
8   as to whether it was historical or ongoing?
9   A.   Well, yes. Like we talked about, the video is
10  certainly evidence of instability.
11  Q.   I'm sorry if I wasn't clear, but what I'm
12  attempting to do when I say "in the emergency
13  department," is during the time he was being cared for by
14  Dr. Rigot and the nurses in the emergency department, as
15  opposed to the waiting room. Is that fair?
16  A.   Okay.
17  Q.   And are you aware of any evidence of any ongoing
18  problems or symptoms, other than the chest pain that he
19  came in for and was adequately addressed, and the note of
20  dizziness, which you were unclear as to whether that was
21  historical or contemporaneous?
22  A.   Well, it appears that it's both. It's -- I'm
23  not unclear. It says, "The patient has dizziness," and
24  it says, "I lost my balance. I just didn't feel right."
25  So to be clear, going back, I think it's, you know, some

Page 55

1   acknowledgment by the nurse that there was dizziness and
2   there is dizziness.
3        But to answer your question, I don't think
4   there's much other specific evidence of him, you know,
5   sort of having this issue of dizziness. I'll note that
6   the medic records do indicate they specifically asked,
7   "Why did you fall?" And he said he was unable to provide
8   an answer why he fell. But I don't think that helps or
9   hurts this either way.
10  Q.   Other than the complaint of chest pain for which
11  he presented and which was adequately addressed, and the
12  note of dizziness that the nurse made in the record, are
13  you aware of any evidence of any ongoing symptoms or
14  problems indicating that Mr. Dunigan had an emergency
15  medical condition in the emergency department?
16  A.   Before getting sent to the lobby?
17  Q.   Correct.
18  A.   No.
19  Q.   The EMS run that you reviewed showed that his
20  breathing was normal, unlabored and clear; true?
21  A.   I'll have to go back and look. They may have
22  documented that.
23       Unlabored, clear, yep. That's what it says.
24  Q.   The Glasgow Coma Scale, what does that mean?
25  A.   That's a measure of consciousness. A

Page 56

1   three-pronged scale giving points for motor engagement,
2   verbal engagement and eye -- using eyes.
3   Q.   And what's the best score you can get?
4   A.   15.
5   Q.   And what was Mr. Dunigan's score, per the EMS
6   record?
7   A.   15.
8   Q.   An EMS record noted his vital signs, were those
9   within normal limits?
10  A.   Yes.
11  Q.   They checked his blood sugar and noted it to be
12  172. Does that indicate a diabetic crisis?
13  A.   Unable to declare from that, but it was mildly
14  elevated.
15  Q.   Earlier you testified that blood sugar of less
16  than 60, 50 or 40 or higher than 180 might indicate a
17  problem. But there would not be a crisis unless it was
18  300 to 500?
19  A.   I didn't say that. I didn't say 180.
20  Q.   Did you say low hundreds?
21  A.   I don't recall what I said.
22  Q.   All right. What would be the level where you
23  believe a blood sugar would indicate a diabetic problem
24  that required treatment?
25  A.   Well, that was one of the first questions we

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 65

1   Q.   His respiratory rate was within normal limits?
2   A.   Yes.
3   Q.   He had good oxygen saturation?
4   A.   Yes. I'm trying to find --
5   Q.   On room air?
6   A.   I'm trying to find the page with this. I
7   believe that's correct, yes.
8   Q.   His neurological was noted to be within normal
9   limits?
10  A.   Yes. They say -- Dr. Rigot documents that he's
11  oriented, with normal strength and no sensory deficits
12  noted. So I like to walk patients. I think it's
13  important for a gait to be observed. But that was not
14  done here.
15  Q.   What was -- what's your knowledge of
16  Mr. Dunigan's pre-presentation gait?
17  A.   It's difficult to say from this record. There
18  is mention of hemiplegia, that he was partially paralyzed
19  from a previous stroke. And then piecing together from
20  outside other records, that he used a cane, which you can
21  see the cane during his stay.
22  Q.   Any other knowledge of his pre-presentation
23  gait?
24  A.   No.
25  Q.   What -- do you believe that Mr. Dunigan had an

