# In the Matter Of:

# DUNIGAN vs OFFICER NUGENT, ET AL.

# CHARLES F. LANDERS, M.D.

February 09, 2018

*Prepared for you by*



US Legal Support

The Power of Commitment™

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy


DEFENDANT'S EXHIBIT H

**Page 29**

1  Q.  (By Mr. O'Loughlin) Right. And I am just
2  trying to narrow it to that and make sure that I am
3  not missing anything because you do understand that
4  this is my only opportunity to learn your opinions
5  before trial?
6  A.  I understand that. And my intent is to
7  focus as mentioned.
8  Q.  Okay. Do you have any opinions as to
9  violations of the standard of care on the part of
10 any of the licensed health care professionals,
11 physicians, EMTs, nurses, radiologists or anyone
12 else who was a licensed health care professional
13 involved in Mr. Dunigan's care on May 6, 2016?
14 A.  No, and that would include the unlicensed
15 employees of the hospital and Bronson, like the
16 registration people as well.
17 Q.  Okay. Do you have any opinion as to
18 whether the health care professionals involved in
19 Mr. Dunigan's care from the presentation at the
20 emergency department through the time that Mr.
21 Dunigan was discharged to the waiting room, in that
22 period of time, do you have any opinion as to
23 whether any of those people in any way violated
24 EMTALA?
25 A.  I have no opinion about that.

**Page 30**

1  Q.  Do you know what EMTALA is?
2  A.  Yes.
3  Q.  What is your understanding of what EMTALA
4  is?
5  A.  In general terms it is an anti-dumping
6  federal law that for the individual facility that
7  involves evaluating medically any person who seeks
8  attention.
9  Q.  From your review of the records of Mr.
10 Dunigan's emergency room care, in other words, the
11 the medical records, did you make a determination as
12 to whether his presenting condition was life
13 threatening?
14 A.  I think on presentation it was potentially
15 life threatening.
16 Q.  Was it a condition which in your opinion
17 if not treated at that time was likely to cause his
18 death or serious impairment, again as of the time of
19 presentation?
20 A.  He was evaluated but not treated, and he
21 was perceived to be stable by the health care
22 providers at that time. The standard of care issues
23 regarding their performance, my understanding is,
24 will be addressed by a plaintiff's emergency room
25 physician.

**Page 31**

1  Q.  But you are the one we are deposing today
2  so I just want to confirm what your opinions are.
3  You mentioned another item. Based upon your review
4  of the medical records themselves over the time
5  period I have talked about, in other words, up
6  through the time Mr. Dunigan was wheeled into the
7  waiting room, was his condition stable?
8  A.  It was felt to be by the people providing
9  care. And the extent to which it may have been life
10 threatening was not evaluated. And they didn't --
11 there were many things that weren't done. They
12 focused only on the presenting complaint.
13 Q.  What was the presenting complaint?
14 A.  It was referred to by the triage nurse as
15 flank pain and chest pain by the EMTs and by the
16 emergency physician Dr. Rigot.
17 Q.  And what was the history of that
18 complaint?
19 A.  On the preceding day, Thursday, he had
20 been on a bus and fell striking his chest and hip on
21 concrete, and subsequent to then, had increasing
22 pain, up to 9 on a scale of 10, which was
23 intolerable, and led to his calling for the
24 paramedics to bring him in as seen on the tapes. He
25 felt he was bleeding inside.

**Page 32**

1  Q.  And was there any evidence that he was
2  bleeding inside?
3  A.  On subsequent evaluation with x-rays did
4  not reveal that. He didn't have any lab work done.
5  But on exam and x-rays he was felt not to be
6  bleeding inside.
7  Q.  Were his vital signs stable?
8  A.  His vital signs were abnormal when he
9  arrived. They were repeated when his heart rate
10 dropped from 113 to 90. He had no vitals done prior
11 to discharge as would be the usual case in my
12 experience.
13 Q.  With the repeat vitals and the heart rate
14 of 90, were the vital signs within normal range?
15 A.  Yes. They were improved and normal.
16 Q.  Would it be accurate to say that you did
17 not find Mr. Dunigan to have a life threatening
18 condition from the time he came to the emergency
19 department to the time he was taken to the waiting
20 room?
21 A.  We have limited information. I don't have
22 enough information to say with confidence that he
23 didn't have a serious or life threatening problem.
24 The focused evaluation regarding his initial
25 complaint did not appear to be life threatening to

