```
                                                                    Page 1
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3   GORDA DUNIGAN, as Personal
     Representative for the
 4   ESTATE OF JAMES DUNIGAN,
     Deceased,
 5
            Plaintiff,
 6                                         Case No. 1:16-CV-01324
      vs.
 7                                         Hon. Ellen S. Carmody
     BRONSON METHODIST HOSPITAL,
 8
            Defendant.
 9   _____/

10
     GORDA DUNIGAN, as Personal
11   Representative of the ESTATE
     OF JAMES DUNIGAN, Deceased,
12
            Plaintiff,
13                                         Case No. 1:16-CV-01324
      vs.
14                                         Hon. Ellen S. Carmody
     DEREK NUGENT, et al.,
15
            Defendants.
16   _____/

17
              DEPOSITION OF C. DENNIS SIMPSON, Ed.D.
18
        Taken by the Defendants on the 26th day of February, 2018, at
19      the offices of O'Brien & Bails, 141 East Michigan, Suite 206,
        Kalamazoo, Michigan, at 1:17 p.m.
20

21   APPEARANCES:

22   For the Plaintiff:     MR. JAMES J. HARRINGTON, IV (P65351)
                            FIEGER, FIEGER, KENNEY & HARRINGTON
23                          19390 West 10 Mile Road
                            Southfield, Michigan 48075
24                          248-355-5555
                            j.harrington@fiegerlaw.com
25
```

DEFENDANT'S EXHIBIT I

Page 26
1    the tape.
2  Q. What was Mr. Dunigan's baseline as far as ambulation was
3    concerned?
4       MR. HARRINGTON: I'm sorry. Form and foundation.
5    Can you give a little bit better of a timeframe?
6  BY MR. O'LOUGHLIN:
7  Q. Before he was in the ambulance and taken to Bronson Hospital,
8    what was his baseline?
9  A. I have no idea. I know he had a cane.
10 Q. You don't know anything beyond that?
11 A. I know nothing about that except the cane fell away from him
12    and he lost track of it for a while on the video.
13 Q. Let's stick with my question. Before he was picked up by the
14    ambulance, that day, the day before, the day before that, the
15    week before that, what was his baseline as far as ambulation?
16 A. I do not know.
17 Q. What was his baseline as to balance?
18 A. I do not know.
19 Q. What was his baseline as to lethargy?
20 A. I have no idea.
21 Q. What was his baseline as to appearing sedated?
22 A. I have no idea.
23 Q. When had he last slept?
24 A. I do not know. And when you're saying "baseline,"
25    you're talking about without any of the drugs in him?

Page 27
1  Q. Correct. No, I'm talking about whether drugs were in him or
2    not, what he looked like. You don't know anything, do you?
3  A. No, I do not. I'm going to keep saying that.
4  Q. Okay. Do you know whether if the day before he was at
5    Bronson, if he had been in the waiting room and was trying to
6    get from chair to chair, he'd look exactly the same as he did
7    in the video?
8       MR. HARRINGTON: Objection, form, foundation,
9    speculation.
10      THE WITNESS: Based upon my expertise, I do not
11    know. That would require a medical opinion on that. By
12    that, I'm saying if he was so affected or unaffected by any
13    diseases or disorder he had to so inhibit him in that manner
14    would require a medical opinion from someone who has
15    expertise well different than mine.
16 BY MR. O'LOUGHLIN:
17 Q. Your opinion is that the drugs on board in Mr. Dunigan did
18    not cause his death?
19 A. They are not at lethal levels by any means, that's correct.
20 Q. And do you intend to offer an opinion as to what did cause
21    his death?
22 A. No. And when we back it up, I do not opine in any way of
23    cause of death, but I can tell you the drug levels we have
24    would not be lethal. Cause of death requires a medical
25    personnel signature. I don't do that.

