SPITZ, M.D., WERNER
03/20/2018
Pages 1–4

**Page 1**

```
1              UNITED STATES DISTRICT COURT
2             WESTERN DISTRICT OF MICHIGAN
3                   SOUTHERN DIVISION
4
5    GORDA DUNIGAN, as Personal
6    Representative for the ESTATE OF
7    JAMES DUNIGAN, Deceased,
8                    Plaintiff,
9         vs.              Case No.1:16-CV-01324
10                         Hon. Ellen S. Carmody
11   BRONSON METHODIST HOSPITAL,
12                    Defendant,
13            and
14   GORDA DUNIGAN, as Personal
15   Representative of the ESTATE OF
16   JAMES DUNIGAN, Deceased,
17                    Plaintiff,
18        vs.            Case No. 1:16-CV-01325
19   DEREK NUGENT, et al,       Hon. Ellen S. Carmody
20                   Defendants.
21                          /
22
23
24
25
```

**Page 2**

```
1         The Deposition of WERNER SPITZ, M.D., F.C.A.P.,
2         Taken at 23001 Greater Mack Avenue,
3         St. Clair Shores, Michigan,
4         Commencing at 2:17 p.m.,
5         Tuesday, March 20, 2018,
6         Before Linda S. Wilson, CSR-0973.
7
8    APPEARANCES:
9
10   DONALD H. DAWSON, JR.
11   Fieger, Fieger, Kenney & Harrington
12   19390 West Ten Mile Road
13   Southfield, Michigan 48075
14   (248) 355-5555
15   d.dawson@fiegerlaw.com
16        Appearing on behalf of the Plaintiff.
17
18   ALLAN C. VANDER LAAN
19   Cummings, McClory, Davis & Acho, P.L.C.
20   2851 Charlevoix Drive, SE, Suite 327
21   Grand Rapids, Michigan 49546
22   (616) 975-7470
23   avanderlaan@cmda-law.com
24        Appearing (Telephonically) on behalf of the
25        Defendants, Nugent, et al.
```

**Page 3**

```
1    JOHN C. O'LOUGHLIN
2    Smith, Haughey, Rice & Roegge, P.C.
3    100 Monroe Center Street, NW
4    Grand Rapids, Michigan 49503
5    (616) 774-8000
6    joloughlin@shrr.com
7         Appearing (Telephonically) on behalf of the
8         Defendant, Bronson Methodist Hospital.
```

**Page 4**

```
1              INDEX TO EXAMINATIONS
2
3    Witness                     Page
4    WERNER SPITZ, M.D. F.C.A.P.
5
6    EXAMINATION                   5
7    BY MR. O'LOUGHLIN:
8    EXAMINATION                  81
9    BY MR. VANDERLAAN:
10   EXAMINATION                  85
11   BY MR. DAWSON:
12   RE-EXAMINATION               86
13   BY MR. O'LOUGHLIN:
14
15             INDEX TO EXHIBITS
16
17   Exhibit                     Page
18   (Exhibit attached to transcript.)
19
20   DEPOSITION EXHIBIT 1          21
21
22
23
24
25
```

**DEFENDANT'S EXHIBIT** tabbies® J

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SPITZ, M.D., WERNER
03/20/2018

Pages 25—28

Page 25

```
 1          way this man was handled, this man was treated, this
 2          man was confronting when he was handled by a number of
 3          people who were not necessarily treating him like a
 4          patient, not like -- and like a sick patient, like a
 5          patient who was in the throes of death.  They did not
 6          recognize it, and they should have recognized it.
 7          That is my opinion.
 8   Q.     You don't claim to be an expert in emergency medicine,
 9          correct?
10   A.     No, I'm not an emergency medicine physician.
11   Q.     You don't claim to be an expert in emergency nursing,
12          correct?
13   A.     No, that is correct.
14   Q.     You don't claim to be an expert in radiology, correct?
15   A.     Correct.
16   Q.     You don't claim to be an expert in hospital security,
17          correct?
18   A.     Correct.
19   Q.     You don't claim to be an expert in law enforcement or
20          the conduct of law enforcement officers, correct?
21   A.     Correct.
22   Q.     Do you claim to be an expert in the law known as
23          EMTALA, the Emergency Medical Treatment and Active
24          Labor Act?
25   A.     Yes, I'm aware of such a thing, but I have not ever
```

