2017 WL 4535714
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan, Southern Division.

Jamie ELMHIRST, Plaintiff,
v.
MCLAREN NORTHERN MICHIGAN, d/b/a Northern Michigan Emergency Medical Center, and McLaren Health Care Corporation, jointly and severally, Defendants.

No. 1:17-cv-00374
|
Signed 07/19/2017

**Attorneys and Law Firms**

Albert James Dib, Jefferson Law Center, St. Claire Shores, MI, for Plaintiff.

Verlin R. Nafziger, Johnson & Wyngaarden PC, Okemos, MI, for Defendants.

**Opinion**

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Paul L. Maloney, United States District Judge

*1 Plaintiff Jamie Elmhirst brings this action against Defendants McLaren Northern Michigan and McLaren Health Care Corporation (collectively, "McLaren") under the Emergency Medical Treatment and Active Labor Act ("**EMTALA**"), 42 U.S.C. § 1395dd. Elmhirst, in her Complaint, alleges that McLaren failed to provide her with an appropriate medical screening, failed to stabilize her, and failed to properly transfer or discharge her. (ECF No. 1 at PageID.9.) Subsequently, McLaren filed its Motion to Dismiss for failure to state a claim upon which relief can be granted. (ECF No. 9.) For the reasons set forth below, the Court must grant the motion.

**A. Background**
On a motion under Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations contained in the Complaint as true.

Jamie Elmhirst received medical care between May 7, 2014 and April 25, 2015 from William J. Steinbach, a chiropractor. On or around April 25, 2015, Steinbach, in his professional capacity as a chiropractor, excessively maneuvered, rotated, adjusted, or manipulated Elmhirst's cervical spine, or her neck. (ECF No. 1 at PageID.5.) After the April 25 visit with Steinbach, Elmhirst developed severe dizziness, including a spinning sensation, difficulty sleeping, nausea, vomiting, and a headache that worsened with movement. (*Id.*)

On May 6, 2015, Elmhirst went to the Emergency Department at McLaren and requested an examination and treatment for her presenting medical condition. (*Id.*) Elmhirst was seen for medical care by Dr. Craig Reynolds, in his professional capacity at McLaren. (*Id.*) Reynolds noted that Elmhirst's symptoms included high blood pressure, elevated white blood cell count, presence of red blood cells in urine, presence of a fever, and dizziness with a worsened headache the night before presenting at the hospital. (*Id.*) There were no other imaging or other diagnostic studies or tests ordered or performed on Elmhirst. (*Id.*)

The signs and symptoms Elmhirst presented were consistent with vertebral artery dissection. (*Id.* at PageID.6.) Extreme or excessive extension of the neck in chiropractic sessions has been reported to cause vertebral artery dissections. (*Id.* at PageID.9.) The most common symptom is dizziness, with other accompanying symptoms, including head/neck pain, vertigo, loss of balance, eye issues, leg and body weakness, and numbness. (*Id.* at PageID.7.) The diagnosis of vertebral artery dissection is usually established by MRI, MRA, or CT imaging, none of which were performed on Elmhirst on May 6, 2015. (*Id.*)

Under the **EMTALA**, McLaren was required to provide Elmhirst with an appropriate medical screening examination, to stabilize Elmhirst, and to "transfer" Elmhirst. (*Id.*)[1] Magnetic, computerized, and digital medical diagnostic imaging must be used to diagnose vertebral dissection. (*Id.*) None of the diagnostic imaging was conducted or performed, and Elmhirst was not admitted to McLaren's hospital for further care or treatment. (*Id.*) However, instead, McLaren, through its actual or apparent agent, Dr. Reynolds, prescribed Elmhirst with Antivert and discharged her, instructing her "to go home to take it easy." (*Id.* at PageID.9–10.)

*2 Elmhirst's symptoms did not improve, and she returned to McLaren four days later, on May 10, 2015.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

DEFENDANT'S EXHIBIT
K

(*Id.* at PageID.10.) Elmhirst was found to have acute cerebellar infarct and left cerebellar lesion, which was consistent with an acute ischemic stroke. (*Id.*) According to Dr. Roger Gietzen, Elmhirst's infarct and stroke were due to vertebral dissection caused by recent chiropractic manipulation of her neck. (*Id.*) Elmhirst was transferred to McLaren-Flint for further evaluation, work-up, and medical treatment. (*Id.*)

**B. Legal Framework**

**1. Rule 12(b)(6)**
A complaint must contain a short and plain statement of the claim showing how the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A defendant bringing a motion to dismiss for failure to state a claim under Rule 12(b)(6) tests whether a cognizable claim has been pled in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must provide sufficient factual allegations that, if accepted as true, suffice to raise a right to relief above the speculative level, *Twombly*, 550 U.S. at 555, and the "claim to relief must be plausible on its face," *Id.* at 570. "A claim is plausible on its face if the 'plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).

Finally, when considering a motion to dismiss, a court must accept as true all factual allegations, but need not accept any legal conclusions. *Ctr. for Bio-Ethical Reform*, 648 F.3d at 369. And the Sixth Circuit has noted that courts "may no longer accept conclusory legal allegations that do not include specific facts necessary to establish the cause of action." *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1050 (6th Cir. 2011).

