**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

GORDA DUNIGAN, as Personal Representative
 for the ESTATE OF JAMES DUNIGAN, Deceased,

     Plaintiff,                         Case No. 1:16-CV-01324
                                                 Hon. Janet T. Neff

v                                            Mag. Judge Ellen S. Carmody

BRONSON METHODIST HOSPITAL,

     Defendant.

_____

GEOFFREY N. FIEGER (P30441)         JOHN C. O'LOUGHLIN (P33343)
JAMES J. HARRINGTON, IV (P65351)    Smith, Haughey, Rice & Roegge
Fieger, Fieger, Kenney & Harrington, P.C.  Attorney for Defendant, Bronson
Attorneys for Plaintiff                  100 Monroe Center NW
19390 West 10 Mile Road              Grand Rapids, MI 49503
Southfield, MI 48075                 (616) 774-8000
(248) 355-5555

_____

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**

**_** ORAL ARGUMENT REQUESTED **_**

NOW COMES Plaintiff, GORDA DUNIGAN, as Personal Representative for the

ESTATE OF JAMES DUNIGAN, Deceased, by and through her attorneys, and in

response opposing Defendant's Motion for Summary Judgment Pursuant to Fed. R. Civ.

P. 56 states as follows:

     1.       Plaintiff admits this paragraph.

     2.       Denied in the manner and form alleged. Plaintiff does not allege in her

complaint that Defendant "failed to recognize" that Mr. Dunigan needed emergency

medical aid. Rather, Plaintiff's complaint alleges that Defendant evicted Mr. Dunigan *despite the fact the he was complaining of pain and was in visible agony*. Mr. Dunigan was forcibly removed from the hospital despite the fact that he was so weakened that he could not even keep himself upright, and despite the fact that he was exhibiting symptoms of congestive heart failure. Mr. Shoemaker, one of Defendant Bronson's security officers involved in the eviction, admitted in his deposition that he knows that labored "snoring respirations" that Mr. Dunigan was exhibiting indicated congestive heart failure, and that the condition is an emergency medical condition. Additionally, the video evidence shows Mr. Dunigan barely responsive, unable to walk on his own, and gasping for air. All Bronson security officers viewing his condition would know that he was in need of emergency medical aid. A reasonable juror, viewing this evidence, could conclude that the security officers had actual knowledge that Mr. Dunigan was suffering from an emergency medical condition. Thus, Plaintiff asserts that Defendant had *actual knowledge* that Mr. Dunigan was in an unstable condition and needed emergency medical aid but evicted him from the hospital anyway.

3.    Admitted that Plaintiff has alleged that Mr. Dunigan was ejected from the hospital while he was in the middle of a medical emergency.

4.    Plaintiff does not contest this restatement of law, but further avers that the gravamen of Plaintiff's EMTALA claim involves "failure to stabilize an emergency medical condition."

5.    Plaintiff does not contest this restatement of law.

6.      Denied. Bronson had a duty under EMTALA to stabilize Mr. Dunigan and provide appropriate emergent medical care. Instead, Mr. Dunigan was forcibly removed from the hospital despite the fact that his physical condition was so bad that he was unable to stand on his own feet. Mr. Dunigan's condition had deteriorated to the point that he was laying prostrate on the ground outside the hospital while Defendant's security waited for the cops to come and pick him up.

7.      Denied that Defendant Bronson is entitled to summary judgment for the reasons explained in the attached brief.

8.      Denied that Defendant Bronson is entitled to summary judgment for the reasons explained in the attached brief.

For all of the foregoing reasons and for the reasons explained more fully in Plaintiff's attached brief, Plaintiff respectfully requests that this Honorable Court DENY Defendant's Motion for Summary Judgment.

Respectfully submitted,

/s/ James J. Harrington, IV

GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON, IV (P65351)
Attorneys for Plaintiff
19390 W. 10 Mile Road
Southfield, MI 48075
(248) 355-5555
j.harrington@fiegerlaw.com

Dated:  May 22, 2018

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GORDA DUNIGAN, as Personal Representative
 for the ESTATE OF JAMES DUNIGAN, Deceased,

     Plaintiff,                                                   Case No. 1:16-CV-01324
                                                                        Hon. Janet T. Neff
v                                                                       Mag. Judge Ellen S. Carmody

BRONSON METHODIST HOSPITAL,

     Defendant.

_____

GEOFFREY N. FIEGER (P30441)                    JOHN C. O'LOUGHLIN (P33343)
JAMES J. HARRINGTON, IV (P65351)               Smith, Haughey, Rice & Roegge
Fieger, Fieger, Kenney & Harrington, P.C.       Attorney for Defendant, Bronson
Attorneys for Plaintiff                         100 Monroe Center NW
19390 West 10 Mile Road                         Grand Rapids, MI 49503
Southfield, MI 48075                            (616) 774-8000
(248) 355-5555

_____

## PLAINTIFF'S BRIEF IN SUPPORT OF HER RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

## CONTROLLING AND MOST APPROPRIATE AUTHORITIES

*Cleland v Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990)

*Moses v. Providence Hosp. & Med. Centers, Inc.*, 561 F.3d 573, 585 (6th Cir. 2009)

*Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 788 (6th Cir. 2003)

42 U.S.C.A. § 1395dd(a)

42 U.S.C.A. § 1395dd(b)

## STATEMENT OF ISSUE PRESENTED

Bronson Methodist Hospital security officers forcibly ejected Mr. Dunigan off the hospital premises while he was in the middle of a medical emergency. Video surveillance footage of the incident shows that Mr. Dunigan was incoherent, unable to walk or stand on his own, and had labored "snoring respirations." A reasonable person seeing Mr. Dunigan's condition could conclude that he was suffering from an emergency medical condition and required emergency medical aid. However, instead of taking Mr. Dunigan to the emergency department for evaluation and treatment, the security officers called the cops and sent Mr. Dunigan away from the hospital. Tragically, Mr. Dunigan died just minutes afterwards, while he was being transported to jail.

Based on these facts, can a reasonable juror conclude that Bronson, through its agents, had actual knowledge that Mr. Dunigan had an emergency medical condition, and that the hospital failed to stabilize him before transferring him from the hospital, in violation of 42 U.S.C.A. § 1395dd(b) (EMTALA)?

Plaintiff answers:          "Yes."
Defendant answers:      "No."

1

## I.      COUNTERSTATEMENT OF MATERIAL FACTS

On May 6, 2016, at about 2:30 in the morning, James Dunigan went to Bronson Methodist Hospital complaining of chest pain and injuries suffered after falling off a bus. After being seen by the emergency department for mechanical fall injuries only, Mr. Dunigan went to the ER waiting room at around 4:30 am. Mr. Dunigan's complaints of chest pain were addressed as a part of injuries suffered in his fall.

Mr. Dunigan's complaints of chest pain were actually warning signs of impending congestive heart failure. While he was in the waiting room, Mr. Dunigan started exhibiting clear symptoms of congestive heart failure and respiratory distress. Mr. Dunigan could not ambulate on his own, and his speech was impaired. At around 6:10 am, Bronson security officer Charles Shoemaker, Art Carlisle and Zach Rickli approached Mr. Dunigan and asked him to leave the hospital. At this point, Mr. Dunigan's medcal condition had deteriorated to the point that he could not follow commands to walk or hold himself upright, and it was clear that he needed emergency medical aid. Instead of being directed back to get looked at, the three Bronson security officers, (Carlisle, Rickli, Shoemaker) ejected Mr. Dunigan from the hospital.  These events are shown on the Hospital Surveillance footage, attached as Exhibit 1 to this response and to be filed with the Court in the traditional manner.[1] When the cops were

---

[1] There are two discs attached, one with an execution file containing proprietary software and the other with the actual video footage. In order to play the videos, the proprietary software must first be installed on a computer. After the software is installed, the videos on the second CD can be viewed.

called, Mr. Dunigan was so unstable that he was unable to stand upright on his own and was barely conscious.

The hospital surveillance videos show that Defendant Bronson, through its security officers, had actual knowledge that Mr. Dunigan was in a deteriorating and unstable medical condition when he was forcibly ejected from the hospital.

The "Waiting Room 5" video shows Mr. Dunigan in the waiting room of the hospital. He is lying in a chair and is unresponsive for the most part. At 6:11, a security officer (identified as Charles Shoemaker) approaches Mr. Dunigan and speaks with him. A few minutes later, at 6:16, Mr. Shoemaker comes back with two others (Carlisle, and Rickli). At this point, the officers try to get Mr. Dunigan to get up, but Mr. Dunigan is unable to stay standing. The officers bring over a wheelchair, and after a few minutes, are able to place Mr. Dunigan in it. It is clear from watching the video that Mr. Dunigan is barely responsive and presents almost a "dead weight" during the process. Despite this, defendant's security officers wheel him out of the hospital instead of taking Mr. Dunigan into the ER and getting Mr. Dunigan emergency medical care.

The "North Pavilion PTZ" video shows Defendant's security officers taking Mr. Dunigan outside to wait for the police. Starting at 6:34 on the video, the security officers remove Mr. Dunigan from the wheelchair he was brought outside in. Mr. Dunigan is so weak and disoriented that he is unable to remain standing. The security officers try to get Mr. Dunigan to stand, but once again he cannot not stay upright and can be seen in the video footage crumbling to the ground. The officers lay him down prostrate on the ground, where he remains until the cops come at 6:42.

3

Eventually, the Kalamazoo Public Safety officers arrived at the hospital. Mr. Dunigan was then physically lifted and placed in the police vehicle in order to be taken to jail. The video from the police vehicle is attached as Exhibit 2, also filed in the traditional manner. This video is significant because it also has audio, and the viewer can both see and *hear* Mr. Dunigan's labored breathing and gasps, concrete evidence that Mr. Dunigan was in the middle of a medical emergency and needed to be taken into the emergency room, not forcibly ejected from the hospital.

Bronson Security Officer Charles Shoemaker was one of the security officers involved in ejecting Mr. Dunigan from the hospital. (Exhibit 3, Deposition of Charles Shoemaker, p. 25) In addition to being a security officer, Mr. Shoemaker is a trained Emergency Medical Technician (EMT). (Id. at 7) As a part of his duties as an EMT, Mr. Shoemaker had training in patient care, including assessing a patient's emergency medical situation and providing EMT care. (Id. at 9) These duties would include assessing a patient's vitals and stabilizing a patient. (Id.)

Mr. Shoemaker, as a part of his training at Bronson, received training regarding patient-rights, with an emphasis on a patient's "right to be seen." (Id. at 20-21) Mr. Shoemaker understood that the "right to be seen" was the patient's right to have medical treatment provided, to not be turned away from the hospital in the face of an obvious emergent medical need. (Id.) Mr. Shoemaker knew that if he observed someone who looked like they were in need of medical attention, the appropriate course of action was to get the person seen for treatment. (Id. at 21)

In fact, Mr. Shoemaker testified that he has previously helped a patient get medical treatment, and he would have done so even if the patient did not (and perhaps could not) verbally ask "to be seen." (Id. at 21-22) At the time, Mr. Shoemaker saw an individual outside on the garden level of the hospital by a ramp. The individual was reported to be homeless and Mr. Shoemaker observed that the individual was "unsteady" and his speech was impaired. (Id. at 22) In response, Mr. Shoemaker procured a wheelchair and assisted that individual to get medical attention. Mr. Shoemaker reiterated that he would have gotten the individual medical treatment, whether he asked for it or not, and regardless of whether the individual had been previously discharged by the hospital. (Id. at 24)

On May 6, 2016, Mr. Shoemaker was involved with ejecting Mr. Dunigan from the hospital. When he first met Mr. Dunigan in the waiting room, Mr. Shoemaker described Mr. Dunigan as "mumbling at lot" and "incoherent." (Id. at 29) Mr. Shoemaker further testified that Mr. Dunigan was breathing fine during the time that he interacted with him; Mr. Dunigan was not exhibiting the loud "snoring respirations" that he was while being transported to the jail (as depicted in the police video). (Id. at 32-33) Mr. Shoemaker admitted that if he had heard the "snoring respirations," he would have been concerned. (Id .at 33) He explained that such respirations would be indicative or respiratory failure, and "it would obviously cause some concern as far as congestive heart failure." (Id. at 34)

Mr. Shoemaker is aware of the signs of congestive heart failure due to his training as an EMT. (Id.) Mr. Shoemaker further admitted that if Mr. Dunigan's

breathing changed from normal to snoring respirations during the time that Mr. Dunigan was outside and being transferred into the police vehicle, the change in breathing would be significant and would require emergency intervention. (Id. at 35) Mr. Shoemaker testified that if he saw the change in breathing, he hypothetically would have gotten Mr. Dunigan medical aid. (Id.)

The video evidence establishes that Mr. Dunigan's breathing *was labored while* he *was still outside the hospital* and being loaded into the police vehicle; Mr. Shoemaker (despite his contradictory deposition testimony) heard the "snoring respirations," yet did nothing to get Mr. Dunigan any aid. Plaintiff's counsel played the relevant video footage during Mr. Shoemaker's deposition. After viewing/hearing the video, Mr. Shoemaker acknowledged that Mr. Dunigan was making the "snoring respirations"— that Mr. Shoemaker earlier admitted he knew indicated congestive heart failure and respiratory failure—while Dunigan was outside of the police vehicle and in Mr. Shoemaker's vicinity. (Id. at 43-44; 49-50) Art Carlisle,  one of the other Bronson Security Officers involved, was standing right next to Mr. Dunigan's head while they were loading him into the police vehicle. (Id. at 49-50) Given his location, Mr. Carlisle would certainly have heard Mr. Dunigan's labored "snoring respirations." Despite this, none of the Bronson officers got Mr. Dunigan any medical aid.

Mr. Shoemaker consistently disregarded Mr. Dunigan's complaints, and even gave misinformation to the Kalamazoo Public Safety officers who responded. Mr. Dunigan told Mr. Shoemaker that "my legs ain't ready," and Mr. Shoemaker responded with "Bull!@#$." (Id. at 48) Mr. Shoemaker also told the officers that Mr. Dunigan had

been "up walking around;" however, Mr. Shoemaker never actually witnessed Mr. Dunigan walking around and had no firsthand knowledge of the fact. (Id. at 51-52) In fact, Mr. Shoemaker's comments that morning disregarded Mr. Dunigan's physical state, were dismissive and unprofessional. On the video, Mr. Shoemaker can be heard stating "Act like a grown-ass man. F&*%ing stupid," and making jokes about dumping Mr. Dunigan out of his wheelchair. (Id. at 53-54)

There is absolutely no doubt, and Plaintiff does have expert support, that Mr. Dunigan's death could have and should have been prevented.[2] Mr. Dunigan died from congestive heart failure.[3]  He had every single classic sign and symptom of congestive heart failure at the time the Bronson security officers became involved with Mr. Dunigan.  Those signs and symptoms included difficulty breathing, shortness of breath, unresponsiveness, audible congestion and most important, foaming at the mouth.[4] Simply put, he was in respiratory distress.  In the autopsy report, the pathologist also noted parenchyma (lung tissue), which was congested and emphysematous (a marked abnormal increase in the size of the airspace resulting in labored breathing and increased susceptibility to infection). There is no doubt that Mr. Dunigan was suffering from congestive heart failure.

All the hospital security officers needed to do in order to save his life was to get Mr. Dunigan medical attention. Instead of getting Mr. Dunigan medical aid at the

---

[2] Exhibit 4, Deposition of Dr. Robert Stark, p. 71; Exhibit 5, Deposition of Dr. Charles Landers, p. 112-113; Exhibit 6, Deposition of Dr. Saul Levine, p. 114.

[3] Exhibit 7, Autopsy Report; Exhibit 8, Deposition of Dr. Werner Spitz, p. 27, 102.

[4] Exhibit 8, Deposition of Dr. Werner Spitz, p. 27.

hospital, Mr. Shoemaker (along with the other Bronson security officers), helped load Mr. Dunigan into the police cruiser and sent him to his death.

Plaintiff initially filed a single count complaint against Bronson alleging a claim under 42 U.S.C. §1395dd, the Emergency Medical Treatment and Active Labor Act (EMTALA) for failing to stabilize Mr. Dunigan and instead dumping him out of the hospital to his death. On June 23, 2017, Plaintiff filed a First Amended Complaint, supplementing the factual background in the complaint to reflect facts learned from the surveillance videos. (Docket No. 25)

This case was consolidated with *Estate of Dunigan v. Nugent et al*, 1:16-cv-01325 for purposes of discovery. In that case, Plaintiff alleged claims of deliberate indifference to a serious medical need in violation of Mr. Dunigan's Fourteenth Amendment constitutional rights, actionable under 42 U.S.C. §1983, against the Kalamazoo Safety Officers. That case has now been resolved.

On April 24, 2018 Defendant Bronson filed a Rule 56 motion for summary judgment of Plaintiff's EMTALA claim against Defendant Bronson.[5] Bronson's motion

---

[5] On May 21, 2018, Plaintiff filed a motion for leave to amend her complaint and administratively stay this case pending expiration of the mandatory notice waiting period for filing medical malpractice cases under M.C.L. 600.2912b. Plaintiff intends to file medical malpractice suits against Bronson and its actual and ostensible agents for the medical care provided to Mr. Dunigan. Plaintiff has asked that the Court grant her motion to amend so that the medical malpractice claims can be litigated in the same case as the EMTALA claim. Alternatively, Plaintiff has requested that the Court allow her to dismiss the EMTALA claim without prejudice, again so that all the claims can be litigated in the same suit. Defendant has not responded to Plaintiff's motion to amend as of the filing of this response.

should be denied because, when the video evidence and testimony is viewed in a light most favorable to Plaintiff, Plaintiff has a valid EMTALA claim for failure to stabilize.

## II.    COUNTERSTATEMENT OF STANDARD OF REVIEW

Summary judgment is appropriate only in those cases where the pleadings, affidavits, and responses to discovery "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P 56(c); *Celotex Corp v. Catrett*, 447 U.S. 317, 323 (1986). In determining whether there is a genuine issue of material fact, the record is viewed in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Under Fed. R. Civ. P. 56(c), the moving party has the burden of establishing that there are no genuine issues of material fact and that he is entitled to a judgment as a matter of law.  *Darrah v. City of Oak Park*, 255 F.3d 301 (6th Cir. 2001).

A material fact is "one that might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id*.  Credibility determinations, the weighting of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge. *Anderson*, 477 U.S. at 255.  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn" in the nommovant's favor.  *Id*.

Despite filing its motion pursuant to Fed. R. Civ. P. 56, Defendant Bronson's argument does not really question the factual support for Plaintiff's claim (although its

recitation of facts are not in a "light most favorable" to plaintiff, as required under that rule). Instead, Bronson's argument focuses on the legal sufficiency of Plaintiff's claims under EMTALA. Defendant ignores Plaintiff's allegations against the Bronson Security Officers, and does not provide any meaningful analysis as to whether the officers' conduct was in violation of EMTALA. Instead, Bronson keeps its argument focused on the medical providers' conduct only.

When the entire record, and the full scope of Plaintiff's allegations against Bronson (especially its Security officers) is viewed in a light most favorable to Plaintiff, it is clear that Plaintiff has valid claims against Defendant Bronson for violation of EMTALA for failure to stabilize Mr. Dunigan before forcibly ejecting him from the hospital premises.

## III.    LAW AND ARGUMENT

### A.    Plaintiff has stated a cause of action for violation of EMTALA.

Defendant spends the bulk of its brief characterizing Plaintiff's claim as an "improper motive"/medical screening case and asserts that, under the standard applied by the Sixth Circuit in *Cleland v Bronson Health Care Group, Inc.*, 917 F.2d 266 (6th Cir. 1990), Plaintiff cannot establish an EMTALA claim as a matter of law. However, Plaintiffs claim as pleaded is for "failure to stabilize an emergency medical condition" before transfer claim. Under this theory of liability, Plaintiff clearly states a claim for relief under 42 U.S.C. § 1395dd with sufficient evidentiary support to survive summary judgment.

### i.      The Statute, its Purpose and its History

Congress passed the EMTALA as part of the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1986, Pub. L. No. 99-272 § 1921, 100 Stat. 82, 164-67 (42 U.S.C. § 1395 dd). To be successful in a claim under the EMTALA, a plaintiff must show that he "was suffering from an 'emergency medical condition' and that the defendant transferred (him) before it had 'stabilized' (him) within the meaning of the act." *Thornton v. Southwest Detroit Hospital*, 895 F.2d 1131, 1133 (6th Cir. 1990). Liability under an EMTALA claim is not based on fault but rather on satisfying these two elements. *Cooper v. Gulf Breeze Hospital, Inc.*, 839 F.Supp. 1539, 1542 (N.D. Fla 1993). Courts universally hold that a cause of action under the Act is not analogous to a state medical malpractice claim because it creates liability for the failure or refusal to treat so as to stabilize someone who is suffering an emergency medical condition. *Cleland v. Bronson Health Care* Group, 917 F.2d 266, 268 (6th Cir. 1990); *Summers v. Baptist Medical Center Arkadelphia*, 91 F3d 1132, 1137 (8th Cir. 1996).

Through the EMTALA, Congress imposes two duties on hospitals that have entered into Medicare provider agreements. The first relates to the hospital's duty to screen, meaning evaluate, all persons in the same manner so as to determine if he or she has an emergency medical condition. 42 U.S.C.A. § 1395dd(a). The second duty arises when, as in the instant case, an emergency medical condition is identified. See 42 U.S.C.A. § 1395dd(b). The treatment necessary to stabilize a person is that treatment necessary to assure within reasonable medical probability, that no material

11

deterioration of the condition is likely to result from or occur during the transfer from the facility. 42 U.S.C.A. § 1395dd (e)(3)(A).

The relevant statutory provisions state:

§ 1395dd. Examination and treatment for emergency medical conditions and women in labor

(a) Medical screening requirement. In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this title [42 USCS §§ 1395 et seq.]) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(l)) exists.

(b) Necessary stabilizing treatment for emergency medical conditions and labor.

(1) In general. If any individual (whether or not eligible for benefits under this title [42 USCS §§ 1395 et seq.]) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either --

(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

(B) for transfer of the individual to another medical facility in accordance with subsection (c).

(c) Restricting transfers until individual stabilized.

(1) Rule. If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual ...

(2) Appropriate transfer. An appropriate transfer to a medical facility is a transfer --

(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health

. . .

(e) Definitions. In this section:

(1) The term "emergency medical condition" means –

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in –

(i) placing the health of the individual[ ] in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part;

. . .

(3)

(A) The term "to stabilize" means, with respect to an emergency medical condition described in paragraph (1)(a), to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result or occur during from the transfer of the individual from a facility,...

(B) The term "stabilized" means, with respect to an emergency medical condition described in paragraph (1)(A), that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility,...

(4) The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed

13

by (or affiliated or associated, directly or indirectly, with) the hospital, but does not include such a movement of an individual who (A) has been declared dead, or (B) leaves the facility without the permission of any such person.

### ii.     *Plaintiff has a "failure to stabilize" EMTALA claim against Bronson.*

Read as a whole, the gravamen of Plaintiff's EMTALA claim deals with Bronson's failure to stabilize Mr. Dunigan before forcibly ejecting him from the hospital. Mr. Dunigan went into congestive heart failure while he was in the hospital. Bronson's security officers knew he was suffering from an "emergency medical condition" (i.e. congestive heart failure), but instead of making sure that Mr. Dunigan received medical care and was "stabilized," the officers instead forcibly ejected Mr. Dunigan, straight to his death. It is tragic that Mr. Dunigan passed away in the back of a police vehicle just minutes after leaving the hospital, when he could very easily have been given life-saving treatment at Bronson. This case is a quintessential "failure to stabilize" EMTALA case.

First, it is undisputed that Mr. Dunigan was suffering from an "emergency medical condition." An "emergency medical condition" is defined in relevant part under the statute as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part" 42 U.S.C. § 1395dd(e)(1)(A).

Congestive heart failure meets this definition. Even if the officers could not put a name to the condition, even a lay person could see that Mr. Dunigan was in the middle of a medical collapse. The video evidence shows Mr. Dunigan unable to stand or walk on his own, stumbling over his words, and almost incoherent. A reasonable person (or hospital security officer) seeing Mr. Dunigan would know that he is suffering from an emergency medical condition that needs attention.

Second, Defendant Bronson, through its agents (security officers Shoemaker, Carlisle, and Rickli) **had actual knowledge** of Mr. Dunigan's rapidly deteriorating and unstable emergency medical condition. When the facts are viewed in a light most favorable to Plaintiff, a reasonable juror can conclude that Defendant Bronson *knew* that Mr. Dunigan was suffering from a serious emergency medical condition (i.e. congestive heart failure), was unstable, but transferred—nay, forcibly evicted—him from the hospital premises anyway. The video evidence in this case, on its own, is enough to create a jury submissible issue regarding whether the Bronson security officers had actual knowledge that Mr. Dunigan was suffering from an emergency medical condition. There is a genuine issue of material fact regarding the "actual knowledge" element of Plaintiff's EMTALA claim based solely on the video evidence, and summary judgment must be denied.

In addition to the video footage, which gives a bird's eye view of what happened, Mr. Shoemaker (one of the security officers involved) admitted that he knew the signs for congestive heart failure, and that Mr. Dunigan was exhibiting the signs of

congestive heart failure. Despite this, Mr. Shoemaker participated in ejecting Mr. Dunigan from the premises.

Mr. Shoemaker testified that he has training as an EMT, and that he knew the signs of congestive heart failure, which include loud respirations and difficulty breathing. (Exhibit 3, Deposition of Charles Shoemaker, p. 33-34) He testified that such respirations would be indicative or respiratory failure, and "it would obviously cause some concern as far as congestive heart failure." (Id. at 34) If he saw someone exhibiting signs of congestive heart failure, Mr., Shoemaker conceded that the appropriate course of action would be to get that person medical treatment.

To escape culpability, Mr. Shoemaker self-servingly testified that he did not hear Mr. Dunigan's labored "snoring respirations"; however, this testimony can be disregarded by the jury, especially in light of the video/audio footage depicting Mr. Dunigan's collapse and labored breaths as he was being loaded into the police vehicle. Mr. Shoemaker (and the other two security officers) were right there, and a jury can conclude that they did, in fact, hear Mr. Dunigan's breathing. As a result, a jury can conclude that Mr. Shoemaker—and, by extension, Defendant Bronson—knew about Mr. Dunigan's serious emergency medical condition, but transferred him out of the hospital anyway.

Defendant implies that knowledge by a doctor or other medical provider is necessary to trigger the duty to stabilize an emergency medical condition under EMTALA. (Although Bronson does not directly make this argument, its sole analysis focuses on what the doctors/nurses knew, and ignores the culpability of the security

16

officers, who were a) agents of the hospital and b) the individuals who forcibly ejected Mr. Dunigan off the premises.) The Sixth Circuit has rejected this analysis, and held instead that "The language of EMTALA clearly implies that [the hospital] is responsible not only for the actions of its doctors, but also for the actions of its other employees. The EMTALA statute, in all its sections, refers to the obligations of hospitals, rather than physicians." *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 788 (6th Cir. 2003). Thus, "while actual knowledge is required, any hospital employee or agent that has knowledge of a patient's emergency medical condition might potentially subject the hospital to liability under EMTALA." *Moses v. Providence Hosp. & Med. Centers, Inc.*, 561 F.3d 573, 585 (6th Cir. 2009) (quoting *Roberts*).

Defendant Bronson also implies in its motion that its duty "to stabilize an emergency medical condition" was extinguished after Mr. Dunigan was evaluated by the emergency department doctor and cleared to be discharged. This argument, however, disregards the plain language of the statute. 42 U.S.C. § 1395dd(e)(4) provides in relevant part: "The term "transfer" means the movement (including the discharge) of an individual outside a hospital's facilities at the direction of any person employed by (or affiliated or associated, directly or indirectly, with) the hospital." Thus, while a discharge *can* be one form of transfer, it is not the only form. In order for there to be a "transfer" under the statute, there only needs to be "movement of an individual outside a hospital" "at the direction of any person employed by the hospital." The Bronson security officers' forcible eviction of Mr. Dunigan from the premises qualifies was a "transfer" under EMTALA.

17

The fact that Mr. Dunigan was previously seen by the emergency department and discharged is irrelevant to the analysis under EMTALA. For a "failure to stabilize" claim, the only relevant inquiries are whether 1) the hospital (through its agents) had "actual knowledge" of an "emergency medical condition," and 2) despite this knowledge, the hospital "transferred" the patient before the emergency medical condition was stabilized. In this case, Bronson had "actual knowledge" of Mr. Dunigan's onset of congestive heart failure through Mr. Shoemaker and the other security officers. Mr. Shoemaker admitted that he knew the signs of congestive heart failure, that it was an emergency medical condition that would require aid, and admitted that Mr. Dunigan was exhibiting those signs. A reasonable juror could evaluate this testimony, and the video evidence, and conclude that the security officers (especially Mr. Shoemaker) had actual knowledge that Mr. Dunigan was suffering from congestive heart failure. As a result, summary judgment of Plaintiff's EMTALA claim is not warranted.

Last, Defendant implies in its motion that, because Mr. Dunigan was incoherent and impaired by the time the security officers were interacting with him, he did not affirmatively "request" medical treatment, and thus Bronson's lack of response to Mr. Dunigan did not trigger EMTALA. This argument ignores the plain language of the statute. 42 U.S.C. § 1395dd(b)(1) provides in relevant part that "If any individual comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide" responsive medical treatment.

There is nothing in this subsection that requires an incapacitated person to affirmatively "request" medical care at a hospital to trigger a hospital's duties under EMTALA. Rather, the statute only requires that "an individual come to the hospital" and that the "hospital determines that the individual has an emergency medical condition." In this case, both of these elements are met. Mr. Dunigan was *at* the hospital, so he obviously came there. The statute does not specify reasons for being at the hospital, only presence. Bronson—through its agents—determined that Mr. Dunigan was suffering from a suspected emergency medical condition, congestive heart failure. As a result, both elements for a claim under the "failure to stabilize" EMTALA claim are met. Defendant Bronson's motion for summary judgment must be denied.

## IV.    CONCLUSION

What happened to Mr. Dunigan is abominable. Any one of the many employees who observed Mr. Dunigan during his time in the waiting room would have seen that he was barely conscious and in visible pain. When Defendant's security officers came to talk to Mr. Dunigan, they saw that he was in an unstable and deteriorating condition that needed emergency medical condition. Mr. Shoemaker even admitted that Mr. Dunigan was exhibiting signs of congestive heart failure, an undisputed emergency medical condition.

Mr. Dunigan was barely conscious and so weak that he was unable to stand on his feet. There is no question that Mr. Dunigan was suffering from serious impairments to his body functions, namely walking and being conscious. The impairments were

visible to everyone and Defendant had a duty to stabilize Mr. Dunigan before transferring him from the premises. Instead of wheeling Mr. Dunigan to get medical attention, Defendant instead called the cops on him. Defendant's security took him outside and laid him down on the grass, dumping all responsibility for him.  EMTALA was enacted by congress to prevent exactly the type of "dumping" that Mr. Dunigan was subjected to.

For all of the foregoing reasons and for the reasons, Plaintiff respectfully requests that this Honorable Court DENY Defendant's Motion for Summary Judgment.


Respectfully submitted,

/s/James J. Harrington, IV

_____

GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON, IV (P65351)
Attorneys for Plaintiff
19390 W. 10 Mile Road
Southfield, MI 48075
(248) 355-5555
j.harrington@fiegerlaw.com

Dated:  May 22, 2018

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GORDA DUNIGAN, as Personal Representative
 for the ESTATE OF JAMES DUNIGAN, Deceased,

     Plaintiff,                                 Case No. 1:16-CV-01324
                                              Hon. Janet T. Neff

v                                               Mag. Judge Ellen S. Carmody

BRONSON METHODIST HOSPITAL,

     Defendant.

_____

GEOFFREY N. FIEGER (P30441)         JOHN C. O'LOUGHLIN (P33343)
JAMES J. HARRINGTON, IV (P65351)   Smith, Haughey, Rice & Roegge
Fieger, Fieger, Kenney & Harrington, P.C.  Attorney for Defendant, Bronson
Attorneys for Plaintiff                 100 Monroe Center NW
19390 West 10 Mile Road             Grand Rapids, MI 49503
Southfield, MI 48075                 (616) 774-8000
(248) 355-5555

_____

## PLAINTIFF'S EXHIBIT LIST

Exhibit 1    Hospital Surveillance videos, along with execution file with proprietary software (filed with the Court in traditional manner)

               There are two discs attached as a part of this exhibit, one with an execution file containing proprietary software and the other with the actual video footage. In order to play the videos, the proprietary software must first be installed on a computer. After the software is installed, the videos on the second disk can be viewed.

Exhibit 2    Police Cruiser video (filed with the Court in traditional manner)

Exhibit 3    Deposition of Charles Shoemaker

Exhibit 4    Deposition of Dr. Robert Stark

Exhibit 5    Deposition of Dr. Charles Landers

Exhibit 6        Deposition of Dr. Saul Levine

Exhibit 7        Autopsy Report

Exhibit 8        Deposition of Dr. Werner Spitz

# Exhibit 1

Hospital Surveillance videos, along with execution file with proprietary software

## (filed with the Court in traditional manner)

There are two discs attached as a part of this exhibit, one with an execution file containing proprietary software and the other with the actual video footage. In order to play the videos, the proprietary software must first be installed on a computer. After the software is installed, the videos on the second disk can be viewed.

Exhibit 2

{00541599.DOCX}

Police Cruiser video

**(filed with the Court in traditional manner)**

Exhibit 3

# In The Matter Of:

*Dunigan vs.*
*Bronson Methodist Hospital*

*Charles Shoemaker*
*June 2, 2017*



**Bingham Farms/Southfield ● Grand Rapids**

Detroit ● Ann Arbor ● Flint ● Lansing ● Jackson ● Mt. Clemens ● Saginaw ● Troy

*Original File SHOEMAKER_CHARLES.txt*
*Min-U-Script® with Word Index*

Case 1:16-cv-01324-SJB   ECF No. 65,   PageID.669   Filed 05/22/18   Page 33 of 203

Dunigan vs.                                                          Charles Shoemaker
Bronson Methodist Hospital                                               June 2, 2017

Page 1

```
 1         IN THE DISTRICT COURT OF THE UNITED STATES
 2            FOR THE WESTERN DISTRICT OF MICHIGAN
 3                     SOUTHERN DIVISION
 4
 5  GORDA DUNIGAN, as Personal
 6  Representative for the Estate
 7  of JAMES DUNIGAN, Deceased,
 8                    Plaintiff,
 9         vs.                 Case No. 1:16-CV-01324
10                             Hon. Janet T. Neff
11                         Mag. Judge Ellen S. Carmody
12  BRONSON METHODIST HOSPITAL,
13                    Defendant.
14  _____
15
16
17       The Deposition of CHARLES SHOEMAKER,
18      Taken at 250 East Lovell Street, Suite 355,
19      Kalamazoo, Michigan,
20      Commencing at 2:36 p.m.,
21      Friday, June 2, 2017,
22      Before Rebecca L. Russo, CSR-2759, RMR, CRR.
23
24
25
```

Page 2

```
 1  APPEARANCES:
 2
 3  JAMES J. HARRINGTON, IV
 4  Fieger Fieger Kenney & Harrington PC
 5  19390 West Ten Mile Road
 6  Southfield, Michigan 48075
 7  248.355.5555
 8  j.harrington@fiegerlaw.com
 9        Appearing on behalf of the Plaintiff.
10
11  JOHN C. O'LOUGHLIN
12  Smith Haughey Rice & Roegge PC
13  100 Monroe Center Street, N.W.
14  Grand Rapids, Michigan 49503
15  616.774.8000
16  joloughlin@shrr.com
17        Appearing on behalf of the Defendant.
18
19
20
21
22
23
24
25
```

Page 3

```
 1  TABLE OF CONTENTS
 2
 3  WITNESS                    PAGE
 4  CHARLES SHOEMAKER
 5
 6  EXAMINATION BY MR. HARRINGTON        4
 7
 8    EXHIBITS
 9
10  EXHIBIT                 PAGE
11  (Exhibits not offered.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

TABLE OF CONTENTS

WITNESS                    PAGE
CHARLES SHOEMAKER

EXAMINATION BY MR. HARRINGTON        4

EXHIBITS

EXHIBIT                 PAGE
(Exhibits not offered.)

Page 4

```
 1  Kalamazoo, Michigan
 2  Friday, June 2, 2017
 3    2:36 p.m.
 4
 5
 6    CHARLES SHOEMAKER,
 7  was thereupon called as a witness herein, and after
 8  having first been duly sworn to testify to the truth,
 9  the whole truth and nothing but the truth, was
10  examined and testified as follows:
11    EXAMINATION
12    BY MR. HARRINGTON:
13  Q.  State your name, for the record, please.
14  A.  Charles Robert Shoemaker.
15    MR. HARRINGTON: Let the record reflect
16  that this is the deposition of Charles Robert
17  Shoemaker.  It's taken pursuant to notice, agreement
18  of counsel, to be used for all purposes contemplated
19  under the Federal Rules of Civil Procedure.
20    BY MR. HARRINGTON:
21  Q.  Good afternoon, sir.
22  A.  Good afternoon.
23  Q.  My name is Jim Harrington and I represent the Dunigan
24  family.  We're here for your deposition.  Just a
25  couple ground rules before we get underway.  I'm going
```

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 5

1  to ask a series of questions and I need you to answer
2  those questions with words, okay?
3  A.  Okay.
4  Q.  If you don't understand something, let me know, I'll
5  rephrase it for you, okay?
6  A.  Yes.
7  Q.  If you do answer it, I'll assume you understood it in
8  the form and manner phrased.  Fair?
9  A.  That's fair.
10  Q.  From time to time your attorney may object.  Let him
11  get his objection out and then answer the question.
12  The only time you don't is if he instructs you not to
13  answer, okay?
14  A.  Understood.
15  Q.  Have you ever had a deposition before?
16  A.  No.
17  Q.  Have you ever testified before?
18  A.  Once.
19  Q.  In connection with what?
20  A.  The hospital.
21  Q.  With what?
22  A.  A security incident.
23  Q.  Were you involved?
24  A.  Yes.
25  Q.  In what capacity?

---

Page 7

1  Q.  Yes.
2  A.  There might have been a suspension.
3  Q.  Do you know, were you suspended?
4  A.  Yeah, for being tardy, absences, I believe.
5  Q.  Any other reasons for the suspension?
6  A.  No.
7  Q.  And you did not re-enroll in high school, did you?
8  A.  No, I went back and received my GED back in '89.
9  Q.  From?
10  A.  Kalamazoo Adult Education.  I couldn't tell you the
11  address.  It's Westnedge Avenue, down here in
12  Kalamazoo.
13  Q.  Any other additional education?
14  A.  Emergency medical technician.
15  Q.  I'm sorry, Morensi?
16  A.  Emergency --
17  Q.  Oh, emergency.
18  A.  -- medical technician.
19  Q.  You're an EMT?
20  A.  Yes, I have a license.
21  Q.  Any others?
22  A.  I have Firefighter I and II.
23  Q.  What else?
24  A.  That's it.
25  Q.  You're a security officer?

---

Page 6

1  A.  It was as far as a security officer, a trespass
2  complaint.  We had two gentlemen that were trespassing
3  into a construction zone that was fenced off and
4  marked "no trespassing."
5  Q.  And those individuals were charged?
6  A.  I believe they were charged with trespassing and DUI,
7  because they drove away and they were intoxicated.
8  Q.  Did you ever -- in your training to be an officer, did
9  you ever take any type of courses or did they give you
10  training on how to testify?
11  A.  No.
12  Q.  All right.  What's your date of birth?
13  A.  4-30 of 1970.
14  Q.  And you're a high school grad?
15  A.  No, GED.
16  Q.  Your highest level of education?
17  A.  Sophomore.
18  Q.  And what high school?
19  A.  Kalamazoo Central.
20  Q.  Why did you leave Kalamazoo Central?
21  A.  As far as dropping out of school?
22  Q.  Yes.
23  A.  Personal reasons, family issues.
24  Q.  Was it any discipline in your past?
25  A.  As far as from the school?

---

Page 8

1  A.  No, I was.
2  Q.  Okay, you were.  And what are you now?
3  A.  I work down in what's called the BRIC, Bronson
4  Referral Information Center.
5  Q.  Let me just -- I kind of got out of order real quick.
6  After you got your GED, did you have any
7  employment in law enforcement?
8  A.  No.
9  Q.  Any employment in medical?
10  A.  No.
11  Q.  Did you ever work as an EMT?
12  A.  Yes.  In the last few years I worked for South
13  County EMS.
14  Q.  What years have you worked for South County EMS?
15  A.  2010, up until last year.
16  Q.  When you say "last year," you mean 2016?
17  A.  Yes.
18  Q.  Pre or post-Dunigan incident?
19  A.  It was pre.
20  Q.  2010 to 2016, do you know which month in 2016?
21  A.  That I stopped working there?
22  Q.  Yes.
23  A.  I don't recall the exact month.  I was a part-time
24  employee on-call, so I didn't work like a whole lot of
25  shifts.  I just basically filled in when they needed

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

Page 9

1  somebody.
2  Q.  Well, the Dunigan incident was early May of 2016,
3  correct?
4  A.  Yes.
5  Q.  So it would have been January, February, March, or
6  April.
7  A.  Probably March would be the last shift I worked.
8  Q.  Your job duties as an EMT include what?
9  A.  Patient care, driving the ambulance and getting the
10  patient safely to the hospital.
11  Q.  Does part of that include assessing emergency medical
12  situations?
13  A.  Yes.
14  Q.  And providing EMT care?
15  A.  Mmm-hmm.
16  Q.  Yes?
17  A.  Basic EMT, that's correct.
18  Q.  And what is -- what are the limitations of basic EMT
19  care?
20  A.  It's pretty much general medical wound care, assessing
21  the patient's vitals, splinting, stabilizing the
22  patient, and the more advanced medical, like the
23  medications, more advanced airway, would be performed
24  by the paramedic that I worked with.  I could do basic
25  airway.

Page 10

1  Q.  And what's basic airway?
2  A.  The Combitube, King tube, oropharyngeal airway, nasal
3  airway.
4  Q.  Have you ever been a party to a lawsuit before?
5  A.  No.
6  Q.  Any criminal history?
7  A.  No.
8  Q.  At all?
9  A.  No.
10  Q.  And where -- I'm sorry, when did you begin employment
11  with Bronson?
12  A.  In February 1999.
13  Q.  And you're currently employed with Bronson?
14  A.  Yes, that's correct.
15  Q.  When you hired in, in February of 1999, what position
16  did you hire in at?
17  A.  Security.
18  Q.  Security officer?
19  A.  Mmm-hmm.
20  Q.  Yes?
21  A.  Yes, that's correct.
22  Q.  I know it's your first dep.  I know what you mean when
23  you nod your head and go "mmm-hmm," but we have a
24  court reporter who's writing --
25  A.  Okay.

Page 11

1  Q.  -- everything word for word.  And the other thing is,
2  is just one person at a time talk, is that okay?
3  A.  Yes.
4  Q.  Thank you.  Hired in as a security officer in
5  February '99?
6  A.  Correct.
7  Q.  And how long were you a security officer?
8  A.  Until about 2003, and then I went down to the BRIC.
9  Q.  What does that mean?
10  A.  Bronson Referral Information Center.
11  Q.  Bronson Referral --
12  A.  Referral Information Center.
13  Q.  So from '03 to when did you do BRIC?
14  A.  Until about January of 2016, and then from
15  January 2016 until October, I worked security.  And
16  then I went back down to the BRIC when a shift opened
17  up that I wanted.
18  Q.  Do you like working in the BRIC?
19  A.  Yes.
20  Q.  More than security?
21  A.  Yes.
22  Q.  Why?
23  A.  Hours is the big one, 12-hour shifts.
24  Q.  Do you still have to work third shift on the BRIC?
25  A.  I work -- well, yeah, it's three p.m. to three a.m.

Page 12

1  Q.  What do you do in the BRIC?
2  A.  In the BRIC, basically answer the phones; we page the
3  doctors.  We do the codes.  Like when somebody -- when
4  there's a patient coding on the floor, we have to get
5  a code team and find out what the location.  We do
6  general information, answering the phones, we answer
7  the main ER lines.  We are the central information hub
8  for the hospital.  People need information, we give
9  that to them.  We do after-hour calls for doctor's
10  offices through Bronson for different practices.
11  Q.  So it's pretty busy 24/7?
12  A.  Yes.  It can be, yes.
13  Q.  So you've had two different stints as a security
14  officer?
15  A.  Correct.
16  Q.  Now, when you hired in, in '99 as a security officer,
17  you received training as an officer?
18  A.  Correct.
19  Q.  You've never been a security officer before, have you?
20  A.  I had prior experience prior to that.
21  Q.  Oh, where?
22  A.  Charles Service, Incorporated.
23  Q.  I'm sorry?
24  A.  Charles Service, Incorporated.  They are out of
25  business.  I believe they got bought out by, I

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 13

1 couldn't even tell you which company.  It used to be
2 called CSI.  Yeah, Charles, so it's no --
3 Q.   I understand.
4 A.   It just happened to be the -- okay.
5 Q.   And how long were you a security officer for them?
6 A.   Probably from '91 to about '95 or '96.
7 Q.   Any other security officer experience?
8 A.   I had armored car experience for a year.  I don't know
9 if that would count, but it was armed courier.
10 Q.   With what company?
11 A.   Wolverine Transport.
12 Q.   And what did you transport, money?
13 A.   Money, yes.  We also stocked ATMs, we'd do -- we'd go
14 to various ATM sites and restock the cassettes, so ...
15 Q.   Did you have to go through background checks for
16 employment with CSI?
17 A.   Yes.
18 Q.   What about Wolverine Transport?
19 A.   Yes.  And they are out of business, as well.
20 Q.   Were you fired from any of those jobs?
21 A.   No.
22 Q.   A voluntary separation?
23 A.   Yes.
24 Q.   Okay.  Were you ever an armed guard for either CSI or
25 Wolverine?

---

Page 14

1 A.   For Wolverine, I was armed.  For CSI, I was not armed.
2 Q.   What about for Bronson, were you armed?
3 A.   No.
4 Q.   Were you given any type of OC spray --
5 A.   No.
6 Q.   -- or a Taser, or anything like that?
7 A.   No.
8 Q.   What type of typical security or police-type equipment
9 were you given from Bronson?
10 A.   A radio.
11 Q.   What about handcuffs?
12 A.   We had handcuffs.
13 Q.   Anything else?
14 A.   No.
15 Q.   What about body cams or shoulder mics, anything like
16 that?
17 A.   We had just a mic for our radio that we could key up.
18 No body cameras.
19 Q.   Do you know if the -- and when you did that, you
20 reached to your shoulder?
21 A.   Depends; shoulder or chest, wherever you felt
22 comfortable carrying the mic.
23 Q.   Do you know if the mic chatter is ever recorded?
24 A.   Not that I'm aware of.  That would be something to ask
25 Dawn Zomer, but as far as I know, it is not recorded.

---

Page 15

1 Q.   So how did you find this job with Bronson to be a
2 security officer in '99?
3 A.   A guy I knew, Rick Mitchell, at the time I started
4 here, it was right after like the Wolverine Transport
5 was going, I heard that we were going -- we got bought
6 out by United Arms Services out of Chicago, they
7 started laying people off.  This guy I knew, Rick
8 Mitchell, said, "Hey, there's an opening here."
9     He actually got me in here, so that's how I
10 started here at Bronson, because I was in the process
11 of probably losing my job at Wolverine because they
12 were downsizing and laying people off, so ...
13 Q.   So when you hired in, in '99 with Bronson --
14 A.   Yes.
15 Q.   -- you hired in as a security officer; yes?
16 A.   That's correct.
17 Q.   You received training; yes?
18 A.   Yes.
19 Q.   After you switched over to BRIC, you received training
20 on how to do your job at BRIC?
21 A.   Yes.
22 Q.   And then you came back to security; yes?
23 A.   Yes.
24 Q.   What were the circumstances surrounding your transfer
25 back to security?

---

Page 16

1 A.   As far as why I transferred back to security?
2 Q.   Yeah.
3 A.   Just a change.  A full-time security spot opened up
4 and I just bid on it and got it, just a little bit of
5 a break from the BRIC.
6 Q.   Did you have to receive any new training or --
7 A.   Yes.
8 Q.   -- be retrained?
9 A.   Yes.
10 Q.   Was the training different at all from what you
11 received in '99 to what you received in 2016?
12 A.   Yes.  There was more training between patient rights
13 and restraint training, for restraining patients, if
14 needed.
15 Q.   On appropriate use of restraints?
16 A.   Yeah, appropriate use of restraints and how to use
17 them.
18 Q.   Was that in the form of PPCT-type training?
19 A.   What --
20 Q.   Have you ever heard of the phrase "PPCT"?
21 A.   No.
22 Q.   Pressure point control tactics?
23 A.   No.  It was mostly just how to put the restraints on
24 and ...
25 Q.   I got you.  So like wrist restraints?

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

Page 17

1 A.  Yes, wrist restraints.
2 Q.  What about use of force, did you ever receive training
3   on --
4 A.  We had use-of-force training --
5     MR. O'LOUGHLIN: Try and let him finish his
6   question, just so --
7     THE WITNESS: Sorry.
8     BY MR. HARRINGTON:
9 Q.  That's all right.  You received training on the force?
10 A.  Yes.
11 Q.  And tell me about that.
12 A.  It was just a quick course on restraining patients.
13   It was more of like how to do like the side-by-side,
14   like walk along, with holding the wrist on the hand.
15   I mean, it wasn't real extensive.  It was just a short
16   course on basically how to not hurt people and how to
17   keep yourself out of danger, from getting hurt, too.
18 Q.  Were you kind of taught about continuously trying to
19   de-escalate situations?
20 A.  Yes.
21 Q.  Did you ever learn about the plus one theory?
22 A.  No, I have not heard of that.
23 Q.  Okay.  During your training in 2016, this took place
24   in January, correct?
25 A.  January, February, around that time.

Page 18

1 Q.  Did you receive training at the same time Nolan
2   Cattell received training?
3 A.  I don't recall.  I mean, we had a class.  I don't
4   recall if he was in there or not.
5 Q.  How big was your class?
6 A.  Only like three or four people in it.
7 Q.  Do you know if your employee file has your training
8   records in there?
9 A.  I would have no idea.  I have not seen my employee
10   file.
11 Q.  Do you know who Nolan is?
12 A.  Yeah, yes.
13 Q.  In the 2016 training that took place in, you said,
14   January or February, were you shown any videos?
15 A.  I don't recall.
16 Q.  Nolan said he had a PowerPoint presentation when he
17   received training in January of 2016.  Do you recall
18   having a PowerPoint presentation?
19 A.  I mean, we had PowerPoint presentations in a lot of
20   our security trainings.  I mean, there could have
21   been.  I just don't recall if we had one or not.
22 Q.  What about training with respect to EMTALA issues, did
23   you receive any training along that regard?
24 A.  I mean, we had -- not specific to EMTALA.  We had like
25   a patient-rights-type CBL, computer-based learning.

Page 19

1 Q.  Say that again, C what?
2 A.  Computer-based learning, CBL, a course online.  As far
3   as specific EMTALA training, not that I recall.
4 Q.  Who sponsored that CBL training?
5 A.  That's through Bronson.  It would be part of our
6   security online training.
7 Q.  Was it a test that you took online?
8 A.  It's computer-based, yeah.
9 Q.  So, yes, it was a test?
10 A.  Yes.
11 Q.  Do you know how you did on that test?
12 A.  I passed --
13 Q.  Good.
14 A.  -- so I ...
15 Q.  Was there a study guide or materials you were given?
16 A.  Yup.  All the computer-based learning courses here,
17   you have reading material that you go through before
18   you take the test.
19 Q.  So if you wanted, let's say, to do a refresher on this
20   CBL test that you took and you wanted to look at the
21   materials that you reviewed to take that test, what
22   would you ask for?
23 A.  Asked for access -- I mean, you have access to the
24   computer-based learning.  I mean, if I needed more, I
25   could have asked Dawn for additional.

Page 20

1 Q.  Yeah, if you wanted to get it like in a paper
2   printout?
3 A.  Yeah, I would ask my supervisor.  I could, yeah.
4 Q.  You would go see Dawn?
5 A.  Yeah.
6 Q.  And what would you ask Dawn?
7 A.  Do we have anything on EMTALA or patient rights or
8   whatever training I needed; is there anything on, you
9   know, restraints or whatever I needed.
10 Q.  My question was a little bit more specific as to what
11   you actually looked at when you did your training in
12   January of 2016.
13 A.  We had the training in the training room, one of the
14   training rooms downstairs in the Gilmore building.
15   And then we had a patient rights training online, so
16   specific materials online.  I mean, there could have
17   been an EMTALA section in that training for the
18   restraints, but, I mean, it was just touched upon.  I
19   mean, it wasn't like an in-depth, you know.
20 Q.  So patient rights, what is your understanding of this
21   patient rights training that you received that was
22   different with your second tour, I guess, as a
23   security guard?
24 A.  It was more emphasis on the right to be seen, more
25   patient rights as far as the right to move about and

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 21

1  be seen in the hospital, you know, that kind of ...
2  Q.  What else?
3  A.  Pretty much touched upon that.
4  Q.  When you say "right to be seen," you mean a right to
5  have medical treatment?
6  A.  Yes.
7  Q.  The right to medical personnel to provide you with
8  that treatment?
9  A.  Correct.
10  Q.  A right not to be turned away from the hospital?
11  A.  Correct.
12  Q.  And this was being provided to you as a security
13  guard, correct?
14  A.  Correct.
15  Q.  Or a security officer?
16  A.  Correct.
17  Q.  And you received training on if you observed somebody
18  who appears to need medical treatment, to help get
19  them treatment?
20  A.  Correct.
21  Q.  And have you ever done that as a security officer,
22  helped somebody get treatment?
23  A.  Yes.
24  Q.  Without using any names, how did that come about?
25  A.  We had a call from the dispatch office that there was

---

Page 22

1  a gentleman down on the garden level of the hospital
2  by the ramp who was reported as homeless, and the
3  caller wasn't sure what was going on.  We went down
4  there.  He was unsteady.  He was provided a wheelchair
5  and wheeled to the emergency room because he stated
6  that he needed to be seen.
7  Q.  Even if he didn't say he needed to be seen, based on
8  your observations, would you have gotten him medical
9  treatment?
10  A.  Yes, correct.
11  Q.  When you say "unsteady," you mean unsteady with his
12  walk?
13  A.  Unsteady on his feet, yes, that's correct.
14  Q.  Meaning that as he was walking, he appeared that he
15  could fall over at any second?
16  A.  Correct.
17  Q.  What about that person's speech, was that person's
18  speech impaired at all?
19  A.  Slightly.
20  Q.  And you assisted that person to get that medical
21  treatment?
22  A.  Correct.
23  Q.  Was the call from a civilian?
24  A.  I don't recall.  I just remember it being dispatched
25  over the radio.

---

Page 23

1  Q.  And you wheeled that person to the ER?
2  A.  Correct.
3  Q.  And helped that person get medical treatment?
4  A.  Correct.
5  Q.  And then your involvement with that person ended?
6  A.  Correct.
7  Q.  You never followed up with how that person did,
8  correct?
9  A.  No.
10  Q.  That's a correct statement?
11  A.  That's correct.
12  Q.  Now, part of your job as a security officer is patrol?
13  A.  Yes.
14  Q.  And this person that was thought to be homeless, what
15  time period was that?  Was that in the year 2016?
16  A.  It would be 2016, my third shift, when I worked.
17  Q.  Do you remember what month that happened?
18  A.  I don't recall.
19  Q.  Do you know if it was before or after the Dunigan
20  incident?
21  A.  It was before.
22  Q.  So if you had been patrolling as part of your regular
23  duties and just saw this person by the garden level
24  who appeared to be unsteady, you would have helped
25  them get medical treatment?

---

Page 24

1  A.  Correct, if that's what they needed.
2  Q.  Well, if you visualized it --
3  A.  Correct.
4  Q.  -- and you thought they needed it, you would have
5  helped them?
6  A.  Correct.
7  Q.  Whether they asked for it or not?
8  A.  Yes.
9  Q.  Whether that person had already had medical treatment
10  and been discharged or not?
11  A.  Yes.
12      MR. O'LOUGHLIN:  Form and foundation.
13      BY MR. HARRINGTON:
14  Q.  Because that's what would be reasonable; yes?
15  A.  Yes.
16      MR. O'LOUGHLIN:  Same.
17      BY MR. HARRINGTON:
18  Q.  And to not do that would be unreasonable?
19      MR. O'LOUGHLIN:  Same.
20      BY MR. HARRINGTON:
21  Q.  Go ahead.
22  A.  Yes.
23  Q.  All right.  You were working on May 6, 2016, correct?
24  A.  Correct.
25  Q.  And that was the early morning hours of the Dunigan

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

Page 25

1 matter, correct?
2 A. Yes.
3 Q. Do you have any recollection of any interactions with
4 Mr. Dunigan prior to his discharge?
5 A. I had no interactions with him prior to his discharge.
6 Q. All interactions with him were after discharge, is
7 that correct?
8 A. That's correct.
9 Q. You have no idea, as of May 6, 2016, why he was at the
10 hospital?
11 A. Correct.
12 Q. When was your first interaction with Mr. Dunigan?
13 A. My first interaction with Mr. Dunigan was when Officer
14 Nugent and Zack went out to the lobby to ask the
15 gentleman to leave because he'd been there apparently
16 for several hours past his discharge time.
17 Q. Well, how did you get involved?
18 A. I went out there just to stand by.
19 Q. Because you were in the office?
20 A. I came back to the office. We were out doing patrol
21 and we were in the office, and I went out there with
22 Zack just to stand by to make sure everything was
23 going to be okay.
24 Q. When you went out to stand by to see if everything was
25 going to be okay, Nolan was still in the office

Page 26

1 monitoring the cameras, correct?
2 A. Correct, yes.
3 Q. It's good practice to have an officer monitoring the
4 cameras at all times?
5 A. There is somebody in the office all the time because
6 it's a dispatch office.
7 Q. You've monitored the cameras, correct?
8 A. Correct.
9 Q. How many cameras are there, approximately?
10 A. Off the top of my head, I couldn't tell you an exact
11 number. There's a lot of cameras.
12 Q. Nolan said about 300.
13 A. I don't have an exact number for you. If that's what
14 he said, I mean, I don't -- I would say close to that,
15 yes.
16 Q. Does that number seem reasonable?
17 A. Yes.
18 Q. All right. Was there something that brought your
19 attention to Mr. Dunigan that you felt it was
20 necessary for you to go out there?
21 A. As far as he had overstayed his discharge time,
22 Officer Nugent went out. I mean, as far as anything
23 specific, I just went out there just to stand by to
24 make sure everything was going to be all right. And
25 it's a common practice we do that, kind of back each

Page 27

1 other up.
2 Q. So you said "overstayed his discharge time." Is there
3 some type of document that says a person is only
4 allowed to stay in the hospital for a particular
5 amount of time?
6 A. I don't recall a specific document, security document
7 states that. It was just a -- generally, if someone
8 was hanging out past their discharge time, we would go
9 out and make contact with them, because in the past
10 we've had problems with people being disruptive in the
11 lobby that would not want to leave the hospital
12 grounds after discharge.
13 Q. Well, you've seen the videos on this case?
14 A. Yes.
15 Q. And there's a point in time where the officers wheel
16 out Mr. Dunigan --
17 A. Yes.
18 Q. -- to the outside, I guess, outside of the ER?
19 A. Mmm-hmm.
20 Q. Yes?
21 A. Yes.
22 Q. While he was in the waiting room, he wasn't being
23 disruptive, was he?
24 A. No.
25 Q. That's a correct statement?

Page 28

1 A. Yes.
2 Q. So why was he asked to leave?
3 A. As far as -- well, he was done being seen. He was
4 discharged. The practice was usually -- he was
5 homeless. Usually we ask people to leave after a
6 certain period of time after they've been discharged
7 to prevent people from hanging out all day in the
8 lobby.
9 Q. You understood, though, that he was waiting for the
10 bus?
11 A. Yes, and he was -- apparently the bus was -- he had
12 not left yet for the buses, and that's the reason why
13 he was asked to leave, because the buses were running
14 at that time.
15 Q. And had you observed Mr. Dunigan on, say, on video at
16 all prior to you going and addressing him?
17 A. No.
18 Q. When you went and addressed him, that was the first
19 time you had seen him, whether in person or on video,
20 to your memory?
21 A. Correct.
22 Q. Did you have a conversation with him when you went and
23 addressed him?
24 A. I don't recall the exact conversation. It was more or
25 less listening to Officer Nugent and Zack. And the

Case 1:16-cv-01324-SJB   ECF No. 65,  PageID.676   Filed 05/22/18   Page 40 of 203

Dunigan vs.
Bronson Methodist Hospital
Charles Shoemaker
June 2, 2017

**Page 29**

1 only thing he would say was, "Take me to jail."
2 That's the only thing that he would repeat back to us.
3 Q. That's all you heard him say, ever, was, "Take me to
4 jail"?
5 A. "Take me to jail," yeah.
6 Q. Did that seem odd to you?
7 A. Slightly.
8 Q. As you're hearing that as a security officer, what's
9 going through your mind to why this individual is
10 wanting to go to jail?
11 A. I mean, I have no idea why he'd want to go to jail. I
12 mean, that would just seem like an odd thing for
13 somebody to say, so ...
14 Q. So in response to that, what did you do?
15 A. Stood by while Officer Nugent and Zack talked to him.
16 Q. Did you see him foaming from the mouth at all?
17 A. No.
18 Q. Was he slurring his words at all?
19 A. No, he was just mumbling a lot.
20 Q. When you say "mumbling" ...
21 A. Like, "Take me to jail," and just kind of mumbling
22 under his breath a little bit. It was incoherent.
23 Q. And that didn't concern you at all?
24 A. I mean, from my observation, no. He was standing. He
25 was breathing fine. We deal with a lot of homeless

**Page 30**

1 people that are -- their condition is, they're
2 slightly slurred a lot, like constantly.
3 Q. Who was taking the lead when they were addressing
4 Mr. Dunigan while he was in the ER waiting area east?
5 A. At what point, when he's being evicted or --
6 Q. No, when he's just being addressed, when you first go
7 out there.
8 A. It would be Officer Nugent.
9 Q. Okay. I'm going to show you Exhibit 14 that we had
10 marked in Officer Nolan Cattell's deposition.
11 A. Mmm-hmm.
12 Q. Do you see Exhibit 14?
13 A. Correct.
14 Q. Are you depicted in that photograph?
15 A. I am leaning against a pillar.
16 Q. You are the individual with his right arm stretched
17 out?
18 A. Correct.
19 Q. May I see that back, please?
20 A. Sure.
21 Q. And the image that we're seeing in Exhibit 14, where
22 you're leaning against, as you say, a pillar, this is
23 the time frame as to when you first address
24 Mr. Dunigan?
25 A. As I recall, yes.

**Page 31**

1 Q. Did any words come out of your mouth in this time
2 frame to Mr. Dunigan?
3 A. Negative.
4 Q. And prior to this time frame as to when you are here
5 as depicted in Exhibit 14, you had never seen him
6 prior?
7 A. Correct.
8 Q. Did you know whether or not he had received any type
9 of medical treatment whatsoever from Bronson?
10 A. I had heard from Zack that he was discharged earlier
11 in the morning and they were letting him sit in the
12 lobby for several hours until the buses started
13 running, so I was told he was discharged.
14 Q. Let me ask you this: As you're sitting there, what if
15 in your mind you say, "You know what? Something
16 doesn't seem right with this guy. I think he still
17 needs to be looked at medically"; if you thought that,
18 what would you do?
19 A. If I thought that?
20     MR. O'LOUGHLIN: Form and foundation.
21     BY MR. HARRINGTON:
22 Q. Yes, if you thought that.
23 A. I would have notified the nurse at the desk that this
24 guy needs to be seen again.
25 Q. And that's part of your responsibilities as a security

**Page 32**

1 officer?
2     MR. O'LOUGHLIN: Form and foundation.
3     BY MR. HARRINGTON:
4 Q. Go ahead.
5 A. Correct.
6 Q. You said he was breathing fine --
7 A. Yes.
8 Q. -- maybe a minute or two ago.
9 A. Yes.
10 Q. At any time in your dealings with Mr. Dunigan, did you
11 notice a change in his breathing?
12 A. I did not.
13 Q. You've seen video?
14 A. Of the police car, yes, when he was -- after he was
15 transported.
16 Q. You've seen police car video?
17 A. It was all over the news, yeah. It was on the news.
18 I've seen not the whole video, but I've seen as they
19 were transporting him to the jail.
20 Q. And the video that you've seen --
21 A. Yes.
22 Q. -- also has audio?
23 A. Yes.
24 Q. And you've heard that breathing that he had?
25 A. The snoring respirations, yes. He was not doing any

Page 33

1 of that in the lobby or out front.
2 Q.  Well, you were with him out front, right?
3 A.  Yes, correct.
4 Q.  Were you with him when he was loaded into the car?
5 A.  Yes.
6 Q.  And if you had heard any of those snoring
7 respirations, would that have caused you concern?
8 A.  Yes.
9    MR. O'LOUGHLIN: Form and foundation.
10    BY MR. HARRINGTON:
11 Q.  If you had heard that, would you have said, "You know
12 what, this guy should be checked out"?
13 A.  Yes.
14 Q.  That would have been reasonable?
15    MR. O'LOUGHLIN: Form and foundation.
16 A.  Correct.
17    BY MR. HARRINGTON:
18 Q.  To not do that would be unreasonable?
19    MR. O'LOUGHLIN: Same.
20 A.  Correct.
21    BY MR. HARRINGTON:
22 Q.  You were with Mr. Dunigan when he was being loaded
23 into the police car, correct?
24 A.  Yes.
25 Q.  Did you assist in loading him into the police car?

Page 34

1 A.  Yes.
2 Q.  What part of his body did you grab to help load him
3 into --
4 A.  I had his feet.  Art had his shoulders, and I believe
5 Nugent was next to me, too.  We had the feet in, and
6 then Art went around the driver's side and helped him
7 with getting him by the shoulders to sit him up.
8 Q.  Real quick, when you said "snoring respirations," in
9 any of your EMT training, what is that significant of?
10 A.  Respiratory failure, could lead up to -- trouble
11 breathing, I should say.
12 Q.  What about congestive heart failure?
13 A.  Possibly.  I mean, I'm not -- as an EMT, that would be
14 more in the realm -- I mean, yeah, it would be, it
15 would obviously cause some concern as far as
16 congestive heart failure.  That wouldn't, couldn't be
17 determined, usually, until we put him up on a monitor
18 to show the heart rhythm.  That would be a paramedic
19 issue, so ...
20 Q.  But you know what congestive heart failure is?
21 A.  Yup.
22 Q.  You know what it is in connection with your training
23 as an EMT?
24 A.  Yes.
25 Q.  And sometimes snoring respirations can be consistent

Page 35

1 with somebody who's in congestive heart failure?
2 A.  Correct.
3 Q.  If none of those signs of this snoring respirations
4 were present when you were dealing with Mr. Dunigan as
5 depicted in Exhibit 14, and then they started to
6 develop when he was out by the car, that's a definite
7 change in his condition --
8    MR. O'LOUGHLIN: Form and foundation.
9    BY MR. HARRINGTON:
10 Q.  -- yes?
11 A.  Correct.
12 Q.  And that is a change that would require medical
13 treatment.
14    MR. O'LOUGHLIN: Same.
15 A.  Correct.
16    BY MR. HARRINGTON:
17 Q.  And if you saw that change, you would have gotten him
18 treatment?
19    MR. O'LOUGHLIN: Same.
20 A.  Yes.
21    BY MR. HARRINGTON:
22 Q.  When you were addressing Mr. Dunigan outside of the
23 police vehicle, that was a Kalamazoo Public Safety
24 vehicle, correct?
25 A.  Correct.

Page 36

1 Q.  Was there an issue about having to wait for a second
2 vehicle that had a gate or a break between?
3 A.  Yes.  The hospital officer that was assigned to the
4 hospital that day, his cruiser did not have a cage for
5 prisoner transport, so he had to call for a second
6 unit to come that had a cage for transport.
7 Q.  And then when that vehicle came, who was driving that
8 vehicle?
9 A.  It was another -- I don't know his name.  It was
10 another public safety officer.  I don't recall the
11 name of the officer.
12 Q.  Do you know if it was Shafer?
13 A.  I couldn't tell you.  I don't recall his name.
14 Q.  And in preparation of your deposition today, did you
15 watch any of the videos?
16 A.  No.
17 Q.  But you have seen them?
18 A.  I have seen partial that was on WOTV.
19 Q.  And did you see the part that had the audio where it
20 said, "He was walking around, he's just playing the
21 game"?
22 A.  No.
23 Q.  Have you ever heard that?  Let me rephrase.
24    Do you remember anybody ever saying that at
25 or around the time that Mr. Dunigan was about to be

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 37

1  loaded inside of the --
2  **A.  I think I recall --**
3  Q.  Let me finish.
4  **A.  Okay.**
5  Q.  -- at or around the time that he was about to be
6  loaded into the scout vehicle?
7  **A.  No.**
8  Q.  Okay.  Do you ever remember anybody saying that at any
9  time as it relates to Mr. Dunigan?
10  **A.  After he was loaded?**
11  Q.  No, before he was loaded.
12  **A.  Before he was loaded?  No.**
13  Q.  Do you remember anybody saying that, ever --
14  **A.  Not that --**
15  Q.  -- something about a game?
16  **A.  Not that I recall.**
17  Q.  Okay.  Do you ever remember anybody ever saying, "Oh,
18  yeah, I know the game well"?
19  **A.  Before or after he was loaded in the car?**
20  Q.  At any time.
21  **A.  At any time?  After he was loaded in the car, out**
22  **front of the vehicle?**
23  Q.  My question to you is, at any time --
24  **A.  No.**
25  Q.  -- in connection with your dealings with Mr. Dunigan,

---

Page 38

1  do you recall anybody saying anything to the extent of
2  "He was walking around, he's just playing the game"?
3  And then somebody says, "Oh, yeah, I know the game
4  well," something to that extent?
5      Do you ever recall anybody ever saying
6  anything like that?
7  **A.  Not that I recall.**
8  Q.  Do you ever remember anybody saying anything like,
9  "Mr. Dunigan, we're going to get you on your feet"?
10      And then he's ordered to stand up, "Stand
11  up right now."
12      He says something to the extent, "My legs
13  ain't ready."
14      And then somebody says, "Bullshit.  Stand
15  up."
16      Do you remember anything like that?
17  **A.  I remember that.**
18  Q.  Okay, who said bullshit?
19  **A.  That would have been me.**
20  Q.  Why did you say bullshit?
21  **A.  Frustration.**
22  Q.  Was that appropriate?
23  **A.  No, it wasn't appropriate.**
24  Q.  What if his legs really weren't ready?
25  **A.  It wouldn't have been appropriate to say that.**

---

Page 39

1  Q.  Do you remember anybody asking Mr. Dunigan if he wants
2  to go in like a baby?
3      **MR. O'LOUGHLIN:** Form and foundation.
4      **BY MR. HARRINGTON:**
5  Q.  Meaning going, whether it be going into the car, going
6  into --
7  **A.  I don't recall anybody saying anything.**
8  Q.  Do you remember anybody saying, "Sit up like an
9  adult"?
10  **A.  No.**
11  Q.  Why didn't you believe Mr. Dunigan when he says his
12  legs weren't ready?
13  **A.  Unfortunately, that's a tactic a lot of folks use on**
14  **us when they don't want to leave the ER.  They do the**
15  **old, "I'm not going to walk for you and you're going**
16  **to carry me out" kind of thing, so ...**
17      **And at that point I saw nothing medically**
18  **that would have said, hey, this guy's really, you**
19  **know, not having an issue.**
20      **This is after they ran him.  He had a**
21  **warrant out for his arrest after Nugent ran him.  That**
22  **was kind of -- my mindset was, okay, if he's got a**
23  **warrant out, he is not wanting to go to jail kind of**
24  **thing, so he's not going to walk for us.**
25  Q.  But you didn't know about the warrant until after you

---

Page 40

1  said bullshit.  True?
2      **MR. O'LOUGHLIN:** Form and foundation.
3  **A.  No.  It was before we put him in the car.  They ran**
4  **him and Nugent came back.  And that's when he was**
5  **handcuffed, when he's out front.**
6      **BY MR. HARRINGTON:**
7  Q.  So you're telling me that there was a discussion
8  outside of the police vehicle about the warrant before
9  you said bullshit?
10  **A.  Correct.**
11  Q.  But you're saying that there was no evidence, ever,
12  that Mr. Dunigan was having difficulty walking?
13  **A.  Not that I could see.**
14  Q.  There is discussion outside of the vehicle between the
15  officers indicating that he's medically cleared and
16  he's been up walking around.
17  **A.  Correct.**
18  Q.  Did you state that?
19  **A.  I believe I said he, yes, he was up walking around in**
20  **the lobby.**
21  Q.  The discussion that you had -- well, did you ever see
22  him walking around in the lobby?
23  **A.  No.  One of the guys said he had been up and walking**
24  **around.**
25  Q.  Who?

---

Bienenstock / U.S. Legal Support
Ph: 248.644.8888    Toll Free:  888.644.8080

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

**Page 41**

1  A.  I don't recall who said that, but when I came back to
2  the office, they said, "He's been up walking around,
3  because he's been in the lobby for the past couple
4  hours, waiting for the buses," and he was still here,
5  so that's when Zack and Nugent went out there to talk
6  with him, and then I went out, so ...
7  Q.  You told that to an officer who had just brought up
8  the new scout vehicle?
9  A.  Okay.
10  Q.  Yes?
11  A.  Possibly.
12  Q.  Is that true or not true?
13  A.  Yes.
14  Q.  So that officer would have no way to verify that
15  except to rely on what you were telling them?
16  A.  Correct.
17  Q.  The discussion about the warrant took place at the
18  scout vehicle, correct?
19      MR. O'LOUGHLIN: Form and foundation.
20  A.  Correct.
21      BY MR. HARRINGTON:
22  Q.  And it didn't take place in the hospital, correct?
23  A.  No.
24  Q.  That's a correct statement?
25  A.  Correct.

---

**Page 42**

1  Q.  Did you see him foaming at the mouth, "him" being
2  Dunigan?
3  A.  No.
4  Q.  And at no time did you ever hear him have any problems
5  breathing?
6  A.  No.
7  Q.  That's a correct statement?
8  A.  That's correct.
9  Q.  Real quick, Exhibit 15 to Nolan's deposition, do you
10  see that?
11  A.  Yes.
12  Q.  Do you know who that individual is that's wheeling
13  Mr. Dunigan?
14  A.  He's an ER nurse.  I don't know him by name.
15  Q.  I'm going to cue up some video feed right now.
16  A.  Okay.
17      MR. HARRINGTON: I'm trying to think what
18  would be the easiest way to do this.  I'd like him to
19  see this.  Would it be possible for both of you to
20  come over to this side while I play some of this
21  video?  I mean, I can sit over on your side, it
22  doesn't matter, but ...
23      MR. O'LOUGHLIN: You're welcome to come
24  over here and turn it around.  We'll get a chair.
25

---

**Page 43**

1      BY MR. HARRINGTON:
2  Q.  You see the video on my screen, correct?
3  A.  Yes.
4  Q.  Okay.  And this is the image of the scout car that
5  eventually Mr. Dunigan is placed into, correct?
6  A.  Correct.
7  Q.  And this is a Kalamazoo Public Safety vehicle,
8  correct?
9  A.  Correct.
10  (Video played)
11      BY MR. HARRINGTON:
12  Q.  Did you hear where somebody just said, "Come on,
13  Mr. Dunigan"?
14  A.  Mmm-hmm.
15  Q.  Yes?
16  A.  Yes.
17  Q.  Okay.  So you can hear the audio to some extent on
18  this playback, correct?
19  A.  Correct.
20  (Video played)
21      BY MR. HARRINGTON:
22  Q.  Do you hear those snoring sounds, that breathing that
23  we had talked about?
24  A.  Mmm-hmm.
25      MR. O'LOUGHLIN: Form and foundation.

---

**Page 44**

1      BY MR. HARRINGTON:
2  Q.  Yes?
3  A.  Yes.
4  Q.  You understand that to be Mr. Dunigan?
5  A.  Yes.
6  Q.  And that is while he is standing outside of the
7  vehicle, or at least outside of the vehicle --
8  A.  Correct.
9  Q.  -- where you would have been in the vicinity of?
10  A.  Correct.
11  Q.  And you did not hear that?
12  A.  No.
13  (Video played)
14      BY MR. HARRINGTON:
15  Q.  The part where it said "put one foot in front of the
16  other," you heard that?
17  A.  Yes.
18  Q.  Who said that?
19  A.  I believe that's Nugent.
20  Q.  That's who it sounded like?
21  A.  Mmm-hmm.
22  Q.  Yes?
23  A.  Yes.
24  (Video played)
25

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 45

1     BY MR. HARRINGTON:
2  Q.  Did you hear that part where it says, "He's walking
3   around just fine"?
4  A.  Yes.
5  Q.  Who said that?
6  A.  I don't recall who said that.  I mean, there was --
7     MR. O'LOUGHLIN: Just if you don't recall,
8   you don't recall.
9     BY MR. HARRINGTON:
10  Q.  How many officers were around Mr. Dunigan at this
11   point in time?
12  A.  Nugent, it was the public safety officer that drove
13   the vehicle, myself.  I don't recall if Zack was out
14   there.  I think Zack was out there.  And Art was going
15   around to the other side, I believe.
16     (Video played)
17     BY MR. HARRINGTON:
18  Q.  Did you hear that, "I know the game well"?
19  A.  Yeah.
20  Q.  Does that refresh your memory of somebody discussing
21   this issue about the quote-unquote game?  Do you want
22   me to rewind it?
23  A.  No, that's fine.
24  Q.  Let me go back, because I want to see if you can tell
25   me who said ...

---

Page 46

1     (Video played)
2     BY MR. HARRINGTON:
3  Q.  You heard that?
4  A.  Yeah.
5  Q.  About the game?
6  A.  Yeah.
7  Q.  Okay.  Do you know who said "playing the game"?
8  A.  It was one of the public safety officers, I just don't
9   recall which one.
10  Q.  No, before "I know the game well" -- I'll go back,
11   because there's somebody that says that he was playing
12   the game, and then somebody responds and says, "I know
13   the game well."
14  A.  It was Nugent or one of the other, the other --
15   Shafer, I guess.
16  Q.  Was it you?
17  A.  Not that I recall.
18  Q.  Do you want me to go back one more time so you can
19   hear it?
20  A.  Sure.
21     (Video played)
22     THE WITNESS: I remember saying he was
23   walking.
24     (Video played)
25

---

Page 47

1     BY MR. HARRINGTON:
2  Q.  Did you hear that, "He's walking around ... playing
3   the game"?
4  A.  Mmm-hmm.
5  Q.  You heard that?
6  A.  Mmm-hmm.
7  Q.  Yes?
8  A.  Yes.
9  Q.  Okay.  Do you know who said that?
10  A.  I don't recall who said that.
11  Q.  Do you know whose voice that sounded like?
12  A.  No.
13  Q.  Was it yours?
14  A.  I don't recall saying that, I don't ...
15  Q.  Yeah, but did that sound like your voice?
16     MR. O'LOUGHLIN: Asked and answered.
17  A.  I couldn't tell you if that was my voice.
18     BY MR. HARRINGTON:
19  Q.  Fair enough.
20     (Video played)
21     BY MR. HARRINGTON:
22  Q.  So do you hear him say, "My legs ain't ready"?
23  A.  Mmm-hmm.
24  Q.  Yes?
25  A.  Yes.

---

Page 48

1  Q.  You have to say yes.
2  A.  Yes.
3  Q.  And then you responded with, "Bullshit."
4  A.  Yes.
5  Q.  You'd agree with me, with what we've listened to thus
6   far, there was no discussion of a warrant, correct?
7  A.  Correct.
8     (Video played)
9     BY MR. HARRINGTON:
10  Q.  You hear that, "Do you want to go in like a baby"?
11  A.  Mmm-hmm.
12  Q.  Yes?
13  A.  Yes.
14  Q.  Who said that?
15  A.  I don't recall which officer said that.  It was either
16   Nugent or --
17  Q.  Was it you?
18  A.  It wasn't me.  I don't -- no.
19     (Video played)
20     BY MR. HARRINGTON:
21  Q.  On the video, we just saw somebody get in from what
22   appears to be the rear passenger side door at 6:41:26
23   on the disk.  Do you see that?
24  A.  Correct.
25  Q.  Who is that?

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

Page 49

1  A.  That's Art.

2  Q.  Art?  What's his last name?

3  A.  I don't remember his last name.

4      (Video played)

5      BY MR. HARRINGTON:

6  Q.  Did you hear the, "Sit up like an adult"?

7  A.  Mmm-hmm.

8  Q.  Yes?

9  A.  Yes.

10  Q.  Who said that?

11  A.  I don't recall who said that.

12      (Video played)

13      BY MR. HARRINGTON:

14  Q.  Who said that, "Come on, please, please sit up like an

15      adult"?  Do you know who said that?

16  A.  I don't recall who said that, no.

17      (Video played)

18      BY MR. HARRINGTON:

19  Q.  Did you hear that breathing, snoring sound?

20      MR. O'LOUGHLIN:  Form and foundation.

21  A.  Yes.

22      BY MR. HARRINGTON:

23  Q.  And the time is 6:41:53?

24  A.  Yes.

25  Q.  And is that you standing just, that we can see the

Page 50

1      legs, standing just on the outside of the rear

2      driver's side door, I'm sorry -- yeah, the rear

3      driver's side door?

4  A.  Possibly.

5  Q.  You would have been right within that vicinity --

6  A.  Correct.

7  Q.  -- because you just helped load him in?

8  A.  Correct.

9  Q.  And while that time frame of 6:41:53, when we heard

10      that noise come out of Mr. Dunigan, he's actually

11      being touched by Art?

12  A.  Correct.

13  Q.  Art is right by his head?

14  A.  Correct.

15  Q.  Art is a security officer with Bronson?

16  A.  Yes.

17      (Video played)

18      BY MR. HARRINGTON:

19  Q.  When we get to around 6:42:50, 52-ish, somebody's

20      going to say something about "medically cleared," and

21      "up walking around."  I want you to listen for that

22      and tell me who said that, okay?

23  A.  Mmm-hmm -- Yes, sorry.

24  Q.  I need words, please.  You're doing fine, but I just

25      need words.

Page 51

1  A.  Yes.

2      (Video played)

3      BY MR. HARRINGTON:

4  Q.  Real quick, somebody said, "I've been hemming and

5      hawing with him in there."  Do you know who said that?

6  A.  I believe it was Nugent.

7      (Video played)

8      BY MR. HARRINGTON:

9  Q.  You just heard the issue about a search warrant?

10  A.  Yes.

11  Q.  And you'd agree with me, that's the first time that

12      we've heard that on this video?

13  A.  On that video, yes.

14  Q.  Okay.  Do you remember where in time it was discussed

15      earlier?

16  A.  It was before that vehicle showed up, out front.

17      (Video played)

18      BY MR. HARRINGTON:

19  Q.  Did you hear that, "He's medically cleared, he's been

20      up walking around"?  Who said that?

21  A.  That would be me.

22  Q.  But you never witnessed that?

23  A.  As far as him being medically cleared?

24  Q.  Let me rephrase.  You never witnessed him up walking

25      around?

Page 52

1  A.  No.

2  Q.  But you told that to the officers?

3  A.  Correct.

4  Q.  You told them that without firsthand knowledge?

5  A.  Correct.

6  Q.  And how did you know he had been medically cleared?

7  A.  Because that's what I was told from one of the other

8      security officers.

9      (Video played)

10      BY MR. HARRINGTON:

11  Q.  That part, "I believe it, you don't have to explain

12      anything to me," who said that?

13  A.  That would be Officer Nugent.

14      (Video played)

15      BY MR. HARRINGTON:

16  Q.  That part where it says "He switched chairs a couple

17      times," who said that?

18  A.  That would be me.

19  Q.  How did you know that?

20  A.  Somebody had said he was up moving around.

21  Q.  You didn't do anything to independently verify that,

22      though, did you?

23  A.  No.

24      (Video played)

25

Page 53

1  BY MR. HARRINGTON:
2  Q. Who said, "Act like a grown-ass man. Fucking stupid"?
3  MR. O'LOUGHLIN: Form and foundation.
4  A. That would be me.
5  BY MR. HARRINGTON:
6  Q. And you were referring to Dunigan?
7  A. Correct.
8  Q. You were calling him fucking stupid?
9  A. No, I said the situation was fucking stupid.
10 Q. Okay. So the whole situation with Dunigan was, in
11 your mind, fucking stupid?
12 A. Out of frustration, yes, I said, "F-ing stupid."
13 (Video played)
14 BY MR. HARRINGTON:
15 Q. So talking about, "Put the front brakes on and shoom,"
16 was that when he was in the wheelchair?
17 MR. O'LOUGHLIN: Form and foundation.
18 A. In reference to him being in the wheelchair?
19 BY MR. HARRINGTON:
20 Q. Yes.
21 A. I believe it was a comment made by one of the public
22 safety officers in reference to being in a wheelchair.
23 Q. Yeah, but the "shoom," was that meaning that they --
24 putting the front brakes on, what would that cause a
25 wheelchair to do?

Page 54

1  A. To possibly, or just -- I think he's referring to
2  somebody dumping somebody on the ground, possibly.
3  Q. In reference to wanting to do that with Dunigan?
4  A. Correct.
5  Q. Why would you guys be talking in that kind of a manner
6  about this man?
7  A. I think he was making a, trying to make a joke about
8  it, with trying to lighten the situation.
9  Q. You understand he's dying now?
10 MR. O'LOUGHLIN: Form and foundation.
11 A. Yeah.
12 BY MR. HARRINGTON:
13 Q. You understand that now?
14 A. After seeing the video, yes.
15 Q. And while he's dying, you guys are making a joke about
16 tipping him in the wheelchair?
17 A. There was a joke --
18 MR. O'LOUGHLIN: What's the question?
19 MR. HARRINGTON: That is the question.
20 MR. O'LOUGHLIN: That's not a question.
21 BY MR. HARRINGTON:
22 Q. So while he was dying, you guys were making a joke
23 about tipping him in a wheelchair, is that correct?
24 A. I wasn't making a joke about tipping him in the
25 wheelchair.

Page 55

1  Q. The officers were?
2  A. A comment was made in reference to tipping a
3  wheelchair.
4  Q. Okay. So while he is dying, there is a comment made
5  in a joking fashion about tipping Mr. Dunigan in the
6  wheelchair?
7  A. Correct.
8  Q. Who pushed the wheelchair?
9  A. As far as pushed it outside?
10 Q. Yes.
11 A. I don't recall. I believe it was Zack had ahold of
12 the wheelchair.
13 Q. Do you remember who made the comment about putting the
14 front brakes on the wheelchair?
15 A. It was a public safety officer.
16 Q. Let me go back just a little bit in time.
17 (Video played)
18 BY MR. HARRINGTON:
19 Q. Did you hear that, where, "You put the front brakes on
20 and go shoom"?
21 A. Yes.
22 Q. Who said that?
23 A. That would be the other public safety -- I guess it
24 would be Shafer, if that's his name. The guy who
25 showed up with the second cruiser.

Page 56

1  Q. And you recall this from independent memory, correct?
2  A. Correct.
3  Q. And he was asking somebody if you guys would do that,
4  right? Let me rephrase.
5  Do you remember who he was asking that
6  towards, or was that just asked towards the group?
7  A. I think it was just, in general, towards the group
8  that was standing out there. It was in a joking
9  fashion.
10 Q. Hindsight, looking back on this, highly inappropriate,
11 correct?
12 A. Correct.
13 (Video played)
14 BY MR. HARRINGTON:
15 Q. Who said, "I wanted to and thought about it," with
16 respect to tipping him in the wheelchair?
17 A. That would be me.
18 Q. Why did you want to tip him?
19 A. I wouldn't want to tip him. It was out of frustration
20 in the moment, responding to the public safety
21 officer. But I would never tip anybody out of a
22 wheelchair. That would be wrong.
23 Q. Were you disciplined in any way, shape, or form with
24 respect to the Dunigan matter?
25 A. No.

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

Page 57

1 Q. Did you ever speak with risk management in any way
2 regarding the Dunigan matter?
3    MR. O'LOUGHLIN: I think we're getting into
4 areas of peer review now, so don't answer that
5 question.
6    MR. HARRINGTON: Just so I'm clear, any
7 type of questions relating to whether or not, not even
8 getting into content, even if he did have a
9 conversation with risk management, are you instructing
10 him not to answer?
11    MR. O'LOUGHLIN: No, he can answer that,
12 I'm sorry. He could answer whether he had one;
13 however, the content is protected by the peer review
14 privilege.
15    BY MR. HARRINGTON:
16 Q. Did you have any type of communications with risk
17 management regarding the Dunigan matter?
18 A. Yes.
19 Q. Okay. Did you ever write a statement out in any way,
20 shape, or form for risk management?
21 A. No.
22 Q. Okay. You did write a statement out regarding the
23 Dunigan incident?
24 A. For security.
25 Q. Yes?

Page 58

1 A. Yes.
2 Q. But you did not do one for risk management, true?
3 A. True.
4 Q. Did you ever give a recorded statement, either video
5 or audio, to risk management about this incident?
6 A. No.
7    MR. HARRINGTON: And I presume, Counsel, if
8 I ask him any questions at all as to what he said with
9 risk management, you would instruct him not to answer,
10 so I don't have to lay a foundation on that?
11    MR. O'LOUGHLIN: Was I also present?
12    THE WITNESS: Yes.
13    MR. O'LOUGHLIN: Thank you.
14    MR. HARRINGTON: But the answer to my
15 question is, you'll instruct him not to answer on
16 that.
17    MR. O'LOUGHLIN: No. It's attorney-client
18 privileged. I'm in the room with him and risk
19 management.
20    MR. HARRINGTON: Right. So, I mean, what
21 I'm getting at is if I ask him any of these questions
22 about what he said to risk management, you're going to
23 object to privilege based on attorney-client and --
24 what's that other privilege you guys raise?
25    MR. O'LOUGHLIN: Peer review.

Page 59

1    MR. HARRINGTON: Peer review, that one.
2    MR. O'LOUGHLIN: Can you imagine that if
3 I'm in a room with two employees of my client
4 discussing something, that it wouldn't be privileged
5 and I would allow him to answer it?
6    MR. HARRINGTON: Well, if they're all
7 employees, I see where you're coming from. I just
8 want to make sure that --
9    MR. O'LOUGHLIN: See where I'm coming from?
10    MR. HARRINGTON: All I'm asking is, I just
11 don't want to keep asking questions just to lay a
12 foundation. I just want to move on and just say that
13 you're going to instruct him not to answer on
14 privilege, that's all.
15    MR. O'LOUGHLIN: With such a broad
16 question, the answer is, broadly, yes.
17    MR. HARRINGTON: Okay.
18    BY MR. HARRINGTON:
19 Q. Were you ever questioned by anybody from Bronson
20 Hospital as to why you used profanity with respect to
21 the Dunigan matter?
22 A. No.
23 Q. Were you ever questioned by anybody from the hospital
24 as to why you were joking about tipping a human being
25 in a wheelchair?

Page 60

1 A. No.
2 Q. Were you ever questioned by anybody from Bronson
3 Hospital --
4    MR. O'LOUGHLIN: Let's hold up here. Are
5 you talking about the questions in these meetings?
6    MR. HARRINGTON: I'm talking about -- I'm
7 asking a broad question if anybody from Bronson
8 Hospital ever asked him a question as to why he would
9 use profanity in connection with the Dunigan matter.
10    MR. O'LOUGHLIN: Outside of discussions
11 with risk management and attorneys?
12    MR. HARRINGTON: At any time.
13    MR. O'LOUGHLIN: Don't answer as to any
14 conversations with risk management and me.
15    MR. HARRINGTON: Okay. He can answer if it
16 was asked and then --
17    MR. O'LOUGHLIN: No, he can't.
18    MR. HARRINGTON: He can answer if it was
19 asked, and then if it was in the presence of an
20 attorney, I don't get to know -- at least -- from what
21 I'm hearing it doesn't sound like I get to know, but I
22 get to know at least if that was ever asked by
23 anybody.
24    MR. O'LOUGHLIN: That's a pure misstatement
25 of privilege and how it works. You think you can get

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 61

1  all my questions but not the answers?
2     MR. HARRINGTON: No.  I'm asking anybody
3  from Bronson Hospital.  You're not from Bronson
4  Hospital.  You're from a law firm.
5     MR. O'LOUGHLIN: If I'm present in the room
6  with risk management and this witness, those
7  conversations are privileged.
8     MR. HARRINGTON: So if I ask him the
9  question if anybody had ever asked him those questions
10  regarding his language or what he was saying, say,
11  outside of the car when this was happening, if it
12  happened in your presence, you're asserting privilege?
13     MR. O'LOUGHLIN: Absolutely.
14     MR. HARRINGTON: Got it.
15     BY MR. HARRINGTON:
16  Q.  Outside of an attorney's presence, did anybody from
17   risk management ever ask you any of those questions as
18   to the profanity that you used in connection with
19   Mr. Dunigan?
20  A.  No.
21  Q.  Did anybody from Bronson Hospital, outside of the
22   presence of your attorney, ever ask you any questions
23   about, really, how you handled the Dunigan situation?
24  A.  No.
25     (Video played)

---

Page 62

1     BY MR. HARRINGTON:
2  Q.  Did you hear the, "All right, guys, see you later"?
3  A.  Yes.
4  Q.  Who said that?
5  A.  That would be Nugent.
6  Q.  At this point in time, are you still at the car?
7  A.  Negative.
8  Q.  Okay.  When he says, "All right, see you later," you
9   remember that in your mind, right?
10  A.  Correct.
11     MR. O'LOUGHLIN: Form and foundation.
12     Do you remember it from that day --
13     THE WITNESS: Yes.
14     MR. O'LOUGHLIN: -- or from watching the
15   video?
16     THE WITNESS: Well, mainly from the video,
17   but at that point we were walking away from the
18   vehicle back inside.
19     BY MR. HARRINGTON:
20  Q.  All right.  And as it appears on the screen of this
21   video, that time is 6:44:02.  Do you agree?
22  A.  Yes.
23  Q.  Okay, so at 6:44:02, as depicted on this screen, you
24   are literally walking away from the scout car?
25  A.  As I recall, yes.

---

Page 63

1     (Video played)
2     BY MR. HARRINGTON:
3  Q.  I'm going to go back to my seat.
4     Document -- well, Exhibit Number 17 that we
5   marked at the previous deposition, do you see that?
6  A.  Yes.
7  Q.  And that is a report that you filled out?
8  A.  That would be a trespass form, yes.
9  Q.  Okay.  You filled this out after Mr. Dunigan had been
10   transported away from the scene, correct?
11     MR. O'LOUGHLIN: Form and foundation.
12  A.  Correct.
13     BY MR. HARRINGTON:
14  Q.  Okay, you wrote what time?
15  A.  0645.
16  Q.  And we know that that was after Mr. Dunigan was in the
17   custody of the Kalamazoo Public Safety, correct?
18  A.  Correct.
19  Q.  You checked that he was, his conduct was disorderly
20   conduct?
21  A.  Yes.
22  Q.  What was disorderly about his conduct?
23  A.  I guess at one point when in the lobby he kind of
24   pulled away from Zack and Nugent.
25  Q.  Did you see that?

---

Page 64

1  A.  Yes, I was standing there.
2  Q.  How did he pull away?
3  A.  Kind of jerked away, like kind of jerked.
4  Q.  And that was a disorderly?
5  A.  A little bit, yes.
6  Q.  Okay.  What else was disorderly?
7  A.  As he was being walked out, the jerking away at the
8   time or not -- the refusing to walk.  And that's
9   something that we've dealt with before with people we
10   were escorting out, they refuse to walk, would be
11   trespass.
12  Q.  Anything else?
13  A.  No.
14  Q.  For the explanation as to disorderly conduct, you
15   didn't write those things about jerking away, did you?
16  A.  No.  I wrote refusing to leave, not cooperating.
17  Q.  Right.  You wrote, "Refusing to leave, not
18   cooperating."  Correct?
19  A.  Correct.
20  Q.  You did not write, "Pulling away from an officer."
21   Correct?
22  A.  That would be correct.  Hence is why I wrote "not
23   cooperating."  Did I word it pulling away?  No.
24   That's why I put not cooperating.
25  Q.  But that's something you could have wrote, right?

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

Page 65

1  A.  Yes.

2  Q.  You've checked a few other boxes on Exhibit 17.  Do
3  you see that?

4  A.  Yes.

5  Q.  After checking disorderly conduct, you checked:  Have
6  been banned from the premises.

7     Do you see that?

8  A.  Correct.

9  Q.  And that's James Dunigan was banned from the premises?

10 A.  Correct.

11 Q.  What does that mean?

12 A.  It means the subject's banned from the premises unless
13 seeking medical treatment, is my understanding from
14 what I was told in security training.

15 Q.  And then the next box you checked, it says, "Remained
16 on the premises after being forbidden to do so"?

17 A.  Correct.

18 Q.  Was that something that he was doing before he was
19 taken away by Kalamazoo?

20 A.  Before he was taken away, he was remaining in the
21 lobby when the buses were running, after like several
22 hours after his discharge thing.

23 Q.  So he was forbidden to be on the property?

24 A.  After he was taken away, yes.  Once we -- when we
25 trespass somebody, we fill one of these out and that

Page 66

1  means it's good for a year.  They can only be there to
2  seek medical attention.  They're not to be hanging
3  around or like wandering the premises.

4  Q.  So you get a lot of people, so to speak, on the
5  property that just hang around?

6  A.  Correct.

7  Q.  And for those individuals you fill out these forms,
8  correct?

9  A.  Those that have been trespassed, correct.

10 Q.  Okay.  And these are individuals that you believe are
11 not seeking medical treatment?

12 A.  Correct.

13 Q.  These are not medical records, this document
14 number 17?

15 A.  No.

16 Q.  This is just something for the overall safety of the
17 hospital?

18 A.  Correct.

19 Q.  How many of these have you filled out in your career?

20 A.  I don't recall.

21 Q.  Where are they kept?

22 A.  In the security office in a book so different shifts
23 can refer back to it.  We trespass a person for
24 whatever reason, whether it be panhandling, disorderly
25 conduct, bothering patients or customers, we fill

Page 67

1  these out.

2     A lot -- not a lot.  Sometimes the people
3  that we trespassed would return back to the
4  property after being trespassed, and this was a way to
5  refer back to, the other shifts could refer back, "Hey
6  has this guy been trespassed," and they could refer
7  back to that, so ...

8     It's also so the city could use that as a
9  reference to pick somebody up for trespassing, too,
10 that they've already been banned for trespassing.

11 Q.  Who maintains these?

12 A.  As far as filing?

13 Q.  Yeah, who keeps them?

14 A.  Well, they're in a book in the security office.  I
15 believe they're filed at the end of the cycle in
16 records for -- I think Dawn deals with that, I
17 believe.

18 Q.  And if I wanted to get a copy of every one of these
19 trespass forms that you had filled out, how would I
20 get those?

21 A.  Contact Dawn Zomer.

22 Q.  And, I mean, are they ever destroyed?

23    MR. O'LOUGHLIN:  Foundation.

24 A.  I don't know.  I believe they're kept in records.

25

Page 68

1     BY MR. HARRINGTON:

2  Q.  Because you'd want to know who the regular offenders
3  are, right?

4  A.  Right.

5  Q.  And if somebody, let's say -- I mean, these are good
6  for a year, correct?

7  A.  Yeah.  It's a big, thick book.  It's a binder about
8  that big that's kept in there.

9  Q.  And just so the record's clear, you held up your hands
10 on top of each other showing how high they were, and
11 it was approximately twelve inches?

12 A.  Yeah.  It's a thick folder, yeah, for trespass
13 complaints.

14 Q.  Dating back how far?

15    MR. O'LOUGHLIN:  That looked like twelve
16 inches to you?

17    MR. HARRINGTON:  Well, the first time it
18 did.  The second time it didn't.

19 A.  It's a thick folder, I don't know the exact diameter
20 or dimensions of it.  It's a big book.

21    I don't know how -- I assume they're back a
22 year.  I have not looked through the whole book to see
23 how far back they go.

24    BY MR. HARRINGTON:

25 Q.  Well, if they're good for a year, they would at least

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 69

1 be in the book?
2 A.  They'd be in the book.  You would assume that, yes.
3 Q.  Okay.  But you've seen some older than a year in
4 there?
5 A.  I don't recall the dates on them.
6 Q.  Okay.  In your second stint as an officer in January
7 of 2016 to October of 2016, how many of these trespass
8 forms did you write?
9 A.  I couldn't give you an exact number.  I've written a
10 few.
11 Q.  I mean, a fair amount?
12 A.  Yes.  Without going back through the book and
13 counting, I couldn't give you an exact number of how
14 many I filled out.
15 Q.  More than ten, more than twenty?
16 A.  I'd say less than twenty but more than ten.
17 Q.  Okay, somewhere in there?
18 A.  Yeah.
19 Q.  And these individuals are primarily, almost always
20 like homeless-looking folks?
21      MR. O'LOUGHLIN: Form and foundation.
22 A.  Not always homeless.  We have people just wandering in
23 off the streets up here, just to wander.  Not
24 necessarily homeless, but they don't, they're here for
25 no other reason other than to just wander and

---

Page 70

1 panhandle.  It hasn't always been homeless people.
2      BY MR. HARRINGTON:
3 Q.  But do they have like a certain look, like the clothes
4 are kind of raggedy?
5 A.  No.
6 Q.  Okay.
7 A.  I've had homeless people that are dressed very nicely
8 that you would -- on first look you wouldn't know that
9 they're homeless.
10 Q.  But, I mean, have you ever issued or written one of
11 these trespass forms, say, like to somebody who is
12 wearing like a suit, like I am today?  And I'm
13 referring to the 2016 form.
14 A.  No.
15 Q.  What percentage of the individuals that you've written
16 these trespass forms for are African-American versus
17 non-African-American, an estimate?
18      MR. O'LOUGHLIN: Form and foundation.
19 A.  I couldn't tell you, it's about -- I mean, I've
20 trespassed people black and white, I mean ...
21      BY MR. HARRINGTON:
22 Q.  Sure.  What percentage?
23 A.  I'd say it's half and half.  I mean, I don't keep
24 track of a percentage.  I don't look for, "Oh, this is
25 a black guy."  I mean, I respond to the calls that --

---

Page 71

1 if we get a complaint call, you know, if the person's
2 disruptive to the campus, then they need to go.
3 Whether they're black, white, I don't look at that, I
4 just --
5 Q.  But if you were to look at the body of work that
6 you've done as far as these trespass forms from
7 January of 2016 to October of 2016, you would believe
8 that the percentage of these forms that you wrote is
9 approximately fifty percent African-American and
10 fifty percent, say, everything else?
11      MR. O'LOUGHLIN: Form and foundation.
12      BY MR. HARRINGTON:
13 Q.  Go ahead.
14 A.  I honestly couldn't tell you.  I'm just guessing that
15 it's half and half, but as far as whether there are
16 more black people than white people, I couldn't tell
17 you.  I've never kept track of that, you know, I've
18 kicked out this many black people, I've kicked out
19 this many white people.
20      If they're an issue on the campus, I
21 respond to the call and deal with the call.  Whether
22 they're black, white, Hispanic, red, green, my job as
23 a security officer was campus safety, so ...
24 Q.  You're white, correct?
25 A.  Correct.

---

Page 72

1 Q.  Officer Nugent is white, correct?
2 A.  Correct.
3 Q.  Officer Shafer is white, correct?
4 A.  Correct.
5 Q.  Officer Zack is, he's white, correct?
6 A.  He's Caucasian.  I don't know -- he's kind of
7 olive-skinned.  I don't know if he's mixed with -- I
8 have never asked him, I've never -- you could say he's
9 white, but he looks more Middle Eastern, I guess.
10 Q.  The other officer was who?
11 A.  Art.
12 Q.  And he's white?
13 A.  Art's black.
14 Q.  Art's black?
15 A.  Yeah, he's African-American.
16 Q.  He's the only African-American that dealt with
17 Mr. Dunigan that evening, correct?
18 A.  Correct.
19 Q.  Well, that early morning hours, I guess you could say.
20 A.  Correct, yes.
21 Q.  And Mr. Dunigan, obviously, is African-American?
22 A.  Yes.
23 Q.  Do you see the document in front of you that was
24 marked Exhibit 12 to Nolan's deposition?
25 A.  Yes.

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

Page 73

1  Q.  And is that your report, at least -- let me put it
2  this way, the contents of the first page continuing to
3  the part of the second page?
4  A.  Yes, it has my initials on it.  I would say yes.
5  Q.  Okay.  Does this look like the report form?
6      MR. O'LOUGHLIN: Form and foundation.
7  A.  It's a report that I wrote up, yes.
8      BY MR. HARRINGTON:
9  Q.  Yeah, but this is a Word document, right?
10  A.  Correct.
11  Q.  You didn't write it on a Word document.
12     MR. O'LOUGHLIN: Form and foundation.
13     BY MR. HARRINGTON:
14  Q.  Correct?
15  A.  I wrote it on the --
16  Q.  Landesk, right?
17  A.  Right, the Landesk.  That would be our tickets.
18  Q.  Landesk is different than Word?
19  A.  Correct.
20  Q.  Do you have any idea why this document was copied onto
21  a Word document?
22  A.  I couldn't tell you.
23  Q.  Have you ever seen the printed version of the Landesk
24  report?
25  A.  Not to my knowledge, no.

Page 74

1  Q.  That is something that can be done, right?
2  A.  As far as printing off documents off Landesk?  I
3  believe so.  I've never done it.  Might want to check
4  with Dawn Zomer.  I mean, most of what we do was our
5  route tickets and complaints, where you put it right
6  in the Landesk and you hit enter and it was filed,
7  so ...
8  Q.  When did you write your report?
9  A.  I believe I wrote a Landesk ticket that morning, and I
10  believe I made, a day or couple days later
11  corrections, because I had some spelling errors in
12  Landesk.
13  Q.  When you say "that morning," what do you mean you
14  wrote it that morning?
15  A.  The morning of Dunigan, I wrote like a brief
16  statement, and I went back a few days later and then
17  did the whole -- after the whole thing with Dunigan,
18  with him being transported, I wrote the whole
19  detailed ...
20  Q.  So you wrote the first part of it before you knew he
21  died, correct?
22  A.  Correct.
23  Q.  You wrote this while you were on the clock, correct?
24  I mean, you wouldn't punch out and then go write a
25  report --

Page 75

1  A.  No, correct.
2  Q.  -- so you wrote it while you were on the clock.
3  A.  As I recall, yes.
4  Q.  All right.  I mean, you don't want to do work for
5  free, right?
6  A.  Right.
7  Q.  And this is part of your work?
8  A.  Correct.
9  Q.  But your shift ends at seven a.m., correct?
10  A.  Correct.
11  Q.  When did you have time between when Dunigan was
12  transported to write this report?
13  A.  I remember writing a brief -- it wasn't even like a
14  couple sentences before I punched out, I remember, in
15  the office, if I recall.
16  Q.  What part of this report as we're looking at on
17  Exhibit 17 did you write before you punched out?
18  A.  This?
19  Q.  Yeah.
20  A.  This was not written before I punched out.  This would
21  be written after, like a few days later.
22  Q.  All right.  From the time that you punched out on
23  May 6, 2016, to the time that you completed the report
24  as marked as Exhibit -- I'm sorry, I think that's
25  Exhibit 12.  I think I referenced 17.  It's

Page 76

1  Exhibit 12.
2  A.  Correct.
3  Q.  Did you, had you spoke to a lawyer?
4  A.  No.
5  Q.  Had you spoke to anybody in risk management?
6  A.  No.
7  Q.  Had you spoken to any of the co-officers who were
8  involved with Dunigan that were employed by Bronson at
9  the time about the Dunigan incident?
10  A.  I know we, I had, not that -- I don't recall.  I don't
11  remember if I was off that weekend and didn't come
12  back until like Monday or Tuesday and that's when I
13  found out that he had passed.  I think I spoke to Zack
14  on our next shift.  And then I remember Dawn Zomer
15  getting ahold of me, saying I needed to write a more
16  detailed report.
17  Q.  Who told you to write the report?
18  A.  Our supervisor, Dawn Zomer.
19  Q.  But you had already started to write a report.
20     MR. O'LOUGHLIN: Form and foundation.
21     BY MR. HARRINGTON:
22  Q.  Right?
23  A.  Correct.
24  Q.  Do you remember what you wrote right before you
25  punched out?

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 77

1 A.  No.
2 Q.  When you write a report, it's important to be as
3     accurate as possible, correct?
4 A.  Correct.
5 Q.  To detail exactly what you remember, correct?
6 A.  Correct.
7 Q.  And to be truthful, correct?
8 A.  Correct.
9 Q.  Did you review any documents prior to completing your
10    report?
11 A.  No, not that I recall.
12 Q.  You didn't review any video?
13    MR. O'LOUGHLIN: Form and foundation.
14    BY MR. HARRINGTON:
15 Q.  Before writing the report, correct?
16 A.  No.
17 Q.  That's a correct statement?
18 A.  Correct.
19 Q.  You didn't review any audio before writing your
20    report, correct?
21 A.  Correct.
22 Q.  You didn't speak with Nugent or Shafer about what
23    happened to Mr. Dunigan before writing your report,
24    correct?
25 A.  Correct.

---

Page 78

1 Q.  What about Rickli, Carlisle, those individuals, did
2     you speak with them --
3 A.  I think there was a little --
4 Q.  Hang on.  Did you speak with them about the incident
5     before writing your report?
6 A.  Yes.
7 Q.  Did you talk about what would be in the contents of
8     your report before you wrote it?
9 A.  No.
10 Q.  What did you speak to them about?
11 A.  I think it was a general discussion about what
12    happened.  There was no discussion about what each
13    individual was putting in his report.  There was just
14    a discussion about, you know, the gentleman passing
15    away in police custody.
16 Q.  You thought he was faking, Dunigan?
17 A.  Correct.
18 Q.  We now know he was not.
19 A.  Correct.
20    MR. O'LOUGHLIN: Form and foundation.
21    BY MR. HARRINGTON:
22 Q.  If you wanted to, you could have gone and got medical
23    treatment for Mr. Dunigan?
24 A.  If I knew what the situation was.
25 Q.  If you wanted to?

---

Page 79

1 A.  If I knew he needed medical assistance, sure.
2 Q.  If you had reason to believe he needed medical
3     assistance, you could have?
4 A.  Sure.
5 Q.  Okay.  I want to go through your report.
6 A.  Okay.
7 Q.  The fourth line on the first page, do you see that?
8     Do you see that, where it says "apparently"?
9 A.  Yeah.
10 Q.  Apparently staff had told him he could wait until the
11    buses started running?
12 A.  Correct.
13 Q.  Do you know what staff?
14 A.  I couldn't tell you what staff.  I know apparently it
15    was ER staff.
16 Q.  What time do the buses start running?
17 A.  I think about six.  I don't really know the bus
18    schedule.  I don't have -- I don't, you know, I don't
19    ride the bus, so ...
20 Q.  Your understanding is you believe they start running
21    around six?
22 A.  Six a.m., yeah.
23 Q.  What buses?
24 A.  Metro Transit.
25 Q.  Who decided to let Dunigan wait until six a.m.?

---

Page 80

1 A.  I believe, from what I heard when I got back to the
2     security office, I believe ER staff had told him he
3     could wait.  And then it was just the consensus from
4     the security that, "Yeah, we're going to let him wait
5     until the buses start running, let him sit in the
6     lobby for a couple hours."
7 Q.  The next sentence says:  At 5:15, Mr. Dunigan called
8     for PSO Knauf -- spelled K-N-A-U-F -- from the ER desk
9     to come talk to him.
10    Do you see that?
11 A.  Yes.
12 Q.  Is that something you witnessed?
13 A.  I think I heard that on hearsay.
14 Q.  So somebody told you that?
15 A.  Right.
16 Q.  So you're getting information from somebody to fill in
17    for your report?
18 A.  Correct.  This is when I got back from doing my tour
19    around the building.  I came back to the office and
20    someone had said that, yeah.
21 Q.  So you're getting a story from somebody else as to
22    what happened to fill in your report?
23 A.  Correct.
24 Q.  Did Knauf tell you that Dunigan wanted to go to jail?
25 A.  Yup.  He came into the office right when I got back to

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 81

1 the office and said that Dunigan said he wanted to go
2 to jail.
3 Q. In the third paragraph you write: Mr. Dunigan stated
4 he wanted PSO Nugent take him to jail.
5 A. Correct.
6 Q. You heard that said?
7 A. Correct.
8 Q. You then heard Nugent say he was not going to take him
9 to jail and that he needed to leave the ER.
10 Is that correct?
11 MR. O'LOUGHLIN: You said Nugent.
12 MR. HARRINGTON: PSO Nugent said he was not
13 going to take him to jail.
14 MR. O'LOUGHLIN: You said Nugent again, and
15 it says Knauf.
16 MR. HARRINGTON: No, PSO Nugent. This is
17 what the report says. I'm reading the report.
18 MR. O'LOUGHLIN: Oh, I thought you were
19 still in that paragraph where: I explained to
20 Mr. Dunigan that he was not going take him to jail.
21 MR. HARRINGTON: No-no-no. I'm on the
22 third full paragraph.
23 MR. O'LOUGHLIN: All right.
24 BY MR. HARRINGTON:
25 Q. PSO Nugent said he was not going take him to jail and

---

Page 82

1 that he needed to leave the ER.
2 Do you see that?
3 A. Yes.
4 Q. You heard that?
5 A. Yes.
6 Q. You then write: Mr. Dunigan was given a few moments
7 to gather his things.
8 What things did he have?
9 A. If I recall, he had a bag. It's just, I don't know
10 what -- I didn't look in the bag. I don't know what's
11 in it. Just items.
12 Q. Did he have a walker or a cane?
13 A. I believe, if I remember, he had a cane.
14 Q. Do you know where he got the cane from?
15 A. I have no idea.
16 Q. When Dunigan stood up, you did see him collapse
17 forward?
18 A. Yes.
19 Q. And you believed he was faking?
20 A. Yes.
21 Q. Why?
22 A. I guess just by the way he was acting after making the
23 statement, "Take me to jail," and the fact that I was
24 told that he had been moving around for the last
25 couple of hours in the ER, he was ambulatory.

---

Page 83

1 Q. Who told you that, again, do you know?
2 A. I think it was Zack, if I remember right.
3 Q. Because then you write: Prior to this, it should be
4 noted that the entire time Mr. Dunigan was in the ER
5 he was moving about without assistance and switching
6 chairs.
7 A. Correct.
8 Q. You would agree with me, walking with a walker is
9 walking with assistance?
10 A. He was walking with a cane, not a walker.
11 Q. I apologize, walking with a cane is walking with
12 assistance?
13 MR. O'LOUGHLIN: Form and foundation.
14 BY MR. HARRINGTON:
15 Q. Yes?
16 A. Sure.
17 Q. You'd agree with me that using the chairs in the ER
18 waiting area east as a support while trying to walk is
19 walking with assistance?
20 MR. O'LOUGHLIN: Form and foundation.
21 BY MR. HARRINGTON:
22 Q. Go ahead.
23 A. I don't remember saying that he was using the chairs.
24 I mean --
25 Q. No. You wrote: Walking, moving about without

---

Page 84

1 assistance.
2 You wrote that, correct?
3 A. Right. He was moving about without assistance and
4 switching chairs.
5 Q. Right. And if he was switching chairs by putting,
6 say, his hands on the chairs, helping guide himself
7 into those chairs, you would agree with me that that
8 would be moving with assistance?
9 MR. O'LOUGHLIN: Form and foundation.
10 BY MR. HARRINGTON:
11 Q. Correct?
12 A. If he was putting his hands on the chair, sure.
13 Q. Why was it decided to get a wheelchair to escort
14 Mr. Dunigan out of the ER?
15 A. Because he was refusing to walk, and instead of
16 hurting our backs trying to lift the gentleman, we put
17 him in a wheelchair.
18 Q. He went into the wheelchair without any problems,
19 correct?
20 A. Correct.
21 Q. I mean, it's not like he had to use any type of --
22 A. No, no.
23 Q. Let me ask my question.
24 A. Sorry.
25 Q. You didn't have to use any type of pressure point

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

---

Page 85

1  control tactic to put him into a wheelchair, correct?
2  A.  No.
3  Q.  He willingly sat into it?
4  A.  Correct.
5  Q.  Didn't fight you at all?
6  A.  When he first stood there, he kind of pulled away a
7  little bit, but, no, he sat in the wheelchair.
8  Q.  Then you write -- and this is in the fourth paragraph.
9  After you write "and placed him into the wheelchair,"
10 you write, "he refused to help."
11  What do you mean by that?
12 A.  Refused to like help us assist him, like he was just
13 like dead weight, refusing to walk or -- he was
14 refusing to walk, so we put him in a wheelchair.
15 Q.  That's what you mean by "refused to help"?
16 A.  Yeah, help us help him.
17 Q.  The last sentence of paragraph 4, you write:  At no
18 time during this ordeal did Mr. Dunigan ask for help
19 or ask to be seen in ER again nor make it known of any
20 discomfort or pain.
21 A.  That's correct.
22 Q.  That's a statement you wrote?
23 A.  Yes.
24 Q.  And you wrote that when?
25 A.  When I wrote this report.

---

Page 86

1  Q.  Did you ask him if he wanted to be seen again?
2  A.  I did not, no.
3  Q.  Did anybody ask him, that you could tell, if he needed
4  to be seen again in the ER?
5  A.  Not that I recall.  The only thing I heard him say
6  was, "Take me to jail."
7  Q.  But you didn't hear any officer say, including
8  yourself, "Mr. Dunigan, do you want to be seen by
9  anybody again in the ER?"
10 A.  No.
11 Q.  Nobody said that?
12 A.  No.
13 Q.  That's a true statement?
14 A.  That's true.  And that was because he was discharged
15 already.  He had been seen in ER and discharged.
16 Q.  Next paragraph, when it says, "We were able to get
17 Mr. Dunigan to stand up and walk a few paces," that
18 took place outside of the hospital, correct?
19 A.  Correct.
20 Q.  And you've seen the video of him outside of the
21 hospital, right --
22 A.  I have --
23 Q.  -- recently?
24 A.  No.
25 Q.  Ever?

---

Page 87

1  A.  Not that I recall, no.
2  Q.  When he gets out of the wheelchair, he was able to
3  walk a few paces?
4  A.  Correct.
5  Q.  So he -- the next statement, you write:  He asked
6  where the nearest bus stop was, and we instructed him
7  that one was right by the ER parking lot.
8    Do you remember that?
9  A.  Correct.
10 Q.  Who told him that?
11 A.  I believe Art said there was one over by the ER
12 parking lot to the west.  It would be Upjohn Street.
13 Q.  And how far was that from where he was at this point
14 in time, a block or so?
15 A.  It's not a block.  I don't know the exact distance.
16 It's right at the end of the parking lot.
17 Q.  And did somebody point him to where it was?
18 A.  Yeah, I pointed, "It's over there."
19 Q.  And did he start to take the steps after you pointed
20 in that direction?
21 A.  Yes.
22 Q.  And after he started taking the steps after you
23 pointed him to where the bus stop was is when he fell
24 to his knees again?
25 A.  Correct.

---

Page 88

1  Q.  So it appears as though he was trying to walk to the
2  bus stop?
3  A.  Correct.
4    MR. O'LOUGHLIN:  Form and foundation.
5    BY MR. HARRINGTON:
6  Q.  Did anybody assist you with writing this statement?
7  A.  No.
8  Q.  When did Officer Nugent run Mr. Dunigan for warrants?
9  A.  Oh, right after -- when we directed Mr. Dunigan to the
10 bus stop and then he became unambulatory and said, you
11 know -- the only thing he would say to us was, "Take
12 me to jail."  At that point, Nugent went to his
13 vehicle that was parked there off to the side of the
14 turnaround and apparently ran Mr. Dunigan through
15 whatever -- I don't know whatever system they use.  I
16 don't know what they use to run people.
17 Q.  So the warrant search was done through the Kalamazoo
18 vehicle?
19 A.  Yes.  The vehicle that he had parked, he went and
20 used, I believe, the MDT, mobile data terminal, is
21 what they call it, the computer in the car.  I don't
22 know whether -- he went to the car to do a check.
23 Whether he called dispatch or whether he used -- I
24 don't know.
25 Q.  Fair enough.  Dunigan was ultimately handcuffed at one

---

Dunigan vs.
Bronson Methodist Hospital

Charles Shoemaker
June 2, 2017

Page 89

1 point in time, correct?
2 A. Correct.
3 Q. Who handcuffed him?
4 A. Officer Nugent.
5 Q. Whose handcuffs were used?
6 A. Officer Nugent's.
7 Q. Was the handcuffing done prior to or after the warrant
8 run?
9 A. After the warrant run.
10 Q. How well do you know Officer Nugent?
11 A. That was the first time I've met him. I mean, as far
12 as -- he's pretty brand-new to the hospital, so ...
13 Q. What does "BSO" stand for?
14 A. Bronson Security Officer.
15 Q. When he's asking, "Just take me to jail," is there
16 anything that's going through your mind as to why this
17 individual would rather go to jail than be at the
18 hospital?
19 A. I just thought it was strange, I mean -- but, you
20 know, sometimes, unfortunately, a lot of our homeless
21 people that we have have mental issues, so I don't
22 know. I can't answer to the fact that what, you know,
23 why he was saying, "Take me to jail." I don't know
24 his state of mind other than, you know, that's what he
25 kept saying.

Page 90

1 Sometimes we've had homeless people, when
2 we evict them, if they can't stay at the hospital,
3 they'll go to jail. They'll want to go to jail
4 because, you know, it's a place to sleep, or whatever,
5 a roof over their head.
6 Q. It's also a place to get medical treatment.
7 A. I have no idea. I don't know what they do at the
8 jail. I don't know, I can't answer that question.
9 Q. I mean, if somebody's brought to jail and they're
10 suffering from a serious medical condition, they are
11 given -- or the constitution requires that they get
12 medical treatment.
13 Do you know that, or no?
14 A. No, I can't answer what the jail does. I don't, I
15 don't have no idea what the jail does. I just assumed
16 they'd send him back to the hospital.
17 Q. Have you ever seen that in your practice as a security
18 officer?
19 A. As far as people brought from the jail? Yes.
20 Q. Would you ever see people who come to the hospital,
21 get treatment, and then are taken to jail and then
22 immediately brought back to jail [sic]?
23 A. Yes.
24 Q. How often did that happen in your time as an officer?
25 A. That I witnessed? Not -- a couple times.

Page 91

1 Q. Is there anything else significant about your
2 interactions with Mr. Dunigan that occurred that we
3 haven't addressed?
4 MR. O'LOUGHLIN: Form.
5 A. No, not that I recall.
6 MR. HARRINGTON: Counsel, do we have
7 Exhibit 7 somewhere? Do you have it, by any chance?
8 MR. O'LOUGHLIN: What was it?
9 MR. HARRINGTON: I found it.
10 BY MR. HARRINGTON:
11 Q. I'm going to show you Exhibit 13 that we marked during
12 Nolan's deposition.
13 A. Okay.
14 Q. Do you see that? Do you see it?
15 A. Yes.
16 Q. Do you see the names that are associated with the
17 various individuals?
18 A. Yes.
19 Q. Do you agree that those are the appropriate names?
20 A. Yes.
21 Q. Meaning, do the names correspond --
22 A. Yes.
23 Q. -- with who's depicted in the picture?
24 In Exhibit 14, we see Officer Nugent,
25 yourself, and who else?

Page 92

1 A. That would be Zack.
2 Q. And in Exhibit 16 we see Mr. Dunigan, but who else do
3 we see with him, if you know?
4 A. Those are Life paramedics.
5 Q. Do you know who they are?
6 A. No.
7 Q. After you had learned of the passing of Mr. Dunigan,
8 what did you do, if anything?
9 MR. O'LOUGHLIN: Form and foundation.
10 A. As far as what did I do in reference to?
11 BY MR. HARRINGTON:
12 Q. I mean, anything. Did you do any type of
13 investigation? Did you do any type of looking at --
14 A. I watched the video on the news, parts of the video.
15 I didn't watch the whole thing. That was it, so ...
16 Q. What was going through your mind when you saw that?
17 A. As far as the video?
18 MR. O'LOUGHLIN: Form and foundation.
19 BY MR. HARRINGTON:
20 Q. I'm sorry?
21 A. I thought it was a horrible situation.
22 Q. Anything else?
23 A. I mean, you know, it was horrible that he died.
24 Q. Do you have any knowledge as to what his cause of
25 death was?

Dunigan vs.                                                    Charles Shoemaker
Bronson Methodist Hospital                                    June 2, 2017

Page 93

1  **A.  No.**
2  Q.  Have you since talked to any of the medical
3    professionals that were involved in any of his care or
4    treatment prior to discharge?
5  **A.  No.**
6  Q.  Sir, I don't think I have any more questions for you.
7    Thank you for your time.
8  **A.  Thanks, appreciate it.**
9      **MR. O'LOUGHLIN:** I will reserve my
10   questions for this witness for the time of trial.
11     (The deposition was concluded at 4:28 p.m.
12     Signature of the witness was not requested by
13     counsel for the respective parties hereto.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 94

1                  CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3                   ) SS
4  COUNTY OF KENT   )
5
6          I, REBECCA L. RUSSO, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14    of this cause.
15
16
17
18
19      *Rebecca L. Russo*
20
21
22          REBECCA L. RUSSO, CSR-2759
23              Notary Public,
24              Kent County, Michigan.
25     My Commission expires: 6-3-2023

# Exhibit 4

**In the Matter Of:**

DUNIGAN vs BRONSON METHODIST HOSPITAL, ET AL.

ROBERT STARK, M.D.

March 02, 2018



*Prepared for you by*

**U S LEGAL SUPPORT**

The Power of Commitment™

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

**STARK, M.D., ROBERT**
03/02/2018

Pages 1–4

---

**Page 1**

```
 1            IN THE DISTRICT COURT OF THE UNITED STATES
 2            FOR THE EASTERN DISTRICT OF MICHIGAN
 3                      SOUTHERN DIVISION
 4
 5   GORDA DUNIGAN, as Personal
 6   Representative for the ESTATE
 7   OF JAMES DUNIGAN, Deceased,
 8                Plaintiff,
 9        vs.                  Case No. 1:16-CV
10                             Hon. Ellen S. Carmody
11   BRONSON METHODIST HOSPITAL,
12                Defendant.
13
14   GORDA DUNIGAN, as Personal
15   Representative of the ESTATE
16   OF JAMES DUNIGAN,
17                Plaintiff,
18        vs.                  Case No. 1:15-CV-01325
19                             Hon. Ellen S. Carmody
20   DEREK NUGENT, et al,
21                Defendant.
22                                    /
23
24
25
```

**Page 2**

```
 1            The Deposition of ROBERT STARK, M.D.,
 2            Taken at 30800 Telegraph Road, Suite 2925,
 3            Bingham Farms, Michigan,
 4            Commencing at 12:09 p.m.,
 5            Friday, March 2, 2018,
 6            Before Sabrina Smith, CSR-2129.
 7   APPEARANCES:
 8
 9   JAMES HARRINGTON
10   Fieger, Fieger, Kenney & Harrington, P.C.
11   19390 West Ten Mile Road
12   Southfield, Michigan 48075
13   248.355.5555
14   j.harrington@fiegerlaw.com
15        Appearing on behalf of the Plaintiff.
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1   JOHN C. O'LOUGHLIN (Video Conference)
 2   Smith, Haughey, Rice, Roegge, P.C.
 3   100 Monroe Center Street NW
 4   Grand Rapids, Michigan 49503
 5   616.458.9370
 6   joloughlin@shrr.com
 7        Appearing on behalf of the Defendant
 8        Bronson Methodist.
 9
10   ALLAN C. VANDER LAAN (Video Conference)
11   Cummings, McClorey, Davis & Acho, PLC
12   2851 Charlevoix Drive SE
13   Suite 327
14   Grand Rapids, Michigan 49546
15   616.975.7470
16   avanderlaan@cmda-law.com
17        Appearing on behalf of the Defendant
18        Derek Nugent.
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    TABLE OF CONTENTS
 2
 3   WITNESS                           PAGE
 4   ROBERT STARK, M.D.
 5
 6   EXAMINATION
 7   BY MR. O'LOUGHLIN:                     5
 8   EXAMINATION
 9   BY MR. VANDER LAAN:               59
10   EXAMINATION
11   BY MR. HARRINGTON:                70
12   RE-EXAMINATION
13   BY MR. O'LOUGHLIN:                72
14
15                    EXHIBIT
16
17   EXHIBIT                           PAGE
18   (Exhibit attached to transcript.)
19
20   DEPOSITION EXHIBIT 1              82
21
22
23
24
25
```

STARK, M.D., ROBERT
03/02/2018

Page 5

1  Bingham Farms, Michigan
2  Friday, March 2, 2018
3  12:09 p.m.
4
5              ROBERT STARK, M.D.,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10             MR. O'LOUGHLIN:  The record should reflect
11  that this is the deposition of Dr. Robert Stark being
12  taken by video conference, and for all purposes under
13  the Federal Rules of Civil Procedure and Federal Rules
14  of Evidence.
15                   EXAMINATION
16  BY MR. O'LOUGHLIN:
17  Q.  Would you please state your full name?
18  A.  Robert M. Stark, M.D.
19  Q.  Dr. Stark, I understand you're actually from
20      Connecticut but you were kind enough to come to
21      Michigan today.
22  A.  Yes.
23  Q.  What was the purpose of your trip to Michigan other
24      than this deposition?
25  A.  I'm from Michigan and visiting my family.

Page 6

1  Q.  Well, good.  Welcome home.
2  A.  Thank you.
3  Q.  And we do pay you for your deposition, but you're not
4      charging us any travel time or transportation costs?
5  A.  None.  That's correct.
6  Q.  And you met with Mr. Harrington before we started
7      today?
8  A.  Yes.
9  Q.  Are you currently involved in any other cases for the
10     Fieger firm?
11  A.  No.
12  Q.  Have you been involved in cases with the Fieger firm
13     in the past?
14  A.  Yes, I have.
15  Q.  On how many occasions?
16  A.  Boy, over 15 years, I would, 30 cases approximately.
17  Q.  And those questions were just asked to the Fieger
18     firm.  What if we expand that to cases you have
19     reviewed, medical legal cases from any source, how
20     many would that be?
21  A.  In my total career?
22  Q.  Yes.
23  A.  Over, over 30 years, I would estimate 250 cases.
24  Q.  And is there -- can you split that for me between
25     cases in which you were contacted by the attorney

Page 7

1      representing the plaintiff as opposed to an attorney
2      representing a defendant?
3  A.  Yes.  About two-thirds for the plaintiff and about
4      one-third for defense.
5  Q.  Of those cases, can you break them down as to the type
6      of case, or tell me how many of them were medical
7      malpractice cases?
8  A.  I would say 90 percent medical malpractice and
9      10 percent other things, but medical or scientifically
10     related.
11  Q.  I have your date of birth as 3-5-48, so you're about
12     to turn 70?
13  A.  Yes, that's right.
14  Q.  Congratulations on that.  Are you still in the active
15     practice of medicine?
16  A.  Yes, I am.
17  Q.  Could you describe your current practice?
18  A.  I'm seeing patients in the office four days a week
19     full time, and about 30 percent of my practice is
20     hospital-based, 70 percent is office-based.  It's
21     mostly cardiology with some internal medicine.
22  Q.  And we're taking your deposition because you've been
23     identified as an expert on behalf of the plaintiff in
24     this case, the Dunigan estate.
25         And I have a report from you, but I'm

Page 8

1      wondering, are you aware of any care of Mr. Dunigan on
2      May 6, 2016 by an internist or a cardiologist?
3  A.  No.
4  Q.  I am correct that you are not an emergency medicine
5      physician?
6  A.  I am not.
7  Q.  And in 2016 you were not practicing as an emergency
8      medicine physician?
9  A.  No.
10  Q.  And you aren't Board certified in emergency medicine?
11  A.  No, I'm not.
12  Q.  You are not a nurse?
13  A.  No.
14  Q.  Do you have any experience or education as a nurse?
15  A.  No.
16  Q.  Do you have any experience or education or training as
17     a law enforcement officer?
18  A.  No.
19  Q.  Do you have any education, training, experience as a
20     hospital security officer?
21  A.  No.
22  Q.  Of those cases that you've reviewed, medical legal
23     cases that you've reviewed over the course of your
24     career, were any of them involving claims of EMTALA
25     violations?

STARK, M.D., ROBERT
03/02/2018                                                                              Pages 9–12

Page 9

1   A.   Yes, I believe one was.
2   Q.   Can you recall the circumstances of, or the facts of
3        that case?
4   A.   I can't.
5   Q.   Was the defendant a hospital?
6   A.   Yes.
7   Q.   Was it a hospital in Michigan?
8   A.   I don't recall.
9   Q.   Have you brought with you today everything you have
10       reviewed related to this case?
11  A.   I haven't, only my notes and selected, selected
12       records and depositions.
13  Q.   Can you tell me when you were first contacted
14       regarding this case?
15  A.   It was in the summer of 2017.
16  Q.   And how were you contacted?
17  A.   A phone call either from Attorney Harrington or his
18       assistant, Devin Berry.
19  Q.   And were you told something about the case at this
20       time?
21  A.   The briefest, the briefest description and was asked
22       if I had time to review it.
23  Q.   And what did you understand your task to be as a
24       reviewer?
25  A.   My understanding at that time was to review the

Page 10

1        medical care and to comment on appropriateness.
2   Q.   Can you identify what you received and reviewed up to
3        the time of the report you prepared in this case,
4        which is dated October 24, 2017?
5   A.   Okay.  I got medical records from the Bronson
6        Methodist Hospital, a narrative from the Bronson
7        Memorial Hospital.
8   Q.   I was going to wait and go back over it, but what'd
9        you mean by a narrative?
10  A.   It was like a 34 page document authored by people at
11       Bronson Memorial who were investigating this
12       particular episode.
13  Q.   Did that narrative have a name or author indicated on
14       it?
15  A.   No.  Also, a similar narrative from the Kalamazoo
16       Police Department on this episode, a Western --
17  Q.   What else, go ahead?
18  A.   Western Michigan University postmortem report, and a
19       Kalamazoo Police Department incident and investigation
20       report.  I think I already mentioned that.  An
21       affidavit for what looks like a search warrant, two CD
22       discs from Bronson, surveillance footage it was
23       called, and one called Dunigan Police Vehicle Footage,
24       a deposition of a Charles Shoemaker and deposition
25       from Public Safety Officer Ernie Knauf, deposition,

Page 11

1        deposition of Deputy Nola Cattell, and I think that's
2        all that I got initially.
3   Q.   Did you review that material?
4   A.   Yes, I did.
5   Q.   In its entirety?
6   A.   Yes, I did.
7   Q.   Including the videos from the Bronson surveillance and
8        the police car?
9   A.   Yes, I did.
10  Q.   And you reviewed those in their entirety?
11  A.   Yes.
12  Q.   Did you review those at regular speed or did you fast
13       forward any portion?
14  A.   No, at regular speed, and I took notes on them.
15  Q.   I want to go back to what you described as a narrative
16       from Bronson, which you described as a 3 to 4 page
17       document.
18  A.   It was --
19  Q.   I'm sorry, go ahead.
20  A.   No, it was a 34 page document.
21  Q.   And that's not referring, that's not medical records
22       or is it medical records?
23  A.   No, it was not medical records.  It was compiled after
24       this incident by administration at Bronson Methodist.
25            MR. O'LOUGHLIN:  Jim, can you help me out?

Page 12

1        Is that something that we produced or --
2            MR. HARRINGTON:  Well, there were, I think
3        there were some records, Counsel, that I, you know how
4        the records that I have are, you know the different
5        pagination that you have.  Maybe that's what he's
6        referring to.
7            MR. O'LOUGHLIN:  He's saying it's a 34 page
8        document that is not the records.  It is a narrative
9        from Bronson.  Do you think he's referring to the
10       medical record?  And I'm not here to question you.
11  BY MR. O'LOUGHLIN:
12  Q.   Do you have this document with you, Doctor?
13  A.   No, I don't have this document.
14            MR. HARRINGTON:  Let me see if this -- hang
15       on one second.
16            Doctor, take a look at the documents I've
17       handed you and tell me if that's what you're referring
18       to.  It may or may not be.  I don't know.
19            THE WITNESS:  What you've handed me is from
20       the Kalamazoo Police Department.  That's separate from
21       the Bronson document.  And here's the affidavit for
22       search warrant that I mentioned.  That was part of the
23       police records.
24            MR. HARRINGTON:  Counsel, I'm not sure what
25       he's referring to because I don't have a 34 page --

STARK, M.D., ROBERT
03/02/2018                                                                                      Pages 13—16

Page 13

1     THE WITNESS:  This, I'm sorry, this does
2  say that it's only 34 pages long, so this must be it.
3     MR. HARRINGTON:  Yes, that's what I was
4  thinking, because it's the -- I handed him the
5  Kalamazoo police records.  Those are 34 pages.
6     THE WITNESS:  I'm sorry.  This has to be
7  it, the Police Accident Incident Investigation.
8  BY MR. O'LOUGHLIN:
9  Q.  Okay.  And that's fine.  I just wanted to clear that
10     up because I wasn't aware of any investigative
11     narrative from Bronson.
12         Did you review the medical records from
13     Bronson?
14  A.  Oh, yes, yes.
15  Q.  From the Emergency Department visit?
16  A.  Yes.
17  Q.  Did you review any other medical records -- well, you
18     mentioned the autopsy.  Did you review any other
19     medical records of Mr. Dunigan?
20  A.  Just toxicology report that went along with the
21     autopsy, but no other medical records.
22  Q.  Have we, and we have now listed everything that you've
23     reviewed up to the time you prepared your report?
24  A.  Yes.
25  Q.  Have you reviewed additional information since your

Page 14

1     report?
2  A.  Yes, I have.
3  Q.  What additional information have you reviewed?
4  A.  Deposition of Dr. Wesley Rigot, an expert report from
5     John Kendall, and one from Randall Commissaris.  An
6     expert report from Robert -- I can't read it but it's
7     S-h, Sherwin, an ER doctor at Sinai Grace; from Daniel
8     Richardson, M.D.; and an expert report from
9     Ernst von Schwartz.  And I may have mentioned this
10     already, Deputy Nola Cattell, a deposition.
11  Q.  I think you did mention Mr. Cattell's deposition.
12  A.  Okay, then that was from before, but those are all the
13     things that I reviewed.
14  Q.  And just to avoid confusion, you've referred to
15     Mr. Cattell as deputy.  I don't believe he's a law
16     enforcement officer.  I believe he was one of the
17     security officers at Bronson.
18  A.  Oh, yes, yes.
19  Q.  Does that appear to be correct?
20  A.  Yes, it is.
21  Q.  And anything else you've reviewed since preparing your
22     report?
23  A.  No, nothing else.
24  Q.  Have we now identified everything you've reviewed
25     related to this case at any time, either before or

Page 15

1     after the preparation of your report?
2  A.  Yes, yes, we have.
3  Q.  Have you done any sort of research or online search of
4     any kind relating to any of the issues in this case?
5  A.  No, I haven't.
6  Q.  Have you reviewed sufficient information to provide us
7     with your opinions?
8  A.  Yes.
9  Q.  Have you asked for any additional information?
10  A.  No, I have not.
11  Q.  Did any of the material you reviewed after your report
12     change your opinions?
13  A.  No.
14  Q.  Are your opinions fairly set forth in your report?
15  A.  A couple of opinions are missing from my report.
16  Q.  Okay.  We'll cover the opinions.
17         Aside from those missing opinions, is there
18     anything else that needs to be added to or corrected
19     in your report?
20  A.  There's, yes, there is an error on the final page of
21     my report.
22  Q.  What are you referring to?
23  A.  In the top paragraph on Page 2 of my report, the last
24     sentence is all jumbled up and it should read "In the
25     case of Mr. Dunigan, this delay in receiving needed

Page 16

1     healthcare, was a substantial causative factor in his
2     death on May 6, 2012."
3  Q.  Okay.  I was unable to locate the area you were
4     talking about.  I have a 3 page report from you dated
5     October 24, 2017.
6  A.  That explains it.  I just have a rough draft here, and
7     I'm sure this was corrected in the 3 page final
8     report.
9     MR. O'LOUGHLIN:  Counsel, do you have --
10  BY MR. O'LOUGHLIN:
11  Q.  Do you not have a copy of your report, Dr. Stark?
12  A.  I only have a rough draft here.
13     MR. HARRINGTON:  Give me one second, Jack.
14     MR. O'LOUGHLIN:  Sure.
15     MR. HARRINGTON:  Doctor --
16     THE WITNESS:  Yes, this 3 page report is
17  correct.
18  BY MR. O'LOUGHLIN:
19  Q.  And does it include the opinions you were referring to
20     earlier, the additional opinions that you were going
21     to add?
22  A.  No, it's missing that sentence that I just read.  It
23     needs one sentence to be added.
24  Q.  And just so I don't forget, why don't you go ahead and
25     tell me again what that sentence you would add to that

STARK, M.D., ROBERT
03/02/2018                                                           Pages 17—20

1     report and where you would put it in.
2  A.  It goes on Page 3 at the end of the second to the
3     final paragraph. It should read "In the case of
4     Mr. Dunigan, this avoidable delay in receiving needed
5     healthcare, was a substantial causative factor in his
6     death on 5-6-16."
7  Q.  Before today and just now, when is the last time you
8     read that report, the typed report that was provided
9     to counsel?
10 A.  Last night was the last time I read it.
11 Q.  And you read it in the format that you're looking at
12    now, the typed version?
13 A.  Yes, and I added in my handwriting the missing
14    sentence.
15 Q.  Okay. Any other additions or corrections to that
16    report that need to be made?
17 A.  The addition would be those two opinions that I said
18    weren't reflected in this report.
19 Q.  Okay. Once again, so I don't forget, why don't you go
20    ahead and tell me what those are.
21 A.  The two things that should have been included were
22    that Dr. Rigot, on May 6th, 2016, didn't query the
23    patient when he had last taken his insulin. He didn't
24    ask the patient when he had last eaten. He didn't ask
25    him to ambulate or watch him ambulate, and he didn't

1     do what are called orthostatic blood pressure readings
2     when his blood pressure was low. He didn't stand him
3     up and recheck it.
4  Q.  Does that cover then one of the new opinions that you
5     have?
6  A.  That's total the new opinions.
7  Q.  All right. And with that addition and the correction
8     you made earlier, is the report, your report,
9     otherwise accurate and correct and reflective of your
10    opinions?
11 A.  Yes.
12 Q.  Based upon your review of all the material you've seen
13    in this case?
14 A.  Yes.
15 Q.  Do you know when Mr. Dunigan last took insulin before
16    the Emergency Department visit?
17 A.  No, I don't.
18 Q.  Do you know when he had last eaten?
19 A.  No.
20 Q.  Do you know what his ambulatory status was up to the
21    time he went to the Emergency Department or was taken
22    to the Emergency Department by EMS?
23 A.  I know, I knew he had some limitation because he had
24    fallen, but I don't know anything after that fall.
25 Q.  Do you know whether he had any limitations before the

1     fall?
2  A.  No, I don't.
3  Q.  Did you, in looking at the video, observe him using a
4     cane?
5  A.  I don't recall, but I did see him stumble and
6     partially collapse.
7  Q.  Did you, in reviewing the noted medical history, see
8     that he had a history of hemiplegia due to a CVA or
9     cerebral vascular accident?
10 A.  I saw that, yes.
11 Q.  Do you know how well Mr. Dunigan was able to ambulate
12    before the fall?
13 A.  I don't.
14 Q.  Do you know the clinical signs and symptoms of
15    hyperkalemia?
16 A.  Yes, I do.
17 Q.  Can you list those for me?
18 A.  If it's primary hyperkalemia with a primary cause, it
19    would be muscle weakness, thirst and cardiac
20    arrhythmias if it's severe enough.
21 Q.  Any others come to mind?
22 A.  No.
23 Q.  Would you include fatigue?
24 A.  Yes, I would.
25 Q.  Would you include shortness of breath or difficulty

1     breathing?
2  A.  Only, only if it's severe enough to involve a cardiac
3     arrhythmia.
4  Q.  Would you include palpitations?
5  A.  Again, only if the hyperkalemia is bad enough that it
6     would cause arrhythmia, that could cause palpitations.
7  Q.  Would you include numbness and tingling in the
8     extremities?
9  A.  No.
10 Q.  Would you include nausea or vomiting?
11 A.  Possibly, yes.
12 Q.  Anything else that you would include as a clinical
13    sign of hyperkalemia?
14 A.  No.
15 Q.  Do you know the signs and symptoms of congestive heart
16    failure?
17 A.  Yes.
18 Q.  Could you list those for me, please?
19 A.  They could range from no shortness of breath to
20    difficulty catching your breath even at rest, having
21    orthopnea, which is shortness of breath even when
22    lying flat. Rapid heart rate, blood pressure that's
23    either too low or too high. And for signs, listening
24    to the heart, hearing what's called a gallop, and the
25    neck veins being more engorged than normal. Also on

STARK, M.D., ROBERT
03/02/2018                                                                    Pages 21—24

```
 1        chest x-ray, which is an early finding, is congestion
 2        of the vessels in the lungs.
 3   Q.   How about swelling or edema, would you include that?
 4   A.   You can have swelling of the lower legs and ankles,
 5        but you don't necessarily have to have that because
 6        that involves failure of the right ventricle rather
 7        than the left which causes congestive heart failure.
 8   Q.   Your report covers some of your background, and you
 9        include in there that you serve as an instructor for
10        the American Heart Association's course in advanced
11        cardiac life support, or ACLS, correct?
12   A.   Yes.
13   Q.   Does that include training in resuscitation or what
14        they might call in hospital, codes?
15   A.   Yes, that's exactly what it involves.
16   Q.   And are you familiar with the rates of success,
17        meaning survival, immediate survival or survival to
18        discharge of resuscitations after a witnessed cardiac
19        arrest in a hospital?
20   A.   I am, yes.
21   Q.   What are the rates of success?
22   A.   If it's witnessed and, by that somebody sees the
23        patient go down but the patient isn't necessarily on a
24        cardiac monitor, those rates are in the 40s, in the
25        40 percent range.  If someone arrests in an emergency
```

```
 1        room while he's on a cardiac monitor or in the
 2        telemetry unit while he's on a monitor, the speed with
 3        which response takes place can result in a 60 or
 4        65 percent rate of success.
 5   Q.   What about on average the rate of success for arrest,
 6        even monitored arrests in the ED?
 7   A.   Monitored arrests in the ED, 60 percent is the
 8        optimal.  It's between 50 and 60 percent if it's in a
 9        facility where you have defibrillators.
10   Q.   And where did you obtain that information?
11   A.   From prior talks that I've had to give and looking at
12        the literature for a prior case.
13   Q.   Are you familiar with literature which states a lower
14        percentage of less than 50 percent for successful
15        resuscitation of patients who have even a witnessed
16        and monitored arrest?
17   A.   No.
18                  MR. HARRINGTON:  Objection to form and
19        foundation.
20   BY MR. O'LOUGHLIN:
21   Q.   Did you review the EMS records for the run that
22        brought Mr. Dunigan to the Emergency Department on
23        May 6th, 2016?
24   A.   I, I don't recall, and I don't believe I did because
25        it's not in my notes.
```

```
 1   Q.   It may have been part of the Bronson records that you
 2        received, but I don't know that.
 3                  So do you know how EMS came to be called to
 4        see, or how they came to see Mr. Dunigan?
 5   A.   I do.
 6   Q.   How?
 7   A.   He got dizzy and fell in getting off a bus, but he
 8        made it to home, but then the chest pain was so severe
 9        that he called EMS.
10   Q.   And he did that from his home?
11   A.   Yes, home.
12   Q.   And how long after the fall did he call EMS?
13   A.   I'm not aware.
14   Q.   Do you know whether, at the time EMS saw and
15        transported Mr. Dunigan, he had any dizziness?
16   A.   At that time, I don't know.
17   Q.   What is it that you reviewed that allowed you to
18        conclude that Mr. Dunigan fell because of dizziness?
19   A.   When he arrived at the emergency room, he told them
20        that he had been dizzy, had a fall, and that he just
21        didn't feel right and he had right-sided chest pain.
22   Q.   You're referring to the nurse's note that says
23        "Dizziness, and then patient states 'lost my balance
24        getting off the bus, I just didn't feel right.'"
25   A.   Yes, that's what I'm referring to.
```

```
 1   Q.   Beyond that, are you aware of anything about the
 2        circumstances of the fall?
 3   A.   No.
 4   Q.   Did you understand from your review that when he fell,
 5        he landed on his right chest and flank?
 6   A.   Yes.
 7   Q.   And did you understand from your review, that that's
 8        what he reported as the cause and source of his right
 9        chest and flank pain?
10   A.   Yes, it was.
11   Q.   Are you aware of any indication of loss of
12        consciousness?
13   A.   No.
14   Q.   Are you aware of any indication of syncope or near
15        syncope?
16   A.   No.  Although dizziness blends in with near syncope.
17        The two can be one in the same, but he did not lose
18        consciousness.
19   Q.   What is your understanding of Mr. Dunigan's medical
20        history as of the time he went to the Emergency
21        Department?
22   A.   He had a history of poorly-controlled hypertension.
23        In fact, had what's called hypertensive crisis where
24        the blood pressure is extremely high.  He had chronic
25        renal failure that required dialysis.  He had diabetes
```

STARK, M.D., ROBERT
03/02/2018

Page 25

1    that was insulin-dependent.  He had recently had
2    congestive heart failure and acute pulmonary edema,
3    which is fluid in the lungs, and at one point had
4    migraine headaches, a pulmonary embolus, which is a
5    blood clot to the lung and -- just one second.  And a
6    stroke, cerebral vascular disease.
7  Q. Did he have any clinical signs or symptoms of any of
8    those conditions at the time he presented to the
9    Emergency Department?
10 A. He had tachycardia, unusually fast heart rate which
11   can be consistent with either a cardiac problem or
12   congestive heart failure or pulmonary embolus.  He had
13   chest pain, which could be related to the heart or
14   related to getting injured on his right chest.  He had
15   abnormally low blood pressure, and this is very
16   important, he had a blood pressure which was
17   alarmingly low for a man who's known to have
18   hypertension.  Other clinical signs are his chest
19   x-ray done for his ribs showed some fluid overload in
20   his lungs.  I think those were all.
21 Q. The fast heart rate, the tachycardia of 113, do you
22   know whether he had an elevated heart rate when seen
23   by EMS, by the ambulance people?
24 A. I don't know.
25 Q. And in the hospital, was that, was his heart rate

Page 26

1    rechecked and, upon recheck, was down to 90?
2  A. I don't know the answer to that.  I don't recall.
3  Q. Would that be significant to your opinions?
4  A. That, yes, it would be significant.
5  Q. How so?
6  A. Less of a sign of cardiopulmonary distress if the
7    heart rate goes down to 90.
8  Q. Have you heard of a phenomenon, colloquially referred
9    to as white coat syndrome?
10 A. Sure, yes.
11 Q. What is that?
12 A. It's an elevation of the blood pressure due to the
13   patient's apprehension usually for, you know,
14   physicians in white coats.
15 Q. The chest pain, did you understand that he complained
16   of any chest pain other than the chest pain related to
17   the fall, the contusion?
18 A. I didn't see any sign of any other kind of chest pain.
19 Q. And clinically, how might one distinguish between
20   chest pain from a trauma or injury to the chest wall
21   as opposed to chest pain attributable to some cardiac
22   event?
23 A. The doctor can gently press over the area that's
24   hurting, and if it hurts worse, that's a strong sign
25   that the pain is probably from the trauma.  They could

Page 27

1    also do an electrocardiogram and see if the heart
2    waves look normal.
3  Q. But as far as clinical examination or history taking,
4    are there other ways to distinguish whether the pain
5    is from trauma or from a cardiac origin?
6  A. Besides the maneuver of pressing on the chest wall,
7    having the patient take a very deep breath, and if
8    that causes more pain, that's usually not from the
9    heart and is from the trauma.
10 Q. Is that also referred to as being reproducible?
11 A. Yes.
12 Q. And was Mr. Dunigan's chest pain or flank pain that he
13   complained of reproducible?
14 A. Yes, it was.
15 Q. So would you agree that his reference to chest pain
16   was not the type of chest pain that would be
17   indicative of a cardiac condition?
18         MR. HARRINGTON:  I'm going to object to
19   form and foundation.
20         THE WITNESS:  Not having done the requisite
21   electrocardiogram, the doctor couldn't conclusively
22   say the chest pain is from the trauma, but it looks
23   like that from the exam that he did do.
24 BY MR. O'LOUGHLIN:
25 Q. Are you able to offer an opinion as to what an EKG

Page 28

1    would have shown if it had been done?
2  A. Yes, I do.  For sure, it would have shown tachycardia,
3    that's a heart rate that's above normal, and it's
4    extremely likely that it would have shown signs of
5    ischemia.  That's inadequate blood flow to the heart
6    muscle.
7  Q. And what allows you to say that an EKG would have
8    shown signs of ischemia?
9  A. We know that this patient had prior cardiac ischemia.
10   We know from the autopsy that he had very high grade
11   narrowings in his coronary arteries, and coupled with
12   the low blood pressure that he had on this ER visit,
13   that would mean the blood would have great trouble
14   getting through those narrowed coronary arteries at
15   that lowered pressure and there would not be enough
16   blood flow to the heart muscle.
17 Q. And you're able to conclude that based upon your
18   review without needing to speculate?
19 A. No.  When you say "conclude," that means absolutely
20   certain.  I can't be absolutely certain, but with his
21   coronaries that we know he had and the low pressure of
22   blood pressure pushing blood through those coronary
23   arteries, it is very likely that he would have
24   ischemia.
25 Q. That you believe would have shown up as changes on an

STARK, M.D., ROBERT
03/02/2018                                                              Pages 29—32

Page 29

1   EKG?
2   A.   Yes, on the electrocardiogram.
3   Q.   What would those changes have been, in your opinion?
4   A.   A downward sagging of a certain segment called the ST
5        segment on his electrocardiogram and/or T wave
6        inversions.  That's T waves that are upside down
7        instead of right side up.
8   Q.   And I'm sorry, did you say T as in Thomas?
9   A.   Yes, T as in Thomas.
10  Q.   And you're talking about ST depression as opposed to
11       elevation?
12  A.   Exactly.  Depression would be seen in ischemia, which
13       he is likely having.  You would also see elevations in
14       an acute myocardial infarction.
15  Q.   Are you able to offer an opinion as to whether he was
16       suffering an acute myocardial infarction at the time
17       that he was in the Emergency Department?
18  A.   There's not enough information to give an opinion.
19  Q.   Have you seen any of his prior EKGs?
20  A.   None, no.
21  Q.   Would those be significant to you?
22  A.   Yes, they would be.
23  Q.   Are you able to offer an opinion that an EKG, if it
24       had been performed in the Emergency Department on
25       May 6, 2016, are you able to offer an opinion whether

Page 30

1        it would have shown changes from prior EKGs?
2   A.   I know it would show ischemia.  I don't know if his
3        prior EKGs would have shown ischemia.  There's just
4        not enough information to conclude that.
5   Q.   Did you review the chest x-ray, the actual images
6        yourself?
7   A.   No, just the report.
8   Q.   From that report, are you suggesting that that chest
9        x-ray demonstrates findings consistent with congestive
10       heart failure?
11  A.   Yes, early congestive heart failure.  Fluid
12       engorgement in the lungs.
13  Q.   That is of clinical significance, you believe?
14  A.   Yes.  It's of clinical significance in the context of
15       a man with his past history and medical conditions.
16  Q.   So you would consider mild central pulmonary vascular
17       congestion and small bilateral pleural effusion to be
18       suggestive of congestive heart failure?
19  A.   Yes, early congestive heart failure.
20  Q.   Would you expect those findings to produce symptoms of
21       congestive heart failure?
22  A.   Not necessarily.  It could range, like I said earlier,
23       symptoms of congestive heart failure can be just no
24       shortness of breath to mild shortness of breath as it
25       gets more severe or can't catch your breath at all.

Page 31

1   Q.   You would agree that Mr. Dunigan had no complaints of
2        shortness of breath?
3   A.   None.
4   Q.   You would agree that his lungs were clear to
5        auscultation bilaterally?
6   A.   Yes.
7   Q.   That he had no rales or wheezes?
8   A.   Right, yes.
9                 MR. HARRINGTON:  Jack, can we take a quick
10       break?
11                MR. O'LOUGHLIN:  Sure.
12                MR. HARRINGTON:  Are you in the middle of
13       something?  Okay.
14                (Off the record at 1:03 p.m.)
15                (Back on the record at 1:09 p.m.)
16  BY MR. O'LOUGHLIN:
17  Q.   In your report, you indicate an opinion that
18       Mr. Dunigan should have had blood tests including
19       glucose?
20  A.   Yes.
21  Q.   Are you able to offer an opinion as to what such a
22       test would have shown?
23  A.   Specifically, the glucose would have been abnormal.
24  Q.   What's abnormal?
25  A.   I believe that it would have been abnormally low.

Page 32

1   Q.   Which would be what level?
2   A.   Below 90.
3   Q.   What allows you to offer that opinion?
4   A.   The blood glucose that they obtained at Western
5        Michigan University, the so-called vitreous glucose,
6        was drastically low at 15 and the blood level, I'm
7        sorry, the level of glucose in your vitreous reflects
8        what the glucose was in your blood shortly before
9        death.
10  Q.   Can that be impacted by resuscitation efforts?
11  A.   No, it can't.
12  Q.   So you're able to offer an opinion, to a reasonable
13       degree of medical probability, greater than 50 percent
14       probability, that Mr. Dunigan's glucose, if it had
15       been checked in the Emergency Department, would have
16       been below 90?
17  A.   Yes.  And I have to add, in all honesty, that the
18       nurse in the police station did a quick AccuCheck
19       glucose, which is less accurate, and got a mildly
20       elevated glucose, which is inconsistent with what they
21       found at autopsy.
22  Q.   Do you recall what that value was?
23  A.   Yes.  I can't find it, but I recall it was around 130
24       or 140 on her AccuCheck.
25  Q.   And if that been detected, if that had been, the value

STARK, M.D., ROBERT
03/02/2018
Pages 33—36

Page 33

1    detected in the Emergency Department, would it have
2    required any additional care?
3 A. No, if that were the value, no, it wouldn't require
4    additional care.
5 Q. What values, high and low, of glucose would you deem
6    to require additional care?
7 A. In a diabetic who comes in after dizziness or a fall,
8    if it's below 70, it requires treatment.
9 Q. And what, is there a high, an upper limit that also
10   requires treatment?
11 A. Yes, but that's not nearly as important.  If it's
12   above 200, they would give him a little insulin, but
13   that's not life-threatening like a low glucose would
14   be.
15 Q. Okay.  I assume that you don't recall seeing the EMS
16   record --
17 A. I do.
18 Q. -- on Mr. Dunigan?
19 A. Yes, I do.
20 Q. I'm sorry, go ahead.
21 A. I know what you're going to ask.
22 Q. What am I going to ask?
23 A. On the ambulance, they did an AccuCheck and they got a
24   glucose of 172.
25 Q. So you did see those records?

Page 34

1 A. Yes, I did.
2 Q. And if that was accurate, that would not require any
3    additional treatment, correct?
4 A. Not at that moment in time when it was 172.
5 Q. Do you have any reason to believe that that AccuCheck
6    by the EMS personnel was inaccurate?
7 A. It's known to be less accurate than a real lab
8    determination, but the other, the other consideration
9    is that a glucose of a certain value can decline by
10   100 points if you inject insulin in that patient and
11   don't give them food.
12 Q. Do you know whether anyone injected insulin in
13   Mr. Dunigan?
14 A. No, we have no information, and the doctor didn't ask,
15   Dr. Rigot didn't ask "When did you last eat," or "When
16   did you last take your insulin?"
17 Q. I think I asked this question and you may have
18   answered it.
19           Are you able to offer an opinion that the
20   glucose level checked by the, by AccuCheck by the EMS
21   personnel, was inaccurate?
22 A. It's less likely to be accurate than the lab-obtained
23   glucose.  But I, no, I can't say that we know that it
24   was inaccurate.
25 Q. And if it was accurate, it didn't require any

Page 35

1    additional treatment, true?
2 A. Not on the ambulance, it didn't, but what is important
3    is what was the glucose in the hospital emergency
4    room.
5 Q. And are you able to offer -- in light of the AccuCheck
6    in the ambulance -- by the way, do you know whether
7    Dr. Rigot was aware of that value?
8 A. He said in his deposition that he had seen it on some
9    sort of hanging chart on a clipboard.
10 Q. And did he have a right to rely upon and consider that
11   information?
12 A. I believe he did.
13 Q. And despite that information, you believe you are able
14   to offer an opinion that if Mr. Dunigan's glucose had
15   been checked by a laboratory test in the ED, it would
16   have been abnormally low?
17 A. Yes.
18 Q. What would you base that on?
19 A. By the level that they obtained upon his death, the
20   level that was just a few hours after the ER visit.
21 Q. Anything else?
22 A. No.
23 Q. What was the time period between his Emergency
24   Department examination by Dr. Rigot and the time of
25   his death?

Page 36

1 A. Approximately five hours.
2 Q. And could the glucose level have dropped in that
3    period of time?
4 A. Yes, it could have.
5 Q. Could it have dropped from normal to the value
6    detected at autopsy?
7 A. Yes, it could have.
8 Q. So it could have been normal at the time he was
9    examined in the Emergency Department, true?
10 A. It's, it's possible, but if this drop was from
11   insulin, which almost certainly was the case, it would
12   have stopped, it would have started dropping already
13   while he was having his ER visit.  No one gave him
14   insulin at Bronson, so he must have gotten it or taken
15   it before he came.
16 Q. Before he came where?
17 A. To the Bronson ER.
18 Q. I'm confused.  If he had gotten insulin, it would have
19   lowered his blood sugar?
20 A. The minute he took it, it would have started lowering
21   his blood sugar and it would have continued lowering
22   his blood sugar over the several hours unless he had
23   been given some orange juice or something to eat.
24 Q. So are you assuming that Mr. Dunigan took insulin
25   before, sometime before the ambulance picked him up?

STARK, M.D., ROBERT
03/02/2018

Page 37

1   A.  I do believe that he did.
2   Q.  You don't hold yourself out as an expert in pathology,
3      do you?
4   A.  No.
5   Q.  If Mr. Dunigan had presented to an Emergency
6      Department with a history of a fall due to tripping
7      and a shoulder injury and exhibited no other signs of
8      a diabetic emergency, would the Emergency Department,
9      in your opinion, have been required to do lab tests
10     including a glucose?
11         MR. HARRINGTON:  Objection to form,
12     foundation, improper hypothetical, facts not in
13     evidence.
14         Go ahead, Doctor.
15         THE WITNESS:  If it were the circumstances
16     that you're describing where it was a clear-cut
17     traumatic shoulder injury due to a slip and fall, I
18     don't think they would be required to do blood work.
19   BY MR. O'LOUGHLIN:
20   Q.  You state that the autopsy revealed congestive heart
21      failure?
22   A.  Yes.
23   Q.  Upon what do you base that statement?
24   A.  The lungs were heavy and had an engorgement, fluid
25     engorgement.

Page 38

1   Q.  Which you believe was indicative of congestive heart
2      failure which was present at the time he was in the
3      Emergency Department?
4   A.  Yes.  Wait.  Could you repeat that question again?
5   Q.  Is it your belief that the lungs were heavy with
6      congestive heart failure at the time he was in the
7      Emergency Department?
8   A.  Yes.  We know it was because of fluid engorgement on
9     the chest x-ray.
10   Q.  Did you see anywhere in the autopsy that they
11     attributed the death to congestive heart failure?
12   A.  That the cause of death -- I don't recall.
13   Q.  If the pathologist concluded that congestive heart
14     failure was a cause of death, would you have expected
15     him or her to put that in the autopsy report?
16         MR. HARRINGTON:  Foundation, form,
17     speculation.
18         Go ahead.
19         THE WITNESS:  They usually put the
20     immediate cause of death, which in his case could be
21     arrhythmia or cardiac arrest, and therefore, might not
22     put in the other contributing causes like congestive
23     heart failure.
24   BY MR. O'LOUGHLIN:
25   Q.  Do you know what causes they did put in?

Page 39

1   A.  I don't recall.  Could I look for a second?
2   Q.  Sure.
3         MR. HARRINGTON:  Shoot, I don't have it
4     here, I don't think.
5         THE WITNESS:  I just have my notes from the
6     autopsy, which don't include the causes of death.
7     Wait a second.
8   BY MR. O'LOUGHLIN:
9   Q.  By the way, Doctor -- I'm sorry, go ahead.
10   A.  They said that the autopsy showed severe coronary
11     artery disease, congestive heart failure and cardiac
12     enlargement.
13   Q.  Who said that?
14   A.  The Western Michigan University pathology people.
15   Q.  And you're reading that from your notes?
16   A.  Yes, from my notes.
17   Q.  You did review the autopsy report?
18   A.  Oh, yes, I did.
19   Q.  And did you see the Notice for this deposition?
20   A.  Sure, yes, I did.
21   Q.  Did you see that it asked you to bring with you all of
22     the material you had reviewed?
23   A.  Yes.
24   Q.  Is there a reason you didn't do that?
25   A.  It was too voluminous.  It was too voluminous to

Page 40

1     bring.
2   Q.  Did Mr. Dunigan have any other clinical signs or
3     symptoms of congestive heart failure at the time he
4     was in the Emergency Department?
5   A.  No, not that were described.
6   Q.  In your report, do you have that now?
7   A.  Yes.
8   Q.  Or do you still only have notes?
9   A.  I have my report.
10   Q.  Okay.  Page 2, first paragraph, the last sentence, you
11     say "After Mr. Dunigan was told he could go home, he
12     objected and a public safety officer, Ernie Knauf,"
13     K-n-a-u-f, "entered his cubicle, ER Room Number 24,
14     and told him he had to leave."  Upon what did you base
15     that information?
16   A.  The testimony of Ernie Knauf.
17   Q.  Which you somehow interpreted meaning that he actually
18     went into the Emergency Department, in the room where
19     Mr. Dunigan was being examined and told him he had to
20     leave?
21   A.  Yes.
22   Q.  You believe that to be true?
23   A.  I do.  I do not believe that Mr. Dunigan willingly
24     left his ER cubicle.  He objected.  The officer said
25     you know, "You got to leave."

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

STARK, M.D., ROBERT
03/02/2018                                                        Pages 41—44

Page 41

1          And the patient said "Well, you can arrest
2    me.  You can take me to jail."  I don't think that
3    that interaction would have occurred if the patient
4    were willing and able to leave the emergency room.
5    Q.   Did you see Dr. Rigot's dictation or his record that
6         indicated that Mr. Dunigan was agreeable to the plan
7         and to the plan for discharge?
8    A.   Yes, I saw that.
9    Q.   So you think that's incorrect and that, in fact,
10        Mr. Dunigan objected to leaving the Emergency
11        Department where he was examined by Dr. Rigot?
12   A.   Yes.
13   Q.   And are you making a distinction here between the
14        Emergency Department where he was examined versus the
15        waiting room?
16   A.   Yes, I am.
17   Q.   Okay.  And does that fact, as you understand it,
18        impact your opinions in this case?
19   A.   It does.
20   Q.   How would it impact your opinions if you were told
21        that Officer Knauf never had any contact with
22        Mr. Dunigan until sometime after 5 o'clock in the
23        morning when Mr. Dunigan was already in the waiting
24        room?
25   A.   If it's really true that Ernie Knauf didn't see the

Page 42

1         patient until he was in the waiting room, that goes
2         against what Officer Knauf said about talking to the
3         patient in the cubicle.  The two are inconsistent.
4    Q.   And where is it that you saw that Officer Knauf said
5         that he talked to the patient in the cubicle?
6    A.   In the report or narrative that he gave, he stated
7         that he was called there by the nurses when the
8         patient didn't want to leave, and this was before he
9         went or was taken to the waiting room.
10   Q.   Okay.
11   A.   I see patients almost daily in the emergency room, and
12        when an interaction is over, if they're not happy, I,
13        as the doctor, have to stay around and reconcile
14        things.  And when it really gets rough, only then is
15        the hospital security officer called in, and this guy,
16        Knauf, was called in to handle this patient.
17   Q.   So you believe that's what happened in this case, that
18        Mr. Dunigan was not happy, that he did not want to
19        leave the Emergency Department, and Officer Knauf was
20        called in because of that?
21   A.   Yes.
22   Q.   And given that belief, it would also be your belief
23        that Dr. Rigot was untruthful when he said that
24        Mr. Dunigan was agreeable to the plan for discharge?
25   A.   It is possible that the emergency room doctor was

Page 43

1         being untruthful, but more likely he ducked out when
2         he was finished with the patient, and only later did
3         the nurses get all the flack that the patient didn't
4         want to go.
5    Q.   And that's your understanding based upon your thorough
6         review of the materials you've received in this case?
7    A.   Well, that he ducked out or wasn't aware that the
8         patient didn't want to leave or didn't indicate that
9         in his note, one of those possibilities.
10   Q.   Did Mr. Dunigan sign for his discharge instructions?
11   A.   Yes, he did.  However, there were some instructions
12        regarding fall in the hospital that he wasn't given,
13        didn't sign out on, and those were later added to his
14        chart.
15   Q.   Upon what do you base that statement?
16   A.   They were unsigned where the patient's signature is
17        indicated, and I don't know the basis for my belief
18        that they were added to the chart after his visit.
19   Q.   Are you aware that he did sign at 4:11 a.m., the form
20        which states "The instructions have been explained to
21        me and I understand the instructions.  All my
22        questions have been answered.  I have been given a
23        copy of these instructions"?
24   A.   Yes.
25   Q.   And again, from what do you conclude that he did not

Page 44

1         receive instructions regarding the fall or anything
2         else?
3    A.   It's a special form, Bronson Hospital's "Falls in the
4         Hospital" form, that requires someone, patient or
5         nurse, to sign that it was reviewed.  It wasn't
6         reviewed with the patient.  They didn't sign it, but
7         it was put in his chart.
8    Q.   I'm sorry.  I can't tell what you're referring to.
9    A.   It's one of the discharge forms that was made a part
10        of his chart.
11   Q.   Which you received and reviewed in this case?
12   A.   I did, yes.
13   Q.   But you don't have it with you?
14   A.   I don't, and I can tell that it was on Pages 21 and 22
15        of his Bronson chart.
16   Q.   Well, as was alluded to earlier, the pages aren't
17        always the same, depending on when and how the chart
18        is printed.
19   A.   Yes, I can see that.
20             MR. O'LOUGHLIN:  Jim, do you have a
21        numbered copy of the records that would be similar to
22        what Dr. Stark received?
23             MR. HARRINGTON:  Let me look.  I'm kind of
24        scratching my head, Jack.  Can you redirect me?
25             MR. O'LOUGHLIN:  I'm trying to determine

STARK, M.D., ROBERT
03/02/2018

Page 45

1   what record or evidence he thought he saw about the
2   patient not getting instructions, if I understood him
3   correctly, about some fall sheet or fall instruction.
4              MR. HARRINGTON:  All of the stuff that I
5   have under the patient education is at the Bates
6   stamped Pages 21, 22, 23, and then on Page 23 it talks
7   about fall prevention, something not on file.  That's
8   all I have.
9              THE WITNESS:  This has got to be what I was
10  referring to.
11             MR. HARRINGTON:  Hang on one second, Jack.
12  I showed him the signature page.
13             MR. O'LOUGHLIN:  But I'm still trying to
14  figure out what he's talking about that Mr. Dunigan
15  didn't get some instruction about a fall.
16             THE WITNESS:  It just indicated under Fall
17  and Fall Prevention, the summary was for learning
18  progress not on file, and discharge instructions
19  indicated none on Page 23.
20  BY MR. O'LOUGHLIN:
21  Q.   You're under the Patient Education section?
22  A.   I am.
23  Q.   And the Topic and Materials Given?
24  A.   Yes.  Education.
25  Q.   And you believe that -- I'm sorry.  Your

Page 46

1   interpretation of that is that it was intended that
2   Mr. Dunigan would get information about preventing
3   falls in the hospital?
4   A.   Yes.
5   Q.   And he didn't?
6   A.   Yes.
7   Q.   Did he -- all right.  Are you somehow critical of
8        that?
9   A.   I'm not sure because I can't tell what they did or did
10       not give him.  That's a criticism.
11  Q.   Do you have an -- oh, I'm sorry, go ahead.
12  A.   It's a criticism that I would like to withdraw.
13  Q.   Good.  But, all right, if Mr. Dunigan was agreeable to
14       being discharged and did not object and did leave the
15       Emergency Department to go to the waiting room
16       voluntarily, would you be critical of anything in
17       relation to his decision to leave the Emergency
18       Department?
19  A.   I would be critical of the physician's decision to
20       have him leave the Emergency Department.  It wasn't an
21       adequate workup.  If the physician told the patient
22       "You're all done, you can leave," I'm not critical of
23       the patient for not having the expertise to know that
24       things were not yet completed.
25  Q.   Is it your belief that Mr. Dunigan objected to being

Page 47

1   discharged from the Emergency Department to the
2   waiting room?
3   A.   Yes.
4   Q.   In the second paragraph on Page 2, you are referring
5        to the surveillance video from the waiting room, true?
6   A.   Yes.
7   Q.   And in the second sentence in that second paragraph,
8        you say "In the process, he fell to the floor,
9        drooling from the mouth.  One officer applied a
10       sternal rub to stimulate him but got no response.
11       'You are fine.  Look at you.  You're acting,' the
12       officer said.  And finally four officers took him by
13       wheelchair and deposited him into the back seat of a
14       patrol car."
15  A.   Yes.
16  Q.   You believe you saw that on the video?
17  A.   I saw everything except the sternal rub.  I couldn't
18       see that, but an officer testified to it.
19  Q.   And you believe that happened in the waiting room at
20       Bronson?
21  A.   Yes.
22  Q.   Okay.  How did you know what the officer was saying?
23  A.   I heard those words on the CD.
24  Q.   Okay.  Do you understand that the Bronson surveillance
25       video had no audio?

Page 48

1   A.   No, I don't.
2   Q.   You believe you heard audio on the Bronson
3        surveillance video?
4   A.   Yes.
5   Q.   And you believe that on that video, you saw
6        Mr. Dunigan drooling from the mouth in the waiting
7        room?
8   A.   No.  I could not see him get a sternal rub or see him
9        drooling from the mouth, but the officers there
10       testified to that.
11  Q.   Would it alter your opinion if those events or
12       anything like them only occurred after Mr. Dunigan was
13       in the back of the police car and not in the waiting
14       room?
15  A.   If that were actually the case, yes, it would alter my
16       perception of what I wrote here.
17  Q.   Do you know whether Mr. Dunigan was ever unresponsive
18       while he was on Bronson's property before he got into
19       the police car?
20  A.   In the waiting room, no, I don't know.  What I do know
21       and could see was him collapse when they were trying
22       to lift him to take him out.
23  Q.   And do you know whether that collapse was due to some
24       physical infirmity or condition, or whether it was a
25       voluntary action?

STARK, M.D., ROBERT
03/02/2018                                                                                        Pages 49—52

Page 49

1  A.  I don't know.  And the officers there testified they
2      thought he intentionally went limp.
3  Q.  And from your observation, you couldn't dispute that?
4  A.  Could not.
5  Q.  Are you aware of any evidence indicating that
6      Mr. Dunigan ever asked to be seen by a healthcare
7      professional after he entered the waiting room?
8  A.  It's not indicated in any of the records or testimony.
9  Q.  In your review of the surveillance in the waiting
10     room, did you see Mr. Dunigan getting up from the
11     wheelchair and moving to different chairs around the
12     waiting room without anyone's assistance?
13 A.  I don't recall.
14 Q.  Do you recall seeing him in the waiting room on the
15     video moving at all?
16 A.  No.  He was seated.
17 Q.  And did he ever change seats, from your review?
18 A.  I don't recall.
19 Q.  Would that be significant to you?
20 A.  It could be, yes.
21 Q.  It would be significant if you saw that he was up and
22     walking around, moving from chair to chair while he
23     was in the waiting room?
24 A.  That could be of significance.  It indicates that at
25     least at one time he was able to ambulate.

Page 50

1         MR. HARRINGTON:  And objection to form,
2      foundation and facts not in evidence.
3  BY MR. O'LOUGHLIN:
4  Q.  Did you ever hear Mr. Dunigan say anything on any of
5      the videos you watched?
6  A.  I don't think so, no.
7  Q.  Do you recall him asking the police officers to take
8      the handcuffs off after he was in the back seat of the
9      car?
10 A.  I do not recall that.
11 Q.  Would that be significant to you?
12 A.  Only in that he was conscious enough to make that
13     request.
14 Q.  That would mean he was not unresponsive, true?
15 A.  At that moment in time, yes.
16 Q.  Are you aware of any evidence indicating that he asked
17     the officers to take him to jail?
18 A.  No.  That was earlier.  That was earlier when the
19     hospital security officer, Ernie Knauf, was
20     confronting him.
21 Q.  Do you know whether Ernie Knauf is a police officer or
22     a Bronson security officer?
23 A.  I believed that he was just a security officer for the
24     hospital.
25 Q.  Are you aware of any evidence indicating that any

Page 51

1      Bronson employee or police officer ever actually
2      recognized that Mr. Dunigan had a serious medical
3      condition?
4  A.  No, there was no evidence of that.
5  Q.  In fact, based upon your review, would you agree that,
6      from all the evidence you've seen, it appears that
7      neither the Emergency Department doctor nor the nurses
8      nor the security guards, ever thought that Mr. Dunigan
9      had a serious emergency medical condition?
10 A.  Your question is whether they perceived or believed
11     that he had an emergency medical condition, and all I
12     can judge is by their actions.  By their actions, they
13     couldn't have believed that he had an emergency
14     condition.
15 Q.  Are you aware of any evidence indicating that
16     Mr. Dunigan's condition was unstable as of the time of
17     discharge?
18 A.  We are limited in that determination by the fact that
19     the ER staff never repeated his blood pressure, which
20     was abnormally low, so we don't know, when he finally
21     left, if it was still low or even if it was lower.  We
22     don't have the information required to know that.
23 Q.  Okay.  So would that mean that you're not aware of any
24     evidence indicating that he was unstable at the time
25     of discharge?

Page 52

1  A.  I would, he was unstable, when they assessed him, but
2      there is no further information.
3  Q.  What evidence of instability, other than your
4      interpretation of the blood pressure, are you aware of
5      when they assessed him?
6  A.  To elevated heart rate of 110 or whatever it was, and
7      the low blood pressure in a formerly hypertensive
8      patient were the signs of instability.
9  Q.  Anything else?
10 A.  No.
11 Q.  What are your parameters for blood pressure within
12     normal limits?
13 A.  The national standards are 120/80, but in the context
14     of a man who's got chronic uncontrolled hypertension,
15     his pressure of 101/60 is alarmingly low.
16 Q.  What do you think was causing that?
17 A.  Heart failure, heart failure.
18 Q.  Anything else?
19 A.  No.
20 Q.  Do you know what Mr. Dunigan's blood pressure was when
21     the EMS picked him up?
22 A.  No, I don't.
23 Q.  And you don't know what his blood pressure was at the
24     time he was discharged, true?
25 A.  No, but that is because they didn't check his blood

STARK, M.D., ROBERT
03/02/2018

Page 53

1    pressure.
2    Q.   And I can't recall if you didn't see it.  You were
3         aware that they rechecked the pulse and it was at 90?
4    A.   Yes.
5    Q.   That wouldn't indicate any instability, true?
6    A.   No.
7    Q.   So are you aware of any evidence indicating that he
8         was unstable at the time of discharge?
9    A.   No.
10   Q.   Are you aware of any evidence indicating that
11        Mr. Dunigan was treated any differently than any other
12        patient who might have presented to Bronson with the
13        same symptoms and history?
14   A.   I think he was, and the evidence is that he was given
15        short shrift compared to other people who had come in
16        with a fall and dizziness.  He wasn't given a simple
17        electrocardiogram, where other patients would have
18        received one.  And in escorting him out of that
19        hospital, the staff were mocking him and provoking
20        him, which is highly unusual for ER patients.  I do
21        think he was treated differently.
22   Q.   Have you seen records or any evidence about how other
23        patients are treated at Bronson?
24   A.   No, none.
25   Q.   You don't know of anybody else who may have presented

Page 54

1         with the same or similar symptoms who were treated any
2         differently than Mr. Dunigan was, true?
3    A.   I know that humane standards and medical standards in
4         Kalamazoo, Michigan are the same or similar to other
5         communities including mine in Greenwich, Connecticut.
6         These medical treatments and interpersonal
7         interactions were far different than what anyone would
8         see in any community.
9    Q.   Are you aware of any evidence indicating that
10        Mr. Dunigan was treated differently because of his
11        age, sex, race, socioeconomic status, religion or any
12        other improper reason?
13   A.   I think he was.  The hard evidence that you asked for
14        is just the indication of his past medical history
15        that's part of the ER chart that he had used drugs,
16        that his race was African-American, that he may be
17        homeless, these are the indicators that I think
18        underlie the treatment that he got.
19   Q.   Those are characteristics he had.
20             What evidence, if any, are you aware of
21        that those factors entered into his treatment
22        decisions or any decisions by Bronson?
23   A.   I can't see into the brains of the staff who
24        interacted with him, but those indicators were present
25        and the treatment that he got was markedly different

Page 55

1         than what people get in any community.
2    Q.   And even though you may believe that, you can't say
3         that the reason he got the treatment he got was
4         because of any of his characteristics or his financial
5         standing?
6    A.   I can't prove it.
7    Q.   And you can't point to any evidence which would
8         support it, true?
9    A.   When the staff say "Act like a grown up ass man.  Are
10        you fucking stupid," that's evidence that the
11        treatment is from how they are disposed to him as a
12        human being.
13   Q.   As far as treatment in the Emergency Department as
14        opposed to after he went to the waiting room, are you
15        aware of any improper motive for the way he was
16        treated and assessed?
17   A.   Just, just what I've described, his profile.
18   Q.   Are you able to offer -- I don't see anything in your
19        report about EMTALA.  Are you going to claim that
20        there is some EMTALA violation in this case?
21   A.   Yes.  If asked, yes.  My report was based on his
22        medical treatment and how it impacted him.
23   Q.   Has anybody advised you that this is not a medical
24        malpractice claim?
25   A.   Recently, yes.

Page 56

1    Q.   So back when you did your report, nobody told you that
2         this was an EMTALA case?
3    A.   I don't believe so, no.
4    Q.   Did you offer any opinion as to whether there were any
5         EMTALA violations?
6    A.   In talking with the -- I don't recall.
7    Q.   Are you familiar with EMTALA?
8    A.   Yes, I am.
9    Q.   What's your understanding of what EMTALA requires?
10   A.   Requires to provide emergency medical care and labor
11        and delivery care without discrimination on religion,
12        economic status, racial background, things like that.
13   Q.   Do you know what the statute says?
14   A.   No.
15   Q.   Do you know whether EMTALA requires that the providers
16        actually recognize and perceive that the patient has
17        an emergency medical condition?
18   A.   I'm aware that this applies to emergency conditions.
19        Not being a lawyer, I don't know what the statute
20        specifically says.
21   Q.   Would it be fair to say then that you don't know if
22        there was an EMTALA violation in this case?
23   A.   Oh, I know there was an EMTALA violation in that they
24        sent this individual out without stabilizing him or
25        doing appropriate workup.

STARK, M.D., ROBERT
03/02/2018                                                                                          Pages 57—60

1   Q.   Are you aware of any evidence that any of the Bronson
2        personnel or the police officers actually perceived
3        that Mr. Dunigan had an emergency medical condition or
4        that he was unstable?
5   A.   **As I said before, I can only go by the behavior of**
6        **these Bronson individuals.  They acted as if there**
7        **were no perception of an emergency situation.**
8   Q.   And if you were to assume that EMTALA requires that
9        the hospital personnel actually recognize that a
10       patient has an emergency medical condition and is
11       unstable, if that's what EMTALA requires, you would
12       agree that EMTALA was not violated here?
13  A.   **I don't have the training to make that legal decision.**
14       **I know that any doctor and any law person, if they saw**
15       **a person buckling his legs and collapsing, would know**
16       **that there is an emergency medical condition.**
17  Q.   Do you recall my question?
18  A.   **Yes.  Whether they, whether they perceived, and I'm**
19       **saying you must have perceived given the behavior that**
20       **he exhibited.**
21  Q.   Didn't you just tell me, based upon your review, that
22       they did not perceive that he had an emergency
23       condition?
24  A.   **I said their actions reflected a lack of appreciation.**
25  Q.   And do you know of any evidence indicating that they

1        did actually perceive and appreciate that Mr. Dunigan
2        had an emergency medical condition?
3   A.   **Not through their actions and their testimony.**
4   Q.   Or anything else you've seen?
5   A.   **Correct.**
6   Q.   And if EMTALA requires that the hospital personnel
7        actually do perceive and recognize that a patient has
8        an emergency medical condition and is unstable, if
9        that was a requirement of EMTALA, you would agree that
10       that requirement was not met in this case?
11              MR. HARRINGTON:  Form, foundation.
12              THE WITNESS:  I'm not in a position to rule
13       **on their requirements.**
14  BY MR. O'LOUGHLIN:
15  Q.   And does that mean that you're not in a position to
16       say whether this was an EMTALA violation?
17  A.   **I'm not in a position to interpret that law.  What I**
18       **can say is they were far below the standard of care**
19       **for any community.  That's what I can say.**
20  Q.   And you would say that your opinions would support,
21       you believe, a medical malpractice claim?
22  A.   **Yes, it would.**
23  Q.   And you're aware that medical malpractice claims can
24       be filed in Michigan?
25  A.   **Yes, yes.**

1   Q.   You testified in medical malpractice claims in
2        Michigan, true?
3   A.   **I have.**
4   Q.   You've done that for Mr. Harrington's law firm, true?
5   A.   **I have in the past.**
6   Q.   And you're aware that this is not a medical
7        malpractice claim?
8   A.   **I'm aware, yes.**
9               MR. O'LOUGHLIN:  Pass the witness.
10                     EXAMINATION
11  BY MR. VANDER LAAN:
12  Q.   Doctor, my name is Allan Vander Laan, and I represent
13       Kalamazoo Department of Public Safety officers who
14       responded and transported Mr. Dunigan to the jail.
15              Can you tell me where on the report you
16       were looking at, what page you're referring to, when
17       you're talking about Ernie Knauf?
18              MR. HARRINGTON:  Allan, you're looking for
19       what, the deposition page or the report?
20              MR. VANDER LAAN:  Was his deposition taken?
21              MR. O'LOUGHLIN:  It was not.
22              MR. VANDER LAAN:  I didn't think so.
23              THE WITNESS:  I'm just looking.  It's going
24       **to take a minute.**
25  BY MR. VANDER LAAN:

1   Q.   What I'm looking for, Doctor, is you indicated that
2        Ernie Knauf told Mr. Dunigan to leave his room, or
3        they had an encounter in his room, and I'm just
4        wondering where you found that.
5   A.   **Yes.  It was actual testimony of Mr. Knauf that was**
6        **part of a summary of this episode, a summary that was**
7        **made.**
8   Q.   Well, Ernie Knauf didn't testify.  His deposition was
9        not taken.
10  A.   **No, it wasn't a deposition.  It was like one of these**
11       **supplemental information forms, incident investigation**
12       **report.**
13  Q.   All right.  I looked through the 34 pages and I
14       couldn't find it, so I'm just wondering where I'm
15       missing it.
16  A.   **I'm on Page 34.  I can't find it.**
17  Q.   Okay.  You couldn't either.
18              So you don't recall where you would have
19       read it or what serves as the basis of your statement
20       about Officer Knauf?  I'm not trying to be difficult.
21       I just don't recall in the record seeing anything.
22  A.   **Do you, may I ask, do you remember the interaction**
23       **where the officer said "Look, you've got to leave,"**
24       **and he said "Well, take me to jail"?**
25  Q.   That was in the waiting room.  I'll represent to you

STARK, M.D., ROBERT
03/02/2018                                                                 Pages 61–64

Page 61

1    that that was an interaction in the waiting room and
2    well after Mr. Dunigan was discharged.
3  A.  From my notes, this came as part of these narratives,
4    quote unquote, that were 34 pages long, but that's
5    what we've just reviewed and it's not in there.
6  Q.  All right.  So what am I supposed to glean if it's not
7    in there, that perhaps your notes may be inaccurate
8    when it comes to Ernie Knauf?
9  A.  That it could have been an interaction in the waiting
10   room and not in the cubicle.
11 Q.  Okay.  So perhaps it's possible that there was no
12   interaction between Knauf and Dunigan in his room,
13   Room 24, where Knauf told him to leave?
14 A.  But isn't there somewhere here a summary of what
15   Mr. Knauf said?  Wasn't that contained in a report?
16 Q.  I don't know.  You tell me.  I can't, I can't find it.
17   I'll wait if you think you know where that is.
18 A.  No.  I've looked where I thought was the source.
19 Q.  Well, I'll just move on, Doctor.  I realize you have
20   limited materials there.  If it's not in the 34 page
21   report that you thought it was in, I mean we'll just
22   go with that.  And I don't recall seeing it anywhere.
23          Can we have an agreement that when you get
24   home --
25 A.  Sure.

Page 62

1  Q.  -- if you find it, if you could let Mr. Harrington
2    know?
3          MR. VANDER LAAN:  And Mr. Harrington, you
4    can let Jack and I know?
5          MR. HARRINGTON:  Not a problem.
6  BY MR. VANDER LAAN:
7  Q.  Okay.  Doctor, I'm just going to move on here, Doctor.
8    On Page 2, second full paragraph in the middle, are
9    you with me?
10 A.  Yes.
11 Q.  All right.  You indicate "One officer applied a
12   sternal rub to stimulate him but got no response.
13   'You're fine.  Look at you.  You're acting,' the
14   officer said."  Do you see that?  Where did that take,
15   where'd you believe that took place and about what
16   time?
17 A.  Until this deposition, I thought it took place in the
18   Bronson waiting room, and the other attorney pointed
19   to the likelihood that that occurred in the police
20   car.
21 Q.  And what's your opinion?
22 A.  Because there was no audio in the waiting room video,
23   it's more likely that those words were said in the
24   patrol car.
25 Q.  Okay, thank you.  The third full paragraph, second to

Page 63

1    the last sentence says you, "He was having grunting
2    respirations and foaming from the mouth."  Do you see
3    that?
4  A.  Yes.
5  Q.  Were you able to see on the video that Mr. Dunigan was
6    foaming from the mouth?
7  A.  No.
8  Q.  And I take it you got that information because you
9    heard one of the officers say that?
10 A.  Yes.
11 Q.  The last sentence of the third full paragraph is "He
12   was totally unresponsive."  What does that mean to
13   you?  To me it means sleeping or dead, so I just
14   wondered what it means to you.
15 A.  He wasn't responding to voice, and they did a sternal
16   rub there in the patrol car and he didn't react.
17 Q.  You didn't have the benefit of reading the two
18   officers who were in the car, testimony, did you, the
19   deposition testimony?  I don't think you listed
20   Schaefer and Nugent's deposition.
21 A.  No, I did not.
22 Q.  And would your opinion change if the officer said that
23   he was in the back seat of the car, when
24   Mr. Harrington was asking about, or contacted him,
25   that they said Mr. Dunigan was responsive, that they

Page 64

1    shined a light in his eye, that he reacted and that he
2    was breathing.  Would that change your mind at all?
3  A.  It wouldn't change my mind about the unresponsive part
4    because shining a light in an unresponsive person's
5    eyes can get a pupillary reflex, but it doesn't mean
6    they're responsive.
7  Q.  Would it change your mind about the totally
8    unresponsive?
9  A.  No, it wouldn't.
10 Q.  In other words, well, if the officers testified in the
11   back seat of the patrol car, he gave him a sternal
12   rub, he reacted and he was breathing and so they
13   brought him, continued to the jail.  If you were to
14   believe the officers that that is true, that he was
15   breathing, then that statement that he was totally
16   unresponsive would not be accurate, am I correct?
17          MR. HARRINGTON:  Form, foundation.
18          Go ahead.
19          THE WITNESS:  No, you're not correct.  The
20   breathing part does not mean that he's responsive in
21   any way, shape or form.  You can be totally
22   unresponsive and yet be breathing.  The sternal rub,
23   on the other hand, has importance.  If he groaned or
24   moved, then he is responsive.
25 BY MR. VANDER LAAN:

STARK, M.D., ROBERT
03/02/2018

Page 65

1  Q.  Well, I guess how I think about it, I'm breathing and
2      I can recall my wife telling me that I'm totally
3      unresponsive, so I guess I just don't want to be, I
4      guess I can somewhat understand that.
5              Can we agree that he wasn't dead at this
6      point?
7  A.  Yes.
8  Q.  Okay.
9  A.  **But this is important, that if you are lying there and**
10     **someone shouts in your ear and you don't startle or**
11     **move, they can say you're unresponsive.  And if they**
12     **rub harshly on your sternum and you have no response,**
13     **then you are totally unresponsive but you're still**
14     **alive.**
15 Q.  Okay.  I have a better understanding of what you
16     meant.  Thank you.
17             Doctor, you've never been to a police
18     academy, have you?
19 A.  **Never.**
20 Q.  But not even, you know, to, perhaps you were invited
21     to see what officers go through or anything like that?
22 A.  **I've taught, I've taught law enforcement about cardiac**
23     **resuscitation.**
24 Q.  Okay.  But have you ever gone, for example, your local
25     Police Department has invited you to observe the

Page 66

1      training of those officers?
2  A.  **No.**
3  Q.  Okay.  And am I fair to -- can I assume that you've
4      never served as a reserve officer?
5  A.  **No.**
6  Q.  And have you ever done ride-alongs with perhaps some
7      of your police friends or anything like that?
8  A.  **No.**
9  Q.  And would I be fair in saying you don't know the
10     requirement that governs the behavior of a police
11     officer in the State of Michigan?
12 A.  **No.**
13 Q.  And you've never testified as an expert in police
14     practices, correct?  I mean, that's not your area of
15     expertise?
16 A.  **It's not my area of expertise.  In taser cases,**
17     **taser-related cases I have testified.**
18 Q.  Okay.  And that would have been on the effects of a
19     taser on the heart?
20 A.  **Yes, yes.**
21 Q.  Okay.  Not whether the officers were justifie or
22     reasonable in tasering someone, but what the effects
23     of a taser is, correct?
24 A.  **No, I have not.**
25 Q.  All right.  Looking at the video or what you remember

Page 67

1      of looking at the video, can you tell if, just from
2      looking at the video, if Mr. Dunigan is legitimately
3      in distress or if he was just giving the appearance of
4      someone in distress?
5  A.  **One thing in particular indicated that it was**
6      **legitimate, and that is when he was lying prone or**
7      **supine on the back seat or on the floor of the back**
8      **seat, his head was lolling around back and forth as**
9      **the car was moving, and that is someone who is really**
10     **legitimately out, I mean unconscious.  That was very**
11     **convincing.  Other things, other things --**
12 Q.  I'm sorry, you don't know if the officers saw that, do
13     you?
14 A.  **No, I can't tell if they saw that.**
15 Q.  And in fact, that lolling motion, is that something
16     that someone could act out?
17 A.  **Hard.  It's when you lose your muscle tone that keeps**
18     **your neck, protecting your head.  When you lose that,**
19     **your head can roll back and forth like a doll's head.**
20     **That was very convincing to me, that he was**
21     **unconscious.**
22 Q.  I'm sorry, go ahead.  My turn or yours?
23 A.  **Yes.**
24 Q.  I think I interrupted you, I'm sorry.
25 A.  **No, I'm finished.**

Page 68

1  Q.  Was there anything else about the video where you
2      could point to and say "A fellow could not act that.
3      This shows objectively that he was in distress,"
4      besides the lolling?
5  A.  **There was some visible spit or foam or something on**
6      **the side of his mouth.  I couldn't tell if he was**
7      **"foaming" or not, but there was something on the side**
8      **of his lips, and that usually you don't see unless**
9      **someone is losing consciousness.**
10 Q.  Okay.  Is it possible that someone could do that
11     intentionally?
12 A.  **Yes, someone could.**
13 Q.  All right.  Is there anything else on the video where
14     you would say someone cannot act this, it's objective,
15     it's objective evidence of someone being in distress
16     at any time in the video?  I'm not confining it to the
17     back of the patrol car.
18 A.  **Yes, the sternal rub, which they did do in the car,**
19     **and you say that he responded in some way.  I didn't**
20     **think that he responded.  If I'm incorrect --**
21 Q.  Well, I can only go by the officers' testimony.  And I
22     understand, I think what you're saying is you're going
23     by what you observed on the video?
24 A.  **Yes.  I thought he didn't respond, and that is also a**
25     **sign.  No one who's conscious and who is faking it**

STARK, M.D., ROBERT
03/02/2018                                                                                    Pages 69–72

Page 69

1      will just lie there and let someone, you know, put
2      their knuckles, rub it on your sternum.
3   Q.  Okay.  Anything else, Doctor, that we haven't covered?
4   A.  No, nothing else.
5   Q.  Doctor, do you have an opinion as to when and/or where
6      Mr. Dunigan died?
7   A.  I do think that it was just before, just before
8      arrival at the police headquarters because no one on
9      arrival actually took his vital signs to determine if
10     there was pulse or breathing.  The nurse there did two
11     or three ancillary things that wouldn't have shown us
12     if he died, and only when she touched his carotid did
13     she know that he was dead.
14  Q.  And I know you don't have the benefit of testimony,
15     but if these two officers said that when they, when
16     the deputies at the jail took Mr. Dunigan out of the
17     car, he was breathing, and if those corrections
18     officers would say "When we took him out of the car he
19     was breathing," would, and you believe that, could we
20     say that he died sometime after he was taken out of
21     the car?
22  A.  Yes, if we believe that, we could say that.
23              MR. VANDER LAAN:  Doctor.  I hope you enjoy
24     your time here with your family, and travel safely.
25     Thank you very much for your patience.

Page 70

1              THE WITNESS:  Thank you.
2              EXAMINATION
3   BY MR. HARRINGTON:
4   Q.  I've got a couple.
5              Doctor, what is a mechanical fall?
6   A.  A mechanical fall is a slip and a fall that's due to
7      some external object like a banana peel or a manhole
8      cover is missing and you slip in it and you fall.  A
9      non mechanical fall is something that causes you to be
10     dizzy or lose consciousness that makes you fall, and
11     that is an indicator of something medically wrong.
12  Q.  What do you believe caused Mr. Dunigan to have the
13     fall that ultimately brought him into the hospital?
14  A.  It was dizziness.
15              MR. O'LOUGHLIN:  Form and foundation.
16              MR. VANDER LAAN:  Join.
17  BY MR. HARRINGTON:
18  Q.  I'm sorry, it was what?
19  A.  It was dizziness.  He told the emergency room staff
20     that he got off the bus, he became dizzy, he just
21     didn't feel right, and he fell and he injured his
22     chest.  This was not a mechanical fall like all those
23     doctors said it was.
24  Q.  There is a question about, I guess, the timing and
25     location of when the sternal rub took place, also

Page 71

1      whether foaming or drooling out of the mouth took
2      place.  And the question was posed to you that if this
3      actually took place in the back of the police vehicle,
4      that it would have changed some of your opinions or
5      altered them in some way.  I don't think the question
6      was asked:  How would it change your opinions as it
7      relates to the timing and location of that occurring?
8   A.  If the foaming and the lack of sternal rub occurred in
9      the back of the vehicle, it means that he was in more
10     danger and should have been taken immediately to an
11     emergency facility, and my opinion isn't changed on
12     that fact.
13  Q.  Had the police officers brought Mr. Dunigan back to
14     the hospital, would he have survived?
15  A.  Yes.  If he were still alive in the car but
16     manifesting these dangerous signs, if they had taken
17     him to an emergency room, he would be there where
18     monitoring and a defibrillator were available so that
19     when he arrested, they could promptly defibrillate
20     him.  He lost any chance of that by staying in the
21     police car.
22  Q.  Well, when did he die?
23  A.  Either near the end of his ride in the vehicle, in the
24     police cruiser or on arrival to the police station.
25  Q.  I just want to clear something up, Doctor.  I know you

Page 72

1      didn't bring your entire file, but I did provide you
2      with some documentation back in July of 2017.
3   A.  Sure, yes.
4   Q.  And you have that referenced in the notes?
5   A.  Oh, yes.
6   Q.  All right.  Also, I have a letter here enclosing those
7      records.
8   A.  Yes.
9   Q.  And what was the first bullet-pointed document that
10     was provided to you?
11  A.  Amended Complaint versus Bronson Hospital outlining
12     the facts of the case.
13  Q.  Okay.  So would that have discussed the EMTALA claim?
14  A.  Yes, yes, it did.  I'm sorry.
15              MR. HARRINGTON:  That's all I've got.
16              RE-EXAMINATION
17  BY MR. O'LOUGHLIN:
18  Q.  I also have a couple more, Doctor.  Can you hear me
19     from here?
20  A.  Yes, yes, I can.
21  Q.  You were asked about how the fact that the sternal rub
22     and supposed foaming of the mouth happened in the back
23     of the police car would affect your opinion.  If you
24     assume that there were no Bronson personnel involved
25     with Mr. Dunigan after he was placed in the police

STARK, M.D., ROBERT
03/02/2018                                                                    Pages 73—76

Page 73

1    car, would you agree that you have no information
2    indicating that any Bronson person ever observed that
3    event?
4    A.  Yes.  If it occurred in the police car, then the
5        Bronson staff didn't observe that event.  They still
6        observed the buckling of his legs and inability to
7        walk in the waiting room.
8    Q.  Which you indicated you could not determine whether
9        that was voluntary or involuntary?
10   A.  That is correct.  No way to determine that.
11   Q.  Are you aware of any indication that any Bronson
12       employee ever observed Mr. Dunigan being short of
13       breath or complaining of shortness of breath?
14   A.  No, I don't believe so.
15   Q.  Do you have any opinion as to Mr. Dunigan's life
16       expectancy if he had survived this evening, or this
17       morning?
18   A.  I haven't been asked, but I do.
19   Q.  What would that be?
20   A.  He was 57 years old, and I honestly would estimate 67
21       or something like that.
22   Q.  On what basis?
23   A.  His medical condition, his lifestyle, his living
24       conditions.  He could not have lived into the 80s like
25       one of the medical experts estimated.

Page 74

1    Q.  Do you know the average life expectancy of a patient
2        in end stage renal disease on dialysis?
3    A.  I think it's six to eight years.
4    Q.  What do you base that on?
5    A.  Just my reading.
6    Q.  Mr. Dunigan was a patient with end stage renal disease
7        on dialysis, true?
8    A.  Yes, he was.
9    Q.  Is that life expectancy shortened if the patient is
10       noncompliant with dialysis?
11   A.  If noncompliant, yes.
12   Q.  Do you believe Mr. Dunigan had any responsibility for
13       his own well-being?
14   A.  Yes.
15             MR. HARRINGTON:  Objection to form and
16       foundation.
17   BY MR. O'LOUGHLIN:
18   Q.  If he was having a medical or physical problem, would
19       you expect him to tell people about that if he wanted
20       help?
21   A.  Yes.
22   Q.  Are you aware of any indication that Mr. Dunigan ever
23       indicated that he wanted help or medical attention
24       after the time he left the Emergency Department and
25       went to the waiting room?

Page 75

1    A.  There's no indication in the records that we have.
2    Q.  In your opinion, is losing one's balance an indication
3        necessarily of a medical problem?
4    A.  It could be, yes.
5    Q.  Is it always?
6    A.  No.
7    Q.  If I'm attempting to walk along a curb, I may lose my
8        balance and fall off the curb into the street or onto
9        the sidewalk without any medical condition causing
10       that, true?
11   A.  That's right.
12   Q.  And if I have hemiparesis due to a past stroke and
13       need a cane to ambulate and I'm getting off a bus, I
14       can fall and lose my balance without any medical
15       problem, true?
16   A.  That's possible due to weakness of one leg, but this
17       patient specifically said that he was dizzy.  He
18       became dizzy and didn't feel himself.
19   Q.  And was it your understanding that that was a
20       historical complaint?  In other words, he was
21       describing what happened at the time of the fall?
22   A.  Yes.
23   Q.  And again, I can't recall if you saw the EMS records
24       or not.  You did indicate you were aware of the blood
25       sugar test by EMS?

Page 76

1    A.  Yes.
2    Q.  Do you know where you got that information?
3    A.  Right.
4    Q.  Do you know where you got that information?
5    A.  I actually got to see that EMS this morning as part of
6        the deposition earlier, so we have it here in the
7        room.
8    Q.  From that, the EMS report, did you note that
9        Mr. Dunigan's breathing at the time EMS saw him was
10       normal, unlabored and clear?
11   A.  Yes.
12   Q.  Were you aware from that report that he ambulated with
13       assistance to the stretcher?
14   A.  No, but I wouldn't be surprised.
15   Q.  Did you find anything abnormal about his vital signs
16       as they were taken by the EMS personnel?
17   A.  I just need to locate that sheet.  All those vital
18       signs were normal except his blood pressure was on the
19       low side.
20   Q.  Low end of normal?
21   A.  Yes, and very low for this individual.
22   Q.  And did you note that EMS found him to have no
23       complaints of chest pain, shortness of breath, nausea,
24       vomiting, weakness, dizziness, numbness or tingling?
25   A.  Where, where was that in the EMS report?

STARK, M.D., ROBERT
03/02/2018

Pages 77–80

Page 77

1  Q.  At the bottom of the second page, at least from what I
2      have.  Change that.  I didn't count the pages right.
3      Bottom of the third page.
4  A.  **Thanks.  It says Page 7 out of 13 on the bottom.**
5  Q.  Not on my copy, but the last two lines of the page
6      that starts Additional Assessment Notes.
7  A.  **Okay, yes, I see that.  All of those things are there.**
8  Q.  Would you agree that an EKG is a poor indicator of the
9      risk of sudden cardiac death?
10 A.  **It's an incentive, it's an incentive indicator, but**
11     **it's one of the best things that we have in an**
12     **emergency room.**
13 Q.  But a patient can have a normal EKG even with cardiac
14     ischemia?
15 A.  **No.  30 percent of the time, if someone has cardiac**
16     **ischemia, it won't show up on an EKG and it will show**
17     **up 70, 80 percent of the time.**
18 Q.  Would you have expected, then, Mr. Dunigan's past EKGs
19     at times when he was short of breath, tachycardic, to
20     have demonstrated ischemia?
21 A.  **During those times, I would have expected it, yes.**
22 Q.  Would it alter your opinion if they did not?
23 A.  **No, it wouldn't.**
24 Q.  Why not?
25 A.  **Because they don't always have to show up on the EKG.**

Page 78

1  Q.  And your belief is that an EKG would have shown ST
2      segment depression and T wave --
3  A.  **Inversion.**
4  Q.  -- inversion?
5  A.  **Yes.**
6  Q.  And why would it have shown those things on this
7      occasion if it didn't show them in the past?
8  A.  **Because he was getting ready to have a cardiac arrest**
9      **five hours later.  He had early congestive heart**
10     **failure on the x-ray and he had been dizzy.  It's**
11     **likely that it would have shown up on this one.**
12 Q.  Doesn't require any speculation on your part to come
13     to that conclusion?
14 A.  **No, because we're only talking about likelihood, not**
15     **that it would absolutely have shown.**
16 Q.  Mr. Dunigan was at risk for sudden cardiac death due
17     to his underlying medical conditions, true?
18 A.  **Yes, he was.**
19 Q.  And he was at risk for sudden cardiac death before he
20     ever fell getting off the bus, true?
21 A.  **Yes, he was.**
22 Q.  If you assume that you are not qualified to offer
23     standard of care opinions as to any of the Bronson
24     personnel -- well, actually, do you have any opinions
25     as to the Bronson Hospital personnel other than

Page 79

1      standard of care opinions?
2          MR. HARRINGTON:  I'm going to object to the
3      form.  I mean this isn't, as pled at this point, a
4      malpractice case.  It's an EMTALA case, and he's
5      qualified to testify as to any EMTALA violations that
6      he sees, whether it be from doctors, nurses, security
7      guards, receptionists, etcetera.
8          MR. O'LOUGHLIN:  I certainly disagree with
9      that, but --
10         MR. HARRINGTON:  So Doctor, if you're
11     critical of any of the people that worked inside of
12     the hospital regarding EMTALA violations, then go
13     ahead and answer his questions.
14         THE WITNESS:  Not being a security guard,
15     I'm probably not qualified to testify on the fine
16     points of law enforcement or maintaining order, but
17     when a security guard does something that is medically
18     wrong, I can comment on it.  And when you're tasked
19     with removing somebody off your premises and then you
20     find that that somebody can't stand and his legs
21     buckle, it's improper to continue to remove that
22     person.  And as a regular person or a law enforcement
23     person, you're obligated to bring them back for
24     medical evaluation, and they didn't do that.
25 BY MR. O'LOUGHLIN:

Page 80

1  Q.  You used, if I understood what you said at the
2      beginning, it sounded like you said if you're a
3      security officer making medical decisions.  Do you
4      believe any security officer made any medical
5      decisions in this case?
6          MR. HARRINGTON:  I'm going to object to the
7      form and foundation.  That's not what he said.
8          THE WITNESS:  No, as opposed to criticizing
9      a fine point of how they put on handcuffs or use
10     restraint devices, I'm commenting on the fact that
11     they hoisted up and dragged someone who couldn't walk
12     on his own who had just been evaluated in the
13     emergency room.  I'm criticizing that, and I think I
14     am qualified to criticize that.
15 BY MR. O'LOUGHLIN:
16 Q.  If the person the security officers were dealing with
17     was simply uncooperative and purposefully went limp,
18     would you find that they had a duty to make sure that
19     he was seen by some medical professional?
20 A.  Yes.
21         MR. HARRINGTON:  Objection to form,
22     foundation, facts not in evidence.
23         Go ahead, Doctor.
24         THE WITNESS:  If they suspected that he was
25     intentionally going limp but he was just on his way

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

STARK, M.D., ROBERT
03/02/2018

Pages 81–84

Page 81

1    out from an ER visit, I do think that they were, they
2    should have gotten him back for some medical
3    attention.
4    BY MR. O'LOUGHLIN:
5    Q.    If they'd already seen him ambulating on his own, if
6          they knew that he'd already been seen and released by
7          a physician, and if they thought that he was simply
8          refusing to cooperate, why would that require that he
9          be seen by a medical professional?
10               MR. HARRINGTON:  Form, foundation, facts
11         not in evidence.
12               Go ahead and answer.
13               THE WITNESS:  Just because he had just been
14         seen by a physician doesn't mean that this limping or
15         collapsing of his legs shouldn't be evaluated by a
16         physician.  They can think that he's faking, but they
17         still need to have some qualified person assess that.
18   BY MR. O'LOUGHLIN:
19   Q.    So would it be your opinion that if a security officer
20         found a visitor sitting in a hallway and asked them to
21         leave and the person was conversant, showing no sign
22         of breathing difficulty or any other problem but
23         simply refused to get up, that they would have to take
24         that person to the Emergency Department?
25               MR. HARRINGTON:  Objection to form,

Page 82

1    foundation, facts not in evidence.
2          Go ahead and answer.
3               THE WITNESS:  What you're describing, no, I
4          don't think they have an obligation to take them to
5          the emergency room because all that they're seeing is
6          that he's refusing to get up.  If they saw his legs
7          buckle or him fall, I think that that's a different
8          story.
9    BY MR. O'LOUGHLIN:
10   Q.    And you watched this surveillance, the surveillance
11         video from start to finish?
12   A.    Oh, I really did, both of them.
13   Q.    And you don't recall Mr. Dunigan ever moving from one
14         chair to another on his own?
15               MR. HARRINGTON:  Form and foundation.
16               THE WITNESS:  No, and this was the Bronson
17         surveillance footage.  No.
18   BY MR. O'LOUGHLIN:
19   Q.    By the way, how many pages of notes do you have there?
20   A.    Five.
21               MR. O'LOUGHLIN:  Can we have those marked
22         as Exhibit 1, please?
23               MARKED FOR IDENTIFICATION:
24               DEPOSITION EXHIBIT 1
25               2:53 p.m.

Page 83

1    BY MR. O'LOUGHLIN:
2    Q.    And Doctor, your 5 pages of notes have now been marked
3          as Exhibit 1?
4    A.    Yes.
5               MR. O'LOUGHLIN:  I would ask that those be
6          attached to the transcript.
7    BY MR. O'LOUGHLIN:
8    Q.    Have you made any other notes or writings relating to
9          this case other than your report?
10   A.    I scribbled a random note on the defense cardiology
11         expert's report.
12   Q.    And what is your random note?
13   A.    It just, that this expert, Ernst von Schwartz said
14         that the patient would have died anyplace if there
15         wasn't a defibrillator present.  He said that his
16         ventricular fibrillation was entirely unforeseen, and
17         he notes that he couldn't find an EKG report in this
18         Bronson ER visit.  And lastly, the fall, the fall from
19         the bus was likely to be syncope since the patient had
20         complained of dizziness and just lost balance.
21   Q.    Whose report is that?
22   A.    His name is Ernst Ruediger von Schwartz from Los
23         Angeles, and I think he's a defense expert.
24   Q.    In what field?
25   A.    Cardiologist.

Page 84

1    Q.    What's his report?  Is his report typed?
2    A.    It's a long typewritten report that's 23 pages long.
3    Q.    Any other writings you've made --
4    A.    No.
5    Q.    -- relating to this case?
6    A.    No.
7    Q.    What'd you charge for your time?
8    A.    $350 for review and $600 for deposition.
9    Q.    What about for trial?
10   A.    Just a second.  $4,200 a day for trial.
11   Q.    What percentage of your income is derived from medical
12         legal work as opposed to your practice of medicine?
13   A.    It varies between 5 percent and 10 percent.
14               MR. O'LOUGHLIN:  Thank you, Doctor.
15               MR. VANDER LAAN:  No questions.
16               MR. HARRINGTON:  No questions.
17               MR. O'LOUGHLIN:  Sabrina, make sure that
18         the exhibit is attached, etran and mini with exhibit
19         attached.
20               MR. VANDER LAAN:  Same order.
21               (The deposition was concluded at 2:58 p.m.
22         Signature of the witness was not requested by
23         counsel for the respective parties hereto.)
24
25

STARK, M.D., ROBERT
03/02/2018                                                                                        Pages 85

```
                                            Page 85
1                  CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                     ) SS

4    COUNTY OF OAKLAND )

5

6            I, SABRINA SMITH, certify that this

7    deposition was taken before me on the date

8    hereinbefore set forth; that the foregoing questions

9    and answers were recorded by me stenographically and

10   reduced to computer transcription; that this is a

11   true, full and correct transcript of my stenographic

12   notes so taken; and that I am not related to, nor of

13   counsel to, either party nor interested in the event

14   of this cause.

15

16

17

18

19

20

21

22               SABRINA SMITH, CSR 2129

23               Notary Public,

24               Oakland County, Michigan.

25   My Commission expires: August 16, 2018
```

# Exhibit 5

# In the Matter Of:

# DUNIGAN vs OFFICER NUGENT, ET AL.

# CHARLES F. LANDERS, M.D.

## February 09, 2018



Prepared for you by

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

LANDERS, M.D., CHARLES F.
02/09/2018                                                    Pages 1–4

## Page 1

```
 1              UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION
 3
 4  GORDA DUNIGAN, as Personal
    Representative for the ESTATE      Case 1:16CV-01325
 5  OF JAMES DUNIGAN, Deceased,        Hon. Janet T. Neff
                                          Mag. Judge
 6         Plaintiff,                   Ellen S Carmody
 7         v.
 8
    OFFICER DEREK NUGENT, and
 9  OFFICER ERIC SHAFFER,
                Defendants.
10
    AND
11  GORDA DUNIGAN, as Personal         Case 16CV-01324
    Representative for the ESTATE      Hon. Janet Neff
12  OF JAMES DUNIGAN,  Deceased,       Mag. Judge Ellen
                                            S. Carmody
13         Plaintiff,
14         v.
15  BRONSON METHODIST HOSPITAL,
                Defendant.
16  _____
17
18       ORAL DEPOSITION OF CHARLES F. LANDERS, M.D.
19          TAKEN ON BEHALF OF THE DEFENDANTS
20          ON FEBRUARY 9, 2018, AT 9:18AM
21              IN TELLURIDE, COLORADO
22
23
24
25
```

## Page 2

```
 1
 2              APPEARANCES:
 3
 4
 5  JAMES J. HARRINGTON, IV (P65351)
    Fieger, Fieger, Kenney & Harrington, P.C.
 6  Attorneys for the Plaintiff
    19390 West 10 Mile Road
 7  Southfield, MI 48075
    (248) 355-5555
 8
 9
    ALLAN C. VANDERLAAN, P33893
10  Cummings, McClorey, Davis & Acho
    Attorneys for the Defendant Officers
11  2851 Charlevoix Drive, SE, Ste 327
    Grand Rapids, MI 49546
12  (616) 975-7470
13
14  JOHN C. O'LOUGHLIN (P33343)
    Smith, Haughey, Rice & Roegge
15  Attorneys for Defendant Bronson
    100 Monroe Center, NW
16  Grand Rapids, MI  49503
    (616) 774-8000
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2                     INDEX
 3
    Examination by Mr. O'Loughlin . . . . . .Page 4
 4
    Examination by Mr. Vanderlaan . . . . . .Page 90
 5
    Examination by Mr. Harrington. . . . . . Page 108
 6
    Examination by Mr. O'Loughlin. . . . . . Page 117
 7
 8
 9
10
11
12
13
             EXHIBITS          DESCRIPTION
14
    Page 10     EX. A    CV OF CHARLES F. LANDERS,
15                       M.D.
16  Page 25     EX. B    INVOICES OF DR. LANDERS
17  Page 13     EX. C    LIST OF MATERIALS PROVIDED
                         TO DR. LANDERS
18
    Page 20     EX. D    NOTES, E-MAIL, REPORT OF DR.
19                       LANDERS
20  Page 19     EX. E    UPTODATE AND NATIONAL
                         KIDNEY FOUNDATION ARTICLES
21
    Page 19     EX. F    DR. LANDERS CASE LIST
22
    Page 85     EX. G    ARTICLE AND DR. LANDERS
23                       NOTES
24
25
```

## Page 4

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2              CHARLES F. LANDERS, M.D.
 3  first having been duly sworn, on oath, testified as
 4  follows:
 5                   EXAMINATION
 6  BY MR. O'LOUGHLIN:
 7       Q.    The record should reflect that this is the
 8  deposition of Dr. Charles F. Landers.  The
 9  deposition is being taken by video conference with
10  Dr. Landers in Telluride, Colorado, Mr. Herrington
11  in Detroit, and Mr. Vanderlaan and myself in Grand
12  Rapids.
13            I just lost the video of Mr. Harrington.
14  Do you see Mr. Harrington, Doctor?
15       A.    We lost him at the same time you did.
16            (There was a pause in the deposition
17  because of video conference technicalities, after
18  which the following proceedings were held:)
19       Q.    (By Mr. O'Loughlin)  We will go back on
20  the record.  We had a brief loss of signal from
21  Detroit.  We are back.  Again, as you got back, I
22  was telling the doctor, I wasn't real comfortable
23  with him talking without you on.
24            What he was asking if we had received the
25  notes and other exhibits, and we did receive those
```

**LANDERS, M.D., CHARLES F.**
02/09/2018
Pages 5–8

Page 5

1  this morning by e-mail.  I appreciate those being
2  sent.  And he started to say that since he made
3  those notes he had, I think, reviewed another report
4  and has come up with an additional opinion.
5       I believe that is all we talked about, is
6  it, Doctor?
7       A.    Yes.  It is not an opinion.  It is just an
8  additional set of things that would have been
9  included in the notes.
10      Q.    Okay.  Beyond that, are we ready to try to
11 get started?
12      (Reporter asking attorneys to identify
13 themselves again please.)
14      MR. O'LOUGHLIN:  Sure.  This is Jack
15 O'Loughlin in Grand Rapids, Michigan.
16      MR. VANDERLAAN:  This is Allan Vanderlaan,
17 Grand Rapids.
18      MR. HARRINGTON:  Hi. Good morning.  James
19 Herrington.  I am in Bingham Park, Michigan.  I
20 represent the Dunigan family.
21      MR. O'LOUGHLIN:  Is that good enough,
22 Ruth?
23      THE REPORTER:  Yes, thank you very much,
24      Q.    (By Mr. O'Loughlin)  All right.  This is
25 the, I think already said, deposition of Dr. Charles

Page 6

1  Landers.  The deposition is being taken by video
2  conference.
3       Would you please state your full name?
4       A.    My name is Charles Landers, L-A-N-D-E-R-S.
5       Q.    And you are a physician?
6       A.    I am.
7       Q.    And you have been identified by the
8  plaintiff in this case as an expert witness.  I
9  presume you are aware of that?
10      A.    Yes.
11      Q.    What are you an expert in?
12      A.    My background is in internal medicine,
13 pulmonary disease and critical care.
14      Q.    And I assume this is not the first time
15 you have testified as an expert?
16      A.    Correct.
17      Q.    Is that true?
18      A.    Yes.
19      Q.    How many times have -- how many times have
20 you testified as an expert?
21      A.    I have been deposed I would estimate more
22 than 200 times.
23      Q.    And we will get to marking the exhibits
24 that you or Mr. Harrington's office were kind enough
25 to provide, and those include a list of depositions

Page 7

1  and trial testimony at least for some of the past
2  years.
3       How long have you been doing expert
4  witness-type work?
5       A.    Approximately 20 years.
6       Q.    The list that was provided to me appears
7  to be all regarding medical malpractice cases, am I
8  correct on that?
9       A.    There is an occasional personal injury I
10 see.
11      Q.    Oh, you are right.  Oh, okay.  Two
12 personal injuries?
13      A.    Two or three.
14      And a note about this list, I looked at it
15 this morning, and I just printed it off the desk top
16 of my computer, and page 2, three-fourths of the way
17 down, it starts over with date and testimony.  And
18 there are three entries there that repeat from the
19 top of the first page.  It is a glitch in how it was
20 printed, otherwise it is accurate --
21      Q.    Okay.
22      A.    -- up through the date of 11-8-17.
23      Q.    And starting in February -- on February
24 21, 2012?
25      A.    Yes.

Page 8

1       Q.    And we will come back and mark those.
2       Of the 200 cases in which you have
3  testified, can you give me an idea of how many of
4  those you have testified at the request of the
5  attorney representing the plaintiff?
6       A.    In the last five years it has been between
7  80 and 90 percent plaintiff.  The remainder defense.
8       Q.    To what do you attribute that majority of
9  plaintiff cases?
10      MR. HARRINGTON:  Objection to foundation,
11 speculation.  Go ahead.
12      THE WITNESS:  It is just whoever calls and
13 I do more reviews than I do testifying.  I would say
14 for the reviews, it is 70 percent plaintiff.  But it
15 is all word-of-mouth.  I don't advertise.  I have no
16 website.  And people call who seek an expert and
17 from there we go.  It is sometimes defense,
18 sometimes it is related to a plaintiff case.
19      Q.    (By Mr. O'Loughlin)  And you raise a
20 question I should have asked you.  The 200 refers to
21 the number of times you  have testified.  If we go
22 through the numbers of times you have been asked to
23 review a case as a potential expert witness, what
24 would that be?
25      A.    I don't keep track of the numbers.  It

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

LANDERS, M.D., CHARLES F.
02/09/2018                                                                    Pages 9–12

Page 9

1    would be more.  The 200 is an estimate.  And I don't
2    have a total.  I don't keep track of it.  But in
3    defense reviews, it is frequent that I prepare a
4    report which is used in support of a motion for
5    summary judgment, and often the defendant ends his
6    involvement as do I in a legal case.
7         Q.    And let me, so we don't get lost later,
8    let me do some housekeeping now with the exhibits
9    that were e-mailed to me this morning.  And I will
10   have them marked on your end with a designation as A
11   B or C on your copy.
12        A.    I have the originals of each note.  And
13   then it was copied then scanned then sent in
14   batches.  They do not have any stickers with letters
15   or numbers in the exhibit sequence but they are in
16   the order that I sent them.
17        Q.    Thank you.  And I should be able to sync
18   those up.  Is it okay if the court reporter places
19   exhibit stickers on your copy?
20        A.    Sure.  And those can go with the court
21   reporter and be returned to me with any other things
22   you want as exhibits.
23        Q.    That sounds good.
24              The first thing I have is your CV.  Do you
25   have that?

Page 10

1         A.    Yes.
2         Q.    A 3-page document?
3         A.    Yes.
4         Q.    And I have that marked as Exhibit A.  And
5    I would appreciate if the court reporter would also
6    mark your copy as Exhibit A?  Okay.  Is that ready?
7         A.    Yes.
8         Q.    Is that CV current and up-to-date?
9         A.    Yes.
10        Q.    Does it contain the details of your
11   education, training and professional background?
12        A.    Yes.
13        Q.    It does include a bibliography for
14   writings that you have authored.  Do any of those
15   writings have anything to do with the issues in this
16   case?
17        A.    Peripherally, the article number 7 in the
18   Lancet has to do with monitoring high risk cardiac
19   patients during transportation in the hospital.  And
20   those are people who were perceived to be at risk
21   for cardiac rhythm problems.  And peripherally that
22   is related to Mr. Dunigan's situation.
23        Q.    Would you describe your practice as it
24   existed in May of 2016?
25        A.    In May of 2016, I was working as a partner

Page 11

1    and employee of our medical group called Chest
2    Medicine and Critical Care Medical Group,
3    Incorporated.  That is a group, at that time, of
4    eight similarly trained internists with pulmonary
5    training and critical care training.  And the
6    practice is hospital based.
7              We previously had an outpatient practice
8    which has closed.  And our primary location was at
9    Sharp, S-H-A-R-P, Memorial Hospital in San Diego and
10   one of the Sharp affiliated facilities, Sharp
11   Coronado Hospital.  We had hospital privileges at
12   those locations as well as responsibilities
13   administratively as medical directors for critical
14   care and respiratory therapy and other respiratory
15   functions.  So my practice was an equal share of
16   time covering those two facilities and being
17   involved in inpatient care, mainly at Sharp
18   Memorial, to do admissions to the hospital from the
19   emergency room or offices, consultative work and
20   functioning as an attending physician in the
21   hospital, the adjacent women's hospital, an
22   inpatient rehab facility and Sharp Memorial, both in
23   the ICU, the stepdown units, and the
24   medical/surgical floors. The group covered the
25   hospital around the clock 7-24. I participated in

Page 12

1    that as well.
2              And for the preceding many years, I had
3    been the medical director of critical care for 20
4    years.   And when we built the new hospital and
5    expanded, I had a partner who I shared that with as
6    the medical co-director of critical care as of the
7    date you mentioned.  The practice was a busy
8    practice.  Each of the physicians would see
9    approximately 15 inpatients a day and have a small
10   administrative responsibility for the ICUs, in my
11   situation, which would be less than 10 percent of my
12   time.
13        Q.    And was the remaining 90 percent of your
14   time spent in the practice you describe?
15        A.    Yes, the rest was clinical, from
16   evaluating people in the emergency room, admissions
17   to the hospital, and ongoing care in the hospital,
18   rehab unit and the women's hospital next door, and a
19   small amount rotating through Sharp Coronado, a much
20   smaller facility.
21        Q.    And on average, how many hours a week did
22   you work?
23        A.    Between 45 and 60 hours a week.
24        Q.    How many weeks out of the year did you
25   work?

LANDERS, M.D., CHARLES F.
02/09/2018                                                                          Pages 13—16

Page 13

1      A.      I believe it was 40 to 42 at that time.
2      Q.      What did you do the other 10 to 12 weeks?
3      A.      The other 10 weeks would be a mixture of
4  vacation, some professional education time and some
5  of the -- in the group of eight, there would be
6  people who would not constantly be assigned, so it
7  would be unrequested days off at times.
8      Q.      Your practice is in San Diego, and at the
9  time of this deposition you are in Telluride,
10 Colorado.  Is this part of your vacation time?
11     A.      Well, as of July of 2016 I went on medical
12 leave, and I have subsequently retired.  And I am in
13 Telluride, Colorado on vacation now.
14             MR. HARRINGTON:  Jack, could we take a
15 one-minute break just for one second?  I have to use
16 the rest room.
17             MR. O'LOUGHLIN:  Sure.
18             (A break was taken in the deposition,
19 after which the following proceedings were held:)
20     Q.      (By Mr. O'Laughlin)  We are back on the
21 record.
22             We have established that I have a list,
23 which was sent to me marked as Exhibit C purporting
24 to be materials provided to Dr. Landers.  And I am
25 going to read that list.  And for each item I would

Page 14

1  ask that Dr. Landers confirm or deny that he has
2  received and reviewed the items.  And the first is
3  the Bronson surveillance video?
4      A.      Yes.
5      Q.      U-tube video of police cruiser?
6      A.      Yes.
7      Q.      Medical records from Bronson Methodist
8  Hospital?
9      A.      Yes.
10     Q.      Police reports from the city of Kalamazoo?
11     A.      Yes.
12     Q.      Autopsy and toxicology from Western
13 Michigan University?
14     A.      Yes.
15     Q.      Death certificate?
16     A.      Yes.
17     Q.      Complaint and Amended Complaint?
18     A.      Yes.
19     Q.      Medical records from Borgess Medical
20 Center?
21     A.      Yes.
22     Q.      And, madam court reporter, that is
23 Borgess, B-O-R-G-E-S-S.
24             Medical records from Life Care EMS?
25     A.      Yes.

Page 15

1      Q.      Deposition transcripts of the following
2  people, Gorda Dunigan?
3      A.      Yes.
4      Q.      Derek Nugent?
5      A.      Yes.
6      Q.      Eric Staffer.  This actually had Staffer,
7  S-T-A-F-F-E-R, but I am sure it is intended to be
8  Eric Shaffer who is a named defendant,
9  S-H-A-F-F-E-R?
10     A.      Yes.
11     Q.      Ryan Szumski, S-Z-U-M-S-K-I?
12     A.      Yes.  Yes.
13     Q.      Nolan Cattell, C-A-T-T-E-L-L, one of the
14 Bronson security officers?
15     A.      Yes.
16     Q.      Charles Shoemaker, another of the Bronson
17 security officers?
18     A.      Yes.
19     Q.      Marian Lodes, L-O-D-E-S, R.N.?
20     A.      Yes.
21     Q.      Kimberley Gilbert-Shay, S-H-A-Y, R.N.?
22     A.      Yes.
23     Q.      Erin, E-R-I-N, Blair, B-L-A-I-R, Bronson
24 registration?
25     A.      Yes.

Page 16

1      Q.      Dennis Watson, R.N.?
2      A.      Yes.
3      Q.      Christine Rohr, R-O-H-R, Bronson
4  registration?
5      A.      Yes.
6      Q.      Amber Bishop, Bronson registration?
7      A.      Yes.
8      Q.      Adrianne, A-D-R-I-A-N-N-E, Kerstetter
9  K-E-R-S-T-E-T-T-E-R, R.N.?
10     A.      Yes.
11     Q.      Wesley, W-E-S-L-E-Y, Rigot, R-I-G-O-T,
12 M.D.?
13     A.      Yes.
14     Q.      And the final item on my list is the CV
15 and expert report of the defendant expert, Dr.
16 Schwartz?
17     A.      Yes.
18     Q.      Is there anything else that -- and I know
19 it is difficult without that in front of you -- is
20 there anything that you reviewed that was not
21 included on that list, in addition to those things?
22     A.      When you mentioned the post mortem exam
23 and toxicology, mine was listed as a lab A-I-D lab
24 records.  Now those may be the same ones you are
25 referring to.

LANDERS, M.D., CHARLES F.
02/09/2018                                                                    Pages 17–20

Page 17

1    Q.    I believe they are but we will sort that
2    out.  Anything else that you know of that you
3    reviewed that is not on this list that we just went
4    through?
5    A.    In my notes there are additional of --
6    there are additional articles from an electronic
7    data base of -- called UpToDate and a internet blurb
8    from the National Kidney Foundation.
9         Then in response to reading the expert
10   report by Dr. Schwartz, Schwarz, I have one page of
11   notes and another UpToDate article, which did not
12   come to you, that I referred to earlier that is
13   called Supportive Data For Advance Cardiac Life
14   Support in Adults With Sudden Cardiac Arrest.
15        Some of the things that he referred to in
16   his report led me to look at that.
17   Q.    And I have the articles you mentioned
18   first.  And they are marked.  Aside from those
19   things, anything else that you know of that you
20   reviewed that hasn't been mentioned?
21   A.    No.  I think that is it.
22   Q.    Okay.  And we will come back to the -- I
23   have them already in record but I will come back to
24   the additional notes and articles that you obtained
25   after seeing Dr. Schwartz's report.

Page 18

1         And the notes you made up to that time, I
2    have one page of notes along with additional notes,
3    and I have notes both on regular lined paper and on
4    the cover pages of various depositions.  I don't
5    know if you have them in the same order as I have
6    them, but I have nine pages of notes on either lined
7    paper or on the copy of the cover sheets of
8    depositions?
9    A.    I guess I would need you to identify the
10   handwritten notes because mine are not grouped
11   together.
12   Q.    Okay.  And I will do that.  I think I am
13   probably going to mess up the order here because the
14   way that these were marked as they are Exhibit B and
15   it also includes a copy of one e-mail to you and Mr.
16   Harrington's assistant, and then it also contains
17   your initial report from October 25, 2017.
18        Jim, can we agree what was sent to me can
19   be included and marked, we get these to the court
20   reporter so that she can use the same copy?
21        MR. HARRINGTON:  Absolutely.
22        MR. O'LOUGHLIN:  All right.
23   Q.    (By Mr. O'Loughlin)  So I am telling you,
24   Doctor, we will come back the notes but what I have
25   as Exhibit D are eight or nine pages of notes, a

Page 19

1    single page of an e-mail or e-mail between you and
2    Mr. Harrington's assistant, and your original report
3    in this matter which is comprised of four pages.  I
4    am putting that on the record and that is what will
5    ultimately be Exhibit D to this deposition.
6         And Exhibit E that I have is the
7    literature article you mentioned earlier from the
8    UpToDate and a National Kidney Foundation.
9         And Exhibit F is the two-page list of
10   cases in which you testified that was referred to
11   earlier.
12   A.    Right.
13   Q.    Ruth, by agreement of counsel, we will
14   send you an e-mail with the attachments being the
15   exhibits that I have referred to.  Hopefully, you
16   will be able to remind me to get your e-mail before
17   we are done.
18   A.    So just as a question, the articles you
19   are referring to are the National Kidney Foundation
20   one and the UpToDate article called Patient
21   Survival and Maintenance Dialysis?
22   Q.    Yes.
23   A.    And there was something else in that
24   cluster?
25   Q.    Not in that cluster.

Page 20

1    A.    Okay.
2    Q.    Just those two items.  And the cluster
3    that was Exhibit D I referred to was your notes and
4    your report, but I will keep like that because they
5    are fairly easy to assemble.  I apologize for taking
6    all that time for housekeeping but I want to make
7    sure we are on the same page.
8         And what ultimately we will get to the
9    court reporter as Exhibit D is what I was provided
10   as a list of materials provided to you.  And we
11   agree that that can be included as an exhibit, even
12   though it probably wasn't produced by you.  I think
13   we have now listed everything you have reviewed.  Is
14   that correct?
15   A.    Yes.
16   Q.    Have you reviewed sufficient materials and
17   obtained sufficient information to provide us with
18   whatever opinions you have today?
19   A.    Yes.
20        MR. HARRINGTON:  Let me just make one
21   clarification.  I think that we provided him with a
22   note, and he can testify to that but we haven't
23   received the x-ray report yet.  And I would like my
24   experts to at least receive that and comment on
25   that.  And to the extent it alters any opinions or

LANDERS, M.D., CHARLES F.
02/09/2018                                                          Pages 21–24

Page 21

1   anything, I will make the witness available to be
2   examined on that issue.
3            MR. O'LOUGHLIN:  All right.  And x-ray
4   report, I am pretty sure you have the report.
5            MR. HARRINGTON:  I meant the film.
6            MR. O'LOUGHLIN:  Yes, I understand.
7       Q.   (By Mr. O'Loughlin)  Have you asked for
8   any additional materials, Doctor?
9       A.   **I don't believe so.**
10      Q.   Do you need any additional materials with
11  the possible exception of the actual x-ray film in
12  order to provide us with your opinion?
13      A.   **I think this should suffice.**
14      Q.   Okay.  From the material you have
15  reviewed, do you have any opinion as to any of the
16  care provided or anything done to, or with or
17  regarding Mr. Dunigan other than on May 6, 2016?
18      A.   **Well, I have the background information**
19  **from his prior Borgess hospitalization.  And the**
20  **past history is largely derived from that, so that**
21  **contributes to my data base about his co-morbidities**
22  **and base line status as well as his life expectancy.**
23      Q.   But from whatever you have reviewed
24  related to that prior medical history or his history
25  in general, did you identify anywhere where you

Page 22

1   felt that the treatment, care -- the treatment and
2   care that he received was in any way inadequate or
3   inappropriate?
4       A.   **No, I have no opinion about those.**
5       Q.   As to the care on May 6th when he
6   presented to the Bronson Methodist Hospital
7   emergency department, you would agree that there
8   were no internists, pulmonologists or critical care
9   physicians involved in his care, true?
10      A.   **Correct.**
11      Q.   You are not an emergency medical
12  physician, true?
13      A.   **At this time, no.**
14      Q.   And you weren't in May of 2016?
15      A.   **Correct.**
16      Q.   You are not a radiologist, true?
17      A.   **Correct.**
18      Q.   You are not an emergency medical
19  technician, true?
20      A.   **Correct.**
21      Q.   You are not a nurse, pre op or otherwise,
22  true?
23      A.   **True.**
24      Q.   And you have never been licensed or
25  practiced in any of those professions I have just

Page 23

1   identified starting with emergency medical
2   physician?
3       A.   **I was a full time emergency medical**
4   **physician in an academic setting for multiple years**
5   **prior to going into private practice.**
6       Q.   What years were those?
7       A.   **That would be 1977 to 1981.**
8       Q.   By the way, Doctor, what is your date of
9   birth?
10      A.   **9-27-1946.**
11      Q.   Making you how old?
12      A.   **Let's see -- 71.**
13      Q.   From your past experience as a witness in
14  many medical malpractice cases, have you become
15  familiar with the term standard of care?
16      A.   **Yes.**
17      Q.   What does standard of care mean to you?
18      A.   **It is the care that would be provided by a**
19  **responsible physician in the same or similar**
20  **training for the same or similar circumstances.**
21      Q.   Would you agree that you did not have the
22  same or similar training as any of the people
23  involved with Mr. Dunigan on May 6, 2016?
24      A.   **Correct.**
25      Q.   Do you intend to offer any opinions as to

Page 24

1   violations of standard of care of any of those other
2   professionals?
3       A.   **That is not my intent.**
4       Q.   What was your tact when you were asked to
5   look at this case?
6       A.   **I was asked to look over the records**
7   **provided to me with attention to the issues of**
8   **causation and to prepare a report.  That is the**
9   **document we have been referring to.  I subsequently**
10  **was asked to review the numerous depositions and**
11  **then the background information from Borgess.**
12      Q.   And did that lead to any opinions beyond
13  causation?
14      A.   **The only additional component to that is a**
15  **life expectancy estimate that I prepared.**
16      Q.   All right.  We will get to that as well.
17           By the way, as far as your background,
18  experience and training, you also do not have any
19  experience or training as a police officer or law
20  enforcement officer?
21      A.   **Correct.**
22      Q.   True?
23      A.   **True.**
24      Q.   Or as a -- or as a private security
25  officer?

**LANDERS, M.D., CHARLES F.**
02/09/2018

Pages 25–28

Page 25

1      A.     Correct.
2      Q.     The invoices which were marked as Exhibit
3  B are headed Charles F. Landers, M.D., Expert
4  Witness Consulting, and is that a corporate entity
5  or a partnership?
6      A.     It is a general partnership.
7      Q.     Who else is involved in that business
8  other than you?
9      A.     My wife who does the administrative work
10 for the invoices and the records and keeping track
11 of the security of the records that we have in our
12 possession, sometimes typing reports.
13     Q.     Anyone else besides you and your wife?
14     A.     No.  Originally it was set up with my
15 daughter as an employee so that we could create a
16 group for her health insurance for multiple knee
17 reconstructions.  That was the whole purpose of
18 setting up the partnership.  And I believe at the
19 end of this year we will take the partnership down.
20 We no longer have any special need for it.  I am the
21 only person who does any consulting or testifying.
22     Q.     Has all of your income from consulting or
23 testifying been run through the partnership, Charles
24 F. Landers, M.D., Expert Witness Consulting?
25     A.     That is the intent.  Sometimes we get

Page 26

1  year-end tax documents that just have my name on it
2  but the intent for us, we do have a separate -- a
3  separate bank account and it keeps the expenses and
4  the income separate.
5      Q.     Can you tell me what the annual revenue
6  for the expert witness consulting business was in
7  2017?
8      A.     No.
9      Q.     Or 2016?
10     A.     No.  I don't share those numbers.
11     Q.     What do you mean share?  You don't know
12 them?
13     A.     No.  I am reluctant to give them to you.
14 I would be glad to tell you the fraction of my total
15 income that comes from medical legal consulting, but
16 not the actual numbers.
17     Q.     I believe I am allowed to ask either or.
18 So all I am asking for is the amount of annual
19 revenue you derived from your expert consulting and
20 testimony work.
21     A.     It is variable each year, and I will not
22 give you the numbers.
23     Q.     Well, then I will take what you will give
24 me.  What is the percentage?  What percentage of
25 your annual income comes from that expert consulting

Page 27

1  work?
2      A.     It would range from 15 to 25 percent of my
3  annual income prior to my retirement in 2016, the
4  dates of this.
5      Q.     You have worked with Mr. Harrington's firm
6  in the past?
7      A.     I have.
8      Q.     And on how many occasions?  Would those be
9  listed on your list of cases where you testified?
10     A.     Several are.  And there may be some from
11 before that time.  I would estimate a half dozen to
12 eight times total.
13     Q.     All right.  Aside from the additional
14 opinions and materials which were after you reviewed
15 the reports and before we got to documents, are all
16 your opinions fairly set forth in your report of
17 October 25, 2017?
18     A.     Yes.  The other materials that I reviewed
19 confirm those opinions, except for the life
20 expectancy, which came off of his report.
21     Q.     What opinion do you have as to Mr.
22 Dunigan's life expectancy?
23     A.     I have made an estimate that his life
24 expectancy would be approximately five years from
25 the time of his early death.

Page 28

1      Q.     Upon what do you base that opinion?
2      A.     The fact that he had been placed on
3  dialysis within the preceding year and that he had
4  insulin dependent diabetes and significant vascular
5  disease.
6      Q.     You indicated a little bit ago that you do
7  not intend to offer any opinions on violations of
8  standard of care by the health care providers in
9  this case.  Did I get that right?
10     A.     Yes.
11         MR. HARRINGTON:  Hang on.  I want a
12 clarification.  When you say standard of care, you
13 are meaning in the traditional medical malpractice
14 sense, not any type of violation under the counts of
15 this Complaint, correct?
16         MR. O'LOUGHLIN:  I am asking if the
17 standard of care that we discussed earlier in
18 response to which I thought he said he did not
19 intend to offer any such opinion.
20         THE WITNESS:  I have opinions about the
21 care provided or not provided by the police officers
22 and the security officers at Bronson.  The main
23 issue was care not provided as reflected in my
24 report.  And it is not medical care it is just
25 referral to medical care.

**LANDERS, M.D., CHARLES F.**
02/09/2018                                                            Pages 29–32

Page 29

```
1    Q.    (By Mr. O'Loughlin)  Right.  And I am just
2    trying to narrow it to that and make sure that I am
3    not missing anything because you do understand that
4    this is my only opportunity to learn your opinions
5    before trial?
6    A.    I understand that.  And my intent is to
7    focus as mentioned.
8    Q.    Okay.  Do you have any opinions as to
9    violations of the standard of care on the part of
10   any of the licensed health care professionals,
11   physicians, EMTs, nurses, radiologists or anyone
12   else who was a licensed health care professional
13   involved in Mr. Dunigan's care on May 6, 2016?
14   A.    No, and that would include the unlicensed
15   employees of the hospital and Bronson, like the
16   registration people as well.
17   Q.    Okay.  Do you have any opinion as to
18   whether the health care professionals involved in
19   Mr. Dunigan's care from the presentation to the
20   emergency department through the time that Mr.
21   Dunigan was discharged to the waiting room, in that
22   period of time, do you have any opinion as to
23   whether any of those people in any way violated
24   EMTALA?
25   A.    I have no opinion about that.
```

Page 30

```
1    Q.    Do you know what EMTALA is?
2    A.    Yes.
3    Q.    What is your understanding of what EMTALA
4    is?
5    A.    In general terms it is an anti-dumping
6    federal law that for the individual facility that
7    involves evaluating medically any person who seeks
8    attention.
9    Q.    From your review of the records of Mr.
10   Dunigan's emergency room care, in other words, the
11   the medical records, did you make a determination as
12   to whether his presenting condition was life
13   threatening?
14   A.    I think on presentation it was potentially
15   life threatening.
16   Q.    Was it a condition which in your opinion
17   if not treated at that time was likely to cause his
18   death or serious impairment, again as of the time of
19   presentation?
20   A.    He was evaluated but not treated, and he
21   was perceived to be stable by the health care
22   providers at that time.  The standard of care issues
23   regarding their performance, my understanding is,
24   will be addressed by a plaintiff's emergency room
25   physician.
```

Page 31

```
1    Q.    But you are the one we are deposing today
2    so I just want to confirm what your opinions are.
3    You mentioned another item.  Based upon your review
4    of the medical records themselves over the time
5    period I have talked about, in other words, up
6    through the time Mr. Dunigan was wheeled into the
7    waiting room, was his condition stable?
8    A.    It was felt to be by the people providing
9    care.  And the extent to which it may have been life
10   threatening was not evaluated.  And they didn't --
11   there were many things that weren't done.  They
12   focused only on the presenting complaint.
13   Q.    What was the presenting complaint?
14   A.    It was referred to by the triage nurse as
15   flank pain and chest pain by the EMTs and by the
16   emergency physician Dr. Rigot.
17   Q.    And what was the history of that
18   complaint?
19   A.    On the preceding day, Thursday, he had
20   been on a bus and fell striking his chest and hip on
21   concrete, and subsequent to then, had increasing
22   pain, up to 9 on a scale of 10, which was
23   intolerable, and led to his calling for the
24   paramedics to bring him in as seen on the tapes.  He
25   felt he was bleeding inside.
```

Page 32

```
1    Q.    And was there any evidence that he was
2    bleeding inside?
3    A.    On subsequent evaluation with x-rays did
4    not reveal that.  He didn't have any lab work done.
5    But on exam and x-rays he was felt not to be
6    bleeding inside.
7    Q.    Were his vital signs stable?
8    A.    His vital signs were abnormal when he
9    arrived.  They were repeated when his heart rate
10   dropped from 113 to 90.  He had no vitals done prior
11   to discharge as would be the usual case in my
12   experience.
13   Q.    With the repeat vitals and the heart rate
14   of 90, were the vital signs within normal range?
15   A.    Yes.  They were improved and normal.
16   Q.    Would it be accurate to say that you did
17   not find Mr. Dunigan to have a life threatening
18   condition from the time he came to the emergency
19   department to the time he was taken to the waiting
20   room?
21   A.    We have limited information.  I don't have
22   enough information to say with confidence that he
23   didn't have a serious or life threatening problem.
24   The focused evaluation regarding his initial
25   complaint did not appear to be life threatening to
```

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 33–36

Page 33

1  the providers.  I understand that.
2      Q.   Are you aware of any evidence that any of
3  the health care providers thought that Mr. Dunigan
4  had a life threatening condition during that time
5  frame?
6      A.   No.  I believe they did not think he had a
7  life threatening problem.  I understand that.
8      Q.   What is your understanding as to Mr.
9  Dunigan's cause of death?
10     A.   He had a change in status after his
11 discharge from the emergency room, and while waiting
12 in the waiting area and during the logistics of
13 eviction and subsequent transfer to the police
14 vehicle and to jail.  He was without vitals signs
15 when checked at the jail and died in transit.
16          The explanation of that I included in my
17 report and I continue to have as my opinion is that
18 he had multiple severe medical problems with
19 physical and mental impairments, and that the actual
20 cause of the death was an altered level of
21 consciousness with several potential causes
22 including metabolic derangements seen in diabetes
23 and with renal failure, arrythmia through metabolic
24 changes in the setting of critical coronary disease,
25 pulmonary edema and multiple drugs on board.

Page 34

1      Q.   Are you able to say which of those
2  conditions actually caused his death?
3      A.   Well, ultimately it is a cardiac arrest,
4  cardiopulmonary arrest with arrythmia.  The only
5  arrythmia documented in the jail attempted
6  resuscitation was something called pulseless
7  electrical activity.  And prior to having a monitor
8  and the medical personnel arriving 15 minutes after
9  his recognized loss of vitals, he had an automated
10 electrical defibrillator applied which did not
11 identify a shockable arrythmia which is consistent
12 with the pulseless electrical activity.  I think
13 that was the ultimate thing that lead to his death
14 at that time.
15     Q.   An arrythmia?
16     A.   It is an arrythmia, yes.  Actually it is
17 -- there is rhythm on an electrical basis without
18 pulse.  It is a cause of the sudden death referred
19 to as an arrythmia.
20     Q.   Given Mr. Dunigan's history of end stage
21 renal disease, diabetes, coronary artery disease and
22 other cardiovascular disease, would he have been at
23 an increased risk to suffer an arrythmia at any
24 time?
25     A.   Yes, particularly on the days prior to

Page 35

1  when he was due to be dialyzed.
2      Q.   What is your understanding of when Mr.
3  Dunigan was last dialyzed?
4      A.   I don't have a precise date.  He was in
5  Borgess recently.  The emergency room physician
6  thought he just been discharged within days.  There
7  is no specific mention of when he had last been
8  dialyzed.  But he had been dialysed twice a week
9  there.  He was due to be dialyzed on the day that he
10 died, so that would, under normal circumstances,
11 mean he had not been dialyzed for the two preceding
12 days at least.
13     Q.   And did you note that the history he gave
14 was that he had been dialyzed twice that week --
15     A.   Yes.
16     Q.   -- and was scheduled later that day?
17     A.   That he got it twice at Borgess but it
18 didn't say, to my recollection, which days that
19 week.  But in a normal circumstance, he was
20 scheduled for Friday.  And he was a three times a
21 week dialyzed patient, so it would normally be on
22 Monday, Wednesday, Friday.
23     Q.   That would be a reasonable conclusion from
24 him saying he had been dialyzed twice that week and
25 was scheduled later that day on Friday?

Page 36

1      A.   I am not sure he said twice that week.  I
2  thought he said he had it twice at Borgess.  He may
3  have said twice that week but I think that is a
4  reasonable scheduling interval.  He would not
5  normally be dialyzed on Sunday.
6      Q.   And not to quibble with the facts, but if
7  you assume that the emergency department report by
8  Dr. Rigot says, under history of present illness,
9  patient admitted discharged from Borgess recently,
10 had dialysis twice this week while there.  Scheduled
11 dialysis tomorrow, open paren, Friday, close paren,
12 would it be reasonable from that history to assume
13 that he had dialysis twice that week and was
14 scheduled to have it again that same day, later in
15 the day on Friday?
16     A.   Yes.  Thank you for clarifying that week,
17 but when he says he is due to have it tomorrow, it
18 is always a question in the middle of the night what
19 you call which day.  Is that the same day he was
20 being seen between 2:00 and 4:00 a.m.
21     Q.   So given that uncertainty, is it correct
22 it would be appropriate for the person taking the
23 history to specifically note that tomorrow meant
24 Friday because the patient was being seen in the
25 middle of the night or early in the morning on

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 37–40

Page 37

1  Friday?
2      A.   Yes.  It is a common way to refer to
3  things.  If you see somebody at 3:00 in the morning
4  is it then tomorrow or today.  It is, I think it was
5  that he was due to be dialyzed on Friday, and that
6  would have been a typical schedule.
7      Q.   And to clarify, he was seen around --
8  between 2:30 and 4:00 o'clock on May 6th, which was
9  a Friday?
10     A.   Yes, the same day.
11     Q.   I can't recall if you answered my previous
12  question.  I apologize but I am going to ask it
13  again.
14          Based upon the history we just went over,
15  it would have been reasonable for the history taker
16  to assume that the patient had been dialyzed already
17  twice that week and was scheduled to be dialyzed
18  again later that same day?
19     A.   Yes.
20          MR. HARRINGTON:  Objection to foundation.
21     Q.   (By Mr. O'Loughlin)  And the answer was?
22     A.   Yes.
23     Q.   In your report from October 25, 2017,
24  under further inspections, you state that Mr.
25  Dunigan was clearly impaired while in the Bronson

Page 38

1  Hospital ER waiting area.
2          Upon what do you base that opinion?
3      A.   We have a video of the entire time in the
4  Bronson Methodist Hospital emergency room.  He was
5  unable to support himself without assistance either
6  with his cane or holding onto multiple pieces of
7  furniture, the chairs in the emergency room.  And he
8  was referred to by the Bronson security people as
9  being fine and walking about without assistance at
10  that time.  That is not borne out by the video tape.
11  And he appeared to be significantly impaired with
12  ambulation at that time.
13          He subsequently, while still in the
14  emergency room, was asked to stand and fell forward
15  to other chairs, and then required assistance into a
16  wheelchair, and then assistance with the wheelchair
17  out to the area outside the emergency room where he
18  was unable to stand and was lowered to the pavement
19  at that time.  Those, to me, suggest that he was
20  severely impaired while at Bronson after discharge.
21     Q.   What was Mr. Dunigan's base line
22  ambulatory status, in other words, the day before,
23  how was he ambulating?
24     A.   He had a previous stroke and had some
25  weakness on his left side and had a cane that he had

Page 39

1  brought with him and was in the EMT equipment that
2  was brought with him.  It was said that the day
3  before when he fell, he fell in the setting of
4  getting either on or off the bus and fell to the
5  ground.  There was one mention that he was dizzy.
6  It is not clear that he was dizzy when he was in the
7  emergency room but his ambulation was not normal at
8  a base line.
9          He was said to have been able to get up
10  from the EMT gurney to get to his emergency room bed
11  and from the emergency room bed to the wheelchair
12  when discharged.  Those are different from the way
13  he appears on the video of the all night stay in the
14  emergency room waiting room.
15     Q.   How are they different?  Let me go back.
16  I will withdraw that.
17          You saw the video from the waiting room?
18     A.   I did.
19     Q.   Correct?  And you saw Mr. Dunigan wheeled
20  in by the nurse Dennis Watson, correct?
21     A.   After discharge.
22     Q.   You saw Mr. Dunigan wheeled in, in the
23  wheelchair by emergency department nurse Watson, by
24  wheeled in, I mean from the emergency department to
25  the waiting room?

Page 40

1      A.   Yes.
2      Q.   And that is from the video, right?
3      A.   Yes.
4      Q.   And you saw him while he was sitting in
5  the wheelchair put on a -- some sort of jacket or
6  other piece of clothing?
7      A.   Yes.
8      Q.   You saw him get up on his own, no one else
9  there, from the wheelchair and move to a seat in the
10  waiting room?
11     A.   Right.
12          MR. HARRINGTON:  Form and foundation.
13     Q.   (By Mr. O'Loughlin) I don't know if you
14  recall my question, Doctor?
15     A.   I don't.  You answered and I didn't hear.
16          MR. HARRINGTON:  I objected.  I placed an
17  objection, Jack, so I don't know if that was cut off
18  or not.
19     Q.   (By Mr. O'Loughlin)  Let me try it again
20  just in case, and subject to the objection.
21          You saw in the video that Mr. Dunigan was
22  able by himself without any assistance from anyone
23  else and without anyone else in the area get up from
24  the wheelchair and move to a chair in the waiting
25  room, true?

LANDERS, M.D., CHARLES F.
02/09/2018                                                                      Pages 41–44

Page 41

1    A.    Right.  But the fact that he didn't have
2 assistance from another person doesn't mean that it
3 is unassisted.  He uses the chairs, the wheelchair
4 arm, the cane and the chairs in the emergency room
5 then and repeatedly throughout the night to assist
6 him mechanically, not assist him with another
7 person.
8    Q.    And repeatedly throughout the night while
9 he is in the waiting room and on that surveillance
10 video, he moves to different chairs throughout the
11 waiting room, true?
12   A.    Several times, yes.
13   Q.    Without anyone assisting him, true?
14   A.    True.  But with the assistance of the
15 furniture and/or cane.
16   Q.    Are you able to offer an opinion as to
17 whether his ambulation in the waiting room up to the
18 time he was asked to leave was any different than
19 his base line?
20   A.    It was clearly very abnormal.  And it was
21 said by the nurses who testified about his moving
22 from the gurney of the EMTs with which he arrived to
23 his ER bed to the wheelchair, that he was able to do
24 so independently.
25         When the police officers asked him to

Page 42

1 stand and leave in the early morning hours several
2 hours later, he fell forward against the other
3 chairs and was clearly not able to ambulate at that
4 time.  So that ambulation test, if you will,
5 demonstrated to me that he was different from his
6 base line, and he was in no condition to walk out to
7 the bus stop and leave.
8    Q.    Perhaps my question wasn't clear.  Let me
9 try it again.
10         Do you have an opinion whether Mr.
11 Dunigan's ambulation around the waiting room moving
12 from chair to chair up to the time he was asked to
13 leave was any different than his base line?
14   A.    I can't tell.  I have no video of what he
15 was like before.  I just have the description that
16 he could move between those three modes of
17 transportation, according to the nurse, in a way
18 that they thought was normal.  He clearly wasn't
19 normal when he was going between the chairs or
20 afterwards, but I don't have any video to verify
21 what he was like in the ER.
22   Q.    Is it fair to say then you can't say Mr.
23 Dunigan's ambulation around the ER was any different
24 than his base line?
25         MR. HARRINGTON:  Objection to form and

Page 43

1 foundation.  He is able to make reasonable
2 impression.
3         THE WITNESS:  I do have an impression that
4 he was different because of the descriptions by the
5 experienced health care providers and then by
6 comparing that to the video.  I think he was worse.
7    Q.    (By Mr. O'Loughlin)  What description by
8 any health care providers are you relying on?
9    A.    The nurse's depositions.
10   Q.    And what specific statement?
11   A.    That he was able to get up on his own
12 between the gurney and the bed and then the bed and
13 the wheelchair.  That is my recollection.
14   Q.    Okay.  Did you see on the video that he
15 was also able to get up from his wheelchair and the
16 chairs in the waiting room and then several more
17 times in the different chairs in the waiting room in
18 the few hours up until he had to leave?
19         MR. HARRINGTON:  Objection.  Form and
20 foundation.
21         THE WITNESS:  As I said with the
22 mechanical assistance of his cane and the furniture.
23   Q.    (By Mr. O'Loughlin)  What makes you think
24 that is any different from the way he got to the EMT
25 gurney to the emergency room bed and from the

Page 44

1 emergency room bed to the wheelchair?
2    A.    Because of their descriptions.  That is
3 all I have.
4    Q.    You have to tell me -- well, none of the
5 nurses said that he didn't use the cane or hold onto
6 things as he moved from the bed to the wheelchair or
7 the bed to the bed, did they?
8    A.    I am not sure they were ever asked that.
9 They just said he was able to get up on his own
10 between those places.
11   Q.    Correct.  Meaning that they didn't feel a
12 need to assist him, that was their testimony.
13   A.    That is part of it.  They thought he was
14 independently doing fine.  That is not the
15 impression I have when he is in the emergency room
16 waiting area and particularly after the police
17 interview him.
18   Q.    But I am talking about up until the
19 time he is asked to leave?
20   A.    Right.
21         MR. HARRINGTON:  Are you at a point where
22 we take can a break, Jack, or are you in thought?
23         MR. O'LOUGHLIN:  I am in thought but that
24 doesn't mean we can't take a break.
25         (A break was taken in the deposition after

**LANDERS, M.D., CHARLES F.**
02/09/2018                                                                          Pages 45–48

Page 45

1   which the following proceedings were held:)
2       Q.   (By Mr. O'Loughlin)  We can go back on the
3   record.
4            Doctor, from your review of the video or
5   any other information that you have relating to this
6   case, are you aware of any evidence that Mr. Dunigan
7   after he is taken to the waiting room was ever asked
8   to be seen again by a health care professional?
9       A.   People have said he did not, and there was
10  no indication.  On the films I had, it was all
11  visual, not audio, but I have no indication that he
12  did ask to be seen again.
13      Q.   You would agree that Mr. Dunigan in the
14  waiting room up until the time he was asked to leave
15  was able to ambulate without the assistance of any
16  other person?
17           MR. HARRINGTON:  Objection to form and
18  foundation.
19           THE WITNESS:  Yes.  He required mechanical
20  assistance from his cane and furniture but there
21  were no other personnel assisting him.
22      Q.   (By Mr. O'Loughlin)  Doctor, from your
23  review of the video in the waiting room up until the
24  time he was asked to leave, did you make an opinion
25  as to whether Mr. Dunigan exhibited any difficulty

Page 46

1   or distress?
2       A.   He was in not in obvious distress.  He was
3   somnolent and sleeping with diminished level of
4   consciousness much of the time, but there was no
5   obvious distress to my review.  And there was no
6   disruptive behavior.
7       Q.   I am sorry.  But from your review of that
8   video up until the time he was asked to leave, did
9   it appear that Mr. Dunigan was at times trying to
10  sleep in chairs or a chair in different locations?
11           MR. HARRINGTON:  Object to form and
12  foundation.
13           THE WITNESS:  That appeared to be the
14  case.  He would move from one single chair to a
15  double chair and put his leg up over the rails and
16  had his head down.  It didn't look like he slept
17  much because he was periodically moving to try to
18  get more comfortable, it looked like.
19      Q.   (By Mr. O'Loughlin)  Would you consider
20  that normal behavior for anybody attempting to sleep
21  in chairs in a waiting room, or an airport or any
22  place like that?
23      A.   I think it is common behavior, yes.
24      Q.   Are you aware of any evidence that Mr.
25  Dunigan ever made a complaint to security officers

Page 47

1   or the police officers about any medical problems?
2       A.   They said that he did not.  That is the
3   information I have.  The only time he made a comment
4   that was worrisome is when they wanted him to stand
5   up, and he said that his legs weren't ready and he
6   could not stand.
7       Q.   Up to that point had you seen or heard
8   anything, or are you aware of any evidence that Mr.
9   Dunigan ever complained of any medical condition or
10  asked for care for any medical treatment?
11      A.   I am not aware of a request or a
12  complaint.
13      Q.   Are you aware of any time after he went to
14  the waiting room that Mr. Dunigan again presented to
15  the emergency department seeking care for a medical
16  condition?
17      A.   That is to me the same question.  He did
18  not as far as I know.
19      Q.   Up to the time that Mr. Dunigan was placed
20  in the police car, are you aware of any evidence
21  that he experienced any respiratory distress?
22      A.   No.  I am not aware of any respiratory
23  distress.  Unfortunately, the video of his upper
24  body is blocked by the trauma emergency room sign
25  but I have no information about respiratory

Page 48

1   distress.
2       Q.   Up to the time he was placed in the police
3   car, are you aware of any evidence indicating that
4   Mr. Dunigan lost consciousness?
5       A.   Only the diminished level of consciousness
6   associated with sleep is what I am aware of.
7       Q.   Okay.  Up to the time he was placed in the
8   police car, are you aware of any evidence that Mr.
9   Dunigan was obtunded, O-B-T-U-N-D-E-D?
10      A.   Again, it is an interpretation of someone
11  who has diminished level of consciousness.  I
12  thought he was most likely asleep, not obtunded.
13  Obtunded to me means he is unarousable, but if no
14  one is checking I can't tell what his real level of
15  consciousness is.
16      Q.   Are you aware of evidence that he was
17  speaking with the security officers and the police
18  officers?
19      A.   He did speak some.  They said he was
20  mumbling a lot.  The main thing I recall is when
21  they asked him to leave, he asked to be taken to
22  jail.  I guess that was interpretable because it was
23  also overheard by people at the triage registration
24  desk.
25      Q.   You would not interpret that statement as

**LANDERS, M.D., CHARLES F.**
02/09/2018                                                    Pages 49–52

1    a request for medical care, would you?
2        A.   No.
3        Q.   In your report from October you made
4    reference to security officer Shoemaker making the
5    remarks indicating that he thought Mr. Dunigan was
6    quote, faking, quote, or, quote, playing games,
7    close quote, and making insulting comments of,
8    quote, bullshit, close quote, and quote, fucking
9    stupid, close quote, regarding Mr. Dunigan's
10   behavior in your report?
11       A.   Yeah.  That is what he said.
12       Q.   Are you aware of any evidence that Mr.
13   Shoemaker or any other Bronson security guard or any
14   police officers ever thought that Mr. Dunigan was
15   suffering from a serious medical condition up to the
16   time he arrived at the jail?
17       A.   Before they put him in the car is when the
18   Bronson security people were involved. They had to
19   physically lift him with three people.  That is when
20   they called him faking and playing games and
21   insulting comments about acting like a man and
22   bullshit, and fucking stupid, certainly not things
23   that suggest that they thought he was seriously ill
24   but they were certainly giving him no benefit of the
25   doubt when he said he couldn't walk and his legs

1    weren't ready and he was laying on the concrete.
2    They stand around and watch him, four or five of
3    them, until the three of them have to lift him into
4    the car.  Certainly very worrisome behavior for
5    people who are there to protect your safety and not
6    treating him with even minimum respect.
7        Q.   I will come back to my question, but from
8    what you just said, are those opinions that you
9    consider to be medical opinions or expert opinions?
10       A.   They are common sense opinions.
11       Q.   You don't need an expert to make that sort
12   of judgment, do you?
13       A.   I don't think so.  I think anybody that
14   looks at those tapes and their behavior and the
15   transcript of what they said would be appalled by
16   these said to be professional, well-trained people
17   with experience.  It is awful.
18       Q.   Thank you for that opinion.  Is that an
19   expert opinion?
20       A.   Sure.  As well as a common sense opinion.
21       Q.   Now let me go back to the question I
22   thought I had asked earlier.  If not, I apologize.
23            Are you aware of any evidence or anything
24   you reviewed or know about this case which would
25   indicate that Mr. Shoemaker or any of the other

1    security guards or Officers Nugent and Shaffer had
2    actually believed that Mr. Dunigan needed medical
3    attention at any time before he arrived at the jail?
4        A.   Well, the two police officers four blocks
5    from the ER, what they said it was one minute away,
6    noticed that he was having distress with his
7    breathing, was still slumped down behind the seat in
8    the back against the cage and had snoring
9    respirations and foaming at the mouth.  They were
10   sufficiently concerned to stop and spend four
11   minutes of doing an assessment, inadequate in my
12   opinion, but left them with the impression that he
13   was still faking.  By the time they got to the jail
14   several minutes later he was dead. They clearly had
15   an indication that there was a change in his status
16   for the worst.  He was not responsive.  They put a
17   flashlight in his eyes and said he blinked.  A
18   flashlight in the eyes is usually used to assess
19   pupils.  There was no verbal interaction from him.
20   He appeared to be severely impaired on the film and
21   that is what they responded to.  So I think there
22   was a significant concern about his change in status
23   at that time.  They ended up saying he was okay and
24   faking.  Clearly, they were wrong.
25       Q.   Do you recall my question?

1        A.   Yes.
2        Q.   The question is whether you are aware of
3    any evidence in this case indicating that the
4    security guards or the police officers ever actually
5    believed or recognized that Mr. Dunigan had a
6    significant health problem up to the time he arrived
7    at the jail?
8        A.   That is what I just described to you, that
9    they did recognize it.  Shaffer is an EMT.  He has
10   been a cop for more than ten years.  He clearly
11   recognized there was a problem and then decided that
12   he was faking.  Clearly he did not do any detailed
13   assessment of a first responder or EMT or any other
14   professional.  He later said he thought he was
15   faking.  All you have to do is look at the tape.
16       Q.   Let me try it again.  Let me just preface
17   this, if the security officers and the police
18   officers thought Mr. Dunigan was faking, would you
19   agree that they did not recognize or appreciate that
20   he had any serious medical problems?
21            MR. HARRINGTON:  Objection to form and
22   foundation.
23            THE WITNESS:  Yes.  I think they thought
24   he was faking without doing any assessment.  Several
25   of them had no idea why he had been there and did

LANDERS, M.D., CHARLES F.
02/09/2018

Page 53

1  not appreciate his distress as demonstrated by his
2  inability to walk or stand.
3      Q.    (By Mr. O'Loughlin)  Let me try it one
4  more time, maybe one we will try to get a straight
5  answer.
6      A.    I have answered it five times so far.
7      Q.    Are you aware of any evidence based upon
8  your review of everything you have seen in this case
9  indicating that the Bronson security officers or the
10  police officers ever actually believed that Mr.
11  Dunigan had a serious medical problem --
12     A.    And I repeat the same.
13     Q.    -- up to the time he arrived at the jail?
14     A.    Exactly the same thing I have said before.
15  They pulled the car over because he was having
16  respiratory difficulties, foaming at the mouth,
17  limited responsiveness and slumped down into the
18  area behind the seat.  That is all the same event.
19  And if you would like I can describe it again.  That
20  is a recognition that he had a problem.  Why else
21  would they have stopped the car?  They were
22  concerned about him.  They checked him minimally and
23  then decided to proceed on after having to
24  physically lift him up onto the seat in the back of
25  the police car.

Page 54

1      Q.    All right.  Let's go up to that point and
2  try to get an answer here.  Up to the point where
3  they stopped the car, are you aware of any evidence
4  that either the security officers or the police
5  officers believed that Mr. Dunigan had a serious
6  health medical problem?
7      A.    They said they didn't believe he did.  I
8  have trouble with the man who is holding his head, I
9  believe it is Officer Carlisle, while he is having
10  snoring and foaming at the mouth, while they are
11  having to lift him into the car and saying, oh, he
12  is fine.  He is -- all the officers say they didn't
13  think he had anything.  They thought he was faking.
14  They were clearly wrong.
15     Q.    And they may have been wrong, Doctor.  I
16  can't believe it is this hard to have a
17  conversation.  Do you understand I am asking about
18  evidence of what they actually believed as opposed
19  to what you think they should have recognized or
20  picked up?
21          MR. HARRINGTON:  Jack, please don't argue
22  with the witness.  He is answering your questions.
23          MR. O'LOUGHLIN:  I would assert that he is
24  not.
25          THE WITNESS:  The only way I can tell what

Page 55

1  they believed is what they say.  On the tapes until
2  he gets into the car, I have no audio to hear.  They
3  are talking about wanting to hit the brakes on the
4  wheelchair so he would get dumped on the concrete.
5  They don't help him up when he is lying on the
6  concrete for several minutes until they load him
7  into the car with three people carrying him.  They
8  say that they think he is faking.  They think he is
9  playing the game. They are doing no assessment.
10  They are -- in the waiting room they are 15 feet
11  from the triage nurse.  Outside, they are probably
12  30 feet from it.  They never considered taking him
13  back inside.  So I don't think they thought he had
14  anything.  They thought he was faking based on a
15  totally inadequate evaluation.
16     Q.    That is exactly my question, Doctor.  I
17  wish you would just answer.
18          Based on everything you know about this
19  case, do you believe that the security officers and
20  the police officers believed Mr. Dunigan was faking
21  and did not really have a serious medical condition?
22     A.    For the tenth time, that is what I have
23  said.
24     Q.    I would submit that it was not.  But you
25  do agree now that you are not aware of any evidence

Page 56

1  indicating that even the security officers or the
2  police officers actually recognized that Mr. Dunigan
3  had a serious medical condition, true?
4      A.    No, I think in the police car when they
5  pulled over and stopped they recognized that he had
6  a serious problem.  They want to talk about and say
7  that he was faking.  They stopped for a reason.
8      Q.    And would you agree based upon review of
9  the video and all the testimonial evidence in the
10  case that after they investigated they did believe
11  he was faking and did not believe he had a serious
12  medical condition?
13     A.    While he was dying, that is true.
14     Q.    You made reference, I believe, to Mr.
15  Carlisle?
16     A.    Mr. Carlisle is one of the security
17  officers from Bronson who helped put him in the car.
18  He had the head end from my view on the left
19  driver's side rear door.
20     Q.    Correct.  You in your earlier testimony
21  suggested that at that time Mr. Dunigan was foaming
22  at the mouth?
23     A.    I couldn't see that but that was the
24  testimony of the officers involved.
25     Q.    As to when?

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 57—60

Page 57

1   A.    At the time when they put him in the car.
2  I am not talking about the time when they stopped
3  the car enroute.  Before they took off, that was the
4  testimony.
5      Q.    If that wasn't their testimony and that is
6  not depicted on the video, would you have any
7  evidence indicating that Mr. Dunigan was ever, as
8  you put it, foaming at the mouth at any time while
9  he was on Bronson premises?
10      A.    I can't see his head when he is being
11  loaded into the car.  And it is their testimony.
12  Hypothetically, if it weren't, I would have no
13  basis.
14          MR. VANDERLAAN:  I move to strike the
15  Doctor's testimony because the officers never
16  testified that he was foaming at the mouth.
17          THE WITNESS:  No, the security officers
18  said he was foaming at the mouth, not the police
19  officers.  They didn't help him into the car.
20      Q.    (By Mr. O'Loughlin)  What security officer
21  do you believe said they saw Mr. Dunigan foaming at
22  the mouth?
23      A.    I can look.  It is in their depositions.
24  Do you want me to look?
25      Q.    It is a pretty important point, so, yes, I

Page 58

1  need you to tell me where that is because my
2  recollection is just exactly the opposite.
3      A.    So the place where I am looking is on
4  Charles Shoemaker, the deposition, page 34 and 35.
5  They are talking about loading him in the car.
6          Were you with him when he was loaded into
7  the car?
8          ANSWER:  Yes, I had his feet.  Art, that
9  would be Carlisle, went around the driver's side and
10  helped him, getting him by the shoulders to sit up.
11          Next question has to do with real quick
12  when you say snoring respirations in any of your EMT
13  training what is that significance of?
14          Respiratory failure could lead up to --
15  trouble breathing, I should say.
16          And then on page 35, it said:  If none of
17  those signs of his snoring respirations were present
18  when you were dealing with Mr. Dunigan as depicted
19  in Exhibit 14, and then you started -- and then they
20  started to develop when he was out by the car, at
21  that time is a definite change in his condition?
22          Correct.
23          So then they are talking about his
24  snoring respirations when he is out by the car which
25  Shoemaker says is a change in his condition while

Page 59

1  they are loading him in the car.  Those are the
2  sequential quotes.  I may be wrong that he is
3  talking about something he observed, and that it is
4  a hypothetical based on his EMT training but that is
5  the way I interpreted it.
6      Q.    Aside from the testimony you just read,
7  any other indication or evidence that you are aware
8  of that Mr. Dunigan either had snoring respirations
9  or foaming at the mouth at any time while he was on
10  Bronson premises?
11      A.    No.  That is the only reference to it I
12  saw.
13      Q.    All right.  From your review of the video
14  and testimony, did you see Mr. Dunigan do anything
15  up until he was placed in the police car that would
16  be inconsistent with him simply being uncooperative?
17      A.    Yes.  His physical condition.  He was
18  staggering when asked to get up in the emergency
19  room waiting room.  He had to have two people assist
20  him into the wheelchair.  And when asked to stand
21  from the wheelchair required two people to lower him
22  to the ground on the concrete out in front.  That
23  is -- that's from the video.  And I have no audio to
24  go with it.  There were four, I think five people
25  with him outside who then just stood around and

Page 60

1  looked at him.
2      Q.    How do any of those things you just
3  mentioned indicate that he was anything other than
4  simply uncooperative?
5      A.    To me, falling to the ground is not what I
6  would call uncooperative.  Uncooperative may be
7  something where he was disruptive or refusing to do
8  something with the police.  The only thing he
9  refused to do was to leave, and it appears to me
10  that he was physically incapable of it.
11          There is no disruptive behavior.  There is
12  no -- someone referred to as he had a mild push
13  against one officer.  It looked to me like he was
14  falling over and they grabbed him.  I don't see any
15  pushing or things that I would call disruptive that
16  would be a much more common reason to evict someone
17  with the police.
18      Q.    You would agree if he refused to leave the
19  premises when asked to leave would be uncooperative?
20      A.    Yes.
21          MR. HARRINGTON:  Objection to form and
22  foundation, vague.
23      Q.    Your answer was yes?
24      A.    Yes.  I think it is uncooperative.  I
25  don't think it is disruptive or anything but

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 61–64

Page 61

1  verbally saying that that he was not in any physical
2  condition to go.  His legs weren't ready.
3      Q.    Would you agree that laying on the floor
4  or laying on the ground and refusing to get up would
5  be uncooperative?
6      A.    It is not --
7            MR. HARRINGTON:  Object to foundation.
8            THE WITNESS:  It is not uncooperative.  It
9  is a demonstration that he is in need of attention
10 that is 15 feet away.  He didn't lie on the ground
11 as a demonstrator in front of the White House.  He
12 was lying on the ground because he can't get up.
13     Q.    (By Mr. O'Loughlin)  How would it look
14 different than when he is lying on the ground
15 because he didn't want to get up and didn't want to
16 leave?
17     A.    You have to give him the benefit of the
18 doubt.  If you can't tell the difference, you just
19 let the medical professionals who have just
20 evaluated him see him again.  There was no urgency
21 on the part of anything they did but take him in.
22 There was no rush to get him to jail.
23     Q.    Do you recall my question?
24     A.    I thought I answered it.
25     Q.    How would it look different if Mr. Dunigan

Page 62

1  was laying on the ground because he was refusing to
2  get up as opposed to laying on the ground because he
3  was unable to get up?
4      A.    You have to interact with him and ask him.
5  If you didn't feel were you medically capable of
6  assessing, you have got the people right there.  You
7  don't just stand and look at him, stare at him and
8  guess that he is faking it, not even knowing why he
9  was there.  Unacceptable.
10     Q.    Do you recall my question?
11     A.    Sure.
12     Q.    Do you recall my question?
13     A.    Sure.  How many times do you want to me to
14 answer each of these questions?
15     Q.    I would like an answer once.
16           MR. HARRINGTON:  Stop arguing.  Counsel,
17 he is answering your questions just because you
18 didn't like the answer doesn't mean you can ask it
19 six times until you get what you like.  He is
20 answering your questions.
21           MR. O'LOUGHLIN:  I would be happy to have
22 the judge decide whether that is the case.
23           MR. HARRINGTON:  That's fine, just don't
24 argue and ask your question.
25           MR. O'LOUGHLIN:  That is what I am trying

Page 63

1  to do.
2            MR. HARRINGTON:  No, it is not, so
3  continue please.
4            MR. VANDERLAAN:  It is yes or no question.
5  He is not answering.
6            MR. HARRINGTON:  No, you can't limit his
7  answer to a yes or no.  He is allowed a reasonable
8  explanation to his answer.  You can't limit what his
9  answers are going to be.
10     Q.    (By Mr. O'Loughlin)  Doctor, based upon
11 your review of the Bronson surveillance video or
12 anything else you saw in this case, was there any
13 evidence that Mr. Dunigan was anything other than
14 alert and oriented up to the time when he was placed
15 in the police car?
16     A.    Well, there is no audio component to the
17 tapes, the nine video tapes that I reviewed.  There
18 is no indication that he was alert or oriented.  He
19 was said to be mumbling and he asked to go to jail
20 which was an unusual request for someone who had
21 been in seeking medical attention.
22           There is no assessment of his orientation,
23 which would be a commonly done series of simple
24 questions best done by the medical personnel
25 immediately nearby.  So, to me, he is not alert or

Page 64

1  oriented unless you inquire and do the assessment,
2  and no assessment was done.
3      Q.    Given the absence of an assessment, would
4  you agree that there is no evidence that Mr. Dunigan
5  was not alert and oriented based up to the time he
6  was placed in the police car?
7            MR. HARRINGTON:  Objection to form and
8  foundation?
9            THE WITNESS:  Well, there is the testimony
10 I just commented on that they found him to be
11 mumbling and unable to stand.  That is not alert and
12 oriented.  There is no assessment despite having
13 qualified medical people who knew him and knew his
14 situation immediately available.
15     Q.    Anything that is not -- first of all, did
16 anybody testify that Mr. Dunigan was unable to stand
17 as opposed to refusing to stand?
18     A.    It is in the video.  He collapses and they
19 lowered him to the ground.  The obligation of a
20 professional is to give him the benefit of the doubt
21 that when he says my legs aren't ready, and that he
22 collapses to the ground, that there is something
23 wrong.  They all say hypothetically, if they saw
24 something based on interpretation that something is
25 wrong they would take him back in.  I can't

LANDERS, M.D., CHARLES F.
02/09/2018

Page 65

1  understand why they didn't interpret it that way.
2      Q.    But you are concerned that they didn't
3  interpret it that way, true?
4      A.    Why else would he have called himself a
5  scape goat from the security guards in regards to
6  the police officers' testimony that he was
7  sandbagged by information that was inaccurate.
8  Shoemaker said he was up walking around without
9  assistance.  Shoemaker wasn't even there.
10     Q.    Do you recall my question?
11     A.    Yes.
12     Q.    Would you answer it please?
13     A.    I just did.
14           MR. HARRINGTON:  Asked and answered.
15     Q.    (By Mr. O'Loughlin) My question was, I
16  believe, Doctor, I heard you were concerned that
17  neither the security officers nor the police
18  officers believed and recognized that Mr. Dunigan
19  was in -- had some serious medical problem?
20     A.    What's the question?  There was no
21  question in that.
22     Q.    Do you agree -- you would agree that
23  neither the security officers nor the police
24  officers actually recognized that Mr. Dunigan had
25  any sort of medical problem, true?

Page 66

1      A.    I think they did not recognize it.
2      Q.    You think they did not recognize it, is
3  that what you said?
4      A.    Yes.  I have said that right along.
5      Q.    In your expert opinion, did Mr. Dunigan
6  have any responsibility for the events in this case?
7           MR. HARRINGTON:  Objection to form and
8  foundation, broad, vague, ambiguous.
9           THE WITNESS:  I think he is not the
10  responsible party.
11     Q.    (By Mr. O'Loughlin) Based upon all you
12  have reviewed, you are of the opinion Mr. Dunigan is
13  not responsible for any of the events in this case?
14           MR. HARRINGTON:  Objection to form and
15  foundation.  I am sorry, counsel, it is really,
16  really broad.  I don't know what you mean.
17           THE WITNESS:  There are a lot of events,
18  what time are you talking about?
19     Q.    (BY Mr. O'Loughlin) Was Mr. Dunigan
20  obligated in your opinion to provide an accurate
21  medical history in the emergency room?
22     A.    Yes.
23     Q.    Was Mr. Dunigan, in your opinion,
24  obligated to the follow sufficient recommendations?
25     A.    Yes.  I think he has some obligations to

Page 67

1  follow directions.  I have no indications he did
2  not.
3      Q.    Was Mr. Dunigan, as a presumed reasonable
4  person, obligated to advise someone if he was having
5  a severe medical problem?
6      A.    If he was capable of it, yes.
7      Q.    And was able to do so?
8      A.    Right.  If he was capable of it.
9      Q.    Based upon your review, are you aware of
10  whether Mr. Dunigan was compliant with his
11  recommended dialysis schedule?
12     A.    There are references in the Borgess record
13  that he, at times, was not compliant with his
14  dialysis schedule or other things.
15     Q.    Do you agree that he did have end of stage
16  renal disease?
17     A.    Yes.
18     Q.    Probably to effect the result of not
19  complying with a dialysis schedule to be with a
20  patient with end stage renal disease?
21     A.    He was still making urine and taking
22  diuretics, and it is not clear what the consequences
23  of skipping a dialysis session were in those
24  records.
25     Q.    Are you talking in general that would

Page 68

1  affect the consequences of failure in keeping to the
2  dialysis schedule to be a patient with end stage
3  renal disease would be?
4      A.    He could feel worse at the time when he
5  didn't get his dialysis from fluid overload or other
6  issues related to his health.
7      Q.    The article that you chose to look at from
8  the National Kidney Foundation, you believe that to
9  be authoritative?
10     A.    Not necessarily.  It is intended for
11  patients, and it gives broad answers to frequently
12  asked questions.
13     Q.    Do you believe it is reliable?
14     A.    I think it is a reliable source.  And I
15  have no reason to think it is not reliable.  It is
16  not authoritative.  It doesn't have the authors and
17  the references to each and every comment made in it.
18     Q.    Actually it has, Doctor.  It has about 167
19  references, does it not?
20     A.    No.  It is four pages and no references.
21     Q.    Oh, I am sorry.  I was looking at the
22  UpToDate information.  The UpToDate information has
23  167 references, true?
24     A.    Yes.  It is a different style document
25  from the electronic data base.

LANDERS, M.D., CHARLES F.
02/09/2018

1    Q.    Okay.  Let's go to the UpToDate document
2  that you pulled regarding patient survival and
3  maintenance dialysis.  Is that a reliable source?
4    A.    Yes.  I think it is reliable.  It carries
5  the authors biases but UpToDate in general is
6  reliable.
7    Q.    And does that publication from UpToDate
8  indicate that the patients who don't comply with
9  their dialysis schedule are more likely to suffer
10  death?
11    A.    It is one of the risks, yes.
12    Q.    Mr. Dunigan was subject to having a fatal
13  arrythmia at any time based upon his past medical
14  history, true?
15    MR. HARRINGTON:  Foundation and form.
16    THE WITNESS:  I suppose potentially at
17  risk but certainly not at special risk that day.
18  Most of his conditions were chronic.
19    Q.    (By Mr. O'Loughlin)  And those conditions
20  of diabetes, end stage renal disease and
21  cardiovascular disease all carry an independent risk
22  of suffering a fatal arrythmia, true?
23    A.    All through the same pathway.  It is all
24  diabetes and end stage renal disease, hypertension,
25  all things that he had.  The main risk is

1  cardiovascular disease.  And he had that but they
2  aren't separate risks.  They are all the same risk.
3    Q.    And that same risk is an increased -- an
4  increased risk of suffering a fatal arrythmia?
5    A.    I am sorry.  What did you say at the end?
6    Q.    That increased risk is the risk of
7  suffering a fatal arrythmia, among other things?
8    A.    Yes.
9    Q.    Patients can suffer fatal arrythmias even
10  in the hospital, and even with full and timely
11  resuscitated measures and still not be resuscitated,
12  true?
13    A.    True.
14    Q.    Are you aware of any statistics as to the
15  percentage survival of patients suffering from
16  arrythmias and undergoing resuscitation in the
17  hospital?
18    A.    Yes, I spent 25 years on a code blue
19  committee.  I was on every code.  I am very aware of
20  statistics at any given institution and the national
21  standards.
22    Q.    Okay.  What is the percentage -- survival
23  percentage of patients suffering arrythmia after
24  having resuscitation in the hospital?
25    A.    It is important when you say arrest, to

1  clarify it is a cardiopulmonary arrest, and the
2  cardiac arrest being the primary event.  It depends
3  on the kind of arrythmia or the setting in which it
4  happens.  If you take all comers, it is between 18
5  and 22 percent survive to go home independently.  He
6  had a pulseless electrical activity.  That is a
7  different resuscitation from what Dr. Schwartz says
8  he has, which is a ventricular fibrillation arrest.
9    Q.    A ventricular fibrillation arrest is one
10  of those in the group that you just talked about,
11  the arrest and the resuscitation attempted and be
12  unsuccessful in 18 to, what did you say, 25 percent
13  of the time?
14    A.    18 to 22 percent is the national average
15  in '16, and in large part it depends on the
16  patient's condition prior to the arrest.
17    Q.    Patients with diabetes, end stage renal
18  disease, cardiovascular disease and hypertension are
19  less likely to be successfully resuscitated
20  following an arrythmia.  Is that correct?
21    A.    Not necessarily.  Those things are chronic
22  conditions and are not necessarily the cause of the
23  arrhythmia arrest. Chronic renal failure is not by
24  itself a cause of an arrest.  It is the hyperkalemia
25  which this man had, which could be the precipitating

1  event.  Hypertension by itself does not cause
2  arrythmias.
3    The other things that he had do not
4  necessarily cause arrythmias.  You need a specific
5  cause.  In his situation, with his specific
6  arrythmia we have several clues as to what the cause
7  was.
8    Q.    Well, what was it?
9    A.    I think it is hyperkalemia, high potassium
10  in a patient who is due to be dialyzed and he had
11  pulmonary edema likely associated with hypoxia when
12  he is foaming at the mouth which was demonstrated at
13  his autopsy as two of the primary events.
14    Could the toxins in his system have
15  participated?  It is possible, but during his entire
16  ER stay he had no indication he was intoxicated nor
17  was there any indication that he took medications in
18  the ER, nor were there any medications in his
19  possession that he might have taken after the
20  technical discharge. So despite having some clinical
21  or chemical evidence for his having had toxins on
22  board, there is no clinical evidence of anything
23  like that.
24    So the hypoxia and hyperkalemia are the
25  most likely causes of the pulseless electrical

LANDERS, M.D., CHARLES F.
02/09/2018                                                                                    Pages 73—76

Page 73

1    activity.
2        Q.    Which of those --
3        A.    I am sorry.  You need to get closer to the
4    speaker again.
5        Q.    Which of those is it, hyper or hypo?
6        A.    Hyper,  high potassium.
7        Q.    Okay.  Was it hyperkalemia or hypoxia that
8    caused Mr. Dunigan to, in your opinion, be unable to
9    stand up?
10       A.    I think that the weakness associated with
11   end stage renal disease, while having metabolic
12   events with hyperglycemia and hyperkalemia can
13   certainly lead to weakness that someone is not able
14   to stand alone, particularly someone with a previous
15   stroke and left hemiparalysis.
16       Q.    Based upon the statistics you provided and
17   your experience as a critical care physician and a
18   reviewer of in-hospital codes, would you agree that
19   according to those percentages, even if Mr. Dunigan
20   suffered a cardiac arrest in the emergency room, he
21   had a less than 50 percent chance of survival?
22       A.    Yes.  I think that is true.  The whole
23   point is to prevent the arrest by treating him when
24   he has a change in status with distress, not wait
25   until the arrest and then try to resuscitate him.

Page 74

1    That was totally unsuccessful at the jail.
2        Q.    And you can't say it would have been any
3    more successful if it was in the emergency room
4    department, true?
5        A.    Correct.  He needed to be treated before
6    he had a life threatening or life-ending arrythmia.
7    That is why he needed timely attention.
8        Q.    Are you able to offer an opinion as to
9    what treatment he would have received if he had been
10   taken back to the emergency department?
11       A.    As I mentioned in my report, I think he
12   needed a set of vital signs, a set of labs.  He
13   needed supplemental oxygen.  With his dramatic
14   hyperkalemia discovered at autopsy, he would have
15   needed reversing of that.  It is done with IV
16   calcium and an IV bicarbonate solution and then
17   proceeding to dialysis that is readily available at
18   Bronson.
19              The reassessment, while he is having
20   snoring respirations and foaming at the mouth was
21   subsequently demonstrated to be pulmonary edema.
22   Supplemental oxygen and respiratory support in the
23   emergency room is readily available.  And evaluation
24   for the toxicology findings that they found at
25   autopsy could easily have been done in the emergency

Page 75

1    room and reversed the narcotic effect with IV
2    Narcan that reverses within minutes the respiratory
3    distress and decompensation that he had in the back
4    of the police car.  So he needed supportive care
5    under the direction of trained medical people who
6    already knew him.
7        Q.    Up to the time he had been back in the
8    police car, do you know whether Mr. Dunigan ever had
9    abnormal vitals signs?
10       A.    Well, they weren't taken on discharge from
11   the ER or in the next several hours or when he was
12   laying on the ground, so he had no vital signs
13   taken.  We don't know what they were.
14       Q.    Which would mean that you are not able to
15   say that he had abnormal vital signs at any time up
16   until the time he was placed the police car, true?
17       A.    We don't have any vital signs until he was
18   dead.  None were taken.  So they weren't normal or
19   abnormal.  There is no information.
20       Q.    Are you able to offer an opinion as to
21   whether, if taken, any of his vitals signs would
22   have been abnormal up to the time he was placed in
23   the police car?
24       A.    It is hard to say.  I think he was in
25   distress and likely would have had abnormal vitals.

Page 76

1    It was from the hypertension.  I expect that would
2    have been a common scenario with somebody who has
3    been having pain in the chest and was unable to walk
4    to have high blood pressure.  He had a high heart
5    rate when he came in.  It would be fully  expectable
6    for him to have a higher heart rate again.  He had
7    snoring respirations.  It would be plausible that he
8    would have an increased respiratory rate at that
9    time, but no vitals were taken, therefore, guessing
10   about his vitals is not productive.  He was in
11   distress and got no vitals.
12       Q.    The question is whether or not you believe
13   you can guess about his vitals?
14       A.    I have been told in the past not to guess
15   in depositions.   I think he would likely have had
16   abnormal vitals but I don't have to guess about
17   that.
18              Before he had died, he had abnormal
19   vitals.
20       Q.    I am not talking about before he died.  I
21   am talking about before he was placed in the police
22   car,  it would be speculation for you say that if
23   vital signs were taken they would have been
24   abnormal?
25       A.    I think they likely would have been

LANDERS, M.D., CHARLES F.
02/09/2018

Page 77

1  abnormal as I mentioned, but I don't think it is a
2  guess.
3      Q.    You are claiming you can offer an opinion
4  he would have had hypertension, high blood pressure?
5      A.    I think that is one of the vital sign
6  abnormalities that he could have demonstrated.  It
7  fits well with developing pulmonary edema.  He had
8  diastolic dysfunction on his previous multiple
9  admissions and evaluations.  Diastolic dysfunction
10  means your heart doesn't work when your blood
11  pressure is high.
12      When he is collapsed onto the pavement and
13  his legs don't work and is being abused verbally, I
14  think that is a situation which his high blood
15  pressure would likely have manifested itself and
16  could easily be the reason, in part, for his change
17  in status with foaming at the mouth and developing
18  pulmonary edema and going downhill.  He clearly had
19  a change in status.
20      Q.    Is it your expert opinion that Mr. Dunigan
21  had a change in status and deterioration because he
22  was verbally abused?
23      A.    I don't think the verbal abuse helped him.
24      Q.    That is not my question.  Are you able to
25  say --

Page 78

1      A.    I think it is a contributor.
2      Q.    Are you able to say within a 50 percent
3  probability that any verbal abuse Mr. Dunigan may
4  have suffered contributed to his demise?
5      A.    His verbal and physical abuse contributed
6  to his demise.  I can say that.  It is not the only
7  thing.
8      Q.    I am talking about the verbal abuse.  You
9  are going to sit there and say that as a medical
10  expert it is greater than 50 percent that what was
11  said to Mr. Dunigan contributed to his demise?
12      A.    Yes.  It contributed to his poor outcome.
13      Q.    How?
14      A.    I have just gone through, high blood
15  pressure and high heart rate while collapsing on the
16  floor and being sworn at with vulgarities and told
17  you are faking is not a situation that people
18  respond to well.
19      And I think as part of his decompensation
20  that occurred during the time when he is unable to
21  walk and laying on the ground and being handcuffed
22  and put into the car with three people putting him
23  in the floor in the back seat, those are not things
24  that I would expect people to just have normal
25  vitals signs with.  And abnormal vitals signs

Page 79

1  participate in his decompensation and contributed to
2  his death.
3      Q.    You are testifying he that was placed on
4  the floor of the police car?
5      A.    That is what the video looks like.  He had
6  his head on one side supported by Art Carlisle and
7  the others had his feet when they put him in.  When
8  they stopped the car what they say is one minute
9  into the transport he was wedged down between the
10  seat and the cage on the floor.
11      Q.    But that is not where he was placed
12  originally, true?
13      A.    I can't tell that.  I can't see anything
14  on the video.
15      Q.    You can't?
16      A.    In the video that is taken at Bronson
17  that, while they are putting him in the car,
18  Carlisle blocks any view I have.  And they have to
19  push the door closed with Dunigan's upper body and
20  head against the left-hand rear door.  Then the
21  video I have of him in the car is when they stop and
22  he is in obvious distress.
23      Q.    The camera in the police video is in the
24  car, true?
25      A.    Yes.

Page 80

1      Q.    And it shows Mr. Dunigan on the seat
2  initially, does it not?
3      A.    I don't have that.  All I have is from
4  when they stopped the car.  I don't have the entire
5  police in-car video.  They say it was one minute
6  later and he is down between the seat and the cage
7  on the floor.
8      I don't have any information except the
9  Bronson video that shows the three of them laying
10  him horizontally in the back.  I have no information
11  that he is setting upright in the police car.  There
12  may be a video but I haven't seen it.
13      Q.    And no information that he was placed on
14  the floor in the back seat of the police car either,
15  true?
16      A.    First time I see him a minute later he is
17  on the floor after having been delivered into the
18  car by three security officers.  And one of them had
19  to put -- reach in from the left side and assist him
20  across the back.  That is the part I saw.
21      Q.    So you can't say that, without
22  speculation, he was placed on the floor of the
23  police vehicle initially?
24      A.    No.  He may have been placed on the seat
25  horizontally.  I just don't have any video

**LANDERS, M.D., CHARLES F.**
02/09/2018

Page 81

1    confirmation of that.
2        Q.    So it would be speculation for you to
3    state that he was placed on the floor in the back
4    seat of the police car, true?
5        A.    I have told you the two points in time
6    that I have information.  One is when he placed in
7    by three people with Carlisle bringing him across to
8    the left-hand side of the back of the car near the
9    door.  And then one minute later he is on the floor.
10   I don't have the entire time.  That is all I have.
11       Q.    So you would agree with me it would be
12   speculation for you to say that he was placed on the
13   floor in the back seat of the police car initially?
14       A.    He may have been on the seat at one point
15   but extrapolating from those two points in time it
16   it is not as if he is sitting up in the normal
17   position.  And I don't think it is speculation.
18       Q.    So you can say without speculation that
19   Mr. Dunigan was placed on the floor in the back of
20   the police car rather than on the seat?
21             MR. HARRINGTON:  Objection to form and
22   foundation.  That's not what he is saying.
23             THE WITNESS:  I didn't say that.
24             MR. O'LOUGHLIN:  I thought it was exactly
25   what he said.

Page 82

1             THE WITNESS:  No, it is not.  Read the
2    transcript.
3        Q.    (By Mr. O'Loughlin)  Was he initially
4    placed on the seat or on the floor in the back of
5    the police car?
6        A.    I can't tell.  I am blocked by Carlisle
7    who has his head against the left rear door, that
8    may be on left of the seat, but within one minute,
9    according to the driver of the car, Shaffer, he is
10   hearing snoring and stops.  And he is at that point
11   wedged between the cage and the front of the rear
12   seats.  Those are the two points in time that I
13   have.
14       Q.    And with that information are you able to
15   conclude without speculation that he was initially
16   placed on the floor rather than on the seat?
17       A.    He may have been placed on the seat, but I
18   have no information he was sitting upright in the
19   way that would be the normal position of someone
20   sitting on a car seat.
21       Q.    Meaning you would have to speculate as to
22   whether he was placed on the seat or on the floor?
23       A.    I am not trying to speculate.  I have
24   those two points in time.  He was dragged into the
25   car and was in a horizontal position when he was put

Page 83

1    in.  When they stopped the car because he was having
2    distress, he was in a horizontal position then.  He
3    was not in a normal sitting in the seat orientation
4    as far as I can tell.
5             And if you would like to ask that a few
6    more times, I will tell you that again.
7        Q.    Thank you.  We are going down this road
8    because you earlier testified that he was placed on
9    the floor of the police car.
10       A.    That's what it looked like to me when they
11   were -- they put him in a position horizontally in
12   the back of the car, and within a minute he was on
13   the floor.  At that time, he was in clear distress.
14       Q.    Wouldn't you want to look at a video from
15   inside the police car before you decided that?
16       A.    I would be glad to look at any information
17   that was made available to me, particularly the
18   audio.  I don't have every image and every audio.  I
19   am told that there is a microphone inside the car.
20   The only information I have about the inside of the
21   car is from partial videos, including the time when
22   they stopped the car a minute after they left.
23       Q.    Do you know why you didn't receive all of
24   the videos?
25       A.    No, I don't.  I received an immense amount

Page 84

1    of video, but it didn't include all of the ones that
2    occurred in the jail either.  But I don't -- some of
3    those were something I don't know about their
4    availability.  I would be glad to look at them.
5        Q.    Of the video you did see, when the
6    officers stopped to check on Mr. Dunigan, did that
7    portion of the video have an audio?
8        A.    I believe so, yes.  Yes.  That is when
9    they flashed a light in his face and say he is
10   faking and do no further assessment.
11             MR. O'LOUGHLIN:  I am going to pass the
12   witness at this time.  And we are going to take a
13   brief break.
14             MR. HARRINGTON:  Okay.  Thank you.
15             ( A break was taken in the deposition
16   after which the following proceedings were held:)
17       Q.    (By Mr. O'Loughlin)  Doctor, I have passed
18   the witness but I have one more area that he
19   mentioned earlier, and that is from new opinions and
20   notes and articles that you made after reviewing the
21   report from Dr. Schwartz.
22       A.    Yes.
23       Q.    Could you tell me what you are talking
24   about?
25       A.    This is another UpToDate article and the

LANDERS, M.D., CHARLES F.
02/09/2018
Pages 85–88

Page 85

1 title of the 14-page chapter is Supportive Data For
2 Advanced Cardiac Life Support and Adults With Sudden
3 Cardiac Arrest.  And it gets into the arrythmias
4 associated with sudden death, which I think is
5 pulseless electrical activity, which is what they
6 saw in the monitor in the jail.  He opined that it
7 was a ventricular fibrillation and that he says a
8 lot of other things, but in the article it gives the
9 classic lists of conditions associated with
10 pulseless electrical activity arrest.
11        On page 5 of that, there are several
12 paragraphs that go through that.  And from that I
13 made some handwritten notes of what are called the 5
14 Hs and Ts, which are the various diagnostic
15 categories associated with P-E-A arrest, several of
16 which we have already talked about.  But that is a
17 single page of handwritten notes and the UpToDate
18 article are the results of reading Dr. Schwartz
19 report with which I have multiple disagreements.
20    Q.    All right.  First of all, do you have the
21 article and your notes marked as Exhibit G?
22    A.    Sure.  The article I think is 14. This one
23 is 15.
24    Q.    All right.  Could you read your notes into
25 the record, Doctor?

Page 86

1    A.    Surely.  It says 5 Hs, capital H and Ts.
2 The H were hypoxia, hypovolemia. H access which is
3 hydrogen ion access or acidosis. Hypo, hyperkalemia
4 and last one is hypothermia.
5        Under the Ts, it is toxins, tamponade,
6 T-A-M-P-O-N-O-D-E, tension pneumothorax, thrombosis
7 pulmonary, and thrombosis coronary.
8        My next note is regarding the
9 hyperkalemia.  It is increased K, meaning
10 hyperkalemia.  The treatment as we have talked about
11 is calcium and bicarb.  And then --
12    Q.    I am sorry.  Are you reading --
13    A.    This is what my notes say.
14    Q.    Are you reading from your notes?
15    A.    Yes.
16    Q.    Okay.  I am just asking you to read
17 exactly what your notes say.
18    A.    All right.  That line says increased K,
19 calcium, comma bicarb. There is a note to myself
20 check EMS glucose and I found the glucose that they
21 obtained, it was 172.  And that is it.
22    Q.    Okay.  And a glucose of 172 obtained by
23 the EMT does not indicate a diabetic crisis, does
24 it?
25    A.    No.  It is abnormally high but not a

Page 87

1 crisis.
2    Q.    Not even something that would require
3 treatment in the absence of other symptoms?
4    A.    Well, it could be used as an avenue for
5 treatment, if they had done lab work in the
6 emergency room and discovered the high potassium.
7 Insulin is the other way to bring the potassium down
8 and you would have room with a glucose of 172 to
9 give some insulin in addition to bicarb and calcium.
10 So it is important to know, more to know that it is
11 not 500 or 20.  Part of the reason I looked, was on
12 the autopsy the fluid on his vitreous was only 14.
13    Q.    Okay.  Let me try it again.  We are
14 talking about the glucose of 127, and that is not a
15 level indicating diabetic crisis or requiring
16 treatment, true?
17    A.    You misspoke.  I believe it is 172.  And
18 if there were a reason to use insulin as an acute
19 treatment for the hyperkalemia, it could be done
20 without giving additional glucose.  The glucose by
21 itself does not require treatment.
22    Q.    That was my question.  So let's try to
23 stick to that.
24        You would agree that a glucose level of
25 172 obtained by the EMTs and known to Dr. Rigot

Page 88

1 would not indicate a diabetic crisis or require
2 treatment in the absence of other symptoms, true?
3    A.    Yes.  It does not require emergency
4 treatment in the absence of other data or symptoms.
5    Q.    Thank you.  Why is that article important
6 in the context of this case?
7    A.    Well, Dr. Schwartz prepared a report. He
8 thought that the life-threatening arrythmia was most
9 likely ventricular fibrillation.  In the data from
10 the case there is no ventricular fibrillation.  The
11 AED did not see a shockable rhythm and the rhythm
12 strip showed P-E-A.  He goes on to explain how bad
13 ventricular fibrillation is, but Mr. Dunigan has no
14 indication that he has that.
15        He also says that had they stopped the car
16 to check him he wouldn't have had any vital signs.
17 He appears not to know that they stopped the car and
18 checked him.  The P-E-A seems the most likely to me
19 and this article is about the causes of P-E-A.
20    Q.    All right.  Just a couple of questions on
21 that.  An initial arrythmia and ventricular
22 fibrillation can cause a fatal arrest, and then
23 later when the patient is placed on a monitor could
24 appear as pulseless electrical activity, true?
25    A.    No.  That is highly unlikely.  If you have

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 89–92

Page 89

1  ventricular fibrillation and they come along and 15
2  minutes later with the ambulance arriving and then
3  it takes some time to set it up, you will be dead.
4  If you started with course ventricular fibrillation,
5  it would become fine ventricular fibrillation, and
6  the AED would have reconized that as a shockable
7  arrythmia.  And you wouldn't have P-E-A, which is an
8  electrical rhythm which looks normal but no pulse.
9  Those don't go together.  The end point for
10 ventricular fibrillation not treated with
11 cardioversion is death.  It doesn't degenerate to
12 P-E-A.
13     Q.    And why does that matter in this case?
14     A.    Because they saw P-E-A, and Dr. Schwartz
15 is wrong, I think.  There is a lot of things in there
16 that I didn't understand or I thought were wrong in
17 his report.
18     Q.    The end results of P-E-A or defib,
19 untreated, is death, true?
20     A.    It may well be, yes.  P-E-A has a lot more
21 treatable options with those 10 Hs and Ts.  It gives
22 you a directed treatment to reverse the cause for
23 the P-E-A.  That is the part about the calcium
24 bicarb and insulin and reversing the hypoxia
25 immediately.

Page 90

1          MR. O'LOUGHLIN:  All right.  I will pass
2  the witness.
3               EXAMINATION
4  BY MR. VANDERLAAN:
5      Q.    Once again, Doctor, I represent Officers
6  Nugent and Shaffer.  Officer Shaffer arrived at the
7  hospital approximately 5:45 a.m. on the 6th.
8  Officer Shaffer was the officer that brought the car
9  to pick up Mr. Dunigan?
10     A.    Did you say he came at 5:45?
11     Q.    Approximately close to that.  I just want
12 to concentrate on the two officers who I represent.
13     A.    Sure, I don't think he came that evening.
14     Q.    Well, the testimony will show otherwise.
15 You are wrong.
16          You are not an expert in the area of
17 police policies and procedures in the state of
18 Michigan, are you?
19     A.    No.
20     Q.    You have never testified as an expert in
21 that area in the state of Michigan, correct?
22     A.    No.  That's not correct.
23     Q.    You have never gone to a police academy,
24 correct?
25     A.    Correct.

Page 91

1      Q.    You do not know the requirements that
2  MCOLES, which is the licensing agency for the state
3  of Michigan, requires for a police officer, correct?
4      A.    Correct.
5      Q.    Would I also be fair in assuming that you
6  have never worked as road patrol officer, correct?
7      A.    As a what?  Control officer?
8      Q.    A road patrol officer?
9      A.    R-O-A-D?
10     Q.    Correct.
11     A.    No, I have not.
12     Q.    It would also be fair to assume that you
13 have never made an arrest of an individual?
14     A.    Correct.
15     Q.    Would I also be fair in assuming that you
16 have never given an expert opinion about how a
17 police officer, a Michigan police officer with EMT
18 training, should handle an arrest of a citizen?
19     A.    I am not sure about the EMT training but I
20 have testified about police officers and death in
21 custody.
22     Q.    I would be fair in assuming that you have
23 never been qualified as an expert in the area of how
24 a police officer in the state of Michigan with EMT
25 training could qualify in or arresting a citizen?

Page 92

1          MR. HARRINGTON:  Object to form and
2  foundation, with the part of the testimony involving
3  his medical training and experience.
4      Q.    (By Mr. Vanderlaan)  You have never been
5  qualified, it is fairly simple, you haven't been
6  qualified in that particular area, correct?
7          MR. HARRINGTON:  Form and foundation.
8  Form and foundation.
9          THE WITNESS:  I am sorry could I have it
10 read back or say it again there are too many
11 interruptions here.
12          MR. VANDERLAAN:  Could Ruth read it back,
13 please?
14          (The following question was read back:
15          You have never been qualified, it is
16          fairly simple, you haven't been qualified
17          in that particular area, correct?)
18          THE WITNESS:  I am not sure what the
19 qualify has to do with it.  Maybe you can state it
20 again.
21     Q.    (By Mr. Vanderlaan)  I don't think either
22 -- I -- okay.  You have never specifically been
23 qualified as an expert in the area of testifying
24 regarding a police officer in the state of Michigan
25 with EMT training goes about arresting a citizen?

LANDERS, M.D., CHARLES F.
02/09/2018                                                                 Pages 93–96

Page 93

1          MR. HARRINGTON:  Objection to form and
2    foundation.
3          THE WITNESS:  Correct.
4     Q.    (By Mr. Vanderlaan)  Okay.  Thank you.
5          Would be fair to assume you are not going
6    to be providing expert opinions what a reasonable
7    police officer in the state of Michigan would do in
8    arresting an individual?
9          MR. HARRINGTON:  Form and foundation, over
10   broad, vague, ambiguous.  You don't know what I am
11   going to be asking him.
12         THE WITNESS:  Regarding the arrest
13   specifically, I would agree with that.
14    Q.    (By Mr. Vanderlaan)  Thank you.
15         Would I be fair in saying that there is
16   nothing in your unique education and background and
17   training as a medical doctor that qualifies you to
18   give opinions about how officers go about their
19   business here in the state of Michigan?
20         MR. HARRINGTON:  Objection to form and
21   foundation, vague and overbroad.
22         THE WITNESS:  Well, I don't.  Are you
23   talking about this kind of transporting of a medical
24   patient, or are you talking about all of the other
25   things they do?

Page 94

1     Q.    (By Mr. Vanderlaan)  What I am trying to
2    get at, Doctor, is that I understand you have
3    opinions in this case.  I can show that video to 100
4    people.  They are all going to have opinions.  Your
5    wife may have seen the video.  She has got an
6    opinion.
7          What I am wondering is, is there anything
8    that is unique about your experience, training,
9    education and background that qualifies you to give
10   opinions about the actions of Officers Nugent and
11   Shaffer, or is it just obvious to anybody?  That is
12   all.
13         MR. HARRINGTON:  Form and foundation.
14         THE WITNESS:  Well, during my training I
15   spent about 20 percent of my time in the emergency
16   room setting for the first three years as an
17   internal medicine intern and resident.  Within the
18   emergency room at the University of California, San
19   Diego, there was designed specifically for prisoners
20   who were under arrest, a part of the emergency room
21   that was sequestered off from the rest, and in which
22   everybody spent time evaluating people, admitting
23   people to the hospital or sending them back to jail
24   with an assessment.  And that included recognizing
25   when someone could not be handled in jail and was

Page 95

1    going to come right back if you sent them there.
2          And as a fellow the next two years after
3    that I supported myself moonlighting in emergency
4    rooms throughout San Diego County.  For the next
5    three and a half years after that I worked as full
6    time emergency room attending and at that time was
7    board qualified to take the ER boards dealing with
8    the same jail population and prisoners in a downtown
9    urban hospital.  So I do have significant experience
10   with the issues of people who are noncompliant,
11   homeless, and have had a background of using drugs.
12   I have a significant experience with people like Mr.
13   Dunigan and his issues.
14         To the extent that that answers your
15   question, you wanted to know if I had specific
16   training and experience.  That is what I have.
17    Q.    I appreciate that, Doctor.  And perhaps
18   those qualifications would uniquely qualify you to
19   give opinions regarding how a person should treat
20   the homeless, deal with the homeless or people on
21   drugs in a hospital or emergency room setting.  I
22   understand that.  But what I am getting at is that
23   there is nothing that uniquely qualifies -- that
24   uniquely qualifies you, with your background and
25   education, to give criticisms about a Michigan

Page 96

1    police officer and how they go about arresting an
2    individual?
3     A.    Not about arresting --
4          MR. HARRINGTON:  Hang on.  Hang on.  I
5    object to form and foundation.
6          And, Allan, if I may, I think what I hear
7    you are saying.  You are trying to eliminate him
8    from being able to testify to police procedure.  My
9    objection, just to get it out on the air, is that it
10   is going to stem from his recognition of his serious
11   medical conditions.  That is all I am trying to do.
12   So I know where you are going.  I don't think it
13   will happen, you know, but I am not going to stand
14   in your way.  I am going to ask you to tailor it a
15   little bit more to actual police procedure.
16         Does that make sense?
17         MR. VANDERLAAN:  So, if you are telling me
18   that you are not going to use him as an expert to
19   testify to police procedures and say that here is
20   where the officers dropped the ball based upon my
21   expertise in this area, you have another expert who
22   I am sure will do that, this will be very short.
23         If you are going to just use him to say
24   the guy had a serious medical problem and here is
25   how I can tell, that I can understand.

LANDERS, M.D., CHARLES F.
02/09/2018

Page 97

1    MR. HARRINGTON:  What I am understanding
2  and here is where I am going with Dr. Landers as it
3  relates to your client, Allan, is that I expect Dr.
4  Landers to provide testimony that at the time that
5  your clients were involved my client was suffering
6  from a serious medical condition that you can see on
7  the video that they should have recognized, and
8  should have known and done something with that.  It
9  is not how he was arrested, whether or not it was
10 valid or anything like that.
11      Does that make sense?
12      MR. VANDERLAAN:  Sure.
13   Q.   (By Mr. Vanderlaan)  Doctor, I take it
14 your testimony would be that not just a police
15 officer but anybody looking at this fellow should
16 have known that he was under a medical distress, am
17 I correct on that?
18   A.   Yes.
19   Q.   Okay.  All right.  Then let me just do
20 some cleaning up.  And I was looking at your report
21 and that's what I want to focus on.  And we still
22 have your opinions on page 3.  I think it is the
23 last sentence of the first paragraph.  You said
24 rather than respond to his distress he was accused
25 of acting.

Page 98

1      At what point in time did someone say --
2  what are you talking about there and who are you
3  talking about?
4    A.   When he was in the back of the police car,
5  my perception was, and apparently their perception
6  was there were worrisome things while they were
7  traveling.  He was four blocks from the hospital.
8  They said it was a minute away.  They thought he was
9  breathing poorly, snoring.  To look at him on the
10 video taken at that time, he was unresponsive, had
11 fallen down between the seats and was flaccid, had
12 to be lifted up to be repositioned.
13      When they flashed the light in his face
14 they said he blinked.  That is not an assessment of
15 a mental status of someone who is -- has diminished
16 level of consciousness.  And rather than respond to
17 his distress as noted at that time, he was accused
18 of acting.
19      That is the two police officers involved,
20 Nugent and Shaffer.  Shaffer is the man who I
21 believe is the EMT who did a sternal rub and said
22 that he was acting.
23   Q.   Well, the police officers did a sternal
24 rub in the back of the police car, flashed a light
25 in his eyes, in their minds he was reactive and they

Page 99

1  thought, to their minds he was breathing, correct?
2  Is that you are understanding?
3    A.   Yes.  They said, you are okay, you are
4  acting, and they lifted him up onto the seat.
5    Q.   Okay.  But those three things that I said
6  that is what the officers did, correct?  I don't
7  want to argue about whether it was enough or
8  whatever.
9    A.   No.  They lifted him up in the seat, and
10 they flashed a light in his eyes.  And I think they
11 did a sternal rub, at least briefly.  Those are the
12 ones you mentioned that I remember.
13   Q.   Do you have any information at all at that
14 point either one of those officers said, we know he
15 is in medical distress, we know he is going to die,
16 we don't care, and we are taking him to jail?  You
17 are not saying that, are you?
18   A.   No.  They didn't say that and I don't
19 believe that they would have said that.
20   Q.   So you are not saying that?
21   A.   I am not saying that.
22   Q.   Okay.  I guess what I am hearing you say
23 is that they dropped the ball?
24   A.   Yes.  They say that if they thought they
25 recognized something they should have taken him for

Page 100

1  medical attention.  Their perception was that he
2  didn't have a medical emergency.
3    Q.   Thank you.
4      And the second full paragraph under
5  opinions, about five lines up, the first paragraph
6  ends with that Mr. Dunigan died in the police car.
7  Did I summarize that accurately?  Is that your
8  opinion he died in the police car?
9    A.   Yes.
10   Q.   And what is that based upon?
11   A.   Well, when they got to the place where the
12 people in jail were going to take over and take him
13 out of the car, these two officers left and were
14 going to do paperwork.  And when the officers tried
15 to get him out of the car he had -- at that time he
16 was unresponsive and he never had vitals after that.
17   Q.   Were you aware that it is the county
18 sheriff's department procedure that when officers
19 bring an arrestee to the jail then they leave and
20 that the corrections officers or deputies of the
21 department take over and get the subject out of the
22 jail?  Did you know that -- or out of the car?
23   A.   That's what the officers who were
24 transporting said and I have no reason to doubt that
25 that was routine.

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

LANDERS, M.D., CHARLES F.
02/09/2018                                                        Pages 101–104

1    Q.    As far as where Mr. Dunigan died, what I
2  am wondering is, did you mean to say he died in the
3  car --
4          Did you mean to say he died in the car
5  because it is my understanding that a doctor
6  pronounced him deceased when he was outside the car?
7    A.    Well, he was pronounced dead at 7:40 after
8  unsuccessful resuscitation.  But he never had any
9  signs of life at the police headquarters or jail
10  after he was taken out of the car.  There was an
11  officer who with his left hand did a sternal rub and
12  thought there might be a moan.  Well, a moan is not
13  the response you would expect for an awake, alert,
14  oriented person who has signs of life.  And there
15  were no attempts to take vitals signs at that time.
16  He was placed in a wheelchair and taken in.
17          The nurse then saw him.  She, after they
18  put the oximeter on his finger, was told that he
19  didn't have any pulse or any oxygen.  And at that
20  time they started resuscitation.  That sudden death
21  occurred before the resuscitation, despite his being
22  pronounced at 7:40.
23    Q.    Would it be more accurate to say that Mr.
24  Dunigan did not exhibit signs of life when they are
25  taking him out of the car as opposed to he died in

1  the car?
2    A.    Those to me are quibbling.  He had had no
3  signs of life from the time he was taken out of the
4  the car.  And I think that is the time when he had a
5  cardiac pulmonary arrest.  The fact that his death
6  was pronounced an hour later is a technicality
7  related to having the intern come over from the
8  hospital in the van and try to resuscitate him.  As
9  soon as they took him out of the car he was dead.
10    Q.    Were you aware that one of the corrections
11  officers had stated that Mr. Dunigan was breathing
12  when he took him out of the car?
13    A.    The thing I remember was the sternal rub
14  with his left hand, and some evidence for a groan.
15  If he was indeed breathing, he died shortly after
16  and not at the moment before they opened the door.
17    Q.    Your point of the deputies or corrections
18  officers is to say that if he was breathing when
19  they took him out of the car, would that be
20  considered a sign of life?
21    A.    Yes, it was.  He was barely breathing when
22  they stopped the car for the four minutes
23  previously.
24    Q.    And what do you base that upon?
25    A.    The video.

1    Q.    What was it in the video that causes you
2  to say that he was barely breathing?
3    A.    He had foam around his mouth, and it
4  looked to me like he had what I would refer to as
5  agonal breathing, a pattern just before death, with
6  a slow rate.  Most people in distress breathe fast
7  and complain.  He was not complaining.  He was
8  flaccid and had foam around his mouth and minimal
9  breathing effort as was described in the autopsy.
10    Q.    Are you able to see the foam around Mr.
11  Dunigan's mouth in the video?
12    A.    Yes.
13    Q.    So if you and I watch that video together
14  it is your recollection that you would be able to
15  stop it at a point and say that is foam around the
16  mouth?
17    A.    That is my recollection.  And that was the
18  testimony of the officers as well.
19    Q.    Well, the testimony of the officer who had
20  qualified that and said it was a poor choice of
21  words I believe.  He had some spittle in the corners
22  of the mouth.  So staying away from what the officer
23  said, I was wondering if that was something that you
24  recall seeing in the video such that you would say
25  he was foaming at the mouth?

1    A.    That was my recollection, yes.
2    Q.    All right.  The last, I think it is the
3  last paragraph -- I am sorry.  I am looking at the
4  second full paragraph where it says, maybe four
5  lines up, Mr. Dunigan died from neglect of his basic
6  needs.  Do you see that?
7    A.    Yes.
8    Q.    And then the last part of the last
9  sentence says that Mr. Dunigan needed reevaluation
10  in the emergency department, not callous disregard
11  for his distress.
12          What do you mean by that?  That seems to
13  me to notch it up a level of almost willful neglect,
14  and I don't believe you are testifying to that?
15    A.    I am not saying it is willful that they
16  decided that he was distress and then decided to
17  drive on anyway.  I thought it was obvious that he
18  was in distress.  They stopped the car.  They did an
19  inadequate evaluation.  And he was clearly in
20  distress based on the video and their version of
21  what happened and they went on to the jail instead
22  of going back to the ER.
23    Q.    Let me give you a hypothetical, which I
24  hope is based upon the testimony and you correct me
25  if I am wrong.  I want you to assume these two

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 105–108

---

Page 105

1  officers have testified as to their belief that
2  because Mr. Dunigan was medically discharged that he
3  was good to go, and that they took him to jail, and
4  that they relied on other officers telling them
5  that Mr. Dunigan was acting.  So right or wrong, and
6  I realize in hindsight he obviously wasn't.  I get
7  that.  But do you still have a criticism of these
8  officers who will testify as to the number of times
9  they take somebody from the hospital to the jail as
10  to not thinking this guy was dying.  Do you still
11  have a criticism?  Or did I state that poorly?
12      A.    I think I understood the background you
13  were giving.
14      Q.    Okay.
15      A.    I think that nonetheless the observations
16  they made, the reason they stopped the car their
17  concern he was not doing well was all appropriate.
18  It is just the response to his observed condition at
19  that time necessitated going back.
20          I am not saying that many people wouldn't
21  have survived to get to jail, but there was a change
22  in this man's status, and the fact that they relied
23  on information that came from other people is a
24  starting place.  But when there is a change in
25  status, then it is time to reassess, not to assume

Page 106

1  that everything is the way it was hours before when
2  discharged.
3      Q.    And do you have an opinion on what would
4  have happened if the officers had either would have
5  gone back to the hospital or perhaps called an
6  ambulance to the scene?  Do you have an opinion one
7  way or the other, or not?
8      A.    Yes.  I think he would have survived.
9  That is the last paragraph of my opinions.  He
10  needed attention to his distress.  The attention was
11  best delivered by people who are already familiar
12  with his condition and had seen him previously, knew
13  about all of the things that had happened earlier,
14  and the most practical is to take him directly.
15  Calling another ambulance responder would incur
16  delay and -- but either way had he been seen and
17  evaluated by medical personnel there were things to
18  do that would have saved his life.
19      Q.    And then it is your opinion that had his
20  life been saved, he would have had a life expectancy
21  give or take of five years, correct?  Did I hear
22  that correctly earlier?
23      A.    Yeah.  That was my estimate.  Dr. Schwartz
24  was very critical of the pathologist who offered an
25  opinion about life expectancy.  And unfortunately

Page 107

1  Dr. Schwartz didn't offer any, and so I just -- I
2  looked at the things I am familiar with about how
3  long people on dialysis with co-morbidities live.  I
4  am not an actuary.  This, as you said, is give or
5  take five years.
6      Q.    And I just want to touch on this before I
7  stop. There a lot about this area, and that is Mr.
8  Dunigan's own responsibility here.  I don't think he
9  was getting at in terms of the fall, but is it your
10  experience that someone who is not experiencing, you
11  know, what Mr. Dunigan may have been experiencing
12  should have said, A, don't take me to jail, take me
13  back to the ER, there is something wrong with me, or
14  something along those lines?
15      A.    To the extent that he would have been
16  capable of doing that, I think that is a hoped for
17  expectation.  By the time they stopped the car, he
18  looked to me like he would not be able to
19  communicate anything.
20      Q.    Do you have an opinion as to what point in
21  that timeline Mr. Dunigan went into cardiac arrest?
22      A.    Well, to the extent that there is
23  testimony that a sternal rub resulted in a moan and
24  you mentioned that the officer has stated that he
25  thought he was breathing, then he didn't have a

Page 108

1  cardiac arrest until after that point.  Cardiac
2  arrest virtually immediately leads to respiratory
3  arrest and unconsciousness.
4      Q.    Thank you, Doctor, for your time.  I hope
5  there is enough time for you to get out ski.  And
6  thank you, sir.
7          MR. O'LOUGHLIN:  I have a couple of more.
8          MR. HARRINGTON:  I have a few questions.
9  Just a second, Doctor.
10              EXAMINATION
11  BY MR. HARRINGTON:
12          Prior to Mr. Dunigan's discharge from
13  Bronson was he suffering from a serious medical
14  condition needing serious medical treatment?
15          MR. O'LOUGHLIN:  Form and foundation.
16  What do you mean by discharge?
17      Q.    (By Mr. Harrington)  You understand that
18  Mr. Dunigan was provided with a discharge, including
19  discharge, I guess, papers from Bronson, correct?
20      A.    Yes.
21      Q.    And prior to that time was he suffering
22  from a serious medical condition requiring medical
23  treatment?
24      A.    Yes.
25      Q.    After discharge and before defendants

Page 109

1  Nugent and Shaffer became involved, was Mr. Dunigan
2  suffering from a serious medical condition requiring
3  medical intervention?
4      A.    Yes.
5      Q.    Had the medical intervention been provided
6  either prior to discharge or after discharge and
7  still before Officers Nugent and Shaffer's
8  involvement, would Mr. Dunigan have survived May 6,
9  2016?
10     A.    Yes.
11           MR. O'LOUGHLIN:  Form and foundation.
12     Q.    (By Mr. Harrington)  After the arrival of
13  Mr. -- I am sorry, Officer Shaffer and Officer
14  Nugent into the picture with Mr. Dunigan, was Mr.
15  Dunigan suffering from an emergency medical
16  condition requiring treatment?
17     A.    Yes.
18     Q.    As you see the events transpire on the
19  videos that were provided, is this something that
20  was observable to you?
21     A.    Yes.
22     Q.    Was this something that was observable to
23  you as a medical professional?
24     A.    Yes.
25     Q.    Was it something observable to you as a

Page 110

1  lay individual?
2      A.    Yes.
3            MR. O'LOUGHLIN:  Form and foundation.
4            MR. VANDERLAAN:  Same objection.
5            MR. HARRINGTON:  And the same question --
6            MR. VANDERLAAN:  As an aside, could we
7  just, I would like to have an agreement that when
8  Mr. O'Loughlin makes an objection, put me down too,
9  thank you, because you can't hear me.
10     Q.    (By Mr. Harrington)  While Mr. Dunigan
11  was in the waiting room after he had been
12  discharged, was it observable to you that he was
13  suffering from an emergency medical condition?
14     A.    Yes.
15           MR. O'LOUGHLIN:  Form and foundation.
16     Q.    (By Mr. Harrington)  Was it observable to
17  you as a trained medical professional that he was
18  suffering from an emergency medical condition while
19  waiting in the emergency room?
20     A.    Yes.
21     Q.    Also as a lay professional or a
22  individual, I mean?
23           MR. O'LOUGHLIN:  Same.
24           THE WITNESS:  Yes.
25     Q.    (By Mr. Harrington)  Doctor, you saw the

Page 111

1  video of Mr. Dunigan in the waiting area after he
2  was discharged, is that correct?
3      A.    Yes.
4      Q.    And you saw that there were nurses that
5  had had some interaction with Mr. Dunigan?
6      A.    Yes.
7      Q.    You saw --
8            MR. O'LOUGHLIN:  Form and foundation.
9      Q.    (By Mr. Harrington)  You saw that there
10  were other hospital employees that had or that were
11  at least within vision of Mr. Dunigan?
12     A.    Correct.
13     Q.    And you have testified that you have
14  knowledge, training and experience as to how
15  emergency departments work?
16     A.    Yes.
17     Q.    If somebody is in visible distress or
18  should reasonably be believed to be in visible
19  distress, say even post discharge, what is the
20  requirements of hospital personnel such as people,
21  either nurses or people in registration, what are
22  they required to do if they observe something?
23           MR. O'LOUGHLIN:  Form and foundation.
24           **THE WITNESS:  They bring them back into
25  the triage area, reinitiate paperwork, and have them**

Page 112

1  **medically screened and reevaluated.**
2      Q.    (By Mr. Harrington)  And based on your
3  review of the video showing Mr. Dunigan in the
4  waiting area in conjunction with visualizing
5  hospital employees in the vicinity of and having an
6  opportunity to observe Mr. Dunigan, and based on
7  your experience in emergency department settings,
8  what is it that the hospital staff should have done?
9      A.    **They should have approached him, talked to
10  him about what they perceived to be going on and
11  offer to bring him back to the emergency room for
12  further evaluation and care.**
13     Q.    And had they done all of that, what would
14  have happened?
15     A.    **I think it would have been  --**
16           MR. O'LOUGHLIN:  Form and foundation.
17  Sorry.
18           **THE WITNESS:  I think it would have been
19  recognized that he was seriously ill and had issues
20  that needed to be treated and that treatment would
21  have been initiated as I have talked about.**
22     Q.    (By Mr. Harrington)  And had all of that
23  been done, would Mr. Dunigan have survived May 6,
24  2016?
25     A.    Yes.

LANDERS, M.D., CHARLES F.
02/09/2018                                                                  Pages 113—116

Page 113

1       MR. O'LOUGHLIN:  Form and foundation.
2       Q.    (By Mr. Harrington)  Understanding all of
3  this, was Mr. Dunigan allowed off of Bronson
4  Hospital campus in an unstable condition?
5       A.    I am sorry.  At which time?
6       MR. O'LAUGHLIN:  Form and foundation.
7       Q.    (By Mr. Harrington) Fair enough.  You
8  understand that Mr. Dunigan was taken off of Bronson
9  Hospital campus, correct?
10      A.    Yes, at about 6:40.
11      Q.    When he left Bronson's campus, was he in a
12 stable or unstable condition?
13      A.    Unstable.
14      Q.    In your understanding of EMTALA, and in
15 conjunction with your prior experience working in
16 emergency departments, does the requirements of
17 EMTALA apply to all hospital staff that would even
18 include security?
19      A.    Yes, and they --
20      MR. O'LOUGHLIN:  Form and foundation.
21      THE WITNESS:  They talk about being
22 trained in EMTALA --
23      MR. O'LOUGHLIN:  We are talking over each
24 other.  Let me restate my objection. Let me restate
25 my objection to form and foundation.

Page 114

1            And my question was, do you really want to
2  do this, Jim, because it is going to go into a lot
3  more questions about who is witnessing because
4  anybody would have violated EMPALA.
5            MR. HARRINGTON:  Well, yeah, because part
6  of my claim against your client is that EMTALA was
7  violated by multiple people.
8            MR. O'LOUGHLIN:  So it does affect your
9  entire claim?
10           MR. HARRINGTON:  So, yeah.  I mean.  So he
11 just said yes.
12           Is that correct, Doctor, that this applies
13 to security staff as well.
14      THE WITNESS:  Yes.  That's what they said
15 and they had been trained with and that would be my
16 understanding.
17      Q.    (By Mr. Harrington) And at the time the
18 hospital security staff was engaged with Mr. Dunigan
19 do you have any opinion as to whether or not he was
20 suffering from a serious medical condition
21 observable to them?
22      A.    I think he was.
23      MR. O'LOUGHLIN:  Form and foundation.
24      Q.    (By Mr. Harrington)  And that they were
25 therefore acting reasonable and prudent?  Under the

Page 115

1  circumstances, what should the hospital security
2  staff have done?
3       A.    Taken him back to the triage nurse after
4  asking him if he needed or wanted help, and he was
5  ten feet away from their desk, get the triage nurse
6  to reassess him and restart the process of him being
7  an emergency patient.
8       Q.    In your experience as a physician have you
9  ever given any type of lectures or speeches or
10 discussions or talks or anything like that to
11 individuals such as, say, registration, nurses and
12 or security staff?
13      A.    The topic being?
14      Q.    Being somewhat of a quasi EMTALA training,
15 where you talk to individuals, you know, say if this
16 is witnessed or that they are this seeing this,
17 this is what you do?  Go ahead.
18      A.    Yes.  I have talked to people about EMTALA
19 and it is partly the kinds of things you are talking
20 about, if you see someone anywhere on the campus, in
21 a parking structure, in the men's room or anywhere
22 else that EMTALA applies.
23            The other much more common circumstance
24 for EMTALA to involve me was as a medical director
25 of the ICU where someone at another hospital would

Page 116

1  be calling asking to transfer a patient for a
2  perceived higher level of care, and that also falls
3  into the EMTALA discussion.  And the emergency room
4  doctor or emergency nurse or the ICU nurse or the
5  discharge nurse in the ICU should not take it upon
6  themselves to say no to that request nor refer it on
7  to the physician in charge for an assessment and
8  also for an assessment is an EMTALA violation to
9  not comply with that request.
10      Q.    One of the things that you have said in
11 answering my question, you said something about
12 those people, and are you referring to security
13 individuals as well?
14      A.    It could be anybody who is employed in the
15 areas around the emergency room, or in my example,
16 in the ICU.  It can't be -- it could be an ICU
17 setting.  It could be a secretary.  It could be a
18 security officer in the ER.  It could be anybody.
19      Q.    Right.  And in your specific experience
20 and training as a physician have some of those talks
21 that you have given included talks to security
22 personnel?
23      A.    Yes security, respiratory therapists,
24 nurses, secretaries and clerical people, the greeter
25 at the main entrance to the hospital as well as

LANDERS, M.D., CHARLES F.
02/09/2018                                                                Pages 117–120

Page 117

1   people that work the grounds around the hospital who
2   are all employees of the hospital.
3       Q.   And in reviewing all of the facts that you
4   reviewed watching the video, have you reached a
5   conclusion to whether or not the EMTALA statute was
6   violated with respect to Mr. Dunigan?
7       A.   Yes.
8           MR. O'LOUGHLIN:  Form and foundation.
9       Q.   (By Mr. Harrington)  I am sorry.  What was
10  the answer?
11      A.   Yes, I think it was violated when he was
12  sent off to jail while in need of medical attention.
13      Q.   You have testified, have you not, in cases
14  involving police officers?
15      A.   I have.
16          MR. HARRINGTON:  That is all I have.
17  Thank you.
18                   EXAMINATION
19  BY MR. O'LOUGHLIN:
20      Q.   Doctor, this is Jack O'Loughlin.  I have
21  few more as you might expect.
22          First of all, you have no criticisms of
23  the resuscitation efforts based upon everything you
24  have reviewed, do you?
25      A.   Sorry.  What point in time?

Page 118

1       Q.   At the jail.
2       A.   At the jail?
3       Q.   Yes.
4       A.   No.  I have limited information from a
5   note from Dr. Patell who was the intern who went to
6   the site and he did what sounded like the
7   appropriate things.  I don't have rhythm strips.
8           MR. HARRINGTON:  And counsel -- counsel,
9   just to make it easier, I am not advancing any
10  theory against Dr. Patell's involvement that he
11  could have done anything to save Mr. Dunigan, if
12  that makes it easier.
13      Q.   (By Mr. O'Loughlin)  I was pretty sure you
14  weren't.  So far nothing makes it easier, but I
15  would like an answer to my question.
16          Doctor, you have no criticisms of the
17  resuscitation efforts based upon evidence at the
18  jail based upon evidence you reviewed, true?
19      A.   True.
20          MR. HARRINGTON:  Performed by Dr. Patell.
21          THE WITNESS:  Patell and the personnel at
22  the jail who started before he did and assisted.
23      Q.   (By Mr. O' Loughlin)  Okay.  So we get a
24  clear record, you don't have any criticisms of the
25  resuscitation effort at the jail by anyone, true?

Page 119

1       A.   True.
2       Q.   You read the autopsy report?
3       A.   I did.
4       Q.   And the toxicology and lab results?
5       A.   I did.
6       Q.   Were any of the drugs found in Mr.
7   Dunigan's system at a toxic level?
8       A.   Yes, some were.
9       Q.   Which ones?
10      A.   I would have to have the sheet in front of
11  me.
12      Q.   What are you basing the -- how are you
13  making a determination as to whether any of those
14  drugs found were at a toxic level?
15      A.   Well, I guess there is two different
16  versions.  One is a therapeutic level.  When a
17  prescribed drug is on board there are target zones
18  for levels which may be exceeded in some cases.
19          The other is that there are some drugs
20  that are always a toxin in the system for which
21  there is no therapeutic level, for example, cocaine.
22  So having cocaine in his system in the preceding
23  five days raises a question whether that is part of
24  what may have precipitated his decompansation.
25          I am just looking for the lab work.  Do

Page 120

1   you want me to go through that in detail?
2       Q.   No.  I want to ask the same question with
3   a better ending of the terms.  If you assume that
4   toxic level means a level that would cause a
5   patient's death, do you know whether any of the
6   drugs found in Mr. Dunigan's system were at a level
7   which would cause the patient's death?
8           MR. HARRINGTON:  Form and foundation.
9           THE WITNESS:  Many of the reports do not
10  give an actual level.  For example, having
11  amphetamine in the system is a potential risk for
12  cardiovascular instability.  Having cocaine
13  metabolites,  which to me means cocaine in the
14  preceding 4 to 6 days has the potential to cause
15  issues with cardiovascular instability.
16          Having hydrocodone positive and at a level
17  above the therapeutic range has the potential to
18  have a respiratory depressant affect. The other
19  drugs, Benadryl and Gabapentin, have nothing to do
20  with that.
21      Q.   Are you familiar with the term toxic level
22  in the sense that I used it?
23      A.   I am not exactly sure how you used it.
24  You are saying it has the potential for being life
25  threatening?

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 121–124

Page 121

1    Q.   I am saying at a level that would cause
2  death?  And if you don't know, you can say you don't
3  know.  Are you a toxicologist?
4    A.   I am not a toxicologist and I don't use
5  that term that way.
6    Q.   All right.  I am asking you to assume that
7  that definition of toxic level in context of this
8  question.  Are you able to say whether any of the
9  drugs found at autopsy in Mr. Dunigan's system were
10 at a toxic level, meaning a level that would have
11 caused his death?
12      MR. HARRINGTON:  Form and foundation.
13      THE WITNESS:  In and of itself?
14   Q.   (By Mr. O'Loughlin)  Each one?
15   A.   Yes.  I think he had many things in his
16 system but not any single one at a lethal level
17 based on the toxicology.
18   Q.   Thank you.
19      Now are you able to say whether the drugs
20 that was found in his system combined, were at a
21 toxic level, again meaning a toxic level as a level
22 that would cause his death?
23      MR. HARRINGTON:  Form and foundation.
24      THE WITNESS:  I can't say that.  I don't
25 have an opinion that says that about the

Page 122

1  combination.
2    Q.   (By Mr. O'Loughlin)  Thank you.
3      Based upon your review of the autopsy, was
4  Mr. Dunigan's death caused by anything that the
5  police officers or security guards did to him
6  physically?
7    A.   I don't think so, no.
8    Q.   Since there was no evidence of trauma in
9  the autopsy, other than the rib fractures, which I
10 believe were attributable to the CPR, did you see
11 any other evidence of trauma, anything that
12 dramatically caused his death?
13   A.   There was blood accumulation within the
14 soft tissue of the chest as well as the rib
15 fractures.  Rib fractures could have been from the
16 fall and/or CPR, but I see no evidence of excessive
17 force or police action that is reflected in the
18 autopsy.
19   Q.   Okay.  There were no rib fractures
20 detected at the hospital before he was discharged
21 from the emergency department, were there?
22   A.   No.  Rib films are notoriously difficult
23 to see.  Rib fractures are commonly missed.
24   Q.   And which side did he fall on?
25   A.   Right.

Page 123

1    Q.   If he fell on his right side and suffered
2  rib fractures, where would you expect them to be?
3    A.   Most likely on the right.
4    Q.   If the rib fractures detected at autopsy
5  with in the anterior parasternal line would that
6  make you think they were caused during the chest
7  compressions of CPR?
8    A.   It is compatible with that.  But he had
9  two kinds of trauma, one was prolonged
10 resuscitation, which is the most likely cause.  And
11 the other is that he had had a chest wall contusion
12 and a fall, which could contribute.  I think more
13 likely it is CPR related.
14   Q.   If Mr. Dunigan, as you said earlier, died
15 in the car, would you agree that you could not say
16 to a medical probability that he would have been
17 salvageable if he had been returned to the hospital
18 after the officers stopped to check on him?
19   A.   Well, they said they were a minute away
20 and then four blocks away.  I think that was time to
21 have returned him to the emergency room and have
22 reassessed and retreated was at that time.
23      I think that going on to jail and then
24 having him assessed and putting him in a wheelchair
25 and take him inside, and he has his event, there was

Page 124

1  a window of opportunity from the time they stopped
2  the car to take him back.  That is why I thought
3  that he could have been saved at that time or
4  preferably earlier when he had signs of medical
5  problems before they even left.
6    Q.   All right.  That's not my question.  First
7  of all, I want to talk from the time the officers
8  stopped to check to him on the way to the jail to
9  the time that you believe he was not salvageable,
10 what was that period of time?
11   A.   I don't have an exact number, but it is
12 approximately 15 minutes -- 15.
13   Q.   And are you able to state --
14      (Reporter asking to witness to repeat.)
15   Q.   And it was 1-5?
16   A.   Yes.
17   Q.   If he had been returned to the emergency
18 department by the police officers, what do you
19 expect would have happened?
20   A.   I believe we have talked about this
21 already.  Are you talking about something new?
22   Q.   No.  I am talking about every single step
23 from pulling up to the hospital?
24   A.   I would expect them to have their -- their
25 flashing lights, their siren, and to have one of the

LANDERS, M.D., CHARLES F.
02/09/2018                                                              Pages 125–128

Page 125

1  officers call ahead and say that they were bringing
2  an emergency.
3           I would expect the people in the emergency
4  room to greet them at the place where the road loops
5  around in front of the emergency room and expedite
6  getting him out of the car on a gurney and into the
7  ER.
8           He looked terrible. Then the emergency
9  room physician would see him in an expedited way and
10 start the interventions that I talked about in my
11 report and today.
12      Q.    How would you know what interventions to
13 give?
14      A.    Well, at the very least they would have
15 evaluated him with a history and then an exam, IV
16 access, labs, supplemental oxygen, and treat the
17 serious potentially life-threatening problems in a
18 differential, which we could have prevented.
19           They already knew him. The simple
20 components of putting on an EKG monitor, obtaining
21 an electrocardiogram and drawing lab work,
22 including an arterial blood gas, starting an IV to
23 give medications.  To the extent they thought their
24 was any drugs involved, giving Narcan to reverse
25 drug effects, listening to him, giving him

Page 126

1  diuretics.  Even though he is in renal failure, he
2  is making urine and is on diuretics.  And then on
3  the EKG there are specific changes of elevated
4  potassium, which in an emergency then leads to
5  giving the insulin, calcium and bicarb, to initiate
6  resuscitation.  Those are the things we talked about
7  before and those are the things I am talking about
8  now.
9       Q.    How long would that take?
10      A.    Minutes.
11      Q.    How many minutes?
12      A.    Two or three minutes, put on the oximeter,
13 get a set of vitals signs, listen to him, decide
14 whether you need to intubate or just put on oxygen,
15 obtain an EKG.  Those things take minutes.
16      Q.    How about labs?
17      A.    Some of the labs are point of care labs
18 where as soon as you draw the blood you can run them
19 through a bedside piece of equipment that gives you
20 potassium and sodium, BUN, creatinine and arterial
21 blood gases, those things take less than five
22 minutes to run.  To see acidosis, those are things
23 in the emergency room can be done very rapidly.
24 Anywhere else they cannot.
25      Q.    And what allows you to offer the opinion

Page 127

1  that those separate events and under that
2  hypothetical situation would have allowed him to
3  survive?
4       A.    Forty years of doing exactly that, in the
5  ICU and going to the ER to help with people who are
6  being resuscitated is what I have spent my entire
7  career doing.
8       Q.    Okay.  And based upon that experience I
9  presume you have gone to the ER and have seen people
10 resuscitated without success?
11      A.    Oh, yeah.  Yes.
12      Q.    More often than not, according to your
13 earlier testimony, that even with a witness
14 performing a resuscitation with a cardiac arrest
15 less than 50 percent survive?
16      A.    If you wait until people arrest it is much
17 more difficult to have a successful resuscitation.
18 The whole concept that I think is the most important
19 is preventing the arrest by addressing the medical
20 decompensation earlier, otherwise it is too little
21 too late.
22      Q.    And had Mr. Dunigan arrested as of the
23 time they stopped to check on him?
24      A.    Pardon me?
25      Q.    Had Mr. Dunigan arrested as of the time

Page 128

1  they stopped to check on him?
2       A.    No.  They said he was still breathing and
3  on the rest of the trip had some snoring breathing
4  and the testimony about the sternal rub and moan,
5  and he was still breathing at the jail, that means
6  he had not had a cardiopulmonary arrest in the car
7  during the four minute stop.
8       Q.    When did he have the cardiopulmonary
9  arrest?
10      A.    Shortly after he arrived in the jail. The
11 moan and the breathing was noted, but by the time
12 they got him inside in the wheelchair, one report
13 says they put an oximeter on and there was no
14 result.  They put -- that also gives you a pulse
15 reading.  They changed it to another finger.  He had
16 none, and then he had arrested.  So it is within a
17 very brief time of the time he arrived. The jail
18 police officers did a brief assessment, and then
19 subsequently had no vital signs.  So I don't think
20 so it happened while he was in the car during the
21 stop or he would not have been breathing and those
22 things happen later.
23      Q.    All right.  Let's talk about EMTALA,
24 Doctor.  Mr. Harrington has now attempted to
25 establish you are an expert on.   What does the

LANDERS, M.D., CHARLES F.
02/09/2018                                                        Pages 129–132

Page 129

1   EMTALA statute say?
2        A.    I am not an experienced person with it.  I
3   wouldn't pretend to be an expert.  I have been
4   instructed about how to apply it to my practice and
5   I know the emergency room facility people have been
6   instructed about how to apply it to them.
7        Q.    What does EMTALA stand for?
8        A.    It is not -- in broad lay terms, it is a
9   no dumping law where if somebody comes to you, you
10  can't just send them away without having at least
11  done a screening medical evaluation if they request
12  it.
13       Q.    Do you understand that EMTALA is an
14  acronym?
15       A.    Yes.
16       Q.    Do you know what it is an acronym for?
17       A.    It is emergency medicine treatment and
18  then I don't know the rest of the numbers or names.
19  It is not too important to me.
20       Q.    Do you know what the statute says?
21       A.    I told you what I have been told.  I have
22  not read the law and I do not know what the statute
23  says.  I have had it interpreted to me by risk
24  management people for the hospital as well as
25  emergency, the head of the emergency room who deal

Page 130

1   with it every day.  My kind of involvement was with
2   inner facility transport, transfers.
3        Q.    Do you claim that EMTALA was in any way
4   violated by Bronson Hospital up to the point that
5   Mr. Dunigan was discharged from the emergency
6   department and wheeled into the waiting room?
7        A.    No.
8        Q.    I think this was covered earlier but I
9   should cover it again.  Do you know of any evidence
10  that while on Bronson's premises any Bronson
11  employee actually recognized and had actual
12  knowledge that Mr. Dunigan had an emergency medical
13  condition?
14              MR. HARRINGTON:  Form and foundation.
15              THE WITNESS:  No.  It is their subsequent
16  testimony that they did not think he had an
17  emergency.
18       Q.    (By Mr. O'Loughlin)  You are not aware of
19  any evidence to the contrary, true?
20              MR. HARRINGTON:  Foundation and form.
21              THE WITNESS:  About their thoughts, I have
22  no other information.
23       Q.    (By Mr. O'Loughlin)  At the time he
24  initially came to the emergency department via EMS,
25  you would agree that Mr. Dunigan did not have severe

Page 131

1   symptoms, such that the absence of immediate medical
2   attention would be expected to result in his death,
3   true?
4        A.    No.  In 9 and out of 10 pain --
5        Q.    True?
6        A.    He had 9 out of 10 chest pain and I think
7   you cannot say based on his presentation that he
8   didn't have anything life threatening.  That's why
9   he was there.
10       Q.    Okay.  But you are not, as I understood
11  earlier, you are not critical of the evaluation he
12  received in the emergency department, are you?
13       A.    I am not.  You are talking about when he
14  presented.
15       Q.    And what you are saying that his symptoms
16  of 9 out of 10 chest pain in and of themselves could
17  be a life-threatening condition?
18       A.    Sure.   In a complicated man with
19  dialysis, diabetes, heart disease, hypertension and
20  previous stroke and dizzy.
21       Q.    And with the specific history he gave of a
22  mechanical fall and trauma to his chest or flank,
23  would that explain the source of those same
24  complaints?
25       A.    That was the emergency room physician's

Page 132

1   interpretation. The actual evidence that was a
2   mechanical fall, that his cane tip slipped or
3   something happened is something I don't see in the
4   record.  The nurse said he was dizzy, and the
5   patient struck the ground after a fall.  There was
6   no loss of consciousness, despite what Dr. Schwartz
7   says, and I think it probably is a mechanical fall.
8   But it is not a mechanical fall as described by the
9   patient, I didn't think.
10              That was the conclusion made, but I think
11  that to ignore the fact that the guy had heart
12  disease, was dizzy, and not evaluate his cardiac
13  condition is one of the questions in the care that I
14  assume will be addressed by the emergency room
15  expert for the plaintiffs.  That is Saul Levine.
16       Q.    Did Mr. Dunigan give the history that his
17  chest pain complaints were caused by a fall where he
18  hit his chest or right flank?
19       A.    Yes, but that's not to say it is
20  mechanical, if you are dizzy.  Dr. Schartz thinks he
21  arrythmia then.  I don't see evidence for either as
22  being definitive.  I suppose you can call it a
23  mechanical fall because he hit the ground, but what
24  caused the fall.  That is the ultimate question
25  about whether it is mechanical or not.

LANDERS, M.D., CHARLES F.
02/09/2018                                                        Pages 133–136

Page 133

1    Q.    Given his history of a fall, which the
2  patient reported, was the source of his chest pain
3  was he reasonably screened when he was in the
4  emergency department?
5           MR. HARRINGTON:  Objection to form.
6           THE WITNESS:  You want to talk standard of
7  care for the emergency room evaluation?  I thought
8  that was going to be somebody else?
9           MR. HARRINGTON:  Doctor, go ahead.  He
10  asked you a question.  Go ahead and answer as you
11  see fit.
12          THE WITNESS:  I think anybody with a known
13  cardiac disease, previous MI on dialysis with a fall
14  with chest discomfort needs to be put on an EKG
15  monitor and have a 12-lead electrocardiogram done at
16  a minimum, as well as having lab work done about the
17  status of his metabolic situation as a diabetic with
18  end stage rental disease.
19    Q.    Do you recognize this is not a negligence
20  or a malpractice case?
21    A.    Yes.
22          MR. HARRINGTON:  Well, I would object.
23  That is currently pending in this action.
24          MR. O'LOUGHLIN:  That is the one we are
25  taking the deposition in, Jim.  I guess we are going

Page 134

1  to have to take his deposition again.
2           MR. HARRINGTON:  Yes, I know.  We will.
3  That's what I am saying, we will.  When you said
4  this case, I don't know if you are referring to
5  solely the case number, you know, that has a EMTALA
6  case or in a broad sense the case referring to the
7  care and treatment of Mr. Dunigan.
8           MR. O'LOUGHLIN:  To my knowledge there is
9  no other case.
10          MR. HARRINGTON:  Not yet.
11          MR. O'LOUGHLIN:  Which means at present,
12  when I am asking the question there is no other
13  case, true?
14          MR. HARRINGTON:  No, there has not been
15  one filed.  I just want to make sure our definitions
16  of the case are the same.  Sometimes physicians
17  would use the word case as in the entire care and
18  treatment of the patient, and sometimes us lawyers
19  when we say case, all we are referring to is just
20  the current case number.  That is all.  I just want
21  to make sure we are on the same page.
22    Q.    (By Mr. O'Loughlin) Doctor, amongst the
23  things you reviewed were the Complaint and Amended
24  Complaint, true?
25    A.    I think there were comments in the

Page 135

1  complaint that wouldn't have been things that I
2  would have been responsible for, or the way I would
3  have said them.  They were prepared at the beginning
4  of the case by the attorneys involved and some of
5  the things in that are not the things that I would
6  have put in.
7    Q.    Do you recall my question?
8    A.    Yes.
9    Q.    My question was, among the things you
10  reviewed, on the list of things that you reviewed
11  were the Complaint and Amended Complaint, true?
12    A.    Yes.
13    Q.    Do you understand the case against Bronson
14  Methodist Hospital are pending currently in federal
15  court in which they supposedly today allege any
16  liability on the part of Bronson other than for an
17  alleged violation of EMTALA?
18    A.    I think that is the bulk of the Complaint.
19  What I am referring to is the historical description
20  in the Complaint that describes his condition.
21    Q.    Assuming that the only theory of liability
22  against Bronson, in this pending lawsuit, is for a
23  violation of EMTALA.  You have agreed that Bronson
24  did not violate EMTALA at any point up until Mr.
25  Dunigan was discharged from the emergency room

Page 136

1  department to the waiting room, true?
2    A.    Yeah.  I think I said that before.
3    Q.    After that time you would agree that there
4  was never another time when Mr. Dunigan presented to
5  the emergency room department seeking medical care,
6  true?
7    A.    True.
8    Q.    And you agree that based upon your review
9  and everything you have seen in the case, no one
10  from Bronson Hospital ever actually determined that
11  Mr. Dunigan had a life-threatening emergency medical
12  condition, true?
13          MR. HARRINGTON:  Objection to form.
14          THE WITNESS:  Yes.  There is nothing that
15  says they thought that.  No one asked him if he
16  wanted to be seen again as far as I could tell.
17    Q.    (By Mr. O'Loughlin)  And he never said he
18  wanted to be seen again, true?
19    A.    Again, true.
20    Q.    Mr. Harrington asked you about the nurses
21  interaction with Mr. Dunigan, and I believe he was
22  referring to him while he was in the waiting room.
23  Are you aware of any intervention between the nurses
24  or medical assistants sitting at the desk in the
25  video and Mr. Dunigan?

LANDERS, M.D., CHARLES F.
02/09/2018

Pages 137–140

Page 137

1    A.    There is one note I had in the eight pages
2  of notes about the 9 video tapes that he looked up
3  to the triage area but there was no interaction that
4  I could detect.
5    Q.    Are you aware of any evidence in that the
6  nurses or medical assistants sitting next to the
7  desk adjacent to the waiting room ever determined
8  actually that Mr. Dunigan had an emergency medical
9  condition?
10   A.    Again, no.
11   Q.    After he was discharged?
12   A.    Correct.
13         MR. O'LOUGHLIN:  Thank you, Doctor.  That
14  is all I have.
15         MR. HARRINGTON:  Anything, Allan?
16         MR. VANDERLAAN:  No.  I am good.
17               EXAMINATION
18  BY MR. HARRINGTON:
19   Q.    I have one question, Doctor.  What?
20         MR. O'LOUGHLIN:  I just said he said no.
21   Q.    (By Mr. Harrington) I have just have one
22  question, Doctor.
23         Should the Bronson staff previously
24  identified reasonably have known that Mr. Dunigan
25  was suffering from a life-threatening medical

Page 138

1  condition at the time -- I am sorry -- after his
2  discharge?
3    A.    Yes.
4         MR. HARRINGTON:  Okay.
5               EXAMINATION
6  BY MR. O'LOUGHLIN:
7    Q.    Oh, Jim.
8         Which of the Bronson staff should have
9  recognized that, Doctor?
10   A.    The security officers who were interacting
11  with him about leaving the emergency room, getting
12  him into the wheelchair, getting him out of the
13  wheelchair onto the ground. There were four of them,
14  I believe, who were involved.
15   Q.    Any other Bronson staff or employee who
16  you believe should have recognized Mr. Dunigan had
17  an emergency medical condition?
18   A.    I don't have detailed information about
19  the triage nurse at the time, but based on the
20  deposition it seemed that she did not have any
21  specific information.  It is the security officers.
22   Q.    Okay.  So when Mr. Harrington asked you
23  about the Bronson staff you said they should have
24  recognized an emergency medical condition, you were
25  talking only about security guards, true?

Page 139

1    A.    Correct.
2         MR. O'LOUGHLIN:  Thank you.
3         MR. HARRINGTON:  I have a question.  What
4  about the women that we see working at the
5  administration desk within eyeshot of Mr. Dunigan,
6  would they be included in that as well?
7         MR. O'LOUGHLIN:  Form and foundation.
8         THE WITNESS:  They had the opportunity but
9  based on their deposition testimony, the
10  registration folks and triage nurse, they had no
11  awareness.
12         The question is whether they should have
13  had an awareness, I think, falls mainly to the
14  security officers who see that he can't stand up and
15  when he gets outside there that the registration and
16  triage people would not have that opportunity.
17         The only opportunity I saw was when he
18  tried to stand up and stumbled forward and needed
19  two people who helped him get in the wheelchair.
20  That is a potential opportunity, and I  don't have
21  detailed information.  I know they didn't get
22  involved.
23         MR. HARRINGTON:  Thank you, Doctor.  I am
24  done.
25         MR. O'LOUGHLIN:  Thank you, Doctor.

Page 140

1         THE WITNESS:  Stipulations?  Do I need to
2  read?
3         MR. VANDERLAAN:  They don't do that in
4  Michigan that I know of.
5         MR. HARRINGTON:  Michigan doesn't have the
6  read and sign like Ohio or some other states do that
7  you fill out an erata sheet.  We don't have that.
8         (Whereupon the deposition was concluded at
9  1:51 p.m.)

LANDERS, M.D., CHARLES F.
02/09/2018                                                                                      Pages 141

```
                                                    Page 141
 1
     State of Colorado  )
 2                      )  ss
     County of Gunnison )
 3
                REPORTER'S CERTIFICATE
 4
 5           I, Ruth E. Collins, do hereby certify that
 6   I am a Registered Professional Reporter and Notary
 7   Public within the State of Colorado; that previous
 8   to the commencement of the examination, the deponent
 9   was duly sworn to testify to the truth.
10           I further certify that this deposition was
11   taken in shorthand by me at the time and place
12   herein set forth, and that the foregoing constitutes
13   a true and correct transcript.
14           I further certify that I am not related
15   to, employed by, nor of counsel for any of the
16   parties or attorneys herein, nor otherwise
17   interested in the result of the within action.
18           In witness whereof, I have affixed my
19   signature this 22nd day of February, 2018.
20           My commission expires December 15, 2020.
21
22           _____
             Ruth E. Collins, RPR, CSR
23           73 Slate Lane
             Crested Butte, CO  81224
24
25
```

Exhibit 6

{00541599.DOCX}

**In the Matter Of:**

DUNIGAN vs BRONSON METHODIST HOSPITAL

SAUL LEVINE, M.D.

February 27, 2018

*Prepared for you by*



Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

LEVINE, M.D., SAUL
02/27/2018

Pages 1–4

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2             WESTERN DISTRICT OF MICHIGAN
 3                  SOUTHERN DIVISION
 4   GORDA DUNIGAN, as Personal
     Representative for the ESTATE
 5   OF JAMES DUNIGAN, Deceased,
 6             Plaintiff,
 7        vs.                 CASE NO. 1:16:CV-01324
 8   BRONSON METHODIST HOSPITAL,
 9             Defendant.
     _____
10
     GORDA DUNIGAN, as Personal
11   Representative for the ESTATE
     OF JAMES DUNIGAN, Deceased,
12
              Plaintiff,
13
          vs.                 CASE NO. 1:16:CV-01325
14
     DEREK NUGENT, et al.,
15
              Defendants.
16   _____
17
18   VIDEOCONFERENCE DEPOSITION OF EXPERT SAUL LEVINE, M.D.
19
20               February 27, 2018
21                   8:03 a.m.
22           1230 Columbia Street, Suite 400
23               San Diego, California
24
25   REPORTED BY:  Renée C. Roberts, CSR No. 6910
```

**Page 2**

```
 1   APPEARANCES:
 2
         For Plaintiff:
 3
             FIEGER, FIEGER, KENNEY & HARRINGTON
 4           JAMES J. HARRINGTON
             19390 West 10 Mile Road
 5           Southfield, Michigan 48075
             248.355.5555
 6           j.harrington@fiegerlaw.com
 7
 8       For Defendant Bronson Methodist Hospital:
 9           SMITH HAUGHEY RICE & ROEGGE
             JOHN C. O'LOUGHLIN
10           100 Monroe Center NW
             Grand Rapids, Michigan 49503
11           616.774.8000
             joloughlin@shrr.com
12
13
14       For Defendants Nugent, et al.:
15           CUMMINGS MCCLOREY DAVIS & ACHO, PLC
             ALLAN C. VANDERLAAN
16           2851 Charlevoix Drive SE, Suite 327
             Grand Rapids, Michigan 49546
17           616.975.7470
             avanderlaan@cmda-law.com
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX TO EXAMINATION
 2
 3          WITNESS:  SAUL LEVINE, M.D
 4   EXAMINATION                        PAGE
 5   By Mr. O'Loughlin             5, 119, 144
 6   By Mr. VanderLaan               109, 115
 7   By Mr. Harrington               112, 141
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1              INDEX TO EXHIBITS
 2                   EXPERT
 3               SAUL LEVINE, M.D
 4   Dunigan vs. Bronson Methodist Hospital, et al.
 5          Tuesday, February 27, 2018
 6          Renée C. Roberts, CSR No. 6910
 7
 8   MARKED         DESCRIPTION            PAGE
 9   Exhibit 1   Life EMS Ambulance records      19
10   Exhibit 2   Excerpts from Harwood-Nuss'     21
                 Clinical Practice of Emergency
11               Medicine, Fourth Edition
12   Exhibit 3   Article from Nephrology entitled  22
                 "Serum Potassium Levels and
13               Mortality in Hemodialysis Patients:
                 A Retrospective Cohort Study"
14
     Exhibit 4   EMTALA statute                  23
15
     Exhibit 5   Handwritten notes made by witness  24
16               from review of Borgess records
17
18
19
20
21
22
23
24
25
```

LEVINE, M.D., SAUL
02/27/2018                                                                    Pages 5–8

Page 5

1              San Diego, California;
2         Tuesday, February 27, 2018; 8:03 a.m.
3
4              SAUL LEVINE, M.D.,
5         having been first duly sworn,
6         was examined and testified as follows:
7
8         MR. O'LOUGHLIN:  Thank you.  And the record
9    should reflect that this is the deposition of Dr. Saul
10   Levine, taken for all purposes allowed under the Federal
11   Rules of Civil Procedure and the Federal Rules of
12   Evidence.
13                  EXAMINATION
14   BY MR. O'LOUGHLIN:
15        Q.   Would you state your name, please.
16        A.   Saul Levine.  Last name is Levine, L-e-v-i-n-e.
17        Q.   You are a medical doctor?
18        A.   Yes.
19        Q.   Specializing and board certified in emergency
20   medicine?
21        A.   Correct.
22        Q.   Do you hold any other board certifications?
23        A.   No.
24        Q.   Do you consider yourself a specialist in any
25

Page 6

1    other medical specialty, aside from emergency medicine?
2         A.   No.
3         Q.   Have you ever worked or had training as a nurse?
4         A.   No.
5         Q.   Have you ever worked or had training as a law
6    enforcement officer?
7         A.   No.
8         Q.   Have you ever worked or had training as a
9    hospital security officer?
10        A.   No.
11        Q.   Would you, based upon your -- everything you
12   know, give -- tell me the signs and symp- -- the clinical
13   signs and symptoms of hyperkalemia.
14        A.   Hyperkalemia can be quite vague.  You can have
15   very few symptoms and have life-threatening hyperkalemia.
16   You can have no symptoms and have life-threatening
17   hyperkalemia.  Commonly, however, you would get weakness,
18   fatigue, sometimes burning pain.
19        Q.   Any others come to mind?
20        A.   Well, at some point, hyperkalemia can cause your
21   heart to cease beating or to beat fast or to beat slow.
22   And in the circumstance where it's beating fast or slow,
23   you can have symptoms from that, of course.  Shortness of
24   breath.  You could have passing out episodes,
25   palpitations and so on.

Page 7

1         Q.   Would you -- you've included now palpitations or
2    an irregular heartbeat, shortness of breath.  Would you
3    also include difficulty breathing?
4         A.   Yes.
5         Q.   Would you include chest pain?
6         A.   Could get.
7         Q.   Would you include nausea?
8         A.   You could have.
9         Q.   Vomiting?
10        A.   Suppose so.  I'm not sure.
11        Q.   Tingling of the skin or numbness?
12        A.   Yes.
13        Q.   Could you tell me the clinical signs and
14   symptoms of fluid retention.
15             Actually, let me change that.  Let me talk about
16   the signs and symptoms -- clinical signs and symptoms of
17   congestive heart failure.
18        A.   Okay.  You want to know what the signs and
19   symptoms of heart failure are?
20        Q.   Correct.
21        A.   Well, classically, fluid backs up, the heart is
22   unable to pump it, so some of the places it backs up is
23   into the legs.  It can back up into the lungs.  That
24   would cause respectively leg swelling and shortness of
25   breath.  It can back up further into the liver and can

Page 8

1    cause liver damage and abdominal pain.  You can have, you
2    know, other things go sour from heart failure, including
3    like we talked about.  Within hyperkalemia you can have
4    funny heart rhythms, you can have your heart beat
5    irregularly or fast or cease beating.
6         Q.   Okay.  And swelling of the legs could also be
7    described as edema?
8         A.   Correct.
9         Q.   And you included shortness of breath?
10        A.   Yes.
11        Q.   And would you also include difficulty breathing
12   when laying flat?
13        A.   Can happen.  Yes.
14        Q.   And could you describe for me the clinical signs
15   and symptoms of a diabetic episode or diabetes?
16        A.   You want to know the signs and symptoms of
17   diabetes?
18        Q.   More of a diabetic emergency.
19        A.   Well, you know, the sort of most common
20   worrisome diabetic emergencies are low sugar or high
21   sugar.  And with --
22        Q.   I'm sorry.  Let me stop you there.  Where would
23   you put those parameters?
24        A.   Oh, it depends.  You know, when you get a
25   glucose below 60, 50, 40, that becomes worrisome for too

LEVINE, M.D., SAUL
02/27/2018                                                              Pages 9–12

Page 9

1   low.
2        And high is -- again, it depends on the clinical
3   setting.  The most worrisome high glucose phenomenon is
4   where you get acidosis or an abnormal pH balance in the
5   blood associated with high sugar, and that acidosis can
6   actually occur at levels, you know, in the 100s, that
7   would be atypical.  Usually in the higher numbers, like,
8   you know, 3-, 4-, 500s.
9        Q.   With diabetic emergency, can you also feel sick
10  or faint?
11       A.   Yes.
12       Q.   All right.  We are taking your deposition
13  because you've been identified as an expert on behalf of
14  the plaintiff in this case.  I assume you're aware of
15  that?
16       A.   Yes.
17       Q.   How often have you acted as an expert in
18  litigation?  And I would include in that anytime you have
19  been -- you have reviewed records and/or testified.
20       A.   How often?  Well, the number of depositions I've
21  been involved with is about 5 or maybe this is 6,
22  somewhere around there.  I've reviewed many more cases
23  than that.  Oftentimes I'll get a case that I don't
24  believe to be meritorious and reject it, and there are
25  other cases that I have reviewed and are in progress

Page 10

1   prior to deposition.  Hard for me to put a number on it.
2   I would estimate maybe, you know, 5 to 10 of those.
3        Q.   So are those 5 to 10 in addition to the 5 to 6
4   you've given depositions in?
5        A.   Yes.
6        Q.   So your total number of reviews in medicolegal
7   cases would be less than 20?
8        A.   No, that's not true.  Because as I said, there's
9   several cases where I've been involved and declined the
10  case after review of records.
11       Q.   So that would be -- I'm sorry.  Go ahead.
12       A.   So I don't know the true numbers.
13       Q.   If you add in the cases that you've reviewed,
14  but have not supported, you can't come up with an
15  estimate as to the number of cases total?
16       A.   It would be difficult for me to do that now.  I
17  would say, you know, 20 to 30 maybe.
18       Q.   Whatever that number is, can you break it down
19  between cases in which you've been contacted by the
20  attorney representing the plaintiff, as opposed to the
21  attorney representing the defendant.
22       A.   I have had a handful of defendant cases.  Those
23  are typically local cases.  I've been deposed in just one
24  of those.  And the majority of my work comes from
25  out-of-town plaintiff's work.

Page 11

1        Q.   Have you worked with Mr. Harrington's firm in
2   the past?
3        A.   Yes.
4        Q.   On how many occasions?
5        A.   The majority of my cases have been through the
6   Fieger firm.  I don't know the numbers offhand.
7        Q.   And when you -- again describing cases, is that
8   the 20 to 30 that we arrived at earlier?
9        A.   Yeah.  Again, rough estimate.
10       Q.   And so the majority of that 20 to 30 would be
11  from the Fieger firm?
12       A.   Overall, I would maybe estimate a small majority
13  overall of the cases is from that firm.
14       Q.   Of those cases, how many involved claims of
15  negligence against a healthcare provider?
16       A.   Well, all of them.  They're medical malpractice
17  cases generally.  And this case being a little unusual in
18  that regard, I wouldn't call this a med mal.  Rather, you
19  know, this EMTALA issue we'll get into, I'm sure.
20       Q.   So all the cases that you've reviewed at the
21  request of the Fieger firm have been cases to determine
22  whether you thought a healthcare professional was
23  negligent?
24       A.   Actually, that's not totally true now.  I think
25  in retrospect, there's a case I have that it's an issue

Page 12

1   of institutional liability.  There's another case that --
2   I think there are two like that, where it's more a
3   question of institutional liability, rather than
4   physician or medical malpractice.
5        Does that make sense?
6        Q.   It may.  But to clarify, what do you mean by
7   "institutional liability"?
8        A.   There was a -- I don't know how much of this is
9   able to be disclosed.  There's a case where a patient had
10  an injury at a facility's property and it wasn't felt
11  that there was medical malpractice, but the patient had
12  an injury that was felt to be related to the policies of
13  the facility regarding fall prevention.
14       Q.   Okay.  And is there -- so that had to do with
15  fall prevention in terms of the condition of the premises
16  or fall prevention in terms of the care or anything else
17  to do with the specific individual?
18       A.   I'm not sure I understand your question.
19       Q.   So, for instance, and I -- the description was
20  general enough, I don't know if that meant it was a fall
21  by a patient.
22       A.   Yes.
23       Q.   Okay.  It was a fall by a patient.  Was it a
24  fall by a patient in the course of being cared for?
25       A.   Yes.

LEVINE, M.D., SAUL
02/27/2018

Pages 13—16

Page 13

1    Q.   Was it a fall by a patient during some transfer?
2    A.   Transfer outside of the facility?  No.
3    Q.   Okay.  Was your claim in that case that there
4  was something wrong with the hospital's policy?
5    A.   That case is too early to really answer that
6  question.  It's in the infantile stages.
7    Q.   All right.  What's the other case where you
8  found -- or you were asked to look at what you thought
9  was institutional liability?
10   A.   Let me think.  I can't recall at the moment,
11 actually.  Hang on.  I'm trying to think of the specifics
12 of the case in my mind and I can't get it because of the
13 previous discussion.  I don't recall.
14   Q.   Okay.  What do you charge for your time?
15   A.   450 an hour.
16   Q.   Is that for any activity or some specific
17 activity?
18   A.   That's for review of materials and reading, you
19 know, phone time and so on.  I have deposition --
20   Q.   Do you --
21   A.   Deposition charges are different.
22   Q.   And what are the deposition charges?
23   A.   $1,600 for the -- any part of the first two
24 hours.  And then $800 an hour after that.
25   Q.   And do you have some different rate or charge if

Page 14

1  you appear at trial?
2    A.   I've only appeared at trial once and there was
3  a -- it was different.  I didn't charge by the hour to
4  fly out there and so on.  It was rather a fee to go.
5         So does that answer your question?
6    Q.   What is that fee?
7    A.   I was paid 10,000 to go from San Diego to
8  Detroit, you know, spend the night, appear in court and
9  return.
10   Q.   And that was a case for the Fieger office?
11   A.   Yes.
12   Q.   When were you contacted regarding this case?
13   A.   I was looking back to try to figure that out.  I
14 think it was the summer of -- hang on a sec.  I might
15 have it.  Yeah, the summer of -- last summer of 2017.
16   Q.   How were you contacted?
17   A.   I believe somebody in the Fieger firm, may have
18 been Mr. Harrington, contacted me and discussed the case
19 with me, you know.  As per usual, these discussions are
20 sort of in broad strokes and then records are sent.  And
21 I review them and render an opinion.
22   Q.   Are you able to identify what you reviewed
23 initially in order to render an initial opinion?
24   A.   Yes.  I assume you have my report from November
25 of 2017?

Page 15

1    Q.   I do.
2    A.   So that outlines what I've reviewed and what my
3  opinions are.
4    Q.   So that would be the records from Bronson
5  Hospital.  And specifically the emergency department
6  visit from May 6, 2016?
7    A.   Yes.
8    Q.   The Kalamazoo County Jail medical records from
9  May 6?
10   A.   Yes.
11   Q.   Security video footage from -- I presume that's
12 the Bronson video footage from May 6?
13   A.   Yes.
14   Q.   The records of the Kalamazoo -- you had
15 Kalamazoo County Sheriff's Department?
16   A.   Yes.
17   Q.   The -- you have -- again you have -- I'm reading
18 from your report, "Sheriff car video footage from May 6,
19 2016"?
20   A.   Yes.
21   Q.   The -- by the way, do you know if they -- if the
22 footage you're talking about is when Mr. Dunigan is in
23 the back of the police car?
24   A.   Yes, it's him getting loaded into the car and
25 then driving and so on.

Page 16

1    Q.   Okay.  And just so there's no confusion, you're
2  not -- you don't really know whether that's a Sheriff or
3  a Kalamazoo Police officer car?
4    A.   Correct.  I may have lumped them together, or
5  misstated that.
6    Q.   You also have listed "Investigation report"
7  under that, would that be an investigation report from
8  the whatever law enforcement agency was involved?
9    A.   Yes.
10   Q.   You have the "Postmortem Examination Report,"
11 would that otherwise also be called an autopsy report?
12   A.   Yes.
13   Q.   You have the "Death Certificate"?
14   A.   Yes.
15   Q.   "Toxicology Report from AIT Labs"?
16   A.   Yes.
17   Q.   The "Prehospital Care Report" from Life EMS
18 Ambulance?
19   A.   Correct.
20   Q.   And you have listed two depositions, Charles
21 Shoemaker and Nolan Cattell?
22   A.   Right.  Correct.
23   Q.   Correct?
24        Have you reviewed any other depositions?
25   A.   Yes.  I have read the deposition of Dr. Rigot

LEVINE, M.D., SAUL
02/27/2018

Pages 17–20

Page 17

1   and Dr. Patel.
2       Q.   Any others?
3       A.   Other depositions, no.  I've seen reports --
4   I've seen reports from several physicians.  There was a
5   Dr. Richardson, Dr. Landers, Dr. Von something.  I don't
6   know if I have that.  These were received electronically,
7   so I don't have them in front of me.
8           MR. O'LOUGHLIN:  Counsel, can I presume those
9   are the same reports that have been submitted to the
10  court?
11          MR. HARRINGTON:  That's correct.
12          MR. O'LOUGHLIN:  All right.  Thank you.
13  BY MR. O'LOUGHLIN:
14      Q.   The last thing you listed is -- in your report
15  is "Records from Borgess Medical Center."  Do you know
16  what records you reviewed from Borgess Medical Center?
17      A.   It was an electronic file.  It was voluminous,
18  almost 3,000 pages.  And it was records of previous ER
19  visits and hospitalizations at Borgess.  It was
20  electronic.
21      Q.   Did you -- I'm sorry, go ahead.
22      A.   It was electronic.  It was shared with me via
23  Dropbox.
24      Q.   Did you review those 3,000 pages?
25      A.   Yes.

Page 18

1       Q.   In reviewing those 3,000 pages, did you find any
2   instances where you thought the care was inappropriate or
3   fell below the standard of care?
4       A.   No.
5       Q.   Did that -- did those records include
6   Mr. Dunigan's latest admission to Borgess Medical Center?
7       A.   Yes.  The admission immediately preceding or the
8   admission preceding his presentation at -- at Bronson,
9   yes.
10      Q.   Okay.  And you reviewed those records?
11      A.   Yes.
12      Q.   Anything else you've reviewed related to this
13  case?
14      A.   I obtained, through the firm, the pre-hospital
15  care records, so the ambulance transportation records.
16  No other sort of documents, though, that I can think of.
17      Q.   And when you say "pre-hospital," you're talking
18  about the ambulance run that brought Mr. Dunigan to
19  Bronson Hospital emergency department in the early
20  morning hours of May 6, 2016?
21      A.   Yes.
22      Q.   Did you find that those records were also
23  included in the Bronson emergency department records?
24      A.   Yes.  But they were illegible.
25      Q.   Okay.  How many pages of records did you receive

Page 19

1   from Life EMS?
2       A.   It's here.  I don't know how many this is.  I
3   can submit this to you, if you want (indicating).  I
4   would say what, that's about a half inch maybe.
5       Q.   You have a half inch of records from Life EMS?
6       A.   Yeah.  That's this (indicating).
7       Q.   And all of that is Life EMS?
8       A.   Yes.
9       Q.   And is that related to more than one run by Life
10  EMS?
11      A.   Oh, absolutely.  It's tons of them.  Yeah.  I
12  was really just interested in the one that I couldn't
13  read with the Borgess records.
14      Q.   Okay.  And I -- my only confusion is I don't
15  think I ever obtained those records.
16          MR. O'LOUGHLIN:  So if I can get them quickly
17  and easily, can we have that packet marked as Deposition
18  Exhibit 1.  And the packet I mean, it's just the Life EMS
19  records.
20          (Exhibit 1 marked)
21          THE WITNESS:  It's the Life EMS records I
22  earmarked here with two stickies here, the date of
23  concern, which is the 6th of May.
24  BY MR. O'LOUGHLIN:
25      Q.   Okay.  But everything in that packet that is

Page 20

1   going to be marked as Exhibit 1 -- that's all marked as
2   Exhibit 1, is all Life EMS records?
3       A.   Correct.  Nothing else.
4       Q.   What else have you reviewed related to this
5   case?
6       A.   I have the EMTALA statute printed, 10-page
7   document.  I have, you know, with me I brought a few
8   things that I thought were reasonable useful references,
9   one regarding dialysis and hyperkalemia.  It's an article
10  from the Journal of Nephrology.  And I photocopied
11  several pages out of a textbook called Harwood and Nuss,
12  one page on dialysis and electrolyte emergencies and
13  another page from the same text on EMTALA and regulatory
14  issues.
15      Q.   And when you say "the same text," that's the
16  text you just mentioned?
17      A.   The textbook Harwood and Nuss, yes.  It's an
18  emergency medicine text.
19      Q.   How do you spell Nuss?
20      A.   N-u-s-s.
21      Q.   And is that a text that you would reference
22  regularly in terms of looking for reliable information on
23  emergency medicine or other medical issues?
24      A.   It's a textbook.  So, you know, like any -- any
25  textbook, it's sort of to be taken with a grain of salt,

LEVINE, M.D., SAUL
02/27/2018

Page 21

1  so to speak.  It's not an authoritative text necessarily,
2  but a useful reference nonetheless.
3     Q.   And do you go to it because you think the
4  information contained therein is reliable?
5     A.   Generally speaking, yes.
6     Q.   I see the pages and here I'm just trying to get
7  an idea of the volume.
8     A.   Oh --
9     Q.   How many pages do you --
10    A.   It's a few pages.  This is the title of the
11 text.  This is the -- just one page out of the book
12 regarding hemodialysis and electrolyte abnormalities, and
13 then there's three pages on -- it's basically the chapter
14 on regulatory issues -- well, most of the chapter.
15    Q.   All right.
16    A.   So it's only --
17         MR. O'LOUGHLIN:  Can we have that marked as
18 Exhibit 2.
19         (Exhibit 2 marked)
20 BY MR. O'LOUGHLIN:
21    Q.   And the other -- do you need to take a break?  I
22 hope you know, Doctor, you can let me know anytime, we'll
23 take a break to accommodate you.
24    A.   Thank you.
25    Q.   The other references you've referred to from

Page 22

1  texts or otherwise, could you identify those and so we
2  can have those marked.
3     A.   Sure.  This is an article from American Journal
4  of Nephrology titled "Serum Potassium Levels and
5  Mortality in Hemodialysis Patients."  It's from 2016.
6         MR. O'LOUGHLIN:  Can we have that marked as
7  Exhibit 3.
8         (Exhibit 3 marked)
9         MR. O'LOUGHLIN:  Has that now been marked as
10 Exhibit 3?
11         THE REPORTER:  Yes.
12 BY MR. O'LOUGHLIN:
13    Q.   Is that correct, Doctor?
14    A.   Yes.
15    Q.   What other references did you obtain and review
16 in relation to this case?
17    A.   That's all I brought.
18    Q.   Did you review anything else that you didn't
19 bring with you?
20    A.   Not really.  I -- you know, I -- like I said, I
21 was given the EMTALA statute.
22    Q.   Okay.  You were given that by whom?
23    A.   The Fieger firm, to review and discuss.
24    Q.   And when were you given that?
25    A.   I think it was last month.

Page 23

1         MR. O'LOUGHLIN:  Can we have that marked as
2  Exhibit 4, please.
3         (Exhibit 4 marked)
4  BY MR. O'LOUGHLIN:
5     Q.   Anything else you've reviewed in relation to
6  this case?
7     A.   Not that I recall.
8     Q.   Do you have anything else with you that relates
9  to this case?
10    A.   Not really.  I brought my CV, as you asked.  I
11 brought my -- I brought the disks of the footage and the
12 x-ray of the chest, which you, I believe, have.  I have
13 some --
14    Q.   Have you reviewed -- I'm sorry.
15    A.   I --
16    Q.   Have you reviewed the x-ray, the images?
17    A.   Yes.
18    Q.   Okay.  Have you -- aside from your report, have
19 you made any notes or other writings related to this
20 case?
21    A.   Yes.  That's what I was going to say, is I
22 did -- because of the volume of the Borgess records, I
23 have some handwritten notes regarding those admissions
24 and hospitalizations.  It's a single sheet, handwritten.
25         MR. O'LOUGHLIN:  Can we have that marked as

Page 24

1  Exhibit 5.
2         (Exhibit 5 marked)
3  BY MR. O'LOUGHLIN:
4     Q.   What else did you bring with you at the -- as
5  part of our request?
6     A.   That's it.  The biggest thing is the original
7  packet with all those records I went through with you
8  earlier, the Bronson records and so on.  I don't have --
9  there's nothing else.
10    Q.   Did you bring any billing records, records of
11 what you've billed in the case?
12    A.   No.
13    Q.   Do you know what you've billed in the case so
14 far?
15    A.   Roughly.  I had -- we had sent you a bill
16 previously that was paid.  And then ballpark on the
17 number of hours leading up to this deposition, I would
18 say in the 13 to 15 range.  I would have to go back and
19 tally it.
20    Q.   Anything else you brought with you that we
21 haven't identified?
22    A.   No.
23    Q.   Anything else you've reviewed related to this
24 case that we haven't identified?
25    A.   Again, not that I recall, no.

LEVINE, M.D., SAUL
02/27/2018

Pages 25–28

Page 25

1    Q.   Have you reviewed sufficient information to
2  provide us with your opinions today?
3    A.   Yes.
4    Q.   Did you ask for any additional information?
5    A.   No.  No.
6    Q.   At the time you prepared your report, the list
7  of items that you reviewed in your report, did that cover
8  all of the information you had reviewed at that time?
9    A.   Yes.
10   Q.   At that time when you prepared your report, is
11 it fair to say you had not reviewed any other expert
12 report?
13   A.   What I had reviewed when I made the record was
14 what I put in the record.  Is that what you're asking?  I
15 think you're driving at, did I have access to other
16 something?
17   Q.   Expert reports that you've identified and
18 reviewed since.
19   A.   No.  Just the ones we spoke about.
20   Q.   Before you prepared your report, did you do any
21 research or read anything or gather any documents
22 regarding EMTALA?
23   A.   No.
24   Q.   Do you have any understanding as to the
25 difference between an EMTALA claim and a medical

Page 26

1  malpractice claim?
2    A.   Yes.
3    Q.   What's your understanding of the difference?
4        MR. HARRINGTON:  I'm going to object to the
5  form.  I mean, in what type of context?  I'll object,
6  it's kind of a broad question.  You know, it may call for
7  a legal conclusion.  Do you want him to speak generally?
8  I mean, can you narrow the question down a little bit?
9        MR. O'LOUGHLIN:  I don't think so.  I want his
10 understanding of the difference between those two types
11 of claims.
12       MR. HARRINGTON:  Well, then I'm going to object
13 to the form and foundation.  Especially with Michigan
14 statutory requirements in all case law, interpreting from
15 a legal standpoint, there's a lot of differences.
16       But go ahead and answer, Doctor.
17       MR. O'LOUGHLIN:  Counsel, your objection's on
18 the record.
19       MR. HARRINGTON:  And I just told him to answer
20 the question to the best of his ability.  Thank you.
21       MR. O'LOUGHLIN:  You can confine your objections
22 to those allowed by the court rules, without adding
23 verbiage.
24       MR. HARRINGTON:  I'm allowed to give a factual
25 basis for the objection.  But thanks for the tutorial.

Page 27

1        THE WITNESS:  Well, I would say, again, this
2  gets into a lot of legal nuance.  I'm not -- I'm not an
3  attorney, so I can't really answer the majority of your
4  question.
5        Medical malpractice, if you want me to speak in
6  broad terms, I'll do that.  I think, you know, medical
7  malpractice claims have to do with standard of care and
8  breach of standard of care; whereas, an EMTALA is a
9  federal mandate, a statute that requires that patients be
10 given a medical screening evaluation for emergency
11 medical conditions.  And that those conditions are
12 addressed, i.e. stabilized prior to transferring or
13 discharging patients.
14       There's another provision of the statute
15 regarding women in labor, and they are similarly
16 considered sort of unstable if a woman is in active
17 labor.
18 BY MR. O'LOUGHLIN:
19   Q.   In the first part of your answer, you referred
20 to a breach of the standard of care.  What does standard
21 of care mean to you?
22   A.   Well, it means what -- you know, essentially
23 what a physician of like or similar training would do
24 under like or similar circumstances.  So an emergency
25 medicine standard of care would be that sort of minimal

Page 28

1  expectation of treatment.
2    Q.   Have you ever reviewed or offered an opinion
3  regarding an alleged violation of EMTALA in any other
4  case where you've acted as an expert?
5    A.   No.
6    Q.   Had you ever read the EMTALA statute before a
7  few months ago, when it was sent to you by plaintiff's
8  counsel?
9    A.   I don't think I had read the actual statute, no.
10   Q.   Had you read the section of the Harwood and Nuss
11 text on EMTALA prior to this case?
12   A.   I don't recall.  But I can tell you that the
13 information contained in both the statute and the
14 textbook is in fitting with my understanding of EMTALA
15 prior to that.
16   Q.   And what is that understanding of EMTALA prior
17 to that?
18   A.   Well, like I said, it's a federal statute.  It's
19 a mandate that requires patients get a medical screening
20 exam to determine if there's an emergency medical
21 condition, and that that condition be addressed and
22 stabilized prior to the patient being discharged or
23 transferred.
24   Q.   Did you -- and I think it's evident in your
25 report, you, based upon your review, identified what you

Page 29

1  believe to be violations of the standard of care in
2  relation to Mr. Dunigan's care?
3      A.  Yes.
4      Q.  Did you identify violations of the standard of
5  care by anyone other than Dr. Rigot?
6      A.  Violation of the standard of care, not really.
7  Although I believe the patient was discharged in an
8  unstable condition, I don't intend on speaking to the
9  standard of care for nursing, police, security, and so
10 on, as you alluded to early on.  But I can certainly say
11 that the patient should not have been discharged in the
12 manner that he was.
13     Q.  And according to your review and understanding,
14 who was responsible for the decision to discharge?
15     A.  Well, it's a little bit of a loaded question.  I
16 think that Dr. Rigot probably ordered the patient to be
17 discharged.  He probably clicked on an icon that said
18 "discharge the patient."  You know, the patient
19 subsequently had continued presence in the hospital and
20 remained in the hospital, so discharge in that sense is
21 that the patient was not discharged until he was picked
22 up and sort of, you know, forcibly removed.
23     Q.  Based upon your review, who made the decision to
24 discharge Mr. Dunigan from the emergency department?
25     A.  Well, again there's sort of two definitions

Page 30

1  here.  One is when Dr. Rigot clicked "discharge" and said
2  he's discharged from Room 24.  And then there's further
3  sort of, quote/unquote, discharge when he's removed from
4  the hospital premises, unable to stand.
5      Q.  Okay.  Let's take the first one.  Who is your
6  understanding -- who, to your understanding, based upon
7  your review, was responsible for the decision to
8  discharge Mr. Dunigan from the area of the emergency
9  department where care and examination is provided?
10     A.  Dr. Rigot.
11     Q.  Okay.  Do you -- up to that point and that
12 decision, do you believe that anyone other than Dr. Rigot
13 violated the standard of care?
14     A.  No.  Again, I don't -- I don't speak to nursing
15 standard of care.  So no.
16     Q.  Or the EMTs or the nursing assistants or the
17 radiologist or anyone else involved in Mr. Dunigan's care
18 up to the point that Dr. Rigot made the decision to
19 discharge him from the emergency department where
20 examination and treatment is provided?
21     A.  Right.
22         MR. HARRINGTON:  I'm going to object -- hang on.
23 I'm going to object to form.  Are you only speaking to a
24 standard of care or are you speaking to EMTALA?
25         MR. O'LOUGHLIN:  So far I'm on EMTALA -- no, I'm

Page 31

1  on standard of care.  That's what I've asked him.
2          MR. HARRINGTON:  I just need that clarification.
3  I'm sorry.
4          THE WITNESS:  I answered yes.
5          MR. O'LOUGHLIN:  Yes, I heard.  Thank you.
6  BY MR. O'LOUGHLIN:
7      Q.  And then all of those 3,000 pages of records
8  from Borgess, you found no instance where any of the care
9  provided in those multiple emergency department
10 individuals, you found no instance where there was a
11 violation of the standard of care?
12     A.  No.  Nothing jumped out to me, although you have
13 to understand I wasn't looking for anything in that --
14 for that purpose.  I was -- I was mainly interested in
15 his recent hospitalization and visit.
16     Q.  Let's talk about the period of time after
17 Dr. Rigot decided to discharge the patient.  Are you
18 aware of any evidence, from anything you've reviewed or
19 know of about this case, that Dr. Rigot was aware of any
20 aspect of Mr. Dunigan's condition after he entered the
21 waiting room?
22     A.  I don't have any evidence that he knew anything
23 about that.
24     Q.  Is it fair to say then that you have no
25 criticisms, meaning opinions, that there were violations

Page 32

1  of the standard of care by Dr. Rigot after the time he
2  decided to discharge the patient?
3      A.  After the time he discharged the patient, no.
4  You know, I feel like a fair answer to that question
5  should include the fact that the patient had -- there was
6  a violation of the standard of care leading to the
7  discharge from the ED.  In other words, the cause of
8  Mr. Dunigan's fall was not addressed, and his weakness
9  and instability was not adequately addressed during his
10 stay.
11         But if you're asking, well, forget all that,
12 after the discharge, was he then -- was there a violation
13 of the standard of care of anything he did after he sort
14 of inappropriately discharged the patient?  No.
15     Q.  Well, would a fair answer to that question be
16 yes, I agree that I did not find any evidence that
17 Dr. Rigot violated the standard of care after the patient
18 was discharged to the waiting room?
19         MR. HARRINGTON:  I'm going to object to the form
20 of the question.  He's already answered the question.
21         THE WITNESS:  Yes.  As I said, I -- I stand by
22 what I said in my last answer.
23 BY MR. O'LOUGHLIN:
24     Q.  Did Dr. Rigot commit any act or make any
25 decision after Mr. Dunigan was discharged to the waiting

LEVINE, M.D., SAUL
02/27/2018

Pages 33—36

Page 33

1  room which you believe was negligent?
2      A.  I feel like you're asking the same question.  I
3  don't believe that Dr. Rigot was -- as we talked about, I
4  don't think Dr. Rigot was aware of the ongoings in the
5  lobby and so on.  I have no reason to believe that.
6      Q.  And therefore, no reason to believe that he
7  violated any standard of care after Mr. Dunigan was
8  discharged to the waiting room?
9          MR. HARRINGTON:  Objection to form.  Foundation.
10         THE WITNESS:  I feel like I've answered the same
11  question three times.
12  BY MR. O'LOUGHLIN:
13     Q.  I don't think you've answered it yet, but I can
14  explain it more, if you need it.
15         MR. HARRINGTON:  He has answered it.
16         MR. O'LOUGHLIN:  He has not.
17         MR. HARRINGTON:  Yes, he has.
18         THE WITNESS:  Why don't you -- let's -- why
19  don't you posit the question one more time, please.
20  BY MR. O'LOUGHLIN:
21     Q.  Can a physician, an emergency medical board
22  certified physician, violate the standard of care without
23  taking some action, making some decision?  I'll leave it
24  at that.
25     A.  Well, that -- is very broad and vague.

Page 34

1          MR. HARRINGTON:  Yeah.  I'm going to object to
2  form.  Foundation.
3  BY MR. O'LOUGHLIN:
4      Q.  Well, this doesn't seem like that difficult a --
5  let me try it one more time.
6      A.  Okay.  I'm not trying to --
7      Q.  Did Dr. Rigot do or fail to do anything that
8  another reasonable emergency medicine physician would or
9  wouldn't do under the same or similar circumstances,
10  after the point where Mr. Dunigan was discharged to the
11  emergency -- to the waiting room?
12     A.  No.  Although it's important to understand that
13  discharge -- the term "discharge" has a different meaning
14  than simply clicking on "discharge" and having the
15  patient taken by wheelchair to the lobby.  That's not the
16  end of the engagement of the patient with the hospital.
17     Q.  Was that the end of the engagement of the
18  patient with Dr. Rigot?
19     A.  It appears that way, yes.
20     Q.  All right.  So do you think Dr. Rigot acted or
21  failed to act in any way that you deemed negligent after
22  the time Mr. Dunigan went to the waiting room?
23     A.  No.
24         MR. HARRINGTON:  Objection to form.  Foundation.
25  ///

Page 35

1  BY MR. O'LOUGHLIN:
2      Q.  Was that a "no"?
3      A.  Correct.
4      Q.  Thank you.
5          MR. HARRINGTON:  And Ms. Court Reporter, you got
6  my objection; right?
7          THE REPORTER:  Yes, I did.
8          MR. HARRINGTON:  Thank you.
9  BY MR. O'LOUGHLIN:
10     Q.  Was there something you didn't understand about
11  the distinction I was trying to make there, Doctor?
12     A.  No.  I just wanted to be clear --
13         MR. HARRINGTON:  Don't argue with him.
14         MR. O'LOUGHLIN:  I'm not arguing.
15         THE WITNESS:  Can I go?
16         MR. O'LOUGHLIN:  Yes.
17         THE WITNESS:  I wanted to be clear that the
18  responsibility to the patient does not end when the
19  patient is discharged from the Room 24 or from the
20  evaluation room.
21  BY MR. O'LOUGHLIN:
22     Q.  And so it's your claim that Dr. Rigot had some
23  responsibility to the patient after the patient went to
24  the waiting room?
25     A.  I don't know the circumstance of that hospital.

Page 36

1  I think when it became apparent that Mr. Dunigan was
2  unable to stand and was incoherent and couldn't engage
3  and couldn't support his own weight, at that point, is it
4  the responsibility of the hospital, the nurses, the
5  security guards, to bring that to the attention of an
6  attending or of a -- of a physician?  Yes.
7          But is Dr. Rigot directly responsible for it?
8  I -- that get -- becomes a little bit more vague to me.
9          And I would add that it's not uncommon for a
10  hospital at -- even at, you know, 5:00, 6:00 in the
11  morning, to have multiple physicians available.  I don't
12  know the schedule.  I don't know what Dr. Rigot -- if
13  there were other physicians.  But ultimately, you know,
14  obviously a reevaluation was warranted and, you know, I
15  don't -- I don't really think of Dr. Rigot as violating a
16  standard of care for not being front and center in the
17  lobby, evaluating the patient, despite these other, you
18  know, multiple opportunities for reevaluation.
19     Q.  Is it your opinion that Dr. Rigot had some
20  responsibility to the patient after the patient was taken
21  to the waiting room?
22     A.  In a roundabout way, yes, in that Dr. Rigot
23  represents the hospital.  The hospital was still managing
24  the patient's affairs and care.  And in fact, you know,
25  for sort of forcibly removing him.  So in a roundabout

LEVINE, M.D., SAUL
02/27/2018                                                      Pages 37–40

Page 37

1  way, yes.
2          But I think in terms of a physician
3  responsibility, standard of care question, no.  As I
4  answered.
5      Q.   Am I correct that you previously testified today
6  that you are only offering opinions as to the standard of
7  care required of Dr. Rigot and not of any other employee
8  of the hospital?
9          MR. HARRINGTON:  Object.  I'm sorry.  I need to
10  get a clarification.  Are you asking standard of care
11  under the typical medical malpractice standard of care,
12  or are you asking it under the EMTALA context?
13  BY MR. O'LOUGHLIN:
14      Q.   Is there a difference, Doctor?
15      A.   Yes, there's a difference.
16      Q.   All right.  Then let's go with the question I
17  asked.  Did I understand your earlier testimony to be
18  that you do not intend to offer opinions that the
19  standard of care was violated by anyone other than
20  Dr. Rigot?
21      A.   I'm not a standard of care expert for nurses,
22  EMTs, security guards and police and so on.  I think my
23  expert opinion is that Mr. Dunigan's care by the hospital
24  and inappropriate discharge, in an unstable state, speaks
25  to a violation of the EMTALA mandate.

Page 38

1      Q.   Do you recall my question?
2          MR. HARRINGTON:  Yeah, he answered it.
3  Objection.
4          THE WITNESS:  Yeah.  Did I not answer the
5  question?
6  BY MR. O'LOUGHLIN:
7      Q.   Do you have an opinion that any healthcare
8  professional or any other person involved in
9  Mr. Dunigan's care, aside from Dr. Rigot, violated the
10  standard of care?
11      A.   Yes.  If you're --
12          MR. HARRINGTON:  Under EMTALA -- hang on.  Under
13  EMTALA or under the medical malpractice understanding of
14  the term of art standard of care?
15  BY MR. O'LOUGHLIN:
16      Q.   Under the medical malpractice standard of care.
17      A.   Under the medical malpractice standard of care,
18  no.
19          Under the EMTALA care --
20      Q.   Thank you.
21      A.   -- yes.
22      Q.   And are you an expert in any other profession
23  other than emergency medicine?
24      A.   No.
25      Q.   Are you an expert in -- well, I think that

Page 39

1  answers the question.
2      A.   EMTALA certainly falls under the auspices of an
3  emergency physician, however.
4      Q.   Based upon your review and everything you know
5  about this case, are you aware of any evidence indicating
6  that any healthcare professional observed Mr. Dunigan's
7  behavior in the waiting room?
8      A.   Do you want -- can you repeat the question?  I'm
9  sorry.
10      Q.   Based upon your review of this case and
11  everything you know about it, are you aware of any
12  evidence that any healthcare professional observed
13  Mr. Dunigan's behavior in the waiting room after he was
14  discharged by Dr. Rigot?
15      A.   Well, you know, I've looked at the surveillance
16  video and it does look like there are observations made
17  of him in the lobby from nurses passing through and from
18  nurses in the nursing station.  I think in -- the next
19  natural question from that is:  Were the security guards
20  of the hospital acting as hospital agents?  And they
21  certainly had interaction with the patient as they were
22  trying to stand him.  You can see in the video.  So I
23  believe in that sense, yes.
24      Q.   You then considered the hospital security
25  officers to be healthcare professionals?

Page 40

1      A.   In the broadest sense, I think they are
2  representatives of the hospital and have, you know, some
3  reasonable expectation of involvement of making a
4  decision, hey, this guy is limp.  He cannot engage.  He
5  cannot -- you know, they should have known that he needed
6  an additional medical evaluation.
7          MR. HARRINGTON:  Belated objection to form and
8  foundation.
9  BY MR. O'LOUGHLIN:
10      Q.   Okay.  What's your definition of "healthcare
11  professionals," Doctor?
12          MR. HARRINGTON:  Objection to foundation and
13  form.
14          Are you talking in his terms or what, you know,
15  Michigan law has interpreted a licensed healthcare
16  professional to be?
17          MR. O'LOUGHLIN:  I don't -- I'm not asking
18  him -- I assume he's not an expert in Michigan law.  He's
19  the one who said in the broad sense, a security guard
20  might be considered a healthcare professional.  So I'm
21  asking him his definition.
22          MR. HARRINGTON:  That's not really what he said
23  or really even close to what he said.  But I just need to
24  make sure that, you know, because Michigan law talks
25  about what a licensed healthcare professional is.  So I

Page 41

1   need you to zero in your question a little bit.  It's a
2   little too broad.
3           MR. O'LOUGHLIN:  How can I get more zeroed in
4   than asking this witness his understanding of that term?
5           MR. HARRINGTON:  But under what context?  Under
6   the context as he knows it and as he operates in his
7   practice or under Michigan law?  There's a -- Jack, you
8   know there's a difference.
9           MR. O'LOUGHLIN:  And I'm asking this witness's
10  understanding.
11          THE WITNESS:  Right.  And I told you I think
12  that the security guards were acting as agents of the
13  hospital.  I don't -- that doesn't make them a licensed
14  healthcare provider.
15  BY MR. O'LOUGHLIN:
16      Q.  So with that understanding, are you aware of any
17  licensed healthcare provider who observed Mr. Dunigan's
18  behavior in the waiting room or outside the hospital or
19  in the police car?
20      A.  As I said earlier, you can see that there are
21  observations made of Mr. Dunigan while he's in the
22  waiting room.  There are nurses that look at him, and I
23  believe there were comments made about how he was up,
24  walking around, quote/unquote.  And somebody must have
25  made that observation to relay to security and police.

Page 42

1   So yes, there is some evidence -- so yes, there is some
2   evidence of that.
3       Q.  Okay.  Have you reviewed any testimony
4   indicating that any -- we'll use the term licensed
5   healthcare professional, observed Mr. Dunigan's behavior
6   in the waiting room or outside the hospital or in the
7   police car?
8       A.  No.  Other than that one statement of he was up
9   walking around, quote/unquote.  And I --
10      Q.  And who was that -- sorry, go ahead.
11      A.  I don't recall.
12      Q.  Was -- well, what have you -- what have you
13  reviewed?  Have you reviewed the testimony of anyone
14  other than the two security guards and Dr. Rigot?
15      A.  I don't believe it was part of the testimony.  I
16  think it's part of the audio or -- maybe it may have been
17  one of the -- the security guard's deposition, I don't
18  recall specifically.  But I believe it was stated from a
19  security guard, whether to the police, or that the patient
20  had been, quote, up walking around.  So that would
21  certainly constitute an observation during the -- his
22  time in the lobby.
23      Q.  If that's true, what, if anything, allows you to
24  assume that that observation was made by a licensed
25  healthcare professional?

Page 43

1       A.  I don't -- I can't answer.  I don't know.
2       Q.  All right.  So back to my question.  Are you
3   aware of any evidence indicating that any licensed
4   healthcare professional observed Mr. Dunigan's behavior
5   in the waiting room, outside the hospital or in the
6   police car?
7       A.  There's no testimony to that.
8       Q.  I didn't limit my question to testimony.
9       A.  I -- I don't know that -- I'm not sure.
10      Q.  Are you -- you're not sure if you're aware of
11  any evidence?  Or you don't know of any evidence?
12      A.  I don't know of any evidence other than this
13  statement, which I don't recall who said it and in whose
14  deposition.  I don't recall where that was from, so I --
15  you know, other than that statement, no.
16      Q.  If you assume that that statement was made by
17  Chuck Shoemaker to a police officer, that Mr. Dunigan was
18  up walking around the waiting room, do you have any
19  reason to believe that that does not translate to a
20  licensed healthcare professional making that observation?
21      A.  No.  Not necessarily.  It could have been
22  something that Mr. Shoemaker came up with.  It could have
23  been something he heard from a nurse, I don't know.  I
24  don't recall any drilling of that in his deposition and I
25  don't know.

Page 44

1       Q.  All right.  Or it could have been something he
2   observed?
3           MR. HARRINGTON:  Foundation.  Form.
4           THE WITNESS:  I suppose so.
5   BY MR. O'LOUGHLIN:
6       Q.  Do you have any reason to believe that
7   Mr. Shoemaker didn't observe Mr. Dunigan walking around
8   the waiting room?
9       A.  No.
10      Q.  What are your opinions as to violations of the
11  standard of care by Dr. Rigot?
12      A.  Well, there -- when somebody falls, there are
13  consequences of the fall.  Dr. Rigot addressed that
14  appropriately.  I think, you know, Mr. Dunigan was
15  injured.  That's a consequence of the fall.  He was
16  diagnosed with a chest contusion.  He had x-rays that
17  didn't reveal evidence of thoracic injuries.
18          But there are also causes of falls, and that is
19  where the standard of care is violated, I believe, with
20  Dr. Rigot.  That the patient had something causing him to
21  fall that's contemporaneously documented by the nurse as,
22  "He didn't feel right.  He was dizzy."  And so I think,
23  you know, it would be a violation of the standard of care
24  not to address both the cause of the fall and the
25  consequence of the fall.

LEVINE, M.D., SAUL
02/27/2018

Page 45

1    Q.   Any other opinions as to violations of the
2  standard of care by Dr. Rigot?
3    A.   No.  Other than that outlined in my report, no.
4    Q.   I'm not limiting the question to things that
5  aren't outlined in your report.  I need -- I'm asking you
6  what your opinions are.
7    A.   Okay.  Well --
8        MR. HARRINGTON:  Wait.  Just so I'm clear, when
9  you're asking this, Counsel, you're asking from a
10 standard of care medical malpractice standpoint, as to
11 what Dr. Rigot's violations were; right?
12       MR. O'LOUGHLIN:  Yeah.  I'll do that for now.
13       MR. HARRINGTON:  And so if there is a subsequent
14 malpractice case filed, do you need his deposition again?
15       MR. O'LOUGHLIN:  Oh, sure.
16       MR. HARRINGTON:  Well, then why are you asking
17 this?  Because I don't know if this is likely to lead to
18 the discovery of admissible evidence.
19       But you know what, go ahead, Doctor, have at it.
20 Have at it.
21       MR. O'LOUGHLIN:  Let me ask a foundation
22 question.
23 BY MR. O'LOUGHLIN:
24    Q.   Doctor, can an emergency medicine physician
25 violate EMTALA without violating the standard of care?

Page 46

1    A.   Yes.  You can certainly commit an EMTALA
2  violation.  I'm trying to think of a circumstance where
3  you would violate an -- where you would create an EMTALA
4  violation without necessarily a standard of care.
5        Standard of care requires that there's a -- a
6  relationship between the patient and the physician.  That
7  there's an expectation and that relationship does not
8  exist, are a lot of EMTALA violations that can take
9  place.
10       So, for instance, if a patient is -- if I'm
11 working a shift and I get a phone call from an outside
12 hospital that cannot manage a patient and there's a
13 standard -- there's no relationship between me and that
14 patient, but the patient was declined for transfer for
15 whatever reason that was later deemed to be an EMTALA
16 violation, then that would be a circumstance where it
17 would be an EMTALA violation, but no standard of care
18 violation.  Does that make sense?
19       In other words, if the transfer was declined for
20 insurance purposes, say, that would be an EMTALA
21 violation, but not necessarily standard of care
22 violation.
23    Q.   Does a decision by an emergency medicine
24 physician to accept or reject a requested patient
25 transfer involve professional medical judgment?

Page 47

1    A.   Yes.
2    Q.   And under the circumstance you described, would
3  it be appropriate professional medical judgment for an
4  emergency physician to reject such a transfer?
5    A.   Would it be a vi- -- would it be a poor judgment
6  you're asking?
7    Q.   Would it be a violation of the standard of care?
8    A.   Well, again, I don't think standard of care
9  applies in that situation, where there's an attempted --
10   Q.   Do you --
11   A.   Where there's an attempted and blocked transfer,
12 it's not really a standard of care issue.  It's an EMTALA
13 question on the table.
14   Q.   So a physician can reject a requested transfer
15 and care of a patient based on insurance reasons without
16 being -- without violating the standard of care?
17   A.   Well, yeah.  I feel like we're splitting hairs
18 here.  Well, not -- I feel like you're -- you're trying
19 to suppose that there is a physician/patient relationship
20 in this theoretical circumstance.  Where there really is
21 not physician/patient relationship.  So there cannot be a
22 standard of care violation.  I don't have a relationship
23 with that patient.  I don't have a duty to that patient.
24 But if it's deemed either by, you know, somebody in my
25 hospital, like -- we don't want to take care of that guy

Page 48

1  because he's uninsured, that's an EMTALA violation.  Not
2  necessarily a standard of care violation.  I feel like
3  I'm saying the same thing.
4    Q.   You may be.
5        Did -- when did Mr. Dunigan's physician/patient
6  relationship with Dr. Rigot end?
7    A.   With Dr. Rigot specifically?
8    Q.   Yes.
9    A.   That's a good question.  I feel like we really
10 drilled on that earlier when we talked about, well, he
11 was discharged to the lobby and, you know, I think we
12 talked about that.  That he -- he still was -- you know,
13 just because the discharge icon was clicked doesn't make
14 the patient gone from the hospital.  Was Dr. Rigot's
15 specific standard of care involvement with the patient
16 then shut enough that he was no longer sponsoring the
17 patient from a standard of care point of view in the
18 lobby?  Yes.  We've talked about this.
19       Was the hospital and its surrogates still
20 responsible for Mr. Dunigan as he was in the lobby?  Yes,
21 I believe so.
22   Q.   When did Dr. Rigot's physician/patient
23 relationship with Mr. Dunigan end?
24   A.   Again, I feel like I've asked it -- answered
25 this question several times.  Mr. Dunigan was discharged

LEVINE, M.D., SAUL
02/27/2018

Pages 49–52

Page 49

1  to the lobby by the order of Dr. Rigot, and so in a -- in
2  a sort of conventional, but not legal sense, the patient
3  was discharged at that point.
4      Q.   All right.  Thank you.
5           Did Dr. Rigot have any further contact with
6  Mr. Dunigan after Mr. Dunigan went to the waiting room?
7      A.   Not to my knowledge.
8      Q.   All right.  I'm going to go back to where I
9  thought I was, which is your opinions as to violations of
10  the standard of care by Dr. Rigot.  And if I understood
11  your testimony, that the consequences of Mr. Dunigan's
12  fall were appropriately addressed, but Dr. Rigot failed
13  to determine the cause of that fall?
14      A.   Correct.
15      Q.   What's your understanding of the cause of the
16  fall?
17      A.   Well, Mr. Dunigan stated that he, quote, just
18  didn't feel right.  And that he, quote, lost his balance.
19  And that he was, quote, dizzy.  So I don't know, other
20  than what like I said, was contemporaneously documented
21  by the nurse, that the patient was with complaints of
22  being unsteady and dizzy and weak.
23           I think your question was why did Mr. Dunigan
24  fall; right?
25      Q.   What's your understanding of why he fell?

Page 50

1      A.   I -- I --
2      Q.   Can you answer that?
3      A.   I can't say.  I don't know.  The --
4  unfortunately, he was discharged to the lobby and that
5  was not determined.  I think there was a reasonable
6  expectation to use the resources available to determine
7  the cause of the fall, including diagnostics and labs and
8  consultants, if need be.
9      Q.   Wasn't the history Mr. Dunigan gave that he
10  accidentally fell getting off a bus?
11      A.   The history was that he fell getting off a bus.
12      Q.   When did that fall occur?  Eight hours --
13      A.   Yeah.
14      Q.   Sorry.  Go ahead.
15      A.   I think the answer was it was several hours
16  prior to 9-1-1 being activated.
17      Q.   And didn't Dr. Rigot put in his history of
18  present illness that Mr. Dunigan stated that the pain
19  began after he accidentally fell getting off a bus, onto
20  cement?
21      A.   Let me open the record.
22           Yes, it does state that.
23      Q.   And didn't Dr. Rigot testify that what he
24  understood Mr. Dunigan had was a mechanical fall?
25      A.   He did testify to that.  That doesn't help

Page 51

1  explain why the nurses say he was dizzy and felt off
2  balance.
3      Q.   And did you understand that was historical
4  information or that he was dizzy or off balance while he
5  was in the emergency department?
6      A.   Well, the nurse, contemporaneous with the
7  patient's care, documented that he, quote, just didn't
8  feel right and that he was dizzy.  So you're asking a
9  histor- -- can you repeat your question, I'm sorry?
10      Q.   Was it your understanding that the nurse's note
11  that you referenced regarding dizziness was a current
12  complaint while he was in the emergency department or a
13  historical complaint?
14      A.   Well, that's a good question.  It's not
15  actually clear.  I mean, it's definitely historical,
16  because it says, "I just didn't feel right,"
17  quote/unquote.  But it also says his neuro symptoms are
18  dizziness.  So I guess the answer is both.
19      Q.   That's your understanding based upon your review
20  of this record?
21      A.   Yeah.
22      Q.   All right.  Good.
23           Doesn't what the patient states is, "I lost my
24  balance getting off the bus"?
25      A.   Where do you see that?  On the nursing notes?

Page 52

1  Yes.
2      Q.   Right above --
3      A.   Yeah.  Yeah.  "I lost my balance.  I just didn't
4  feel right."  You know, I think had the physician been
5  aware of this issue or had the physician known about
6  this, this is a cry for check my potassium.  Because as
7  Dr. Rigot's note points out, the patient is noncompliant
8  with dialysis.  And when somebody that's noncompliant
9  with dialysis is dizzy and didn't feel right, that's --
10  that's a cry for help for checking potassium and further
11  investigation.
12           Again, this gets at the cause of the fall, you
13  know, not the consequence, which was the unfortunate
14  focus of the care.
15      Q.   Okay.  And just to clarify that.  As far as what
16  Mr. Dunigan did present with, the chest or flank pain due
17  to the fall, that was adequately addressed by Dr. Rigot?
18      A.   The consequence of the fall and the injury to
19  the thorax, yes.  I think that was adequately addressed,
20  that part of it.
21      Q.   Okay.  And at the time Mr. Dunigan was in the
22  emergency department, other than that note of dizziness
23  that you find unclear, did you find any indication that
24  he was continuing to complain of any problem other than
25  the pain?

LEVINE, M.D., SAUL
02/27/2018

Pages 53–56

Page 53

1    A.  Well, not really, although "continuing to
2  complain" is a little bit loaded.  Because he was
3  essentially evaluated, had an x-ray and was discharged.
4  So it doesn't -- you know, he only had one set of vitals.
5  And I mean, he had another later recheck, but, you know,
6  it's a fairly short ED visit.  So I don't know that there
7  was ample opportunity to complain of things.
8        Although, you know, reviewing the video from the
9  lobby, it appears the patient had continued issues with
10  being off balance, dizzy and weak and so on.
11    Q.  Okay.  Did you follow my question?
12    A.  Yes.  Did I not answer it?
13    Q.  Did you see any evidence, aside from that one
14  nurse's note that you deemed unclear, as to whether it
15  was contemporaneous for history and note of dizziness?
16  Did you see any evidence that Mr. Dunigan presented any
17  other symptoms in the emergency department which would
18  indicate an emergency medical condition?
19       MR. HARRINGTON:  Objection.  Form.  Foundation.
20       THE WITNESS:  I think your question was did
21  he -- did he fall because he was dizzy or is there other
22  evidence besides that nursing note?  And then your
23  question became was there any other emergency medical
24  condition that was evident?  Is that -- am I
25  oversimplifying things?

Page 54

1        Maybe if you restate your question is better,
2  I'm sorry.
3  BY MR. O'LOUGHLIN:
4    Q.  Was there any evidence of ongoing problems or
5  symptoms in the emergency department, other than the
6  chest pain Mr. Dunigan complained of due to the fall and
7  that single note of dizziness, which to you was unclear
8  as to whether it was historical or ongoing?
9    A.  Well, yes.  Like we talked about, the video is
10  certainly evidence of instability.
11    Q.  I'm sorry if I wasn't clear, but what I'm
12  attempting to do when I say "in the emergency
13  department," is during the time he was being cared for by
14  Dr. Rigot and the nurses in the emergency department, as
15  opposed to the waiting room.  Is that fair?
16    A.  Okay.
17    Q.  And are you aware of any evidence of any ongoing
18  problems or symptoms, other than the chest pain that he
19  came in for and was adequately addressed, and the note of
20  dizziness, which you were unclear as to whether that was
21  historical or contemporaneous?
22    A.  Well, it appears that it's both.  It's -- I'm
23  not unclear.  It says, "The patient has dizziness," and
24  it says, "I lost my balance.  I just didn't feel right."
25  So to be clear, going back, I think it's, you know, some

Page 55

1  acknowledgment by the nurse that there was dizziness and
2  there is dizziness.
3        But to answer your question, I don't think
4  there's much other specific evidence of him, you know,
5  sort of having this issue of dizziness.  I'll note that
6  the medic records do indicate they specifically asked,
7  "Why did you fall?"  And he said he was unable to provide
8  an answer why he fell.  But I don't think that helps or
9  hurts this either way.
10    Q.  Other than the complaint of chest pain for which
11  he presented and which was adequately addressed, and the
12  note of dizziness that the nurse made in the record, are
13  you aware of any evidence of any ongoing symptoms or
14  problems indicating that Mr. Dunigan had an emergency
15  medical condition in the emergency department?
16    A.  Before getting sent to the lobby?
17    Q.  Correct.
18    A.  No.
19    Q.  The EMS run that you reviewed showed that his
20  breathing was normal, unlabored and clear; true?
21    A.  I'll have to go back and look.  They may have
22  documented that.
23        Unlabored, clear, yep.  That's what it says.
24    Q.  The Glasgow Coma Scale, what does that mean?
25    A.  That's a measure of consciousness.  A

Page 56

1  three-pronged scale giving points for motor engagement,
2  verbal engagement and eye -- using eyes.
3    Q.  And what's the best score you can get?
4    A.  15.
5    Q.  And what was Mr. Dunigan's score, per the EMS
6  record?
7    A.  15.
8    Q.  An EMS record noted his vital signs, were those
9  within normal limits?
10    A.  Yes.
11    Q.  They checked his blood sugar and noted it to be
12  172.  Does that indicate a diabetic crisis?
13    A.  Unable to declare from that, but it was mildly
14  elevated.
15    Q.  Earlier you testified that blood sugar of less
16  than 60, 50 or 40 or higher than 180 might indicate a
17  problem.  But there would not be a crisis unless it was
18  300 to 500?
19    A.  I didn't say that.  I didn't say 180.
20    Q.  Did you say low hundreds?
21    A.  I don't recall what I said.
22    Q.  All right.  What would be the level where you
23  believe a blood sugar would indicate a diabetic problem
24  that required treatment?
25    A.  Well, that was one of the first questions we

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

LEVINE, M.D., SAUL
02/27/2018                                                                    Pages 57—60

1    went over.  As I said, it can be low and that would be a
2    diabetic crisis that would require intervention.  It
3    could be high and that can be a sign of, you know, sort
4    of a marker of acidosis.  We talked about that earlier.
5        Q.   What is high?
6        A.   You can get acidosis with a not that high level.
7    You can get acidosis with a level of 150 to 200.  You
8    can.  It's unusual.  More typically, you would see
9    acidosis with higher levels, 3-, 4-, 500 plus.
10       Q.   And Mr. Dunigan's level was 152, per the EMS
11   record; true?
12       A.   Right.
13       Q.   The EMS record indicates that his mental status
14   was normal?
15       A.   Yes.
16       Q.   Their exam was negative for complaints of chest
17   pain, shortness of breath, headache, nausea, vomiting,
18   weakness, dizziness, numbness or tingling?
19       A.   Well, no.  I mean, he was there for -- his chief
20   complaint was chest pain.  So where are you reading that
21   it says no chest pain?  It's not uncommon -- I'll say
22   it's not uncommon for a -- a paramedic to quickly click
23   through screens that are forced fields, to permit them to
24   close the record.  And they're often clicked through in
25   a -- an expeditious fashion to get through the chart.  So

1    it's not that uncommon to have the patient say, "I called
2    paramedics for chest pain," and they go through a little
3    review of symptoms and it says "no chest pain."  It's not
4    that common, but I don't put too much weight on that.
5        Q.   Where do you see that?  What page are you on?
6        A.   I don't know if your pages are numbered the same
7    as mine, but it's the bottom of the page, which is
8    actually my third page in the EMS record.  It's under
9    "Physical Assessment" and below the itemized physical
10   assessment.
11       Q.   Let me see.
12       A.   Under "Additional Assessment Notes," there's a
13   headings of "Vitals, Treatments and Medications."  Or is
14   it under -- and then there's "EKG, Narrative History
15   Text," is it that section?
16       Q.   Do you have -- yes.  It's below that, with
17   "Narrative History Text" being bolded, and it's at the
18   bottom of that page on my copy.
19       A.   Okay.
20       Q.   Under the "Physical Assessment."
21       A.   Let me see.  Oh, at the very bottom.  Okay.  So
22   "pupils, mental status, airway," okay.
23            And then it goes on to "chest, right-sided chest
24   pain reported, no obvious instability" -- it says, "No
25   obvious instability, crepitus or deformity noted.

1    Breathing rate normal.  Quality unlabored.  Lung sounds,
2    left clear, right clear."  And then --
3        Q.   Keep going.
4        A.   And then down a section, yeah, it says,
5    "Additional Assessment Notes.  The patient did not
6    complain of chest pain, shortness of breath, headache,
7    nausea," and so on.  So --
8        Q.   "No vomiting, diarrhea, weakness, dizziness, or
9    numbness or tingling"; true?
10       A.   Well, that's what they wrote.  But clearly the
11   first part of what they wrote is inaccurate.
12       Q.   Well, not if they determined that his real
13   complaint was not chest pain, but flank pain?
14       A.   Well, I don't know.  I mean, it says in here,
15   several times, there's chest pain.  Look at the very top
16   of that page, what does the first sentence say on that
17   page?  "Right-sided chest pain reported"; right?
18       Q.   Which if we're clear, that's the symptom that
19   you believe was adequately addressed in the ER?
20       A.   Well --
21            MR. HARRINGTON:  Objection to form.  Foundation.
22            THE WITNESS:  Yeah.  No, I didn't say that.  I
23   said that I think the consequence of his fall, the
24   thoracic injury, was adequately addressed.  Was there
25   something else -- was there something else more sinister

1    causing him to fall that also produced chest pain?  I
2    don't know the answer to that question.
3    BY MR. O'LOUGHLIN:
4        Q.   Is there any indication that he had chest pain
5    other than the pain described from the fall?
6        A.   That's not clear to me.
7        Q.   And you didn't find anything in the record that
8    clarified that?
9        A.   Correct.
10            MR. HARRINGTON:  Counsel, whenever you're at a
11   point, I would like to take a quick break.
12            MR. O'LOUGHLIN:  We can do that right now.
13            MR. HARRINGTON:  Thank you very much.
14            (Recess)
15   BY MR. O'LOUGHLIN:
16       Q.   Doctor, initially in this deposition, we went
17   over the signs and symptoms of hyperkalemia and
18   congestive heart failure.  Do you recall those?
19       A.   Yes.
20       Q.   I'm not asking you to repeat them.  From your
21   review of the records while Mr. Dunigan was in the
22   emergency department, and by that I mean in the area
23   where he was examined and treated by nurses and doctors,
24   did he exhibit any signs or symptoms of hyperkalemia?
25       A.   It's hard to say.  Again, hyperkalemia can be --

LEVINE, M.D., SAUL
02/27/2018

Page 61

1   can be cryptic.  You can have very high levels and have
2   very few symptoms.
3          And further, I would like to add that you asked
4   under -- while under the care of the nurses or physicians
5   and nurses, I -- you know, I sort of view the lobby as
6   under the purview of the nurses.  So I don't -- I think
7   what you meant is the room, and just to be clear.
8       Q.   Well, just to be clear, let's talk about up to
9   the time he was wheeled into the waiting room.  Is that
10  clear enough for you?
11      A.   Yeah, that's clearer, although I would -- I
12  stand by what I said, which is that, you know, signs and
13  symptom of hyperkalemia can be almost nonexistent.  It
14  could be dizziness and feeling not right.
15      Q.   Okay.  Let's try and parse that out.  If the
16  symptoms are nonexistent, then there would be no signs or
17  symptoms of hyperkalemia; true?
18      A.   There would be no symptoms, yeah.  If there were
19  no symptoms, there are no symptoms; right?
20          There can be signs.  Signs can be an abnormal
21  wave form on an EKG.  It could be -- you know, arguably
22  you could have -- a symptom of hyperkalemia is feeling
23  weak and dizzy.  So, you know, we don't know whether his
24  being weak and feeling not right is related to
25  hyperkalemia.  We don't know that.

Page 62

1       Q.   Please listen to my question.  While he was in
2   the emergency department, is there any evidence that he
3   exhibited any symptoms of hyperkalemia?
4       A.   Well, potentially, yes.
5       Q.   What are they?
6       A.   Weakness.  Dizziness.  Not feeling right.
7       Q.   And do you see -- other than that single note by
8   the nurse that says "dizziness," and then describes how
9   he felt at the time of the fall, is there anything other
10  than that that you would see that he exhibited in terms
11  of a symptom of hyperkalemia while in the emergency
12  department?
13      A.   No.  Not really.
14      Q.   While he was in the emergency department, did he
15  exhibit any signs or symptoms of congestive heart
16  failure?
17      A.   Again, the same answer as the hyperkalemia,
18  really.  Not specifically when he was back in the -- in
19  the room that I can see.
20      Q.   He had no shortness of breath; true?
21      A.   I don't recall if that was specifically asked.
22  I can look.  I don't see that they specifically asked
23  about it.
24      Q.   Under "Respiratory" there's no respiratory
25  distress, normal breath sounds, no rales, no wheezing;

Page 63

1   correct?
2       A.   Yeah.  On this physical exam, correct.  Physical
3   exam findings and complaints are not the same.  I mean,
4   you can certainly be short of breath and have normal lung
5   sounds.  So -- but I didn't --
6       Q.   Do you --
7       A.   But to be clear, I don't see evidence that he
8   was complaining of shortness of breath.
9       Q.   And you don't see evidence that he -- that his
10  lungs were anything other than clear?
11      A.   They're documented as clear here by the doctor.
12      Q.   Okay.  Back to my question.  Any signs or
13  symptoms of congestive heart failure while he was in the
14  emergency department, up to the time he went to the
15  waiting room?
16      A.   Well, again excluding this question about
17  dizziness, I mean, the -- or feeling weak and something's
18  not right, that could be a symptom of heart failure.  It
19  could be a symptom of heart failure.  But no.
20      Q.   Other than that --
21      A.   But other than that, no.
22      Q.   Were his vital signs normal in the emergency
23  department?
24      A.   No.  Initially he was tachycardic.  His heart
25  rate was 113.

Page 64

1          Let me look.  His blood pressure was on the low
2   side, particularly for somebody with hypertension, 101
3   over 60, I think.  Other than that, the vitals don't seem
4   particularly abnormal.
5       Q.   And the pulse/heart rate was rechecked and was
6   normal?
7       A.   Yes, it was normal on recheck, correct.
8       Q.   And it was normal in the field with EMS?
9       A.   Yes.
10      Q.   At 64?
11      A.   Yes.
12      Q.   And in your experience, have you seen what they
13  call white coat syndrome, patients who experience an
14  elevated heart rate as they present to a physician or to
15  an emergency department?
16      A.   Sure.  That's pretty well-described.  I think
17  this is somebody who is pretty familiar with the medical
18  field.  But if we were to guess why his heart rate was
19  high, I have no -- I have no reasonable guess on that.  I
20  don't know.
21      Q.   And is that initial heart rate of 113 that
22  dropped to 90 of any clinical significance to you?
23      A.   It's worrisome, mildly so.  I think a high heart
24  rate would be, you know, one of our warning signs we get.
25  But as you pointed out, it was improved on reevaluation.

LEVINE, M.D., SAUL
02/27/2018                                                                          Pages 65–68

Page 65

1    Q.   His respiratory rate was within normal limits?
2    A.   Yes.
3    Q.   He had good oxygen saturation?
4    A.   Yes.  I'm trying to find --
5    Q.   On room air?
6    A.   I'm trying to find the page with this.  I
7    believe that's correct, yes.
8    Q.   His neurological was noted to be within normal
9    limits?
10   A.   Yes.  They say -- Dr. Rigot documents that he's
11   oriented, with normal strength and no sensory deficits
12   noted.  So I like to walk patients.  I think it's
13   important for a gait to be observed.  But that was not
14   done here.
15   Q.   What was -- what's your knowledge of
16   Mr. Dunigan's pre-presentation gait?
17   A.   It's difficult to say from this record.  There
18   is mention of hemiplegia, that he was partially paralyzed
19   from a previous stroke.  And then piecing together from
20   outside other records, that he used a cane, which you can
21   see the cane during his stay.
22   Q.   Any other knowledge of his pre-presentation
23   gait?
24   A.   No.
25   Q.   What -- do you believe that Mr. Dunigan had an

Page 66

1    emergency medical condition when he was in the emergency
2    department prior to the time he went to the waiting room,
3    other than his chest and flank pain from the fall?
4    A.   Yes.
5    Q.   And what do you believe that emergency medical
6    condition was?
7    A.   Well, he was -- as I alluded to with getting at
8    the cause of his fall, he was dizzy and weak and
9    unsteady.  So with that, I think the answer to your
10   question is he was having those symptoms throughout his
11   ED stay, and --
12   Q.   I'm sorry.  Just so I'm clear, did you say
13   having no symptoms or having those symptoms?
14   A.   "Those."
15   Q.   You said he was having those symptoms throughout
16   his ER stay?
17   A.   Well, that's what's documented.  The nurse
18   points out that he was dizzy and unstable -- you know,
19   his lack of stability is -- is seen in the immediate, you
20   know, timeframe after his discharge to the lobby.
21   Q.   Anything other than the nurse's note, that
22   states dizziness, indicating that he had an emergency
23   medical condition up to the time that he went into the
24   waiting room?
25   A.   No.  Other than these things we've talked about,

Page 67

1    his -- you know, his heart rate was transiently high.
2    His -- you know, the symptoms that prompted him to come
3    in and so on.  But no, there's no other evidence of stuff
4    until he was sent to the lobby.
5    Q.   And if that dizziness was in fact meant to be a
6    historical notation, referring to when he fell, can
7    you -- is there any indication that he continued to have
8    an emergency medical condition while he was in the
9    emergency department, meaning up to the time he went to
10   the waiting room?
11   A.   Yeah.  I know what you mean.  No, I think the
12   answer's no.  Although they don't test it.  They don't
13   walk him.  They don't stand him.  So that, you know, even
14   it's maybe historical that he's unable to stand and he
15   was unusually -- something's not right, off-balance,
16   that's not -- that's not challenged in the ED.
17   Q.   Is the answer to my question "no"?
18   A.   Correct.
19       MR. HARRINGTON:  Objection.  Form.  Foundation.
20       THE WITNESS:  Yeah.
21   BY MR. O'LOUGHLIN:
22   Q.   Are you aware of any evidence indicating that
23   Dr. Rigot, or any of the other licensed healthcare
24   professionals in the emergency department, ever actually
25   perceived that Mr. Dunigan had an emergency medical

Page 68

1    condition beyond the chest and flank pain from the fall?
2    A.   I think you're asking -- can you repeat the
3    question again?  I apologize about that.
4    Q.   Sure.
5        Are you aware of any evidence, based upon
6    everything you've reviewed, indicating that Dr. Rigot or
7    any of the nurses actually perceived that Mr. Dunigan had
8    an emergency medical condition, other than the chest and
9    flank pain attributed to the fall?
10   A.   Well, yeah.  I mean, the nurse -- we're talking
11   about the same thing again and again.  The nurse points
12   out that he was not right and dizzy.  So I would say
13   that's a perception of there being an emergency medical
14   condition.
15   Q.   Anything other than that?
16   A.   No.  I feel like I've answered this question
17   several times.  But no, I don't see other evidence.
18   Q.   And even if the nurse noted dizziness, do you
19   have -- do you know of any evidence that indicates that
20   the nurse perceived that as a serious medical condition,
21   which if not treated would be life-threatening?
22   A.   I have no way of saying -- answering that.
23   Q.   You're not aware of any evidence indicating that
24   any nurse or doctor actually perceived Mr. Dunigan to
25   have a medical condition which, if left untreated, would

Page 69

1  threaten his life?
2       MR. HARRINGTON:  Objection.  Form.  Foundation.
3       THE WITNESS:  Yeah.  Again, I don't see that
4  there's that perception.  Of course you can't see what
5  you don't look for; right?
6  BY MR. O'LOUGHLIN:
7       Q.  Let's try it with an answer to my question,
8  Doctor.
9           Are you aware of any evidence indicating that
10  any nurse or physician actually perceived that
11  Mr. Dunigan had a life-threatening medical condition or a
12  serious medical condition while he was in the emergency
13  department, before he went to the waiting room?
14       A.  Yes.
15       MR. HARRINGTON:  Objection.  Form foundation.
16       Go ahead.
17  BY MR. O'LOUGHLIN:
18       Q.  And your answer?
19       A.  Yes.
20       Q.  And what evidence are you referring to?
21       A.  The nursing documentation that he didn't feel
22  right and was dizzy.
23       Q.  Okay.  The nursing documentation says
24  "dizziness."  Is it your understanding that the verbiage
25  below the word "dizziness" is historical and not as of

Page 70

1  the time he was in the emergency department?
2       A.  It's -- I can read it.  It says, "The patient
3  states," quote, "lost my balance getting off the bus.  I
4  just didn't feel right," quote.  And then above that, it
5  says, "Dizziness."  So I don't -- I'm not the nurse.  I
6  don't know what -- I wasn't there.  I don't know if she
7  was saying, "Are you having any dizziness?  Were you
8  having any dizziness?"  She might have said, "Are you or
9  were you having any dizziness," that could have triggered
10  that input.  I don't know.
11       Q.  Let's go back.  Other than that, are you aware
12  of any evidence indicating that any nurse or doctor
13  actually perceived that Mr. Dunigan had an emergency
14  medical condition, other than the chest pain attributable
15  to the fall for which he presented?
16       A.  No.
17       Q.  Would a mechanical fall on one's lower right
18  ribs resulting in an emergency department presentation
19  require an EKG?
20       A.  Mechanical fall?  No.  It would be atypical to
21  require an EKG.  In the circumstance where there was
22  perceived dysrhythmia, in other words, if the patient
23  fell, was on cardiac monitor and there was abnormal EKG
24  rhythm seen on the monitor, would that warrant a 12-lead
25  EKG?  Yes.  But in the circumstance of where that's not

Page 71

1  picked up or it's a simple mechanical fall, no.
2       Q.  Would a mechanical fall resulting in a contusion
3  to the lower right ribs in and of itself require any
4  laboratory studies?
5       A.  No.
6           But, again, in this case, we don't have evidence
7  that this was a mechanical fall and he has further
8  complaints of dizziness, weakness, and no noncompliance
9  with hemodialysis, so this is really quite separate from
10  the circumstance you describe.
11       Q.  Did you believe there was a history of
12  noncompliance with hemodialysis that was known to
13  Dr. Rigot or the nurses?
14       A.  Yes.
15       Q.  What do you base that upon?
16       A.  Dr. Rigot's note saying there's a history of
17  noncompliance with hemodialysis.
18       Q.  You'll have to point that out to me.
19       A.  Okay.  I don't know how your pages are noted.
20  The Bronson ED visit, it says, Page 9, right in the
21  middle there, "End stage renal disease, Monday,
22  Wednesday, Friday, Fresenius.  Noncompliance."
23       Q.  I guess ours aren't the same.
24       A.  Well, there's two versions.  There's two
25  versions of the ED record.  There's also Page 14.  It

Page 72

1  appears on 9 or 14, in the middle.
2       Q.  I'm sorry.  I'm not finding it.  Can you give me
3  any other landmarks as to what it's near?
4       A.  Sure.  Let's see.  Let's go to -- just pull up
5  the ED record.  It says, "ED provider notes by Wesley
6  Rigot at 2:26 a.m."  Do you see that kind of heading,
7  with an underline?
8       Q.  Yes.
9       A.  And that says Version 2 of 2 or Version 1 of 2
10  next to it?
11           Oh, I see.  Here -- okay.  So you must be on
12  Version 2 of 2; right?  It says, "ED provider note by
13  Dr. Wesley Rigot."  Do you see that?
14       A.  And then it says -- below that, it says,
15  "Emergency department encounter.  First contact.  Chief
16  complaint"; right?
17       Q.  Yes.
18       A.  Okay.  Turn the page.  And then there's a dark
19  heading "Diagnosis."  In the middle of the page, it says,
20  "Diagnosis," and a bar.  It's basically describing his
21  past medical history.  Is all caps heading, "PAST MEDICAL
22  HISTORY."
23       Q.  Okay.  I have a heading which says, "PAST
24  MEDICAL HISTORY."

LEVINE, M.D., SAUL
02/27/2018                                                                    Pages 73—76

Page 73

1    A.   Okay.  Then look halfway down, "End-stage renal
2    disease, Monday, Wednesday, Friday, Fresenius.
3    Noncompliance."  Fresenius is a company that does
4    dialysis.
5    Q.   Okay.  And you understand that's past medical
6    history?
7    A.   Well, yeah, it's part of the patient's medical
8    history.
9    Q.   As far as the history of Mr. Dunigan's dialysis
10   that week, what did Dr. Rigot report?
11   A.   He recorded that he had had dialysis at an
12   outside facility, at Borgess.  That note is generated 12
13   hours after Mr. Dunigan's death, I would point out.
14   Although he does state that he got dialysis, quote, twice
15   this week.
16   Q.   You would agree with me that what it says is,
17   "Patient admitted.  Just discharged from Borgess
18   recently.  Had dialysis twice this week while there.
19   Scheduled dialysis tomorrow," open paren, "(Friday),"
20   close paren.  That's what it says; right?
21   A.   Yes, that's what it says.
22   Q.   Okay.  And the Friday was actually the day he
23   was in the emergency department?
24   A.   Yep.  That's the day.  The 6th of May, 2016, is
25   a Friday.

Page 74

1    Q.   So the -- did Dr. Rigot have any history of
2    recent noncompliance with dialysis?
3    A.   Oh, I have no idea.  He doesn't document that he
4    does, except that it says "noncompliance," with the past
5    medical history.
6    Q.   All right.  And I actually forgotten why we got
7    off on this.  I honestly can't remember where I was.  I
8    think I was asking you if the -- a patient presenting
9    with pain in the lower right ribs due to a fall required
10   laboratory studies.
11   A.   Right.  And I answered with the caveat that that
12   circumstance of what you -- actually, your original
13   question was about a mechanical fall, and I was pointing
14   out that that circumstance of a mechanical fall is quite
15   discrepant from this case where, you know, the patient
16   was dizzy and not right.
17   Q.   Does a patient who presents with lower right rib
18   pain due to a mechanical fall require any lab studies?
19   A.   Generally, no.  Although again I will point out
20   that the circumstance we're talking about is not that
21   clear.  It's not clear that this was a simple mechanical
22   fall.  In fact, it's quite clear it's not a mechanical
23   fall.
24   Q.   Did you understand my question to be capable of
25   being answered "yes" or "no"?

Page 75

1    MR. HARRINGTON:  You can't limit him to "yes" or
2    "no."  If he needs to explain his answer beyond "yes" or
3    "no," he's allowed to do that.
4    BY MR. O'LOUGHLIN:
5    Q.   The question had nothing to do with this case.
6    It was a hypothetical question on a patient presenting
7    with lower right rib pain from a mechanical fall.  Does
8    that presenting, in and of itself, require any laboratory
9    studies?
10   A.   Well, the short answer is it depends.  I mean,
11   if somebody fell 12 feet and they have an obvious injury
12   of their thorax and abdomen, they would get screening
13   labs, CAT scanned and further workup, higher imaging so
14   to speak.
15   If you're asking about a -- so does that answer
16   your question?
17   Q.   If you want that caveat in there, I'll just ask
18   you another one with that understanding.  Does a patient
19   presenting with lower right rib pain due to a mechanical
20   fall, that presents with only tenderness and a contusion
21   at the site of the injury and no indication that the fall
22   was from a height, does that patient require laboratory
23   studies?
24   MR. HARRINGTON:  Objection to form.  Foundation.
25   Facts not in evidence.  Improper hypothetical.

Page 76

1    THE WITNESS:  Yeah.  Again, usually not.  Your
2    hypothetical includes that the patient has right rib pain
3    only, rib tenderness only.  Boy, you know, in those
4    circumstances, it's really critical to evaluate the right
5    upper quadrant of the abdomen carefully, because you can
6    have a liver injury, and that would require imaging and
7    that would require labs.
8    BY MR. O'LOUGHLIN:
9    Q.   Is it your claim that in this case with
10   Mr. Dunigan on May 6, 2016, the standard of care required
11   laboratory studies?
12   A.   Yes.
13   Q.   Why?
14   A.   Because he was dizzy, not right, unstable,
15   unsteady, and was a known dialysis patient with
16   noncompliance.
17   Q.   And if laboratory studies had been done, are you
18   able to offer an opinion as to what they -- first of all,
19   what lab studies do you think should have been done?
20   A.   Well, checking the potassium level, you know,
21   would be paramount.  I think that would certainly be the
22   main concern.  I think would likely to have, you know,
23   offered an answer for the patient's symptoms, the --
24   excuse me.
25   Were there any other labs that were indicated

LEVINE, M.D., SAUL
02/27/2018                                                              Pages 77–80

Page 77

1  besides potassium, I think is going to be your follow-up
2  question.  I think the answer to that is, well, you don't
3  typically just check a potassium level.  You get a
4  bicarbonate, which gives you a sense as to the acid
5  balance of the patient.  You get glucose, you get sodium
6  and so on.
7          I think the critical action was checking the
8  patient's potassium, but I don't view the other labs as
9  important.  But I do view them, as expected, if you're
10 checking potassium.
11     Q.   Is it your opinion that a potassium -- what
12 potassium level would require further assessment or
13 treatment?
14     A.   Well, it's hard to say.  Some of this comes down
15 to what the patient's symptoms are.  And it comes down to
16 what the patient's EKG shows.  The determination for does
17 this patient need emergency hemodialysis for
18 hyperkalemia, that would hinge on the absolute potassium
19 level, as well as the patient's symptoms and EKG
20 findings, most likely.
21     Q.   Okay.  What potassium level would require
22 further assessment and treatment in the absence of any
23 symptoms of hyperkalemia?
24     A.   Well, as we've spoken about, hyperkalemia can
25 have no symptoms.  So a patient misses dialysis, has

Page 78

1  critical hyperkalemia, that patient may have no symptoms.
2  We talked about this a couple of times.  So I think that
3  makes your question not really answerable.
4      Q.   Well, here's the reason I asked that question
5  Doctor, because I asked you about the level of potassium
6  that would require further assessment and treatment, and
7  you said it depends upon the symptoms.
8      A.   Well, it depends on a variety of things.  The
9  absolute level and whether or not there are symptoms and
10 whether or not there are EKG changes.  So is there any --
11 is there any circumstance where you can have a very high
12 potassium level, not have any symptoms and need emergency
13 hemodialysis?  Yes.  Is there an absolute number on that?
14 It depends.  I think it depends in part on the opinion of
15 a nephrologist, a kidney specialist, who is required to
16 arrange the dialysis.  So that phone consultation would
17 usually be held between the emergency physician and the
18 nephrologist, to help determine, do we have to do
19 dialysis now?  Can we wait until the morning?  Is the
20 patient stable to go until, you know, the next treatment
21 arranged as an outpatient?
22     Q.   What number would trigger that call?
23     A.   I don't know that there's an absolute number.
24 Certainly the high normal range would be, you know, 5.,
25 you know, 5.  I think it depends on the lab and the

Page 79

1  assay.  I think 5.1 to 5.  You know, 8 or 9 is considered
2  kind of abnormal.  Once you get above 6, it's really --
3  you know, 5.8, 5.9 and 6 and up is considered more
4  emergent.
5      Q.   If a potassium level had been obtained in this
6  case and was 5.1, would any further treatment or
7  assessment have been required, with the understanding
8  that Mr. Dunigan was scheduled for dialysis that same
9  day, later in the day?
10     A.   You know, it's a difficult theoretical, because
11 the potassium wasn't checked and I don't know that it was
12 5.1.  You're saying if it was 5.1, would there have been
13 any other standard of care requirements?  Is that what
14 you're asking?
15     Q.   Yes.
16     A.   You know, I guess I agree with the cardiology
17 defense experts that said that an EKG should have been
18 done.  I think in the circumstance where, you know, the
19 patient is dizzy, it would be useful to know, you know,
20 the cardiac rhythm.  So yes, I think in addition to lab
21 evaluation an EKG was warranted, needed.
22         But does that answer your question adequately?
23     Q.   Anything other than an EKG if, hypothetically,
24 the potassium had been obtained and was 5.1?
25     A.   Again, this is -- we're sort of entering a realm

Page 80

1  of theoreticals here.  I mean, in the case where, boy,
2  they checked the EKG and it's normal.  They checked the
3  labs and they're normal.  They checked the potassium and
4  it's normal.  Then the question is:  Can the patient
5  walk?  Is he stable?  Is he able to ambulate?  And if the
6  answer to all of that is yes, I think that would be an
7  adequate evaluation of this patient.
8          I think there are some additional, you know,
9  nuances that could be undertaken to help the patient, you
10 know, social services and so on.  But I think that gets
11 into a vague realm unrelated to why the patient had
12 cardiac arrest shortly thereafter.
13     Q.   Are you able to offer an opinion as to what the
14 potassium level would have been if the laboratory test
15 had been done?
16     A.   No.  I can't say what the laboratory value would
17 have been.  My opinion is that it likely would have been
18 critically elevated, but I -- I don't know, because it
19 wasn't done.
20     Q.   Which is -- and which would you say that you
21 could offer an opinion of to a greater than 50 percent
22 probability, as to the level of a potassium if it had
23 been done?
24     A.   You want me to put a number of potassium, a
25 potassium level number?  I have no clue.  I don't feel

LEVINE, M.D., SAUL
02/27/2018

Page 81

1  comfortable answering that question.  I don't know what
2  it would have been.
3      Q.   Would it be fair to say that you could not offer
4  the opinion that the potassium level would have been
5  greater than 5.1?
6      A.   Oh, most likely.
7      Q.   Most likely what?
8      A.   Would have been greater than 5.1.
9      Q.   And what do you base that opinion on?
10     A.   The patient's presentation, clinical history,
11 and findings.  In other words, all these things we keep
12 talking about, the dizziness, the "I don't feel right."
13 "I missed dialysis."  Frequently noncompliant.  Unsteady.
14 Falling.
15     Q.   You would agree, 5.1 is the upper range of
16 normal?
17     A.   Again, I don't know.  It depends on the lab and
18 the assay that's used.  Is that what -- I would have to
19 review.  I don't know if I have what that hospital does.
20     Q.   What's your understanding of when Mr. Dunigan
21 left Borgess, before presenting to Bronson?
22     A.   Yes.  He left on the 5th.  No.  Yes, he left on
23 the 5th.
24     Q.   Do you know what his potassium level was at
25 Borgess?

Page 82

1      A.   I wrote down that it was 6.8 when he arrived.
2  And I did not see if it was rechecked.  I don't know.
3  After that, I'm not sure.  I looked at the dialysis.  I
4  looked at the dialysis orders.  He had dialysis on the
5  30th of April and the 1st of May and then there was
6  another order for hemodialysis on the 5th that he did not
7  get.  So the last hemodialysis he had had -- had was the
8  morning of May 1st.  That's Page 1950 of those records.
9      Q.   Do you know what his potassium was -- I'm sorry,
10 yeah -- his potassium was on May 2?
11     A.   No.  Again, I know that it was 6.8 when he got
12 there on the 30th.  Beyond that, I don't know.
13     Q.   Do you know what it was on May 3?
14     A.   No.
15     Q.   Would it impact your opinions at all if his
16 potassium was 4.8 and 5.1 on those dates?
17     A.   No.  It wouldn't.
18     Q.   Why not?
19     A.   It wouldn't affect my opinion.
20          Well, because potassium can climb quickly.  It
21 can climb quickly, even more so if you get injured and
22 contuse your muscles.  So I don't think knowing that it
23 was normal three days before he came in is particularly
24 useful.
25     Q.   Do you have an opinion as to what caused

Page 83

1  Mr. Dunigan's death?
2      A.   Did you say what caused his death?
3      Q.   Correct.
4      A.   Yeah.  Well, I mean, what caused him to have
5  cardiac arrest?  Is that what you're asking my opinion
6  on, what caused his cardiac arrest?
7      Q.   Yes.  If you have an opinion as to cause of
8  death.  If you don't, that's fine.
9      A.   Well, I've read the autopsy and I'm not a
10 pathologist.  I know that the autopsy was done sometime
11 after he died, making --
12     Q.   As most are.
13     A.   Well, yeah.  But sometimes they're done quickly,
14 within hours, and sometimes they're done, you know, 12 or
15 24 hours later.  I've read the autopsy.  I think, you
16 know, my opinion is that more likely than not that his
17 potassium level was contributory to his cardiac arrest.
18 As you pointed out, this is sort of theoretical.  I don't
19 have hard proof of that, because the potassium level
20 wasn't checked.  But if there's a hemodialysis patient
21 that's in cardiac arrest, it's a reasonable presumption
22 to make that the patient has hyperkalemia, causing his
23 cardiac arrest or her cardiac arrest.
24     Q.   Did Mr. Dunigan have other co-morbidities that
25 increased his risk of cardiac death?

Page 84

1      A.   Absolutely.
2      Q.   What were those?
3      A.   Oh, heart failure are chief among the others.  I
4  can look at his medical history here.
5          Heart failure.  Chronic kidney disease.
6  Coronary disease.  Hypertension, and so on.  Diabetes.
7      Q.   And could those conditions have caused a sudden
8  cardiac death in the absence of hyperkalemia?
9      A.   Yes.
10     Q.   Do you have an opinion as to Mr. Dunigan's life
11 expectancy if he had been treated, as you claim he should
12 have been treated, at Bronson?
13     A.   No.
14     Q.   Would you agree that it is dramatically
15 shortened, given his end-stage renal disease?
16     A.   I don't have an opinion about that.
17     Q.   What evidence are you aware of that would
18 indicate that Mr. Dunigan was unstable as of the time he
19 was wheeled into the waiting room?
20     A.   Well, his gait was not observed.  He was never
21 asked to stand outside of the wheelchair.  So if you mean
22 unstable as in he cannot support his weight with his
23 legs, or do you mean unstable in a more global sense of
24 an EMTALA definition, for instance?
25     Q.   Let's go by the EMTALA definition.

LEVINE, M.D., SAUL
02/27/2018

Pages 85-88

Page 85

1    A.   Okay.
2    Q.   Are you aware of any evidence, up to the time he
3  is wheeled into the waiting room, indicating that he was
4  unstable --
5    A.   Yes.  The evidence is --
6    Q.   -- as --
7    A.   Go ahead.  I'm sorry, I cut you off.
8    Q.   No.  I was just going to add, as used in EMTALA
9  or your understanding of EMTALA.
10   A.   Yeah.  That his instability is evidenced by
11 these things we talked about.  He's a dialysis patient
12 that's noncompliant.  He was dizzy, weak and not right.
13 He was falling.  That's all evidence that he was
14 unstable.
15   Q.   Okay.  Other than the dizzy, was he any of those
16 things while he was in the emergency department?
17   A.   Well, what else did I list?  He was -- he was a
18 dialysis patient, yeah, he was that.  You know, they
19 didn't stand him to walk, to see if he was able to
20 support his weight, so I don't know the answer to that.
21 I think that answers the question.  I'm not sure.
22   Q.   Well, you said weak.  Was he weak while he was
23 in the emergency department?
24   A.   Again, that doesn't appear to have been
25 specifically addressed in terms of global weakness,

Page 86

1  ability to ambulate.  But his strength as documented is
2  normal, by the physician.  Doesn't he say -- here, let me
3  look.
4        "Strength normal," yeah, he wrote that.
5    Q.   You also used the term "not right"?
6    A.   Right.
7    Q.   What evidence is there that he was, quote, "not
8  right," close quote, while in the emergency department?
9    A.   Well, just the nurse's documentation, as we've
10 talked about, that he had dizziness, he lost his balance
11 and just didn't feel right.
12   Q.   I know this is -- you would agree that lost his
13 balance and just didn't feel right was historical
14 information referring to the time of the fall?
15   A.   Well, I think you're trying to get me to say
16 that there was this transient episode while he was on the
17 bus, and that that transient episode that made him weak,
18 dizzy, fall and feeling not right resolved entirely.  And
19 I don't know if that's the case.  I -- it's sort of --
20 you're -- that's an assumption that is being made that we
21 can't clarify, because the records don't ask the patient,
22 Why did you fall?  Are you still unsteady?  Are you going
23 to fall again?  Are you going to pass out?  So we
24 don't -- we don't -- it's an assumption.
25   Q.   How -- all right.  You're looking at that entry?

Page 87

1    A.   Yeah.
2    Q.   All right.  Is "lost" a term used in the past
3  tense?
4    A.   Yes.  No, I don't -- I don't disagree with you,
5  that she's saying he lost his balance getting off the bus
6  and that he didn't feel right.  I get that that's being
7  documented.  The follow-up question to that is:  Is this
8  persisting?  Or if you try to stand, is that going to
9  happen again?  That's not addressed.  And instead, it's a
10 dangerous assumption to say, well, this is a mechanical
11 fall.  In light of this, that's a little preposterous
12 really.  I mean --
13   Q.   My first question was whether you would agree
14 that the statement "lost my balance getting off the bus"
15 and "just didn't feel right" was historical, referring to
16 the time he fell?
17   A.   Yes.
18   Q.   That was my question.
19   A.   Okay.  I answered it.
20   Q.   Eventually.
21        Any evidence of any instability other than
22 that -- the word "dizziness," of any instability of any
23 kind while he was in the emergency department?
24   A.   No.  Although again we're talking about -- you
25 want me to say there was -- there's no evidence of it.

Page 88

1  But they didn't do the appropriate step of testing it, of
2  looking for it.  So you're saying is there -- is there
3  any evidence that -- it's inappropriate.  It should have
4  been addressed.  And it wasn't.  So no, I don't see
5  evidence of that, but --
6    Q.   Would it be significant to you if Mr. Dunigan
7  was able to get off the paramedic's gurney and get onto
8  the emergency department bed on his own?
9    A.   That would be a piece of information speaking to
10 his ability to ambulate.  But it is not really an
11 ambulation trial.
12   Q.   Well, what would be an ambulation trial?
13   A.   Standing and walking.
14   Q.   And what would indicate that that trial was
15 normal?
16   A.   Steady gait.
17   Q.   Anything else?
18   A.   Well, I think it would be reasonable to assess
19 somebody's gait with more than just "Can you stand
20 momentarily?"  Rather, "Can you stand and walk?  Can you
21 pivot and turn?"
22        But am I getting to your question appropriately?
23 I'm not sure.
24   Q.   I don't know if you did or not.  But let me ask
25 another one.

Page 89

1        What was Mr. Dunigan's gait prior to
2   presentation to Bronson and prior to the fall?
3        A.   I don't know.  Again, there's evidence of --
4   there's mention of a previous stroke and partial
5   paralysis.
6        Q.   Do you know whether he was able to ambulate on
7   his own, without a cane, without support, as a baseline
8   condition, meaning before the fall?
9        A.   That I don't know.
10       Q.   Do you -- are you aware of any evidence
11  indicating whether Mr. Dunigan could ambulate on his own
12  any better than is depicted in the waiting room video?
13       A.   No, I don't know.  But I would not expect him to
14  say something wasn't right if it was his normal baseline.
15       Q.   He had no loss of consciousness when he fell;
16  true?
17       A.   That's not documented.
18       Q.   It is documented by the EMS, isn't it?
19       A.   Okay.  I don't know.  I don't have any knowledge
20  that he lost consciousness.  I have no knowledge of that.
21  That would be --
22       Q.   Do you deny it?
23       A.   Okay.  That would be new information to me.  I
24  don't believe he did.
25       Q.   Meaning, if he lost consciousness, that would be

Page 90

1   new information to you?
2        A.   Correct.
3        Q.   And you're not aware of any information
4   indicating that he did lose consciousness; true?
5        A.   Correct.
6        Q.   And the EMS noted that he denied dizziness;
7   true?
8        A.   I don't know about that specifically.  I can
9   look at the record.  I do remember them saying they asked
10  why he fell, and he was unable to provide that
11  information.  They couldn't obtain that.  Let me find
12  that.
13            Well, it says here -- let me see.  It says he
14  ambulated with assistance of the EMT and they asked --
15  they're supposed to ask is the patient unable to
16  ambulate?  Yes, no.  They didn't answer.
17            And then the question about loss of
18  consciousness, is that what we're talking about?
19       Q.   That was one of the things.
20       A.   And the other thing I was looking for was -- oh,
21  they asked him why he fell.  And he was unable to provide
22  an answer to that.  Let me see if I can find that.
23            Do you have that piece?  It might make it
24  faster.  Yeah, the patient was not descriptive in how he
25  had fallen, but he stated that he had fallen at

Page 91

1   6:00 p.m., so --
2        Q.   Did you see the EMT record that said he had no
3   complaints of weakness, dizziness, numbness, tingling,
4   shortness of breath, nausea or vomiting?
5        A.   Right, that's right in the same sentence that
6   says he has no chest pain.  Yes, I see where that's
7   documented.  But it's -- at least one part of that
8   sentence is obviously inaccurate.  We talked about that
9   earlier.
10       Q.   You reviewed the surveillance videos from the
11  emergency department and the external camera outside the
12  hospital and the patrol car camera?
13       A.   Yes, sir.
14       Q.   Up to the time Mr. Dunigan is placed in the
15  police car, are you aware of any indication that he
16  requested any sort of help or medical attention?
17       A.   That he verbally requested that?  No.
18       Q.   Are you aware of any evidence that he asked for
19  any kind of medical care?
20       A.   Not to my knowledge.  No.
21       Q.   Are you aware of whether he stated that he had
22  any sort of medical problem?
23       A.   Again, same answer.
24       Q.   Are you aware of whether he exhibited any
25  shortness of breath?

Page 92

1        A.   Whether he exhibited shortness of breath --
2   whether he complained of shortness of breath or he was
3   perceived to be short of breath?  Or can --
4        Q.   Either.
5        A.   Well, I mean, you know, at some point during
6   his -- if you watch the video, he looks like he's in
7   respiratory distress and failure more so as time goes by.
8   But so from an outside observer, yes.  Does he
9   specifically say, "I'm short of breath, I can't breathe"?
10  Not to my knowledge.
11       Q.   Okay.  That's part of the question.  You're not
12  aware that he ever complained of shortness of breath.
13  When do you believe he exhibited shortness of breath --
14       A.   Well, when he --
15       Q.   -- before the time he was placed in the police
16  car?
17       A.   Well, yeah, I mean, you can see that he's in
18  respiratory failure.  Respiratory distress is probably a
19  better phrase for a lot of the time that he's in the
20  lobby, and then certainly that becomes amplified on
21  the -- when he's loaded into the police vehicle.  It's
22  quite clear he's in respiratory failure at that point.
23       Q.   What is it that you were able to see that told
24  you he was in respiratory distress for a lot of time
25  while he was in the waiting room?

LEVINE, M.D., SAUL
02/27/2018

Pages 93–96

Page 93

1    A.  Well, as I said, I think it's -- you know,
2  respiratory distress evidenced by irregular and rapid,
3  heavy breathing, that's -- you know, I think of less
4  importance than his becoming limp, weak and unable to
5  stand, in terms of his need for reassessment.  But I
6  think that he does have respiratory distress, blurring
7  into respiratory failure, over the hours that he's then
8  eventually loaded into the police car.  But, again, I
9  view that as less critical than the, you know, motor
10  weakness.
11    Q.  Did you watch the entire video in the waiting
12  room?
13    A.  I watched it on -- I sped it up, for most of it.
14  There were times I slowed it down to normal speed.
15    Q.  And it's your claim that at normal speed, you
16  could discern difficulty breathing or irregular and
17  rapid, heavy breathing?
18    A.  I think that's reasonable.  There are times that
19  it looks that way, yes.
20    Q.  As far as the events when you said that he
21  demonstrated limpness and inability to stand, could you
22  tell from looking at the video whether that was him
23  purposely going limp and refusing to stand, versus
24  inability?
25    A.  No.  I don't think I can say that.  Although,

Page 94

1  you know, it's difficult to tease this away from his
2  ultimate demise and understanding that he was -- you
3  know, by the time he's being -- four people are loading
4  him into a police car and he's dead weight, it's quite
5  clear then that that's -- that he's just plain, you know,
6  weak.
7    Q.  And do -- I'm sorry.  Go ahead.
8    A.  So I think that's all I have to say about that.
9    Q.  And do you know if he was dead weight because he
10  was purposefully going limp, or was it because he was
11  unable to move?
12    A.  I have no reason to believe he was feigning
13  anything.
14    Q.  Well, the purposefully not cooperating, going
15  limp and not being able to move, doesn't necessarily mean
16  feigning anything.  Were you able to distinguish -- based
17  on the video, whether up to the time he was loaded into
18  the police car, he was ever unable to stand, as opposed
19  to going limp or refusing to stand?
20    A.  I don't know or have opinion about that.
21    Q.  Are you aware of any evidence -- and you now
22  reviewed the depositions of the security guards, you've
23  reviewed all of the surveillance video, are you aware of
24  any evidence that either the security -- that the
25  security guards ever actually perceived or recognized

Page 95

1  that Mr. Dunigan had an emergency medical condition?
2    A.  I don't know.
3    Q.  Meaning you're not aware of any evidence
4  indicating that any of the security officers actually
5  recognized that Mr. Dunigan had a -- an emergency medical
6  condition or a serious medical condition?
7    A.  I don't know.  I'm not aware.
8    Q.  Okay.  What is your understanding of what would
9  constitute an EMTALA violation?
10    MR. HARRINGTON:  Objection.  Calls for a legal
11  conclusion.
12    But go ahead and answer.
13    THE WITNESS:  Discharging a patient with an
14  emergency medical condition that had not been stabilized.
15  As it relates to this.  I mean, there are other
16  circumstances of EMTALA violations, but I think you want
17  me to, you know, stick to this case.
18  BY MR. O'LOUGHLIN:
19    Q.  I do want you to stick to this case.
20    But as far as your opinions on EMTALA, do you
21  know whether an EMTALA violation includes situations
22  where the patient may have an emergency medical
23  condition, but the provider doesn't recognize that
24  emergency medical condition?
25    A.  In other words, if they failed to look for, say,

Page 96

1  hyperkalemia and the patient had hyperkalemia, was
2  discharged unstable, would that constitute an EMTALA
3  violation you're asking?  Is that sort of your question?
4    Q.  If that's your understanding, yeah, you can
5  answer that one.  And then I'll ask that question or a
6  different question.
7    A.  Well, yes.  That would be -- that would be a
8  violation of -- of the patient's stabilization.  And
9  inadequate screening.
10    Q.  In your opinion, could Mr. Dunigan had presented
11  to any emergency department -- given his medical history
12  and his co-morbidities, could he have presented to any
13  emergency department, at any time, without getting
14  laboratory studies and an EKG?
15    A.  Yes.
16    Q.  Under what circumstances?
17    A.  Well, let's say he cut his finger cooking in the
18  kitchen and he wanted stitches.  He had a cut on his
19  finger, that circumstance would not call for checking of
20  labs and so on.
21    Q.  Why not?
22    A.  Well, he, you know, presumably accidentally cut
23  his finger with a knife.  He didn't get, you know, dizzy,
24  not feeling right and fell.  It's a different
25  circumstance.

LEVINE, M.D., SAUL
02/27/2018

Page 97

1    Q.   Why did he cut his finger?  Did he have blurred
2  vision or loss of perception?
3    A.   You know, again in this theoretical that I made
4  up where he cut his finger, you know, I think he just,
5  you know, cut his finger accidentally in the kitchen.
6  You've done it, I've done it, we've all done that; right?
7    Q.   But -- so your -- so a reasonable emergency
8  medical physician asked this patient who cut his finger,
9  he knows he has a -- has end-stage renal disease, that
10 he's noncompliant with dialysis, that he has history of
11 heart disease, diabetes, stroke, and now he's come in
12 with a cut finger, it wouldn't be an EMTALA violation to
13 simply stitch the finger and send him on his way?
14   A.   Right.  Although knowing that he was
15 noncompliant with dialysis would give me a very low
16 threshold to check.  I would probably ask some follow-up
17 questions.  That's sort of getting to what you were
18 asking:  Why did you cut your finger?  What happened?
19   Q.   Okay.  And if you ask those questions, what
20 would allow you to discharge the patient without
21 violating EMTALA?
22   A.   Well, if the answer is I got -- I couldn't see,
23 I got weak, I fell with the knife, and things weren't
24 right, I think it would be a violation of both EMTALA and
25 standard of care to not pursue critical hyperkalemia and

Page 98

1  not pursue further workup for missed dialysis.
2    Q.   By the way, did you -- are you aware of any
3  evidence indicating that Dr. Rigot oversaw or knew of
4  that notation by the nurse of dizzy or dizziness --
5    A.   I don't --
6    Q.   -- or the words under it?
7    A.   I don't know.  I don't know if he saw that.
8    Q.   If he didn't see it and didn't know of that
9  history, would there have been an EMTALA violation here?
10   A.   Well, he -- you know, I think there's a
11 reasonable expectation that he pursue those questions on
12 his own, if not owning the nursing documentation.  In
13 other words, if he's not going to read and digest and own
14 the nurse's documentation about why the patient fell,
15 that he was dizzy and didn't feel right, then it would
16 be, you know, standard for him to take that history
17 himself.  Or better yet, specifically address, well, I
18 took this history and he said he wasn't dizzy.  I see
19 that the nurse wrote this, we clarified this by talking
20 to him together, and so on.
21   Q.   If Dr. Rigot did not see the nurse's notes
22 regarding dizziness and how the patient felt when he fell
23 and did not get a history that the fall was caused by
24 dizziness or was anything other than a mechanical fall,
25 would there have been an EMTALA violation in this case?

Page 99

1    A.   I just answered the question, and I'll say it
2  again, which is that in your theoretical case where the
3  nurse -- you're not saying the nurse didn't write it.
4  You're saying the nurse wrote it in a parallel universe
5  and the physician was unaware; is that accurate?
6    Q.   Sure.
7    A.   And that the physician never asked or said that
8  it was a mechanical fall, I think it still constitutes a
9  breach of this adequate, you know, addressing of an
10 emergent medical condition.  In other words, the patient,
11 you know, still went on to have the trouble that he had,
12 and the physician's lack of awareness of the nurse's
13 documentation does not make that emergency medical
14 condition go away.
15   Q.   But it would impact whether the physician was
16 aware that there was an emergency medical condition;
17 true?
18   A.   Well, your -- it's a circular argument.  You're
19 saying the physician was unaware that there was an
20 emergency medical condition.  So he was unaware of an
21 emergency medical condition; right?
22   Q.   Well, if he didn't know of that history that
23 you've interpreted as meaning that the patient was dizzy
24 or lost his balance or didn't feel right, and that's why
25 he fell, if he wasn't aware of that, he wouldn't have had

Page 100

1  to have perceived that this was an emergency medical
2  condition; true?
3    A.   I can't agree with that, because I feel like the
4  physician has an obligation to dig deeper, to ask the
5  questions about:  Why did you fall?  What happened?  And
6  if he was unaware of the nurse's documentation, that
7  doesn't absolve him of the duty to find that information
8  out.
9    Q.   But let's say he didn't have that information.
10   A.   Because he didn't ask it or because he didn't
11 read the nurse's note?
12   Q.   Because he didn't read the nurse's notes and he
13 didn't ask it beyond asking about the circumstances of
14 the fall and the patient said he accidentally fell
15 getting off a bus, onto cement.
16   A.   But your theoretical falls apart, because the
17 nurse did ask and he did say, "I didn't feel right and I
18 was dizzy."
19   Q.   Yeah.  But you can challenge the hypothetical.
20 But this is the question I'm asking and it is a
21 hypothetical.  Everything else is the same here except
22 Dr. Rigot did not see the nurse's note that we've been
23 referring to.
24   A.   Uh-huh.
25   Q.   And the history he obtained regarding the fall

LEVINE, M.D., SAUL
02/27/2018

Pages 101–104

Page 101

1   is that the patient accidentally fell getting off of a
2   bus, onto cement.
3       MR. HARRINGTON:  I'm going to object to the
4   form.  And foundation.  Improper hypothetical.  It
5   contains facts not in evidence.
6       THE WITNESS:  Yeah.  Again, I think the
7   physician doesn't address the cause of the fall by saying
8   it was an accident.  But I -- so I don't know.  I stand
9   by what I've said.
10  BY MR. O'LOUGHLIN:
11      Q.  I don't know what you said.  But I'm trying to
12  get an answer to my question.
13      A.  Okay.
14      MR. HARRINGTON:  The one I objected to?
15      MR. O'LOUGHLIN:  Yes.  Which obviously doesn't
16  change whether or not I can ask it or whether he can
17  answer it.
18      THE WITNESS:  Okay.  Sorry.
19      MR. HARRINGTON:  I didn't instruct him not to
20  answer.
21      MR. O'LOUGHLIN:  Pardon me?
22      MR. HARRINGTON:  I said I didn't instruct him
23  not to answer.
24      MR. O'LOUGHLIN:  Okay.
25  ///

Page 102

1   BY MR. O'LOUGHLIN:
2       Q.  Doctor, in a hypothetical situation where
3   everything is the same as this case, except that the
4   patient -- that the doctor does not see the nurse's note
5   stating "dizziness" and the words under "dizziness," and
6   gives a history that the patient accidentally fell
7   getting off of a bus, onto cement, in that hypothetical
8   situation, would the doctor be required to recognize that
9   the patient has an emergency medical condition?
10      A.  Yes.  I think the physician had a duty to
11  recognize the emergency medical condition even if he
12  didn't see the nursing notes, because the patient fell.
13  There are causes of falls that he is not addressing.
14  He's addressing the consequence of the fall, not the
15  cause of the fall.  So if he didn't read the nursing
16  note, in this theoretical Mr. Dunigan then -- and he
17  wasn't aware that the nurse was writing this, and his
18  history was, well, the patient fell, that does not
19  adequately address the issue to identify the emergency
20  medical condition.  He doesn't address the cause of the
21  fall.
22      Q.  All right.  And now I want to go with that same
23  hypothetical, except that he's also aware that there was
24  no loss of consciousness.  That the patient had no
25  syncope or near syncope.  And that the patient, as of the

Page 103

1   time of his exam, was not dizzy, had no sensory deficits,
2   and was alert and oriented.  Under that hypothetical,
3   would the doctor be required to recognize that this was
4   an emergency medical condition?
5       A.  Well, you're taking pieces that exist out of
6   this case.  You're taking facts out of this case and
7   making them go away, and you're asking me if he was -- if
8   this fabricated Mr. Dunigan wasn't dizzy and didn't feel
9   lousy and didn't almost pass out, or whatever happened,
10  if you're saying all those things didn't happen and he
11  fell, is there some duty to figure out why he fell?  Or
12  is your question if he specifically says, "I stumbled
13  over uneven footing and tripped," is that your question?
14      Do you understand there's two distinctions?
15      Q.  Yes, I do.  And my question is this:  If
16  everything else is the same, except hypothetically that
17  nurse's note does not exist.  And the history the doctor
18  gets is that the patient accidentally fell getting off of
19  the bus, onto cement.  And the doctor is aware that there
20  was no loss of consciousness.  That there was no syncope
21  or near syncope.  That the patient, on presentation, was
22  not dizzy and had no sensory deficits.  And that the
23  patient was alert and oriented, that he had normal mental
24  status.  He had no numbness or tingling or weakness.
25  Would the physician, in your opinion, be required to

Page 104

1   recognize that the patient had an emergency medical
2   condition, other than the chest contusion or rib
3   contusion from the fall?
4       MR. HARRINGTON:  Objection to form.  Foundation.
5   Improper hypothetical.  Facts not in evidence and
6   excluding facts that should be.  Go ahead.
7       THE WITNESS:  I -- honestly, I'm a little
8   baffled -- that was a long question.  I -- I -- what
9   you're not asking is if the patient tripped and stumbled
10  and fell, or stumbled over something and fell, that's not
11  your question.  Your question is this other theoretical
12  about, well, if he wasn't dizzy and the physician knew
13  that, you know, the patient wasn't -- didn't lose
14  consciousness and the nurse didn't document that.  It's a
15  very difficult question.  I -- I honestly don't know how
16  to answer your question.
17  BY MR. O'LOUGHLIN:
18      Q.  If the patient did trip and fall, resulting in
19  the fall off the bus, and that history was obtained by
20  Dr. Rigot, would he be required to recognize that this
21  was an emergency medical condition which required further
22  screening and/or admission in order to comply with
23  EMTALA?
24      A.  No.  For the physician part of it, that is true.
25  Although once the patient is in the lobby, EMTALA still

LEVINE, M.D., SAUL
02/27/2018

Pages 105—108

Page 105

1  applies.  So I think that for the -- you're pushing the
2  physician and the EMTALA into one thing, and I don't
3  think they are one thing.  I think EMTALA is not an
4  event.  It's a process whereby the patient remains sort
5  of within the hospital.  During that time, I don't really
6  view Dr. Rigot's involvement in this theoretical -- and
7  he tripped and fell and gets discharged to the lobby, is
8  Dr. Rigot off the hook at that point if he doesn't check
9  anything?  I think the reasonable answer is yes.
10 However, EMTALA still applies.  The patient is still as a
11 continuing part of his hospital stay.
12     Q.  Based on your interpretation of EMTALA?
13     A.  Yes.
14     Q.  After Mr. Dunigan was wheeled into the waiting
15 room, did he ever again present to the hospital for care
16 of an emergency medical condition?
17     A.  I've answered this question.  You -- the answer
18 is, he doesn't appear to verbalize anything, but does he
19 re-present?  Does he leave the hospital premises and come
20 back and ask to be seen again?  No.  Does he verbalize
21 something?  As best I can tell, no.  But is he still part
22 of the same ED stay and ER visit?  Yes, I would argue.
23     Q.  After Mr. Dunigan is wheeled into the emergency
24 department, are you aware of any evidence indicating that
25 any hospital employee recognized that he had an emergency

Page 106

1  medical condition?
2      MR. HARRINGTON:  Foundation.  Form.
3      THE WITNESS:  It does not appear they did.  I
4  think the nurse drove at it with her documentation, but
5  no.
6  BY MR. O'LOUGHLIN:
7      Q.  I'm sorry, I didn't hear that.
8      A.  I said I think the nurse drove at it with her
9  documentation, but no.  I don't think it was really
10 recognized.
11     Q.  That what nurse drove at it, with what
12 documentation?
13     A.  The nurse that wrote that he was dizzy, weak,
14 didn't feel right, and so on.  That nurse drove at the
15 idea that he was having an emergency medical condition.
16 But I don't -- I wouldn't say that -- I think your
17 question was did anybody -- is there evidence that any
18 hospital person realized that there was an emergency
19 medical condition?  And I think I answered no.
20     Q.  That nurse -- neither that nurse, nor any other
21 healthcare provider, indicated in any way that
22 Mr. Dunigan exhibited weakness in the emergency
23 department; true?
24     A.  Not that's documented.
25     Q.  Neither that nurse, nor any healthcare provider,

Page 107

1  nor doctor, indicates that Mr. Dunigan just didn't feel
2  right in the emergency department; true?
3      A.  The nurse documents that there's dizziness.  The
4  timing of that dizziness, as we've talked about, is not
5  totally clear.  Again, I would answer that question with
6  the caveat that the patient was not really sort of tested
7  or wasn't really ambulated.
8      I've said this over and over.  And so, you know,
9  you're asking me is there evidence that they saw that he
10 was weak in the ER?  Well, no.  There wasn't evidence
11 that they saw that he was weak in the ER.  Not until
12 later, when he's out in the lobby.
13     Q.  Do you know whether, out in the lobby, what you
14 observed was his baseline condition or some new weakness
15 or inability to ambulate?
16     A.  I still don't know, as we've -- you've asked me
17 that a couple of times.  I still don't know the answer to
18 that question.  But it's clear that his weakness is
19 obvious, progressive, and profound, you know, certainly
20 by the time he's being loaded into the police car.
21     Q.  Then let me --
22     THE REPORTER:  I'm sorry.  I didn't hear the
23 question and the objection.
24 BY MR. O'LOUGHLIN:
25     Q.  You wouldn't be able to tell from the video or

Page 108

1  any other evidence you've seen that Mr. Dunigan was
2  unable to stand or walk because of his baseline condition
3  or because of some new indication?
4      A.  No.
5      Q.  Or some new condition?
6      A.  No, no, no, no.  Your question was about was he
7  feigning or was he putting on, I think?  Your question
8  that he objected to.
9      Q.  And you couldn't tell from the video; true?
10     A.  Again --
11     MR. HARRINGTON:  Objection.  Form.  Foundation.
12 BY MR. O'LOUGHLIN:
13     Q.  Whether he was feigning or putting on or
14 deliberately going limp and not cooperative?
15     A.  No.  I could not tell.
16     MR. O'LOUGHLIN:  I'll pass the witness.
17     MR. VANDERLAAN:  Good morning, Doctor.  Do you
18 need a break?  I'm going to be very short.
19     MR. HARRINGTON:  I do, but I don't know if the
20 doctor does.
21     THE WITNESS:  I'm okay taking a break.  I don't
22 need it, but if you want to pause, that's fine.
23     MR. VANDERLAAN:  I don't.  I'm going to be very
24 short.  So if someone needs a break, that's fine, but --
25     MR. HARRINGTON:  I've got to use the restroom.

LEVINE, M.D., SAUL
02/27/2018

Page 109

1    THE WITNESS:  All right.  Let's pause again.
2    (Recess)
3
4              EXAMINATION
5  BY MR. VANDERLAAN:
6    Q.  Doctor, my name is Allan VanderLaan.  I
7  represent the two officers who transported Mr. Dunigan to
8  the jail from the Kalamazoo County Department of Public
9  Safety.  Okay?
10   A.  Yes, sir.
11   Q.  Am I safe in assuming that you don't plan on
12  offering any expert opinions in regard to what those two
13  officers did or didn't do?
14       I mean, you're not offering any expert opinions
15  as to the officers; correct?
16   A.  No.
17       MR. HARRINGTON:  I'm sorry, Al, you mean your
18  client officers; right?
19  BY MR. VANDERLAAN:
20   Q.  Yes, I'm sorry.  There were security officers
21  there and then there were two officers from the Kalamazoo
22  Department of Public Safety.  They transported
23  Mr. Dunigan.  And I represent those two fellas.
24   A.  Okay.
25   Q.  And I'm wondering -- so I'm just wondering that

Page 110

1  you're not an expert in police procedures or policies or
2  probably have never been a police officer, and you're not
3  offering any expert opinions regarding those two
4  officers, are you?
5    A.  No.
6        MR. HARRINGTON:  I'm going to object.  Hang on,
7  let me just put a slight objection.  I'm going to object
8  to the form of the question.  Just to the extent of, you
9  know, Allan, you have a client who was there at the
10  hospital, and I don't know if any of the opinions or
11  criticisms the doctor gave regarding the officers would
12  include Officer Nugent.  So form.  Foundation.
13  BY MR. VANDERLAAN:
14   Q.  I understand, Doctor, that you may have some
15  opinions.  But are you offering -- are you going to offer
16  any expert opinions as to the two Kalamazoo Department of
17  Public Safety officers?
18   A.  I don't -- I don't put myself out as an expert
19  in police procedures.  I think it's --
20   Q.  Okay.
21   A.  -- very simple to be critical of the people that
22  managed Mr. Dunigan, particularly true from the time that
23  he was lifted into the wheelchair in the ER lobby,
24  transported outside, picked up off the ground, with full
25  assist, and then -- and then put into the police car in

Page 111

1  full assist.  During all this time, he's clearly in
2  distress.  That's my opinion.
3        I don't -- I don't have a -- you know, again, I
4  don't really consider myself an expert in police policy
5  and procedure or management of this kind of thing.  But
6  I -- you know, I would certainly add that my opinion is
7  that the patient was in distress throughout this entire
8  time and was inappropriately forcibly removed.
9    Q.  You have heard the old saying that if you're a
10  hammer, everything looks like a nail?
11   A.  Yes.
12   Q.  Okay.  So when you say he was clearly in
13  distress, if -- I think you have acknowledged that by
14  simply looking at the video, you cannot say with a
15  reasonable degree of certainty whether he was doing
16  things on purpose, in other words, faking, or if he was
17  in actual medical distress, just by looking at the video?
18  I mean, I know from hindsight, it's obvious he was in
19  distress, but by looking at the video, you can't make
20  that judgment, can you?
21   A.  You can't.  I don't think you can say what his
22  intent was based on the video, if that's what you're
23  asking me.
24   Q.  Yes.
25       At some point, did you follow the video far

Page 112

1  enough where you saw that the two officers stopped their
2  vehicle and checked on Mr. Dunigan?
3    A.  Yes.
4    Q.  And my question is:  Are you able to say with a
5  reasonable degree of medical certainty whether if
6  Mr. Dunigan was taken back to the hospital, which I think
7  they traveled maybe a minute, if I recall, or so, if
8  he -- whether he would have lived?  Can you say one way
9  or the other?
10   A.  Difficult to say.  I don't -- that's difficult.
11  I'm not sure.
12   Q.  Okay.  So I think what I hear you saying is that
13  under oath, in front of a jury, you would say, "I can't
14  tell you one way or the other if he would have lived.  He
15  might have, he might not have"?
16   A.  That's reasonable.  Yes.
17       MR. VANDERLAAN:  All right.  Thank you, Doctor.
18  That's all I have.  Thanks for being so patient.
19
20              EXAMINATION
21  BY MR. HARRINGTON:
22   Q.  Doctor, I've got a couple of questions in
23  follow-up.
24       With respect to whether or not he would have
25  lived if he was taken back to the hospital, you say you

LEVINE, M.D., SAUL
02/27/2018

Pages 113—116

Page 113

1   don't know because that exceeds the scope of your
2   expertise; is that correct?
3       A.   Yes.  As well, I think honestly he -- at the
4   point that they're driving and they make the decision to
5   pull over and look at him, he's not breathing and he
6   doesn't really have evidence of, you know, brain
7   perfusion.  He's kind of slumped over and -- and so at
8   that point, had a paramedic been summoned, they showed
9   up, or had they immediately pulled back, lights and
10  sirens, into the ER, would he have been able to survive?
11  That I think is -- you know, that's right on the cusp.  I
12  mean, had the police officers started doing CPR and then
13  the paramedics get there and take over, could that
14  patient have survived?  You know, I'm just being honest,
15  I think it's difficult to say.  It's very difficult to
16  say.
17          At that point -- you know, I think at the point
18  where he's voicing words and he's clearly perfusing his
19  brain -- backing up before when he's in the ER lobby or
20  when he's out at the curb, where the audio is not
21  available, I think it's easier to say at that point, more
22  likely than not, he would have survived.  I think
23  honestly, it's difficult to say at the point where they
24  pulled over.
25      Q.   Okay.  Appreciating you've testified that you

Page 114

1   don't know what Mr. Dunigan's intent was from what you
2   visualized on the video, being really the waiting room,
3   to the time that he's being wheeled out and ultimately
4   outside of the hospital, are you able, though, Doctor,
5   when you watch the video, to tell if Mr. Dunigan is ill,
6   from what you see on video?
7           MR. O'LOUGHLIN:  Objection.  Form.  Foundation.
8           THE WITNESS:  Yes, he looks ill.  He looks
9   obviously ill.
10  BY MR. HARRINGTON:
11      Q.   Does he look like he's in need of medical
12  treatment?
13          MR. O'LOUGHLIN:  Same objection.
14          THE WITNESS:  Absolutely.
15  BY MR. HARRINGTON:
16      Q.   Can you explain that in a little bit more
17  detail, as to what you visualized that shows?  That
18  Mr. Dunigan was a sick man, from what you saw on video?
19      A.   Well, he was -- he was limp and weak, to the
20  point that he was unable to stand.  He couldn't engage or
21  verbalize appropriately.  You know, if you see that in an
22  emergency room lobby, whether the patient's coming or
23  going, that just screams of need for medical evaluation.
24  So, you know, those are the physical clues that were
25  there.

Page 115

1           MR. HARRINGTON:  That's all I have, Doctor.
2   Thank you.
3
4                FURTHER EXAMINATION
5   BY MR. VANDERLAAN:
6       Q.   Doctor, did you say that when the officers
7   pulled over, Mr. Dunigan was not breathing?
8       A.   I believe he was -- I believe -- I would have to
9   look at the video again.  I think he really had what I
10  would describe as agonal respirations.  In other words,
11  prolonged periods of apnea, or not breathing, punctuated
12  by a solitary deep breath.  That's usually a perimorbid
13  finding.  I'd have to look at the video again.  But as I
14  recall, he had had sort of agonal respirations, not
15  breathing, you know, clearly respiratory failure during
16  this time.
17      Q.   Did you read the two officers, that would be
18  Nugent and Schaeffer's, deposition testimony?
19      A.   No.  I have Shoemaker and Cattell, are security
20  officers.  I don't have any other officer deposition.
21      Q.   The two officers testified that when they pulled
22  over, they pulled over to check to see whether
23  Mr. Dunigan was breathing.  And their testimony was that
24  he was still breathing.  You don't have any reason one
25  way or the other to dispute that, do you?

Page 116

1       A.   Well, I think the video speaks for itself.
2   Again, I don't have it pulled up.  I'd be curious to
3   review it again, now speaking about it.  But as I recall,
4   they were -- you know, it was clear the patient was not
5   breathing.  But I -- again not having the video in front
6   of me, I don't know for sure.
7       Q.   Would you agree with me that the officers would
8   be in a much better position to make that determination
9   than we would?  Or than you would in looking at the
10  video?
11      A.   I don't know if I would agree with that.  I
12  mean, you're saying that the officer that was there
13  should be able to better document and assess the
14  patient's breathing than we would be able to see and hear
15  on a video?  I'm not sure I --
16      Q.   No.  I think what I'm saying, Doctor, is that if
17  the officers -- if the man wasn't breathing, and the
18  officers knew that, and they took him to the jail, they
19  would be guilty of manslaughter, practically.
20          I mean, going in the opposite, they testified he
21  was still breathing, we checked him and we took him to
22  the jail.  So, I mean, don't we take the officers at
23  their word, unless we're going to assume that, you know,
24  they wanted to do the guy harm?  I mean, barring that,
25  don't we have to take their word for it?

Page 117

1    A.  I hear you.
2         MR. HARRINGTON:  Objection to form.  Foundation.
3         THE WITNESS:  I hear you.  Although the video
4  speaks for itself, I think.  I don't -- I wasn't there.
5  I don't -- I don't know what they saw, heard and felt.
6  But I have watched the video.
7  BY MR. VANDERLAAN:
8    Q.  You're not attributing any ill motives to the
9  officers, are you?
10        MR. HARRINGTON:  Objection to form, as to "ill."
11 I mean, undefined term.
12 BY MR. VANDERLAAN:
13   Q.  Motive.  You're not testifying to that, are you?
14   A.  No, sir.  Absolutely not.
15   Q.  Okay.  Thank you.
16        Do you have any -- do you have any expert
17 criticism of the officers at all, based on your expert
18 opinion?
19   A.  Well, I mean, other than what we've spoken
20 about, no.
21   Q.  Okay.  The two officers, when they arrived -- or
22 I'm sorry, one officer was there about a quarter to 6:00
23 and the other officer arrived when he was outside.  Both
24 officers were told -- I want you to assume the testimony
25 will be that Mr. Dunigan was acting.  Based on the fact

Page 118

1  that -- I mean, your profession allows you to look at one
2  thing probably a little more narrowly.  A police officer
3  looks at something in a different light, and similar
4  experiences.  Do you understand how the officers would
5  have thought that Mr. Dunigan may have been acting if
6  they were told by security personnel that this fellow was
7  acting and we want him to go to jail?
8    A.  I can understand that they would think that.
9  And I can understand that that's what they were told.
10 That said, though, his physical appearance and attributes
11 make me think that -- you know, make me sure or know that
12 the patient needed a medical evaluation.  So as you
13 pointed out, I have a, you know, skewed view of things
14 perhaps, because I'm an emergency physician.  But I think
15 the patient's distress was fairly obvious, even to a
16 layperson.
17   Q.  So I take it, can I assume that if you were
18 looking at the video and you have the two officers in the
19 room, you might say to them, "Hey, guys you missed this
20 one," as opposed to, "Why did you try and kill him?"  In
21 other words, you're not attributing any malevolent motive
22 to the officers?  You would tell the officers, "Fellows,
23 I think you missed this"?
24        MR. HARRINGTON:  Form.  Foundation.
25        THE WITNESS:  I wholeheartedly agree with that

Page 119

1  statement.
2         MR. VANDERLAAN:  Okay.  All right, Doctor.
3  Thank you.  If I never see you again, which I probably
4  may not, I wish you all the best in the world.
5         MR. O'LOUGHLIN:  I have a few more, Doctor.
6         THE WITNESS:  Yes, sir.
7
8                 FURTHER EXAMINATION
9  BY MR. O'LOUGHLIN:
10   Q.  If you can see me.
11   A.  Yep.
12   Q.  Let me ask this:  Are you aware of -- based upon
13 everything you've reviewed, are you aware of any evidence
14 that Mr. Dunigan was treated the way he was at Bronson
15 due to any improper motive, such as race, sex, political
16 views, occupation, education, personal prejudice,
17 socioeconomic status?
18   A.  No, sir.
19   Q.  In the emergency department, other than the
20 dizziness noted by the nurse, are you aware or did
21 Mr. Dunigan present with any symptoms so severe that in
22 the absence of immediate medical treatment, his life
23 would be expected to be placed in jeopardy?  That's a
24 terrible question, but I'm probably going to ask it
25 again.

Page 120

1    A.  I'm sure you will.
2         I feel like this is the bulk of what we talked
3  about.  And that this -- I feel like I've answered the
4  this question.  You wanted to know if the nursing note
5  didn't exist, was there evidence that Mr. Dunigan had a
6  life-threatening condition?
7    Q.  I'll start with that.
8    A.  And the answer is yes.  Because of these issues
9  of he fell, we don't know why he fell.  Even removing the
10 nurse's knowledge of he fell because he was dizzy and
11 didn't feel right, removing that, then it leaves a
12 question mark and a void.  Why did he fall?  That's not
13 addressed.  So this is the same answer I've given in the
14 past.
15   Q.  All right.  And my question was intended to be a
16 little different, so let me try it again.
17        I'm talking about the symptoms he actually
18 exhibited in the emergency department.  Even if we
19 include the dizziness, were those symptoms such that --
20 so severe that in the absence of treatment, one would
21 expect his life to be in jeopardy?
22   A.  I have a hard time with this question, because
23 it seems you're teasing apart Mr. Dunigan from his
24 reality, which is he fell for an unknown reason and he
25 missed his dialysis.  And so you're asking me to ignore

LEVINE, M.D., SAUL
02/27/2018

Pages 121–124

Page 121

1  those facts and answer a question about this specific
2  guy. So you can understand why I would have a hard time
3  with this question; right?
4      Q.  Okay. And I'm -- you may have, except you
5  understand Dr. Rigot had no knowledge that he had missed
6  his dialysis that week; true?
7      A.  Dr. Rigot documents that the patient had had
8  dialysis twice that week.
9      Q.  Correct. So Dr. Rigot did not have any
10  knowledge that he missed his dialysis that week; true?
11      MR. HARRINGTON: Form. Foundation.
12  Speculation.
13      THE WITNESS: It is again a little bit
14  speculative, just because the note is made after the
15  patient's deceased. But I think that the statement that
16  Dr. Rigot makes that he had had dialysis twice, that
17  seems to have been the information he understood.
18  BY MR. O'LOUGHLIN:
19      Q.  You're right, I forgot to follow up on that too.
20  We might be here a little longer, Doctor.
21      Are you suggesting Dr. Rigot's note was made
22  after the fact and based on some knowledge later
23  obtained?
24      A.  Well, those are two separate questions. One is
25  was it made later? Yes, it was. It was made about 12

Page 122

1  hours after the patient died. Was Dr. Rigot aware of the
2  patient's demise? He testifies no. So I have no reason
3  to think that he did know.
4      Q.  And what is it that tells you it was made 12
5  hours later?
6      A.  There's a timing entry, timing of the note.
7  Would you like me to read it to you?
8      Q.  Please do.
9      A.  There's the history of present illness, is a big
10  fat paragraph that looks like it was put together by the
11  scribe. And then there's one more sentence added as a
12  separate paragraph below that. That separate sentence is
13  written by Dr. Rigot himself. And that says, "Patient
14  admitted. Just discharged from Borgess recently. Had
15  dialysis twice this week while there. Scheduled dialysis
16  tomorrow, Friday." And that documentation there's a
17  little footnote on there that says Dr. Rigot made that at
18  1.1, which is -- corresponds later to the time. Here you
19  can look -- actually back up the page and you can see
20  when the entry was made. It says at 7:19 a.m. No, no,
21  no. Oh, wait, I'm mixing up two things here. Let's see.
22  Well, there's a marker for what 1.1 means. It's probably
23  several pages forward. Yeah, it's several pages forward.
24  It's at 7:14 p.m. on the 6th.
25      Q.  All right. Getting back to my point. Are you

Page 123

1  suggesting that Dr. Rigot falsely entered that
2  information? In other words, that the patient didn't
3  tell him what is noted there?
4      A.  No, I'm not saying that. I'm saying what's
5  documented contemporaneously, which is really by the
6  nurse, is that the patient was weak and dizzy. And
7  what's documented later, after the patient is deceased,
8  is this statement that he had had dialysis twice this
9  week. Which I don't know what to say. I'm not accusing
10  him of lying. I don't want you to get the wrong idea.
11  I'm just pointing out the facts.
12      Q.  Why? Are you suggesting that's not a credible
13  note?
14      A.  No, I'm not.
15      Q.  So you find it credible?
16      A.  Well, it's his note. It's his documentation.
17  So that's what he put in the chart. I don't have any
18  opinion or -- or -- I don't think he was lying. I have
19  no reason to think he was lying or making anything up. I
20  certainly would believe that he got that information from
21  the patient.
22      Q.  Okay. Now, is it your opinion that Mr. Dunigan
23  presented in the emergency department, and while he was
24  in the emergency department, had symptoms so severe that
25  one would expect that his life would be in jeopardy, in

Page 124

1  the absence of treatment?
2      A.  It's the same question you've asked me several
3  times; right?
4      Q.  It's different. But go ahead.
5      MR. HARRINGTON: No, it's the same. Asked and
6  answered. Objection.
7      THE WITNESS: Do you mind repeating the
8  question? I'm sorry to keep doing that to you.
9  BY MR. O'LOUGHLIN:
10      Q.  Is it your opinion that Mr. Dunigan presented
11  with symptoms, while he was in the emergency department,
12  that were so severe that they would be expected to be
13  life-threatening?
14      A.  Yes. That's why we're here.
15      Q.  What symptoms? I'm sorry?
16      A.  He -- he -- I said that's why we're here,
17  because he fell because he was weak and dizzy, or not
18  right and dizzy, and that's -- those are the symptoms
19  that brought him in. So to say those don't exist as part
20  of his emergency department care is -- is not reasonable.
21  It is part of his ER visit. That's the reason he's
22  there.
23      Q.  There's no place that indicates he complained of
24  weakness; true? Or that he had a symptom of weakness?
25      A.  Technically right. It says, "I lost my balance

LEVINE, M.D., SAUL
02/27/2018

Pages 125–128

Page 125

1  and I didn't feel right and I was dizzy." Or there's
2  dizziness. So --
3      Q.  Okay.
4      A.  Right. It doesn't say weakness specifically.
5      Q.  And there's no indication that he -- that while
6  he was in the emergency department, he lost his balance
7  or just didn't feel right; true?
8      A.  While he was in the ER, as we've talked about,
9  they didn't test him. They didn't stand him and walk
10  him. So that --
11      Q.  Do you recall my question?
12      A.  -- that could not have been documented. So I --
13  you and I have talked about this very issue, I thought.
14      Q.  And I'm talking about exhibit -- symptoms
15  exhibited while he was in the emergency department.
16      A.  Right.
17      Q.  Is the only one you're aware of that note of
18  dizziness?
19      A.  Right. That -- that critically important
20  nursing note is -- is the -- is a big piece, yes.
21          Besides that, do I see any other documentation
22  that while he was in the ER, he was weak or dizzy or
23  lightheaded or passing out? No, I don't see any other
24  evidence of that.
25      Q.  And there's no evidence of any other symptom

Page 126

1  which you believe was so severe that it would be expected
2  to be life-threatening?
3      A.  Other than what we see on the videos, no.
4      Q.  The videos were taken after he was out, he was
5  done being evaluated by the department, and I'm still in
6  the department.
7      A.  Right. Again, you know, just the bird's eye
8  view of this is a patient that has fallen, noncompliant
9  with dialysis, and -- you know, so say that he was not
10  having symptoms in the ER, before he was sent to the
11  lobby, you know, again, this is a little bit of a painful
12  theoretical. But yes.
13      Q.  Okay. I don't know what that answer meant. But
14  let me try and get it right.
15          The only symptom, according to your review and
16  your interpretation of the record, that he exhibited
17  while he was in the emergency department were the rib
18  pain from the injury and the fall and dizziness; true?
19      A.  Fair enough. I mean, he talks about hip pain
20  and rib pain and flank pain. But yes.
21      Q.  Okay. Were the rib pain or hip pain or flank
22  pain symptoms so severe that one would expect that they
23  would place his life in jeopardy?
24      A.  No. Not necessarily.
25      Q.  Are they symptoms such that one would expect

Page 127

1  that they would place his life in jeopardy?
2      A.  No.
3      Q.  All right. And the dizziness, as you've
4  interpreted it, is an isolated note by the nurse, is that
5  a symptom such that one would reasonably expect that if
6  it was not treated, his life would be in jeopardy?
7      A.  The dizziness was -- if the diz- -- the cause of
8  the dizziness was not treated, is that a medical
9  emergency you're asking?
10      Q.  I believe my question was: Was the dizziness as
11  you've interpreted the record, was that a symptom that
12  was so severe that one would expect that in the absence
13  of treatment, his life was in jeopardy?
14      A.  Yes.
15      Q.  And what was it that -- about that symptom that
16  indicated his life was in jeopardy?
17      A.  He was weak and dizzy, or he's dizzy and not
18  right, to the point that he fell and got an injury. And
19  that was the warning shot that we have an opportunity to
20  diagnose him properly. That was the time.
21      Q.  And you're not -- other than the note of
22  dizziness, is there any indication that he was unstable
23  in the emergency department, up to the time he went to
24  the waiting room?
25      A.  Well, there's unstable meaning unstable on his

Page 128

1  feet or meaning hemodynamically unstable? Or do you mean
2  more in the EMTALA phrase of unstable from his emergency
3  medical condition? I just -- I'm sorry. I know I'm
4  being difficult, but I'm having a hard time teasing apart
5  his history. The whole picture. I can't tease out this,
6  well, ignore the nurse -- ignore the fact that the nurse
7  said he was dizzy. And ignore the fact that he fell,
8  with no explanation. And ignore the fact that they've
9  never stood him and walked him. Ignore that and then
10  what do you think about Mr. Dunigan and his presentation?
11  Because that's very difficult. That's not a reality.
12      Q.  My question, I believe, was: Other than the
13  note of dizziness, is there any evidence that Mr. Dunigan
14  was unstable in the emergency department?
15          MR. HARRINGTON: Form and foundation.
16          THE WITNESS: Yes. Again, I'll say the --
17  BY MR. O'LOUGHLIN:
18      Q.  Go ahead.
19      A.  I'll say yes, they didn't stand and walk him, so
20  they don't know that he was stable. So does the absence
21  of testing declare that he is stable? No. The blood
22  pressure was low-ish. That was not rechecked. Does that
23  mean that he was unstable? I don't know. It wasn't
24  rechecked. So I know -- I realize I'm not answering your
25  question to your satisfaction, because it's a very

LEVINE, M.D., SAUL
02/27/2018                                                                Pages 129–132

Page 129

1  difficult thing you're asking me to answer.
2       Q.   I'm asking you to answer based on the evidence.
3  Not on guesses or what might have been or might have not
4  been done.
5            MR. HARRINGTON:  Don't argue.  He is answering.
6  BY MR. O'LOUGHLIN:
7       Q.   Can you point me to -- other than the note of
8  dizziness, can you point me to any evidence indicating
9  that Mr. Dunigan was unstable in the emergency
10  department?
11      A.   Other than what we've talked about, no.
12      Q.   No, I want -- I want -- what is it we've talked
13  about that you're referring to there?
14      A.   The -- the absence of road testing.  The absence
15  of testing and walking.  And the low blood pressure, the
16  low-ish blood pressure.  Is there evidence beyond those
17  things?  Well, yes.  The other evidence is that he missed
18  dialysis and he was -- so if you're excluding that
19  evidence also, then no, I guess there was no other
20  evidence.
21      Q.   The absence of testing doesn't indicate
22  instability, does it?
23      A.   How do you mean?
24      Q.   When I ask you -- I just asked you the question
25  about evidence of instability, that he was unstable in

Page 130

1  the department, and you went into, well, they didn't road
2  test him, that he hadn't had dialysis.  And those aren't
3  things that occurred in the emergency department.
4       A.   Okay.  Fair enough.
5       Q.   All right.  Other than the note of dizziness,
6  can you point to any evidence indicating that Mr. Dunigan
7  was unstable in the emergency department, using unstable
8  in the EMTALA sense?
9            MR. HARRINGTON:  Objection to form and
10  foundation.  Asked and answered like six times.
11           THE WITNESS:  Yes.  I would say the other
12  evidence is his medical history says that he's
13  noncompliant with dialysis; right?  And that taken in
14  combination with his presenting symptoms of "I fell."  I
15  would say that that is, in broad terms, suggesting that
16  there is an emergency medical condition.  So there is
17  some evidence despite that note.
18  BY MR. O'LOUGHLIN:
19      Q.   The indication that Mr. Dunigan was noncompliant
20  with dialysis had been following him for quite some time,
21  had it not?
22      A.   I'm not sure how long that documentation was in
23  there.  It doesn't have a time of entry.  Some of the
24  other diagnoses have times of entry.  That one does not.
25  But at other hospitals, at Borgess, Borgess Hospital,

Page 131

1  it's documented that he's noncompliant.  But I don't know
2  that Dr. Rigot would have known that.
3       Q.   Could any patient who had a history of being
4  noncompliant with dialysis be considered stable after
5  presenting to the emergency department with a history of
6  a fall?
7       A.   Yes.  As we talked about earlier, there's the
8  circumstance where "I stumbled and tripped."  I think
9  that would be different.
10      Q.   If the history here was that Mr. Dunigan had
11  stumbled and tripped, would he have been able to be
12  considered stable as of the time that he was wheeled into
13  the waiting room?
14      A.   I think that's reasonable.  I've said that.  I
15  think that if he had provided the history that he tripped
16  and fell, not -- in contrast to what we're seeing, which
17  is a nursing note that that is not the circumstance.  But
18  if in that circumstance, I think had -- was it obligating
19  to check his potassium and work him up for that?  No.
20      Q.   In answer to some of Mr. VanderLaan's questions,
21  you talked about Mr. Dunigan not being able to verbalize
22  appropriately after he was wheeled into the waiting room.
23  When did you perceive that occurred?
24      A.   I don't have audio from that lobby video.  I
25  think there's audio on the police vehicle, so --

Page 132

1       Q.   After he was in -- I'm sorry.  After he was in
2  the back of the car?
3       A.   Correct.  As he was getting put into the car,
4  there's audio.
5       Q.   Okay.  And does that in any way indicate that
6  he's unable to verbalize appropriately?
7       A.   I think I just hear grunting, again.  I should
8  watch the video again.  I think it's mainly grunting and
9  nonsensical words.
10      Q.   Is "take me to jail" a nonsensical word?
11           MR. HARRINGTON:  Foundation.  Form.
12           THE WITNESS:  No.  But I don't remember hearing
13  that.
14  BY MR. O'LOUGHLIN:
15      Q.   Is "Can you take these cuffs off" a nonsensical
16  phrase?
17      A.   No.
18      Q.   Do you recall hearing that while he was in the
19  back of the police vehicle?
20      A.   No, I don't.
21      Q.   Would that be significant to you?
22      A.   Not really.  I mean, just based on his
23  appearance and his inability to, you know, follow
24  commands, engage and so on.
25      Q.   Just so we're clear, you don't know whether he

LEVINE, M.D., SAUL
02/27/2018                                                                    Pages 133–136

Page 133

1  was unable to follow commands or he was refusing to
2  follow commands; right?
3      **A.   Right.  I don't know.**
4      Q.   It would be speculation on your part to decide
5  which of those was the case?
6      **A.   Correct.  I don't know his intent or exactly.**
7  **That's right.**
8      Q.   Okay.  Now, based on everything we've talked
9  about, if hypothetically EMTALA requires that the
10 hospital personnel actually recognize an emergency
11 medical condition exists, would you agree that no Bronson
12 employee violated EMTALA in this case?
13         MR. HARRINGTON:  Form.  Foundation.
14         **THE WITNESS:  You're saying if they did**
15 **recognize -- wait.  Repeat it again, I'm sorry.**
16 BY MR. O'LOUGHLIN:
17     Q.   If EMTALA requires that the hospital personnel
18 actually recognize an emergency medical condition exists,
19 you would agree that Bronson personnel did not violate
20 EMTALA in this case?
21     **A.   But that's not --**
22         MR. HARRINGTON:  Same objection.
23         **THE WITNESS:  That's not what EMTALA says.  The**
24 **preface to your question is if EMTALA says you have to**
25 **recognize it.  That's not what the EMTALA says.  It says**

Page 134

1  **you have to screen for an emergency medical condition.**
2  **It doesn't say have to recognize it.**
3  BY MR. O'LOUGHLIN:
4      Q.   I asked hypothetical -- that's why I asked you
5  hypothetically.  I don't expect you to know the law.  I
6  don't expect you to know how courts interpret EMTALA.  So
7  hypothetically, if EMTALA requires that the hospital
8  personnel actually recognize an emergency medical
9  condition exists, you would agree that under your
10 analysis, Bronson did not violate EMTALA in this case?
11         MR. HARRINGTON:  Objection to form.  Foundation.
12         **THE WITNESS:  I honestly am not sure how to**
13 **answer that question, because you're asking me about a**
14 **theoretical statute.**
15         MR. HARRINGTON:  And you're asking him about a
16 legal conclusion.  And I don't think that's appropriate.
17 BY MR. O'LOUGHLIN:
18     Q.   Doctor, do you agree that based upon everything
19 you've reviewed, you are unable to say that any Bronson
20 personnel actually recognized that Mr. Dunigan had an
21 emergency medical condition that might be
22 life-threatening?
23     **A.   It does appear that the staff of the hospital**
24 **failed to recognize that he had an emergency medical**
25 **condition.**

Page 135

1      Q.   Thank you.  I appreciate it.
2      Does that mean the answer to my question is yes,
3  you can't say that any Bronson personnel actually
4  recognized that Mr. Dunigan had an emergency medical
5  condition?
6      **A.   Exactly.  They failed to recognize that he had**
7  **an emergency medical condition, yes, we're saying the**
8  **same thing now.**
9      Q.   We are.  Except now given that, if you assume
10 that EMTALA requires that they actually recognize an
11 emergency medical condition, then given that you agree
12 that there's no evidence that they did recognize it, they
13 did not violate EMTALA?
14         MR. HARRINGTON:  Form.  Foundation.  Calls for a
15 legal conclusion.
16         Doctor, if you know what the courts have ruled
17 and how they've interpreted this across the country and
18 within this Sixth Circuit, go ahead and answer.
19         MR. O'LOUGHLIN:  I don't think that requires any
20 of that.  It just requires him to answer the
21 hypothetical.
22         MR. HARRINGTON:  No.  I think it does require
23 him to know that.  Because you're asking him to -- with
24 your constrained hypothetical and saying how the courts
25 have interpreted EMTALA, did they violate it?  I mean,

Page 136

1  that's a question that the court is going to have to
2  decide, or the jury.  So I don't think it's appropriate
3  for this expert to answer that question as phrased.  I
4  think you need to rephrase it.
5  BY MR. O'LOUGHLIN:
6      Q.   Can you answer the question, Doctor?
7          MR. HARRINGTON:  Same objection.  I don't think
8  you can.
9          **THE WITNESS:  I honestly --**
10         MR. HARRINGTON:  Calls for a legal conclusion.
11         **THE WITNESS:  Yeah.  As well it's -- you're**
12 **taking this -- you're taking EMTALA and you're carving**
13 **something out of it saying, well, they have to recognize**
14 **that there's a problem.  And then in that circumstance,**
15 **where you've already said that they -- they didn't**
16 **recognize that there was an emergency medical condition,**
17 **now is to be applied to the circumstance where EMTALA has**
18 **to -- has to have the person recognize it and they --**
19 **they're saying they failed to recognize it.  So I guess I**
20 **have a very difficult time with this -- this question.**
21 BY MR. O'LOUGHLIN:
22     Q.   But you do appreciate the difference between
23 actually recognizing the correct diagnosis and
24 negligently failing to make the diagnosis, don't you?
25     **A.   That's a little blurred.**

LEVINE, M.D., SAUL
02/27/2018

Page 137

1    Q.   Let me ask this one:  If EMTALA requires that
2 hospital personnel have an improper motive for failing to
3 recognize and stabilize a patient's emergency medical
4 condition, you would agree that you could not say that
5 any of the hospital personnel -- or there's evidence that
6 any of the hospital personnel had an improper motive;
7 true?
8         MR. HARRINGTON:  Form foundation.
9         Go ahead.
10         THE WITNESS:  I don't think there's any evidence
11 that hospital personnel had a malicious approach to this
12 gentleman's care.
13         Does that answer your question?
14 BY MR. O'LOUGHLIN:
15    Q.   And if that's a required element of EMTALA, then
16 you would not be able to say that EMTALA was violated in
17 this case; true?
18    A.   I think you're asking me to answer a legal
19 question.  I think --
20    Q.   Well, I'm asking for your --
21    A.   So --
22    Q.   I'm asking you for your knowledge, based upon
23 your review of the materials and assuming that a required
24 element of an EMTALA violation is that the hospital
25 personnel did so for an improper motive, such as race,

Page 138

1 sex, political views, occupation, education, personal
2 prejudice, socioeconomic status or the availability of
3 insurance, you would not be able to say that any of those
4 were factors in this case?
5    A.   I don't -- I don't believe that they were
6 factors in this case.
7    Q.   All right.  Do you know whether Mr. Dunigan was
8 treated any differently than any other paying patient who
9 presented with the same symptoms and conditions?
10    A.   I would like to think that a patient that missed
11 his dialysis and is dizzy and falling would have a
12 different evaluation, but I don't have any reason to
13 believe that they treated Mr. Dunigan differently because
14 of his race or insurance, for instance.
15    Q.   Based upon your review and everything you know
16 about this case, did the hospital personnel actually
17 determine that Mr. Dunigan had an emergency medical
18 condition which could be life-threatening?
19    A.   It doesn't appear they did.
20    Q.   And if hypothetically EMTALA says and requires
21 that the hospital personnel determine that the individual
22 has an emergency medical condition, then the defendants
23 didn't violate EMTALA because of that requirement; true?
24         MR. HARRINGTON:  Counsel, now you're asking the
25 same thing again about the legal standards, and I don't

Page 139

1 think that's appropriate.  I'm going to object to the
2 form and foundation of the question.
3 BY MR. O'LOUGHLIN:
4    Q.   You can answer my question.
5         MR. HARRINGTON:  As long as it doesn't require
6 him to do a case law analysis of what the courts
7 determined.  I don't know that he can.
8         MR. O'LOUGHLIN:  It was a hypothetical.
9         MR. HARRINGTON:  You're saying what the courts
10 determined.  You keep throwing that in there.
11         MR. O'LOUGHLIN:  No.  I'm reading from EMTALA.
12         MR. HARRINGTON:  Oh, so you're reading from a
13 statute or case law interpreting a statute?
14         MR. O'LOUGHLIN:  No.  I'm asking him to assume
15 this interpretation and then agree with my conclusion.
16 What I'm asking him to assume is that EMTALA is not
17 violated unless the hospital personnel actually
18 determined that the individual has an emergency medical
19 condition.
20 BY MR. O'LOUGHLIN:
21    Q.   Based on that assumption, would you agree that
22 EMTALA was not violated in this case?
23         MR. HARRINGTON:  Doctor, that calls for a legal
24 conclusion.  If you -- if you know the law well enough to
25 answer, go ahead and answer.

Page 140

1         THE WITNESS:  I can't answer the question as
2 thoroughly as he would like me to.  But I think that
3 the -- the assumption that the hospital has to be aware
4 that they're sending somebody out with an emergency
5 medical condition, that's not really the intent of that
6 statute, I don't think.  Just because the hospital is
7 unaware of the dangerous condition doesn't absolve them
8 of the obligation to look for it or to stabilize it.
9 BY MR. O'LOUGHLIN:
10    Q.   Well, now you are getting into interpreting
11 statutes and giving legal conclusions.  I'm trying to
12 avoid that by asking you to assume that EMTALA requires
13 what it says it requires, which is that the hospital
14 determine that the individual has an emergency medical
15 condition.  If that is required for a violation of
16 EMTALA, would you agree that these defendants did not
17 actually determine that Mr. Dunigan had a -- an emergency
18 medical condition, and therefore, did not violate EMTALA?
19         MR. HARRINGTON:  Counsel, with all due respect,
20 we're going round and round.  You're asking him about
21 making legal conclusions, and then he's trying to give
22 you an answer, and then you're trying to say no, I'm
23 trying to steer you away from making legal conclusions.
24 What do you want this expert to do?
25         MR. O'LOUGHLIN:  The record speaks for itself.

LEVINE, M.D., SAUL
02/27/2018                                                                        Pages 141–144

Page 141

1    And please stop the speaking objections.
2         MR. HARRINGTON:  Well, this is probably the 10th
3    or 15th time you've asked him to make a legal conclusion.
4    I've remained virtually silent until about the 10th or
5    15th time you've asked it.
6         MR. O'LOUGHLIN:  I'll let the record speak for
7    itself.
8         Can I have an answer?
9         THE WITNESS:  I don't know.
10   BY MR. O'LOUGHLIN:
11        Q.  You do know that there's no evidence that anyone
12   at the hospital actually determined that Mr. Dunigan had
13   an emergency medical condition which could be
14   life-threatening; true?
15        A.  They did not appear -- as I said, they did not
16   appear to identify his emergency medical condition.
17        MR. O'LOUGHLIN:  Thank you, Doctor.
18        MR. HARRINGTON:  Allan, do you have anything?
19        MR. VANDERLAAN:  No questions.
20        MR. HARRINGTON:  I've got a couple.
21
22                FURTHER EXAMINATION
23   BY MR. HARRINGTON:
24        Q.  Doctor, what are some of the reasons for placing
25   somebody in a wheelchair to move them from an emergency

Page 142

1    department room to an emergency department waiting area?
2         A.  What are the reasons?  Ease of transport, you
3    know, inability to walk.
4         Q.  Does everybody who leaves an emergency
5    department room to the waiting room get transferred into
6    a wheelchair?
7         A.  No.
8         Q.  The fact that we can see Mr. Dunigan being
9    wheeled, and we know that he's coming from the emergency
10   department room to the waiting room, is that evidence of
11   patient instability?
12        MR. O'LOUGHLIN:  Form.  Foundation.
13        THE WITNESS:  I guess that's evidence of, you
14   know, potentially gait instability.
15   BY MR. HARRINGTON:
16        Q.  And also, Doctor, knowing what we know about the
17   entire clinical picture of Mr. Dunigan, the fact that he
18   had fallen, there was reported dizziness, and that he is
19   being wheeled from the emergency department -- an
20   emergency department room, examination room, to the
21   waiting area, can we make a reasonable inference that he
22   was -- had gait instability?
23        MR. O'LOUGHLIN:  Form and foundation.
24        MR. VANDERLAAN:  Join.
25        THE WITNESS:  I think that's a reasonable

Page 143

1    assumption to, you know, assume that he was unable to
2    walk.  I think that's demonstrated fairly quickly in the
3    lobby as well.
4    BY MR. HARRINGTON:
5         Q.  More likely than not, Doctor, at the time that
6    Mr. Dunigan was being taken out of the emergency
7    department examination room to the waiting area, do you
8    agree with me that Mr. Dunigan had gait instability?
9         MR. O'LOUGHLIN:  Form and foundation.
10        MR. VANDERLAAN:  Join.
11        THE WITNESS:  More likely than not.
12   BY MR. HARRINGTON:
13        Q.  Doctor, if hospital personnel wanted to have
14   people that they considered homeless off of their
15   property and would treat them different than, say,
16   somebody dressed like you right now, in a sport coat and
17   button-down shirt, or me wearing a suit and tie, would
18   that be actions for an improper motive?
19        MR. O'LOUGHLIN:  Form and foundation.
20        MR. VANDERLAAN:  Join.
21        THE WITNESS:  I suppose so.  I mean, my slanted
22   view of that is that I treat everybody the same and I
23   expect that other people would do that.  But -- so yeah,
24   I don't know.
25        Did I answer your question?

Page 144

1         MR. HARRINGTON:  No.
2    BY MR. HARRINGTON:
3         Q.  What I'm saying, if assuming the hospital wanted
4    to have people that they considered homeless off of their
5    property, in a different way than, say, people who are
6    dressed like you and I today, as I previously described,
7    that would be actions for improper motive, would it not?
8         MR. O'LOUGHLIN:  Form and foundation.
9         MR. VANDERLAAN:  Join.
10        THE WITNESS:  Yes.
11   BY MR. HARRINGTON:
12        Q.  Okay.  And if a disproportionate amount of
13   people that were being removed from, say, a hospital or
14   being ticketed for trespassing on the hospital were
15   African-American, would that potentially be evidence of
16   improper motive?
17        MR. O'LOUGHLIN:  Form and foundation.
18        THE WITNESS:  Potentially so.
19        MR. HARRINGTON:  Okay.  That's all I have.
20
21                FURTHER EXAMINATION
22   BY MR. O'LOUGHLIN:
23        Q.  All right.  Doctor, is gait instability the type
24   of instability that, in your opinion, EMTALA is talking
25   about as an unstable medical condition?

LEVINE, M.D., SAUL
02/27/2018

Page 145

1    A.   No.
2    Q.   If gait instability was the type of thing EMTALA
3  was talking about, would you be able to discharge any
4  patient who was a fall risk?
5    A.   That's a little preposterous.  I mean, anybody
6  that's had a stroke or is wheelchair bound or paralyzed,
7  they couldn't be discharged from the hospital.  Is that
8  what you're saying, because they don't have stable gait?
9  That's a strange hypothetical.
10   Q.   Okay.  So when Mr. Harrington was asking you
11 about evidence of gait instability, whether or not
12 Mr. Dunigan had gait instability wouldn't constitute an
13 unstable medical condition as contemplated by EMTALA,
14 with your understanding of EMTALA?
15   A.   Well, look, I mean, Mr. Dunigan has a cane.
16 He's somebody who's functionally ambulatory.  So to fail
17 to assess that at the time of his discharge, after
18 falling and being dizzy, is substandard.  So I think that
19 the wheelchair then becomes a marker of, well, they
20 didn't look.  They just wheeled him to the lobby.  I
21 think that's what he was getting at when he was drilling
22 on the wheelchair.
23   Q.   And do you know if that's the reason they
24 wheeled him to the lobby?
25   A.   No, I don't know.

Page 146

1    Q.   And he did get up on his own from the wheelchair
2  and move to several different locations within the
3  waiting room; true?
4    A.   True.  Although he was very unsteady.
5    Q.   And you don't know whether that unsteadiness was
6  his baseline or whether it was something new; true?
7    A.   Correct.  I don't know that.
8    Q.   Because you do recognize he had a stroke, had
9  hemiparesis and used a cane; correct?
10   A.   Yes.  I'm aware of those facts.
11   Q.   At the institution where you practice, I assume
12 you work in an emergency department?
13   A.   Yes, sir.
14   Q.   That emergency department has a waiting room?
15   A.   Yes, sir.
16   Q.   Are you aware of occasions where homeless people
17 come in and sit in the waiting room?
18   A.   That they come in from the outside world and sit
19 in the lobby, not as a patient being discharged, you're
20 asking?
21   Q.   Correct.
22   A.   I'm not --
23   Q.   I mean, not as a patient intending to be seen.
24   A.   I'm not familiar.  I don't know.
25   Q.   You don't know if that happens?

Page 147

1    A.   I don't know.
2    Q.   If that did happen, do you know whether the
3  hospital would be within its rights in asking a person
4  who has no legitimate business purpose there to leave?
5    A.   It would be -- in this theoretical, it would be
6  very strange for the hospital not to ask the patient if
7  they have a purpose of being in the hospital or if they
8  are there for a medical problem.  It would be weird if
9  they didn't ask that; right?
10   Q.   Okay.  And if they said "no"?
11   A.   If they said, "No, I'm here for" -- "to be a
12 visitor," or "I'm going to use your bathroom," or "Do you
13 have I vending machine?"  I don't see any reason that
14 that patient would need to be taken in and evaluated.
15   Q.   And if they had said none of those reasons, but
16 they have no -- they're not there for medical help, would
17 the hospital be within its right in asking them to vacate
18 the premises?
19   A.   You know, there's too many unknowns in this
20 theoretical.  "You're not here to use the bathroom.
21 You're not hungry.  What is it that you need?  Are you
22 confused?  Can you walk?"  I think that would probably
23 trigger a nurse's involvement, or assessment at least.
24   Q.   And what if it was none of those things, if the
25 person was just there to get out of the outdoors and have

Page 148

1  a place to sit?
2    A.   In this theoretical, it's -- again, you know, I
3  live in San Diego, so there's not many times you need to
4  come in from outside.  But you're saying it was for
5  weather or it's not declared, the patient just doesn't
6  say?
7    Q.   Or they say, "I'm waiting for the bus."
8    A.   Waiting for the bus.  There is a bus stop for
9  the bus.
10   Q.   Okay.  And you tell them that and they don't
11 leave.
12   A.   Well, it sounds like your patient's confused, so
13 I think it would be reasonable to bring them in and make
14 some kind of assessment.
15   Q.   You're not stretching things here, are you,
16 Doctor?
17        Did the hospital have a right to remove people
18 who aren't patients and aren't in the hospital for any
19 legitimate purpose from its premises?
20   A.   Yeah.  Hospitals are private property generally.
21 But it is a hospital.  So when people show up for no
22 reason or are confused in the lobby of an emergency
23 department, it would stand to reason that the patient
24 needs medical assistance.  This really, I think, is a --
25   Q.   I don't --

LEVINE, M.D., SAUL
02/27/2018

1    A.  -- broadly different theoretical than the case
2  that you and I are here for today.
3    Q.  Did Mr. Dunigan have, based on your review of
4  the evidence, a legitimate reason to remain in the
5  waiting room after the buses started running?
6    A.  I don't know.
7    Q.  What evidence since you -- well, are you aware
8  of any evidence that he was confused?
9    A.  Evidence that he was confused?  Not
10 particularly.  I mean, it does seem strange that he told
11 somebody he wanted to go to jail.  That seems a little
12 odd.  But confused outright, like he doesn't know what
13 day of the week it is or he doesn't know why he's there?
14 Not really evidence of that.
15   Q.  Or anything like it?
16   A.  Okay.
17   Q.  I mean, he was determined to be alert and
18 oriented earlier in the department; true?
19   A.  Yes.
20   Q.  Any other opinions you have regarding this case
21 that we haven't covered?
22       MR. HARRINGTON:  Objection to form.  Foundation.
23 I don't know what I'm going to ask at trial.
24       THE WITNESS:  No, sir.
25 ///

1  BY MR. O'LOUGHLIN:
2    Q.  Oh, the chest x-ray that you reviewed, was your
3  interpretation different than the radiologist's?
4    A.  No.
5    Q.  Did that chest x-ray indicate congestive heart
6  failure?
7    A.  It showed some mild pulmonary vascular
8  congestion.  I don't think particularly worrisome x-ray
9  standalone.
10   Q.  It wouldn't -- the x-ray would not indicate an
11 emergency medical condition which would be
12 life-threatening to the patient; correct?
13   A.  It does not show evidence of that.
14       MR. O'LOUGHLIN:  Thank you, Doctor.
15       MR. HARRINGTON:  I'm good.  I don't have any
16 questions.
17       THE REPORTER:  Are we off the record, Counsel?
18       MR. O'LOUGHLIN:  We are.
19       (The deposition concluded at 12:20 p.m.)
20                    * * *
21
22
23
24
25

1                REPORTER'S CERTIFICATE
2
3
4       I, Renée C. Roberts, CSR No. 6910, Certified
5  Shorthand Reporter, certify:
6       That the foregoing proceedings were taken
7  before me at the time and place therein set forth, at
8  which time the witness was put under oath by me;
9       That the testimony of the witness, the
10 questions propounded, and all objections and statements
11 made at the time of the examination were recorded
12 stenographically by me and were thereafter transcribed;
13       That a review of the transcript by the deponent
14 was not requested;
15       That the foregoing is a true and correct
16 transcript of my shorthand notes so taken.
17       I further certify that I am not a relative or
18 employee of any attorney of the parties, nor financially
19 interested in the action.
20       I declare under penalty of perjury under the
21 laws of California that the foregoing is true and
22 correct.
23       Dated this 1st day of March, 2018.
24
   _____
25 Renée C. Roberts, CSR No. 6910

# Exhibit 7



WESTERN MICHIGAN UNIVERSITY
— Homer Stryker M.D. —
SCHOOL OF MEDICINE

## Postmortem Examination Report

# James R. Dunigan

| | |
|---|---|
| WMed Number: | W16-326 |
| Date of Birth: | 03/24/1959 |
| Date Pronounced Dead: | 05/06/2016 |
| Age: | 57 years |
| Sex: | Male |
| Date of Examination: | 05/07/2016 |
| Time of Examination: | 0800 hours |
| Procedure: | Complete Autopsy |
| Identification: | Identification tags |
| County: | Kalamazoo |
| Medical Examiner: | Elizabeth A. Douglas, MD |
| Persons in Attendance: | Lee Morgan, Autopsy Assistant; Kalamazoo County Sheriff's Office representative |

**Cause of Death:** Hypertensive atherosclerotic cardiovascular disease, diabetes mellitus, chronic obstructive pulmonary disease,  and end stage renal disease complicated by acute intoxication by the combined effects of hydrocodone, diphenhydramine, ephedrine, and gabapentin

Department of Pathology
1000 Oakland Drive    Kalamazoo, MI 49008-8074
PHONE 269.337.6173    FAX 844.337.6001    WEB med.wmich.edu

**Other Conditions:** Chronic cocaine use, Fentanyl ingestion

**Manner of Death:** Accident

## Investigative Summary/Comment

The decedent, a 57 year-old male, who had reportedly been discharged from the emergency department following a work-up for flank pain which developed after a fall. He then reportedly refused to leave the hospital, and was transported to the local jail. However, he was unresponsive upon arrival to the jail. Additional details of this investigation are on file with the Kalamazoo County Medical Examiner's Office.

## Receipt of Remains

The remains were transported to the morgue by Mike Daniel on Friday, May 06, 2016 at 09:30 hours and assisted into the facility by Sarah Prolo of the Pathology Department.

The remains are received in the supine position contained within a blue plastic transport pouch. A tag attached to the transport pouch bears the name, "Dunigan James". A seal securing the zippers on the transport pouch bears the number "0080885". A tag attached to the right foot bears the decedent's name. A hospital issued identification band is around the left wrist.

## External Examination

**Clothing and personal effects**
The remains are received wearing and with the following:

- Gray and red hooded shirt
- Dark denim jeans
- Multi-colored boxer shorts
- Yellow socks
- Beige athletic shoes
- Brown wallet containing assorted bank cards, identification cards, and papers

**Features of identification**
The body is that of an African American male, whose appearance is consistent with the reported age of 57 years. The body weighs 171 pounds, including the weight of the personal effects and transport pouch, and is 69 inches in length. The scalp hair is short and dark brown with normal distribution. The facial hair is unshaven. The irides appear brown. The upper teeth are natural and in fair condition. The lower teeth are natural and in fair condition. In addition to these features of identification, multiple blue-black tattoos of the neck, trunk, and extremities including interlocking geometric designs, text, a cross, a flower, and a chain are identified. Multiple linear, ovoid, and irregular scars measuring up to 1-inch in length are present over the upper and lower extremities. The following scars are also present:

- 3-inch horizontally oriented linear scar of the left antecubital fossa
- 2-1/2 inch horizontally oriented linear scar of the left antecubital fossa
- ¾-inch x 1 ½-inch irregular scar of the left knee
- ¾-inch linear scar of the right supraclavicular chest

**Postmortem changes**

Rigor mortis is full. Fixed red lividity is over the posterior body surfaces. The skin temperature is cool; the body has been refrigerated. The corneas are clear. The remains are well-preserved in the absence of embalming.

**Evidence of therapeutic intervention**

- Oral endotracheal tube
- Single lumen intravascular catheter secured with occlusive dressing piercing the skin of the right antecubital fossa
- Four electrocardiogram electrode pads
- Two sets of cardiac defibrillator pads
- Anterior rib fractures in the parasternal line
- Suture closure overlying fistula of the left upper extremity
- Double lumen peripherally inserted central catheter (PICC), right supraclavicular

**Postmortem Imaging Studies**

Postmortem radiographs are not obtained during the examination.

**General**

The body habitus is normal. The distribution of body hair is normal for the gender and reported age. There is no evidence of malnutrition or dehydration. No peculiar odors or color changes of the decedent are noted. There are no adherent foreign materials on the body. There are no unusual vascular markings. There is no visible or palpable adenopathy.

**Head**

The scalp and soft tissues of the face are free of injury. The periorbital, nasal, and facial bones are intact to palpation. The conjunctivae and periorbital regions are pale. The sclerae are anicteric. The pupils are unremarkable. The nasal vestibules are unremarkable. The lips, gums, tongue, and buccal mucosa, where seen, appear free of injury and significant natural disease. The external ears are normally formed and positioned. The mastoid and mandibular regions are unremarkable.

**Neck**

The neck is of normal configuration; there is no crepitance with manipulation or subcutaneous emphysema. There are no palpable masses of the neck. There is no tracheal deviation.

**Torso**

The thorax is symmetrical and normal in configuration. The breasts are of normal adult male configuration, and there are no palpable masses. The abdomen is soft. The cervical, supraclavicular, axillary, and inguinal regions are free of palpable adenopathy. The distribution of body hair is appropriate for the reported age. The external genitalia

are of normal male conformation, and there are no external lesions. The perineum and perianal areas are unremarkable. The lower back and buttocks are free of significant abnormalities.

**Upper Extremities**
The upper extremities are symmetrical and appropriately developed for the reported age. All digits are present.

**Lower Extremities**
The lower extremities are symmetrical and appropriately developed for the reported age. There is a moderate degree of pitting edema over the feet and distal lower extremities. All digits are present.

## Evidence of Injury
There are abraded contusions over the ulnar and volar surfaces of the wrists in addition to a ½-inch red abrasion of the right knee. An approximate 2-inch zone of extravasated blood is in the left anterior chest wall in the midclavicular line, and a 1-inch zone of extravasated blood is in the right anterior chest wall in the midclavicular line.

## Internal Examination

**Torso**

*Evisceration/Dissection Method*
The organs of the thoracic, abdominal and pelvic cavities are removed using the Virchow technique (individually).

*Chest and Abdomen- Walls and Cavities*
The body is opened by means of the usual "Y" incision. The subcutaneous fat and musculature are normal and free of injury. The sternum and chest plate are intact. Prior to their removal, the viscera of the thoracic, abdominal and pelvic cavities are examined in situ and occupy their normal sites. The serous surfaces of the right thoracic cavity are adhesed to the right lung. The serous surfaces of the left thoracic cavity are adhesed to the left lung. There are delicate fibrinous adhesions between loops of bowel. The serous surfaces are otherwise smooth and glistening.  No significant fluid accumulations are present in the pericardial sac, pleural cavities or abdominal cavity. There are no abnormal masses present. The diaphragmatic leaves are normally situated. The margins of the liver and spleen are in proper relationship to their costal margins. The weights of the organs are as follows and, unless specified below, show no additional evidence of congenital or acquired disease.

*Organ Weights*
Heart - 550 grams
Right lung - 1060 grams

Left lung - 820 grams
Spleen - 180 grams
Liver - 2140 grams
Right kidney - 160 grams
Left kidney - 170 grams

### Cardiovascular System
Heart:
The heart is enlarged. The coronary arteries have a normal anatomic distribution, and multiple cross sections reveal up to 99% narrowing right coronary artery and 99% narrowing of the first diagonal branch of the left anterior descending coronary artery. The epicardium is smooth and glistening. There is a normal amount of epicardial fat and its distribution is normal. The great vessels enter and leave the heart in a normal manner. The cardiac chambers have a normal configuration. The septa are intact, and there are no congenital abnormalities. The myocardium is of normal consistency and appearance. The left and right ventricles are 2.0 centimeters and 0.3 centimeters thick, respectively. The interventricular septum is 2.0 centimeters thick. The heart valves are thin, pliable, and delicate, and are free of deformity. Valve circumferences are as follows: tricuspid valve = 12 centimeters, pulmonic valve = 8 centimeters, mitral valve = 11 centimeters, and aortic valve = 6 centimeters.

Aorta and its major branches:
There is a moderate degree of atheromatous streaking and plaque formation of the thoracic and abdominal aorta. There is minimal ulceration and calcification of the atheromatous plaques of the infrarenal abdominal aorta.

Venae cavae and their major tributaries:
The superior and inferior venae cavae and their major tributaries are patent throughout. No areas of extrinsic or intrinsic stenosis are present. The deep veins of the lower extremities are dissected and sectioned; no areas of thrombosis are identified.

### Respiratory System
The major bronchi have a normal caliber and are free of obstruction. The right and left lungs have a normal lobar configuration. The visceral pleura is adhesed to the chest wall and is mottled severely with black streaks and macules. There are subpleural emphysematous bullae. The distal segmental pulmonary arteries are occupied by thromboemboli. The lungs are sub-crepitant throughout. The parenchyma is congested and emphysematous.

### Digestive System
The distal esophagus is erythematous; the esophagus is otherwise free of lesions. The stomach has a normal configuration. The serosa is smooth and

glistening. The wall is of normal thickness and the mucosa is thrown into rugal folds. There are pinpoint areas of mucosal ulceration. The stomach contains 300 cc of semisolid and partially chewed material suspended in brown liquid. The duodenum is free of ulceration and other intrinsic lesions. The remainder of the small bowel, the colon, and the rectum are normal in appearance.  The appendix is present and is unremarkable.

### Hepatobiliary System and Pancreas
*Liver:*
The capsule is smooth and glistening. The liver configuration is normal. Multiple cross sections through the liver reveal a normal parenchyma.

*Gallbladder:*
The gallbladder is of normal size and configuration. The wall is thin and the mucosa is bile-stained. It contains approximately 20 mL of bile. No calculi are present.

*Pancreas:*
The pancreas is firm. Multiple cross sections through the pancreas reveal a moderate degree of fibrosis. The main pancreatic duct is probe patent.

### Reticuloendothelial System
The spleen has a normal configuration. The capsule is blue-gray and smooth, without areas of thickening. On section, the splenic pulp is of normal consistency and appearance. No abnormal lymph nodes are encountered. Lymph nodes of the mediastinal, and abdominal areas appear normal. There is moderate anthracosis of the pulmonary hilar lymph nodes. Where bone marrow is seen, it is unremarkable. The thymus is involute.

### Urogenital System
*Kidneys and Ureters:*
The right and left kidneys are similar. The capsules strip with minor difficulty to reveal granular subcapsular surfaces. On section, the renal cortices are attenuated and the cortico-medullary demarcations are distinct. The pelvo-calyceal systems are normal in appearance. The ureters are unremarkable.

*Bladder:*
The bladder is of normal configuration. The mucosa is intact and free of ulcerations or other lesions. It contains 50 mL of clear, straw-colored urine.

*Prostate and seminal vesicles:*
Multiple cross sections through the prostate reveal rubbery, firm, gray-white parenchyma, free of lesions. The seminal vesicles are unremarkable.

*Testes:*

The testes are both present within the scrotal sac. The tunica vaginalis of the right teste contains clear, serous fluid. Bivalve sections of the testes show a normal parenchyma.

### *Endocrine Organs*

No abnormalities are present in the thyroid or adrenal glands. The pituitary gland is mildly enlarged.

## Head and Brain:

The scalp is reflected using the standard intermastoidal incision. The cranial contents are examined in situ as the calvarium is removed and as the dura is reflected.

Weight: 1250 grams

The scalp shows no evidence of contusions or galeal hemorrhages. The skull is intact. The dura is smooth and glistening. There are no subdural blood accumulations. The convexities of the cerebral hemispheres are symmetrical. The leptomeninges are thin and transparent. The subarachnoid space does not contain any hemorrhage. The cerebrum presents normal convolutions, with no flattening of the gyri or deepening or widening of the sulci. There is no evidence of subfalcial, uncal, or cerebellar tonsillar herniation present. The major cerebral arteries show mild atherosclerosis, most prominently at the branch points of the circle of Willis. There are no congenital anomalies of the cerebral arteries. The roots of the cranial nerves are unremarkable. Serial coronal sections through the cerebral hemispheres show a remote infarct in the right basal ganglia, but an otherwise grossly normal cortical ribbon and underlying white matter. Serial cross sections through the brainstem and sagittal sections through the cerebellum fail to show any gross lesions or abnormalities. The ventricular system is symmetrical and of normal size and configuration. After removal of the brain, the base of the skull does not demonstrate any fractures.

## Neck and Pharynx:

The skin of the neck is dissected up to the angle of the mandible. There is no evidence of soft tissue trauma to the major airways or vital structures of the lateral neck compartments. A layered dissection of the anterior strap muscles of the neck does not disclose injury. The neck organs are excised en bloc and examined separately. The larynx and trachea have a normal caliber and are free of obstruction. The laryngeal and tracheal mucosa is soft and free of lesions. The paravertebral musculature is unremarkable. The cervical spine, hyoid bone, and tracheal cartilage are intact.

## Musculoskeletal:

The axial and appendicular skeleton shows no abnormalities. The exposed musculature is unremarkable. The anterior cervical spine and atlanto-occipital joint are stable to manipulation.

**Spinal Cord:**
Serial cross sections through a small portion of the proximal cervical spinal cord show no gross abnormalities.

## Other Procedures

1. Photographs for identification and documentation purposes are obtained.
2. Tissue samples are retained in formalin.
3. Tissue samples are placed in cassettes for processing to slides for microscopic examination.
4. Blood is submitted for a postmortem drug screen.
5. Urine is submitted for a postmortem drug screen.
6. Vitreous fluid is obtained for analysis, if indicated.
7. Fingerprints are obtained and are retained in this office.
8. Blood is placed on a DNA card and is retained for analysis, if indicated.

## Slide Block Index

A- Representative section, right lung
B- Representative section, left lung
C- Representative sections, left and right ventricular myocardium, first diagonal branch of the left anterior descending coronary artery
D- Representative sections, interventricular septum and right coronary artery
E- Representative sections, right kidney and liver
F- Representative section, left kidney
G- Representative section, right hippocampus and cerebellum
H- Representative sections, left hippocampus and cerebellum

## Microscopic Descriptions

Heart
- Myocyte hypertrophy
- Interstitial and subendocardial fibrosis
- Intramyocardial arteriolosclerosis

Right coronary artery
- Severe atherosclerotic plaque formation characterized by intimal fibrosis, calcific deposits, cholesterol cleft formation, and mild chronic inflammation

First diagonal branch of the left anterior descending coronary artery
- Tangential section through vessel wall showing atherosclerotic plaque formation characterized by intimal fibrosis, calcific deposits, cholesterol cleft formation, and mild chronic inflammation

Lungs

- Enlarged alveoli separated by thin septa and loss of attachments of the alveoli to the outer walls of small airways with concomitant expansion of airspaces
- Vascular congestion
- Intra-alveolar pigment laden macrophages
- Diffuse extravasation of blood within alveolar spaces
- Rare paravascular multinucleated cells with polarizable debris within cytoplasmic space
- Formalin pigment artifact
- Organizing embolus, right lung

Liver
- Periportal clusters of modestly dilated and angulated bile ducts containing intraluminal bile in fibrous stroma without significant atypia or inflammation.
- Moderate degree of chronic, portal-based inflammatory cell infiltrates

Kidneys
- Scattered foci of polarizable debris
- Occasional focus of irregular, coarse basophilic deposits
- Hyaline tubular debris
- Chronic interstitial inflammatory cell infiltrates
- Nodular glomerulosclerosis
- Arteriolonephrosclerosis

Central Nervous System
- Hyaline arteriopathy, penetrating vessels of the cerebrum
- Vascular congestion



**Examination and Investigative Findings**

I. Hypertensive atherosclerotic cardiovascular disease

   a) Cerebral atherosclerosis, mild

      i) Remote cerebral vascular accident

   b) Hypertensive cardiovascular disease (clinical history)

      i) Cardiomegaly

      ii) Left ventricular hypertrophy

      iii) Light microscopic changes consistent with essential hypertension

         (1) Replacement fibrosis of the ventricular myocardium

         (2) Intramyocardial arteriolosclerosis

         (3) Myocyte hypertrophy

         (4) Hyaline arteriopathy of the penetrating vessels of the cerebrum

         (5) Arteriolonephrosclerosis

   c) Coronary artery atherosclerosis

      i) Acute coronary syndrome (clinical history, circa 07/2014)

      ii) 99% narrowing, right coronary artery

      iii) 99% narrowing, first diagonal branch of the left anterior descending coronary artery

   d) Congestive heart failure (clinical) with pitting pedal edema

   e) Aortic atherosclerosis

II. Diabetes mellitus, by clinical history

   a) Nodular glomerulosclerosis

   b) Postmortem vitreous glucose 14 mg/dL

   c) Volatiles not detected

III. Chronic kidney disease, by history

   a) Hemodialysis, three times weekly (clinical history)

   b) Date of last hemodialysis unknown

      c)  Arteriovenous fistula, left upper extremity

      d)  PICC line, right subclavian

      e)  Postmortem vitreous electrolytes

          i)  Sodium- 145 mmol/L

          ii)  Potassium- 10.3 mmol/L

          iii)  Chloride- 115 mmol/L

          iv)  Glucose- 14 mg/dL

          v)  Urea nitrogen- 52 mg/dL

          vi)  Creatinine- 3.3 mg/dL

IV. Chronic tobacco exposure

      a)  Eleven pack year smoking history (clinical)

      b)  Mottling of the pulmonary visceral pleura

      c)  Anthracotic hilar lymph nodes

      d)  Intra-alveolar pigment laden macrophages

      e)  Pulmonary emphysema

V.  Mixed drug intoxication

      a)  Pulmonary edema

      b)  Obtundation and diminished respiratory drive observed in video obtained from police vehicle used to transport decedent from hospital to jail

      c)  Femoral blood

          i)  Ephedrine- 141 ng/mL

          ii)  Benzoylecgonine- 1146 ng/mL

          iii)  Hydrocodone- 50.2 ng/mL

          iv)  Gabapentin- 9.8 mcg/mL

          v)  Diphenhydramine- 346 ng/mL

      d)  Urine drug screen positive for:

          i)  Benzoylecgonine

          ii)  Fentanyl

          iii)  Norfentanyl

          iv)  Hydrocodone

          v)  Hydromorphone

e) Postmortem vitreous fluid negative for volatiles

f) Query of Michigan Automated Prescription System performed 07/05/2016 did not return a record of a hydrocodone prescription in the decedent's name

g) Review of emergency department records from decedent's last visit does not disclose hydrocodone administration

VI. Chronic cocaine use

a) Weekly cocaine use, clinical history

b) Urine and femoral blood positive for cocaine metabolites

c) Date of last hemodialysis run unknown

VII. Fentanyl ingestion

a) Urine positive for fentanyl and fentanyl metabolite

b) Query of Michigan Automated Prescription System performed 07/05/2016 did not return a record of a fentanyl prescription in the decedent's name

c) Review of emergency department records from decedent's last visit does not disclose fentanyl administration

VIII. Subsegmental right lower lobe pulmonary embolus

IX. Pancreatic fibrosis

X. Chronic Hepatitis C

XI. Right testicular hydrocele

XII. Bile duct hamartoma

XIII. Abrasions and contusions of the wrists

XIV. Soft tissue hemorrhage, anterior chest wall

Elizabeth A. Douglas, M.D.

July 5, 2016

Exhibit 8

# In the Matter Of:

# DUNIGAN vs BRONSON METHODIST HOSPITAL, ET AL.

# WERNER SPITZ, M.D.

March 20, 2018

*Prepared for you by*



**US LEGAL SUPPORT**

The Power of Commitment™

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

SPITZ, M.D., WERNER
03/20/2018                                                                                      Pages 1–4

---

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            WESTERN DISTRICT OF MICHIGAN
 3                  SOUTHERN DIVISION
 4
 5   GORDA DUNIGAN, as Personal
 6   Representative for the ESTATE OF
 7   JAMES DUNIGAN, Deceased,
 8                Plaintiff,
 9        vs.                Case No.1:16-CV-01324
10                           Hon. Ellen S. Carmody
11   BRONSON METHODIST HOSPITAL,
12                Defendant,
13        and
14   GORDA DUNIGAN, as Personal
15   Representative of the ESTATE OF
16   JAMES DUNIGAN, Deceased,
17                Plaintiff,
18        vs.                Case No. 1:16-CV-01325
19   DEREK NUGENT, et al,         Hon. Ellen S. Carmody
20                Defendants.
21                      /
22
23
24
25
```

---

**Page 2**

```
 1            The Deposition of WERNER SPITZ, M.D., F.C.A.P.,
 2        Taken at 23001 Greater Mack Avenue,
 3        St. Clair Shores, Michigan,
 4        Commencing at 2:17 p.m.,
 5        Tuesday, March 20, 2018,
 6        Before Linda S. Wilson, CSR-0973.
 7
 8   APPEARANCES:
 9
10   DONALD H. DAWSON, JR.
11   Fieger, Fieger, Kenney & Harrington
12   19390 West Ten Mile Road
13   Southfield, Michigan 48075
14   (248) 355-5555
15   d.dawson@fiegerlaw.com
16        Appearing on behalf of the Plaintiff.
17
18   ALLAN C. VANDER LAAN
19   Cummings, McClorey, Davis & Acho, P.L.C.
20   2851 Charlevoix Drive, SE, Suite 327
21   Grand Rapids, Michigan 49546
22   (616) 975-7470
23   avanderlaan@cmda-law.com
24        Appearing (Telephonically) on behalf of the
25        Defendants, Nugent, et al.
```

---

**Page 3**

```
 1   JOHN C. O'LOUGHLIN
 2   Smith, Haughey, Rice & Roegge, P.C.
 3   100 Monroe Center Street, NW
 4   Grand Rapids, Michigan 49503
 5   (616) 774-8000
 6   joloughlin@shrr.com
 7        Appearing (Telephonically) on behalf of the
 8        Defendant, Bronson Methodist Hospital.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1                INDEX TO EXAMINATIONS
 2
 3   Witness                              Page
 4   WERNER SPITZ, M.D. F.C.A.P.
 5
 6     EXAMINATION                          5
 7   BY MR. O'LOUGHLIN:
 8     EXAMINATION                         81
 9   BY MR. VANDERLAAN:
10     EXAMINATION                         85
11   BY MR. DAWSON:
12     RE-EXAMINATION                      86
13   BY MR. O'LOUGHLIN:
14
15                INDEX TO EXHIBITS
16
17   Exhibit                              Page
18   (Exhibit attached to transcript.)
19
20     DEPOSITION EXHIBIT 1                21
21
22
23
24
25
```

---

SPITZ, M.D., WERNER
03/20/2018                                                                    Pages 5–8

Page 5

1    St. Clair Shores, Michigan
2    Tuesday, March 20, 2018
3    2:17 p.m.
4
5                    WERNER SPITZ, M.D., F.C.A.P.,
6    was thereupon called as a witness herein, and after
7    having first been duly sworn to testify to the truth,
8    the whole truth and nothing but the truth, was
9    examined and testified as follows:
10            MR. O'LOUGHLIN:  The record should reflect
11   that this is the deposition of Dr. Werner Spitz being
12   taken for all purposes allowed under the Federal Court
13   Rules and the Federal Rules of Procedure.
14            Did somebody else just join the call, or
15   did I hear that wrong?  Okay.  Never mind.
16                    EXAMINATION
17   BY MR. O'LOUGHLIN:
18   Q.   Would you state your name, please?
19   A.   Werner Spitz, S like Sam, P like Paul, I, T like Tom,
20        Z like zebra.
21            MR. O'LOUGHLIN:  I didn't ask.  Who is
22        there for the Plaintiff's Counsel?
23            MR. DAWSON:  I'm here.  Don Dawson on
24        behalf of Harrington.  He couldn't make it.
25

Page 6

1    BY MR. O'LOUGHLIN:
2    Q.   And Doctor, what is your profession?
3    A.   I'm a medical doctor, and I'm a forensic pathologist.
4    Q.   You have been listed as an expert for the Plaintiff in
5         this case, and I have a report from you that is dated
6         April 15th, 2017.  Do you have that report available
7         to you?
8    A.   Yes, indeed, I do.
9    Q.   Can you estimate for me the numbers of times you have
10        acted as an expert reviewer or witness in a legal
11        case?
12   A.   Oh my God.  I don't know.  Many times.  Over maybe
13        2,000 or 3,000.  I have been doing this work -- I have
14        been a forensic pathologist for the last 64 years.
15   Q.   Your date of birth is March 24th, 1959?
16   A.   I wish it was.
17   Q.   I'm sorry.  I'm sorry.  I was looking at the -- that
18        is very bad.  Your date of birth is August 22, 1926?
19   A.   You are correct.
20   Q.   Making you 91 years old?
21   A.   That's correct.
22   Q.   Do you continue to actively practice?
23   A.   Yes.
24   Q.   Of the 2,000 to 3,000 cases which you have acted as an
25        expert reviewer or witness, how many of those were for

Page 7

1    the Fieger law firm?
2    A.   Well, nowhere near the total of course, but I really
3         don't know.  I have testified for the Fieger firm, and
4         I have also testified against the Fieger firm.  So I
5         couldn't say.  I don't really know.  I have testified
6         a lot of times for and a fair number of times against
7         the Fieger firm.
8    Q.   Have you testified for the Fieger firm more than 100
9         times?
10   A.   I doubt that, but maybe 50.
11   Q.   The fee scheduled we were provided in this case
12        indicates that before being listed as an expert you
13        require a $4,000 retainer; is that correct?
14   A.   Yes, that is correct.
15   Q.   In those 50 or so cases in which you have reviewed
16        cases for the Fieger firm, did you receive that $4,000
17        retainer?
18   A.   Oh, yes.
19   Q.   For this deposition you required us, the Defendants,
20        to prepay $2,500?
21   A.   Yes.  I have received the usual fee of $2,500 for this
22        deposition.
23   Q.   Does that limit us to any particular time or apply to
24        any particular amount of time?
25   A.   Well, it limits you to three hours.

Page 8

1    Q.   I didn't see that in the fee schedule, but that
2         shouldn't be a problem.
3    A.   Okay.
4    Q.   If we only take a half hour, do we get a refund?
5    A.   No, you don't.  It says on the invoice that the fee is
6         not refundable.
7    Q.   What amount of income do you derive from acting as an
8         expert reviewer or witness per year?
9    A.   Well, this is my profession.  All my professional
10        income comes from my work as a forensic pathologist.
11        That involves review, and it involves testimony when
12        it happens.  Many times it doesn't happen.  I have
13        additional income, but that is from investments.
14   Q.   I'm just asking about the amount of income from your
15        expert work either as a reviewer or witness in
16        medical-legal cases.
17   A.   You mean you want an amount?
18   Q.   Yes, please.
19   A.   No, I cannot give you that.  The reason that I cannot
20        give it to you is because my work -- my professional
21        work is jointly accomplished with my wife, and my wife
22        is adamant about not releasing that amount.
23   Q.   All right.  We will reserve that for the judge at the
24        time of trial.  How much would you have to be paid to
25        dance naked on the table?

SPITZ, M.D., WERNER
03/20/2018                                                                                    Pages 9–12

Page 9

1   A.   I don't understand.
2   Q.   Have you in the past testified that if you are paid
3        enough, you will dance naked on the table?
4   A.   Well, you know, that was a stupid statement that I
5        made, but I was aggravated by the lawyer who was
6        questioning me incessantly, but the main --
7        unnecessarily.  The main comment that I have to make
8        now about that comment that I made is that I have
9        never had an offer.  So yes, I made the statement, but
10       I have never had anybody wanting to take me up on it.
11  Q.   We don't know your price.
12  A.   Well, I'm pretty cheap.
13  Q.   All right, Doctor.  Going to your report of April
14       15th, 2017 in this case, you initially list the
15       material you have reviewed.  Do you have that in front
16       of you?
17  A.   Yes.
18  Q.   Is that a list of all of the material you have
19       reviewed regarding this case?
20  A.   No.  There was some additional materials that I
21       received just a couple -- in fact, one of them I
22       received a big, fat envelope just yesterday.  But most
23       of the material I received before I wrote this report.
24  Q.   All right.  I will try and break it down.  As of the
25       time you wrote this report are the items listed all of

Page 10

1        the materials you have reviewed related to this case?
2   A.   No.  All the material that I listed on the front page
3        of the report were reviewed and used to write this
4        report.  There were additional materials which came in
5        as late as yesterday.
6   Q.   Correct.  I may not have been clear in my question.  I
7        was trying to go back to the time you wrote this
8        report and asking if at that time the materials listed
9        here were all the materials you had related to this
10       case.
11  A.   Yes, that's correct.  I did have all the materials
12       listed that I reviewed available to me when I wrote
13       this report.
14  Q.   Did you have anything other than those materials
15       available to you when you wrote this report?
16  A.   No.
17  Q.   Can you identify what material you have received since
18       April 15th, 2017?
19  A.   There were expert opinions, expert depositions,
20       including, those that I remember offhand without
21       searching, Dr. Levine in San Diego, Dr. Landers, and
22       there were some others.  There were at least two
23       others.  Do you want me to go look for them?
24  Q.   Do you have with you today everything that you have
25       reviewed related to this case?

Page 11

1   A.   Yes, I do.
2   Q.   Did you review the deposition testimony of Dr. Stark?
3   A.   Yes, I did.
4   Q.   Pardon me?
5   A.   Yes, I do have that deposition.
6   Q.   Okay.  We are talking deposition transcripts, not
7        their written report?  Although those were referred to
8        and may have been included with the transcripts, you
9        actually reviewed their deposition testimony in this
10       case?
11  A.   Yes, I did.
12  Q.   What else have you reviewed since April 15th, 2017?
13  A.   Well, like I said, Dr. Levine that I received
14       yesterday, Dr. Levine, Dr. Landers, Dr. Stark, and
15       there is another one.  I forgot which one that is.
16  Q.   The pharmacologist, whatever he was,
17       psychopharmacologist?
18  A.   Yes.  He has, I think, a Greek name.  Komesaroff.
19  Q.   Okay.  He has not yet been deposed, but you may have
20       his report?
21  A.   I think I have his report, and I thought I had a
22       deposition.
23  Q.   Well, if you do, I wasn't there.
24  A.   Maybe I don't have that.  But I do know that I
25       reviewed something that is about a half inch or so in

Page 12

1        thickness given by Dr. Komesaroff.  He is a professor
2        at a college as far as I know, or a university.
3   Q.   What else have you reviewed?  What other depositions
4        have you received?
5   A.   I received the deposition of Dr. Levine, of Dr. Stark,
6        of Dr. Landers.  Those are all depositions that I
7        received yesterday.
8   Q.   Have you ever reviewed the depositions of any of the
9        healthcare providers involved in Mr. Dunigan's
10       Emergency Department visit of May 6th, 2016?
11  A.   Yes, I did.  I don't recall all their names, but I
12       remember one, Shoemaker, and if you mention another
13       one, then I will know whether I reviewed this
14       gentleman's as well.
15  Q.   Mr. Shoemaker, I believe, was a security officer at
16       Bronson.  Was the other deposition you reviewed of
17       another security officer?
18  A.   Yes.  I forget his name.
19  Q.   Did you review depositions of any of the actual
20       healthcare providers from Bronson, emergency room
21       physician?
22  A.   Yes.
23  Q.   Nurses, medical assistants?
24  A.   Yes.  There is a physician.  I forgot his name.  Let
25       me see.  I don't find it here.  I would have to go and

SPITZ, M.D., WERNER
03/20/2018

Pages 13–16

Page 13

1    get it and then tell you.  If you want me to do that,
2    I will do that.
3  Q.  I really would like to know what it is you have had
4      access to for --
5  A.  Let me go and look at what that is.
6  Q.  Please bring back all of the depositions you have
7      reviewed --
8  A.  Okay.
9  Q.  -- and any other material.
10  A.  Okay.
11              (Recess taken at 2:33 p.m.)
12              (Back on the record at 2:35 p.m.)
13  A.  Gorda Dunigan.
14  BY MR. O'LOUGHLIN:
15  Q.  Doctor, just so the record is clear, you are now
16      listing the names of witness' depositions you have
17      read?
18  A.  Yes.  Dr. Simpson.  That is a doctor of education,
19      Dr. Dennis Simpson, Nolan Cattell.  I already
20      mentioned Charles Shoemaker.
21  Q.  You did.
22  A.  I think I already mentioned Gorda Dunigan.
23  Q.  Yes, you did.
24  A.  Dr. Stark, Dr. Landers, Dr. Levine.  I think that is
25      all.  That's all the depositions.  There are other

Page 14

1    documents.
2  Q.  And I appreciate you doing that.  Sorry it took as
3      long as it did.  What other documents have you
4      reviewed since the material you listed on April 15th,
5      2017?
6  A.  I have reviewed -- wait a minute.  No, I'm sorry.
7      That is not all the depositions.  There are other
8      depositions as well, only they are packaged a little
9      differently, and so I did not think that they were --
10      I did not remember that they were depositions.  But
11      there are two big binders with depositions.  Those
12      contain Dr. Regot, deposition of Kevin Patel,
13      deposition of Ryan Szumski, that is S-Z-U-M-S-K-I,
14      deposition of Marianne Loudes, L-O-U-D-E-S, deposition
15      of Kimberly Gilbert, Shay, S-H-A-Y, deposition of
16      Brian Blair, deposition of Dennis Watson, deposition
17      of Amber Bishop, deposition of Christine Rohr,
18      R-O-H-R, Antoura Farrell Dunigan, Farrell is
19      F-A-R-R-E-L-L, deposition of Lola Streeter, that's
20      S-T-R-E-E-T-E-R, deposition of Steven Dunigan,
21      deposition of Quincy Lamar Dunigan, a deposition of
22      Detective Eric Shaffer, S-H-A-F-F-E-R, deposition of
23      officer Derek Nugent, N-U-G-E-N-T.
24              I think I have gotten to the end.  Yes.
25      Oh, you wanted all of the documents.  So hold on a

Page 15

1    minute.  These are statements made by Officer Shaffer
2    and Derek Nugent.  Ernst, that is E-R-N-S-T, R. Von
3    Schwarz, M.D., Ph.D. -- M.D. Ph.D.  Von Schwarz,
4    S-C-H-W-A-R-Z.  There are a number of e-mails.  Do you
5    want those too, or do you want me to clear that with
6    Counsel?
7  Q.  Is there anything in those e-mails that you relied on
8      to form your opinions?
9  A.  No.  I didn't rely on that.  But those are e-mails
10      regarding scheduling and stuff like that with the
11      Fieger firm.
12  Q.  No, I don't need those.
13  A.  And those are secretarial -- they were not even
14      addressed to me.  They are secretaries to secretaries.
15      There is one document here that is entitled Notice to
16      Produce Documents.
17  Q.  What document does it refer to?
18  A.  Let me see.  Records, diaries and bills prepared in
19      connection with this investigation and evaluation of
20      the issues involved in this lawsuit.
21  Q.  Is that a notice for this deposition to ask you to
22      produce those things?
23  A.  Let me see.  Well, the witness is not described here,
24      so I don't know if it is to me or not.  There are
25      statements here.  Allen VanderLaan, Kurt Benson,

Page 16

1    Cummings, McClorey, Davis and Acho.  That's it.
2  Q.  All right.  That appears to be perhaps either a
3      Request for Production to the Plaintiff or from the
4      Plaintiff to the Defendant, so I don't need that
5      either.
6  A.  Okay.
7  Q.  I'm looking for any other material you have reviewed
8      related to this case.
9  A.  I will tell you.  I have the Complaint.  There is a
10      Complaint to each of the Defendants.  So then there is
11      a document here, a discharge note from the ER.  It
12      doesn't say from whom this is, but that is somebody in
13      the emergency room that discharged this patient.  It's
14      a discharge note suffice it to say.  I don't know by
15      whom.
16  Q.  Is it discharge instructions?
17  A.  No, it's not discharge instructions.  It describes --
18      I will read to you the beginning of it, and then you
19      will know.  "Went out to assist Bronson Security
20      Officer Ripley and day shift Public Safety Officer
21      Nugent with a subject James Ronald Dunigan, who was
22      refusing to leave the emergency room after being
23      discharged.  Mr. Dunigan had been cleared medically by
24      ER and wheeled out to the lobby around 4:27 a.m.
25      Apparently staff had told him he could wait until the

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson

U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids

Phone: 888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

SPITZ, M.D., WERNER
03/20/2018

Pages 17–20

Page 17

1     busses started running.  Security" --
2  Q.  All right.  Doctor, I'm sorry to interrupt.  I
3     apologize.  You don't need to read the whole thing.
4     That appears to be a statement by the security officer
5     or police officer.
6  A.  Yes, that is what it is.
7  Q.  But let's continue trying to identify the material you
8     have reviewed.
9  A.  Okay.  I will tell you material that I reviewed.
10    There is an almost two-inch document of medical
11    records from Bronson Hospital.
12 Q.  Records in addition to -- do those records include the
13    Emergency Department visit of May 6th, 2016 or records
14    of prior care?
15 A.  Let me see.  These are old records.  The date on the
16    top record is August 8th -- sorry, August 11th, it's
17    hard to make out, of the year 2009.
18 Q.  Can you tell where those records are from?  Are they
19    from Bronson?
20 A.  Bronson.  Bronson Hospital.
21 Q.  All right.  As you held them up, I saw what appeared
22    to be sticky notes, pink sticky notes?
23 A.  Yes, they are sticky notes that my office manager put
24    in.
25 Q.  You did not put those in?

Page 18

1  A.  No, I did not.
2  Q.  Do you know what they designate?
3  A.  No, I don't know what they designate specifically
4     other than that they are old medical records.
5  Q.  Did you review those old medical records?
6  A.  I skimmed them.  That's about it.
7  Q.  Did you review the depositions you have listed?
8  A.  Most of them I have.  Some of them I have skimmed just
9     to make me acquainted with the fact that those are
10    really not necessary for me to know in detail because
11    I had already formulated my opinions.  I had written a
12    document about my main opinions.  I supplemented my
13    information that I had from before by reading the
14    depositions that came yesterday, and that's about it.
15         There is some documents that I thought I
16    need to review.  Others I really did not need to
17    review because there was duplicate information in
18    them.  By skimming them the information that I would
19    be confronting is already covered in other depositions
20    and documents.  So I did not really continue to review
21    those documents.  I did not think that that was
22    necessary.
23         There is a record here from the ambulance
24    crew, which is listed -- which is labeled pre-hospital
25    care report summary.  That is dated 01-17-2016.  Then

Page 19

1     there is another copy of the Complaint, a Complaint to
2     another entity, another person, another Complaint.  I
3     think there are four such Complaints.  There is
4     another medical record from Bronson Hospital, which is
5     an admitting record.  The date of this record is the
6     date in question, which is May 6th, 2016 at 2:13 at
7     night, which is the date that Mr. Dunigan came to the
8     emergency room.
9          There is another similar record, which is
10    labeled Incident/Investigation Report dated May 13th,
11    2016.  This is subtitled Incident Information.  The
12    main title on the top is Incident/Investigation
13    Report.
14 Q.  Do you know by whom that report was created or by what
15    entity that report was created?
16 A.  The report is the same format as other reports, and in
17    particular the Bronson Hospital record dated 5-6-2016
18    and with a time of 2:13, which I just read to you a
19    minute ago.  That is the record -- these two seem to
20    be related because they look the same.
21         The first one, of course, as I stated, was
22    the time 2:13 is when Mr. Dunigan came -- arrived at
23    the emergency room, at 2:13 at night.  Then there is a
24    record here, which is from -- which I think is a
25    duplicate actually, from Ernst R. Von Schwarz, M.D.,

Page 20

1     Ph.D.  This one is dated December 31, 2017.
2          In addition to these records there is an
3     autopsy report, which was compiled by Dr. Douglas, I
4     think, Elizabeth Douglas, M.D.  There is also a death
5     certificate and a toxicology report.  This is the
6     extent of the documents that I have except for the
7     document that I generated, which is my opinion letter.
8  Q.  So you have now identified all of the material you
9     have reviewed related to this case?
10 A.  Yes.
11 Q.  Aside from the report you prepared on April 15th, 2017
12    that we have received, do you have any other notes or
13    writings related to your review of this case?
14 A.  I do.  But I hasten to in this regard because these
15    are not opinion notes, but rather sections that I
16    wanted to summarize from the records.  So they are
17    notes, all right, but they are not opinion notes.  My
18    opinions are rendered in the letter that I wrote to
19    Mr. Harrington on April 15th, 2017.
20 Q.  How many pages of notes do you have?
21 A.  Let me see.  I don't know.  Somewhere around ten or
22    so.  Maybe it's nine.  That's it.
23 Q.  Please assemble all of the pages of the notes you have
24    and hand them to the court reporter to be marked as an
25    exhibit.

SPITZ, M.D., WERNER
03/20/2018                                                              Pages 21–24

Page 21

1   A.   Okay.
2                    MARKED BY THE REPORTER:
3                    DEPOSITION EXHIBIT 1
4                    3:10 p.m.
5   BY MR. O'LOUGHLIN:
6   Q.   Has it been marked?
7   A.   It has been marked, and this is Exhibit Number 1.
8   Q.   Is Exhibit Number 1 then collectively the pages of all
9        of the notes you have made related to this case?
10  A.   Yes.  There is one letter on the top of -- I didn't
11       separate a letter from Mr. Harrington's paralegal,
12       Devon Barry.  That letter is appended to five yellow
13       pages, lined yellow pages, which are my notes.
14  Q.   Thank you.
15  A.   There is additional yellow pages, which are also part
16       of this package that we marked just now, but those are
17       not -- they are loose.  They are not attached to the
18       Fieger office letter.
19  Q.   But they are part of Exhibit 1?
20  A.   They are part of Exhibit 1.  Am I correct?  Yes, I am
21       correct.
22  Q.   I would like those to be kept together and arranged
23       for copies to be made to be attached to the
24       transcript.
25  A.   Okay.

Page 22

1   Q.   When you were contacted regarding this case, what were
2        you asked to do?
3   A.   I was asked to, like I normally do, determine the
4        cause of death, determine to see if there was
5        conscious pain and suffering, and I'm saying I wasn't
6        specifically instructed to do this or that because
7        that is the way that Fieger's office sends me files.
8        I have worked with them a fairly large number of
9        times, so I should know what they need.  So I address
10       those issues.  Those are addressed in my report.
11  Q.   So what are those things that you know the Fieger firm
12       needs when it sends you a file, a record?
13  A.   Well, they want to know the cause of death.  They want
14       to know whether this individual had conscious pain and
15       suffering, whether the death certificate is correctly
16       issued, whether the manner of death is correct and
17       various -- yes, that's about it.
18            Then if they have other questions, they
19       call me, and they say well, you didn't include such
20       and such, and then I may add it or I may not add it,
21       depending on what is the question that they ask me.
22       But I've known Jim Harrington for a long time, and I
23       know what he wants usually.
24  Q.   Have you now listed those things that you understood
25       he wanted?

Page 23

1   A.   Not necessarily that he wanted, but I have my own
2        method of writing opinions.  So most of my opinions
3        are very similar, depending on the case of course.  So
4        I write the opinion accordingly.  Usually it
5        answers -- the opinions would answer anybody's request
6        for review and opinion.  Many times I don't even know
7        these lawyers, but the opinions are usually very
8        similar in that they would answer the majority of
9        inquiries.
10  Q.   Did you understand, either from being directly asked
11       or from your routine, based upon the many cases you
12       have had with the Fieger firm in the past, did you
13       understand whether you were being asked to comment in
14       any way on the quality of care provided?
15  A.   No.  The quality of care I don't usually tackle that
16       because I am not an emergency physician, and I'm a
17       forensic pathologist, so I do not address standard of
18       care.  Although there are some issues here in this
19       case that I, as a person, not as an expert even, but
20       as a person, I took exception to the way that this
21       individual was handled.  He was not handled like I
22       would want to be handled or like anybody in my family
23       should be handled.  So I told him that.  But I don't
24       know if I wrote it in my opinion.
25            I haven't reviewed my opinion in some time,

Page 24

1        but I don't believe that Mr. Dunigan, with his
2        underlying condition that he had at the time the
3        police came and took him to the jail, that they
4        handled him correctly.  I would not want to be handled
5        that way.
6   Q.   Okay.  Let's sort a few things out.  You have agreed
7        that you are not an emergency medicine physician,
8        correct?
9   A.   No, that is correct.
10  Q.   And not an expert in emergency medicine, correct?
11  A.   No, I'm not an expert in emergency medicine, but I'm a
12       physician who knows certain things that occurred here.
13       And under those circumstances this is individual did
14       not belong in jail, belonged to the hospital, and he
15       was not allowed to stay in the hospital.  He was not
16       even admitted.
17            So all of these things together, and then
18       on top of that, taken to the hospital, yes, I know
19       that he asked to be taken to the hospital, but what
20       does he know about what needs to be admitted and what
21       really his underlying condition is.  He didn't know
22       that.  Mr. Dunigan had no idea what he is suffering.
23            So when I take all that together, I did not
24       like the -- as a physician, not as an expert forensic
25       pathologist, but as a physician, I did not like the

SPITZ, M.D., WERNER
03/20/2018                                                                 Pages 25—28

Page 25

1 way this man was handled, this man was treated, this
2 man was confronting when he was handled by a number of
3 people who were not necessarily treating him like a
4 patient, not like -- and like a sick patient, like a
5 patient who was in the throes of death.  They did not
6 recognize it, and they should have recognized it.
7 That is my opinion.
8 Q.  You don't claim to be an expert in emergency medicine,
9 correct?
10 A.  No, I'm not an emergency medicine physician.
11 Q.  You don't claim to be an expert in emergency nursing,
12 correct?
13 A.  No, that is correct.
14 Q.  You don't claim to be an expert in radiology, correct?
15 A.  Correct.
16 Q.  You don't claim to be an expert in hospital security,
17 correct?
18 A.  Correct.
19 Q.  You don't claim to be an expert in law enforcement or
20 the conduct of law enforcement officers, correct?
21 A.  Correct.
22 Q.  Do you claim to be an expert in the law known as
23 EMTALA, the Emergency Medical Treatment and Active
24 Labor Act?
25 A.  Yes, I'm aware of such a thing, but I have not ever

Page 26

1 made use of that type of information.  So I know of
2 it, but I really don't know a whole lot of it.
3 Q.  When you say you haven't made use of it, that means
4 you haven't had to worry about complying with EMTALA?
5 A.  Or not complying.  I don't know enough about EMTALA to
6 know how to handle that.  I don't see patients in my
7 practice.
8 Q.  Correct.  What is your understanding of why
9 Mr. Dunigan came to the Emergency Department in the
10 early morning hours of May 6th, 2016?
11 A.  Well, he had chest pain he claims, and he came because
12 it was for him a fearful experience.  That is what
13 took him to the hospital.  He, in fact, was in a
14 condition which in his mind required transport to the
15 hospital, like you said, in the middle of the
16 nighttime, and it was a fearful experience for him, so
17 he called for an ambulance to take him.
18 Q.  What is your understanding of how long he had had this
19 chest pain?
20 A.  He indicates that, as a layperson, I have to say that,
21 he says that -- or he thought there is a connection
22 between his chest pain and the bruise he had on his
23 chest and his actual pain, that that resulted from
24 internal bleeding he thought, and that he -- chest
25 pain from -- the real reason for the chest pain was

Page 27

1 really very little connected to him falling out of a
2 bus when he sustained the fall and hit something on
3 cement, as he indicated.
4         It was a different kind of chest pain
5 altogether, and that chest pain is notorious for
6 fearing doom.  That pain is a different kind of pain.
7 That is the pain of a heart attack.
8 Q.  Upon what do you base that statement?
9 A.  On the fact that he had manifestations of congestive
10 heart failure.  His breathing, his sickening type of
11 snoring that is not that he is sleeping, but it is a
12 kind of snoring, if you will, where fluids in the lung
13 go up and down the airway every breath he takes.  That
14 is not necessarily annoying for others to hear.  That
15 is not the issue.  The issue is that it scared the
16 daylights out of the individual who suffers it.
17         It is a type of pain is associated with
18 asphyxiation.  Asphyxiation is always a very fearful
19 experience because here the lung contains fluid.  When
20 the fluid is moved by breathing up and down, there is
21 in addition to the noise that this makes, there is
22 also a lack of air in the lungs substituted for
23 fluids, so-called edema fluids, which is none other
24 than froth.
25         And the officers looked at all that, stated

Page 28

1 it in their packing him into the seat in the police
2 vehicle, did nothing about it.  They said:  Oh, he is
3 faking.  Oh, we know well what to expect from him, and
4 so on and so forth.  The officers know or should know
5 what that means.  I know they are not physicians, but
6 they should know that because it occurs a lot more
7 often than we want.
8 Q.  Doctor, if we can, for the sake of addressing
9 different periods of time, break this ED presentation
10 down into the period of time from when Mr. Dunigan was
11 picked up by the ambulance to the time that he was
12 discharged from the Emergency Department into the
13 waiting room, when he was wheeled into the waiting
14 room in a wheelchair.  Do you understand that frame of
15 time I'm talking about?
16 A.  Well, it's kind of a long question which requires
17 probably a long answer, but I hope I will comply with
18 your request.  If I don't, so please tell me.
19 Q.  Let me go back and get some foundation.  Did you
20 review the videos that you received as listed in your
21 report?
22 A.  Yes, I did review that.  I reviewed the videos.  To
23 answer your question, I would like to state that the
24 video clearly shows, or one of them, clearly shows a
25 restful -- I mean a restless individual who aimlessly

Page 29

```
 1   walks around because he is experiencing -- well, for
 2   lack of a better term, he is experiencing the sense
 3   that he is no long for this world.  He is experiencing
 4   pain that elicits in him the thought that he will soon
 5   die.  He hears himself breathe.  He knows how he
 6   feels.  He has acute chest pain of the type that is
 7   horrible.  People are driven to hospitals all the time
 8   when they experience this kind of pain.
 9            So that is what the video clearly shows.
10   Then the video shows him in the way he was handled
11   when they put him out on the curb because they decided
12   in the hospital that he has to leave the hospital.  So
13   they gave an order to the police safety people, to the
14   police officers that worked for the hospital, to take
15   him out of there.  That was not very nice of them
16   either.
17            Although they gave him permission to stay
18   until 6:00, it wasn't until 6:30 that -- or close to
19   6:30 that he was actually placed on the curb to fend
20   for himself.  Police came and took him off from the
21   hospital, and there is a video which shows how he is
22   handled when he is put in the vehicle.  He is pushed
23   into the vehicle.  He is falling over.  They pull him
24   and shove him and treat him like an object, not like a
25   person.
```

Page 30

```
 1            He is heard by me breathing this terrible
 2   snoring sound.  He at the same time he is -- a comment
 3   is made by officers that he is foaming at the mouth.
 4   Well, you know, as a physician, not as an emergency
 5   physician, but as a physician who has been taught over
 6   and again that this kind of thing is not long.  This
 7   type of thing is ending in death of this patient.
 8            How does he die?  He dies of suffocation.
 9   That is a horrible type of death.  That is what I saw.
10   That I hope answers your question.
11   Q.  Not even close, Doctor.  My question was did you
12       review the videos, yes or no?
13   A.  Yes, I did.
14   Q.  Thank you.  I will move to strike all of the other
15       information you just tried to convey.
16   A.  Okay.
17   Q.  Do I have your permission to interrupt you in the
18       future when you go way off course and go beyond the
19       question I'm asking?
20   A.  Of course.
21   Q.  All right.  Did you review the videos from the Bronson
22       waiting room?
23   A.  Yes.
24   Q.  Did you understand that what was depicted in those
25       videos was a period of time after Mr. Dunigan had been
```

Page 31

```
 1   evaluated and discharged from the Emergency
 2   Department?
 3   A.  Yes.  I'm fully aware of that, but I don't necessarily
 4       agree with that handling either.
 5   Q.  All I'm trying to get here, Doctor, is to a timeframe
 6       so that we can ask questions.  What I'm talking about
 7       is the timeframe up to the time that Mr. Dunigan is
 8       discharged from the Emergency Department and into the
 9       waiting room.  My question is do you understand the
10       timeframe I'm talking about?
11   A.  Yes, I understand fully.  From 2:13 when he arrived
12       until 4:30.
13   Q.  Okay.  Thank you.  From the time he was picked up by
14       the ambulance until the time he is discharged to the
15       waiting room, are you aware of any evidence that he
16       exhibited any clinical signs or symptoms of I will
17       start with a myocardial infarction?
18   A.  I don't know whether I can answer that because there
19       really is no medical information that would have
20       allowed me to make that kind of statement to answer
21       your question.  An x-ray to determine whether he has
22       got broken ribs and then they find no broken ribs and
23       make a diagnosis that there is nothing wrong with him,
24       so they discharged him, that is not the way to do it.
25            My objection is that I, without necessarily
```

Page 32

```
 1   dealing with the standard of care, because I don't
 2   know what the standard of care is, but as a physician,
 3   I can tell you that I don't want to be handled that
 4   way.  Neither do I want anybody else to be handled
 5   that way.  They did nothing for this individual.  They
 6   did nothing in the emergency room, and they should
 7   have done something for him.  That something may even
 8   have extended his life.
 9   Q.  Doctor, if you could listen to my question and try
10       just to answer the question rather than giving
11       speeches.  I will tell you right now that I will
12       object to paying you one dime if we go beyond three
13       hours because of the length of your answers, and I
14       will be happy to present that to Court.
15   A.  Okay.
16   Q.  Now, my question was are you aware of any evidence
17       that Mr. Dunigan exhibited any clinical signs or
18       symptoms of an MI, a heart attack, up to the time he
19       was discharged from the Emergency Department into the
20       waiting room?
21   A.  Yes.  He complained of pain, of chest pain.  That is
22       all he could complain about.  In addition to that
23       there is some evidence of him having swollen legs.  In
24       addition to that he had difficulty breathing.  So all
25       this points to at least excluding --
```

SPITZ, M.D., WERNER
03/20/2018                                                                    Pages 33—36

Page 33

1          (Telephone connection cut out at 3:35 p.m.)
2          (Back on the record at 3:39 p.m.)
3    BY MR. O'LOUGHLIN:
4    Q.   I can tell you that I lost you after my last question
5         from the time you said "chest pain." So I don't have
6         any idea what you said after that or if the court
7         reporter took it down. We will try to resume if I
8         may.
9    A.   Well, maybe that is all as well that you lost it.
10   Q.   It probably is all as well, but thank you. If I may,
11        I don't want the answer read back because it looked
12        like you were talking for a really long time after
13        that question. So if I may, I would like to ask it
14        again. Is that acceptable?
15   A.   Sure.
16   Q.   I am talking about the time period from the time
17        Mr. Dunigan was picked up by the ambulance to the time
18        he was discharged from the Emergency Department and
19        wheeled into the waiting room. Can you point to
20        evidence of any clinical signs or symptoms of a heart
21        attack that he exhibited?
22   A.   None really as indicated in the emergency room records
23        that permits me to quote them at this time. When such
24        a situation arises, it should -- there are situations
25        where it's a matter of ruling out. Not every

Page 34

1         condition is manifested by symptoms. But chest pain
2         in a 57 year old individual with a history of -- he
3         had a history, a long history, from the hospital where
4         he is known to have hypertension and diabetes and all
5         these conditions that he had. They knew that. They
6         had this on record.
7              So it's a matter of saying wait a minute,
8         this individual has been here for years and been
9         coming here to get medical care. So why don't we look
10        this up on the computer. If they would have done
11        that, they would have known his background. That was
12        never done. Instead, they took an x-ray and sent him
13        to the curb.
14             Actually, they allowed him to stay until
15        6:00 when the busses go. So he sat there, but he is
16        obviously on the video that I saw, he is --
17   Q.   Doctor, you gave me permission earlier when you went
18        way beyond the question --
19   A.   Okay.
20   Q.   Now, my question -- do you remember my question?
21   A.   What did he do between 2:13 -- or what happened
22        between 2:13 and 4:30. That is your question. Am I
23        correct?
24   Q.   My question is from the time he was picked up by the
25        ambulance to the time he was discharged from the

Page 35

1         Emergency Department and wheeled into the waiting
2         room, did he have any signs or symptoms of a heart
3         attack? Your answer started as "no." If that is the
4         answer, I will take it. If you know the signs and
5         symptoms, I want to know about those.
6    A.   Well, he had chest pain. That was his complaint when
7         he came in.
8    Q.   Any potential sign or symptom of a heart attack other
9         than that?
10   A.   That is a sign of a heart attack unless proven
11        otherwise.
12   Q.   Anything other than chest pain which you would
13        consider a sign or symptom of a heart attack that he
14        presented up to the time he was discharged to the
15        waiting room?
16   A.   I do not see any mention in the record of the
17        emergency room that would talk about manifestations of
18        a heart attack because I must think from the lack of
19        mentioning any other manifestations, which in my
20        opinion don't have to be there, but at least -- I
21        don't know that they even tried to find anything else.
22             There are things that can be done with
23        somebody who has chest pain with a history of a heart
24        condition that would at least need -- call for doing
25        something that would confirm or dismiss the thought of

Page 36

1         a heart attack.
2    Q.   Aside from the complaint of chest pain as reflected in
3         the medical record from the Emergency Department, did
4         Mr. Dunigan exhibit any signs or symptoms of a heart
5         attack up to the time he was wheeled into the waiting
6         room?
7    A.   No, I'm not aware of any direct manifestations of a
8         heart attack, but they don't have to be there. So I
9         mean I don't know how else to answer that. If
10        everybody had other manifestations that without any
11        doubt confirm a heart attack other than a pathologist,
12        the -- what ever happened to Troponin to do that, to
13        find out if he has got manifestations of a heart
14        attack? I don't know how to answer that any
15        differently.
16   Q.   How about answering it straight, Doctor. You have
17        given thousands of depositions. Please just try to
18        answer my question without the speeches. What do you
19        consider to be a clinical sign or symptom of a heart
20        attack?
21   A.   Laboratory work.
22   Q.   You consider laboratory work to be a clinical sign or
23        symptom?
24   A.   Yes. That is done in the clinic when somebody comes
25        in in a condition that could be related to a heart

SPITZ, M.D., WERNER
03/20/2018

Page 37

1    attack.  That should be used, and that is called for a
2    laboratory.
3    Q.   Okay.  I guess we should remember that you are not a
4         clinician, true?
5    A.   No, I'm not a clinician.
6    Q.   Okay.  This is unbelievable.  Are you aware that every
7         day all across the country thousands of people present
8         to Emergency Departments with complaints of chest
9         pain?
10              MR. DAWSON:  Objection, foundation.
11   A.   I'm sure that is true.
12              MR. DAWSON:  Go ahead, Doctor.
13   A.   I'm sure that that is true.
14   BY MR. O'LOUGHLIN:
15   Q.   Are you aware of the fact that the vast majority of
16        those patients do not have chest pain due to a heart
17        attack?
18              MR. DAWSON:  Objection, foundation.  Go
19        ahead, Doctor.
20   A.   That is not my consideration, whether they have or
21        don't have.  It is -- it requires that everything be
22        done in the interest of the patient with the chest
23        pain at the right age that that patient could have a
24        heart attack, and therefore, it has to be ruled out.
25

Page 38

1    BY MR. O'LOUGHLIN:
2    Q.   Okay.  Are you aware of any evidence, based upon your
3         thorough review of all these materials, that
4         Mr. Dunigan's condition in any way deteriorated up to
5         the time that he was discharged from the Emergency
6         Department and wheeled into the waiting room?
7    A.   I don't know what that means.  Could you ask me that
8         differently, please?
9    Q.   Are you aware of any evidence, based upon your review,
10        that Mr. Dunigan's condition deteriorated or got worse
11        up to the time that he was wheeled into the waiting
12        room?
13              MR. DAWSON:  After he was discharged from
14        care?
15              MR. O'LOUGHLIN:  Correct.
16              MR. DAWSON:  There you go, Doctor.
17              MR. O'LOUGHLIN:  But before he is wheeled
18        into the waiting room or up to that time.
19   BY MR. O'LOUGHLIN:
20   Q.   Do you understand my question, Doctor?
21   A.   Not really.  No, I don't.  He was discharged from the
22        emergency room to the waiting room like around 4:30.
23   Q.   Let me just -- I'm still trying to set the stage.  I
24        can't believe it's this hard.
25              After he is discharged to the waiting room

Page 39

1    in the wheelchair is when you see video of him in the
2    waiting room, true?
3    A.   Yes.
4    Q.   Up to that point are you aware of any evidence
5         indicating that his condition deteriorated or got
6         worse up to that time from the time he got to the
7         hospital?
8    A.   No, I don't see that in the emergency room there was
9         evidence that he got worse in the emergency room.
10   Q.   With that same end point, up to the time that he was
11        rolled into the waiting room after being discharged
12        from the Emergency Department are you aware of any
13        evidence that he had any sort of breathing difficulty
14        or respiratory difficulty?
15   A.   There is no mention of any of that.  The heart attack
16        could have occurred with little or no manifestations.
17        So that clinically a heart attack would not -- would
18        may well be there but needs to be explored whether
19        it's there or not because heart attacks can be very
20        subtle in onset.
21              So if you don't make an effort to find it,
22        you are not going to know that it's there or not.  He
23        did not -- other than chest pain, severe chest pain,
24        such that it was fearful for him to have that chest
25        pain, and the negative x-ray on top of it, that

Page 40

1    creates a problem if you are not going to continue
2    looking for what may be the source of the pain when
3    nothing that would show up on x-ray is actually there.
4    Q.   You agree that the chest x-ray was negative?
5    A.   The chest x-ray was negative.  There was no evidence
6         of broken ribs.  There was no evidence of bruised
7         lungs.  There was no evidence of any positive
8         manifestation that would warrant that kind of chest
9         pain.
10   Q.   What was thought to be -- based upon your review, what
11        was thought to be the cause of Mr. Dunigan's chest
12        pain?
13   A.   He had chest pain because he had 99 percent occlusion
14        of two major coronary arteries.
15   Q.   Maybe you misunderstood my question.  Let me make it
16        clear.  From your review of the record and the reason
17        Mr. Dunigan came to the hospital and the conclusion
18        reached by the healthcare providers in the Emergency
19        Department, what is your understanding of what was
20        thought to be the cause of his chest pain?
21   A.   I have to believe that they thought that he fell out
22        of the bus and bruised himself.
23   Q.   Which is exactly what he reported, true?
24   A.   Which is what he reported, yes.  Otherwise, they
25        wouldn't have known.  Otherwise, they wouldn't have

SPITZ, M.D., WERNER
03/20/2018

Page 41

1        taken the x-ray.

2   Q.  And from your close review of the records, did you

3       discern that on examination that chest pain was

4       reproducible with palpation?

5   **A.  You mean that if they pushed with their hand on his**

6       **chest that it became worse?**

7   Q.  In the area where the patient was complaining, yes.

8   **A.  Yes. I understand that. I'm not surprised of that.**

9       **But at the same time, it was the chest pain that got**

10      **worse by exertion.**

11  Q.  Upon what do you base that claim?

12  **A.  Because the record does show that.**

13  Q.  Where do you see anywhere in the record that it says

14      this pain was worse with exertion?

15  **A.  Well, I don't know where I saw it right now, but**

16      **somewhere in the records it mentions chest pain**

17      **getting worse from exertion.**

18  Q.  Well, you better dig out the record.

19  **A.  No, I can't do that now. That is just too much work**

20      **to do that now.**

21  Q.  It's not a long record.

22  **A.  Because I need to read the record from the beginning.**

23      **Let me see what I can come up with. This record is**

24      **Bronson emergency room record. The middle of the**

25      **page. I don't know what number. Here, page 2, it**

Page 42

1       **says chest pain on exertion. It's about five inches**

2       **from the top.**

3   Q.  Are you familiar with how you read Emergency

4       Department records?

5   **A.  I read them. I mean I know how to read English. It**

6       **says chest pain on exertion.**

7   Q.  Right. Do you believe that applies to a past history

8       as opposed to what he presented on this occasion?

9   **A.  This is a record of -- let me see.**

10  Q.  Let me try as hard as I can to try to shorten it up.

11      Do you see a date associated with that complaint?

12  **A.  I see it is -- well, there are several dates. Maybe**

13      **not. Yes, there are several dates.**

14  Q.  2012 and 2014?

15  **A.  Yes.**

16  Q.  Do you believe that that reference suggests that he

17      had chest pain with exertion at the time he presented

18      to the Emergency Department on May 6th, 2016?

19  **A.  Well, it may be. I'm not clear about**

20      **whether it was on -- these were the dates when he had**

21      **chest pain on exertion, and that would have -- should**

22      **have raised a red flag for any time that if you have**

23      **chest pain on exertion, at any other time that means**

24      **the coronary arteries are in bad shape.**

25  Q.  My question, again, I attempted to talk about the

Page 43

1       timeframe from when he was picked up by the ambulance

2       on May 6th to the time he was discharged from the

3       Emergency Department and wheeled into the waiting room

4       on May 6th. Do you have an opinion as to what was

5       thought to be -- I'm sorry -- do you have any evidence

6       that you can point to that indicates Mr. Dunigan

7       complained of chest pain with exertion?

8   **A.  Whether he had chest pain on exertion or not, he has**

9       **evidence in the records where they know that he is**

10      **diabetic, where they know that he is hypertensive,**

11      **where they know that he has got some other time chest**

12      **pain on exertion. All these things add up. Then he**

13      **has -- somewhere I read that he had had swollen ankles**

14      **as well.**

15  Q.  I didn't understand what you said there.

16  **A.  I said that somewhere I noticed that he had on that**

17      **day he had swollen ankles, and he is a patient of**

18      **diabetes, and they --**

19  Q.  Doctor, I'm going to interrupt you again. Do you

20      recall my question?

21  **A.  Yes, I know your question. But I need to point out to**

22      **you that there is a previous number of records at that**

23      **very same hospital. So they knew of his condition or**

24      **should have known.**

25  Q.  Do you recall my question?

Page 44

1   **A.  Yes.**

2   Q.  Any evidence that Mr. Dunigan complained of chest pain

3       with exertion at any time on that day, May 6th, 2016,

4       at any time?

5   **A.  No, I'm not aware.**

6   Q.  Thank you. Based upon your review, would you agree

7       that the healthcare professionals caring for

8       Mr. Dunigan believed that his chest pain was due to

9       the fall he reported when he got off the bus and fell

10      at 6:00 p.m. the evening before?

11  **A.  No, I don't agree with that.**

12  Q.  You think the healthcare providers thought his chest

13      pain was caused by something else?

14  **A.  I think that they thought it was caused by something**

15      **else because they did not eliminate anything else in a**

16      **patient with the underlying record that he has.**

17  Q.  Based upon your review -- can you point me to any

18      evidence which would indicate that any of the

19      healthcare professionals involved with Mr. Dunigan's

20      care actually thought that his chest pain was due to

21      something other than the fall he had suffered?

22  **A.  I cannot crawl into their minds, but I can tell you**

23      **that no effort was made to find out what really caused**

24      **his chest pain.**

25  Q.  Can you, based upon your review, identify any evidence

SPITZ, M.D., WERNER
03/20/2018                                                      Pages 45–48

Page 45

1    that Mr. Dunigan's condition was unstable at the time
2    he was discharged from the Emergency Department?
3  A.  Evidence there was not that he was unstable.  But if
4      they had explored, they would have found out that it
5      was unstable.
6  Q.  Is the answer to my question that you are not aware of
7      any evidence indicating that Mr. Dunigan's condition
8      was unstable as of the time he was discharged from the
9      Emergency Department to the waiting room?
10 A.  Well, he was unstable even -- I mean you could argue
11     that he was unstable because of the way he behaved in
12     the waiting room once he was discharged from the
13     emergency room.  He was totally anxious.  He was
14     walking around with his cane.  He was holding on to
15     furniture and seats and his cane to walk around.  Let
16     me think of the word I am looking for.  Yes, he was
17     anxious.  He was concerned.  He was worried about his
18     condition because the pain was not related to -- they
19     ruled out -- the x-ray ruled out that he had any major
20     condition in his chest.  Even a broken rib was not
21     found.  Nothing was found that would indicate that he
22     had chest pain because of an injury.
23 Q.  Do you believe that one can experience chest pain from
24     a fall without breaking a rib?
25 A.  Of course you can, but here you have a patient who has

Page 46

1      a record of heart conditions, cardiovascular
2      conditions, COPD, he is known to have diabetes, known
3      to have manifestations on other occasions that point
4      to his heart and breathing organs, like lungs and
5      chest wall and so on.  They knew what they are dealing
6      with, but did they make use of that knowledge?  No,
7      they did not.
8  Q.  Did you do any research or online search or reading in
9      order to prepare your opinions and provide your
10     opinions in this case?
11 A.  I did a lot of reading.  Not for this case, but I
12     started my reading when I went to medical school.
13 Q.  Have you done any research specifically for your
14     review and providing opinions in this case?
15 A.  No, not providing for this case, but providing for all
16     kinds of other cases that have similar problems.
17 Q.  Have you done any reading or research as to the life
18     expectancy of a patient with end stage renal disease
19     on dialysis?
20 A.  Well, I do a lot of autopsies on these patients, so I
21     get their records.  The life expectancy of a dialysis
22     patient is about seven years.  This individual was on
23     dialysis.  In fact, I think that, if I'm not mistaken,
24     this visit to the emergency room on May 6th was a
25     Friday.  So he got dialysis on Fridays.  That is what

Page 47

1      I gleaned from the records.
2          But it doesn't make any difference whether
3      this was the day or not because he got -- he had to
4      have dialysis in order to clear his blood of the waste
5      product that it normally has if he does not get
6      dialysis.
7          His life expectancy was governed by his
8      kidneys and probably to some extent of his heart as
9      well and diabetes and so on and so forth.  But that is
10     not -- I disagree, by the way, with the comment made
11     on the death certificate that the drugs that he took
12     were a contributing factor to his death.  I don't
13     believe that.
14 Q.  Doctor, do you think you are capable of answering the
15     questions I ask?
16 A.  I answer you the best I can.
17 Q.  Here is my question:  Have you done any research or
18     reading which would allow you to offer an opinion as
19     to the average life expectancy of a patient in end
20     stage renal failure requiring dialysis?
21 A.  Between five and seven years.
22 Q.  Upon what do you base that opinion?
23 A.  On the statistics.
24 Q.  From where?
25 A.  I don't know from where to tell you right now, but I

Page 48

1      can always research where that comes from.  But I have
2      known that for a long time.  There are documents
3      issued by the life insurance companies, the major life
4      insurance companies, and the CDC that gives you these
5      kinds of estimates.
6  Q.  You have referred to statistics from life insurance
7      companies in your report, correct?
8  A.  That's correct.
9  Q.  You suggested that, based upon those statistics,
10     someone of Mr. Dunigan's age could expect to live
11     another 23 years?
12 A.  Yes.  With compliance he stands the chance of that
13     kind of longevity.  He was not always compliant.
14 Q.  How do you reconcile the opinion you just gave, that a
15     person with end stage renal disease on dialysis has a
16     life expectancy of five to seven years, with your
17     suggestion that Mr. Dunigan had a life expectancy of
18     23 years?
19 A.  No.  Well, first of all, when I wrote that, I was not
20     aware that he was not always compliant.  That is one
21     factor at least.  So I also did not know much about
22     his general medical conditions.  But I know now, and
23     that is why I'm saying with compliance he probably
24     stands a much better chance than the average person.
25 Q.  Okay.  Let me ask this:  The average life expectancy

SPITZ, M.D., WERNER
03/20/2018                                                                                      Pages 49—52

Page 49

1  of patients in end stage renal disease on dialysis
2  doesn't necessarily mean patients who are compliant or
3  noncompliant, true?
4  A.  No.  I'm assuming that he was not always compliant.
5      That is what I know.  What that assumes in regards to
6      Mr. Dunigan I really don't know.
7  Q.  Is it fair to say you don't really know what his life
8      expectancy would have been?
9  A.  No, I don't say that.  I say that the average life
10     expectancy may be five to seven years, but what was
11     Mr. Dunigan's life expectancy requires some more
12     inquiry.  I don't know what it means that he was not
13     always compliant.  If he was compliant or not
14     compliant, I would assume that the conditions
15     indicated on the death certificate have been with him
16     for years, and so when I read that and when I read the
17     comments on the death certificate with regards to
18     drugs, I tend to believe that he had a much better
19     life expectancy than is maybe assumed at face value.
20 Q.  First of all, you would withdraw the opinion in your
21     report of April 15th, 2017 that Mr. Dunigan was
22     deprived of at least 23 years of life.  You no longer
23     hold that opinion, true?
24 A.  No, that is not really true.  I don't know if it's in
25     the 20-year level that his life expectancy would have

Page 50

1  been, but that may require some more research.  But
2  only the future really would really tell whether it
3  was or was even an extent of that.  But for right now
4  I think I would consider that the life expectancy may
5  have been as high as 23 years, but may not have been.
6  I would like to know that he improved his lifestyle.
7  I would like to know that he is under medical
8  supervision, compliant as it is, and I would then make
9  my opinion as to the veracity of that statement in my
10 report.
11 Q.  But we don't have the benefit of knowing what would
12     have happened in the future if he lived, do we?
13 A.  Well, I don't know what would have been -- what would
14     have occurred if he had lived, but I'm not surprised
15     that he died because nothing was done for this
16     individual.
17 Q.  When you attempt to -- and you do believe you are
18     qualified to offer opinions on life expectancy?
19 A.  Oh, yes, I am.
20 Q.  Okay.  In every case where you are offering that
21     opinion in a death case, the patient is already dead.
22     You have to rely upon statistics and studies and
23     reviews of past cases to determine the likely time a
24     patient would be expected to live beyond their actual
25     date of death, true?

Page 51

1  A.  Not quite.
2  Q.  All right.
3  A.  In every -- is that a question?  Because then I can
4      answer.
5  Q.  Didn't you already tell me that a patient with end
6      stage renal failure on dialysis has an average life
7      expectancy of five to seven years?
8  A.  Yes, I did.
9  Q.  All right.  Didn't Mr. Dunigan have end stage renal
10     disease and required dialysis?
11 A.  Yes, he required dialysis or transplant.
12 Q.  That five- to seven-year life expectancy with patients
13     on dialysis doesn't only apply to patients who are
14     noncompliant, does it?
15 A.  I don't know what that is based on other than the
16     statistics indicate that the life expectancy of
17     individuals on dialysis, three times a week dialysis,
18     would have on the average a life expectancy of five to
19     seven years.
20 Q.  Okay.  Mr. Dunigan was a patient with end stage renal
21     disease requiring dialysis three times a week, true?
22 A.  I think it is.  Usually it is three times a week
23     because when the kidneys are shot like in this case,
24     then he would need dialysis three times a week.
25 Q.  So isn't he the kind of patient, based on statistics,

Page 52

1  that would be considered to have a five-to seven-year
2  life expectancy?
3  A.  Not necessarily.
4  Q.  Why not?
5  A.  Well, how do I know?  Maybe next week something comes
6      out where he can get a transplant.  How do I know
7      that?  And why not?  Why is he not eligible for a
8      transplant?  A lot of kidneys floating around these
9      days.
10 Q.  Do you know whether that average life expectancy of
11     five to seven years with patients in end stage renal
12     disease includes the whole range of patients from
13     patients who are noncompliant to patients who get a
14     transplant?
15 A.  No, no, no.  That is not so.  I'm aware of patients
16     with transplanted kidneys who do very well, very well
17     indeed.
18 Q.  But the average overall of a patient like Mr. Dunigan,
19     a patient in end stage renal failure requiring
20     dialysis, is five to seven years according to your
21     opinion.  It's actually shorter than that, but --
22 A.  No.  My opinion is perfectly fine to consider the life
23     expectancy in Mr. Dunigan, sorry, in this individual,
24     is based on the maximum that he is likely to live,
25     considering all his conditions, not just the kidneys.

SPITZ, M.D., WERNER
03/20/2018

Page 53

1    The kidneys are one item here, and the
2  necessity of dialysis is not a given in anybody.
3  There are a lot of people who now get kidneys who
4  never even thought of the likelihood that they might
5  get one.  They are able to get kidneys.  So I think
6  that the likelihood of an individual like this is not
7  necessarily carved in rock that he would not qualify.
8  I don't know that.  So if he qualifies, he stands a
9  chance, and that would eliminate dialysis.
10    Dialysis is not a nontraumatic event.  So
11  dialysis has its own perils, and if he does not need
12  dialysis, he is way ahead.
13  Q.  So did you or did you not testify multiple times so
14  far today that on average a patient with end stage
15  renal disease on dialysis has a life expectancy of
16  five to seven years?
17  A.  That may be, but that goes for each and every case
18  separately.  It's not uniform for all of them.
19  Q.  But you attempt to decide on life expectancy by taking
20  those statistical averages and applying them to a
21  particular patient, true?
22  A.  When the circumstantial evidence causes me to do that,
23  I do.  When it doesn't, I do that too.  That is why my
24  testimony is what it is.
25  Q.  That five- to seven-year average life expectancy you

Page 54

1  referred to could be reduced by other comorbidities
2  other than end stage renal disease, true?
3  A.  Well, it obviously did in this case, but it didn't
4  have to.
5  Q.  So that five- to seven-year average that you are
6  talking about would be reduced even further if a
7  patient also had diabetes and coronary artery disease?
8  A.  He has had diabetes for a long time.  He has had
9  coronary artery for a long time.  He had COPD for a
10  long time.  He had hypertension for a long time.  Does
11  that mean that he has to die necessarily without
12  affording him the best possible medical treatment that
13  America can provide?  Because that could be me.  Maybe
14  I shouldn't say me, but that could be I.
15  Q.  Up to the time that Mr. Dunigan was wheeled into the
16  waiting room are you aware of any evidence that he had
17  an obvious manifestation of serious illness or that he
18  was foaming at the mouth or that he was experiencing
19  pulmonary edema or that he was having air hunger,
20  difficulty breathing, dyspnea or fear of doom?
21  A.  I'm sorry.  I don't know -- I'm losing track of the
22  question.  Would you be so kind to say it again?
23  Q.  I'm still on the time period up to the time he is
24  discharged from the Emergency Department to the
25  waiting room.

Page 55

1  A.  Yes.
2  Q.  Are you aware of any evidence indicating that he still
3  had obvious manifestations of serious illness --
4  A.  He had --
5  Q.  -- referred to in your report?
6  A.  I have answered that.  I have answered that before.  I
7  am unaware of him having other conditions because
8  nothing else was done to find out if he had other
9  conditions except that the record in the record room
10  is full of them, and nobody ever pulled them and
11  studied them and knew what they say.
12  Q.  Are you aware of any evidence that Mr. Dunigan
13  demonstrated any frothing at the mouth at any time
14  before he was placed in the police vehicle?
15  A.  No, I'm not aware of it, that he was frothing at the
16  mouth at the hospital, but he sure was frothing at the
17  mouth in the vehicle because I heard it.  Frothing at
18  the mouth and snoring, that type of snoring which I
19  can only hope I never hear again.
20  Q.  Please try and listen to my question, Doctor.  At any
21  time before Mr. Dunigan is placed in the police
22  vehicle are you aware of any evidence indicating that
23  he had frothing at the mouth or was experiencing air
24  hunger, difficulty breathing or dyspnea?
25  A.  No.  I said that.  I said that I'm unaware of it, if

Page 56

1  he had it before he left.
2  Q.  Are you aware of any evidence indicating that at any
3  time after his initial presentation to the Emergency
4  Department Mr. Dunigan ever asked for any medical care
5  or medical attention?
6  A.  Before what?
7  Q.  At any time after his initial presentation.
8  A.  You mean on 5-6-2016 at 2:13?  That is when he came to
9  the hospital.
10  Q.  Let me try it this way:  Let's go from the time he was
11  discharged from the Emergency Department and wheeled
12  into the waiting room.  Do you understand where I am
13  in the time sequence there?
14  A.  Well, I don't know that he asked for medical care, but
15  he didn't want to leave.  That is for sure.  He
16  certainly didn't want to leave the hospital.  Why he
17  didn't want to leave I can only speculate.  I don't
18  know why he didn't want to leave, but it's obvious
19  that if you don't want to leave the hospital, you are
20  looking for more medical care, but maybe I'm wrong.
21  Q.  Upon what do you base the claim you just made, that
22  Mr. Dunigan did not want to leave the hospital?
23  A.  Well, the records all show that.  He didn't want to
24  go.  He didn't want to be taken elsewhere.  He asked
25  to be taken -- I don't know why he wanted to go to

SPITZ, M.D., WERNER
03/20/2018

Pages 57—60

Page 57

1   jail, but maybe he had hopes that they would provide
2   him with more medical care.  I don't know.  He did not
3   want to leave Bronson because that is abundantly
4   documented in the various depositions that I read.
5   Q.  Are you aware of any evidence indicating that
6       Mr. Dunigan ever complained of a medical problem or
7       asked for medical care after he was wheeled into the
8       waiting room?
9   A.  I'm unaware whether he asked for additional medical
10      care.  Maybe he didn't know that there was such
11      available, but it's obvious that that is what he
12      needed.  Many times in my -- to my knowledge, patients
13      don't know that they can get medical care for whatever
14      they have, an ailment or a condition.  They may not
15      know.  He may not have known that he should -- he has
16      to ask for medical care.  I really don't know that.
17           But the fact is that he wasn't given that
18      choice.  He wasn't asked to come back in the room, in
19      the emergency room.  When he was seen walking around
20      aimlessly holding on to furniture, obviously something
21      is wrong with this man.  So as a doctor, you would
22      kind of frown that somebody, a nurse or a health
23      provider, would not point out to the physician in the
24      emergency room or other personnel that there is
25      something wrong with that patient that should be

Page 58

1       explored.  But nothing like that ever happened.  The
2       one thing that was done was an x-ray, which excluded
3       trauma.
4   Q.  I'm becoming convinced that you are not capable of
5       answering my questions, Doctor.  But I'm just going to
6       keep asking them.
7   A.  Go ahead.
8   Q.  I'm going to have to ask the same one again.  Are you
9       aware of any evidence indicating that Mr. Dunigan ever
10      asked for any type of medical care after he went to
11      the waiting room?
12  A.  I've already answered that.  I said no, I'm not.
13  Q.  Thank you.  Please stop there.  Are you aware of any
14      evidence that any physician or nurse saw any behavior
15      in Mr. Dunigan which indicated that he needed medical
16      attention?
17  A.  Any nurse?
18           MR. DAWSON:  After he was discharged from
19      the ED?
20           MR. O'LOUGHLIN:  Correct.
21           MR. DAWSON:  Go ahead, Doctor.
22  A.  Any nurse at Bronson or any doctor at Bronson, or am I
23      included in that too, because I saw him.
24  BY MR. O'LOUGHLIN:
25  Q.  Are you aware of any evidence that any nurse or doctor

Page 59

1       at Bronson saw Mr. Dunigan in a condition that
2       indicated he needed medical attention after he was
3       discharged to the waiting room?
4   A.  No, I'm not aware.
5   Q.  Thank you.  What is your understanding of
6       Mr. Dunigan's ability to ambulate prior to the time he
7       fell getting off the bus on May 5th?
8   A.  I don't know what his walking -- I have no idea what
9       his condition caused him to -- by way of ability to
10      walk.  I can't imagine that it did anything other
11      than -- the heart condition that he had is likely to
12      have caused him pain from walking, from exerting, from
13      being exerted.  But I don't know where I would have
14      found that, that what happened on the day before, on
15      the day before he went to Bronson.  But stress is not
16      exactly a good thing for somebody with that kind of
17      heart condition that Mr. Dunigan had.
18  Q.  Based upon your review of everything you have seen in
19      this case are you aware that Mr. Dunigan had a history
20      of a stroke with hemiparesis?
21  A.  He had some difficulty walking because of that stroke
22      because one side was weaker than the other, but
23      whether they really interfered with his ability to
24      walk with a cane I am not aware.
25  Q.  We are back to that.  You don't know what his ability

Page 60

1       was to walk or ambulate with or without a cane prior
2       to May 6th, 2016, true?
3   A.  No.  I think with a cane he was able to walk.  Maybe
4       not as well as he did before he had the stroke, but he
5       walked with a cane, or was able to walk with a cane.
6       I can see him walk in the waiting room.
7   Q.  Do you know whether he was able to walk any better
8       than he was when you saw him in the waiting room on
9       the day before?
10  A.  I don't know how he was walking the day before, but in
11      general he was able to walk.  He was able to walk even
12      on May 6th because that is when I saw him.
13  Q.  Did you say was or wasn't?
14  A.  Was.  He was walking okay.  He was walking.  He was
15      holding on to furniture, but that is explainable by
16      his condition on that day, because on the 6th he was
17      different than on -- he may have been different than
18      on May 5th.
19  Q.  You don't know one way or the other, true?
20  A.  I know how he behaved on May 6th.  I'm not so sure
21      whether that applies to May 5th as well.
22  Q.  That is the point of my question, Doctor.  Do you know
23      whether his ability to ambulate as you saw it on May
24      6th in the waiting room was any different than his
25      ability to ambulate on May 5th before he fell getting

SPITZ, M.D., WERNER
03/20/2018

Pages 61–64

Page 61

1     off the bus?
2  A.  I just said that I do not know.
3  Q.  All right.  Thank you.  In your report you claim that
4     Mr. Dunigan was discharged from the ER at 4:30 a.m.
5     and that he was still in severe pain with obvious
6     manifestations of serious illness?
7  A.  Yes.
8  Q.  What are you referring to in that claim as obvious
9     manifestations of serious illness or an indication
10     that he was still in severe pain?
11  A.  Well, his breathing, his froth, his behavior when he
12     was trying to lie down and they didn't let him.  They
13     wanted him to sit up, and he couldn't maintain
14     balance.  All these things clearly indicate that he
15     was not in a very good health condition.
16  Q.  You saw some difficulty breathing while he was in the
17     waiting room?
18  A.  He didn't snore for nothing.  That is a difficulty
19     breathing.  That is fluid, edema fluid, going up and
20     down in his airways.
21  Q.  Are you now referring to the time when he was in the
22     police vehicle?
23  A.  That is what you asked.
24  Q.  No.  I asked in the waiting room.
25  A.  Well, that was not my impression.

Page 62

1  Q.  That period of time.  Let's go from the time that he
2     is wheeled into the waiting room until the time he is
3     in the police vehicle.  Are you aware of any
4     indication that he was still in severe pain or had
5     obvious manifestations of a serious illness?
6  A.  In the waiting room I did not hear him snore like
7     that, although he may have.  I did not hear it.  In
8     the police vehicle I heard it personally.  So
9     therefore, I'm fully aware that he was in a state of
10     air hunger at that time.  Air hunger is horrible.  Air
11     hunger is equivalent to fear of doom and fear of
12     death.
13          So having said that, the rest of the
14     behavior in the police car where he couldn't sit up
15     but constantly fell to the side where he would lie
16     down, but they didn't let him, they sat him up by
17     force.  So that is also a manifestation of severe
18     illness because normally people sit.  They don't lie
19     down in a vehicle unless they are in some condition
20     that makes it imperative that they lie down.
21          And then the foam at the mouth that the
22     police officer who saw it, I did not personally see
23     it, but he pointed to my attention of froth at the
24     mouth when he said so.  So I can only put all this
25     under one umbrella, and that means bad health, short

Page 63

1     life expectancy.
2  Q.  Okay.  Let's talk about my question, which if you will
3     recall, was specifically up to the time he was in the
4     police vehicle.  Do you recall that?
5  A.  Well, I interpreted that to mean --
6  Q.  Do you recall that or not?
7  A.  I interpreted that question to mean in the police
8     vehicle.
9  Q.  Okay.  So when I said between the time he was wheeled
10     into the waiting room up to the time he was placed in
11     the police vehicle, you thought that included the time
12     after he was placed in the police vehicle?
13  A.  Not after, but in the police vehicle.
14  Q.  All right.  Now, let me try and specify the parameters
15     so we can get a straight answer.  From the time
16     Mr. Dunigan was wheeled into the waiting room after
17     being discharged from the Emergency Department up
18     until the time he is placed in the police car, but not
19     including the time after he is placed in the police
20     car, are you aware of any evidence that he exhibited
21     severe pain or obvious manifestations of a serious
22     illness?
23  A.  Well, yes, I am.  I mean why would somebody in the
24     room -- in the waiting room walk around holding on to
25     the chairs and benches and using his cane?  Why would

Page 64

1     they do that if they are in such good health?  So
2     having said that, he obviously had something happening
3     to him that was not indicative of great health at that
4     time.  So that is really all I can tell you.
5          Otherwise, I did not see him or hear him
6     breathe.  I did not see or hear him have foam around
7     his mouth.  But I base my opinion on his demeanor in
8     the waiting room where he was anxious, did not sit
9     down in spite of pain that he had because he came
10     there with pain.  Nothing was done to alleviate pain.
11     So therefore, he still had it.
12  Q.  Is it fair to say that the only evidence you can point
13     to indicating that Mr. Dunigan was still in severe
14     pain or had obvious manifestations of a serious
15     illness is what you saw on the video from the waiting
16     room?
17  A.  What happened in the waiting room is what I saw on the
18     pictures of what he did in the waiting room.
19  Q.  All right.  What you just said, I believe, was that
20     the only evidence you can point to to support that
21     claim is the way he was moving around the waiting
22     room?
23  A.  He was moving around.  He was walking.  He was trying
24     to walk with a cane.  He was holding on to the
25     furniture.  He was trying to lie down at some time and

SPITZ, M.D., WERNER
03/20/2018

Page 65

```
1    then got up suddenly again and moved around again.  He
2    was anxious.  That is what he was.  That is called
3    exertion.  That is called stress.  That is called
4    agitation.  That is called an underlying health
5    condition.
6  Q.  Did you earlier testify that you didn't know whether
7    the way that Mr. Dunigan moved around the waiting room
8    was any different than the way he moved the day
9    before?
10 A.  I don't know how he moved the day before.  I'm saying
11   that again.  But how he moved in the waiting room is
12   clearly indicated on the pictures, on the video.
13 Q.  It is.  It is.  Is there anything about the way he
14   moved that you can say would be different if he had
15   been in the waiting room the day before, before he
16   fell from the bus?
17 A.  I don't know what your question is, sir.  I'm sorry,
18   but I don't understand your questions.  They are a
19   little bit convoluted for me.
20 Q.  Okay.  Let's try one that is not.  You have in your
21   report, first paragraph, second page, "Despite
22   Mr. Dunigan's appearance and complaints of pain and
23   his worsening condition," and again, that is the
24   paragraph that refers to 4:30, after he was discharged
25   to the waiting room.  What evidence do you have that
```

Page 66

```
1    Mr. Dunigan ever complained of pain after he was
2    discharged to the waiting room?
3  A.  I don't know.  Maybe he did have.  Maybe he didn't.  I
4    don't know.  I don't know the answer.
5  Q.  Why did you put it in your report?
6  A.  Well, what did I put in the report?  Could you read me
7    what I put?
8  Q.  Yes.  You have, "At about 4:30 a.m. Dunigan was
9    discharged from the ER and waited in the lobby at the
10   hospital still in severe pain and obvious
11   manifestations of serious illness.  Despite Dunigan's
12   appearance and complaints of pain and his worsening
13   condition, Bronson personnel approved his release from
14   the hospital."
15 A.  He came to the hospital with pain, with severe pain,
16   in an ambulance.  Nothing was ever done with him to
17   alleviate that pain.  So why would there suddenly be
18   no pain?  When he walks around in the waiting room, he
19   is walking with difficulty.  He is holding on to the
20   furniture.  He is walking with a cane.  He is trying
21   to lie down.  He gets up after a minute or two and
22   walks around again.  He is anxious.  He is worried.
23   He is in a state of stress at that time.  So whether
24   he complained to anybody, I have no idea.
25       But people watch like I do, and they see
```

Page 67

```
1    somebody in distress.  So in a hospital, in a medical
2    environment, is it likely that somebody may have seen
3    him?  Well, I don't know how likely it is, but people
4    walk around, nurses, healthcare personnel.  So chances
5    are, more likely than not, that somebody would have
6    seen him.  His doctor that he saw at 2:13 was also
7    around.  Other than that, I cannot answer that.  That
8    is my answer.
9  Q.  Well, okay.  The paragraph I read referred to 4:30
10   after he was discharged to the waiting room.  Did you
11   understand that?
12 A.  After he was discharged from the waiting room all I
13   have is what the police tell me, and then there was
14   also some pictures that I saw which depict
15   Mr. Dunigan, but were they enough for me to make a
16   diagnosis?  No.  So I'm not even referring to those
17   pictures.
18       But the fact is that there were police
19   around.  They also were aware about what he was doing
20   and not believing him and all this is fake and so on.
21 Q.  Doctor, all right.  After he was discharged from the
22   waiting room and before he was placed in the police
23   car are you aware of any evidence indicating that he
24   complained of pain?
25 A.  I don't know if he complained.  I didn't hear him.
```

Page 68

```
1    All I know is what I can substantiate, and what I can
2    substantiate I already said several times.
3  Q.  Would you put something in your report that you could
4    not substantiate?
5  A.  I put something in my report that I could not
6    substantiate?  Is that what your question is?
7  Q.  Yes.  Would you?
8  A.  I don't know.  What I put in my report is clearly
9    written down and in black and white, so --
10 Q.  What you put in your report was that, "Despite
11   Mr. Dunigan's appearance and complaints of pain and
12   his worsening condition Bronson personnel approved his
13   release from the hospital."
14       What I'm trying to find out is whether you
15   have any evidence indicating that he complained of
16   pain at any time after he was wheeled to the waiting
17   room.
18 A.  That is obvious that he complained of pain because he
19   came to the hospital because of it.  That is why he
20   summoned an ambulance.  Did he not tell the ambulance
21   why he is going to the hospital and not to the movies?
22 Q.  Apparently you didn't hear my question.  Let me try it
23   again.  I'm talking about the time period after he was
24   discharged from the Emergency Department to the
25   waiting room, which is the time referred to in your
```

SPITZ, M.D., WERNER
03/20/2018                                                               Pages 69—72

1    paragraph that starts, "At about 4:30."  Do you
2    understand the timeframe I'm talking about?
3 A. After 4:30.  Is that what you are -- after 4:30.
4 Q. Are you aware of any evidence that Mr. Dunigan ever
5    complained of pain or a worsening condition after
6    4:30?
7 A. No, I'm not.  I'm not aware that he complained to the
8    police, because they are the ones that were outside
9    with him, that he complained to them about pain.  But
10   I think that that would have fallen on deaf ears if he
11   did.  They are the ones who charged him with faking to
12   begin with.
13 Q. Do you hear my question?
14 A. Yes, I hear your question.
15 Q. Then please answer it.
16 A. I told you that I have no knowledge.  I would not talk
17   to the police either because they are the ones that
18   ran him into the ground.  They are the ones that
19   claimed that he was faking, and that occurred in fact
20   all the time.
21 Q. Are you aware of any evidence indicating that any
22   Bronson security officer or other Bronson employee or
23   any police officer didn't think that Mr. Dunigan was
24   faking?
25 A. I don't know.  I did not talk to them about it.  I am

1    aware that that is their conversation among each
2    other.  That is what I heard.
3 Q. I think I got this, but I will tell you it's getting
4    hard to tell.  At any time up until Mr. Dunigan was
5    placed in the police car are you aware of any evidence
6    that he was experiencing air hunger, difficulty
7    breathing, dyspnea or fear of doom?
8 A. Yes, that is my opinion.  That is correct.  Nothing
9    was done for Mr. Dunigan from 2:13 until -- or to
10   alleviate pain and stress and fear.  Nothing was done
11   except an x-ray was done, which did nothing.
12 Q. What evidence up to the time Mr. Dunigan was placed in
13   the police car are you aware of that indicated he was
14   having difficulty breathing, air hunger, dyspnea or
15   fear of doom?
16 A. His behavior in the waiting room.
17 Q. What about that behavior indicated any of those
18   things?
19 A. I have already said that, and I think that the time
20   will come when I will not say it again.  I have said
21   it now I don't know how many times.  I really refuse
22   to answer that again, so please ask me another
23   question.
24 Q. Did you read in testimony from the security officers
25   and the police their statements that Mr. Dunigan never

1    indicated that he had a medical problem?
2         MR. DAWSON:  Objection, form of the
3    question.  When?
4 A. I'm not aware of that statement in relationship to
5    that visit on May 6th.
6 BY MR. O'LOUGHLIN:
7 Q. If that was the testimony of the security officers and
8    the police officers, are you aware of any evidence
9    that would contradict their testimony that Mr. Dunigan
10   never indicated he had a medical problem?
11 A. No, I'm not aware.
12 Q. If they also testified that Mr. Dunigan never asked
13   for medical care or asked to be seen by any healthcare
14   provider after the time he was discharged to the
15   waiting room, would you be able to point to any
16   evidence that would contradict that testimony?
17 A. Yes, I think I would, because he started snoring and
18   frothing at the mouth as soon as he was put in the
19   police vehicle.  The pulmonary edema did not just
20   suddenly occur.  The pulmonary edema took time to
21   develop.  The frothing needed time to mix air with
22   fluid as a result of breathing, so that took time as
23   well.  How much time?  Fairly long time.  All this
24   must have, by necessity, have started before he even
25   went into the vehicle.  This did not just suddenly

1    develop out of the blue.  Consequently, it is one
2    thing to lie down, which already is visible on the
3    video in the waiting room.  Why should it now be
4    different?  So it didn't suddenly disappear.
5    Therefore, it had to go on.
6 Q. Let's try my question.  If the security officers and
7    police officers testified that Mr. Dunigan never asked
8    for medical care, never asked to be seen by a
9    healthcare professional, are you aware of any evidence
10   contraindicating that testimony?
11 A. No, he may not have.  He may not have.  I answered
12   that before too.  He may not have because he
13   doesn't -- he doesn't need some more comments about
14   oh, I know about him faking.  I know about that.  I
15   have seen that well before many times.
16        When you hear that kind of comment, you
17   don't want to talk to those people.
18 Q. I'm just going to keep asking, Doctor, because you
19   seem incapable of --
20 A. I told you before I did not hear that.  I wasn't
21   present at the time that he was in the emergency room,
22   in the waiting room, on the curb, in the police car.
23   I wasn't there.  I'm basing my opinion only on what I
24   read.  What I read is not very complimentary to the
25   police and to the hospital.

SPITZ, M.D., WERNER
03/20/2018                                                                    Pages 73–76

Page 73

1  Q.   And what you have read and reviewed and everything you
2       know about this case does not allow you to point to
3       any evidence indicating that Mr. Dunigan ever asked
4       for any medical care or attention after the time he
5       was wheeled to the waiting room, true?
6  A.   He never asked.  He may have talked to the doctor who
7       saw him in the emergency room because he had to tell
8       him something.  He would have asked him why are you
9       here.  Then he would have told them.  So we know that.
10      I forget the name of that doctor.  It's an M.D.
11      physician who saw him in the emergency room and who
12      gave a deposition.  Other than that I don't know
13      anything.  I only base my opinions on the evidence
14      that I read.
15           MR. O'LOUGHLIN:  If you would read back my
16      question, please.
17           (The requested portion of the record was
18           read by the reporter at 5:00 p.m.)
19           "Q.   And what you have read and reviewed
20           and everything you know about this case
21           does not allow you to point to any evidence
22           indicating that Mr. Dunigan ever asked for
23           any medical care or attention after the
24           time he was wheeled to the waiting room,
25           true?"

Page 74

1  A.   Yes, I have answered that.  I have answered it that I
2       did not hear it, but I wouldn't talk to those people
3       that you indicated or asked me about whether I heard
4       him talk to them.  I would not be surprised if he
5       didn't tell them anything.
6  BY MR. O'LOUGHLIN:
7  Q.   At autopsy, the postmortem examinations, are there
8       findings which would be indicative of a recent
9       myocardial infarction?
10 A.   Yes.  Well, no, there is not a myocardial infarction
11      per se because myocardial infarctions take hours to be
12      manifested even under the microscope.  So there are
13      manifestations of 99 percent occlusions, stenosis, of
14      two major coronary arteries.
15 Q.   Are there findings on microscopic postmortem
16      examinations of the heart muscle that are indicative
17      of a recent myocardial infarction?
18 A.   I would prefer if I could answer that question after I
19      have reviewed the microscopic slides, but I have not.
20      The answer to that question I gave you before where I
21      said it requires hours for a myocardial infarction to
22      make microscopic manifestations to allow
23      identification of a myocardial infarct.  But the 99
24      percent stenosis of the passage in two major coronary
25      arteries indicates a very lousy blood flow, which

Page 75

1       indicates that a myocardial infarct is likely to be in
2       the making.  By the way, the left anterior descending
3       coronary artery is also called the widow maker.
4  Q.   That's cute too.  Did I ask anything about that,
5       Doctor?  Just let me ask my question, please.  After
6       hours what microscopic changes of a myocardial
7       infarction would you expect to see at autopsy?
8  A.   Myocardial fibers being -- beginning to be necrotic,
9       and you may expect some neutrophils to be scattered
10      around the same area.
11 Q.   Does this autopsy report indicate such findings?
12 A.   No, it does not.  I told you it requires hours for
13      that to occur.
14 Q.   Hours of what, hours of infarction?
15 A.   Hours of a clock.
16 Q.   Do you have any knowledge that would tell you whether
17      a patient can have ischemic chest pain for more than
18      an hour and not have infarction?
19 A.   Say that again.
20 Q.   Are you aware, based upon your medical knowledge, that
21      if a patient has ischemic chest pain for more than an
22      hour, that, by definition, has to result in
23      infarction?
24 A.   No, that is not true.
25 Q.   How many hours does it take for contraction band

Page 76

1       necrosis and neutrophils, as you referred to, to
2       appear on autopsy?
3  A.   How long it takes for a myocardial infarct to be
4       identifiable microscopically?  Is that your question?
5  Q.   I will start with that.  Sure.
6  A.   Several hours.  Four or five hours.
7  Q.   Which is it?  Several or four or five?
8  A.   Well, sometimes it takes four.  Sometimes it takes
9       five.  Sometimes it takes five and-a-half, and
10      sometimes it takes three and-a-half.  So it doesn't
11      always do the same thing, but the average in my
12      personal experience is four to five hours.
13 Q.   Are you aware that upon presentation to the Emergency
14      Department Mr. Dunigan had a history of chest pain for
15      eight hours?
16 A.   He may have had 25 hours, but he may not have had a
17      myocardial infarct at the instant of the pain
18      starting.  Lots of people have bad coronary arteries
19      and never develop a myocardial infarct.  But the
20      coronary arteries supply the heart muscle with blood,
21      cause the arrhythmia and death.
22 Q.   And Mr. Dunigan was at risk for an arrhythmia and a
23      sudden cardiac death at any time, including even the
24      day before he was seen in the Emergency Department,
25      true?

SPITZ, M.D., WERNER
03/20/2018

Pages 77–80

Page 77

1  A.  Mr. Dunigan was at risk for myocardial infarct for
2     years to have the changes that he had with scars and
3     fibrosis in the heart muscle, but he didn't die until
4     he came to the emergency room on the 6th -- on May
5     6th, 2016.
6  Q.  By the way, are you critical in any way of the manner
7     of performance or the conclusions reached in the
8     autopsy report of Dr. Douglas?
9  A.  No. I never gave that a thought. It's an autopsy
10    report. I don't take this with a grain of salt. I do
11    take with a grain of salt what she puts in the death
12    certificate, but that is not the autopsy report. You
13    didn't ask that.
14  Q.  But I am now asking about your opinion of the autopsy
15    report, which I believe is the only thing you have
16    expert qualifications to comment on.
17          MR. DAWSON: Well, let me object to your
18    commentary. Why don't you just ask a question?
19  A.  I take exception to that comment of yours because I
20    wrote about, what, 60,000, maybe 70,000 death
21    certificates myself. Do you think I can do that?
22  BY MR. O'LOUGHLIN:
23  Q.  My question is as to the autopsy report in this case.
24    Do you have any criticisms of the manner in which the
25    autopsy was performed or its conclusion?

Page 78

1  A.  I don't really take any exception with the -- I don't
2    have any quarrel with the autopsy report.
3  Q.  What is your quarrel with what is on the death
4    certificate?
5  A.  On the death certificate she puts that two minutes of
6    interval between the onset and the manifestations,
7    that is one thing, for each and every diagnosis. Then
8    she puts there is illegal drugs in the blood of
9    Mr. Dunigan, and that is really unsupportable because
10    there is no illegal drugs. Which drugs are those?
11  Q.  I'm not sure I understand your opinion. Are you
12    claiming that Mr. Dunigan did not have illegal drugs
13    in his system?
14  A.  I'm not aware of. Which are the illegal drugs?
15  Q.  Did he have metabolites of cocaine?
16  A.  That is not a drug now. That is a metabolite. You
17    don't go to the pharmacy and ask for BE or
18    benzoylecgonine. I wonder what they are going to give
19    you.
20  Q.  You don't dispute that Mr. Dunigan was a drug abuser,
21    do you?
22  A.  I don't go into all that research, sir. I'm saying
23    there is no illegal drug in his system.
24  Q.  I'm sorry, Doctor. First of all --
25  A.  Among the illegal drugs she does not -- I don't see

Page 79

1    where she says cocaine or even BE in that list of the
2    illegal drugs.
3  Q.  First of all, are you aware that Mr. Dunigan gave a
4    history of using marijuana and cocaine 14 times a
5    week?
6  A.  I'm aware of that, sir, but I'm talking about the
7    death certificate. That is another question that you
8    asked me now. My answer to that is that is not what I
9    referred to originally. I am unaware of there being
10    any illegal drug in his system in that list of drugs
11    on the death certificate.
12  Q.  To your knowledge, did Mr. Dunigan have any
13    prescription for opiates?
14  A.  I don't know if he did or not, but my not knowing is
15    that Hydrocodone is a prescription medication. But
16    it's not illegal. It must not be illegal.
17  Q.  Do you know whether Mr. Dunigan had a prescription for
18    any medication that would leave cocaine metabolites in
19    his system?
20  A.  I don't know. He probably did not, but I don't know
21    if he did or not. He may have had cocaine. Maybe
22    somebody slipped it to him. But BE is a metabolite,
23    not a drug. It's a metabolite of cocaine.
24  Q.  Do you know whether Mr. Dunigan had a prescription for
25    Fentanyl?

Page 80

1  A.  I don't know, but it's a prescription medication.
2  Q.  But if he took it and he didn't have a prescription
3    for it, that would be illegal, true?
4  A.  You know, I don't know where he got it, so am I going
5    to make him an addict of Fentanyl just because he
6    could have taken it without a prescription?
7  Q.  Why do you have qualms with the fact that the death
8    certificate says that he has illegal drugs in his
9    system?
10  A.  Because they are legal.
11  Q.  Any other disagreements with the death certificate or
12    the autopsy report?
13  A.  No. Maybe I should read the death certificate a few
14    more times. I don't know. I don't think so.
15         May I ask you how much longer you are going
16    to be?
17  Q.  I think I will pass the witness. If you want to take
18    a break, we can do that.
19  A.  No. I would like to finish the deposition. That is
20    important to me, but that is up to you to tell me that
21    you are done. If you say you pass the witness, that
22    tells me that you are finished.
23         MR. DAWSON: There is another lawyer,
24    Doctor.
25

Page 81

BY MR. O'LOUGHLIN:

1
2   Q.   That means the other attorney here gets to ask you
3        some questions.
4   A.   Okay.
5                   EXAMINATION
6   BY MR. VANDERLAAN:
7   Q.   Dr. Spitz, my name is Allan VanderLaan.  I simply want
8        to concentrate on one aspect of your report.  You
9        indicate in the third paragraph, the second page -- I
10       don't think you have your report with you.  Let me
11       read it.  "There can be no greater pain than the fear
12       of imminent death."
13            Would you agree with me that that is a
14       personal opinion as opposed to an expert one?
15  A.   No, I don't agree with you.
16  Q.   Would you agree with me that reasonable experts could
17       disagree on that statement?
18  A.   I don't know what reasonable experts do, but I can
19       tell you that you only die one time.  If you don't --
20  Q.   Doctor, Doctor, stop.  We want to get out of here.
21       Just stop.  Would you agree with me that there are a
22       number of psychologists or psychiatrists or religious
23       scholars that would disagree with that statement, that
24       there can be no greater pain than the fear of imminent
25       death?

Page 82

1   A.   I don't know what these people believe.  I have no
2        idea.  So I can tell you that this guy here that is
3        sitting and giving this deposition does not agree with
4        those people who think that dying is a pleasure.
5   Q.   Doctor, if this fellow here speaking were to tell you
6        that based upon his religious faith, that he would
7        absolutely disagree that there is no greater pain than
8        the fear of imminent death because his faith system
9        allows him to believe that there is something beyond
10       that, so he has no fear, which I don't, of imminent
11       death, would you view that as an unreasonable
12       position?
13  A.   Yes.  I disagree with you.  I disagree with you, and I
14       think you are arguing with me, but that is up to you.
15  Q.   I'm not arguing with you.  If I were to tell you,
16       Doctor, I have no fear of imminent death, only because
17       of the religious faith that I have, would you tell me
18       that I was absolutely wrong and that I do have a fear
19       of death?
20  A.   No, I'm not going to argue that.  I'm not going to
21       answer that.  We live in a free country.  You can
22       think what you want, and I think what I want.
23  Q.   In which case would you agree with me that my position
24       would be just as reasonable as yours?
25  A.   I don't argue that.  You can have your opinions any

Page 83

1        time all day, but I disagree with that --
2   Q.   Tell me again --
3   A.   -- because I cherish life.  I love life.  I would like
4        to be in a position where, because of all the people
5        that I have followed to the good Lord, I would like to
6        be allowed to be put in for an extension when my time
7        comes.  Having said that, thank you very much.
8   Q.   I respect your opinion, Doctor.  But tell me, based
9        upon your expertise, what allows you to make that
10       particular statement, that there is no -- there can be
11       no greater pain than the fear of imminent death?
12  A.   Because of my profession, because of my religion,
13       because of my being the happiest person in the world
14       when I wake up in the morning and I see the sunrise,
15       especially yesterday because it was a magnificent view
16       out of my bedroom window over the lake.  I'm telling
17       you it was a sight to behold.
18            As long as I am around -- I'm 91 years old.
19       I enjoy every minute.  So is it just as good to die?
20       No, sir, it is not.
21  Q.   Doctor, how would that -- how would that disagree with
22       my reasonable position that, based upon my profession,
23       my religion, my getting up in the morning and looking
24       at a beautiful sunrise and saying to the good Lord I
25       don't fear death?  Why wouldn't that be reasonable?

Page 84

1   A.   Well, because the opposite is much, much better.
2   Q.   That would be an opinion of yours, correct?
3   A.   That is why I wrote that in the opinion.  I wrote it
4        in other opinions too because that is my conviction.
5   Q.   That is your conviction based upon your personal
6        belief system?
7   A.   That is my personal belief and my professional belief
8        too because there really is no difference between my
9        professional belief and my personal belief.  I believe
10       what I practice.
11  Q.   As do I, Doctor.  We can both be reasonable people and
12       happen to disagree on that point?
13  A.   Okay.
14  Q.   You are not saying physical pain, correct?  You are
15       talking about emotional?
16  A.   I'm talking about all pain, all pain.
17  Q.   That statement --
18  A.   All pain.
19  Q.   Doctor, thank you.  I wish you well.
20  A.   Thank you.
21  Q.   It's been an honor to ask you questions, sir.  I'm
22       done.
23            MR. O'LOUGHLIN:  I'm going to have a couple
24       more, Don.  Do you have any?
25            MR. DAWSON:  I have a couple.  I will be

SPITZ, M.D., WERNER
03/20/2018                                                                                          Pages 85-88

Page 85

1      very brief.
2                          EXAMINATION
3   BY MR. DAWSON:
4   Q.   Doctor, during the multiple years that you have been a
5        physician you talked to other colleagues who have
6        actually been at the bedside with patients who have
7        died and learned of the fear of death that patients
8        have expressed?
9   A.   Have I talked to other colleagues --
10  Q.   Yes, sir.
11  A.   Who did what?
12  Q.   Were at the bedside of people who were dying and saw
13       their pain.
14  A.   Oh, absolutely.  I have talked to lots of people like
15       that.  I have talked to lots of people who have tried
16       to commit suicide and were unsuccessful and are
17       delighted to have not succeeded.
18  Q.   And talked about their fear of death?
19  A.   Talked about their fear of death.
20  Q.   Are those all bases for your statement that people do
21       have a great fear of imminent death?
22  A.   There are people who are petrified at the thought of
23       dying.
24  Q.   That's all I have, Doctor?
25

Page 86

1                         RE-EXAMINATION
2   BY MR. O'LOUGHLIN:
3   Q.   Doctor, just a couple more.  In that paragraph
4        Mr. VanderLaan was referring you to also, after you
5        talk about the fear of doom and the utmost pain and
6        there can be no greater pain than the fear of imminent
7        death, you state in your report, "James Dunigan
8        experienced this type of conscious pain and suffering
9        for a duration of at least one and three quarters
10       hours."
11            What one and three quarter hour period of
12       time were you referring to?
13  A.   Well, I believe that is the time that he spent in the
14       waiting room.  You know, I don't remember what I
15       thought, but you see, he left the waiting room -- he
16       went into the waiting room at 4:30.  He left the
17       waiting room after 6, like around 6:30 actually.  He
18       was pronounced dead at 7:40.  Somewhere in that period
19       is an hour and a quarter.
20  Q.   Okay.  It's an hour and three quarters is what you put
21       in your report.
22  A.   Maybe it is then an hour and three quarters.  I don't
23       really remember that.  But the period was figured on
24       from the time that he went out on the street where he
25       was supposed to go to catch the bus, but he really

Page 87

1        didn't want to catch the bus.  The police came and
2        took him, and then he was pronounced dead at 7:40.
3        I'm not sure if that is exactly an hour and three
4        quarters, but somewhere around there.
5   Q.   And again, I'm having trouble.  I'm having trouble
6        figuring out what period of time you are talking
7        about.  Are you talking about the time after he was
8        outside the waiting room?
9   A.   He was out in the street from -- let me see.  I think
10       somewhere around 6:15 or something like that.  I don't
11       know the exact time because there are different times
12       mentioned, but --
13  Q.   Let's talk about what you saw that indicated to you
14       that Mr. Dunigan was starting to have this utmost pain
15       and the fear of imminent death.
16  A.   He was in a state of building up large quantities of
17       edema in the lungs.  His lungs weighed like close to
18       2,000 ml.  I think the combined weight of both lungs
19       was 19 -- around 1,900 grams.  That is approximately
20       900 or 950 grams per lung.  That is approximately
21       three times normal of what these lungs weighed.  It
22       takes time for that to occur.  Now he has to breathe
23       and breathe hard to mix that fluid with air.  That is
24       what causes foam.  That is like drowning in your own
25       fluids.  That is asphyxiation like drowning without

Page 88

1        being even close to the water.  That is a most painful
2        type of death.
3   Q.   Okay.  I think the only part of that answer that was
4        responsive to my question was the "that takes time"
5        part in terms of the fluid in the lungs.  How much
6        time does that take?
7   A.   Well, it takes quite a while.  I cannot tell you
8        exactly how long because I don't know when it started
9        here.  But to have the lungs weigh three times normal
10       takes time to develop.  I mean it goes without saying.
11       I cannot tell you how long.  It doesn't take a minute,
12       and it doesn't take 15 minutes either.
13  Q.   Is there a range?
14  A.   I don't know that range, but I can only tell you that
15       three times normal lungs do not -- is not an
16       instantaneous condition.
17  Q.   That is what I'm asking.
18  A.   The lungs could have only weighed two times normal or
19       maybe only somewhat wet lungs, but in this case they
20       weighed three times normal.  That is a lot of weight.
21       That is -- well, to give you a better example, that
22       would be -- let me just think a minute.  Give me a --
23       be patient with me.  A half gallon, that would be like
24       a gallon of -- that would be half -- that would be a
25       gallon of fluid that the lungs had because the lungs

SPITZ, M.D., WERNER
03/20/2018

Pages 89–92

1   normally weigh about 350 grams, 350 to 400, somewhere
2   in that range.
3           When you start having lungs that weigh
4   close to 2,000, that is a lot of weight, a lot of
5   fluid.  With that is the hard work breathing, not
6   getting enough oxygen and developing the anxiety that
7   goes with inability to oxygenate.  That is what he
8   had.  That is called dyspnea.  That is called air
9   hunger.  That is called all kinds of names.
10  Q.  Thank you.  Now, my questioning started because you
11      put in your report one and three quarters hours.  In
12      answer to my questions about that you said you weren't
13      sure what period of time you were referring to.
14          My next question was what was going on with
15      Mr. Dunigan that allowed you to say that he was
16      experiencing that utmost pain, that fear of imminent
17      death, and I believe you then referred to how heavy
18      his lungs were, but you couldn't tell me how long that
19      would take.  Is that kind of a synopsis?
20          MR. DAWSON:  Let me object to the form of
21      that question.  First of all, he told you that the one
22      and three quarter hour time was from the time he was
23      in the waiting room until the time he went out to the
24      squad car, so your statement is wrong.  That is my
25      objection.

1           MR. O'LOUGHLIN:  He changed that.
2   BY MR. O'LOUGHLIN:
3   Q.  Is that your testimony, Doctor, and your belief, that
4       Mr. Dunigan had this utmost pain and the fear of
5       imminent death from the time he was wheeled into the
6       waiting room until the time he went in the police car?
7   A.  Well, he was in the waiting room from 4:30 until 6:30.
8       That means he was in the waiting room -- just taking
9       those numbers he was in the waiting room two hours.
10      He didn't get a ride from the police car.  The police
11      car wasn't even there when he went outside.  It took
12      time for them to come.  Then it took time for them to
13      load him.  Then it took time for them to drive to the
14      jail.
15          He was dead when they came to the jail, but
16      he died in the car.  I don't know exactly the moment
17      that he really died.  He was pronounced dead at 7:40.
18      According to the laws of this country everywhere you
19      go all the medical examiners will tell you that a
20      person is dead when he is pronounced dead.  He could
21      have died three months earlier.
22          So consequently the period of time that I
23      thought was appropriate was an hour and three
24      quarters.  Maybe I'm wrong.  Maybe I have exaggerated
25      by 15 minutes, maybe I have not.  Maybe I have

1   underestimated.  I don't know that.  I can tell you
2   this:  To get lungs to weigh close to 2,000 ml takes
3   time.  It is a lot of painful --
4   Q.  That is what I'm trying to get at, Doctor.  How much
5       time does it take?
6   A.  I have told you.  It takes a lot of time.  How much is
7       a lot?  An hour and three quarters would qualify.
8   Q.  Did it take an hour and three quarters for Mr. Dunigan
9       to get to the point where he had what you claim was
10      this fluid accumulating in the lungs that caused the
11      air hunger, difficulty breathing and dyspnea and fear
12      of doom?
13  A.  Yes, that is exactly what I'm saying, that the buildup
14      of fluids in the lung -- imagine that each and every
15      air sac in the lung --
16  Q.  Unless you are going to say something that tells me
17      how long it takes, I really don't want to hear it.
18  A.  Well, I told you how long it takes.  It takes an hour
19      and three quarters.
20  Q.  That is your claim?
21  A.  That is my claim.
22  Q.  And that is based on what in relation to this case?
23  A.  Well, when you have done 60,000 autopsies, either done
24      myself or supervised, and you talk to relatives and
25      when did your uncle start snoring and when did this

1   develop and when did that develop, then you develop a
2   scale in your mind.
3           Then you can even write a paper about it.
4   I never had the time to do that, therefore, I didn't
5   write a paper, but could I?  Yes, I could write a
6   paper about things like that.  I'm telling you with
7   total reliability that an hour and three quarters
8   would qualify.
9   Q.  Okay.  Is that a possibility in this case?
10  A.  That is a possibility, yes.  That is a possibility.  I
11      don't know -- I have told you I don't know exactly
12      whether it's an hour and three quarters or an hour and
13      40 minutes or maybe even an hour and-a-half.  I don't
14      know that for sure.  But is it within the realm of
15      likelihood?  Absolutely.
16  Q.  Would you expect that at the point where Mr. Dunigan
17      has this fear of doom, that he would at that point
18      have difficulty breathing, air hunger and dyspnea?
19  A.  He would have the same as anybody who is submerged in
20      water with nowhere to go.  He is fearful of dying but
21      nowhere to go to escape.  That is all conducive to
22      this fear of dying, that there is no -- nothing for
23      him that he could do to escape that fate.
24  Q.  Okay.  Can you point to any evidence that Mr. Dunigan
25      was experiencing air hunger, difficulty breathing or

SPITZ, M.D., WERNER
03/20/2018

Page 93

1     dyspnea up to the point he was placed in the police
2     car?
3  A.  I don't really know that at that point it was to the
4     point of being certain that he would die at the end of
5     it, but it was more likely than not that that exactly
6     happened, that he was building up fluids as the
7     minutes went by.  As I said before, you don't build up
8     this fluid in the lungs in just a few minutes.
9           So therefore, how many minutes is it?  I
10    can only say an hour and three quarters would be
11    within the realm.  Is it a little bit less, a little
12    bit more?  I do not know.  So that is my answer.  So
13    you can take it or leave it.
14  Q.  What is the shortest period of time in which a patient
15    with a prolonged resuscitation effort can build up
16    that degree of wet lung?
17  A.  There can be no doubt -- not wet, but drowning lungs.
18    The shortest time begins only when we know and hear
19    that he is starting to snore.  But it isn't snoring.
20    To say snoring means -- to the average person means he
21    was sleeping and snoring.  Lots of people snore when
22    they sleep.  He wasn't sleeping.  He was wide awake,
23    afraid to die.  That is what he was.
24           So to do with the sound that I heard on
25    the -- coming from the automobile where he was trying

Page 94

1     to find peace by lying down and wasn't let to lie down
2     and had to sit up because they wanted him to sit up
3     because it is a matter of police procedure that I have
4     acquainted myself so many times where I show you who
5     the boss is here.  That is what that is.
6           So how long?  I don't know.  An hour and
7     three quarters in this case.
8  Q.  What is the shortest period of time in which
9    Mr. Dunigan could have developed the lungs that were
10    identified at autopsy?
11  A.  If I give you the shortest way, I would also have to
12    add that same amount to the longest way.  That is not
13    the longest way.  The longest way is two hours.  The
14    shortest way is quarter of an hour less.
15  Q.  Is what?
16  A.  A quarter of an hour less.  That means an hour
17    and-a-half to two hours.
18  Q.  That is your claim?
19  A.  That is my claim.
20  Q.  All right.  Is that based on anything?
21  A.  Yes, on my experience.  That is because I say so.
22    That is not a very welcome statement to make to a
23    lawyer, but in this case I cannot -- you want me to be
24    a wizard.  I cannot put my finger on the exact minute,
25    but I can tell you that an hour and three quarters,

Page 95

1     which I figured out is most likely, that is the most
2     likely time.
3           If you want me to cut it down, I can do a
4     deal with you.  I think that is a joke.  To tell you
5     that it is an hour and-a-half, but then I have to add
6     a quarter of an hour to the end, which means between
7     an hour and-a-half and two hours.
8  Q.  Okay.  I honestly don't think I got an answer to this
9    question.  Are you aware of any evidence that
10    Mr. Dunigan experienced air hunger, difficulty
11    breathing or dyspnea at any time before he was placed
12    in the back of the police car?
13  A.  Absolutely.  The knowledge is that the amount of fluid
14    that he eventually had had to have been a long one
15    because of the amount of weight of the lungs.  That is
16    measured to the gram because she put the --
17    Dr. Douglas put the lungs on a scale and measured the
18    weight of each lung separately.  One was 800 some
19    grams, and the other one was whatever it was.  I don't
20    recall.  Close to the -- the total weight was over --
21    close to 2,000, like 1,900 grams for both lungs.
22  Q.  Any evidence other than the weight of the lungs at
23    autopsy that allowed you to say that Mr. Dunigan was
24    experiencing any air hunger, difficulty breathing,
25    dyspnea or fear of doom before he was placed in the

Page 96

1     back of the police car?
2  A.  Yes.  All these things together, each one of those
3    words and nouns and adjectives and whatever you said
4    just now is in keeping with that opinion for the
5    simple reason that the weight of the lungs like in
6    this case is almost in the maximum.  You don't often
7    have this kind of weight.  The only equivalent to that
8    is in drowning cases.  Now, imagine that --
9  Q.  Thank you, Doctor.  Please listen to my question.
10    Other than the weight of the lungs can you point to
11    any evidence indicating that Mr. Dunigan was
12    experiencing air hunger, dyspnea, difficulty breathing
13    or fear of imminent death before the time he was
14    placed in the police car?
15  A.  Yes, because he was in need of air, but he had fluid
16    in the lungs.  He was in need of air.  That is why he
17    was in a state of air hunger.  That is why he was
18    trying to breathe and couldn't.  That is why he was in
19    a state of fear of death and all these other words
20    that you mentioned.  That is why.
21  Q.  Again, did you see on video or read in any testimony
22    or any other information you have regarding this case
23    any evidence that he was short of breath, had
24    difficulty breathing, had dyspnea, had air hunger or
25    fear of imminent death at any time before he was

SPITZ, M.D., WERNER
03/20/2018                                                                    Pages 97—100

Page 97

1    placed in the police car other than the weight of the
2    lungs?
3  A.  I cannot tell you that.  The lungs only weigh that
4    much because of the fluid in it.  You want me to
5    ignore that.  I cannot do that.  The man tells me by
6    his breathing that he is in a state of fear of death
7    because he cannot breathe.  That is indicated by the
8    foam and by the weight of the lungs and by the amount
9    of fluid in them.
10           Then I can tell you this:  That when you
11   weigh those lungs, once you take them out of the body,
12   you lose a significant amount of fluid because when
13   you cut the lungs as you do in an autopsy, you take
14   them out of the body, so you cut parts that would lose
15   some fluid.  So it's even more than 1,900.
16           So don't make me say things that I don't
17   want to say because I think that is nonsense what you
18   are asking me.
19  Q.  Did you see any evidence on the video -- did you hear
20   anything that indicated Mr. Dunigan had any difficulty
21   breathing at any time before he was placed in the
22   police car?
23  A.  Well, when the lungs contain a lot of fluid, you have
24   difficulty breathing.  Take it from me.  Take it from
25   those who survived a drowning.  Take it from any one

Page 98

1    of those kind of people, including myself, and I will
2    tell you.
3           You put the body in a swimming pool and put
4    the body on the bottom, they will tell you too.  If
5    they ever get the chance of getting out of the pool,
6    they will tell you what went through their mind.
7  Q.  Did you see or hear anything on the video that
8    indicated to you that Mr. Dunigan had any difficulty
9    breathing, air hunger, dyspnea or fear of imminent
10   death before he was placed in the back of the police
11   car?
12           MR. DAWSON:  Objection, asked and answered.
13   Go ahead, Doctor.
14  A.  I don't know that I have.  I don't know that I have
15   heard it before.  I wasn't there on the premises.  I
16   don't know that I even have pictures of him before he
17   was loaded up into the car, but I do know that he was
18   restless when he was in the car.  Before that I
19   necessarily did not see him.  I don't know what he did
20   before.
21  BY MR. O'LOUGHLIN:
22  Q.  Thank you.
23  A.  But I can visualize that with that amount of fluid he
24   had to have had not just 10 minutes or 15 minutes or
25   not even just an hour to develop enough fluid to have

Page 99

1    as much as a drowning victim.
2  Q.  Would it be your opinion that that amount of fluid in
3    the lungs would be evident to anyone looking at
4    Mr. Dunigan and watching or listening to him breathe?
5  A.  I don't know what anybody would see or remember or try
6    to convince me that he was just on his way to a party
7    when he was put in the police car.  No, he was not.
8    He was fighting for survival because he could not
9    breathe.  If somebody tells me he was not making any
10   manifestations, let me tell you, they are lying.
11  Q.  All right.  Let's go with that.  By the way, have you
12   watched the video?
13  A.  Yes, I did.
14  Q.  All of them?
15  A.  Yes.  Several.  I think three or four.
16  Q.  Start to finish from the time Mr. Dunigan went into
17   the waiting room until the time he was wheeled out of
18   the waiting room?  Did you watch that video?
19  A.  I watched several disks.  I don't know if they were
20   three or four.  I don't remember that because I didn't
21   put the videos into the computer.  My office manager
22   did that.  I watched them.
23  Q.  Do you know whether you watched the complete video of
24   the time period from where the surveillance in the
25   waiting room is shown on the video?

Page 100

1  A.  Yes.  I watched in the waiting room.  I watched the
2    videos outside on -- outside the door of the entrance
3    door to the Emergency Department.  I watched -- well,
4    as I said, I watched all the videos that were sent
5    here.
6  Q.  That is my question.  Did you watch them in realtime,
7    or did you fast forward?
8  A.  No, not fast forward.  Realtime.
9  Q.  You watched the entire video, all three sets of
10   videos, from the surveillance in the waiting room, the
11   outside exterior camera at Bronson which shows him on
12   the sidewalk and the video from the back of the police
13   car?
14  A.  Yes, I did.  It took a long time.  I can tell you that
15   too.
16  Q.  We know exactly how long it took because all those
17   videos have times on them.
18  A.  Yes.  I don't remember what time it took because I
19   didn't look.  But it took a long time.  I know that.
20  Q.  Great.  At any time before Mr. Dunigan was placed in
21   the back of the police car are you aware of any
22   evidence indicating that he was foaming at the mouth?
23  A.  I don't know what he did at each time.  I cannot tell
24   you.  I can only tell you what he is likely to have
25   done because of the weight of the lungs, because of

SPITZ, M.D., WERNER
03/20/2018                                                                      Pages 101–104

Page 101

1    the amount of water in the lungs, because all that
2    would have caused him to be short of breathing space
3    because most of the lungs were occupied by edema, by
4    fluid.  So that causes someone to not be able to
5    breathe and have air hunger.
6           So if he is an exception, well, I don't
7    know.  There is no exceptions to air hunger.  When you
8    don't have ability to breathe, you develop air hunger,
9    whether you like it or you don't.
10  Q.  You would expect that to be visible to someone who was
11      looking at him?
12  A.  I don't know what somebody observes when he observes
13      air hunger.  Maybe he calls it something else.  I
14      don't know.  I don't know that.  But I do know what
15      people who come out of water what they think about
16      drowning, and that is drowning in your own fluids.
17  Q.  By the way, you would agree that he had no signs or
18      symptoms of air hunger, dyspnea, difficulty breathing
19      or wet lungs while he was being examined in the
20      Emergency Department, true?
21  A.  I don't know what he exhibited there.  There is no
22      mention of him having snoring breath sounds when he
23      was in the emergency room.  There is no mention in
24      this doctor's records that he heard or saw air hunger.
25      I don't even know that he knows that term.  I have no

Page 102

1    idea.  Maybe he calls it dyspnea.  I have no idea.  I
2    don't know this doctor.
3   Q.  If Mr. Dunigan was in the condition you are describing
4       in the Emergency Department, would you expect him to
5       have a regular respiratory pattern?
6   A.  I don't know what a regular respiratory pattern is
7       when somebody has edema in the lungs because he
8       probably did have edema because those coronaries did
9       not afford him good health.  So was he -- did he have
10      edema/fluid in the lungs?  I'm sure he did.  He was in
11      congestive heart failure.
12  Q.  And you are saying that was the case when he was in
13      the Emergency Department being examined by Dr. Regot?
14  A.  Exactly.
15  Q.  All right.  Let's stick with that.  That is what you
16      just said, true?
17  A.  Yes.  Exactly.  Yes, and I sign it.
18  Q.  All right.  Listen to me, please.  Would you expect
19      someone who was -- who had edema of the lungs and
20      congestive heart failure on clinical examination to
21      have no respiratory distress, normal breaths sounds,
22      no rales, no wheezing, clear lungs on auscultation
23      bilaterally, a regular respiratory pattern and a 98
24      percent oxygen saturation?
25  A.  On oxygen, right?  Now, that you didn't tell me

Page 103

1    conveniently, that he was given oxygen at the same
2    time.
3   Q.  On room air.  No.
4   A.  On room air.  That is marked in the records that it's
5       on room air, right?
6   Q.  Yes.
7   A.  Okay.  Well, tell me another one.  He was building up
8       fluids.
9   Q.  You are saying that couldn't have been the case when
10      he was in the Emergency Department being examined by
11      Dr. Regot?
12  A.  Well, he was in the Emergency Department because of
13      chest pain, and the chest pain was obviously not from
14      falling off the bus or falling on the cement.  So he
15      had no injuries according to this doctor.  So you
16      can't have it both ways.  Okay.  Thank you very much.
17      I think I'm going to leave now.  You have kept me way
18      beyond 5:00.  I don't know what the time is.  What is
19      the time?
20           COURT REPORTER:  5:52.
21  A.  5:52.  So it's an hour later.  It's almost 6:00.
22  BY MR. O'LOUGHLIN:
23  Q.  So you are terminating the deposition?
24  A.  Well, I'm not terminating anything, but I mean I have
25      asked you to let me go out of here at 5:00, but you

Page 104

1    didn't.  So now you can keep me until midnight.
2   Q.  I asked you if you wanted a break.  You said you
3       wanted to go ahead and finish, which I am very close
4       to doing if I can get an answer to my question.
5   A.  Okay.
6   Q.  Would a patient with pulmonary edema to the extent
7       that the patient is experiencing the fear of doom be
8       expected to have clear lungs to auscultation
9       bilaterally, no respiratory distress, normal breath
10      sounds, no rales, no wheezing, a regular breathing
11      pattern and a 98 percent oxygen saturation on room
12      air?
13  A.  I'm inclined to believe, since I cannot believe that
14      the doctor over there in the emergency room did not
15      hear him snore.  So I believe that he probably did not
16      snore at that time, but he did snore later on, and it
17      got worse and not better because he didn't do anything
18      to make this patient get better.  He just gave him an
19      x-ray.  The x-ray didn't touch him as far as improving
20      his condition.  The x-ray didn't do anything.
21  Q.  Are you able to --
22  A.  I'm sorry?
23  Q.  Are you able to answer my question?
24  A.  Yes.  I am answering your question.  You just don't
25      like the answer.

SPITZ, M.D., WERNER
03/20/2018

Pages 105–108

Page 105

1  Q.  Was your answer that you didn't believe those findings
2      were correct?
3  A.  No, I didn't say that.  I said he probably was not
4      snoring at the time, but the snoring developed while
5      he was in with him from 2:13 until 4:30.  Then at 4:30
6      he was in the waiting room.  So for another two hours
7      or hour and-a-half.  So did he have all of these
8      manifestations at that time?  Maybe not.  Maybe he had
9      a few other manifestations, but that he was without
10     any edema and he was perfectly fine and he was on his
11     way to the dancing club, no, that he wasn't.  He
12     wasn't on his way to the dancing club.
13             He was in dire condition.  He had two
14     coronary arteries that were almost obstructed.  Almost
15     obstructed, well, they were one percent short of being
16     almost obstructed.  So you are telling me that this
17     didn't manifest itself in any way?  Well, you must
18     think that I was born yesterday.
19 Q.  Would the findings described be completely
20     inconsistent with a patient who has pulmonary edema to
21     the extent that they are suffering the fear of
22     imminent death?
23 A.  I didn't say that he had fear of imminent death in the
24     first two hours in the emergency room.  I didn't say
25     that.

Page 106

1  Q.  That is what I'm trying to ask you, Doctor.
2  A.  I didn't say that.  I said he was not breathing heavy.
3      I didn't say that he was -- that Dr. Regot heard him
4      snore but he didn't say it.  I didn't say that.  He
5      developed the pulmonary edema down the line, this
6      heavy pulmonary edema that caused him to be heard
7      around the block.  That is the pulmonary edema he
8      ended up with.
9  Q.  Is there a single piece of evidence that you are aware
10     of that Mr. Dunigan exhibited any respiratory symptoms
11     that would indicate pulmonary edema or anything else
12     while he was in the Emergency Department before he
13     went to the waiting room?
14 A.  I don't know.  There is no such thing mentioned, but
15     there is plenty mentioned later on because I heard it,
16     and that did not develop --
17 Q.  I don't care about later on, Doctor.  Please listen to
18     my question.
19 A.  No, no, no, no, no.  You are misleading, sir.  By
20     doing that you are misleading me and the reader of
21     this deposition.  You are misleading asking me like
22     that.
23             I am saying that this snoring in the car
24     did not develop instantly, and I tell you that again
25     and again and again.

Page 107

1  Q.  Does that mean you can say that it was occurring while
2      he was in the Emergency Department?
3  A.  Yes.
4  Q.  Which was --
5  A.  I'm saying because the waiting room is the Emergency
6      Department also.
7  Q.  No.  We have already distinguished that, but I will
8      try it again.  Up to the time he went to the waiting
9      room after he was discharged from the Emergency
10     Department are you aware of any evidence indicating
11     that he had any respiratory difficulty or pulmonary
12     edema whatsoever?
13 A.  I have already answered this I don't know how many
14     times today.  I will answer this one more time, sir.
15     Then after that I hope you will have the decency of
16     letting me out of here.
17 Q.  I think it can be answered yes or no.
18 A.  Then ask me again.
19 Q.  Are you aware from the time -- pardon me -- up to the
20     time -- before the time that Mr. Dunigan was
21     discharged from the Emergency Department to the
22     waiting room are you aware of any evidence indicating
23     that he had any respiratory difficulties whatsoever?
24 A.  No, I do not.
25 Q.  Thank you.

Page 108

1  A.  Okay.
2  Q.  Do you know when Mr. Dunigan lost consciousness?
3  A.  I'm sorry?
4  Q.  Do you know when Mr. Dunigan lost consciousness?
5  A.  He lost consciousness in the automobile.
6  Q.  What --
7  A.  Yes, he lost consciousness in the automobile because
8      when -- yes.  When he was not getting oxygen, he lost
9      consciousness.
10 Q.  Do you recall from the video and audio in the police
11     car that after the officers got into the car
12     Mr. Dunigan asked them if they could take the cuffs
13     off?
14 A.  Yes, I know that.  He was conscious then.
15 Q.  Did he indicate that he was having any difficulty
16     breathing or respiratory difficulty at that time?
17 A.  No, he didn't, but he wanted the handcuffs off because
18     it's more comfortable than having your wrists tied
19     behind your back.  He was not comfortable.  The
20     decency of the police officer would have been to
21     comply with the request.  It wouldn't have hurt them
22     to do that.
23 Q.  At that time, the time he asked to have the cuffs
24     taken off, did he indicate that he had the fear of
25     imminent death?

SPITZ, M.D., WERNER
03/20/2018                                                                      Pages 109–112

Page 109

1   A.   No.  Come on now.  You know that he didn't do that.
2        No, he didn't do that.
3   Q.   Okay.  From that point how long was it before he lost
4        consciousness?
5   A.   I don't know when he lost consciousness.  He was found
6        dead.  They were most surprised.  How did this faker
7        die of fake?
8   Q.   Do you know how long --
9   A.   That was strange.
10  Q.   Do you know how long Mr. Dunigan was conscious in the
11       back of the police car?
12  A.   I don't know.  But when they put him in there, he was
13       conscious.  He was conscious when he asked for the
14       cuffs to be removed.  How long he was unconscious
15       before he was pronounced dead I have no idea.  Nobody
16       knows when he died.
17  Q.   That was my question.  That was my question, Doctor.
18       Thank you.  You don't know, right?
19  A.   I don't know because nobody knows when he actually
20       died.  We know that he was pronounced dead at 7:40,
21       but when he actually died we do not know in the
22       presence of those cuffs.
23  Q.   Okay.  So you also don't know how long he experienced
24       any conscious pain and suffering, true?
25  A.   I assume that he died shortly before they arrived at

Page 110

1        the police station, but I cannot be absolutely sure.
2        It can be before, and it can be later.  I do not know
3        exactly.  I don't know.  I would have to speculate
4        when he actually stopped breathing and had a
5        heartbeat.
6   Q.   So you are --
7   A.   They certainly never made an effort in the police car
8        to determine when he died, to be aware that he
9        suddenly stopped breathing because God only knows when
10       he breathed, he let them know that he is breathing by
11       snoring loud and clear, and suddenly it stopped.
12  Q.   You are unable to offer an opinion as to how long
13       Mr. Dunigan experienced conscious pain and suffering
14       while in the back of the police car, true?
15  A.   He stopped breathing at some time in the police car.
16       When the exact minute was that he stopped breathing I
17       cannot tell you.
18  Q.   And stopping breathing -- one can be breathing and
19       still not be conscious, true?
20  A.   Say that again.
21  Q.   One can be breathing but unconscious, true?
22  A.   Well, you can snore and be unconscious, so I guess you
23       can breathe and be unconscious.  But --
24  Q.   All right.
25  A.   But when you stop breathing, the neighborhood knows it

Page 111

1        because that breathing is ominous.  And if you hear
2        it, you know that somebody is breathing and probably
3        conscious because that breathing is fighting for air.
4   Q.   What makes you say that that means they are probably
5        conscious?
6   A.   Because he's fighting for air.  He cannot go to sleep.
7   Q.   Were you involved at all in Dr. Kevorkian's case?
8   A.   Yes.  I did autopsies on some of his victims.
9   Q.   Were you involved in any of the litigation?
10  A.   No, I was not.
11  Q.   Did any of Dr. Kevorkian's victims have that utmost
12       worst pain, no greater fear than the fear of imminent
13       death?
14  A.   You know, I don't remember that.  That is too long
15       ago.  I don't remember.
16  Q.   All right, Doctor.  I will tell you in advance that I
17       will protest any bills for the time this deposition
18       took beyond what was the $2,500 that we paid you.  I
19       will take it to the Judge with this transcript to
20       explain why it took so long.
21            MR. VANDERLAAN:  Doctor, this is Allan
22       VanderLaan.  I pray for your continued good health and
23       that you see many more sunrises.  Mr. Dawson, I didn't
24       see you, but --
25            MR. DAWSON:  That's all right.  I am here.

Page 112

1            MR. VANDERLAAN:  It's been a pleasure.
2   Thank you.
3            MR. DAWSON:  Good seeing you all.
4            (The deposition was concluded at 6:05 p.m.
5        Signature of the witness was not requested by
6        counsel for the respective parties hereto.)

SPITZ, M.D., WERNER
03/20/2018                                                                    Pages 113

1                  CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3                     ) SS
4    COUNTY OF OAKLAND)
5
6           I, Linda S. Wilson, certify that this
7    deposition was taken before me on the date
8    hereinbefore set forth; that the foregoing questions
9    and answers were recorded by me stenographically and
10   reduced to computer transcription; that this is a
11   true, full and correct transcript of my stenographic
12   notes so taken; and that I am not related to, nor of
13   counsel to, either party nor interested in the event
14   of this cause.
15
16
17
18
19
20           *Linda S. Wilson*
21
22           LINDA S. WILSON, CSR-0973
23           Notary Public,
24           Oakland County, Michigan.
25   My Commission expires:  2/24/19.