**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

GORDA DUNIGAN, as Personal Representative
 for the ESTATE OF JAMES DUNIGAN, Deceased,

  Plaintiff,        Case No. 1:16-CV-01324
             Hon. Janet T. Neff
v              Mag. Judge Ellen S. Carmody

BRONSON METHODIST HOSPITAL,

  Defendant.

---

| | |
|---|---|
| GEOFFREY N. FIEGER (P30441) | JOHN C. O'LOUGHLIN (P33343) |
| JAMES J. HARRINGTON, IV (P65351) | Smith, Haughey, Rice & Roegge |
| Fieger, Fieger, Kenney & Harrington, P.C. | Attorney for Defendant, Bronson |
| Attorneys for Plaintiff | 100 Monroe Center NW |
| 19390 West 10 Mile Road | Grand Rapids, MI 49503 |
| Southfield, MI 48075 | (616) 774-8000 |
| (248) 355-5555 | |

---

# EXHIBIT 8 (CORRECTED)

# In the Matter Of:

## DUNIGAN vs BRONSON METHODIST HOSPITAL, ET AL.

### WERNER SPITZ, M.D.

March 20, 2018



*Prepared for you by*

**US LEGAL SUPPORT**

The Power of Commitment™

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw • Troy

SPITZ, M.D., WERNER
03/20/2018                                                                                        Pages 1–4

**Page 1**

```
1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5   GORDA DUNIGAN, as Personal

6   Representative for the ESTATE OF

7   JAMES DUNIGAN, Deceased,

8                 Plaintiff,

9        vs.            Case No.1:16-CV-01324

10                      Hon. Ellen S. Carmody

11  BRONSON METHODIST HOSPITAL,

12             Defendant,

13        and

14  GORDA DUNIGAN, as Personal

15  Representative of the ESTATE OF

16  JAMES DUNIGAN, Deceased,

17                 Plaintiff,

18        vs.            Case No. 1:16-CV-01325

19  DEREK NUGENT, et al,      Hon. Ellen S. Carmody

20             Defendants.

21                      /

22

23

24

25
```

**Page 2**

```
1        The Deposition of WERNER SPITZ, M.D., F.C.A.P.,

2        Taken at 23001 Greater Mack Avenue,

3        St. Clair Shores, Michigan,

4        Commencing at 2:17 p.m.,

5        Tuesday, March 20, 2018,

6        Before Linda S. Wilson, CSR-0973.

7

8   APPEARANCES:

9

10  DONALD H. DAWSON, JR.

11  Fieger, Fieger, Kenney & Harrington

12  19390 West Ten Mile Road

13  Southfield, Michigan 48075

14  (248) 355-5555

15  d.dawson@fiegerlaw.com

16      Appearing on behalf of the Plaintiff.

17

18  ALLAN C. VANDER LAAN

19  Cummings, McClorey, Davis & Acho, P.L.C.

20  2851 Charlevoix Drive, SE, Suite 327

21  Grand Rapids, Michigan 49546

22  (616) 975-7470

23  avanderlaan@cmda-law.com

24      Appearing (Telephonically) on behalf of the

25      Defendants, Nugent, et al.
```

**Page 3**

```
1   JOHN C. O'LOUGHLIN

2   Smith, Haughey, Rice & Roegge, P.C.

3   100 Monroe Center Street, NW

4   Grand Rapids, Michigan 49503

5   (616) 774-8000

6   joloughlin@shrr.com

7       Appearing (Telephonically) on behalf of the

8       Defendant, Bronson Methodist Hospital.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Page 4**

```
1              INDEX TO EXAMINATIONS

2

3   Witness                          Page

4   WERNER SPITZ, M.D. F.C.A.P.

5

6    EXAMINATION                       5

7   BY MR. O'LOUGHLIN:

8    EXAMINATION                      81

9   BY MR. VANDERLAAN:

10   EXAMINATION                      85

11  BY MR. DAWSON:

12   RE-EXAMINATION                   86

13  BY MR. O'LOUGHLIN:

14

15             INDEX TO EXHIBITS

16

17  Exhibit                          Page

18  (Exhibit attached to transcript.)

19

20   DEPOSITION EXHIBIT 1             21

21

22

23

24

25
```

SPITZ, M.D., WERNER
03/20/2018                                                                    Pages 5–8

Page 5

1    St. Clair Shores, Michigan
2    Tuesday, March 20, 2018
3    2:17 p.m.
4
5                    WERNER SPITZ, M.D., F.C.A.P.,
6    was thereupon called as a witness herein, and after
7    having first been duly sworn to testify to the truth,
8    the whole truth and nothing but the truth, was
9    examined and testified as follows:
10            MR. O'LOUGHLIN:  The record should reflect
11   that this is the deposition of Dr. Werner Spitz being
12   taken for all purposes allowed under the Federal Court
13   Rules and the Federal Rules of Procedure.
14            Did somebody else just join the call, or
15   did I hear that wrong?  Okay.  Never mind.
16                    EXAMINATION
17   BY MR. O'LOUGHLIN:
18   Q.   Would you state your name, please?
19   A.   **Werner Spitz, S like Sam, P like Paul, I, T like Tom,**
20        **Z like zebra.**
21            MR. O'LOUGHLIN:  I didn't ask.  Who is
22   there for the Plaintiff's Counsel?
23            MR. DAWSON:  I'm here.  Don Dawson on
24   behalf of Harrington.  He couldn't make it.
25

Page 6

1    BY MR. O'LOUGHLIN:
2    Q.   And Doctor, what is your profession?
3    A.   **I'm a medical doctor, and I'm a forensic pathologist.**
4    Q.   You have been listed as an expert for the Plaintiff in
5         this case, and I have a report from you that is dated
6         April 15th, 2017.  Do you have that report available
7         to you?
8    A.   **Yes, indeed, I do.**
9    Q.   Can you estimate for me the numbers of times you have
10        acted as an expert reviewer or witness in a legal
11        case?
12   A.   **Oh my God.  I don't know.  Many times.  Over maybe**
13        **2,000 or 3,000.  I have been doing this work -- I have**
14        **been a forensic pathologist for the last 64 years.**
15   Q.   Your date of birth is March 24th, 1959?
16   A.   **I wish it was.**
17   Q.   I'm sorry.  I'm sorry.  I was looking at the -- that
18        is very bad.  Your date of birth is August 22, 1926?
19   A.   **You are correct.**
20   Q.   Making you 91 years old?
21   A.   **That's correct.**
22   Q.   Do you continue to actively practice?
23   A.   **Yes.**
24   Q.   Of the 2,000 to 3,000 cases which you have acted as an
25        expert reviewer or witness, how many of those were for

Page 7

1    the Fieger law firm?
2    A.   **Well, nowhere near the total of course, but I really**
3        **don't know.  I have testified for the Fieger firm, and**
4        **I have also testified against the Fieger firm.  So I**
5        **couldn't say.  I don't really know.  I have testified**
6        **a lot of times for and a fair number of times against**
7        **the Fieger firm.**
8    Q.   Have you testified for the Fieger firm more than 100
9         times?
10   A.   **I doubt that, but maybe 50.**
11   Q.   The fee scheduled we were provided in this case
12        indicates that before being listed as an expert you
13        require a $4,000 retainer; is that correct?
14   A.   **Yes, that is correct.**
15   Q.   In those 50 or so cases in which you have reviewed
16        cases for the Fieger firm, did you receive that $4,000
17        retainer?
18   A.   **Oh, yes.**
19   Q.   For this deposition you required us, the Defendants,
20        to prepay $2,500?
21   A.   **Yes.  I have received the usual fee of $2,500 for this**
22        **deposition.**
23   Q.   Does that limit us to any particular time or apply to
24        any particular amount of time?
25   A.   **Well, it limits you to three hours.**

Page 8

1    Q.   I didn't see that in the fee schedule, but that
2         shouldn't be a problem.
3    A.   **Okay.**
4    Q.   If we only take a half hour, do we get a refund?
5    A.   **No, you don't.  It says on the invoice that the fee is**
6        **not refundable.**
7    Q.   What amount of income do you derive from acting as an
8         expert reviewer or witness per year?
9    A.   **Well, this is my profession.  All my professional**
10        **income comes from my work as a forensic pathologist.**
11        **That involves review, and it involves testimony when**
12        **it happens.  Many times it doesn't happen.  I have**
13        **additional income, but that is from investments.**
14   Q.   I'm just asking about the amount of income from your
15        expert work either as a reviewer or witness in
16        medical-legal cases.
17   A.   **You mean you want an amount?**
18   Q.   Yes, please.
19   A.   **No, I cannot give you that.  The reason that I cannot**
20        **give it to you is because my work -- my professional**
21        **work is jointly accomplished with my wife, and my wife**
22        **is adamant about not releasing that amount.**
23   Q.   All right.  We will reserve that for the judge at the
24        time of trial.  How much would you have to be paid to
25        dance naked on the table?

SPITZ, M.D., WERNER
03/20/2018                                                                                    Pages 9–12

Page 9

1   A.   I don't understand.
2   Q.   Have you in the past testified that if you are paid
3        enough, you will dance naked on the table?
4   A.   Well, you know, that was a stupid statement that I
5        made, but I was aggravated by the lawyer who was
6        questioning me incessantly, but the main --
7        unnecessarily.  The main comment that I have to make
8        now about that comment that I made is that I have
9        never had an offer.  So yes, I made the statement, but
10       I have never had anybody wanting to take me up on it.
11  Q.   We don't know your price.
12  A.   Well, I'm pretty cheap.
13  Q.   All right, Doctor.  Going to your report of April
14       15th, 2017 in this case, you initially list the
15       material you have reviewed.  Do you have that in front
16       of you?
17  A.   Yes.
18  Q.   Is that a list of all of the material you have
19       reviewed regarding this case?
20  A.   No.  There was some additional materials that I
21       received just a couple -- in fact, one of them I
22       received a big, fat envelope just yesterday.  But most
23       of the material I received before I wrote this report.
24  Q.   All right.  I will try and break it down.  As of the
25       time you wrote this report are the items listed all of

Page 10

1        the materials you have reviewed related to this case?
2   A.   No.  All the material that I listed on the front page
3        of the report were reviewed and used to write this
4        report.  There were additional materials which came in
5        as late as yesterday.
6   Q.   Correct.  I may not have been clear in my question.  I
7        was trying to go back to the time you wrote this
8        report and asking if at that time the materials listed
9        here were all the materials you had related to this
10       case.
11  A.   Yes, that's correct.  I did have all the materials
12       listed that I reviewed available to me when I wrote
13       this report.
14  Q.   Did you have anything other than those materials
15       available to you when you wrote this report?
16  A.   No.
17  Q.   Can you identify what material you have received since
18       April 15th, 2017?
19  A.   There were expert opinions, expert depositions,
20       including, those that I remember offhand without
21       searching, Dr. Levine in San Diego, Dr. Landers, and
22       there were some others.  There were at least two
23       others.  Do you want me to go look for them?
24  Q.   Do you have with you today everything that you have
25       reviewed related to this case?

Page 11

1   A.   Yes, I do.
2   Q.   Did you review the deposition testimony of Dr. Stark?
3   A.   Yes, I did.
4   Q.   Pardon me?
5   A.   Yes, I do have that deposition.
6   Q.   Okay.  We are talking deposition transcripts, not
7        their written report?  Although those were referred to
8        and may have been included with the transcripts, you
9        actually reviewed their deposition testimony in this
10       case?
11  A.   Yes, I did.
12  Q.   What else have you reviewed since April 15th, 2017?
13  A.   Well, like I said, Dr. Levine that I received
14       yesterday, Dr. Levine, Dr. Landers, Dr. Stark, and
15       there is another one.  I forgot which one that is.
16  Q.   The pharmacologist, whatever he was,
17       psychopharmacologist?
18  A.   Yes.  He has, I think, a Greek name.  Komesaroff.
19  Q.   Okay.  He has not yet been deposed, but you may have
20       his report?
21  A.   I think I have his report, and I thought I had a
22       deposition.
23  Q.   Well, if you do, I wasn't there.
24  A.   Maybe I don't have that.  But I do know that I
25       reviewed something that is about a half inch or so in

Page 12

1        thickness given by Dr. Komesaroff.  He is a professor
2        at a college as far as I know, or a university.
3   Q.   What else have you reviewed?  What other depositions
4        have you received?
5   A.   I received the deposition of Dr. Levine, of Dr. Stark,
6        of Dr. Landers.  Those are all depositions that I
7        received yesterday.
8   Q.   Have you ever reviewed the depositions of any of the
9        healthcare providers involved in Mr. Dunigan's
10       Emergency Department visit of May 6th, 2016?
11  A.   Yes, I did.  I don't recall all their names, but I
12       remember one, Shoemaker, and if you mention another
13       one, then I will know whether I reviewed this
14       gentleman's as well.
15  Q.   Mr. Shoemaker, I believe, was a security officer at
16       Bronson.  Was the other deposition you reviewed of
17       another security officer?
18  A.   Yes.  I forget his name.
19  Q.   Did you review depositions of any of the actual
20       healthcare providers from Bronson, emergency room
21       physician?
22  A.   Yes.
23  Q.   Nurses, medical assistants?
24  A.   Yes.  There is a physician.  I forgot his name.  Let
25       me see.  I don't find it here.  I would have to go and

SPITZ, M.D., WERNER
03/20/2018

Page 13

1   get it and then tell you. If you want me to do that,
2   I will do that.
3   Q. I really would like to know what it is you have had
4      access to for --
5   A. Let me go and look at what that is.
6   Q. Please bring back all of the depositions you have
7      reviewed --
8   A. Okay.
9   Q. -- and any other material.
10  A. Okay.
11              (Recess taken at 2:33 p.m.)
12              (Back on the record at 2:35 p.m.)
13  A. Gorda Dunigan.
14  BY MR. O'LOUGHLIN:
15  Q. Doctor, just so the record is clear, you are now
16     listing the names of witness' depositions you have
17     read?
18  A. Yes. Dr. Simpson. That is a doctor of education,
19     Dr. Dennis Simpson, Nolan Cattell. I already
20     mentioned Charles Shoemaker.
21  Q. You did.
22  A. I think I already mentioned Gorda Dunigan.
23  Q. Yes, you did.
24  A. Dr. Stark, Dr. Landers, Dr. Levine. I think that is
25     all. That's all the depositions. There are other

Page 14

1   documents.
2   Q. And I appreciate you doing that. Sorry it took as
3      long as it did. What other documents have you
4      reviewed since the material you listed on April 15th,
5      2017?
6   A. I have reviewed -- wait a minute. No, I'm sorry.
7      That is not all the depositions. There are other
8      depositions as well, only they are packaged a little
9      differently, and so I did not think that they were --
10     I did not remember that they were depositions. But
11     there are two big binders with depositions. Those
12     contain Dr. Regot, deposition of Kevin Patel,
13     deposition of Ryan Szumski, that is S-Z-U-M-S-K-I,
14     deposition of Marianne Loudes, L-O-U-D-E-S, deposition
15     of Kimberly Gilbert, Shay, S-H-A-Y, deposition of
16     Brian Blair, deposition of Dennis Watson, deposition
17     of Amber Bishop, deposition of Christine Rohr,
18     R-O-H-R, Antoura Farrell Dunigan, Farrell is
19     F-A-R-R-E-L-L, deposition of Lola Streeter, that's
20     S-T-R-E-E-T-E-R, deposition of Steven Dunigan,
21     deposition of Quincy Lamar Dunigan, a deposition of
22     Detective Eric Shaffer, S-H-A-F-F-E-R, deposition of
23     officer Derek Nugent, N-U-G-E-N-T.
24              I think I have gotten to the end. Yes.
25     Oh, you wanted all of the documents. So hold on a

Page 15

1   minute. These are statements made by Officer Shaffer
2   and Derek Nugent. Ernst, that is E-R-N-S-T, R. Von
3   Schwarz, M.D., Ph.D. -- M.D. Ph.D. Von Schwarz,
4   S-C-H-W-A-R-Z. There are a number of e-mails. Do you
5   want those too, or do you want me to clear that with
6   Counsel?
7   Q. Is there anything in those e-mails that you relied on
8      to form your opinions?
9   A. No. I didn't rely on that. But those are e-mails
10     regarding scheduling and stuff like that with the
11     Fieger firm.
12  Q. No, I don't need those.
13  A. And those are secretarial -- they were not even
14     addressed to me. They are secretaries to secretaries.
15     There is one document here that is entitled Notice to
16     Produce Documents.
17  Q. What document does it refer to?
18  A. Let me see. Records, diaries and bills prepared in
19     connection with this investigation and evaluation of
20     the issues involved in this lawsuit.
21  Q. Is that a notice for this deposition to ask you to
22     produce those things?
23  A. Let me see. Well, the witness is not described here,
24     so I don't know if it is to me or not. There are
25     statements here. Allen VanderLaan, Kurt Benson,

Page 16

1   Cummings, McClorey, Davis and Acho. That's it.
2   Q. All right. That appears to be perhaps either a
3      Request for Production to the Plaintiff or from the
4      Plaintiff to the Defendant, so I don't need that
5      either.
6   A. Okay.
7   Q. I'm looking for any other material you have reviewed
8      related to this case.
9   A. I will tell you. I have the Complaint. There is a
10     Complaint to each of the Defendants. So then there is
11     a document here, a discharge note from the ER. It
12     doesn't say from whom this is, but that is somebody in
13     the emergency room that discharged this patient. It's
14     a discharge note suffice it to say. I don't know by
15     whom.
16  Q. Is it discharge instructions?
17  A. No, it's not discharge instructions. It describes --
18     I will read to you the beginning of it, and then you
19     will know. "Went out to assist Bronson Security
20     Officer Ripley and day shift Public Safety Officer
21     Nugent with a subject James Ronald Dunigan, who was
22     refusing to leave the emergency room after being
23     discharged. Mr. Dunigan had been cleared medically by
24     ER and wheeled out to the lobby around 4:27 a.m.
25     Apparently staff had told him he could wait until the

SPITZ, M.D., WERNER
03/20/2018

Page 17

1    busses started running.  Security" --
2  Q.  All right.  Doctor, I'm sorry to interrupt.  I
3      apologize.  You don't need to read the whole thing.
4      That appears to be a statement by the security officer
5      or police officer.
6  A.  Yes, that is what it is.
7  Q.  But let's continue trying to identify the material you
8      have reviewed.
9  A.  Okay.  I will tell you material that I reviewed.
10     There is an almost two-inch document of medical
11     records from Bronson Hospital.
12 Q.  Records in addition to -- do those records include the
13     Emergency Department visit of May 6th, 2016 or records
14     of prior care?
15 A.  Let me see.  These are old records.  The date on the
16     top record is August 8th -- sorry, August 11th, it's
17     hard to make out, of the year 2009.
18 Q.  Can you tell where those records are from?  Are they
19     from Bronson?
20 A.  Bronson.  Bronson Hospital.
21 Q.  All right.  As you held them up, I saw what appeared
22     to be sticky notes, pink sticky notes?
23 A.  Yes, they are sticky notes that my office manager put
24     in.
25 Q.  You did not put those in?

Page 18

1  A.  No, I did not.
2  Q.  Do you know what they designate?
3  A.  No, I don't know what they designate specifically
4      other than that they are old medical records.
5  Q.  Did you review those old medical records?
6  A.  I skimmed them.  That's about it.
7  Q.  Did you review the depositions you have listed?
8  A.  Most of them I have.  Some of them I have skimmed just
9      to make me acquainted with the fact that those are
10     really not necessary for me to know in detail because
11     I had already formulated my opinions.  I had written a
12     document about my main opinions.  I supplemented my
13     information that I had from before by reading the
14     depositions that came yesterday, and that's about it.
15        There is some documents that I thought I
16     need to review.  Others I really did not need to
17     review because there was duplicate information in
18     them.  By skimming them the information that I would
19     be confronting is already covered in other depositions
20     and documents.  So I did not really continue to review
21     those documents.  I did not think that that was
22     necessary.
23        There is a record here from the ambulance
24     crew, which is listed -- which is labeled pre-hospital
25     care report summary.  That is dated 01-17-2016.  Then

Page 19

1      there is another copy of the Complaint, a Complaint to
2      another entity, another person, another Complaint.  I
3      think there are four such Complaints.  There is
4      another medical record from Bronson Hospital, which is
5      an admitting record.  The date of this record is the
6      date in question, which is May 6th, 2016 at 2:13 at
7      night, which is the date that Mr. Dunigan came to the
8      emergency room.
9         There is another similar record, which is
10     labeled Incident/Investigation Report dated May 13th,
11     2016.  This is subtitled Incident Information.  The
12     main title on the top is Incident/Investigation
13     Report.
14 Q.  Do you know by whom that report was created or by what
15     entity that report was created?
16 A.  The report is the same format as other reports, and in
17     particular the Bronson Hospital record dated 5-6-2016
18     and with a time of 2:13, which I just read to you a
19     minute ago.  That is the record -- these two seem to
20     be related because they look the same.
21        The first one, of course, as I stated, was
22     the time 2:13 is when Mr. Dunigan came -- arrived at
23     the emergency room, at 2:13 at night.  Then there is a
24     record here, which is from -- which I think is a
25     duplicate actually, from Ernst R. Von Schwarz, M.D.,

Page 20

1      Ph.D.  This one is dated December 31, 2017.
2         In addition to these records there is an
3      autopsy report, which was compiled by Dr. Douglas, I
4      think, Elizabeth Douglas, M.D.  There is also a death
5      certificate and a toxicology report.  This is the
6      extent of the documents that I have except for the
7      document that I generated, which is my opinion letter.
8  Q.  So you have now identified all of the material you
9      have reviewed related to this case?
10 A.  Yes.
11 Q.  Aside from the report you prepared on April 15th, 2017
12     that we have received, do you have any other notes or
13     writings related to your review of this case?
14 A.  I do.  But I hasten to in this regard because these
15     are not opinion notes, but rather sections that I
16     wanted to summarize from the records.  So they are
17     notes, all right, but they are not opinion notes.  My
18     opinions are rendered in the letter that I wrote to
19     Mr. Harrington on April 15th, 2017.
20 Q.  How many pages of notes do you have?
21 A.  Let me see.  I don't know.  Somewhere around ten or
22     so.  Maybe it's nine.  That's it.
23 Q.  Please assemble all of the pages of the notes you have
24     and hand them to the court reporter to be marked as an
25     exhibit.

SPITZ, M.D., WERNER
03/20/2018                                                                 Pages 21–24

Page 21