Page 66

1   emergency medical condition when he was in the emergency
2   department prior to the time he went to the waiting room,
3   other than his chest and flank pain from the fall?
4   A.   Yes.
5   Q.   And what do you believe that emergency medical
6   condition was?
7   A.   Well, he was -- as I alluded to with getting at
8   the cause of his fall, he was dizzy and weak and
9   unsteady. So with that, I think the answer to your
10  question is he was having those symptoms throughout his
11  ED stay, and --
12  Q.   I'm sorry. Just so I'm clear, did you say
13  having no symptoms or having those symptoms?
14  A.   "Those."
15  Q.   You said he was having those symptoms throughout
16  his ER stay?
17  A.   Well, that's what's documented. The nurse
18  points out that he was dizzy and unstable -- you know,
19  his lack of stability is -- is seen in the immediate, you
20  know, timeframe after his discharge to the lobby.
21  Q.   Anything other than the nurse's note, that
22  states dizziness, indicating that he had an emergency
23  medical condition up to the time that he went into the
24  waiting room?
25  A.   No. Other than these things we've talked about,

Page 67

1   his -- you know, his heart rate was transiently high.
2   His -- you know, the symptoms that prompted him to come
3   in and so on. But no, there's no other evidence of stuff
4   until he was sent to the lobby.
5   Q.   And if that dizziness was in fact meant to be a
6   historical notation, referring to when he fell, can
7   you -- is there any indication that he continued to have
8   an emergency medical condition while he was in the
9   emergency department, meaning up to the time he went to
10  the waiting room?
11  A.   Yeah. I know what you mean. No, I think the
12  answer's no. Although they don't test it. They don't
13  walk him. They don't stand him. So that, you know, even
14  it's maybe historical that he's unable to stand and he
15  was unusually -- something's not right, off-balance,
16  that's not -- that's not challenged in the ED.
17  Q.   Is the answer to my question "no"?
18  A.   Correct.
19       MR. HARRINGTON: Objection. Form. Foundation.
20       THE WITNESS: Yeah.
21  BY MR. O'LOUGHLIN:
22  Q.   Are you aware of any evidence indicating that
23  Dr. Rigot, or any of the other licensed healthcare
24  professionals in the emergency department, ever actually
25  perceived that Mr. Dunigan had an emergency medical

Page 68

1   condition beyond the chest and flank pain from the fall?
2   A.   I think you're asking -- can you repeat the
3   question again? I apologize about that.
4   Q.   Sure.
5       Are you aware of any evidence, based upon
6   everything you've reviewed, indicating that Dr. Rigot or
7   any of the nurses actually perceived that Mr. Dunigan had
8   an emergency medical condition, other than the chest and
9   flank pain attributed to the fall?
10  A.   Well, yeah. I mean, the nurse -- we're talking
11  about the same thing again and again. The nurse points
12  out that he was not right and dizzy. So I would say
13  that's a perception of there being an emergency medical
14  condition.
15  Q.   Anything other than that?
16  A.   No. I feel like I've answered this question
17  several times. But no, I don't see other evidence.
18  Q.   And even if the nurse noted dizziness, do you
19  have -- do you know of any evidence that indicates that
20  the nurse perceived that as a serious medical condition,
21  which if not treated would be life-threatening?
22  A.   I have no way of saying -- answering that.
23  Q.   You're not aware of any evidence indicating that
24  any nurse or doctor actually perceived Mr. Dunigan to
25  have a medical condition which, if left untreated, would

Page 69

1 threaten his life?
2      MR. HARRINGTON: Objection. Form. Foundation.
3      THE WITNESS: Yeah. Again, I don't see that
4 there's that perception. Of course you can't see what
5 you don't look for; right?
6 BY MR. O'LOUGHLIN:
7   Q.  Let's try it with an answer to my question,
8 Doctor.
9      Are you aware of any evidence indicating that
10 any nurse or physician actually perceived that
11 Mr. Dunigan had a life-threatening medical condition or a
12 serious medical condition while he was in the emergency
13 department, before he went to the waiting room?
14   A.  Yes.
15      MR. HARRINGTON: Objection. Form foundation.
16      Go ahead.
17 BY MR. O'LOUGHLIN:
18   Q.  And your answer?
19   A.  Yes.
20   Q.  And what evidence are you referring to?
21   A.  The nursing documentation that he didn't feel
22 right and was dizzy.
23   Q.  Okay. The nursing documentation says
24 "dizziness." Is it your understanding that the verbiage
25 below the word "dizziness" is historical and not as of