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 33-36

Page 33

1  the providers. I understand that.
2      Q.   Are you aware of any evidence that any of
3  the health care providers thought that Mr. Dunigan
4  had a life threatening condition during that time
5  frame?
6      A.   No. I believe they did not think he had a
7  life threatening problem. I understand that.
8      Q.   What is your understanding as to Mr.
9  Dunigan's cause of death?
10     A.   He had a change in status after his
11 discharge from the emergency room, and while waiting
12 in the waiting area and during the logistics of
13 eviction and subsequent transfer to the police
14 vehicle and to jail. He was without vitals signs
15 when checked at the jail and died in transit.
16          The explanation of that I included in my
17 report and I continue to have as my opinion is that
18 he had multiple severe medical problems with
19 physical and mental impairments, and that the actual
20 cause of the death was an altered level of
21 consciousness with several potential causes
22 including metabolic derangements seen in diabetes
23 and with renal failure, arrythmia through metabolic
24 changes in the setting of critical coronary disease,
25 pulmonary edema and multiple drugs on board.

Page 34

1      Q.   Are you able to say which of those
2  conditions actually caused his death?
3      A.   Well, ultimately it is a cardiac arrest,
4  cardiopulmonary arrest with arrythmia. The only
5  arrythmia documented in the jail attempted
6  resuscitation was something called pulseless
7  electrical activity. And prior to having a monitor
8  and the medical personnel arriving 15 minutes after
9  his recognized loss of vitals, he had an automated
10 electrical defibrillator applied which did not
11 identify a shockable arrythmia which is consistent
12 with the pulseless electrical activity. I think
13 that was the ultimate thing that lead to his death
14 at that time.
15     Q.   An arrythmia?
16     A.   It is an arrythmia, yes. Actually it is
17 -- there is rhythm on an electrical basis without
18 pulse. It is a cause of the sudden death referred
19 to as an arrythmia.
20     Q.   Given Mr. Dunigan's history of end stage
21 renal disease, diabetes, coronary artery disease and
22 other cardiovascular disease, would he have been at
23 an increased risk to suffer an arrythmia at any
24 time?
25     A.   Yes, particularly on the days prior to

Page 35

1  when he was due to be dialyzed.
2      Q.   What is your understanding of when Mr.
3  Dunigan was last dialyzed?
4      A.   I don't have a precise date. He was in
5  Borgess recently. The emergency room physician
6  thought he just been discharged within days. There
7  is no specific mention of when he had last been
8  dialyzed. But he had been dialysed twice a week
9  there. He was due to be dialyzed on the day that he
10 died, so that would, under normal circumstances,
11 mean he had not been dialyzed for the two preceding
12 days at least.
13     Q.   And did you note that the history he gave
14 was that he had been dialyzed twice that week --
15     A.   Yes.
16     Q.   -- and was scheduled later that day?
17     A.   That he got it twice at Borgess but it
18 didn't say, to my recollection, which days that
19 week. But in a normal circumstance, he was
20 scheduled for Friday. And he was a three times a
21 week dialyzed patient, so it would normally be on
22 Monday, Wednesday, Friday.
23     Q.   That would be a reasonable conclusion from
24 him saying he had been dialyzed twice that week and
25 was scheduled later that day on Friday?

Page 36

1      A.   I am not sure he said twice that week. I
2  thought he said he had it twice at Borgess. He may
3  have said twice that week but I think that is a
4  reasonable scheduling interval. He would not
5  normally be dialyzed on Sunday.
6      Q.   And not to quibble with the facts, but if
7  you assume that the emergency department report by
8  Dr. Rigot says, under history of present illness,
9  patient admitted discharged from Borgess recently,
10 had dialysis twice this week while there. Scheduled
11 dialysis tomorrow, open paren, Friday, close paren,
12 would it be reasonable from that history to assume
13 that he had dialysis twice that week and was
14 scheduled to have it again that same day, later in
15 the day on Friday?
16     A.   Yes. Thank you for clarifying that week,
17 but when he says he is due to have it tomorrow, it
18 is always a question in the middle of the night what
19 you call which day. Is that the same day he was
20 being seen between 2:00 and 4:00 a.m.
21     Q.   So given that uncertainty, is it correct
22 it would be appropriate for the person taking the
23 history to specifically note that tomorrow meant
24 Friday because the patient was being seen in the
25 middle of the night or early in the morning on