Page 28
1    But I can tell you the lethal -- the levels of
2    drugs in his body are not lethal, or the interactions are not
3    lethal, by any means.
4  Q. Does it require a medical opinion to determine whether the
5    behavior you observed on all the videos was due to drugs,
6    underlying medical conditions, purposeful noncooperation?
7  A. On the first one, I could opine. It's not the drugs.
8  Q. Okay.
9  A. That's my field, neuropsychopharmacology. If there's an
10    underlying medical condition, there would have to be a
11    physician who could either examine said individual or could
12    examine detailed records, medical records of said individual
13    to make that opinion. On the third --
14 Q. You're not that guy?
15 A. I'm not. That's what I said.
16 Q. That's my question. You're not able to opine --
17 A. On the drugs, yes. On the rest of it, no.
18 Q. From your observation on the video, what told you that Mr.
19    Dunigan was sedated and lethargic as opposed to tired and had
20    ambulation deficits?
21 A. I assumed he had some ambulation deficits only because he had
22    a cane with him and had used it at the initial part of the
23    thing. I'm saying what appeared to me on those tapes was to
24    be sedation, especially the way he was going up and down and
25    up and down into at least stuporous states, if not asleep.

Page 29
1    His problems with balance, extreme problems with
2    balance could not be attenuated just to a cane because he
3    fell down many times with the cane. And his lethargy, his
4    movements were very gross in movements, especially with arms,
5    head, not especially legs.
6       So I'm saying that's not -- only thing I can say,
7    it's not the drugs doing this. That's all I can say, it's
8    not the drugs doing this.
9  Q. But you don't know whether he had underlying conditions or
10    lack of sleep or pain or renal failure or anything else that
11    was causing him to behave as you saw in the video?
12 A. No. As I said in "K" there, I can only say it is not the
13    drugs or the interaction of the drugs.
14 Q. Was it contributed to by the drugs?
15 A. Not in a manner which would be observable, no. I'm going
16    back to if I put the instruments on you, I could measure
17    things in nanoseconds or that, but in an observable fashion,
18    no. And I don't know what I'm "contributing" to, but I'm
19    back to saying I can only say that it is not the drugs
20    producing this observable behavior.
21 Q. Or, in your opinion, even contributing to it?
22 A. Not contributing to it because of the levels we're talking
23    about, no. I am restricting all my opinions to the drugs and
24    general behavior to the drugs.
25 Q. And your opinion is the drugs were not causing this behavior

Page 34

1 A. Let me turn this. I did not note it so I don't know if I did
2    or if he was or wasn't.
3 Q. Did he appear to be trying to sleep on that bench that he
4    initially moved to from the wheelchair?
5 A. He was trying to lay down. He was laying to his side, to the
6    right side.
7 Q. Did he appear to sleep at all while he was on that bench?
8 A. His head went down, but these were things which were
9    happening all in one-minute blocks. We're talking about
10   4:38, 4:39 to 4:40 something happens, but then he did nod for
11   a while between 4:40 and 4:49 back and forth, but 4:50 he sat
12   up. At 4:51, he fell over to the left side of the chair.
13   4:51 again, in the same minute, he sat up nodding. 4:53, he
14   stands up with the cane. 4:54, he stopped and leaned on the
15   chair, walks, leans over again on another chair. 4:55,
16   walks, two stops with chair, using a chair to support
17   himself, then totally stopped. 4:56, he went down in the
18   chair and leaned over. 4:57, he falls over into the couch.
19   5:04 -- he stayed there for a while. 5:04, he actually fell
20   on to the floor and sits up with the nodding, got up.
21 Q. I'm sorry. Let me stop you there. At 5:04 you're saying he
22   fell onto the floor?
23 A. Almost falls on the floor, went down on one knee.
24 Q. 5:04?
25 A. Tape 5:04.