Page 26

```
 1          made use of that type of information.  So I know of
 2          it, but I really don't know a whole lot of it.
 3   Q.     When you say you haven't made use of it, that means
 4          you haven't had to worry about complying with EMTALA?
 5   A.     Or not complying.  I don't know enough about EMTALA to
 6          know how to handle that.  I don't see patients in my
 7          practice.
 8   Q.     Correct.  What is your understanding of why
 9          Mr. Dunigan came to the Emergency Department in the
10          early morning hours of May 6th, 2016?
11   A.     Well, he had chest pain he claims, and he came because
12          it was for him a fearful experience.  That is what
13          took him to the hospital.  He, in fact, was in a
14          condition which in his mind required transport to the
15          hospital, like you said, in the middle of the
16          nighttime, and it was a fearful experience for him, so
17          he called for an ambulance to take him.
18   Q.     What is your understanding of how long he had had this
19          chest pain?
20   A.     He indicates that, as a layperson, I have to say that,
21          he says that -- or he thought there is a connection
22          between his chest pain and the bruise he had on his
23          chest and his actual pain, that that resulted from
24          internal bleeding he thought, and that he -- chest
25          pain from -- the real reason for the chest pain was
```

Page 27

```
 1          really very little connected to him falling out of a
 2          bus when he sustained the fall and hit something on
 3          cement, as he indicated.
 4                 It was a different kind of chest pain
 5          altogether, and that chest pain is notorious for
 6          fearing doom.  That pain is a different kind of pain.
 7          That is the pain of a heart attack.
 8   Q.     Upon what do you base that statement?
 9   A.     On the fact that he had manifestations of congestive
10          heart failure.  His breathing, his sickening type of
11          snoring that is not that he is sleeping, but it is a
12          kind of snoring, if you will, where fluids in the lung
13          go up and down the airway every breath he takes.  That
14          is not necessarily annoying for others to hear.  That
15          is not the issue.  The issue is that it scared the
16          daylights out of the individual who suffers it.
17                 It is a type of pain is associated with
18          asphyxiation.  Asphyxiation is always a very fearful
19          experience because here the lung contains fluid.  When
20          the fluid is moved by breathing up and down, there is
21          in addition to the noise that this makes, there is
22          also a lack of air in the lungs substituted for
23          fluids, so-called edema fluids, which is none other
24          than froth.
25                 And the officers looked at all that, stated
```

Page 28

```
 1          it in their packing him into the seat in the police
 2          vehicle, did nothing about it.  They said:  Oh, he is
 3          faking.  Oh, we know well what to expect from him, and
 4          so on and so forth.  The officers know or should know
 5          what that means.  I know they are not physicians, but
 6          they should know that because it occurs a lot more
 7          often than we want.
 8   Q.     Doctor, if we can, for the sake of addressing
 9          different periods of time, break this ED presentation
10          down into the period of time from when Mr. Dunigan was
11          picked up by the ambulance to the time that he was
12          discharged from the Emergency Department into the
13          waiting room, when he was wheeled into the waiting
14          room in a wheelchair.  Do you understand that frame of
15          time I'm talking about?
16   A.     Well, it's kind of a long question which requires
17          probably a long answer, but I hope I will comply with
18          your request.  If I don't, so please tell me.
19   Q.     Let me go back and get some foundation.  Did you
20          review the videos that you received as listed in your
21          report?
22   A.     Yes, I did review that.  I reviewed the videos.  To
23          answer your question, I would like to state that the
24          video clearly shows, or one of them, clearly shows a
25          restful -- I mean a restless individual who aimlessly
```