**2. EMTALA**
Congress intended for **EMTALA** to prevent hospitals from disregarding patients who suffered from emergency medical conditions because they were indigent or lacked insurance to pay the medical bills. *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268 (6th Cir. 1990); *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1134 (6th Cir. 1990). Congress did not intend nor design **EMTALA** "to establish guidelines or standards for patient care, provide a suit for medical negligence, or substitute for a medical malpractice claim." *Estate of Lacko ex rel. Griswatch v. Mercy Hosp., Cadillac*, 829 F. Supp. 2d 543, 548 (E.D. Mich. 2011) (citing *Moses v. Providence Hosp. and Med. Ctrs., Inc.*, 561 F.3d 573, 578 (6th Cir. 2009)).

**EMTALA** imposes two requirements upon hospitals that participate in Medicare and operate an "emergency department." 42 U.S.C. § 1395dd; *see Moses*, 561 F.3d at 579. The first requirement is that all individuals who present to an emergency department and request treatment are provided an "appropriate medical screening examination ... to determine whether or not an emergency medical condition ... exists." *Moses*, 561 F.3d at 579 (quoting 42 U.S.C. § 1395dd(a)). The Sixth Circuit has interpreted the phrase " 'appropriate medical screening' to mean a screening that the hospital would have offered to any paying patient, and the vague phrase 'emergency medical condition' to mean a condition within the actual knowledge of the doctors on duty." *Cleland*, 917 F.2d at 268–69; *see also Romine v. St. Joseph Health Sys.*, 541 Fed.Appx. 614, 618 (6th Cir. 2013). The second requirement is that if "the hospital determines that the individual has an emergency medical condition," then the hospital must either: (1) provide further examination and treatment to stabilize the emergency medical condition with the available staff, or (2) provide for the individual's transfer to another medical facility. *Id.* (quoting 42 U.S.C. § 1395dd(b)).[2]

**a. Appropriate Medical Screening Under § 1395dd(a)**

*3 With respect to the first requirement, the Sixth Circuit has explicitly held that " 'appropriate' ... refer[s] to the motives with which the hospital acts," and therefore, in order to administer an inappropriate medical examination, the hospital must act with improper motive. *Cleland*, 917 F.2d at 272. Thus, in order to establish that an individual was not provided with an "appropriate medical screening," "a plaintiff must demonstrate an improper motive" on behalf of the hospital. *Romine*, 541 Fed.Appx. at 620.[3]

### b. Stabilizing Emergency Medical Conditions Under § 1395dd(b)

With respect to the second requirement, § 1395dd(b) states that if a "individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either": (1) the medical examination and treatment required to stabilize the emergency medical condition, or (2) "transfer of the individual to another medical facility." 42 U.S.C. § 1395dd(b)(1). Unlike *Cleland*'s requirement for appropriateness in the medical examination, the Supreme Court overturned the requirement for an improper motive in the appropriateness of stabilizing a medical condition. *Roberts*, 525 U.S. at 252; *see also supra* note 3. However, the requirement of a hospital to stabilize the medical condition under § 1395dd(b) requires that the hospital have "actual knowledge" of the medical condition. *See Cleland*, 917 F.2d at 268; *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 786 (6th Cir. 2003) ("This court has long held that liability under section (b) requires actual knowledge of the condition."). Therefore, in order to effectively plead a claim for failure to stabilize under § 1395dd(b), a plaintiff must allege sufficient facts to demonstrate a hospital had actual knowledge of the plaintiff's emergency medical condition. *See Johnson*, 325 F.3d at 787 (stating that section (c), the restricting-transfers-until-stabilized requirement, also requires actual knowledge of the emergency medical condition).

### C. Analysis

Elmhirst alleges that McLaren violated EMTALA under three theories: (1) a failure to provide an appropriate medical screening examination; (2) a failure to stabilize Elmhirst's emergency medical condition; and (3) a failure to "transfer" Elmhirst properly. (ECF No. 1.)

**1. Elmhirst's first theory fails because she has not alleged sufficient facts to establish that McLaren, through Dr. Reynolds, had an improper motive when it provided a medical screening examination.**

In the present case, Elmhirst has not alleged sufficient facts that would demonstrate McLaren acted with an improper motive in providing a medical screening examination. Elmhirst states that she presented to McLaren's Emergency Department with symptoms and signs of vertebral dissection. (ECF No. 1 at PageID.5–6.) McLaren, through Dr. Reynolds, gave Elmhirst a medical screening examination without any alleged delay on May 6, 2015. Nowhere does Elmhirst allege any specific facts that would show McLaren, or Dr. Reynolds, plausibly had an improper motive when providing a medical examination or screening.