```
 1  A.  Okay.
 2                     MARKED BY THE REPORTER:
 3                     DEPOSITION EXHIBIT 1
 4                     3:10 p.m.
 5  BY MR. O'LOUGHLIN:
 6  Q.  Has it been marked?
 7  A.  It has been marked, and this is Exhibit Number 1.
 8  Q.  Is Exhibit Number 1 then collectively the pages of all
 9      of the notes you have made related to this case?
10  A.  Yes.  There is one letter on the top of -- I didn't
11      separate a letter from Mr. Harrington's paralegal,
12      Devon Barry.  That letter is appended to five yellow
13      pages, lined yellow pages, which are my notes.
14  Q.  Thank you.
15  A.  There is additional yellow pages, which are also part
16      of this package that we marked just now, but those are
17      not -- they are loose.  They are not attached to the
18      Fieger office letter.
19  Q.  But they are part of Exhibit 1?
20  A.  They are part of Exhibit 1.  Am I correct?  Yes, I am
21      correct.
22  Q.  I would like those to be kept together and arranged
23      for copies to be made to be attached to the
24      transcript.
25  A.  Okay.
```

Page 22

```
 1  Q.  When you were contacted regarding this case, what were
 2      you asked to do?
 3  A.  I was asked to, like I normally do, determine the
 4      cause of death, determine to see if there was
 5      conscious pain and suffering, and I'm saying I wasn't
 6      specifically instructed to do this or that because
 7      that is the way that Fieger's office sends me files.
 8      I have worked with them a fairly large number of
 9      times, so I should know what they need.  So I address
10      those issues.  Those are addressed in my report.
11  Q.  So what are those things that you know the Fieger firm
12      needs when it sends you a file, a record?
13  A.  Well, they want to know the cause of death.  They want
14      to know whether this individual had conscious pain and
15      suffering, whether the death certificate is correctly
16      issued, whether the manner of death is correct and
17      various -- yes, that's about it.
18              Then if they have other questions, they
19      call me, and they say well, you didn't include such
20      and such, and then I may add it or I may not add it,
21      depending on what is the question that they ask me.
22      But I've known Jim Harrington for a long time, and I
23      know what he wants usually.
24  Q.  Have you now listed those things that you understood
25      he wanted?
```

Page 23

```
 1  A.  Not necessarily that he wanted, but I have my own
 2      method of writing opinions.  So most of my opinions
 3      are very similar, depending on the case of course.  So
 4      I write the opinion accordingly.  Usually it
 5      answers -- the opinions would answer anybody's request
 6      for review and opinion.  Many times I don't even know
 7      these lawyers, but the opinions are usually very
 8      similar in that they would answer the majority of
 9      inquiries.
10  Q.  Did you understand, either from being directly asked
11      or from your routine, based upon the many cases you
12      have had with the Fieger firm in the past, did you
13      understand whether you were being asked to comment in
14      any way on the quality of care provided?
15  A.  No.  The quality of care I don't usually tackle that
16      because I am not an emergency physician, and I'm a
17      forensic pathologist, so I do not address standard of
18      care.  Although there are some issues here in this
19      case that I, as a person, not as an expert even, but
20      as a person, I took exception to the way that this
21      individual was handled.  He was not handled like I
22      would want to be handled or like anybody in my family
23      should be handled.  So I told him that.  But I don't
24      know if I wrote it in my opinion.
25              I haven't reviewed my opinion in some time,
```

Page 24