Page 70

1 the time he was in the emergency department?
2   A.  It's -- I can read it. It says, "The patient
3 states," quote, "lost my balance getting off the bus. I
4 just didn't feel right," quote. And then above that, it
5 says, "Dizziness." So I don't -- I'm not the nurse. I
6 don't know what -- I wasn't there. I don't know if she
7 was saying, "Are you having any dizziness? Were you
8 having any dizziness?" She might have said, "Are you or
9 were you having any dizziness," that could have triggered
10 that input. I don't know.
11   Q.  Let's go back. Other than that, are you aware
12 of any evidence indicating that any nurse or doctor
13 actually perceived that Mr. Dunigan had an emergency
14 medical condition, other than the chest pain attributable
15 to the fall for which he presented?
16   A.  No.
17   Q.  Would a mechanical fall on one's lower right
18 ribs resulting in an emergency department presentation
19 require an EKG?
20   A.  Mechanical fall? No. It would be atypical to
21 require an EKG. In the circumstance where there was
22 perceived dysrhythmia, in other words, if the patient
23 fell, was on cardiac monitor and there was abnormal EKG
24 rhythm seen on the monitor, would that warrant a 12-lead
25 EKG? Yes. But in the circumstances of where that's not

Page 71

1 picked up or it's a simple mechanical fall, no.
2   Q.  Would a mechanical fall resulting in a contusion
3 to the lower right ribs in and of itself require any
4 laboratory studies?
5   A.  No.
6      But, again, in this case, we don't have evidence
7 that this was a mechanical fall and he has further
8 complaints of dizziness, weakness, and no noncompliance
9 with hemodialysis, so this is really quite separate from
10 the circumstance you describe.
11   Q.  Did you believe there was a history of
12 noncompliance with hemodialysis that was known to
13 Dr. Rigot or the nurses?
14   A.  Yes.
15   Q.  What do you base that upon?
16   A.  Dr. Rigot's note saying there's a history of
17 noncompliance with hemodialysis.
18   Q.  You'll have to point that out to me.
19   A.  Okay. I don't know how your pages are noted.
20 The Bronson ED visit, it says, Page 9, right in the
21 middle there, "End stage renal disease, Monday,
22 Wednesday, Friday, Fresenius. Noncompliance."
23   Q.  I guess ours aren't the same.
24   A.  Well, there's two versions. There's two
25 versions of the ED record. There's also Page 14. It

Page 72

1 appears on 9 or 14, in the middle.
2   Q.  I'm sorry. I'm not finding it. Can you give me
3 any other landmarks as to what it's near?
4   A.  Sure. Let's see. Let's go to -- just pull up
5 the ED record. It says, "ED provider notes by Wesley
6 Rigot at 2:26 a.m." Do you see that kind of heading,
7 with an underline?
8   Q.  Yes.
9   A.  And that says Version 2 of 2 or Version 1 of 2
10 next to it?
11      Oh, I see. Here -- okay. So you must be on
12 Version 2 of 2; right? It says, "ED provider note by
13 Dr. Wesley Rigot." Do you see that?
14   Q.  Yes.
15   A.  And then it says -- below that, it says,
16 "Emergency department encounter. First contact. Chief
17 complaint"; right?
18   Q.  Yes.
19   A.  Okay. Turn the page. And then there's a dark
20 heading "Diagnosis." In the middle of the page, it says,
21 "Diagnosis," and a bar. It's basically describing his
22 past medical history. Is all caps heading, "PAST MEDICAL
23 HISTORY."
24   Q.  Okay. I have a heading which says, "PAST
25 MEDICAL HISTORY."

Page 89

1    What was Mr. Dunigan's gait prior to
2  presentation to Bronson and prior to the fall?
3      A.  I don't know.  Again, there's evidence of --
4  there's mention of a previous stroke and partial
5  paralysis.
6      Q.  Do you know whether he was able to ambulate on
7  his own, without a cane, without support, as a baseline
8  condition, meaning before the fall?
9      A.  That I don't know.
10     Q.  Do you -- are you aware of any evidence
11 indicating whether Mr. Dunigan could ambulate on his own
12 any better than is depicted in the waiting room video?
13     A.  No, I don't know.  But I would not expect him to
14 say something wasn't right if it was his normal baseline.
15     Q.  He had no loss of consciousness when he fell;
16 true?
17     A.  That's not documented.
18     Q.  It is documented by the EMS, isn't it?
19     A.  Okay.  I don't know.  I don't have any knowledge
20 that he lost consciousness.  I have no knowledge of that.
21 That would be --
22     Q.  Do you deny it?
23     A.  Okay.  That would be new information to me.  I
24 don't believe he did.
25     Q.  Meaning, if he lost consciousness, that would be