LANDERS, M.D., CHARLES ..
02/09/2018
Pages 45–48

Page 45

1  which the following proceedings were held:)
2      Q.   (By Mr. O'Loughlin)  We can go back on the
3  record.
4           Doctor, from your review of the video or
5  any other information that you have relating to this
6  case, are you aware of any evidence that Mr. Dunigan
7  after he is taken to the waiting room was ever asked
8  to be seen again by a health care professional?
9      A.   People have said he did not, and there was
10 no indication.  On the films I had, it was all
11 visual, not audio, but I have no indication that he
12 did ask to be seen again.
13     Q.   You would agree that Mr. Dunigan in the
14 waiting room up until the time he was asked to leave
15 was able to ambulate without the assistance of any
16 other person?
17          MR. HARRINGTON:  Objection to form and
18 foundation.
19          THE WITNESS:  Yes.  He required mechanical
20 assistance from his cane and furniture but there
21 were no other personnel assisting him.
22     Q.   (By Mr. O'Loughlin)  Doctor, from your
23 review of the video in the waiting room up until the
24 time he was asked to leave, did you make an opinion
25 as to whether Mr. Dunigan exhibited any difficulty

Page 46

1  or distress?
2      A.   He was in not in obvious distress.  He was
3  somnolent and sleeping with diminished level of
4  consciousness much of the time, but there was no
5  obvious distress to my review.  And there was no
6  disruptive behavior.
7      Q.   I am sorry.  But from your review of that
8  video up until the time he was asked to leave, did
9  it appear that Mr. Dunigan was at times trying to
10 sleep in chairs or a chair in different locations?
11          MR. HARRINGTON:  Object to form and
12 foundation.
13          THE WITNESS:  That appeared to be the
14 case.  He would move from one single chair to a
15 double chair and put his leg up over the rails and
16 had his head down.  It didn't look like he slept
17 much because he was periodically moving to try to
18 get more comfortable, it looked like.
19     Q.   (By Mr. O'Loughlin)  Would you consider
20 that normal behavior for anybody attempting to sleep
21 in chairs in a waiting room, or an airport or any
22 place like that?
23     A.   I think it is common behavior, yes.
24     Q.   Are you aware of any evidence that Mr.
25 Dunigan ever made a complaint to security officers

Page 47

1  or the police officers about any medical problems?
2      A.   They said that he did not.  That is the
3  information I have.  The only time he made a comment
4  that was worrisome is when they wanted him to stand
5  up, and he said that his legs weren't ready and he
6  could not stand.
7      Q.   Up to that point had you seen or heard
8  anything, or are you aware of any evidence that Mr.
9  Dunigan ever complained of any medical condition or
10 asked for care for any medical treatment?
11     A.   I am not aware of a request or a
12 complaint.
13     Q.   Are you aware of any time after he went to
14 the waiting room that Mr. Dunigan again presented to
15 the emergency department seeking care for a medical
16 condition?
17     A.   That is to me the same question.  He did
18 not as far as I know.
19     Q.   Up to the time that Mr. Dunigan was placed
20 in the police car, are you aware of any evidence
21 that he experienced any respiratory distress?
22     A.   No.  I am not aware of any respiratory
23 distress.  Unfortunately, the video of his upper
24 body is blocked by the trauma emergency room sign
25 but I have no information about respiratory

Page 48

1  distress.
2      Q.   Up to the time he was placed in the police
3  car, are you aware of any evidence indicating that
4  Mr. Dunigan lost consciousness?
5      A.   Only the diminished level of consciousness
6  associated with sleep is what I am aware of.
7      Q.   Okay.  Up to the time he was placed in the
8  police car, are you aware of any evidence that Mr.
9  Dunigan was obtunded, O-B-T-U-N-D-E-D?
10     A.   Again, it is an interpretation of someone
11 who has diminished level of consciousness.  I
12 thought he was most likely asleep, not obtunded.
13 Obtunded to me means he is unarousable, but if no
14 one is checking I can't tell what his real level of
15 consciousness is.
16     Q.   Are you aware of evidence that he was
17 speaking with the security officers and the police
18 officers?
19     A.   He did speak some.  They said he was
20 mumbling a lot.  The main thing I recall is when
21 they asked him to leave, he asked to be taken to
22 jail.  I guess that was interpretable because it was
23 also overheard by people at the triage registration
24 desk.
25     Q.   You would not interpret that statement as