Page 35

1 Q. On the video?
2 A. Yes. All times can we agree are on the video. I wasn't
3    there.
4 Q. What was he doing when he, as you put it, almost fell to the
5    floor?
6 A. He was moving from one position to another on the far side
7    chairs. And at 5:14 -- and he sat up for the rest of the
8    time until 5:14 nodding, and that's when the police -- police
9    arrived at that time.
10 Q. Okay. Let me just ask this. Is there anything about your
11   expertise that allows you to judge what you saw in that video
12   in terms of Mr. Dunigan's level of alertness and/or ability
13   to ambulate, is there anything in your expertise that makes
14   you better able to judge that than the jurors in this case?
15 A. Nothing except for my statement that the drugs could not have
16   caused this.
17 Q. Okay.
18 A. And that's in my expertise.
19 Q. But you don't know whether everything you saw Mr. Dunigan do
20   in this video was his normal baseline behavior?
21 A. I do not know what his normal baseline behavior was, period,
22   again. The only thing I can say is what I've said about four
23   times, the drugs would not cause this.
24 Q. And is that because Gabapentin, Benadryl, and hydrocodone
25   don't cause drowsiness at -- in therapeutic levels?

Page 36

1 A. They do not cause that drowsiness at therapeutic levels of
2    wanting to sleep, they do not cause lethargy at therapeutic
3    levels we're talking about. They only cause things at
4    therapeutic levels which I can measure with instrumentation,
5    not from observation. You're talking about toxic levels.
6 Q. In describing what you interpreted to be sedation, lethargy
7    or lack of balance, there were a couple of times where you
8    said Mr. Dunigan couldn't maintain standing and needed to be
9    supported?
10 A. Yes.
11 Q. How did you decide that he wasn't purposefully not moving?
12   In other words, how did you decide that he simply wasn't
13   laying on the floor and refused to get up?
14 A. I did not decide that. I said he couldn't make -- he
15   appeared not to be able to maintain his own balance, his own
16   weight.
17 Q. What about whether he could or couldn't get up on his own?
18 A. I have no idea. Most of this occurred relative to the
19   police, and the only time it occurred in the waiting room was
20   security lifted him upright and then he fell over toward the
21   floor at 6:20. If it was intentional or not, he did not
22   maintain his own weight at 6:21, and they lifted him, under
23   arms, to the wheelchair. He then slid off the wheelchair at
24   6:21 again. And he was rolled out the door, and then the
25   rest was in the police -- where the police had to lift him

Page 37

1    up.
2 Q. And you don't know whether any of that was because he was
3    purposefully going limp or not standing or whether it was
4    because he was unable to?
5 A. I could not read his mind, no, so I don't know. And again,
6    the only thing I can say is that would not be caused by the
7    drugs.
8 Q. You are not in a position to offer any opinion as to whether
9    he, Mr. Dunigan, had an emergency medical condition?
10 A. I have no idea. I just know he was brought to the emergency
11   room and they obviously discharged him back out of the
12   emergency room to the waiting room.
13 Q. And you are not in a position to criticize any of that
14   decision-making?
15 A. I don't even know what the decision-making was so I can't
16   criticize anything, and even if I knew, I could not criticize
17   it.
18 Q. Do you know what EMTALA is?
19 A. EMTALA?
20 Q. E-M-T-A-L-A.
21 A. Is that a drug?
22 Q. No.
23 A. I have no idea what it is. I would have said if you tell me
24   that's a drug, it's going to be new to me.
25 Q. You did review the medical records from the emergency

**Page 42**

1 Q. What about the cocaine metabolites that were found in the
2   tox. screen?
3 A. That's the benzoylecgonine. Benzoylecgonine is not
4   intoxicating. It is called a bright line metabolite which
5   means the only thing it can come from is cocaine
6   hydrochloride. In itself, it is not intoxicating, so at the
7   time of his death, he had no effect at all from the cocaine.
8 Q. Okay. Now counsel had asked you something about whether we
9   need an expert such as yourself to give certain types of
10  opinions.
11      Do we in fact need your expertise to rule out the
12  drugs being a cause or a contributing factor to Mr. Dunigan's
13  ultimate demise?
14 A. Yes, myself or such as -- and I have met him a number of
15  times, Doctor --
16      MR. O'LOUGHLIN: Commissaris.
17      THE WITNESS: -- Commissaris and are a number of
18  others in the State of Michigan so --
19      MR. HARRINGTON: That's all I have. Thank you.
20          RE-EXAMINATION
21 BY MR. O'LOUGHLIN:
22 Q. Do you know when -- do you have any knowledge of when Mr.
23  Dunigan last had dialysis before his death?
24 A. There was a statement in the medical records at Bronson that
25  his dialysis was on a cyclic basis, but I'm not sure. It