Page 57

1    jail, but maybe he had hopes that they would provide
2    him with more medical care. I don't know. He did not
3    want to leave Bronson because that is abundantly
4    documented in the various depositions that I read.
5 Q. Are you aware of any evidence indicating that
6    Mr. Dunigan ever complained of a medical problem or
7    asked for medical care after he was wheeled into the
8    waiting room?
9 A. I'm unaware whether he asked for additional medical
10   care. Maybe he didn't know that there was such
11   available, but it's obvious that that is what he
12   needed. Many times in my -- to my knowledge, patients
13   don't know that they can get medical care for whatever
14   they have, an ailment or a condition. They may not
15   know. He may not have known that he should -- he has
16   to ask for medical care. I really don't know that.
17            But the fact is that he wasn't given that
18   choice. He wasn't asked to come back in the room, in
19   the emergency room. When he was seen walking around
20   aimlessly holding on to furniture, obviously something
21   is wrong with this man. So as a doctor, you would
22   kind of frown that somebody, a nurse or a health
23   provider, would not point out to the physician in the
24   emergency room or other personnel that there is
25   something wrong with that patient that should be

Page 58

1    explored. But nothing like that ever happened. The
2    one thing that was done was an x-ray, which excluded
3    trauma.
4 Q. I'm becoming convinced that you are not capable of
5    answering my questions, Doctor. But I'm just going to
6    keep asking them.
7 A. Go ahead.
8 Q. I'm going to have to ask the same one again. Are you
9    aware of any evidence indicating that Mr. Dunigan ever
10   asked for any type of medical care after he went to
11   the waiting room?
12 A. I've already answered that. I said no, I'm not.
13 Q. Thank you. Please stop there. Are you aware of any
14   evidence that any physician or nurse saw any behavior
15   in Mr. Dunigan which indicated that he needed medical
16   attention?
17 A. Any nurse?
18            MR. DAWSON: After he was discharged from
19   the ED?
20            MR. O'LOUGHLIN: Correct.
21            MR. DAWSON: Go ahead, Doctor.
22 A. Any nurse at Bronson or any doctor at Bronson, or am I
23   included in that too, because I saw him.
24 BY MR. O'LOUGHLIN:
25 Q. Are you aware of any evidence that any nurse or doctor

Page 59

1    at Bronson saw Mr. Dunigan in a condition that
2    indicated he needed medical attention after he was
3    discharged to the waiting room?
4 A. No, I'm not aware.
5 Q. Thank you. What is your understanding of
6    Mr. Dunigan's ability to ambulate prior to the time he
7    fell getting off the bus on May 5th?
8 A. I don't know what his walking -- I have no idea what
9    his condition caused him to -- by way of ability to
10   walk. I can't imagine that it did anything other
11   than -- the heart condition that he had is likely to
12   have caused him pain from walking, from exerting, from
13   being exerted. But I don't know where I would have
14   found that, that what happened on the day before, on
15   the day before he went to Bronson. But stress is not
16   exactly a good thing for somebody with that kind of
17   heart condition that Mr. Dunigan had.
18 Q. Based upon your review of everything you have seen in
19   this case are you aware that Mr. Dunigan had a history
20   of a stroke with hemiparesis?
21 A. He had some difficulty walking because of that stroke
22   because one side was weaker than the other, but
23   whether they really interfered with his ability to
24   walk with a cane I am not aware.
25 Q. We are back to that. You don't know what his ability

Page 60

1    was to walk or ambulate with or without a cane prior
2    to May 6th, 2016, true?
3 A. No. I think with a cane he was able to walk. Maybe
4    not as well as he did before he had the stroke, but he
5    walked with a cane, or was able to walk with a cane.
6    I can see him walk in the waiting room.
7 Q. Do you know whether he was able to walk any better
8    than he was when you saw him in the waiting room on
9    the day before?
10 A. I don't know how he was walking the day before, but in
11   general he was able to walk. He was able to walk even
12   on May 6th because that is when I saw him.
13 Q. Did you say was or wasn't?
14 A. Was. He was walking okay. He was walking. He was
15   holding on to furniture, but that is explainable by
16   his condition on that day, because on the 6th he was
17   different than on -- he may have been different than
18   on May 5th.
19 Q. You don't know one way or the other, true?
20 A. I know how he behaved on May 6th. I'm not so sure
21   whether that applies to May 5th as well.
22 Q. That is the point of my question, Doctor. Do you know
23   whether his ability to ambulate as you saw it on May
24   6th in the waiting room was any different than his
25   ability to ambulate on May 5th before he fell getting