*4 Elmhirst formulaically alleges that McLaren acted "out of spite and/or based on [her] lack of insurance, financial status, and/or other impermissible motives to be discovered." (*Id.*) However, these are mere "naked assertions devoid of further factual enhancement," which "contribute nothing to the sufficiency of the complaint." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678); *see Iqbal*, 556 U.S. at 686 ("[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.").[4] Moreover, not only did Dr. Reynolds apparently give Elmhirst a prompt examination, Elmhirst did not allege any facts that Dr. Reynolds even *knew* about Elmhirst's "lack of insurance" or "financial status." (ECF No. 1 at PageID.5–6.)[5]

Finally, in Elmhirst's brief (ECF No. 12 at PageID.82), she states that "Defendants' focus on '*improper motive*' is misplaced," noting the Supreme Court found no improper motive requirement in § 1395dd(b). However, in Defendants' Motion, the only focus on "improper motive" is in the context of an "appropriate medical screening," or § 1395dd(a). (ECF No. 9 at PageID.37.) This focus is well founded. As stated above, in *Roberts*, the U.S. Supreme Court only overturned the improper motive requirement with respect to § 1395dd(b), but the Court left the improper motive requirement with respect to § 1395dd(a) unscathed. *See Roberts*, 525 U.S. at 252–53 (expressing no opinion on "the *Cleland* court's reading of § 1395dd(a)'s 'appropriate medical screening' requirement"); *see Romine*, 541 Fed.Appx. at 620 (stating "*Cleland* remains the law of the Sixth Circuit").

Therefore, putting aside Elmhirst's "naked assertions devoid of further factual enhancement," *Flagstar Bank*, 727 F.3d at 506, she has failed to plausibly allege McLaren provided an insufficient examination under § 1395dd(a) and the relevant case law.

**2. Elmhirst's second and third theories fail because she has not alleged sufficient facts that McLaren had actual knowledge of her specific medical condition.**

In addition to not sufficiently pleading facts demonstrating an improper motive, Elmhirst fails to allege any facts that on May 6, 2015, McLaren had actual knowledge of Elmhirst's emergency medical condition, or vertebral artery dissection.

Elmhirst asserts that McLaren failed "to determine whether or not an emergency medical condition existed." (ECF No. 1 at PageID.9.) However, that actually undermines Elmhirst's theory under § 1395dd(b); in order to violate that section, under a theory that the hospital failed to stabilize an emergency medical condition, the hospital must have had *actual knowledge* of the condition. *See Cleland*, 917 F.2d at 268–69 (requiring "actual knowledge of the doctors on duty"); *Johnson*, 325 F.3d at 786 ("Section (b) explicitly states that the duty to stabilize patients only arises when 'the hospital determines that the individual has an emergency medical condition.' ") (quoting 42 U.S.C. § 1395dd(b)(1)).

Therefore, since there are no facts in the Complaint to plausibly support that McLaren had *actual knowledge* regarding Elmhirst's condition, or vertebral artery dissection, there was no failure to stabilize a medical condition under § 1395dd(b)(1) because the condition was unknown to the treating physician. *See Cleland*, 917 F.2d at 268–69.

*5 Finally, Elmhirst's failure-to-transfer theory should be more accurately characterized as a discharge-before-stabilization theory. *See* 42 U.S.C. § 1395dd(c)(1) (requiring stabilization before a hospital can transfer an individual, with a few exceptions). Thus, under these circumstances, the hospital's failure to transfer properly can only arise if there was a failure to stabilize an individual, and regardless, both the transfer and stabilization violations require the hospital's "actual knowledge" of an emergency medical condition. *See Cleland*, 917 F.2d at 268. Since Elmhirst did not plead sufficient facts to establish McLaren, through Dr. Reynolds, had "actual knowledge" of Elmhirst's emergency medical condition when she presented to McLaren on May 6, 2015, her third theory fails to state a claim, as well.

**D. Conclusion**

McLaren's Motion to Dismiss Elmhirst's Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted must be granted in its entirety.

**ORDER**

For the reasons provided in the accompanying Opinion, Defendants' Motion to Dismiss (ECF No. 9) is **GRANTED**, dismissing both Counts stated in Elmhirst's Complaint (ECF No. 1). Judgment will enter separately.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 4535714

Footnotes

1   "The term 'transfer' means the movement (including the discharge) of an individual outside a hospital's facilities...." 42 U.S.C. § 1395dd(e)(4).

2   The Sixth Circuit has explicitly stated that "for any individual who seeks treatment in a hospital, the hospital must determine whether an 'emergency medical condition' exists, and if the hospital believes such a condition exists, it must provide treatment to 'stabilize' the patient." *Id.* (citing *Thornton*, 895 F.2d at 1134).

3   The Supreme Court acknowledged the Sixth Circuit's requirement for evidence of an improper motive to establish inappropriateness of a medical examination, but it definitively has made no opinion on the Sixth Circuit's interpretation. *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253 (1999) (expressing no opinion on "the *Cleland* court's reading of § 1395dd(a)'s 'appropriate medical screening' requirement"); *see Romine*, 541 Fed.Appx. at 620 (stating "*Cleland* remains the law of the Sixth Circuit").