```
 1      but I don't believe that Mr. Dunigan, with his
 2      underlying condition that he had at the time the
 3      police came and took him to the jail, that they
 4      handled him correctly.  I would not want to be handled
 5      that way.
 6  Q.  Okay.  Let's sort a few things out.  You have agreed
 7      that you are not an emergency medicine physician,
 8      correct?
 9  A.  No, that is correct.
10  Q.  And not an expert in emergency medicine, correct?
11  A.  No, I'm not an expert in emergency medicine, but I'm a
12      physician who knows certain things that occurred here.
13      And under those circumstances this is individual did
14      not belong in jail, belonged to the hospital, and he
15      was not allowed to stay in the hospital.  He was not
16      even admitted.
17              So all of these things together, and then
18      on top of that, taken to the hospital, yes, I know
19      that he asked to be taken to the hospital, but what
20      does he know about what needs to be admitted and what
21      really his underlying condition is.  He didn't know
22      that.  Mr. Dunigan had no idea what he is suffering.
23              So when I take all that together, I did not
24      like the -- as a physician, not as an expert forensic
25      pathologist, but as a physician, I did not like the
```

SPITZ, M.D., WERNER
03/20/2018

Page 25

1    way this man was handled, this man was treated, this
2    man was confronting when he was handled by a number of
3    people who were not necessarily treating him like a
4    patient, not like -- and like a sick patient, like a
5    patient who was in the throes of death.  They did not
6    recognize it, and they should have recognized it.
7    That is my opinion.
8  Q.  You don't claim to be an expert in emergency medicine,
9      correct?
10 A.  No, I'm not an emergency medicine physician.
11 Q.  You don't claim to be an expert in emergency nursing,
12     correct?
13 A.  No, that is correct.
14 Q.  You don't claim to be an expert in radiology, correct?
15 A.  Correct.
16 Q.  You don't claim to be an expert in hospital security,
17     correct?
18 A.  Correct.
19 Q.  You don't claim to be an expert in law enforcement or
20     the conduct of law enforcement officers, correct?
21 A.  Correct.
22 Q.  Do you claim to be an expert in the law known as
23     EMTALA, the Emergency Medical Treatment and Active
24     Labor Act?
25 A.  Yes, I'm aware of such a thing, but I have not ever

Page 26

1    made use of that type of information.  So I know of
2    it, but I really don't know a whole lot of it.
3  Q.  When you say you haven't made use of it, that means
4      you haven't had to worry about complying with EMTALA?
5  A.  Or not complying.  I don't know enough about EMTALA to
6      know how to handle that.  I don't see patients in my
7      practice.
8  Q.  Correct.  What is your understanding of why
9      Mr. Dunigan came to the Emergency Department in the
10     early morning hours of May 6th, 2016?
11 A.  Well, he had chest pain he claims, and he came because
12     it was for him a fearful experience.  That is what
13     took him to the hospital.  He, in fact, was in a
14     condition which in his mind required transport to the
15     hospital, like you said, in the middle of the
16     nighttime, and it was a fearful experience for him, so
17     he called for an ambulance to take him.
18 Q.  What is your understanding of how long he had had this
19     chest pain?
20 A.  He indicates that, as a layperson, I have to say that,
21     he says that -- or he thought there is a connection
22     between his chest pain and the bruise he had on his
23     chest and his actual pain, that that resulted from
24     internal bleeding he thought, and that he -- chest
25     pain from -- the real reason for the chest pain was

Page 27

1    really very little connected to him falling out of a
2    bus when he sustained the fall and hit something on
3    cement, as he indicated.
4         It was a different kind of chest pain
5    altogether, and that chest pain is notorious for
6    fearing doom.  That pain is a different kind of pain.
7    That is the pain of a heart attack.
8  Q.  Upon what do you base that statement?
9  A.  On the fact that he had manifestations of congestive
10     heart failure.  His breathing, his sickening type of
11     snoring that is not that he is sleeping, but it is a
12     kind of snoring, if you will, where fluids in the lung
13     go up and down the airway every breath he takes.  That
14     is not necessarily annoying for others to hear.  That
15     is not the issue.  The issue is that it scared the
16     daylights out of the individual who suffers it.
17          It is a type of pain is associated with
18     asphyxiation.  Asphyxiation is always a very fearful
19     experience because here the lung contains fluid.  When
20     the fluid is moved by breathing up and down, there is
21     in addition to the noise that this makes, there is
22     also a lack of air in the lungs substituted for
23     fluids, so-called edema fluids, which is none other
24     than froth.
25          And the officers looked at all that, stated

Page 28

1    it in their packing him into the seat in the police
2    vehicle, did nothing about it.  They said:  Oh, he is
3    faking.  Oh, we know well what to expect from him, and
4    so on and so forth.  The officers know or should know
5    what that means.  I know they are not physicians, but
6    they should know that because it occurs a lot more
7    often than we want.
8  Q.  Doctor, if we can, for the sake of addressing
9      different periods of time, break this ED presentation
10     down into the period of time from when Mr. Dunigan was
11     picked up by the ambulance to the time that he was
12     discharged from the Emergency Department into the
13     waiting room, when he was wheeled into the waiting
14     room in a wheelchair.  Do you understand that frame of
15     time I'm talking about?
16 A.  Well, it's kind of a long question which requires
17     probably a long answer, but I hope I will comply with
18     your request.  If I don't, so please tell me.
19 Q.  Let me go back and get some foundation.  Did you
20     review the videos that you received as listed in your
21     report?
22 A.  Yes, I did review that.  I reviewed the videos.  To
23     answer your question, I would like to state that the
24     video clearly shows, or one of them, clearly shows a
25     restful -- I mean a restless individual who aimlessly

Page 29

1    walks around because he is experiencing -- well, for
2    lack of a better term, he is experiencing the sense
3    that he is no long for this world.  He is experiencing
4    pain that elicits in him the thought that he will soon
5    die.  He hears himself breathe.  He knows how he
6    feels.  He has acute chest pain of the type that is
7    horrible.  People are driven to hospitals all the time
8    when they experience this kind of pain.
9             So that is what the video clearly shows.
10   Then the video shows him in the way he was handled
11   when they put him out on the curb because they decided
12   in the hospital that he has to leave the hospital.  So
13   they gave an order to the police safety people, to the
14   police officers that worked for the hospital, to take
15   him out of there.  That was not very nice of them
16   either.
17            Although they gave him permission to stay
18   until 6:00, it wasn't until 6:30 that -- or close to
19   6:30 that he was actually placed on the curb to fend
20   for himself.  Police came and took him off from the
21   hospital, and there is a video which shows how he is
22   handled when he is put in the vehicle.  He is pushed
23   into the vehicle.  He is falling over.  They pull him
24   and shove him and treat him like an object, not like a
25   person.

Page 30

1             He is heard by me breathing this terrible
2    snoring sound.  He at the same time he is -- a comment
3    is made by officers that he is foaming at the mouth.
4    Well, you know, as a physician, not as an emergency
5    physician, but as a physician who has been taught over
6    and again that this kind of thing is not long.  This
7    type of thing is ending in death of this patient.
8             How does he die?  He dies of suffocation.
9    That is a horrible type of death.  That is what I saw.
10   That I hope answers your question.
11   Q.  Not even close, Doctor.  My question was did you
12       review the videos, yes or no?
13   A.  Yes, I did.
14   Q.  Thank you.  I will move to strike all of the other
15       information you just tried to convey.
16   A.  Okay.
17   Q.  Do I have your permission to interrupt you in the
18       future when you go way off course and go beyond the
19       question I'm asking?
20   A.  Of course.
21   Q.  All right.  Did you review the videos from the Bronson
22       waiting room?
23   A.  Yes.
24   Q.  Did you understand that what was depicted in those
25       videos was a period of time after Mr. Dunigan had been

Page 31

1    evaluated and discharged from the Emergency
2    Department?
3    A.  Yes.  I'm fully aware of that, but I don't necessarily
4        agree with that handling either.
5    Q.  All I'm trying to get here, Doctor, is to a timeframe
6        so that we can ask questions.  What I'm talking about
7        is the timeframe up to the time that Mr. Dunigan is
8        discharged from the Emergency Department and into the
9        waiting room.  My question is do you understand the
10       timeframe I'm talking about?
11   A.  Yes, I understand fully.  From 2:13 when he arrived
12       until 4:30.
13   Q.  Okay.  Thank you.  From the time he was picked up by
14       the ambulance until the time he is discharged to the
15       waiting room, are you aware of any evidence that he
16       exhibited any clinical signs or symptoms of I will
17       start with a myocardial infarction?
18   A.  I don't know whether I can answer that because there
19       really is no medical information that would have
20       allowed me to make that kind of statement to answer
21       your question.  An x-ray to determine whether he has
22       got broken ribs and then they find no broken ribs and
23       make a diagnosis that there is nothing wrong with him,
24       so they discharged him, that is not the way to do it.
25            My objection is that I, without necessarily

Page 32

1    dealing with the standard of care, because I don't
2    know what the standard of care is, but as a physician,
3    I can tell you that I don't want to be handled that
4    way.  Neither do I want anybody else to be handled
5    that way.  They did nothing for this individual.  They
6    did nothing in the emergency room, and they should
7    have done something for him.  That something may even
8    have extended his life.
9    Q.  Doctor, if you could listen to my question and try
10       just to answer the question rather than giving
11       speeches.  I will tell you right now that I will
12       object to paying you one dime if we go beyond three
13       hours because of the length of your answers, and I
14       will be happy to present that to Court.
15   A.  Okay.
16   Q.  Now, my question was are you aware of any evidence
17       that Mr. Dunigan exhibited any clinical signs or
18       symptoms of an MI, a heart attack, up to the time he
19       was discharged from the Emergency Department into the
20       waiting room?
21   A.  Yes.  He complained of pain, of chest pain.  That is
22       all he could complain about.  In addition to that
23       there is some evidence of him having swollen legs.  In
24       addition to that he had difficulty breathing.  So all
25       this points to at least excluding --

SPITZ, M.D., WERNER
03/20/2018                                                                                    Pages 33—36

---

Page 33

1        (Telephone connection cut out at 3:35 p.m.)
2        (Back on the record at 3:39 p.m.)
3   BY MR. O'LOUGHLIN:
4   Q.   I can tell you that I lost you after my last question
5        from the time you said "chest pain."  So I don't have
6        any idea what you said after that or if the court
7        reporter took it down.  We will try to resume if I
8        may.
9   A.   Well, maybe that is all as well that you lost it.
10  Q.   It probably is all as well, but thank you.  If I may,
11       I don't want the answer read back because it looked
12       like you were talking for a really long time after
13       that question.  So if I may, I would like to ask it
14       again.  Is that acceptable?
15  A.   Sure.
16  Q.   I am talking about the time period from the time
17       Mr. Dunigan was picked up by the ambulance to the time
18       he was discharged from the Emergency Department and
19       wheeled into the waiting room.  Can you point to
20       evidence of any clinical signs or symptoms of a heart
21       attack that he exhibited?
22  A.   None really as indicated in the emergency room records
23       that permits me to quote them at this time.  When such
24       a situation arises, it should -- there are situations
25       where it's a matter of ruling out.  Not every

---

Page 34

1        condition is manifested by symptoms.  But chest pain
2        in a 57 year old individual with a history of -- he
3        had a history, a long history, from the hospital where
4        he is known to have hypertension and diabetes and all
5        these conditions that he had.  They knew that.  They
6        had this on record.
7             So it's a matter of saying wait a minute,
8        this individual has been here for years and been
9        coming here to get medical care.  So why don't we look
10       this up on the computer.  If they would have done
11       that, they would have known his background.  That was
12       never done.  Instead, they took an x-ray and sent him
13       to the curb.
14            Actually, they allowed him to stay until
15       6:00 when the busses go.  So he sat there, but he is
16       obviously on the video that I saw, he is --
17  Q.   Doctor, you gave me permission earlier when you went
18       way beyond the question --
19  A.   Okay.
20  Q.   Now, my question -- do you remember my question?
21  A.   What did he do between 2:13 -- or what happened
22       between 2:13 and 4:30.  That is your question.  Am I
23       correct?
24  Q.   My question is from the time he was picked up by the
25       ambulance to the time he was discharged from the

---

Page 35

1        Emergency Department and wheeled into the waiting
2        room, did he have any signs or symptoms of a heart
3        attack?  Your answer started as "no."  If that is the
4        answer, I will take it.  If you know the signs and
5        symptoms, I want to know about those.
6   A.   Well, he had chest pain.  That was his complaint when
7        he came in.
8   Q.   Any potential sign or symptom of a heart attack other
9        than that?
10  A.   That is a sign of a heart attack unless proven
11       otherwise.
12  Q.   Anything other than chest pain which you would
13       consider a sign or symptom of a heart attack that he
14       presented up to the time he was discharged to the
15       waiting room?
16  A.   I do not see any mention in the record of the
17       emergency room that would talk about manifestations of
18       a heart attack because I must think from the lack of
19       mentioning any other manifestations, which in my
20       opinion don't have to be there, but at least -- I
21       don't know that they even tried to find anything else.
22            There are things that can be done with
23       somebody who has chest pain with a history of a heart
24       condition that would at least need -- call for doing
25       something that would confirm or dismiss the thought of

---

Page 36

1        a heart attack.
2   Q.   Aside from the complaint of chest pain as reflected in
3        the medical record from the Emergency Department, did
4        Mr. Dunigan exhibit any signs or symptoms of a heart
5        attack up to the time he was wheeled into the waiting
6        room?
7   A.   No, I'm not aware of any direct manifestations of a
8        heart attack, but they don't have to be there.  So I
9        mean I don't know how else to answer that.  If
10       everybody had other manifestations that without any
11       doubt confirm a heart attack other than a pathologist,
12       the -- what ever happened to Troponin to do that, to
13       find out if he has got manifestations of a heart
14       attack?  I don't know how to answer that any
15       differently.
16  Q.   How about answering it straight, Doctor.  You have
17       given thousands of depositions.  Please just try to
18       answer my question without the speeches.  What do you
19       consider to be a clinical sign or symptom of a heart
20       attack?
21  A.   Laboratory work.
22  Q.   You consider laboratory work to be a clinical sign or
23       symptom?
24  A.   Yes.  That is done in the clinic when somebody comes
25       in in a condition that could be related to a heart

---

SPITZ, M.D., WERNER
03/20/2018                                                                          Pages 37–40

Page 37

1    attack.  That should be used, and that is called for a
2    laboratory.
3    Q.   Okay.  I guess we should remember that you are not a
4         clinician, true?
5    A.   No, I'm not a clinician.
6    Q.   Okay.  This is unbelievable.  Are you aware that every
7         day all across the country thousands of people present
8         to Emergency Departments with complaints of chest
9         pain?
10                  MR. DAWSON:  Objection, foundation.
11   A.   I'm sure that is true.
12                  MR. DAWSON:  Go ahead, Doctor.
13   A.   I'm sure that that is true.
14   BY MR. O'LOUGHLIN:
15   Q.   Are you aware of the fact that the vast majority of
16        those patients do not have chest pain due to a heart
17        attack?
18                  MR. DAWSON:  Objection, foundation.  Go
19        ahead, Doctor.
20   A.   That is not my consideration, whether they have or
21        don't have.  It is -- it requires that everything be
22        done in the interest of the patient with the chest
23        pain at the right age that that patient could have a
24        heart attack, and therefore, it has to be ruled out.
25

Page 38

1    BY MR. O'LOUGHLIN:
2    Q.   Okay.  Are you aware of any evidence, based upon your
3         thorough review of all these materials, that
4         Mr. Dunigan's condition in any way deteriorated up to
5         the time that he was discharged from the Emergency
6         Department and wheeled into the waiting room?
7    A.   I don't know what that means.  Could you ask me that
8         differently, please?
9    Q.   Are you aware of any evidence, based upon your review,
10        that Mr. Dunigan's condition deteriorated or got worse
11        up to the time that he was wheeled into the waiting
12        room?
13                  MR. DAWSON:  After he was discharged from
14        care?
15                  MR. O'LOUGHLIN:  Correct.
16                  MR. DAWSON:  There you go, Doctor.
17                  MR. O'LOUGHLIN:  But before he is wheeled
18        into the waiting room or up to that time.
19   BY MR. O'LOUGHLIN:
20   Q.   Do you understand my question, Doctor?
21   A.   Not really.  No, I don't.  He was discharged from the
22        emergency room to the waiting room like around 4:30.
23   Q.   Let me just -- I'm still trying to set the stage.  I
24        can't believe it's this hard.
25                  After he is discharged to the waiting room

Page 39

1    in the wheelchair is when you see video of him in the
2    waiting room, true?
3    A.   Yes.
4    Q.   Up to that point are you aware of any evidence
5         indicating that his condition deteriorated or got
6         worse up to that time from the time he got to the
7         hospital?
8    A.   No, I don't see that in the emergency room there was
9         evidence that he got worse in the emergency room.
10   Q.   With that same end point, up to the time that he was
11        rolled into the waiting room after being discharged
12        from the Emergency Department are you aware of any
13        evidence that he had any sort of breathing difficulty
14        or respiratory difficulty?
15   A.   There is no mention of any of that.  The heart attack
16        could have occurred with little or no manifestations.
17        So that clinically a heart attack would not -- would
18        may well be there but needs to be explored whether
19        it's there or not because heart attacks can be very
20        subtle in onset.
21                  So if you don't make an effort to find it,
22        you are not going to know that it's there or not.  He
23        did not -- other than chest pain, severe chest pain,
24        such that it was fearful for him to have that chest
25        pain, and the negative x-ray on top of it, that

Page 40

1    creates a problem if you are not going to continue
2    looking for what may be the source of the pain when
3    nothing that would show up on x-ray is actually there.
4    Q.   You agree that the chest x-ray was negative?
5    A.   The chest x-ray was negative.  There was no evidence
6         of broken ribs.  There was no evidence of bruised
7         lungs.  There was no evidence of any positive
8         manifestation that would warrant that kind of chest
9         pain.
10   Q.   What was thought to be -- based upon your review, what