Page 90

1  new information to you?
2      A.  Correct.
3      Q.  And you're not aware of any information
4  indicating that he did lose consciousness; true?
5      A.  Correct.
6      Q.  And the EMS noted that he denied dizziness;
7  true?
8      A.  I don't know about that specifically.  I can
9  look at the record.  I do remember them saying they asked
10 why he fell, and he was unable to provide that
11 information.  They couldn't obtain that.  Let me find
12 that.
13         Well, it says here -- let me see.  It says he
14 ambulated with assistance of the EMT and they asked --
15 they're supposed to ask is the patient unable to
16 ambulate?  Yes, no.  They didn't answer.
17         And then the question about loss of
18 consciousness, is that what we're talking about?
19     Q.  That was one of the things.
20     A.  And the other thing I was looking for was -- oh,
21 they asked him why he fell.  And he was unable to provide
22 an answer to that.  Let me see if I can find that.
23         Do you have that piece?  It might make it
24 faster.  Yeah, the patient was not descriptive in how he
25 had fallen, but he stated that he had fallen at

Page 91

1  6:00 p.m., so --
2      Q.  Did you see the EMT record that said he had no
3  complaints of weakness, dizziness, numbness, tingling,
4  shortness of breath, nausea or vomiting?
5      A.  Right, that's right in the same sentence that
6  says he has no chest pain.  Yes, I see where that's
7  documented.  But it's -- at least one part of that
8  sentence is obviously inaccurate.  We talked about that
9  earlier.
10     Q.  You reviewed the surveillance videos from the
11 emergency department and the external camera outside the
12 hospital and the patrol car camera?
13     A.  Yes, sir.
14     Q.  Up to the time Mr. Dunigan is placed in the
15 police car, are you aware of any indication that he
16 requested any sort of help or medical attention?
17     A.  That he verbally requested that?  No.
18     Q.  Are you aware of any evidence that he asked for
19 any kind of medical care?
20     A.  Not to my knowledge.  No.
21     Q.  Are you aware of whether he stated that he had
22 any sort of medical problem?
23     A.  Again, same answer.
24     Q.  Are you aware of whether he exhibited any
25 shortness of breath?

Page 92

1      A.  Whether he exhibited shortness of breath --
2  whether he complained of shortness of breath or he was
3  perceived to be short of breath?  Or can --
4      Q.  Either.
5      A.  Well, I mean, you know, at some point during
6  his -- if you watch the video, he looks like he's in
7  respiratory distress and failure more so as time goes by.
8  But so from an outside observer, yes.  Does he
9  specifically say, "I'm short of breath, I can't breathe"?
10 Not to my knowledge.
11     Q.  Okay.  That's part of the question.  You're not
12 aware that he ever complained of shortness of breath.
13 When do you believe he exhibited shortness of breath --
14     A.  Well, when he --
15     Q.  -- before the time he was placed in the police
16 car?
17     A.  Well, yeah, I mean, you can see that he's in
18 respiratory failure.  Respiratory distress is probably a
19 better phrase for a lot of the time that he's in the
20 lobby, and then certainly that becomes amplified on
21 the -- when he's loaded into the police vehicle.  It's
22 quite clear he's in respiratory failure at that point.
23     Q.  What is it that you were able to see that told
24 you he was in respiratory distress for a lot of time
25 while he was in the waiting room?

Page 105

1  applies. So I think that for the -- you're pushing the
2  physician and the EMTALA into one thing, and I don't
3  think they are one thing. I think EMTALA is not an
4  event. It's a process whereby the patient remains sort
5  of within the hospital. During that time, I don't really
6  view Dr. Rigot's involvement in this theoretical -- and
7  he tripped and fell and gets discharged to the lobby, is
8  Dr. Rigot off the hook at that point if he doesn't check
9  anything? I think the reasonable answer is yes.
10 However, EMTALA still applies. The patient is still as a
11 continuing part of his hospital stay.
12     Q.  Based on your interpretation of EMTALA?
13     A.  Yes.
14     Q.  After Mr. Dunigan was wheeled into the waiting
15 room, did he ever again present to the hospital for care
16 of an emergency medical condition?
17     A.  I've answered this question. You -- the answer
18 is, he doesn't appear to verbalize anything, but does he
19 re-present? Does he leave the hospital premises and come
20 back and ask to be seen again? No. Does he verbalize
21 something? As best I can tell, no. But is he still part
22 of the same ED stay and ER visit? Yes, I would argue.
23     Q.  After Mr. Dunigan is wheeled into the emergency
24 department, are you aware of any evidence indicating that
25 any hospital employee recognized that he had an emergency