LANDERS, M.D., CHARLES F.
02/09/2018
Pages 65–68

Page 65

1  understand why they didn't interpret it that way.
2  Q.   But you are concerned that they didn't
3  interpret it that way, true?
4  A.   Why else would he have called himself a
5  scape goat from the security guards in regards to
6  the police officers' testimony that he was
7  sandbagged by information that was inaccurate.
8  Shoemaker said he was up walking around without
9  assistance.  Shoemaker wasn't even there.
10 Q.   Do you recall my question?
11 A.   Yes.
12 Q.   Would you answer it please?
13 A.   I just did.
14      MR. HARRINGTON:  Asked and answered.
15 Q.   (By Mr. O'Loughlin)  My question was, I
16 believe, Doctor, I heard you are concerned that
17 neither the security officers nor the police
18 officers believed and recognized that Mr. Dunigan
19 was in -- had some serious medical problem?
20 A.   What's the question?  There was no
21 question in that.
22 Q.   Do you agree -- you would agree that
23 neither the security officers nor the police
24 officers actually recognized that Mr. Dunigan had
25 any sort of medical problem, true?

Page 66

1  A.   I think they did not recognize it.
2  Q.   You think they did not recognize it, is
3  that what you said?
4  A.   Yes.  I have said that right along.
5  Q.   In your expert opinion, did Mr. Dunigan
6  have any responsibility for the events in this case?
7       MR. HARRINGTON:  Objection to form and
8  foundation, broad, vague, ambiguous.
9       THE WITNESS:  I think he is not the
10 responsible party.
11 Q.   (By Mr. O'Loughlin)  Based upon all you
12 have reviewed, you are of the opinion Mr. Dunigan is
13 not responsible for any of the events in this case?
14      MR. HARRINGTON:  Objection to form and
15 foundation.  I am sorry, counsel, it is really,
16 really broad.  I don't know what you mean.
17      THE WITNESS:  There are a lot of events,
18 what time are you talking about?
19 Q.   (BY Mr. O'Loughlin)  Was Mr. Dunigan
20 obligated in your opinion to provide an accurate
21 medical history in the emergency room?
22 A.   Yes.
23 Q.   Was Mr. Dunigan, in your opinion,
24 obligated to the follow sufficient recommendations?
25 A.   Yes.  I think he has some obligations to

Page 67

1  follow directions.  I have no indications he did
2  not.
3  Q.   Was Mr. Dunigan, as a presumed reasonable
4  person, obligated to advise someone if he was having
5  a severe medical problem?
6  A.   If he was capable of it, yes.
7  Q.   And was able to do so?
8  A.   Right.  If he was capable of it.
9  Q.   Based upon your review, are you aware of
10 whether Mr. Dunigan was compliant with his
11 recommended dialysis schedule?
12 A.   There are references in the Borgess record
13 that he, at times, was not compliant with his
14 dialysis schedule or other things.
15 Q.   Do you agree that he did have end of stage
16 renal disease?
17 A.   Yes.
18 Q.   Probably to effect the result of not
19 complying with a dialysis schedule to be with a
20 patient with end stage renal disease?
21 A.   He was still making urine and taking
22 diuretics, and it is not clear what the consequences
23 of skipping a dialysis session were in those
24 records.
25 Q.   Are you talking in general that would

Page 68

1  affect the consequences of failure in keeping to the
2  dialysis schedule to be a patient with end stage
3  renal disease would be?
4  A.   He could feel worse at the time when he
5  didn't get his dialysis from fluid overload or other
6  issues related to his health.
7  Q.   The article that you chose to look at from
8  the National Kidney Foundation, you believe that to
9  be authoritative?
10 A.   Not necessarily.  It is intended for
11 patients, and it gives broad answers to frequently
12 asked questions.
13 Q.   Do you believe it is reliable?
14 A.   I think it is a reliable source.  And I
15 have no reason to think it is not reliable.  It is
16 not authoritative.  It doesn't have the authors and
17 the references to each and every comment made in it.
18 Q.   Actually it has, Doctor.  It has about 167
19 references, does it not?
20 A.   No.  It is four pages and no references.
21 Q.   Oh, I am sorry.  I was looking at the
22 UpToDate information.  The UpToDate information has
23 167 references, true?
24 A.   Yes.  It is a different style document
25 from the electronic data base.