**Page 43**

1   might be in the records but I did not record it into my
2   notes.
3 Q. Do you know when he last ate?
4 A. Not to the best of my knowledge, no.
5 Q. The Bronson video has no audio. Correct?
6 A. No audio.
7 Q. So you don't know anything that was being said in the waiting
8   room or outside the hospital until the police car arrived?
9 A. I don't know what was said. You could tell there was
10  verbalizations but that was it. Mouths were moving.
11 Q. Could you tell from the video whether Mr. Dunigan was having
12  any breathing difficulty in the waiting room or outside the
13  hospital before he got into the police car?
14 A. That's well outside my expertise, but it didn't -- he wasn't
15  heaving the chest at any point in time that I saw, but it's
16  outside my expertise if he has breathing difficulties or not.
17 Q. Up until the time he got in the police car and other than the
18  times where he appeared to be sleeping, could you make any
19  determination as to whether or not he was alert and oriented?
20 A. I don't know if he was alert. You're talking about
21  orientation times three?
22 Q. Yes.
23 A. I could not make a judgment of that at all. He was placed in
24  the police car. He did not get into it from his own
25  ambulatory nature. He was picked up and put in there.

**Page 44**

1 Q. Up until that time, you could not make any determination as
2   to whether he was alert and oriented. Correct?
3 A. I could not as to that except for the time he was dozing.
4 Q. Was he, other than the times he was dozing and when he was
5   interacting with the police officers or security officers,
6   conversant?
7 A. His mouth was moving. I don't know what he was saying. I
8   don't know if he could -- if his conversation was normal,
9   abnormal or what is what I'm saying. I could not tell.
10  There was no sound.
11 Q. From anything you've seen, heard or read, are you aware of
12  whether Mr. Dunigan ever asked for any medical attention
13  after he was discharged from the emergency department?
14 A. I'm not aware of anything of that nature. Obviously when
15  they took him back into the ER initially, he was being
16  attended to.
17 Q. Right. So we're talking about after he was seen --
18 A. After that, I have no idea.
19 Q. -- in the ER and after --
20 A. I have no idea. Yes or no, I have no idea.
21 Q. Do you know of any reason why Mr. Dunigan could not have
22  asked for medical attention if he needed it?
23 A. That I don't know. As I said, I had no -- if there had been
24  audio on the videotape, you could tell if his verbal
25  interactions with, Number 1, the security personnel at

**Page 45**

1   Bronson and the police officers, if that indicated he was
2   cogent or not, but from what I saw, I couldn't tell.
3 Q. Do you know what Dr. Commissaris' specialty is?
4 A. He's tox. He's a pharmacologist.
5 Q. And how does that differ from you?
6 A. Pharmacology is the broad range study of drugs. I noticed
7   from his vitae and also I've seen some things, he's been
8   looking recently at some of the things I looked at which is
9   relative to operation of motorized vehicles. He used
10  simulators like I do. But he's a tox. He's a
11  pharmacologist, has been that.
12      Neuropsychopharmacology is a very small specialty
13  of those drugs and substances, sometimes called substances,
14  which are psychoactive, psychotropic. And I'm not
15  questioning his credentials at all is what I'm telling you.
16 Q. Are you questioning his opinions?
17 A. The only one I said was where he said there was a, I can give
18  you that quote again, "might have," whatever that word was.
19  I would never have used that word because I've never seen
20  research which would show that. In science, anything may be
21  possible. But other than that, no. I think that's the
22  bottom of Page 3.
23 Q. So in your report when you say, under Subparagraph H, "the
24  interaction of Diphenhydramine," which is Benadryl, "and
25  hydrocodone can also produce dizziness, drowsiness and