4   Admittedly, Elmhirst also alleges that McLaren provided a medical screening that was of a low standard. (*Id.* at PageID.12.) But, an **EMTALA** claim does not "substitute for a medical malpractice claim." *Griswatch*, 829 F. Supp. 2d at 548. Plaintiff is apparently pursuing a medical negligence claim, a better fit for this fact pattern.

5   Surely, Dr. Reynolds was not running a one-man emergency department. Thus, it is difficult to see how he would have even known about Elmhirst's insurance or financial statuses.

**Elmhirst v. McLaren Northern Michigan, Slip Copy (2017)**

**End of Document**                                          © 2018 Thomson Reuters. No claim to original U.S. Government Works.

610 Fed.Appx. 464
This case was not selected for publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.
See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

CROSSVILLE MEDICAL ONCOLOGY, P.C., et al., Plaintiffs–Appellees,
v.
GLENWOOD SYSTEMS, LLC, Defendant–Appellant.

No. 14–5444.
|
May 1, 2015.

**Synopsis**
**Background:** After medical billing services provider prevailed in arbitration on client's claim for breach of billing service agreement, provider submitted for confirmation arbitration award of $221,147.45, with $16,238.75 in attorney fees and costs. The United States District Court for the Middle District of Tennessee confirmed award, but denied provider's motion for post-arbitration additional attorney fees, enhancement of attorney fees, and prejudgment interest. Provider appealed.

**Holdings:** The Court of Appeals, Damon J. Keith, Circuit Judge, held that:

[1] arbitration agreement only authorized award of attorney fees by arbitrator;

[2] client did not engage in bad faith warranting award of post-arbitration attorney fees; but

[3] denial of prejudgment interest required remand.

Affirmed in part; reversed and remanded in part.

West Headnotes (3)

[1]  **Alternative Dispute Resolution**
    ⇐ Costs

Under Connecticut law, only arbitrator was authorized to award attorney fees and costs during arbitration, under billing services agreement, requiring arbitration of any dispute arising out of or in connection with agreement and providing that "it is the express desire of the parties that the prevailing party be awarded costs and attorneys' fees and the award be entered as a judgment in any jurisdiction in which the non-prevailing party does business," and thus, district court was not authorized to award additional attorney fees and costs for post-arbitration litigation to confirm arbitration award in favor of medical billing services provider in amount of $221,147.45 with $16,238.75 in attorney fees and costs for prevailing on client's claim that provider breached agreement.

6 Cases that cite this headnote

[2]  **Alternative Dispute Resolution**
    ⇐ Costs

Client's continued litigation by appealing district court's confirmation of arbitration award in favor of medical billing services provider did not constitute bad faith refusal to abide by arbitrator's award, thus precluding award of post-arbitration attorney fees, where client prevailed on one appeal that resulted in reversal in his favor.

3 Cases that cite this headnote

[3]  **Alternative Dispute Resolution**
    ⇐ Hearing and determination in general

District court's handwritten order denying medical billing services provider's motion for post-arbitration attorney fees and summarily denying provider's motion for prejudgment interest, while citing to case law as controlling authority for denying motion, required

remand to determine whether provider was entitled to prejudgment interest, where cited case law did not address issue of prejudgment interest.

Cases that cite this headnote

**\*465** On Appeal from the United States District Court for the Middle District of Tennessee.

BEFORE: KEITH, COOK, and DONALD, Circuit Judges.

**Opinion**

DAMON J. KEITH, Circuit Judge.

This appeal stems from a litany of litigation between the parties spanning over more than a decade, and is our third review. Today we decide whether the parties' contract allows a district court to award additional attorneys' fees in an arbitration confirmation. The prevailing party in the arbitration proceedings, Glenwood Systems, LLC d/b/a Glenwood Systems, Inc. ("Glenwood"), filed a motion for attorneys' fees, enhancement of attorneys' fees and prejudgment interest, but was denied by the district court. Glenwood argued that the arbitration agreement provided for attorneys' fees and due to the court's prior enforcement, it had the authority to issue additional fees. Alternatively, Glenwood asserted that its adversary's constant evasion of the arbitrator's award constitutes bad faith and warrants additional **\*466** fees. The district court held that under the Federal Arbitration Act ("FAA") as interpreted by *Menke v. Monchecourt,* 17 F.3d 1007 (7th Cir.1994), it did not have jurisdiction to award attorneys' fees associated with confirmation of an arbitration award. The district court only confirmed the award as issued by the arbitrator: $221,147.45, with $16,238.75 for attorney's fees and costs. The district court did not state why it declined to order enhancement of attorneys' fees and prejudgment interest. Because we find that the parties' contract does not authorize a court to award attorneys' fees beyond those issued by an arbitrator, it was not error to deny Glenwood's request. We AFFIRM the district court's judgment denying Glenwood's motion for attorneys' fees and fee enhancement. However, the denial of prejudgment interest is REVERSED and REMANDED for findings of fact.