11        was thought to be the cause of Mr. Dunigan's chest
12        pain?
13   A.   He had chest pain because he had 99 percent occlusion
14        of two major coronary arteries.
15   Q.   Maybe you misunderstood my question.  Let me make it
16        clear.  From your review of the record and the reason
17        Mr. Dunigan came to the hospital and the conclusion
18        reached by the healthcare providers in the Emergency
19        Department, what is your understanding of what was
20        thought to be the cause of his chest pain?
21   A.   I have to believe that they thought that he fell out
22        of the bus and bruised himself.
23   Q.   Which is exactly what he reported, true?
24   A.   Which is what he reported, yes.  Otherwise, they
25        wouldn't have known.  Otherwise, they wouldn't have

Page 41

1      taken the x-ray.

2  Q.  And from your close review of the records, did you

3      discern that on examination that chest pain was

4      reproducible with palpation?

5  **A.**  **You mean that if they pushed with their hand on his**

6      **chest that it became worse?**

7  Q.  In the area where the patient was complaining, yes.

8  **A.**  **Yes. I understand that. I'm not surprised of that.**

9      **But at the same time, it was the chest pain that got**

10     **worse by exertion.**

11  Q.  Upon what do you base that claim?

12  **A.**  **Because the record does show that.**

13  Q.  Where do you see anywhere in the record that it says

14     this pain was worse with exertion?

15  **A.**  **Well, I don't know where I saw it right now, but**

16     **somewhere in the records it mentions chest pain**

17     **getting worse from exertion.**

18  Q.  Well, you better dig out the record.

19  **A.**  **No, I can't do that now. That is just too much work**

20     **to do that now.**

21  Q.  It's not a long record.

22  **A.**  **Because I need to read the record from the beginning.**

23     **Let me see what I can come up with. This record is**

24     **Bronson emergency room record. The middle of the**

25     **page. I don't know what number. Here, page 2, it**

Page 42

1      **says chest pain on exertion. It's about five inches**

2      **from the top.**

3  Q.  Are you familiar with how you read Emergency

4     Department records?

5  **A.**  **I read them. I mean I know how to read English. It**

6     **says chest pain on exertion.**

7  Q.  Right. Do you believe that applies to a past history

8     as opposed to what he presented on this occasion?

9  **A.**  **This is a record of -- let me see.**

10  Q.  Let me try as hard as I can to try to shorten it up.

11     Do you see a date associated with that complaint?

12  **A.**  **I see it is -- well, there are several dates. Maybe**

13     **not. Yes, there are several dates.**

14  Q.  2012 and 2014?

15  **A.**  **Yes.**

16  Q.  Do you believe that that reference suggests that he

17     had chest pain with exertion at the time he presented

18     to the Emergency Department on May 6th, 2016?

19  **A.**  **Well, it may be. I'm not clear about**

20     **whether it was on -- these were the dates when he had**

21     **chest pain on exertion, and that would have -- should**

22     **have raised a red flag for any time that if you have**

23     **chest pain on exertion, at any other time that means**

24     **the coronary arteries are in bad shape.**

25  Q.  My question, again, I attempted to talk about the

Page 43

1      timeframe from when he was picked up by the ambulance

2      on May 6th to the time he was discharged from the

3      Emergency Department and wheeled into the waiting room

4      on May 6th. Do you have an opinion as to what was

5      thought to be -- I'm sorry -- do you have any evidence

6      that you can point to that indicates Mr. Dunigan

7      complained of chest pain with exertion?

8  **A.**  **Whether he had chest pain on exertion or not, he has**

9     **evidence in the records where they know that he is**

10     **diabetic, where they know that he is hypertensive,**

11     **where they know that he has got some other time chest**

12     **pain on exertion. All these things add up. Then he**

13     **has -- somewhere I read that he had had swollen ankles**

14     **as well.**

15  Q.  I didn't understand what you said there.

16  **A.**  **I said that somewhere I noticed that he had on that**

17     **day he had swollen ankles, and he is a patient of**

18     **diabetes, and they --**

19  Q.  Doctor, I'm going to interrupt you again. Do you

20     recall my question?

21  **A.**  **Yes, I know your question. But I need to point out to**

22     **you that there is a previous number of records at that**

23     **very same hospital. So they knew of his condition or**

24     **should have known.**

25  Q.  Do you recall my question?

Page 44

1  **A.**  **Yes.**

2  Q.  Any evidence that Mr. Dunigan complained of chest pain

3     with exertion at any time on that day, May 6th, 2016,

4     at any time?

5  **A.**  **No, I'm not aware.**

6  Q.  Thank you. Based upon your review, would you agree

7     that the healthcare professionals caring for

8     Mr. Dunigan believed that his chest pain was due to

9     the fall he reported when he got off the bus and fell

10     at 6:00 p.m. the evening before?

11  **A.**  **No, I don't agree with that.**

12  Q.  You think the healthcare providers thought his chest

13     pain was caused by something else?

14  **A.**  **I think that they thought it was caused by something**

15     **else because they did not eliminate anything else in a**

16     **patient with the underlying record that he has.**

17  Q.  Based upon your review -- can you point me to any

18     evidence which would indicate that any of the

19     healthcare professionals involved with Mr. Dunigan's

20     care actually thought that his chest pain was due to

21     something other than the fall he had suffered?

22  **A.**  **I cannot crawl into their minds, but I can tell you**

23     **that no effort was made to find out what really caused**

24     **his chest pain.**

25  Q.  Can you, based upon your review, identify any evidence

SPITZ, M.D., WERNER
03/20/2018

Page 45

1  that Mr. Dunigan's condition was unstable at the time
2  he was discharged from the Emergency Department?
3  A.  Evidence there was not that he was unstable.  But if
4  they had explored, they would have found out that it
5  was unstable.
6  Q.  Is the answer to my question that you are not aware of
7  any evidence indicating that Mr. Dunigan's condition
8  was unstable as of the time he was discharged from the
9  Emergency Department to the waiting room?
10 A.  Well, he was unstable even -- I mean you could argue
11 that he was unstable because of the way he behaved in
12 the waiting room once he was discharged from the
13 emergency room.  He was totally anxious.  He was
14 walking around with his cane.  He was holding on to
15 furniture and seats and his cane to walk around.  Let
16 me think of the word I am looking for.  Yes, he was
17 anxious.  He was concerned.  He was worried about his
18 condition because the pain was not related to -- they
19 ruled out -- the x-ray ruled out that he had any major
20 condition in his chest.  Even a broken rib was not
21 found.  Nothing was found that would indicate that he
22 had chest pain because of an injury.
23 Q.  Do you believe that one can experience chest pain from
24 a fall without breaking a rib?
25 A.  Of course you can, but here you have a patient who has

Page 46

1  a record of heart conditions, cardiovascular
2  conditions, COPD, he is known to have diabetes, known
3  to have manifestations on other occasions that point
4  to his heart and breathing organs, like lungs and
5  chest wall and so on.  They knew what they are dealing
6  with, but did they make use of that knowledge?  No,
7  they did not.
8  Q.  Did you do any research or online search or reading in
9  order to prepare your opinions and provide your
10 opinions in this case?
11 A.  I did a lot of reading.  Not for this case, but I
12 started my reading when I went to medical school.
13 Q.  Have you done any research specifically for your
14 review and providing opinions in this case?
15 A.  No, not providing for this case, but providing for all
16 kinds of other cases that have similar problems.
17 Q.  Have you done any reading or research as to the life
18 expectancy of a patient with end stage renal disease
19 on dialysis?
20 A.  Well, I do a lot of autopsies on these patients, so I
21 get their records.  The life expectancy of a dialysis
22 patient is about seven years.  This individual was on
23 dialysis.  In fact, I think that, if I'm not mistaken,
24 this visit to the emergency room on May 6th was a
25 Friday.  So he got dialysis on Fridays.  That is what

Page 47

1  I gleaned from the records.
2      But it doesn't make any difference whether
3  this was the day or not because he got -- he had to
4  have dialysis in order to clear his blood of the waste
5  product that it normally has if he does not get
6  dialysis.
7      His life expectancy was governed by his
8  kidneys and probably to some extent of his heart as
9  well and diabetes and so on and so forth.  But that is
10 not -- I disagree, by the way, with the comment made
11 on the death certificate that the drugs that he took
12 were a contributing factor to his death.  I don't
13 believe that.
14 Q.  Doctor, do you think you are capable of answering the
15 questions I ask?
16 A.  I answer you the best I can.
17 Q.  Here is my question:  Have you done any research or
18 reading which would allow you to offer an opinion as
19 to the average life expectancy of a patient in end
20 stage renal failure requiring dialysis?
21 A.  Between five and seven years.
22 Q.  Upon what do you base that opinion?
23 A.  On the statistics.
24 Q.  From where?
25 A.  I don't know from where to tell you right now, but I

Page 48

1  can always research where that comes from.  But I have
2  known that for a long time.  There are documents
3  issued by the life insurance companies, the major life
4  insurance companies, and the CDC that gives you these
5  kinds of estimates.
6  Q.  You have referred to statistics from life insurance
7  companies in your report, correct?
8  A.  That's correct.
9  Q.  You suggested that, based upon those statistics,
10 someone of Mr. Dunigan's age could expect to live
11 another 23 years?
12 A.  Yes.  With compliance he stands the chance of that
13 kind of longevity.  He was not always compliant.
14 Q.  How do you reconcile the opinion you just gave, that a
15 person with end stage renal disease on dialysis has a
16 life expectancy of five to seven years, with your
17 suggestion that Mr. Dunigan had a life expectancy of
18 23 years?
19 A.  No.  Well, first of all, when I wrote that, I was not
20 aware that he was not always compliant.  That is one
21 factor at least.  So I also did not know much about
22 his general medical conditions.  But I know now, and
23 that is why I'm saying with compliance he probably
24 stands a much better chance than the average person.
25 Q.  Okay.  Let me ask this:  The average life expectancy

1    of patients in end stage renal disease on dialysis
2    doesn't necessarily mean patients who are compliant or
3    noncompliant, true?
4    A.   No.  I'm assuming that he was not always compliant.
5         That is what I know.  What that assumes in regards to
6         Mr. Dunigan I really don't know.
7    Q.   Is it fair to say you don't really know what his life
8         expectancy would have been?
9    A.   No, I don't say that.  I say that the average life
10        expectancy may be five to seven years, but what was
11        Mr. Dunigan's life expectancy requires some more
12        inquiry.  I don't know what it means that he was not
13        always compliant.  If he was compliant or not
14        compliant, I would assume that the conditions
15        indicated on the death certificate have been with him
16        for years, and so when I read that and when I read the
17        comments on the death certificate with regards to
18        drugs, I tend to believe that he had a much better
19        life expectancy than is maybe assumed at face value.
20   Q.   First of all, you would withdraw the opinion in your
21        report of April 15th, 2017 that Mr. Dunigan was
22        deprived of at least 23 years of life.  You no longer
23        hold that opinion, true?
24   A.   No, that is not really true.  I don't know if it's in
25        the 20-year level that his life expectancy would have

1         been, but that may require some more research.  But
2         only the future really would really tell whether it
3         was or was even an extent of that.  But for right now
4         I think I would consider that the life expectancy may
5         have been as high as 23 years, but may not have been.
6         I would like to know that he improved his lifestyle.
7         I would like to know that he is under medical
8         supervision, compliant as it is, and I would then make
9         my opinion as to the veracity of that statement in my
10        report.
11   Q.   But we don't have the benefit of knowing what would
12        have happened in the future if he lived, do we?
13   A.   Well, I don't know what would have been -- what would
14        have occurred if he had lived, but I'm not surprised
15        that he died because nothing was done for this
16        individual.
17   Q.   When you attempt to -- and you do believe you are
18        qualified to offer opinions on life expectancy?
19   A.   Oh, yes, I am.
20   Q.   Okay.  In every case where you are offering that
21        opinion in a death case, the patient is already dead.
22        You have to rely upon statistics and studies and
23        reviews of past cases to determine the likely time a
24        patient would be expected to live beyond their actual
25        date of death, true?

1    A.   Not quite.
2    Q.   All right.
3    A.   In every -- is that a question?  Because then I can
4         answer.
5    Q.   Didn't you already tell me that a patient with end
6         stage renal failure on dialysis has an average life
7         expectancy of five to seven years?
8    A.   Yes, I did.
9    Q.   All right.  Didn't Mr. Dunigan have end stage renal
10        disease and required dialysis?
11   A.   Yes, he required dialysis or transplant.
12   Q.   That five- to seven-year life expectancy with patients
13        on dialysis doesn't only apply to patients who are
14        noncompliant, does it?
15   A.   I don't know what that is based on other than the
16        statistics indicate that the life expectancy of
17        individuals on dialysis, three times a week dialysis,
18        would have on the average a life expectancy of five to
19        seven years.
20   Q.   Okay.  Mr. Dunigan was a patient with end stage renal
21        disease requiring dialysis three times a week, true?
22   A.   I think it is.  Usually it is three times a week
23        because when the kidneys are shot like in this case,
24        then he would need dialysis three times a week.
25   Q.   So isn't he the kind of patient, based on statistics,

1         that would be considered to have a five-to seven-year
2         life expectancy?
3    A.   Not necessarily.
4    Q.   Why not?
5    A.   Well, how do I know?  Maybe next week something comes
6         out where he can get a transplant.  How do I know
7         that?  And why not?  Why is he not eligible for a
8         transplant?  A lot of kidneys floating around these
9         days.
10   Q.   Do you know whether that average life expectancy of
11        five to seven years with patients in end stage renal
12        disease includes the whole range of patients from
13        patients who are noncompliant to patients who get a
14        transplant?
15   A.   No, no, no.  That is not so.  I'm aware of patients
16        with transplanted kidneys who do very well, very well
17        indeed.
18   Q.   But the average overall of a patient like Mr. Dunigan,
19        a patient in end stage renal failure requiring
20        dialysis, is five to seven years according to your
21        opinion.  It's actually shorter than that, but --
22   A.   No.  My opinion is perfectly fine to consider the life
23        expectancy in Mr. Dunigan, sorry, in this individual,
24        is based on the maximum that he is likely to live,
25        considering all his conditions, not just the kidneys.

Page 53

1    The kidneys are one item here, and the
2 necessity of dialysis is not a given in anybody.
3 There are a lot of people who now get kidneys who
4 never even thought of the likelihood that they might
5 get one. They are able to get kidneys. So I think
6 that the likelihood of an individual like this is not
7 necessarily carved in rock that he would not qualify.
8 I don't know that. So if he qualifies, he stands a
9 chance, and that would eliminate dialysis.
10    Dialysis is not a nontraumatic event. So
11 dialysis has its own perils, and if he does not need
12 dialysis, he is way ahead.
13 Q. So did you or did you not testify multiple times so
14    far today that on average a patient with end stage
15    renal disease on dialysis has a life expectancy of
16    five to seven years?
17 A. That may be, but that goes for each and every case
18    separately. It's not uniform for all of them.
19 Q. But you attempt to decide on life expectancy by taking
20    those statistical averages and applying them to a
21    particular patient, true?
22 A. When the circumstantial evidence causes me to do that,
23    I do. When it doesn't, I do that too. That is why my
24    testimony is what it is.
25 Q. That five- to seven-year average life expectancy you

Page 54

1    referred to could be reduced by other comorbidities
2    other than end stage renal disease, true?
3 A. Well, it obviously did in this case, but it didn't
4    have to.
5 Q. So that five- to seven-year average that you are
6    talking about would be reduced even further if a
7    patient also had diabetes and coronary artery disease?
8 A. He has had diabetes for a long time. He has had
9    coronary artery for a long time. He had COPD for a
10    long time. He had hypertension for a long time. Does
11    that mean that he has to die necessarily without
12    affording him the best possible medical treatment that
13    America can provide? Because that could be me. Maybe
14    I shouldn't say me, but that could be I.
15 Q. Up to the time that Mr. Dunigan was wheeled into the
16    waiting room are you aware of any evidence that he had
17    an obvious manifestation of serious illness or that he
18    was foaming at the mouth or that he was experiencing
19    pulmonary edema or that he was having air hunger,
20    difficulty breathing, dyspnea or fear of doom?
21 A. I'm sorry. I don't know -- I'm losing track of the
22    question. Would you be so kind to say it again?
23 Q. I'm still on the time period up to the time he is
24    discharged from the Emergency Department to the
25    waiting room.

Page 55

1 A. Yes.
2 Q. Are you aware of any evidence indicating that he still
3    had obvious manifestations of serious illness --
4 A. He had --
5 Q. -- referred to in your report?
6 A. I have answered that. I have answered that before. I
7    am unaware of him having other conditions because
8    nothing else was done to find out if he had other
9    conditions except that the record in the record room
10    is full of them, and nobody ever pulled them and
11    studied them and knew what they say.
12 Q. Are you aware of any evidence that Mr. Dunigan
13    demonstrated any frothing at the mouth at any time
14    before he was placed in the police vehicle?
15 A. No, I'm not aware of it, that he was frothing at the
16    mouth at the hospital, but he sure was frothing at the
17    mouth in the vehicle because I heard it. Frothing at
18    the mouth and snoring, that type of snoring which I
19    can only hope I never hear again.
20 Q. Please try and listen to my question, Doctor. At any
21    time before Mr. Dunigan is placed in the police
22    vehicle are you aware of any evidence indicating that
23    he had frothing at the mouth or was experiencing air
24    hunger, difficulty breathing or dyspnea?
25 A. No. I said that. I said that I'm unaware of it, if

Page 56

1    he had it before he left.
2 Q. Are you aware of any evidence indicating that at any
3    time after his initial presentation to the Emergency
4    Department Mr. Dunigan ever asked for any medical care
5    or medical attention?
6 A. Before what?
7 Q. At any time after his initial presentation.
8 A. You mean on 5-6-2016 at 2:13? That is when he came to
9    the hospital.
10 Q. Let me try it this way: Let's go from the time he was
11    discharged from the Emergency Department and wheeled
12    into the waiting room. Do you understand where I am
13    in the time sequence there?
14 A. Well, I don't know that he asked for medical care, but
15    he didn't want to leave. That is for sure. He
16    certainly didn't want to leave the hospital. Why he
17    didn't want to leave I can only speculate. I don't
18    know why he didn't want to leave, but it's obvious
19    that if you don't want to leave the hospital, you are
20    looking for more medical care, but maybe I'm wrong.
21 Q. Upon what do you base the claim you just made, that
22    Mr. Dunigan did not want to leave the hospital?
23 A. Well, the records all show that. He didn't want to
24    go. He didn't want to be taken elsewhere. He asked
25    to be taken -- I don't know why he wanted to go to

Page 57