Page 106

1  medical condition?
2       MR. HARRINGTON:  Foundation. Form.
3       THE WITNESS:  It does not appear they did. I
4  think the nurse drove at it with her documentation, but
5  no.
6  BY MR. O'LOUGHLIN:
7      Q.  I'm sorry, I didn't hear that.
8      A.  I said I think the nurse drove at it with her
9  documentation, but no. I don't think it was really
10 recognized.
11     Q.  That what nurse drove at it, with what
12 documentation?
13     A.  The nurse that wrote that he was dizzy, weak,
14 didn't feel right, and so on. That nurse drove at the
15 idea that he was having an emergency medical condition.
16 But I don't -- I wouldn't say that -- I think your
17 question was did anybody -- is there evidence that any
18 hospital person realized that there was an emergency
19 medical condition? And I think I answered no.
20     Q.  That nurse -- neither that nurse, nor any other
21 healthcare provider, indicated in any way that
22 Mr. Dunigan exhibited weakness in the emergency
23 department; true?
24     A.  Not that's documented.
25     Q.  Neither that nurse, nor any healthcare provider,

Page 107

1  nor doctor, indicates that Mr. Dunigan just didn't feel
2  right in the emergency department; true?
3      A.  The nurse documents that there's dizziness. The
4  timing of that dizziness, as we've talked about, is not
5  totally clear. Again, I would answer that question with
6  the caveat that the patient was not really sort of tested
7  or wasn't really ambulated.
8          I've said this over and over. And so, you know,
9  you're asking me is there evidence that they saw that he
10 was weak in the ER? Well, no. There wasn't evidence
11 that they saw that he was weak in the ER. Not until
12 later, when he's out in the lobby.
13     Q.  Do you know whether, out in the lobby, what you
14 observed was his baseline condition or some new weakness
15 or inability to ambulate?
16     A.  I still don't know, as we've -- you've asked me
17 that a couple of times. I still don't know the answer to
18 that question. But it's clear that his weakness is
19 obvious, progressive, and profound, you know, certainly
20 by the time he's being loaded into the police car.
21     Q.  Then let me --
22        THE REPORTER:  I'm sorry. I didn't hear the
23 question and the objection.
24 BY MR. O'LOUGHLIN:
25     Q.  You wouldn't be able to tell from the video or

Page 108

1  any other evidence you've seen that Mr. Dunigan was
2  unable to stand or walk because of his baseline condition
3  or because of some new indication?
4      A.  No.
5      Q.  Or some new condition?
6      A.  No, no, no, no. Your question was about was he
7  feigning or was he putting on, I think? Your question
8  that he objected to.
9      Q.  And you couldn't tell from the video; true?
10     A.  Again --
11        MR. HARRINGTON:  Objection. Form. Foundation.
12 BY MR. O'LOUGHLIN:
13     Q.  Whether he was feigning or putting on or
14 deliberately going limp and not cooperative?
15     A.  No. I could not tell.
16        MR. O'LOUGHLIN:  I'll pass the witness.
17        MR. VANDERLAAN:  Good morning, Doctor. Do you
18 need a break? I'm going to be very short.
19        MR. HARRINGTON:  I do, but I don't know if the
20 doctor does.
21        THE WITNESS:  I'm okay taking a break. I don't
22 need it, but if you want to pause, that's fine.
23        MR. VANDERLAAN:  I don't. I'm going to be very
24 short. So if someone needs a break, that's fine, but --
25        MR. HARRINGTON:  I've got to use the restroom.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

Page 117

1  A.  I hear you.
2      MR. HARRINGTON: Objection to form. Foundation.
3      THE WITNESS: I hear you. Although the video
4  speaks for itself, I think. I don't -- I wasn't there.
5  I don't -- I don't know what they saw, heard and felt.
6  But I have watched the video.
7  BY MR. VANDERLAAN:
8  Q.  You're not attributing any ill motives to the
9  officers, are you?
10     MR. HARRINGTON: Objection to form, as to "ill."
11 I mean, undefined term.
12 BY MR. VANDERLAAN:
13 Q.  Motive. You're not testifying to that, are you?
14 A.  No, sir. Absolutely not.
15 Q.  Okay. Thank you.
16     Do you have any -- do you have any expert
17 criticism of the officers at all, based on your expert
18 opinion?
19 A.  Well, I mean, other than what we've spoken
20 about, no.
21 Q.  Okay. The two officers, when they arrived -- or
22 I'm sorry, one officer was there about a quarter to 6:00
23 and the other officer arrived when he was outside. Both
24 officers were told -- I want you to assume the testimony
25 will be that Mr. Dunigan was acting. Based on the fact