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 129–132

Page 129

1  EMTALA statute say?
2    A.  I am not an experienced person with it. I
3  wouldn't pretend to be an expert. I have been
4  instructed about how to apply it to my practice and
5  I know the emergency room facility people have been
6  instructed about how to apply it to them.
7    Q.  What does EMTALA stand for?
8    A.  It is not -- in broad lay terms, it is a
9  no dumping law where if somebody comes to you, you
10 can't just send them away without having at least
11 done a screening medical evaluation if they request
12 it.
13   Q.  Do you understand that EMTALA is an
14 acronym?
15   A.  Yes.
16   Q.  Do you know what it is an acronym for?
17   A.  It is emergency medicine treatment and
18 then I don't know the rest of the numbers or names.
19 It is not too important to me.
20   Q.  Do you know what the statute says?
21   A.  I told you what I have been told. I have
22 not read the law and I do not know what the statute
23 says. I have had it interpreted to me by risk
24 management people for the hospital as well as
25 emergency, the head of the emergency room who deal

Page 130

1  with it every day. My kind of involvement was with
2  inner facility transport, transfers.
3    Q.  Do you claim that EMTALA was in any way
4  violated by Bronson Hospital up to the point that
5  Mr. Dunigan was discharged from the emergency
6  department and wheeled into the waiting room?
7    A.  No.
8    Q.  I think this was covered earlier but I
9  should cover it again. Do you know of any evidence
10 that while on Bronson's premises any Bronson
11 employee actually recognized and had actual
12 knowledge that Mr. Dunigan had an emergency medical
13 condition?
14         MR. HARRINGTON: Form and foundation.
15         THE WITNESS: No. It is their subsequent
16 testimony that they did not think he had an
17 emergency.
18   Q.  (By Mr. O'Loughlin) You are not aware of
19 any evidence to the contrary, true?
20         MR. HARRINGTON: Foundation and form.
21         THE WITNESS: About their thoughts, I have
22 no other information.
23   Q.  (By Mr. O'Loughlin) At the time he
24 initially came to the emergency department via EMS,
25 you would agree that Mr. Dunigan did not have severe

Page 131

1  symptoms, such that the absence of immediate medical
2  attention would be expected to result in his death,
3  true?
4    A.  No. In 9 and out of 10 pain --
5    Q.  True?
6    A.  He had 9 out of 10 chest pain and I think
7  you cannot say based on his presentation that he
8  didn't have anything life threatening. That's why
9  he was there.
10   Q.  Okay. But you are not, as I understood
11 earlier, you are not critical of the evaluation he
12 received in the emergency department, are you?
13   A.  I am not. You are talking about when he
14 presented.
15   Q.  And what you are saying that his symptoms
16 of 9 out of 10 chest pain in and of themselves could
17 be a life-threatening condition?
18   A.  Sure. In a complicated man with
19 dialysis, diabetes, heart disease, hypertension and
20 previous stroke and dizzy.
21   Q.  And with the specific history he gave of a
22 mechanical fall and trauma to his chest or flank,
23 would that explain the source of those same
24 complaints?
25   A.  That was the emergency room physician's

Page 132

1  interpretation. The actual evidence that was a
2  mechanical fall, that his cane tip slipped or
3  something happened is something I don't see in the
4  record. The nurse said he was dizzy, and the
5  patient struck the ground after a fall. There was
6  no loss of consciousness, despite what Dr. Schwartz
7  says, and I think it probably is a mechanical fall.
8  But it is not a mechanical fall as described by the
9  patient, I didn't think.
10         That was the conclusion made, but I think
11 that to ignore the fact that the guy had heart
12 disease, was dizzy, and not evaluate his cardiac
13 condition is one of the questions in the care that I
14 assume will be addressed by the emergency room
15 expert for the plaintiffs. That is Saul Levine.
16   Q.  Did Mr. Dunigan give the history that his
17 chest pain complaints were caused by a fall where he
18 hit his chest or right flank?
19   A.  Yes, but that's not to say it is
20 mechanical, if you are dizzy. Dr. Schartz thinks he
21 arrythmia then. I don't see evidence for either as
22 being definitive. I suppose you can call it a
23 mechanical fall because he hit the ground, but what
24 caused the fall. That is the ultimate question
25 about whether it is mechanical or not.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