**I. BACKGROUND**

Crossville Medical Oncology ("Crossville"), through its sole shareholder, Dr. David C. Tabor, initially brought suit against Glenwood in September 2004, alleging that Glenwood breached a Billing Service Agreement (the "Agreement") between the parties. The claim was dismissed after the district court determined that there was an enforceable arbitration clause in the Agreement. We affirmed. *Crossville Med. Oncology, P.C. v. Glenwood Sys., LLC,* 310 Fed.Appx. 858 (6th Cir.2009).

In March 2006, Crossville filed an arbitration demand, and Glenwood filed a counterclaim against Crossville and Dr. Tabor. Over objection that Dr. Tabor consented to arbitration, the arbitrator issued an award against Dr. Tabor for $221,147.45 ("Award"), with an additional $16,238.75 for attorneys' fees. The arbitrator found that Dr. Tabor was liable because he signed of the agreement in his individual capacity. The arbitrator further held that Dr. Tabor breached the Agreement.

Glenwood sought to confirm the Award in federal district court. Crossville objected to the confirmation, arguing that Glenwood's motion to enforce the award against Dr. Tabor was improper because Dr. Tabor had not consented to the arbitration. The district court granted Glenwood's motion, and Crossville appealed. We reversed the district court's decision and remanded the case. *Crossville Med. Oncology, P.C. v. Glenwood Sys., LLC,* 485 Fed.Appx. 821 (6th Cir.2012). We held that the FAA precluded judicial review of those whom were bound by the Agreement. *Id.* We remanded, specifically instructing the district court to determine whether Dr. Tabor was bound by the Agreement. A bench trial was held on September 10, 2013, and the district court found that Dr. Tabor was personally bound by the Agreement. The district court entered a judgment confirming the Award against Dr. Tabor. Dr. Tabor filed an appeal, but subsequently withdrew it.

After the trial, Glenwood filed a motion for attorneys' fees and prejudgment interest. Glenwood sought recovery of attorneys' fees incurred for the various litigation involved after arbitration. Dr. Tabor responded and asserted that the district court lacked authority under the FAA to award attorneys' fees associated with confirmation of an arbitration award. To support his position Dr. Tabor cited *Menke.*

On March 11, 2014, the district court entered a handwritten order denying Glenwood's motion for **attorneys' fees** and prejudgment interest. The ruling stated:

> Based upon *Menke v. Monchecourt*, 17 F.3d 1007 (7th Cir.1994) this motion is DENIED as beyond the authority of the court. The *Huntsville Golf* decision cited by Plaintiff is inapplicable as here the ***467** Defendant Tabor was a party to the **arbitration**, but most of the Defendants in *Huntsville Golf* were not parties to the **arbitration** proceeding.

Order, PageID # : 1407, Jan. 31, 2014, ECF No. 169. Glenwood filed this appeal.

## II. STANDARD OF REVIEW
Generally, a district court's denial of **attorneys' fees** is reviewed for abuse of discretion. *Cleveland v. Ibrahim,* 121 Fed.Appx. 88, 89 (6th Cir.2005). However, when the court's denial of **attorneys' fees** is based on an underlying legal conclusion, we review denial de novo. *See Edwards v. United Parcel Serv., Inc.,* 99 Fed.Appx. 658, 660 (6th Cir.2004). Thus, because the district court determined that it lacked the authority to **award** Glenwood's **attorneys' fees**, we review the district court's decision de novo. *See id.*

## III. DISCUSSION
Glenwood appeals the district court's judgment denying its motion for post-**arbitration attorneys' fees** and fee enhancement. Glenwood first asserts that paragraph 10 of the Agreement provides for the recovery of **attorneys' fees**; Glenwood argues that because the district court proceedings were not to simply confirm the **award**, it can enforce the Agreement. Glenwood also contends that, in the alternative, it is entitled to **attorneys' fees** "based on Dr. Tabor's repeated acts of bad faith in avoiding confirmation of the **Award** against him personally." Appellant's Br. 34. In addition to appealing the district court's judgment denying its motion for **attorneys' fees**, Glenwood also appeals the district court's judgment denying prejudgment interest. We address each of these arguments in turn.

### A. *Attorneys' Fees*

#### 1. *Arbitration Agreement Provision*

The parties dispute whether a court may **award attorneys' fees** to a party for post-**arbitration** litigation. Citing *Menke,* the district court held that it did not have jurisdiction to **award attorneys' fees** for post-**arbitration** litigation, and we agree.

Generally, under the "American" rule, litigants pay their own **attorneys' fees**. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 263–64, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The FAA neither contemplates nor precludes an **award** of **attorneys' fees**. *See Menke,* 17 F.3d at 1009. In *Menke* the Seventh Circuit held that "there is nothing in the Federal **Arbitration** Act which provides **attorneys' fees** to a party who is successful in seeking confirmation of an **arbitration award** in federal courts." *Id.* The Court further stated that a court may only **award attorneys' fees** if it is authorized by statute, or by the parties' contractual agreement. *Id.* ("Absent statutory authorization or contractual agreement between the parties, the prevailing American rule is that each party in federal litigation pays his own **attorneys' fees**.").

[1] Crossville argues that this case presents no exception; the parties are bound by the American rule and *Menke,* and thus are required to pay their own **attorneys' fees**. Crossville, however, concedes that the Agreement anticipates **attorneys' fees**, but only in the limited context of fees associated with the **arbitration** proceedings, not fees to enforce the **Award**. Glenwood agrees that the FAA does not provide recovery for **attorneys' fees**, *See* Appellant Br. 24, but argues that the parties' agreement warrants departing from the American rule, and rendering *Menke* inapplicable. Specifically, Glenwood asserts that the Agreement entitles it to all fees associated with enforcing its **Award**. Glenwood contends that paragraph 10 of the Agreement provides for an ***468 award** of **attorneys' fees** to the prevailing party not just at **arbitration**, but "at any stage of litigation between the parties."

Paragraph 10 of the Agreement states:

> Miscellaneous: This Agreement shall be governed by laws of the State of Connecticut. Any dispute arising out of or in connection with this Agreement, if not otherwise

> resolved, shall be determined by **arbitration** in New Haven County, Connecticut, in accordance with the Rules of American **Arbitration** Association and it is the express desire of the parties that the prevailing party be **awarded** costs and **attorneys' fees** and the **award** be entered as a judgment in any jurisdiction in which the non-prevailing party does business.

Billing Service Agreement, Case 2:10–cv–00061, Document 1–2 PageID # :37.

Contract interpretation requires us to apply state substantive law and determine the parties' intent from "the plain language of the contract."[1] *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.,* 525 F.3d 409, 421 (6th Cir.2008). Thus, "[w]e accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract." *Cantonbury Heights Condominium Ass'n, Inc. v. Local Land Dev., LLC,* 273 Conn. 724, 873 A.2d 898, 904 (2005). "Where the language is unambiguous, we must give the contract effect according to its terms." *Id.* "Moreover, in construing contracts, we give effect to all the language included therein, as 'the law of contract interpretation ... militates against interpreting a contract in a way that renders a provision superfluous.' " *Ramirez v. Health Net of Ne., Inc.,* 285 Conn. 1, 938 A.2d 576, 586 (2008) (quoting *Wesley v. Schaller Subaru, Inc.,* 277 Conn. 526, 893 A.2d 389, 402 (2006)).

A rational construction of the Agreement compels the conclusion that the Agreement is not as broad as Glenwood asserts. The Agreement here only authorizes an *arbitrator* to **award attorneys' fees** and costs during *arbitration,* and authorizes the district court to enter the **award** as a judgment. The words "**award**" and "entered as a judgment" support our conclusion. **Arbitration** proceedings, and subsequent confirmation, operate such that **arbitrators** make an "**award**," and judges "enter," as "judgments," **arbitration** "**awards**." Thus, applying the rules of contract interpretation, the Agreement does not anticipate an **award** of post-**arbitration attorneys' fees** for subsequent proceedings and litigation.

Glenwood cites *Sailfrog Software, Inc. v. Theonramp Group., Inc.,* No. 97–7014, 1998 WL 30100 (N.D.Cal. Jan. 20, 1998), as support for its argument that the Agreement provision authorizes an additional **award** of **attorneys' fees**. However, *Sailfrog* does not support Glenwood's position. The *Sailfrog* court interpreted an **arbitration** agreement and concluded that the parties' contract anticipated the payment of costs incurred to confirm an **arbitration award**. *Id.* at *5. The *Sailfrog* **arbitration** agreement stated:

> [i]f any action at law or in equity is brought for breach of or is necessary to enforce the terms of this agreement, the prevailing party shall be entitled to reasonable **attorney's fees**, costs, and necessary disbursements in addition to any other release to which this party may be entitled.

**\*469** *Id.* The district court held the clause was broad, incorporating "any action at law or in equity." It reasoned that "such clauses support the **awarding** of court costs and reasonable **attorneys' fees** to the successful party both for the **arbitration** itself and the confirmation proceeding." *Id.*

While parties are free to contract for the payment of **attorney's fees**, *see Menke,* 17 F.3d at 1009, the provision in dispute here is not as broad as *Sailfrog* 's . Here, there is language that limits the **award** of **attorneys' fees**. Instead, of the all-encompassing entitlement to **attorneys' fees** for "any action at law or in equity[,]" the provision here states that "the **award** be entered as a judgment." As stated above, judges enter judgments. There is no language that can be interpreted to imply that a court may do more than enter the judgment. Additionally, the provision in *Sailfrog* allows **attorneys' fees** for an action "necessary to enforce the terms of this agreement." *Sailfrog,* 1998 WL 30100, at *5. These words contemplate an **award** of **attorneys' fees** for actions outside the scope of **arbitration** because additional litigation could be necessary to enforce the agreement. No similar wording appears in paragraph 10. Thus, because the provision in *Sailfrog* is broader than the provision here, we reject Glenwood's argument that *Sailfrog* supports its entitlement to post-**arbitration attorneys' fees**.

We must note that our sister circuit in *Schlobohm v. Pepperidge Farm, Inc.,* 806 F.2d 578 (5th Cir.1986),

upheld the district court's **award** of **attorneys' fees** in a post-**arbitration** proceeding. *Id.* at 578. However, our holding today does not conflict with the Fifth Circuit's holding in *Schlobohm;* it is supported by it. In *Schlobohm,* Pepperidge Farm argued that the district court had no power to **award** Schlobohm **attorneys' fees** because under the FAA, the court sat solely to confirm the **arbitration award**. *Id.* at 580. The Fifth Circuit rejected Pepperidge Farm's argument, holding that because the parties' agreement did not state that "any dispute arising from the contract" would be submitted to **arbitration**, a court was free to consider whether an **award** of post-**arbitration** fees was warranted. *Id.* at 581. The Fifth Circuit further reasoned that because there was an **arbitration** proceeding, which did not address **attorneys' fees**, a court would not be precluded from deciding whether an **award** of **attorneys' fees** was appropriate. *Id.* *Schlobohm* stated that only in cases where the parties' agreement "intended to avoid court litigation by resolving the entire dispute through **arbitration**, [would] intervention by the court to **award** additional relief [ ] be inconsistent with the language and policy of the Federal **Arbitration** Act." *Id.* The *Schlobohm* court opined that this is especially the case when the agreement provides that "any dispute arising from the contract" would be submitted to **arbitration**. *Id.* ("If, as is often the case, the **arbitration** agreement had provided that 'any dispute arising from the contract' would be submitted to **arbitration**, a strong case could be made that any **award** of **attorney's fees**, interest, and costs was necessarily submitted to the **arbitrators** and a district court that made such an **award** would be impermissibly modifying the **arbitrators' decision**").

The Agreement in dispute here has the precise language that the Fifth Circuit in *Schlobohm* suggested would preclude a court from adjudicating the issue of post-**arbitration attorneys' fees**. It is evident that the Agreement does not authorize a court to **award attorneys' fees**. Paragraph 10 states that "[a]ny dispute arising out of or in connection with this Agreement ... shall be determined by **arbitration**." The parties intended to avoid court litigation by resolving "any dispute" through **arbitration**, *470 including **attorneys' fees**. Glenwood, indeed, did submit the issue of **attorneys' fees** to **arbitration**. And, Glenwood, as the prevailing party, received an **award** of **attorneys' fees** in the **arbitration award**. Thus, while the agreement in *Schlobohm* allowed the court to **award** additional **attorneys' fees**, such is not the case here because Glenwood agreed to submit its entire dispute to **arbitration**. Accordingly, we find that the Agreement does not authorize the court to do more than enter the **arbitration award** as a judgment.

Because the FAA does not provide for an **award** of **attorney's fees** in a confirmation action, and because the Agreement does not authorize additional **attorneys' fees**, we conclude that there is no basis for departing from the American rule; *Menke* is directly on point. As held in *Menke,* "[a]bsent statutory authorization or contractual agreement between the parties, the prevailing American rule is that each party in federal litigation pays his own **attorneys' fees**." *Menke,* 17 F.3d at 1009. Therefore, the district court did not err in denying Glenwood's motion for post-**arbitration attorneys' fees**.

### 2. Bad Faith

Glenwood's alternative argument is that Dr. Tabor litigated the **arbitrator's decision** in bad faith, and thus, it is entitled to its post-**arbitration attorneys' fees**. Glenwood asserts that Dr. Tabor has refused to abide by the **arbitrator's decision**, and has essentially stalled the confirmation of the **Award** by continuing to litigate the matter.

As we have already indicated, generally, "each party in federal litigation pays its own **attorneys' fees**," *id.,* except in circumstances "where a party or counsel have [sic] acted in bad faith in the instigation or conduct of litigation." *Monroe Auto Equip. Co. v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers,* 981 F.2d 261, 270 (6th Cir.1992) (quoting *Ray A. Scharer & Co. v. Plabell Rubber Prod., Inc.,* 858 F.2d 317, 320 (6th Cir.1988)). In such circumstances, "the court has the inherent authority to assess an **award** of **attorney's fees** against either the litigant or his attorney." *Id.* "[A]n **award** of **attorney's fees** ... is an extreme sanction, and must be limited to truly egregious cases of misconduct." *Id.* "An unjustified refusal to abide by an **arbitrator's award** may constitute bad faith for the purpose of **awarding attorneys' fees**." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. United Farm Tools, Inc., Speedy Mfg. Div.,* 762 F.2d 76, 77 (8th Cir.1985) (citing *Int'l Union of Petroleum & Indus. Workers v. W. Indus. Maint., Inc.,* 707 F.2d 425, 428 (9th Cir.1983)).

[2] The record does not support Glenwood's claim that Dr. Tabor refused to abide by the **arbitrator's award** in bad faith. While the record shows that Crossville and Dr. Tabor filed three appeals to this Court, these actions do not rise to the level of "egregious misconduct" as demonstrated in other cases warranting sanctioned **attorneys' fees**. *See, e.g., Dreis & Krump Mfg. Co. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 8,* 802 F.2d 247, 249 (7th Cir.1986) (**awarding** fees after concluding that the " 'company had no ground for challenging the [**arbitrator's**] **decision** in court,' " and finding that company filed suit after the statute of limitations had run); *see also United Farm Tools,* 762 F.2d at 77 (finding **attorneys' fees** were warranted because the defendant failed to show any substantial ground for refusal to comply with **arbitrator's award** when it did not even act to have the **award** set aside).

Dr. Tabor presented adequate arguments during the litigation, one of which resulted in the reversal of the district *471 court's confirmation. Crossville filed its first appeal after the district court dismissed its case and referred it to **arbitration**. On appeal, Crossville argued that Glenwood waived its right to **arbitration** by first engaging in litigation; that Glenwood could not enforce the **arbitration** clause because it was not a party to the Agreement; and that the district court erred in allowing it to properly state a claim against Glenwood. The basis for Crossville's last argument was that it was unaware that Glenwood Systems, Inc. (a company that it entered into the Agreement with, and believed to be a trade name of Glenwood Services, LLC), was a separate and distinct entity from Glenwood Systems, LLC (whom it filed its complaint against). We affirmed the district court's dismissal and referral to **arbitration**. The parties participated in **arbitration** proceedings, and without discussion the **arbitrator** found that Dr. Tabor was personally liable. Crossville filed its second appeal after the district court confirmed that **award**. The arguments raised during the second appeal were successful. In that appeal, Dr. Tabor asserted that he had not agreed to be bound by **arbitration**, and thus, that he was not a party to the **arbitration**. This Court agreed, finding that Dr. Tabor had not "clearly and unmistakably" agreed to submit to **arbitration**. *Crossville,* 485 Fed.Appx. at 823. Therefore, Dr. Tabor's appeal of the district court's judgment was certainly not unfounded, as he prevailed in his assertion. Consequently, we cannot say that Dr. Tabor engaged in bad faith in the filing and litigation of two appeals, one of which resulted in a reversal in his favor.

Based on the foregoing actions, we do not find that Dr. Tabor's continued litigation constitutes bad faith.

### B. Fee Enhancement

Glenwood also requests an enhancement of **attorneys' fees**. "Fee enhancements are permissible in rare cases of 'exceptional success.' " *Gonter v. Hunt Valve Co.,* 510 F.3d 610, 621 (6th Cir.2007) (quoting *Barnes v. City of Cincinnati,* 401 F.3d 729, 745 (6th Cir.2005)). The relevant inquiry is "whether an adjustment is necessary to the determination of a reasonable fee." *Barnes,* 401 F.3d at 745 (citing *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The party seeking an enhancement bears the burden of proving such necessity. *See Blum,* 465 U.S. at 898, 104 S.Ct. 1541.

Glenwood does not clearly state whether it requests an enhancement of the fees issued by the **arbitrator** or additional **attorneys' fees** that it sought from the district court. A review of its memorandum in support of its motion states that "this Court should enhance any **attorney's fee** *ultimately* **awarded**." Appellant Mem. in Support of Mot. for Att'y's Fees, Case 2:04–cv–00091 Document 163 PageID # : 1334 (emphasis added). Because the **arbitrator's** fees had already been **awarded**, we interpret this statement to mean that Glenwood sought an enhancement of any additional post-**arbitration attorneys' fees** that the district court may have **awarded**. As held above, Glenwood is not entitled to additional post-**arbitration attorneys' fees**, and thus, it could not be entitled to an enhancement of those fees. We uphold the decision of the district court, which declined to enhance fees.

### C. Prejudgment Interest

[3] In its handwritten order denying Glenwood's motion for **attorneys' fees**, the district court summarily denied Glenwood's motion for prejudgment interest. The order cites *Menke* as controlling authority for the denial of the motion. However, *Menke,* does not address the issue of prejudgment interest, and the district *472 court gave no other reason to support its decision. Because **attorneys' fees** and prejudgment interest are not mutually exclusive, the district court's denial of Glenwood's **attorneys' fees** does not necessitate a denial

of Glenwood's request for prejudgment interest. Thus, we remand to the district court to determine whether Glenwood is entitled to an **award** of prejudgment interest. *See Drennan v. Gen. Motors Corp.,* 977 F.2d 246, 253 (6th Cir.1992) ("The district court, without explanation, declined to impose prejudgment interest ... [t]hus, the denial of prejudgment interest on the damages **award** is remanded with instructions to support an **award** or denial of prejudgment interest with findings of fact incorporating its reasons for its decision.").

### IV. CONCLUSION

Accordingly, we **AFFIRM** the district court's judgment denying Glenwood's motion for **attorneys' fees** and fee enhancement. The denial of prejudgment interest is **REVERSED** and **REMANDED** for findings of fact.

**All Citations**

610 Fed.Appx. 464

---

Footnotes

1   The Agreement provides that Connecticut law governs, but the Agreement may have been entered into in Tennessee. We do not determine whether the choice-of-law provision is valid, although neither party disputes its validity because there is no meaningful distinction under either state's substantive law as conceded by the parties.

---

**End of Document**  © 2018 Thomson Reuters. No claim to original U.S. Government Works.