```
 1          jail, but maybe he had hopes that they would provide
 2          him with more medical care.  I don't know.  He did not
 3          want to leave Bronson because that is abundantly
 4          documented in the various depositions that I read.
 5   Q.    Are you aware of any evidence indicating that
 6          Mr. Dunigan ever complained of a medical problem or
 7          asked for medical care after he was wheeled into the
 8          waiting room?
 9   A.    I'm unaware whether he asked for additional medical
10          care.  Maybe he didn't know that there was such
11          available, but it's obvious that that is what he
12          needed.  Many times in my -- to my knowledge, patients
13          don't know that they can get medical care for whatever
14          they have, an ailment or a condition.  They may not
15          know.  He may not have known that he should -- he has
16          to ask for medical care.  I really don't know that.
17                But the fact is that he wasn't given that
18          choice.  He wasn't asked to come back in the room, in
19          the emergency room.  When he was seen walking around
20          aimlessly holding on to furniture, obviously something
21          is wrong with this man.  So as a doctor, you would
22          kind of frown that somebody, a nurse or a health
23          provider, would not point out to the physician in the
24          emergency room or other personnel that there is
25          something wrong with that patient that should be
```

Page 58

```
 1          explored.  But nothing like that ever happened.  The
 2          one thing that was done was an x-ray, which excluded
 3          trauma.
 4   Q.    I'm becoming convinced that you are not capable of
 5          answering my questions, Doctor.  But I'm just going to
 6          keep asking them.
 7   A.    Go ahead.
 8   Q.    I'm going to have to ask the same one again.  Are you
 9          aware of any evidence indicating that Mr. Dunigan ever
10          asked for any type of medical care after he went to
11          the waiting room?
12   A.    I've already answered that.  I said no, I'm not.
13   Q.    Thank you.  Please stop there.  Are you aware of any
14          evidence that any physician or nurse saw any behavior
15          in Mr. Dunigan which indicated that he needed medical
16          attention?
17                Any nurse?
18                MR. DAWSON:  After he was discharged from
19          the ED?
20                MR. O'LOUGHLIN:  Correct.
21                MR. DAWSON:  Go ahead, Doctor.
22   A.    Any nurse at Bronson or any doctor at Bronson, or am I
23          included in that too, because I saw him.
24   BY MR. O'LOUGHLIN:
25   Q.    Are you aware of any evidence that any nurse or doctor
```

Page 59

```
 1          at Bronson saw Mr. Dunigan in a condition that
 2          indicated he needed medical attention after he was
 3          discharged to the waiting room?
 4   A.    No, I'm not aware.
 5   Q.    Thank you.  What is your understanding of
 6          Mr. Dunigan's ability to ambulate prior to the time he
 7          fell getting off the bus on May 5th?
 8   A.    I don't know what his walking -- I have no idea what
 9          his condition caused him to -- by way of ability to
10          walk.  I can't imagine that it did anything other
11          than -- the heart condition that he had is likely to
12          have caused him pain from walking, from exerting, from
13          being exerted.  But I don't know where I would have
14          found that, that what happened on the day before, on
15          the day before he went to Bronson.  But stress is not
16          exactly a good thing for somebody with that kind of
17          heart condition that Mr. Dunigan had.
18   Q.    Based upon your review of everything you have seen in
19          this case are you aware that Mr. Dunigan had a history
20          of a stroke with hemiparesis?
21   A.    He had some difficulty walking because of that stroke
22          because one side was weaker than the other, but
23          whether they really interfered with his ability to
24          walk with a cane I am not aware.
25   Q.    We are back to that.  You don't know what his ability
```

Page 60

```
 1          was to walk or ambulate with or without a cane prior
 2          to May 6th, 2016, true?
 3   A.    No.  I think with a cane he was able to walk.  Maybe
 4          not as well as he did before he had the stroke, but he
 5          walked with a cane, or was able to walk with a cane.
 6          I can see him walk in the waiting room.
 7   Q.    Do you know whether he was able to walk any better
 8          than he was when you saw him in the waiting room on
 9          the day before?
10   A.    I don't know how he was walking the day before, but in
11          general he was able to walk.  He was able to walk even
12          on May 6th because that is when I saw him.
13   Q.    Did you say was or wasn't?
14   A.    Was.  He was walking okay.  He was walking.  He was
15          holding on to furniture, but that is explainable by
16          his condition on that day, because on the 6th he was
17          different than on -- he may have been different than
18          on May 5th.
19   Q.    You don't know one way or the other, true?
20   A.    I know how he behaved on May 6th.  I'm not so sure
21          whether that applies to May 5th as well.
22   Q.    That is the point of my question, Doctor.  Do you know
23          whether his ability to ambulate as you saw it on May
24          6th in the waiting room was any different than his
25          ability to ambulate on May 5th before he fell getting
```

SPITZ, M.D., WERNER
03/20/2018

Pages 61–64

Page 61

1    off the bus?
2  A.   I just said that I do not know.
3  Q.   All right.  Thank you.  In your report you claim that
4       Mr. Dunigan was discharged from the ER at 4:30 a.m.
5       and that he was still in severe pain with obvious
6       manifestations of serious illness?
7  A.   Yes.
8  Q.   What are you referring to in that claim as obvious
9       manifestations of serious illness or an indication
10      that he was still in severe pain?
11 A.   Well, his breathing, his froth, his behavior when he
12      was trying to lie down and they didn't let him.  They
13      wanted him to sit up, and he couldn't maintain
14      balance.  All these things clearly indicate that he
15      was not in a very good health condition.
16 Q.   You saw some difficulty breathing while he was in the
17      waiting room?
18 A.   He didn't snore for nothing.  That is a difficulty
19      breathing.  That is fluid, edema fluid, going up and
20      down in his airways.
21 Q.   Are you now referring to the time when he was in the
22      police vehicle?
23 A.   That is what you asked.
24 Q.   No.  I asked in the waiting room.
25 A.   Well, that was not my impression.

Page 62

1  Q.   That period of time.  Let's go from the time that he
2       is wheeled into the waiting room until the time he is
3       in the police vehicle.  Are you aware of any
4       indication that he was still in severe pain or had
5       obvious manifestations of a serious illness?
6  A.   In the waiting room I did not hear him snore like
7       that, although he may have.  I did not hear it.  In
8       the police vehicle I heard it personally.  So
9       therefore, I'm fully aware that he was in a state of
10      air hunger at that time.  Air hunger is horrible.  Air
11      hunger is equivalent to fear of doom and fear of
12      death.
13            So having said that, the rest of the
14      behavior in the police car where he couldn't sit up
15      but constantly fell to the side where he would lie
16      down, but they didn't let him, they sat him up by
17      force.  So that is also a manifestation of severe
18      illness because normally people sit.  They don't lie
19      down in a vehicle unless they are in some condition
20      that makes it imperative that they lie down.
21            And then the foam at the mouth that the
22      police officer who saw it, I did not personally see
23      it, but he pointed to my attention of froth at the
24      mouth when he said so.  So I can only put all this
25      under one umbrella, and that means bad health, short

Page 63

1       life expectancy.
2  Q.   Okay.  Let's talk about my question, which if you will
3       recall, was specifically up to the time he was in the
4       police vehicle.  Do you recall that?
5  A.   Well, I interpreted that to mean --
6  Q.   Do you recall that or not?
7  A.   I interpreted that question to mean in the police
8       vehicle.
9  Q.   Okay.  So when I said between the time he was wheeled
10      into the waiting room up to the time he was placed in
11      the police vehicle, you thought that included the time
12      after he was placed in the police vehicle?
13 A.   Not after, but in the police vehicle.
14 Q.   All right.  Now, let me try and specify the parameters
15      so we can get a straight answer.  From the time
16      Mr. Dunigan was wheeled into the waiting room after
17      being discharged from the Emergency Department up
18      until the time he is placed in the police car, but not
19      including the time after he is placed in the police
20      car, are you aware of any evidence that he exhibited
21      severe pain or obvious manifestations of a serious
22      illness?
23 A.   Well, yes, I am.  I mean why would somebody in the
24      room -- in the waiting room walk around holding on to
25      the chairs and benches and using his cane?  Why would

Page 64

1       they do that if they are in such good health?  So
2       having said that, he obviously had something happening
3       to him that was not indicative of great health at that
4       time.  So that is really all I can tell you.
5             Otherwise, I did not see him or hear him
6       breathe.  I did not see or hear him have foam around
7       his mouth.  But I base my opinion on his demeanor in
8       the waiting room where he was anxious, did not sit
9       down in spite of pain that he had because he came
10      there with pain.  Nothing was done to alleviate pain.
11      So therefore, he still had it.
12 Q.   Is it fair to say that the only evidence you can point
13      to indicating that Mr. Dunigan was still in severe
14      pain or had obvious manifestations of a serious
15      illness is what you saw on the video from the waiting
16      room?
17 A.   What happened in the waiting room is what I saw on the
18      pictures of what he did in the waiting room.
19 Q.   All right.  What you just said, I believe, was that
20      the only evidence you can point to to support that
21      claim is the way he was moving around the waiting
22      room?
23 A.   He was moving around.  He was walking.  He was trying
24      to walk with a cane.  He was holding on to the
25      furniture.  He was trying to lie down at some time and

Page 65

1    then got up suddenly again and moved around again.  He
2    was anxious.  That is what he was.  That is called
3    exertion.  That is called stress.  That is called
4    agitation.  That is called an underlying health
5    condition.
6    Q.   Did you earlier testify that you didn't know whether
7         the way that Mr. Dunigan moved around the waiting room
8         was any different than the way he moved the day
9         before?
10   A.   I don't know how he moved the day before.  I'm saying
11        that again.  But how he moved in the waiting room is
12        clearly indicated on the pictures, on the video.
13   Q.   It is.  It is.  Is there anything about the way he
14        moved that you can say would be different if he had
15        been in the waiting room the day before, before he
16        fell from the bus?
17   A.   I don't know what your question is, sir.  I'm sorry,
18        but I don't understand your questions.  They are a
19        little bit convoluted for me.
20   Q.   Okay.  Let's try one that is not.  You have in your
21        report, first paragraph, second page, "Despite
22        Mr. Dunigan's appearance and complaints of pain and
23        his worsening condition," and again, that is the
24        paragraph that refers to 4:30, after he was discharged
25        to the waiting room.  What evidence do you have that

Page 66

1         Mr. Dunigan ever complained of pain after he was
2         discharged to the waiting room?
3    A.   I don't know.  Maybe he did have.  Maybe he didn't.  I
4         don't know.  I don't know the answer.
5    Q.   Why did you put it in your report?
6    A.   Well, what did I put in the report?  Could you read me
7         what I put?
8    Q.   Yes.  You have, "At about 4:30 a.m. Dunigan was
9         discharged from the ER and waited in the lobby at the
10        hospital still in severe pain and obvious
11        manifestations of serious illness.  Despite Dunigan's
12        appearance and complaints of pain and his worsening
13        condition, Bronson personnel approved his release from
14        the hospital."
15   A.   He came to the hospital with pain, with severe pain,
16        in an ambulance.  Nothing was ever done with him to
17        alleviate that pain.  So why would there suddenly be
18        no pain?  When he walks around in the waiting room, he
19        is walking with difficulty.  He is holding on to the
20        furniture.  He is walking with a cane.  He is trying
21        to lie down.  He gets up after a minute or two and
22        walks around again.  He is anxious.  He is worried.
23        He is in a state of stress at that time.  So whether
24        he complained to anybody, I have no idea.
25             But people watch like I do, and they see

Page 67

1    somebody in distress.  So in a hospital, in a medical
2    environment, is it likely that somebody may have seen
3    him?  Well, I don't know how likely it is, but people
4    walk around, nurses, healthcare personnel.  So chances
5    are, more likely than not, that somebody would have
6    seen him.  His doctor that he saw at 2:13 was also
7    around.  Other than that, I cannot answer that.  That
8    is my answer.
9    Q.   Well, okay.  The paragraph I read referred to 4:30
10        after he was discharged to the waiting room.  Did you
11        understand that?
12   A.   After he was discharged from the waiting room all I
13        have is what the police tell me, and then there was
14        also some pictures that I saw which depict
15        Mr. Dunigan, but were they enough for me to make a
16        diagnosis?  No.  So I'm not even referring to those
17        pictures.
18             But the fact is that there were police
19        around.  They also were aware about what he was doing
20        and not believing him and all this is fake and so on.
21   Q.   Doctor, all right.  After he was discharged from the
22        waiting room and before he was placed in the police
23        car are you aware of any evidence indicating that he
24        complained of pain?
25   A.   I don't know if he complained.  I didn't hear him.

Page 68

1    All I know is what I can substantiate, and what I can
2    substantiate I already said several times.
3    Q.   Would you put something in your report that you could
4         not substantiate?
5    A.   I put something in my report that I could not
6         substantiate?  Is that what your question is?
7    Q.   Yes.  Would you?
8    A.   I don't know.  What I put in my report is clearly
9         written down and in black and white, so --
10   Q.   What you put in your report was that, "Despite
11        Mr. Dunigan's appearance and complaints of pain and
12        his worsening condition Bronson personnel approved his
13        release from the hospital."
14             What I'm trying to find out is whether you
15        have any evidence indicating that he complained of
16        pain at any time after he was wheeled to the waiting
17        room.
18   A.   That is obvious that he complained of pain because he
19        came to the hospital because of it.  That is why he
20        summoned an ambulance.  Did he not tell the ambulance
21        why he is going to the hospital and not to the movies?
22   Q.   Apparently you didn't hear my question.  Let me try it
23        again.  I'm talking about the time period after he was
24        discharged from the Emergency Department to the
25        waiting room, which is the time referred to in your

SPITZ, M.D., WERNER
03/20/2018                                                                          Pages 69–72

Page 69

1    paragraph that starts, "At about 4:30."  Do you
2    understand the timeframe I'm talking about?
3    A.  After 4:30.  Is that what you are -- after 4:30.
4    Q.  Are you aware of any evidence that Mr. Dunigan ever
5        complained of pain or a worsening condition after
6        4:30?
7    A.  No, I'm not.  I'm not aware that he complained to the
8        police, because they are the ones that were outside
9        with him, that he complained to them about pain.  But
10       I think that that would have fallen on deaf ears if he
11       did.  They are the ones who charged him with faking to
12       begin with.
13   Q.  Do you hear my question?
14   A.  Yes, I hear your question.
15   Q.  Then please answer it.
16   A.  I told you that I have no knowledge.  I would not talk
17       to the police either because they are the ones that
18       ran him into the ground.  They are the ones that
19       claimed that he was faking, and that occurred in fact
20       all the time.
21   Q.  Are you aware of any evidence indicating that any
22       Bronson security officer or other Bronson employee or
23       any police officer didn't think that Mr. Dunigan was
24       faking?
25   A.  I don't know.  I did not talk to them about it.  I am

Page 70

1        aware that that is their conversation among each
2        other.  That is what I heard.
3    Q.  I think I got this, but I will tell you it's getting
4        hard to tell.  At any time up until Mr. Dunigan was
5        placed in the police car are you aware of any evidence
6        that he was experiencing air hunger, difficulty
7        breathing, dyspnea or fear of doom?
8    A.  Yes, that is my opinion.  That is correct.  Nothing
9        was done for Mr. Dunigan from 2:13 until -- or to
10       alleviate pain and stress and fear.  Nothing was done
11       except an x-ray was done, which did nothing.
12   Q.  What evidence up to the time Mr. Dunigan was placed in
13       the police car are you aware of that indicated he was
14       having difficulty breathing, air hunger, dyspnea or
15       fear of doom?
16   A.  His behavior in the waiting room.
17   Q.  What about that behavior indicated any of those
18       things?
19   A.  I have already said that, and I think that the time
20       will come when I will not say it again.  I have said
21       it now I don't know how many times.  I really refuse
22       to answer that again, so please ask me another
23       question.
24   Q.  Did you read in testimony from the security officers
25       and the police their statements that Mr. Dunigan never

Page 71

1    indicated that he had a medical problem?
2              MR. DAWSON:  Objection, form of the
3    question.  When?
4    A.  I'm not aware of that statement in relationship to
5        that visit on May 6th.
6    BY MR. O'LOUGHLIN:
7    Q.  If that was the testimony of the security officers and
8        the police officers, are you aware of any evidence
9        that would contradict their testimony that Mr. Dunigan
10       never indicated he had a medical problem?
11   A.  No, I'm not aware.
12   Q.  If they also testified that Mr. Dunigan never asked
13       for medical care or asked to be seen by any healthcare
14       provider after the time he was discharged to the
15       waiting room, would you be able to point to any
16       evidence that would contradict that testimony?
17   A.  Yes, I think I would, because he started snoring and
18       frothing at the mouth as soon as he was put in the
19       police vehicle.  The pulmonary edema did not just
20       suddenly occur.  The pulmonary edema took time to
21       develop.  The frothing needed time to mix air with
22       fluid as a result of breathing, so that took time as
23       well.  How much time?  Fairly long time.  All this
24       must have, by necessity, have started before he even
25       went into the vehicle.  This did not just suddenly

Page 72

1        develop out of the blue.  Consequently, it is one
2        thing to lie down, which already is visible on the
3        video in the waiting room.  Why should it now be
4        different?  So it didn't suddenly disappear.
5        Therefore, it had to go on.
6    Q.  Let's try my question.  If the security officers and
7        police officers testified that Mr. Dunigan never asked
8        for medical care, never asked to be seen by a
9        healthcare professional, are you aware of any evidence
10       contraindicating that testimony?
11   A.  No, he may not have.  He may not have.  I answered
12       that before too.  He may not have because he
13       doesn't -- he doesn't need some more comments about
14       oh, I know about him faking.  I know about that.  I
15       have seen that well before many times.
16              When you hear that kind of comment, you
17       don't want to talk to those people.
18   Q.  I'm just going to keep asking, Doctor, because you
19       seem incapable of --
20   A.  I told you before I did not hear that.  I wasn't
21       present at the time that he was in the emergency room,
22       in the waiting room, on the curb, in the police car.
23       I wasn't there.  I'm basing my opinion only on what I
24       read.  What I read is not very complimentary to the
25       police and to the hospital.

SPITZ, M.D., WERNER
03/20/2018                                                                     Pages 73—76

1   Q.   And what you have read and reviewed and everything you
2        know about this case does not allow you to point to
3        any evidence indicating that Mr. Dunigan ever asked
4        for any medical care or attention after the time he
5        was wheeled to the waiting room, true?
6   A.   He never asked.  He may have talked to the doctor who
7        saw him in the emergency room because he had to tell
8        him something.  He would have asked him why are you
9        here.  Then he would have told them.  So we know that.
10       I forget the name of that doctor.  It's an M.D.
11       physician who saw him in the emergency room and who
12       gave a deposition.  Other than that I don't know
13       anything.  I only base my opinions on the evidence
14       that I read.
15               MR. O'LOUGHLIN:  If you would read back my
16       question, please.
17               (The requested portion of the record was
18               read by the reporter at 5:00 p.m.)
19               "Q.    And what you have read and reviewed
20               and everything you know about this case
21               does not allow you to point to any evidence
22               indicating that Mr. Dunigan ever asked for
23               any medical care or attention after the
24               time he was wheeled to the waiting room,
25               true?"

1   A.   Yes, I have answered that.  I have answered it that I
2        did not hear it, but I wouldn't talk to those people
3        that you indicated or asked me about whether I heard
4        him talk to them.  I would not be surprised if he
5        didn't tell them anything.
6   BY MR. O'LOUGHLIN:
7   Q.   At autopsy, the postmortem examinations, are there
8        findings which would be indicative of a recent
9        myocardial infarction?
10  A.   Yes.  Well, no, there is not a myocardial infarction
11       per se because myocardial infarctions take hours to be
12       manifested even under the microscope.  So there are
13       manifestations of 99 percent occlusions, stenosis, of
14       two major coronary arteries.
15  Q.   Are there findings on microscopic postmortem
16       examinations of the heart muscle that are indicative
17       of a recent myocardial infarction?
18  A.   I would prefer if I could answer that question after I
19       have reviewed the microscopic slides, but I have not.
20       The answer to that question I gave you before where I
21       said it requires hours for a myocardial infarction to
22       make microscopic manifestations to allow
23       identification of a myocardial infarct.  But the 99
24       percent stenosis of the passage in two major coronary
25       arteries indicates a very lousy blood flow, which

1        indicates that a myocardial infarct is likely to be in
2        the making.  By the way, the left anterior descending
3        coronary artery is also called the widow maker.
4   Q.   That's cute too.  Did I ask anything about that,
5        Doctor?  Just let me ask my question, please.  After
6        hours what microscopic changes of a myocardial
7        infarction would you expect to see at autopsy?
8   A.   Myocardial fibers being -- beginning to be necrotic,
9        and you may expect some neutrophils to be scattered
10       around the same area.
11  Q.   Does this autopsy report indicate such findings?
12  A.   No, it does not.  I told you it requires hours for
13       that to occur.
14  Q.   Hours of what, hours of infarction?
15  A.   Hours of a clock.
16  Q.   Do you have any knowledge that would tell you whether
17       a patient can have ischemic chest pain for more than
18       an hour and not have infarction?
19  Q.   Say that again.
20  Q.   Are you aware, based upon your medical knowledge, that
21       if a patient has ischemic chest pain for more than an
22       hour, that, by definition, has to result in
23       infarction?
24  A.   No, that is not true.
25  Q.   How many hours does it take for contraction band

1        necrosis and neutrophils, as you referred to, to
2        appear on autopsy?
3   A.   How long does it take for a myocardial infarct to be
4        identifiable microscopically?  Is that your question?
5   Q.   I will start with that.  Sure.
6   A.   Several hours.  Four or five hours.
7   Q.   Which is it?  Several or four or five?
8   A.   Well, sometimes it takes four.  Sometimes it takes
9        five.  Sometimes it takes five and-a-half, and
10       sometimes it takes three and-a-half.  So it doesn't
11       always do the same thing, but the average in my
12       personal experience is four to five hours.
13  Q.   Are you aware that upon presentation to the Emergency
14       Department Mr. Dunigan had a history of chest pain for
15       eight hours?
16  A.   He may have had 25 hours, but he may not have had a
17       myocardial infarct at the instant of the pain
18       starting.  Lots of people have bad coronary arteries
19       and never develop a myocardial infarct.  But the
20       coronary arteries supply the heart muscle with blood,
21       cause the arrhythmia and death.
22  Q.   And Mr. Dunigan was at risk for an arrhythmia and a
23       sudden cardiac death at any time, including even the
24       day before he was seen in the Emergency Department,
25       true?

SPITZ, M.D., WERNER
03/20/2018                                                                    Pages 77–80

1  A.   Mr. Dunigan was at risk for myocardial infarct for
2       years to have the changes that he had with scars and
3       fibrosis in the heart muscle, but he didn't die until
4       he came to the emergency room on the 6th -- on May
5       6th, 2016.
6  Q.   By the way, are you critical in any way of the manner
7       of performance or the conclusions reached in the
8       autopsy report of Dr. Douglas?
9  A.   No.  I never gave that a thought.  It's an autopsy
10      report.  I don't take this with a grain of salt.  I do
11      take with a grain of salt what she puts in the death
12      certificate, but that is not the autopsy report.  You
13      didn't ask that.
14 Q.   But I am now asking about your opinion of the autopsy
15      report, which I believe is the only thing you have
16      expert qualifications to comment on.
17              MR. DAWSON:  Well, let me object to your
18      commentary.  Why don't you just ask a question?
19 A.   I take exception to that comment of yours because I
20      wrote about, what, 60,000, maybe 70,000 death
21      certificates myself.  Do you think I can do that?
22 BY MR. O'LOUGHLIN:
23 Q.   My question is as to the autopsy report in this case.
24      Do you have any criticisms of the manner in which the
25      autopsy was performed or its conclusion?

1       where she says cocaine or even BE in that list of the
2       illegal drugs.
3  Q.   First of all, are you aware that Mr. Dunigan gave a
4       history of using marijuana and cocaine 14 times a
5       week?
6  A.   I'm aware of that, sir, but I'm talking about the
7       death certificate.  That is another question that you
8       asked me now.  My answer to that is that is not what I
9       referred to originally.  I am unaware of there being
10      any illegal drug in his system in that list of drugs
11      on the death certificate.
12 Q.   To your knowledge, did Mr. Dunigan have any
13      prescription for opiates?
14 A.   I don't know if he did or not, but my not knowing is
15      that Hydrocodone is a prescription medication.  But
16      it's not illegal.  It must not be illegal.
17 Q.   Do you know whether Mr. Dunigan had a prescription for
18      any medication that would leave cocaine metabolites in
19      his system?
20 A.   I don't know.  He probably did not, but I don't know
21      if he did or not.  He may have had cocaine.  Maybe
22      somebody slipped it to him.  But BE is a metabolite,
23      not a drug.  It's a metabolite of cocaine.
24 Q.   Do you know whether Mr. Dunigan had a prescription for
25      Fentanyl?

1  A.   I don't really take any exception with the -- I don't
2       have any quarrel with the autopsy report.
3  Q.   What is your quarrel with what is on the death
4       certificate?
5  A.   On the death certificate she puts that two minutes of
6       interval between the onset and the manifestations,
7       that is one thing, for each and every diagnosis.  Then
8       she puts there is illegal drugs in the blood of
9       Mr. Dunigan, and that is really unsupportable because
10      there is no illegal drugs.  Which drugs are those?
11 Q.   I'm not sure I understand your opinion.  Are you
12      claiming that Mr. Dunigan did not have illegal drugs
13      in his system?
14 A.   I'm not aware of.  Which are the illegal drugs?
15 Q.   Did he have metabolites of cocaine?
16 A.   That is not a drug now.  That is a metabolite.  You
17      don't go to the pharmacy and ask for BE or
18      benzoylecgonine.  I wonder what they are going to give
19      you.
20 Q.   You don't dispute that Mr. Dunigan was a drug abuser,
21      do you?
22 A.   I don't go into all that research, sir.  I'm saying
23      there is no illegal drug in his system.
24 Q.   I'm sorry, Doctor.  First of all --
25 A.   Among the illegal drugs she does not -- I don't see

1  A.   I don't know, but it's a prescription medication.
2  Q.   But if he took it and he didn't have a prescription
3       for it, that would be illegal, true?
4  A.   You know, I don't know where he got it, so am I going
5       to make him an addict of Fentanyl just because he
6       could have taken it without a prescription?
7  Q.   Why do you have qualms with the fact that the death
8       certificate says that he has illegal drugs in his
9       system?
10 A.   Because they are legal.
11 Q.   Any other disagreements with the death certificate or
12      the autopsy report?
13 A.   No.  Maybe I should read the death certificate a few
14      more times.  I don't know.  I don't think so.
15              May I ask you how much longer you are going
16      to be?
17 Q.   I think I will pass the witness.  If you want to take
18      a break, we can do that.
19 A.   No.  I would like to finish the deposition.  That is
20      important to me, but that is up to you to tell me that
21      you are done.  If you say you pass the witness, that
22      tells me that you are finished.
23              MR. DAWSON:  There is another lawyer,
24      Doctor.
25

Page 81

BY MR. O'LOUGHLIN:

Q.   That means the other attorney here gets to ask you
     some questions.

A.   Okay.

                    EXAMINATION

BY MR. VANDERLAAN:

Q.   Dr. Spitz, my name is Allan VanderLaan.  I simply want
     to concentrate on one aspect of your report.  You
     indicate in the third paragraph, the second page -- I
     don't think you have your report with you.  Let me
     read it.  "There can be no greater pain than the fear
     of imminent death."
            Would you agree with me that that is a
     personal opinion as opposed to an expert one?

A.   No, I don't agree with you.

Q.   Would you agree with me that reasonable experts could
     disagree on that statement?

A.   I don't know what reasonable experts do, but I can
     tell you that you only die one time.  If you don't --

Q.   Doctor, Doctor, stop.  We want to get out of here.
     Just stop.  Would you agree with me that there are a
     number of psychologists or psychiatrists or religious
     scholars that would disagree with that statement, that
     there can be no greater pain than the fear of imminent
     death?

Page 82

A.   I don't know what these people believe.  I have no
     idea.  So I can tell you that this guy here that is
     sitting and giving this deposition does not agree with
     those people who think that dying is a pleasure.

Q.   Doctor, if this fellow here speaking were to tell you
     that based upon his religious faith, that he would
     absolutely disagree that there is no greater pain than
     the fear of imminent death because his faith system
     allows him to believe that there is something beyond
     that, so he has no fear, which I don't, of imminent
     death, would you view that as an unreasonable
     position?

A.   Yes.  I disagree with you.  I disagree with you, and I
     think you are arguing with me, but that is up to you.

Q.   I'm not arguing with you.  If I were to tell you,
     Doctor, I have no fear of imminent death, only because
     of the religious faith that I have, would you tell me
     that I was absolutely wrong and that I do have a fear
     of death?

A.   No, I'm not going to argue that.  I'm not going to
     answer that.  We live in a free country.  You can
     think what you want, and I think what I want.

Q.   In which case would you agree with me that my position
     would be just as reasonable as yours?

A.   I don't argue that.  You can have your opinions any

Page 83

     time all day, but I disagree with that --

Q.   Tell me again --

A.   -- because I cherish life.  I love life.  I would like
     to be in a position where, because of all the people
     that I have followed to the good Lord, I would like to
     be allowed to be put in for an extension when my time
     comes.  Having said that, thank you very much.

Q.   I respect your opinion, Doctor.  But tell me, based
     upon your expertise, what allows you to make that
     particular statement, that there is no -- there can be
     no greater pain than the fear of imminent death?

A.   Because of my profession, because of my religion,
     because of my being the happiest person in the world
     when I wake up in the morning and I see the sunrise,
     especially yesterday because it was a magnificent view
     out of my bedroom window over the lake.  I'm telling
     you it was a sight to behold.
            As long as I am around -- I'm 91 years old.
     I enjoy every minute.  So is it just as good to die?
     No, sir, it is not.

Q.   Doctor, how would that -- how would that disagree with
     my reasonable position that, based upon my profession,
     my religion, my getting up in the morning and looking
     at a beautiful sunrise and saying to the good Lord I
     don't fear death?  Why wouldn't that be reasonable?

Page 84

A.   Well, because the opposite is much, much better.

Q.   That would be an opinion of yours, correct?

A.   That is why I wrote that in the opinion.  I wrote it
     in other opinions too because that is my conviction.

Q.   That is your conviction based upon your personal
     belief system?

A.   That is my personal belief and my professional belief
     too because there really is no difference between my
     professional belief and my personal belief.  I believe
     what I practice.

Q.   As do I, Doctor.  We can both be reasonable people and
     happen to disagree on that point?

A.   Okay.

Q.   You are not saying physical pain, correct?  You are
     talking about emotional?

A.   I'm talking about all pain, all pain.

Q.   That statement --

A.   All pain.

Q.   Doctor, thank you.  I wish you well.

A.   Thank you.

Q.   It's been an honor to ask you questions, sir.  I'm
     done.
            MR. O'LOUGHLIN:  I'm going to have a couple
     more, Don.  Do you have any?
            MR. DAWSON:  I have a couple.  I will be

SPITZ, M.D., WERNER
03/20/2018

Pages 85–88

Page 85

```
 1        very brief.
 2                    EXAMINATION
 3   BY MR. DAWSON:
 4   Q.   Doctor, during the multiple years that you have been a
 5        physician you talked to other colleagues who have
 6        actually been at the bedside with patients who have
 7        died and learned of the fear of death that patients
 8        have expressed?
 9   A.   Have I talked to other colleagues --
10   Q.   Yes, sir.
11   A.   Who did what?
12   Q.   Were at the bedside of people who were dying and saw
13        their pain.
14   A.   Oh, absolutely.  I have talked to lots of people like
15        that.  I have talked to lots of people who have tried
16        to commit suicide and were unsuccessful and are
17        delighted to have not succeeded.
18   Q.   And talked about their fear of death?
19   A.   Talked about their fear of death.
20   Q.   Are those all bases for your statement that people do
21        have a great fear of imminent death?
22   A.   There are people who are petrified at the thought of
23        dying.
24   Q.   That's all I have, Doctor?
25
```

Page 86

```
 1                    RE-EXAMINATION
 2   BY MR. O'LOUGHLIN:
 3   Q.   Doctor, just a couple more.  In that paragraph
 4        Mr. VanderLaan was referring you to also, after you
 5        talk about the fear of doom and the utmost pain and
 6        there can be no greater pain than the fear of imminent
 7        death, you state in your report, "James Dunigan
 8        experienced this type of conscious pain and suffering
 9        for a duration of at least one and three quarters
10        hours."
11             What one and three quarter hour period of
12        time were you referring to?
13   A.   Well, I believe that is the time that he spent in the
14        waiting room.  You know, I don't remember what I
15        thought, but you see, he left the waiting room -- he
16        went into the waiting room at 4:30.  He left the
17        waiting room after 6, like around 6:30 actually.  He
18        was pronounced dead at 7:40.  Somewhere in that period
19        is an hour and a quarter.
20   Q.   Okay.  It's an hour and three quarters is what you put
21        in your report.
22   A.   Maybe it is then an hour and three quarters.  I don't
23        really remember that.  But the period was figured on
24        from the time that he went out on the street where he
25        was supposed to go to catch the bus, but he really
```

Page 87

```
 1        didn't want to catch the bus.  The police came and
 2        took him, and then he was pronounced dead at 7:40.
 3        I'm not sure if that is exactly an hour and three
 4        quarters, but somewhere around there.
 5   Q.   And again, I'm having trouble.  I'm having trouble
 6        figuring out what period of time you are talking
 7        about.  Are you talking about the time after he was
 8        outside the waiting room?
 9   A.   He was out in the street from -- let me see.  I think
10        somewhere around 6:15 or something like that.  I don't
11        know the exact time because there are different times
12        mentioned, but --
13   Q.   Let's talk about what you saw that indicated to you
14        that Mr. Dunigan was starting to have this utmost pain
15        and the fear of imminent death.
16   A.   He was in a state of building up large quantities of
17        edema in the lungs.  His lungs weighed like close to
18        2,000 ml.  I think the combined weight of both lungs
19        was 19 -- around 1,900 grams.  That is approximately
20        900 or 950 grams per lung.  That is approximately
21        three times normal of what these lungs weighed.  It
22        takes time for that to occur.  Now he has to breathe
23        and breathe hard to mix that fluid with air.  That is
24        what causes foam.  That is like drowning in your own
25        fluids.  That is asphyxiation like drowning without
```

Page 88

```
 1        being even close to the water.  That is a most painful
 2        type of death.
 3   Q.   Okay.  I think the only part of that answer that was
 4        responsive to my question was the "that takes time"
 5        part in terms of the fluid in the lungs.  How much
 6        time does that take?
 7   A.   Well, it takes quite a while.  I cannot tell you
 8        exactly how long because I don't know when it started
 9        here.  But to have the lungs weigh three times normal
10        takes time to develop.  I mean it goes without saying.
11        I cannot tell you how long.  It doesn't take a minute,
12        and it doesn't take 15 minutes either.
13   Q.   Is there a range?
14   A.   I don't know that range, but I can only tell you that
15        three times normal lungs do not -- is not an
16        instantaneous condition.
17   Q.   That is what I'm asking.
18   A.   The lungs could have only weighed two times normal or
19        maybe only somewhat wet lungs, but in this case they
20        weighed three times normal.  That is a lot of weight.
21        That is -- well, to give you a better example, that
22        would be -- let me just think a minute.  Give me a --
23        be patient with me.  A half gallon, that would be like
24        a gallon of -- that would be half -- that would be a
25        gallon of fluid that the lungs had because the lungs
```

Page 89

1     normally weigh about 350 grams, 350 to 400, somewhere
2     in that range.
3         When you start having lungs that weigh
4     close to 2,000, that is a lot of weight, a lot of
5     fluid. With that is the hard work breathing, not
6     getting enough oxygen and developing the anxiety that
7     goes with inability to oxygenate. That is what he
8     had. That is called dyspnea. That is called air
9     hunger. That is called all kinds of names.
10 Q. Thank you. Now, my questioning started because you
11     put in your report one and three quarters hours. In
12     answer to my questions about that you said you weren't
13     sure what period of time you were referring to.
14         My next question was what was going on with
15     Mr. Dunigan that allowed you to say that he was
16     experiencing that utmost pain, that fear of imminent
17     death, and I believe you then referred to how heavy
18     his lungs were, but you couldn't tell me how long that
19     would take. Is that kind of a synopsis?
20         MR. DAWSON: Let me object to the form of
21     that question. First of all, he told you that the one
22     and three quarter hour time was from the time he was
23     in the waiting room until the time he went out to the
24     squad car, so your statement is wrong. That is my
25     objection.

Page 90

1         MR. O'LOUGHLIN: He changed that.
2 BY MR. O'LOUGHLIN:
3 Q. Is that your testimony, Doctor, and your belief, that
4     Mr. Dunigan had this utmost pain and the fear of
5     imminent death from the time he was wheeled into the
6     waiting room until the time he went in the police car?
7 A. Well, he was in the waiting room from 4:30 until 6:30.
8     That means he was in the waiting room -- just taking
9     those numbers he was in the waiting room two hours.
10     He didn't get a ride from the police car. The police
11     car wasn't even there when he went outside. It took
12     time for them to come. Then it took time for them to
13     load him. Then it took time for them to drive to the
14     jail.
15         He was dead when they came to the jail, but
16     he died in the car. I don't know exactly the moment
17     that he really died. He was pronounced dead at 7:40.
18     According to the laws of this country everywhere you
19     go all the medical examiners will tell you that a
20     person is dead when he is pronounced dead. He could
21     have died three months earlier.
22         So consequently the period of time that I
23     thought was appropriate was an hour and three
24     quarters. Maybe I'm wrong. Maybe I have exaggerated
25     by 15 minutes, maybe I have not. Maybe I have

Page 91

1     underestimated. I don't know that. I can tell you
2     this: To get lungs to weigh close to 2,000 ml takes
3     time. It is a lot of painful --
4 Q. That is what I'm trying to get at, Doctor. How much
5     time does it take?
6 A. I have told you. It takes a lot of time. How much is
7     a lot? An hour and three quarters would qualify.
8 Q. Did it take an hour and three quarters for Mr. Dunigan
9     to get to the point where he had what you claim was
10     this fluid accumulating in the lungs that caused the
11     air hunger, difficulty breathing and dyspnea and fear
12     of doom?
13 A. Yes, that is exactly what I'm saying, that the buildup
14     of fluids in the lung -- imagine that each and every
15     air sac in the lung --
16 Q. Unless you are going to say something that tells me
17     how long it takes, I really don't want to hear it.
18 A. Well, I told you how long it takes. It takes an hour
19     and three quarters.
20 Q. That is your claim?
21 A. That is my claim.
22 Q. And that is based on what in relation to this case?
23 A. Well, when you have done 60,000 autopsies, either done
24     myself or supervised, and you talk to relatives and
25     when did your uncle start snoring and when did this

Page 92

1     develop and when did that develop, then you develop a
2     scale in your mind.
3         Then you can even write a paper about it.
4     I never had the time to do that, therefore, I didn't
5     write a paper, but could I? Yes, I could write a
6     paper about things like that. I'm telling you with
7     total reliability that an hour and three quarters
8     would qualify.
9 Q. Okay. Is that a possibility in this case?
10 A. That is a possibility, yes. That is a possibility. I
11     don't know -- I have told you I don't know exactly
12     whether it's an hour and three quarters or an hour and
13     40 minutes or maybe even an hour and-a-half. I don't
14     know that for sure. But is it within the realm of
15     likelihood? Absolutely.
16 Q. Would you expect that at the point where Mr. Dunigan
17     has this fear of doom, that he would at that point
18     have difficulty breathing, air hunger and dyspnea?
19 A. He would have the same as anybody who is submerged in
20     water with nowhere to go. He is fearful of dying but
21     nowhere to go to escape. That is all conducive to
22     this fear of dying, that there is no -- nothing for
23     him that he could do to escape that fate.
24 Q. Okay. Can you point to any evidence that Mr. Dunigan
25     was experiencing air hunger, difficulty breathing or

Page 93

1    dyspnea up to the point he was placed in the police
2    car?
3  A.  I don't really know that at that point it was to the
4    point of being certain that he would die at the end of
5    it, but it was more likely than not that that exactly
6    happened, that he was building up fluids as the
7    minutes went by. As I said before, you don't build up
8    this fluid in the lungs in just a few minutes.
9        So therefore, how many minutes is it? I
10   can only say an hour and three quarters would be
11   within the realm. Is it a little bit less, a little
12   bit more? I do not know. So that is my answer. So
13   you can take it or leave it.
14 Q.  What is the shortest period of time in which a patient
15   with a prolonged resuscitation effort can build up
16   that degree of wet lung?
17 A.  There can be no doubt -- not wet, but drowning lungs.
18   The shortest time begins only when we know and hear
19   that he is starting to snore. But it isn't snoring.
20   To say snoring means -- to the average person means he
21   was sleeping and snoring. Lots of people snore when
22   they sleep. He wasn't sleeping. He was wide awake,
23   afraid to die. That is what he was.
24       So to do with the sound that I heard on
25   the -- coming from the automobile where he was trying

Page 94

1    to find peace by lying down and wasn't let to lie down
2    and had to sit up because they wanted him to sit up
3    because it is a matter of police procedure that I have
4    acquainted myself so many times when I show you who
5    the boss is here. That is what that is.
6        So how long? I don't know. An hour and
7    three quarters in this case.
8  Q.  What is the shortest period of time in which
9    Mr. Dunigan could have developed the lungs that were
10   identified at autopsy?
11 A.  If I give you the shortest way, I would also have to
12   add that same amount to the longest way. That is not
13   the longest way. The longest way is two hours. The
14   shortest way is quarter of an hour less.
15 Q.  Is what?
16 A.  A quarter of an hour less. That means an hour
17   and-a-half to two hours.
18 Q.  That is your claim?
19 A.  That is my claim.
20 Q.  All right. Is that based on anything?
21 A.  Yes, on my experience. That is because I say so.
22   That is not a very welcome statement to make to a
23   lawyer, but in this case I cannot -- you want me to be
24   a wizard. I cannot put my finger on the exact minute,
25   but I can tell you that an hour and three quarters,

Page 95

1    which I figured out is most likely, that is the most
2    likely time.
3        If you want me to cut it down, I can do a
4    deal with you. I think that is a joke. To tell you
5    that it is an hour and-a-half, but then I have to add
6    a quarter of an hour to the end, which means between
7    an hour and-a-half and two hours.
8  Q.  Okay. I honestly don't think I got an answer to this
9    question. Are you aware of any evidence that
10   Mr. Dunigan experienced air hunger, difficulty
11   breathing or dyspnea at any time before he was placed
12   in the back of the police car?
13 A.  Absolutely. The knowledge is that the amount of fluid
14   that he eventually had had to have been a long one
15   because of the amount of weight of the lungs. That is
16   measured to the gram because she put the --
17   Dr. Douglas put the lungs on a scale and measured the
18   weight of each lung separately. One was 800 some
19   grams, and the other one was whatever it was. I don't
20   recall. Close to the -- the total weight was over --
21   close to 2,000, like 1,900 grams for both lungs.
22 Q.  Any evidence other than the weight of the lungs at
23   autopsy that allowed you to say that Mr. Dunigan was
24   experiencing any air hunger, difficulty breathing,
25   dyspnea or fear of doom before he was placed in the

Page 96

1    back of the police car?
2  A.  Yes. All these things together, each one of those
3    words and nouns and adjectives and whatever you said
4    just now is in keeping with that opinion for the
5    simple reason that the weight of the lungs like in
6    this case is almost in the maximum. You don't often
7    have this kind of weight. The only equivalent to that
8    is in drowning cases. Now, imagine that --
9  Q.  Thank you, Doctor. Please listen to my question.
10   Other than the weight of the lungs can you point to
11   any evidence indicating that Mr. Dunigan was
12   experiencing air hunger, dyspnea, difficulty breathing
13   or fear of imminent death before the time he was
14   placed in the police car?
15 A.  Yes, because he was in need of air, but he had fluid
16   in the lungs. He was in need of air. That is why he
17   was in a state of air hunger. That is why he was
18   trying to breathe and couldn't. That is why he was in
19   a state of fear of death and all these other words
20   that you mentioned. That is why.
21 Q.  Again, did you see on video or read in any testimony
22   or any other information you have regarding this case
23   any evidence that he was short of breath, had
24   difficulty breathing, had dyspnea, had air hunger or
25   fear of imminent death at any time before he was

SPITZ, M.D., WERNER
03/20/2018                                                    Pages 97—100

Page 97

1  placed in the police car other than the weight of the
2  lungs?
3  A. I cannot tell you that.  The lungs only weigh that
4     much because of the fluid in it.  You want me to
5     ignore that.  I cannot do that.  The man tells me by
6     his breathing that he is in a state of fear of death
7     because he cannot breathe.  That is indicated by the
8     foam and by the weight of the lungs and by the amount
9     of fluid in them.
10        Then I can tell you this:  That when you
11     weigh those lungs, once you take them out of the body,
12     you lose a significant amount of fluid because when
13     you cut the lungs as you do in an autopsy, you take
14     them out of the body, so you cut parts that would lose
15     some fluid.  So it's even more than 1,900.
16        So don't make me say things that I don't
17     want to say because I think that is nonsense what you
18     are asking me.
19  Q. Did you see any evidence on the video -- did you hear
20     anything that indicated Mr. Dunigan had any difficulty
21     breathing at any time before he was placed in the
22     police car?
23  A. Well, when the lungs contain a lot of fluid, you have
24     difficulty breathing.  Take it from me.  Take it from
25     those who survived a drowning.  Take it from any one

Page 98

1  of those kind of people, including myself, and I will
2  tell you.
3        You put the body in a swimming pool and put
4     the body on the bottom, they will tell you too.  If
5     they ever get the chance of getting out of the pool,
6     they will tell you what went through their mind.
7  Q. Did you see or hear anything on the video that
8     indicated to you that Mr. Dunigan had any difficulty
9     breathing, air hunger, dyspnea or fear of imminent
10     death before he was placed in the back of the police
11     car?
12        MR. DAWSON:  Objection, asked and answered.
13     Go ahead, Doctor.
14  A. I don't know that I have.  I don't know that I have
15     heard it before.  I wasn't there on the premises.  I
16     don't know that I even have pictures of him before he
17     was loaded up into the car, but I do know that he was
18     restless when he was in the car.  Before that I
19     necessarily did not see him.  I don't know what he did
20     before.
21  BY MR. O'LOUGHLIN:
22  Q. Thank you.
23  A. But I can visualize that with that amount of fluid he
24     had to have had not just 10 minutes or 15 minutes or
25     not even just an hour to develop enough fluid to have

Page 99

1  as much as a drowning victim.
2  Q. Would it be your opinion that that amount of fluid in
3     the lungs would be evident to anyone looking at
4     Mr. Dunigan and watching or listening to him breathe?
5  A. I don't know what anybody would see or remember or try
6     to convince me that he was just on his way to a party
7     when he was put in the police car.  No, he was not.
8     He was fighting for survival because he could not
9     breathe.  If somebody tells me he was not making any
10     manifestations, let me tell you, they are lying.
11  Q. All right.  Let's go with that.  By the way, have you
12     watched the video?
13  A. Yes, I did.
14  Q. All of them?
15  A. Yes.  Several.  I think three or four.
16  Q. Start to finish from the time Mr. Dunigan went into
17     the waiting room until the time he was wheeled out of
18     the waiting room?  Did you watch that video?
19  A. I watched several disks.  I don't know if they were
20     three or four.  I don't remember that because I didn't
21     put the videos into the computer.  My office manager
22     did that.  I watched them.
23  Q. Do you know whether you watched the complete video of
24     the time period from where the surveillance in the
25     waiting room is shown on the video?

Page 100

1  A. Yes.  I watched in the waiting room.  I watched the
2     videos outside on -- outside the door of the entrance
3     door to the Emergency Department.  I watched -- well,
4     as I said, I watched all the videos that were sent
5     here.
6  Q. That is my question.  Did you watch them in realtime,
7     or did you fast forward?
8  A. No, not fast forward.  Realtime.
9  Q. You watched the entire video, all three sets of
10     videos, from the surveillance in the waiting room, the
11     outside exterior camera at Bronson which shows him on
12     the sidewalk and the video from the back of the police
13     car?
14  A. Yes, I did.  It took a long time.  I can tell you that
15     too.
16  Q. We know exactly how long it took because all those
17     videos have times on them.
18  A. Yes.  I don't remember what time it took because I
19     didn't look.  But it took a long time.  I know that.
20  Q. Great.  At any time before Mr. Dunigan was placed in
21     the back of the police car are you aware of any
22     evidence indicating that he was foaming at the mouth?
23  A. I don't know what he did at each time.  I cannot tell
24     you.  I can only tell you what he is likely to have
25     done because of the weight of the lungs, because of

SPITZ, M.D., WERNER
03/20/2018                                                                    Pages 101–104

1  the amount of water in the lungs, because all that
2  would have caused him to be short of breathing space
3  because most of the lungs were occupied by edema, by
4  fluid.  So that causes someone to not be able to
5  breathe and have air hunger.
6            So if he is an exception, well, I don't
7  know.  There is no exceptions to air hunger.  When you
8  don't have ability to breathe, you develop air hunger,
9  whether you like it or you don't.
10 Q.  You would expect that to be visible to someone who was
11     looking at him?
12 A.  I don't know what somebody observes when he observes
13     air hunger.  Maybe he calls it something else.  I
14     don't know.  I don't know that.  But I do know what
15     people who come out of water what they think about
16     drowning, and that is drowning in your own fluids.
17 Q.  By the way, you would agree that he had no signs or
18     symptoms of air hunger, dyspnea, difficulty breathing
19     or wet lungs while he was being examined in the
20     Emergency Department, true?
21 A.  I don't know what he exhibited there.  There is no
22     mention of him having snoring breath sounds when he
23     was in the emergency room.  There is no mention in
24     this doctor's records that he heard or saw air hunger.
25     I don't even know that he knows that term.  I have no

1  idea.  Maybe he calls it dyspnea.  I have no idea.  I
2  don't know this doctor.
3  Q.  If Mr. Dunigan was in the condition you are describing
4      in the Emergency Department, would you expect him to
5      have a regular respiratory pattern?
6  A.  I don't know what a regular respiratory pattern is
7      when somebody has edema in the lungs because he
8      probably did have edema because those coronaries did
9      not afford him good health.  So was he -- did he have
10     edema/fluid in the lungs?  I'm sure he did.  He was in
11     congestive heart failure.
12 Q.  And you are saying that was the case when he was in
13     the Emergency Department being examined by Dr. Regot?
14 A.  Exactly.
15 Q.  All right.  Let's stick with that.  That is what you
16     just said, true?
17 A.  Yes.  Exactly.  Yes, and I sign it.
18 Q.  All right.  Listen to me, please.  Would you expect
19     someone who was -- who had edema of the lungs and
20     congestive heart failure on clinical examination to
21     have no respiratory distress, normal breaths sounds,
22     no rales, no wheezing, clear lungs on auscultation
23     bilaterally, a regular respiratory pattern and a 98
24     percent oxygen saturation?
25 A.  On oxygen, right?  Now, that you didn't tell me

1  conveniently, that he was given oxygen at the same
2  time.
3  Q.  On room air.  No.
4  A.  On room air.  That is marked in the records that it's
5      on room air, right?
6  Q.  Yes.
7  A.  Okay.  Well, tell me another one.  He was building up
8      fluids.
9  Q.  You are saying that couldn't have been the case when
10     he was in the Emergency Department being examined by
11     Dr. Regot?
12 A.  Well, he was in the Emergency Department because of
13     chest pain, and the chest pain was obviously not from
14     falling off the bus or falling on the cement.  So he
15     had no injuries according to this doctor.  So you
16     can't have it both ways.  Okay.  Thank you very much.
17     I think I'm going to leave now.  You have kept me way
18     beyond 5:00.  I don't know what the time is.  What is
19     the time?
20            COURT REPORTER:  5:52.
21 A.  5:52.  So it's an hour later.  It's almost 6:00.
22 BY MR. O'LOUGHLIN:
23 Q.  So you are terminating the deposition?
24 A.  Well, I'm not terminating anything, but I mean I have
25     asked you to let me go out of here at 5:00, but you

1  didn't.  So now you can keep me until midnight.
2  Q.  I asked you if you wanted a break.  You said you
3      wanted to go ahead and finish, which I am very close
4      to doing if I can get an answer to my question.
5  A.  Okay.
6  Q.  Would a patient with pulmonary edema to the extent
7      that the patient is experiencing the fear of doom be
8      expected to have clear lungs to auscultation
9      bilaterally, no respiratory distress, normal breath
10     sounds, no rales, no wheezing, a regular breathing
11     pattern and a 98 percent oxygen saturation on room
12     air?
13 A.  I'm inclined to believe, since I cannot believe that
14     the doctor over there in the emergency room did not
15     hear him snore.  So I believe that he probably did not
16     snore at that time, but he did snore later on, and it
17     got worse and not better because he didn't do anything
18     to make this patient get better.  He just gave him an
19     x-ray.  The x-ray didn't touch him as far as improving
20     his condition.  The x-ray didn't do anything.
21 Q.  Are you able to --
22 A.  I'm sorry?
23 Q.  Are you able to answer my question?
24 A.  Yes.  I am answering your question.  You just don't
25     like the answer.

SPITZ, M.D., WERNER
03/20/2018

Page 105

1  Q.  Was your answer that you didn't believe those findings
2      were correct?
3  A.  No, I didn't say that.  I said he probably was not
4      snoring at the time, but the snoring developed while
5      he was in with him from 2:13 until 4:30.  Then at 4:30
6      he was in the waiting room.  So for another two hours
7      or hour and-a-half.  So did he have all of these
8      manifestations at that time?  Maybe not.  Maybe he had
9      a few other manifestations, but that he was without
10     any edema and he was perfectly fine and he was on his
11     way to the dancing club, no, that he wasn't.  He
12     wasn't on his way to the dancing club.
13            He was in dire condition.  He had two
14     coronary arteries that were almost obstructed.  Almost
15     obstructed, well, they were one percent short of being
16     almost obstructed.  So you are telling me that this
17     didn't manifest itself in any way?  Well, you must
18     think that I was born yesterday.
19 Q.  Would the findings described be completely
20     inconsistent with a patient who has pulmonary edema to
21     the extent that they are suffering the fear of
22     imminent death?
23 A.  I didn't say that he had fear of imminent death in the
24     first two hours in the emergency room.  I didn't say
25     that.

Page 106

1  Q.  That is what I'm trying to ask you, Doctor.
2  A.  I didn't say that.  I said he was not breathing heavy.
3      I didn't say that he was -- that Dr. Regot heard him
4      snore but he didn't say it.  I didn't say that.  He
5      developed the pulmonary edema down the line, this
6      heavy pulmonary edema that caused him to be heard
7      around the block.  That is the pulmonary edema he
8      ended up with.
9  Q.  Is there a single piece of evidence that you are aware
10     of that Mr. Dunigan exhibited any respiratory symptoms
11     that would indicate pulmonary edema or anything else
12     while he was in the Emergency Department before he
13     went to the waiting room?
14 A.  I don't know.  There is no such thing mentioned, but
15     there is plenty mentioned later on because I heard it,
16     and that did not develop --
17 Q.  I don't care about later on, Doctor.  Please listen to
18     my question.
19 A.  No, no, no, no, no.  You are misleading, sir.  By
20     doing that you are misleading me and the reader of
21     this deposition.  You are misleading asking me like
22     that.
23            I am saying that this snoring in the car
24     did not develop instantly, and I tell you that again
25     and again and again.

Page 107

1  Q.  Does that mean you can say that it was occurring while
2      he was in the Emergency Department?
3  A.  Yes.
4  Q.  Which was --
5  A.  I'm saying because the waiting room is the Emergency
6      Department also.
7  Q.  No.  We have already distinguished that, but I will
8      try it again.  Up to the time he went to the waiting
9      room after he was discharged from the Emergency
10     Department are you aware of any evidence indicating
11     that he had any respiratory difficulty or pulmonary
12     edema whatsoever?
13 A.  I have already answered this I don't know how many
14     times today.  I will answer this one more time, sir.
15     Then after that I hope you will have the decency of
16     letting me out of here.
17 Q.  I think it can be answered yes or no.
18 A.  Then ask me again.
19 Q.  Are you aware from the time -- pardon me -- up to the
20     time -- before the time that Mr. Dunigan was
21     discharged from the Emergency Department to the
22     waiting room are you aware of any evidence indicating
23     that he had any respiratory difficulties whatsoever?
24 A.  No, I do not.
25 Q.  Thank you.

Page 108

1  A.  Okay.
2  Q.  Do you know when Mr. Dunigan lost consciousness?
3  A.  I'm sorry?
4  Q.  Do you know when Mr. Dunigan lost consciousness?
5  A.  He lost consciousness in the automobile.
6  Q.  What --
7  A.  Yes, he lost consciousness in the automobile because
8      when -- yes.  When he was not getting oxygen, he lost
9      consciousness.
10 Q.  Do you recall from the video and audio in the police
11     car that after the officers got into the car
12     Mr. Dunigan asked them if they could take the cuffs
13     off?
14 A.  Yes, I know that.  He was conscious then.
15 Q.  Did he indicate that he was having any difficulty
16     breathing or respiratory difficulty at that time?
17 A.  No, he didn't, but he wanted the handcuffs off because
18     it's more comfortable than having your wrists tied
19     behind your back.  He was not comfortable.  The
20     decency of the police officer would have been to
21     comply with the request.  It wouldn't have hurt them
22     to do that.
23 Q.  At that time, the time he asked to have the cuffs
24     taken off, did he indicate that he had the fear of
25     imminent death?

SPITZ, M.D., WERNER
03/20/2018                                                                                          Pages 109–112

---

Page 109

1   A.   No.  Come on now.  You know that he didn't do that.
2        No, he didn't do that.
3   Q.   Okay.  From that point how long was it before he lost
4        consciousness?
5   A.   I don't know when he lost consciousness.  He was found
6        dead.  They were most surprised.  How did this faker
7        die of fake?
8   Q.   Do you know how long --
9   A.   That was strange.
10  Q.   Do you know how long Mr. Dunigan was conscious in the
11       back of the police car?
12  A.   I don't know.  But when they put him in there, he was
13       conscious.  He was conscious when he asked for the
14       cuffs to be removed.  How long he was unconscious
15       before he was pronounced dead I have no idea.  Nobody
16       knows when he died.
17  Q.   That was my question.  That was my question, Doctor.
18       Thank you.  You don't know, right?
19  A.   I don't know because nobody knows when he actually
20       died.  We know that he was pronounced dead at 7:40,
21       but when he actually died we do not know in the
22       presence of those cuffs.
23  Q.   Okay.  So you also don't know how long he experienced
24       any conscious pain and suffering, true?
25  A.   I assume that he died shortly before they arrived at

---

Page 110

1        the police station, but I cannot be absolutely sure.
2        It can be before, and it can be later.  I do not know
3        exactly.  I do not know.  I would have to speculate
4        when he actually stopped breathing and had a
5        heartbeat.
6   Q.   So you are --
7   A.   They certainly never made an effort in the police car
8        to determine when he died, to be aware that he
9        suddenly stopped breathing because God only knows when
10       he breathed, he let them know that he is breathing by
11       snoring loud and clear, and suddenly it stopped.
12  Q.   You are unable to offer an opinion as to how long
13       Mr. Dunigan experienced conscious pain and suffering
14       while in the back of the police car, true?
15  A.   He stopped breathing at some time in the police car.
16       When the exact minute was that he stopped breathing I
17       cannot tell you.
18  Q.   And stopping breathing -- one can be breathing and
19       still not be conscious, true?
20  A.   Say that again.
21  Q.   One can be breathing but unconscious, true?
22  A.   Well, you can snore and be unconscious, so I guess you
23       can breathe and be unconscious.  But --
24  Q.   All right.
25  A.   But when you stop breathing, the neighborhood knows it

---

Page 111

1        because that breathing is ominous.  And if you hear
2        it, you know that somebody is breathing and probably
3        conscious because that breathing is fighting for air.
4   Q.   What makes you say that that means they are probably
5        conscious?
6   A.   Because he's fighting for air.  He cannot go to sleep.
7   Q.   Were you involved at all in Dr. Kevorkian's case?
8   A.   Yes.  I did autopsies on some of his victims.
9   Q.   Were you involved in any of the litigation?
10  A.   No, I was not.
11  Q.   Did any of Dr. Kevorkian's victims have that utmost
12       worst pain, no greater fear than the fear of imminent
13       death?
14  A.   You know, I don't remember that.  That is too long
15       ago.  I don't remember.
16  Q.   All right, Doctor.  I will tell you in advance that I
17       will protest any bills for the time this deposition
18       took beyond what was the $2,500 that we paid you.  I
19       will take it to the Judge with this transcript to
20       explain why it took so long.
21            MR. VANDERLAAN:  Doctor, this is Allan
22       VanderLaan.  I pray for your continued good health and
23       that you see many more sunrises.  Mr. Dawson, I didn't
24       see you, but --
25            MR. DAWSON:  That's all right.  I am here.

---

Page 112

1            MR. VANDERLAAN:  It's been a pleasure.
2   Thank you.
3            MR. DAWSON:  Good seeing you all.
4            (The deposition was concluded at 6:05 p.m.
5        Signature of the witness was not requested by
6        counsel for the respective parties hereto.)

---

SPITZ, M.D., WERNER
03/20/2018                                                                    Pages 113

Page 113

1                    CERTIFICATE OF NOTARY

2    STATE OF MICHIGAN )

3                      ) SS

4    COUNTY OF OAKLAND)

5

6            I, Linda S. Wilson, certify that this

7    deposition was taken before me on the date

8    hereinbefore set forth; that the foregoing questions

9    and answers were recorded by me stenographically and

10   reduced to computer transcription; that this is a

11   true, full and correct transcript of my stenographic

12   notes so taken; and that I am not related to, nor of

13   counsel to, either party nor interested in the event

14   of this cause.

15

16

17

18

19

20                  *Linda S. Wilson*

21

22            LINDA S. WILSON, CSR-0973

23            Notary Public,

24            Oakland County, Michigan.

25   My Commission expires:  2/24/19.