Page 118

1  that -- I mean, your profession allows you to look at one
2  thing probably a little more narrowly. A police officer
3  looks at something in a different light, and similar
4  experiences. Do you understand how the officers would
5  have thought that Mr. Dunigan may have been acting if
6  they were told by security personnel that this fellow was
7  acting and we want him to go to jail?
8  A.  I can understand that they would think that.
9  And I can understand that that's what they were told.
10 That said, though, his physical appearance and attributes
11 make me think that -- you know, make me sure or know that
12 the patient needed a medical evaluation. So as you
13 pointed out, I have a, you know, skewed view of things
14 perhaps, because I'm an emergency physician. But I think
15 the patient's distress was fairly obvious, even to a
16 layperson.
17 Q.  So I take it, can I assume that if you were
18 looking at the video and you have the two officers in the
19 room, you might say to them, "Hey, guys you missed this
20 one," as opposed to, "Why did you try and kill him?" In
21 other words, you're not attributing any malevolent motive
22 to the officers? You would tell the officers, "Fellows,
23 I think you missed this"?
24     MR. HARRINGTON: Form. Foundation.
25     THE WITNESS: I wholeheartedly agree with that

Page 119

1  statement.
2      MR. VANDERLAAN: Okay. All right, Doctor.
3  Thank you. If I never see you again, which I probably
4  may not, I wish you all the best in the world.
5      MR. O'LOUGHLIN: I have a few more, Doctor.
6      THE WITNESS: Yes, sir.
7
8              FURTHER EXAMINATION
9  BY MR. O'LOUGHLIN:
10 Q.  If you can see me.
11 A.  Yep.
12 Q.  Let me ask this: Are you aware of -- based upon
13 everything you've reviewed, are you aware of any evidence
14 that Mr. Dunigan was treated the way he was at Bronson
15 due to any improper motive, such as race, sex, political
16 views, occupation, education, personal prejudice,
17 socioeconomic status?
18 A.  No, sir.
19 Q.  In the emergency department, other than the
20 dizziness noted by the nurse, are you aware or did
21 Mr. Dunigan present with any symptoms so severe that in
22 the absence of immediate medical treatment, his life
23 would be expected to be placed in jeopardy? That's a
24 terrible question, but I'm probably going to ask it
25 again.

Page 120

1  A.  I'm sure you will.
2      I feel like this is the bulk of what we talked
3  about. And that this -- I feel like I've answered the
4  this question. You wanted to know if the nursing note
5  didn't exist, was there evidence that Mr. Dunigan had a
6  life-threatening condition?
7  Q.  I'll start with that.
8  A.  And the answer is yes. Because of these issues
9  of he fell, we don't know why he fell. Even removing the
10 nurse's knowledge of he fell because he was dizzy and
11 didn't feel right, removing that, then it leaves a
12 question mark and a void. Why did he fall? That's not
13 addressed. So this is the same answer I've given in the
14 past.
15 Q.  All right. And my question was intended to be a
16 little different, so let me try it again.
17     I'm talking about the symptoms he actually
18 exhibited in the emergency department. Even if we
19 include the dizziness, were those symptoms such that --
20 so severe that in the absence of treatment, one would
21 expect his life to be in jeopardy?
22 A.  I have a hard time with this question, because
23 it seems you're teasing apart Mr. Dunigan from his
24 reality, which is he fell for an unknown reason and he
25 missed his dialysis. And so you're asking me to ignore

Page 133

1  was unable to follow commands or he was refusing to
2  follow commands; right?
3    A.  Right. I don't know.
4    Q.  It would be speculation on your part to decide
5  which of those was the case?
6    A.  Correct. I don't know his intent or exactly.
7  That's right.
8    Q.  Okay. Now, based on everything we've talked
9  about, if hypothetically EMTALA requires that the
10 hospital personnel actually recognize an emergency
11 medical condition exists, would you agree that no Bronson
12 employee violated EMTALA in this case?
13       MR. HARRINGTON: Form. Foundation.
14       THE WITNESS: You're saying if they did
15 recognize -- wait. Repeat it again, I'm sorry.
16 BY MR. O'LOUGHLIN:
17   Q.  If EMTALA requires that the hospital personnel
18 actually recognize an emergency medical condition exists,
19 you would agree that Bronson personnel did not violate
20 EMTALA in this case?
21   A.  But that's not --
22       MR. HARRINGTON: Same objection.
23       THE WITNESS: That's not what EMTALA says. The
24 preface to your question is if EMTALA says you have to
25 recognize it. That's not what the EMTALA says. It says

Page 134

1  you have to screen for an emergency medical condition.
2  It doesn't say have to recognize it.
3  BY MR. O'LOUGHLIN:
4    Q.  I asked hypothetical -- that's why I asked you
5  hypothetically. I don't expect you to know the law. I
6  don't expect you to know how courts interpret EMTALA. So
7  hypothetically, if EMTALA requires that the hospital
8  personnel actually recognize an emergency medical
9  condition exists, you would agree that under your
10 analysis, Bronson did not violate EMTALA in this case?
11       MR. HARRINGTON: Objection to form. Foundation.
12       THE WITNESS: I honestly am not sure how to
13 answer that question, because you're asking me about a
14 theoretical statute.
15       MR. HARRINGTON: And you're asking him about a
16 legal conclusion. And I don't think that's appropriate.
17 BY MR. O'LOUGHLIN:
18   Q.  Doctor, do you agree that based upon everything
19 you've reviewed, you are unable to say that any Bronson
20 personnel actually recognized that Mr. Dunigan had an
21 emergency medical condition that might be
22 life-threatening?
23   A.  It does appear that the staff of the hospital
24 failed to recognize that he had an emergency medical
25 condition.

Page 135

1    Q.  Thank you. I appreciate it.
2        Does that mean the answer to my question is yes,
3  you can't say that any Bronson personnel actually
4  recognized that Mr. Dunigan had an emergency medical
5  condition?
6    A.  Exactly. They failed to recognize that he had
7  an emergency medical condition, yes, we're saying the
8  same thing now.
9    Q.  We are. Except now given that, if you assume
10 that EMTALA requires that they actually recognize an
11 emergency medical condition, then given that you agree
12 that there's no evidence that they did recognize it, they
13 did not violate EMTALA?
14       MR. HARRINGTON: Form. Foundation. Calls for a
15 legal conclusion.
16       Doctor, if you know what the courts have ruled
17 and how they've interpreted this across the country and
18 within this Sixth Circuit, go ahead and answer.
19       MR. O'LOUGHLIN: I don't think that requires any
20 of that. It just requires him to answer the
21 hypothetical.
22       MR. HARRINGTON: No. I think it does require
23 him to know that. Because you're asking him to -- with
24 your constrained hypothetical and saying how the courts
25 have interpreted EMTALA, did they violate it? I mean,

Page 136

1  that's a question that the court is going to have to
2  decide, or the jury. So I don't think it's appropriate
3  for this expert to answer that question as phrased. I
4  think you need to rephrase it.
5  BY MR. O'LOUGHLIN:
6    Q.  Can you answer the question, Doctor?
7        MR. HARRINGTON: Same objection. I don't think
8  you can.
9        THE WITNESS: I honestly --
10       MR. HARRINGTON: Calls for a legal conclusion.
11       THE WITNESS: Yeah. As well it's -- you're
12 taking this -- you're taking EMTALA and you're carving
13 something out of it saying, well, they have to recognize
14 that there's a problem. And then in that circumstance,
15 where you've already said that they -- they didn't
16 recognize that there was an emergency medical condition,
17 now is to be applied to the circumstance where EMTALA has
18 to -- has to have the person recognize it and they --
19 they're saying they failed to recognize it. So I guess I
20 have a very difficult time with this -- this question.
21 BY MR. O'LOUGHLIN:
22   Q.  But you do appreciate the difference between
23 actually recognizing the correct diagnosis and
24 negligently failing to make the diagnosis, don't you?
25   A.  That's a little blurred.

LEVINE, M.D.; SAUL
02/27/2018
Pages 137–140

Page 137

1   Q.  Let me ask this one:  If EMTALA requires that
2  hospital personnel have an improper motive for failing to
3  recognize and stabilize a patient's emergency medical
4  condition, you would agree that you could not say that
5  any of the hospital personnel -- or there's evidence that
6  any of the hospital personnel had an improper motive;
7  true?
8       MR. HARRINGTON:  Form foundation.
9       Go ahead.
10      THE WITNESS:  I don't think there's any evidence
11  that hospital personnel had a malicious approach to this
12  gentleman's care.
13      Does that answer your question?
14  BY MR. O'LOUGHLIN:
15   Q.  And if that's a required element of EMTALA, then
16  you would not be able to say that EMTALA was violated in
17  this case; true?
18   A.  I think you're asking me to answer a legal
19  question.  I think --
20   Q.  Well, I'm asking for your --
21   A.  So --
22   Q.  I'm asking you for your knowledge, based upon
23  your review of the materials and assuming that a required
24  element of an EMTALA violation is that the hospital
25  personnel did so for an improper motive, such as race,

Page 138

1  sex, political views, occupation, education, personal
2  prejudice, socioeconomic status or the availability of
3  insurance, you would not be able to say that any of those
4  were factors in this case?
5   A.  I don't -- I don't believe that they were
6  factors in this case.
7   Q.  All right.  Do you know whether Mr. Dunigan was
8  treated any differently than any other paying patient who
9  presented with the same symptoms and conditions?
10  A.  I would like to think that a patient that missed
11  his dialysis and is dizzy and falling would have a
12  different evaluation, but I don't have any reason to
13  believe that they treated Mr. Dunigan differently because
14  of his race or insurance, for instance.
15  Q.  Based upon your review and everything you know
16  about this case, did the hospital personnel actually
17  determine that Mr. Dunigan had an emergency medical
18  condition which could be life-threatening?
19  A.  It doesn't appear they did.
20  Q.  And if hypothetically EMTALA says and requires
21  that the hospital personnel determine that the individual
22  has an emergency medical condition, then the defendants
23  didn't violate EMTALA because of that requirement; true?
24      MR. HARRINGTON:  Counsel, now you're asking the
25  same thing again about the legal standards, and I don't

Page 139

1  think that's appropriate.  I'm going to object to the
2  form and foundation of the question.
3  BY MR. O'LOUGHLIN:
4   Q.  You can answer my question.
5       MR. HARRINGTON:  As long as it doesn't require
6  him to do a case law analysis of what the courts
7  determined.  I don't know that he can.
8       MR. O'LOUGHLIN:  It was a hypothetical.
9       MR. HARRINGTON:  You're saying what the courts
10  determined.  You keep throwing that in there.
11      MR. O'LOUGHLIN:  No.  I'm reading from EMTALA.
12      MR. HARRINGTON:  Oh, so you're reading from a
13  statute or case law interpreting a statute?
14      MR. O'LOUGHLIN:  No.  I'm asking him to assume
15  this interpretation and then agree with my conclusion.
16  What I'm asking him to assume is that EMTALA is not
17  violated unless the hospital personnel actually
18  determined that the individual has an emergency medical
19  condition.
20  BY MR. O'LOUGHLIN:
21  Q.  Based on that assumption, would you agree that
22  EMTALA was not violated in this case?
23      MR. HARRINGTON:  Doctor, that calls for a legal
24  conclusion.  If you -- if you know the law well enough to
25  answer, go ahead and answer.

Page 140

1       THE WITNESS:  I can't answer the question as
2  thoroughly as he would like me to.  But I think that
3  the -- the assumption that the hospital has to be aware
4  that they're sending somebody out with an emergency
5  medical condition, that's not really the intent of that
6  statute, I don't think.  Just because the hospital is
7  unaware of the dangerous condition doesn't absolve them
8  of the obligation to look for it or to stabilize it.
9  BY MR. O'LOUGHLIN:
10  Q.  Well, now you are getting into interpreting
11  statutes and giving legal conclusions.  I'm trying to
12  avoid that by asking you to assume that EMTALA requires
13  what it says it requires, which is that the hospital
14  determine that the individual has an emergency medical
15  condition.  If that is required for a violation of
16  EMTALA, would you agree that these defendants did not
17  actually determine that Mr. Dunigan had a -- an emergency
18  medical condition, and therefore, did not violate EMTALA?
19      MR. HARRINGTON:  Counsel, with all due respect,
20  we're going round and round.  You're asking him about
21  making legal conclusions, and then he's trying to give
22  you an answer, and then you're trying to say no, I'm
23  trying to steer you away from making legal conclusions.
24  What do you want this expert to do?
25      MR. O'LOUGHLIN:  The record speaks for itself.