**Page 133**

1  Q.  Given his history of a fall, which the
2  patient reported, was the source of his chest pain
3  was he reasonably screened when he was in the
4  emergency department?
5      MR. HARRINGTON:  Objection to form.
6      THE WITNESS:  You want to talk standard of
7  care for the emergency room evaluation?  I thought
8  that was going to be somebody else?
9      MR. HARRINGTON:  Doctor, go ahead.  He
10 asked you a question.  Go ahead and answer as you
11 see fit.
12     THE WITNESS:  I think anybody with a known
13 cardiac disease, previous MI on dialysis with a fall
14 with chest discomfort needs to be put on an EKG
15 monitor and have a 12-lead electrocardiogram done at
16 a minimum, as well as having lab work done about the
17 status of his metabolic situation as a diabetic with
18 end stage rental disease.
19 Q.  Do you recognize this is not a negligence
20 or a malpractice case?
21 A.  Yes.
22     MR. HARRINGTON:  Well, I would object.
23 That is currently pending in this action.
24     MR. O'LOUGHLIN:  That is the one we are
25 taking the deposition in, Jim.  I guess we are going

**Page 134**

1  to have to take his deposition again.
2      MR. HARRINGTON:  Yes, I know.  We will.
3  That's what I am saying, we will.  When you said
4  this case, I don't know if you are referring to
5  solely the case number, you know, that has a EMTALA
6  case or in a broad sense the case referring to the
7  care and treatment of Mr. Dunigan.
8      MR. O'LOUGHLIN:  To my knowledge there is
9  no other case.
10     MR. HARRINGTON:  Not yet.
11     MR. O'LOUGHLIN:  Which means at present,
12 when I am asking the question there is no other
13 case, true?
14     MR. HARRINGTON:  No, there has not been
15 one filed.  I just want to make sure our definitions
16 of the case are the same.  Sometimes physicians
17 would use the word case as in the entire care and
18 treatment of the patient, and sometimes us lawyers
19 when we say case, all we are referring to is just
20 the current case number.  That is all.  I just want
21 to make sure we are on the same page.
22 Q.  (By Mr. O'Loughlin)  Doctor,  amongst the
23 things you reviewed were the Complaint and Amended
24 Complaint, true?
25 A.  I think there were comments in the

**Page 135**

1  complaint that wouldn't have been things that I
2  would have been responsible for, or the way I would
3  have said them.  They were prepared at the beginning
4  of the case by the attorneys involved and some of
5  the things in that are not the things that I would
6  have put in.
7  Q.  Do you recall my question?
8  A.  Yes.
9  Q.  My question was, among the things you
10 reviewed, on the list of things that you reviewed
11 were the Complaint and Amended Complaint, true?
12 A.  Yes.
13 Q.  Do you understand the case against Bronson
14 Methodist Hospital are pending currently in federal
15 court in which they supposedly today allege any
16 liability on the part of Bronson other than for an
17 alleged violation of EMTALA?
18 A.  I think that is the bulk of the Complaint.
19 What I am referring to is the historical description
20 in the Complaint that describes his condition.
21 Q.  Assuming that the only theory of liability
22 against Bronson, in this pending lawsuit, is for a
23 violation of EMTALA.  You have agreed that Bronson
24 did not violate EMTALA at any point up until Mr.
25 Dunigan was discharged from the emergency room

**Page 136**

1  department to the waiting room, true?
2  A.  Yeah.  I think I said that before.
3  Q.  After that time you would agree that there
4  was never another time when Mr. Dunigan presented to
5  the emergency room department seeking medical care,
6  true?
7  A.  True.
8  Q.  And you agree that based upon your review
9  and everything you have seen in the case, no one
10 from Bronson Hospital ever actually determined that
11 Mr. Dunigan had a life-threatening emergency medical
12 condition, true?
13     MR. HARRINGTON:  Objection to form.
14     THE WITNESS:  Yes.  There is nothing that
15 says they thought that.  No one asked him if he
16 wanted to be seen again as far as I could tell.
17 Q.  (By Mr. O'Loughlin)  And he never said he
18 wanted to be seen again, true?
19 A.  Again, true.
20 Q.  Mr. Harrington asked you about the nurses
21 interaction with Mr. Dunigan, and I believe he was
22 referring to him while he was in the waiting room.
23 Are you aware of any intervention between the nurses
24 or medical assistants sitting at the desk in the
25 video and Mr. Dunigan?

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U.S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy