UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GORDA DUNIGAN,

       Plaintiff,                    Hon. Ellen S. Carmody

v.                                   Case No. 1:16-cv-1324

BRONSON METHODIST HOSPITAL,

       Defendant.
_____/

## OPINION

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 62). The parties have consented to proceed in this Court for all further proceedings, including trial and an order of final judgment. 28 U.S.C. § 636(c)(1). By Order of Reference, the Honorable Janet T. Neff referred this case to the undersigned. For the reasons discussed herein, Defendant's motion is **denied**.

**I.      Background**

The following allegations are contained in Plaintiff's First Amended Complaint. (ECF No. 25). At approximately 2:30 a.m. on May 6, 2016, James Dunigan was transported via ambulance to Bronson Methodist Hospital (Bronson). Upon arrival at the hospital, Dunigan "was suffering from a medical condition which required immediate medical treatment." Dunigan was soon thereafter examined by a medical doctor, but nevertheless his complaints and symptoms continued to worsen. Despite Dunigan's "obvious physical symptoms and worsening complaints," hospital personnel "approved [Dunigan's] discharge, at or around 4:30 a.m.," at which point Dunigan was "in an unstable and/or deteriorated condition."

Following his discharge, Dunigan remained in the Emergency Department waiting room. At approximately 6:16 a.m., Dunigan, despite being "unable to stand upright," was placed in a wheelchair and removed from the waiting room at the request of hospital personnel. Dunigan was taken outside despite the fact that he required emergency medical treatment. Dunigan was subsequently removed from his wheelchair and placed "prostrate on the ground because [he] was so weak and disoriented that he was unable to remain standing on his own." At approximately 6:42 a.m., Dunigan was arrested and placed in a police vehicle. Approximately one hour later, Dunigan passed away while in police custody. Gorda Dunigan, as Personal Representative of James Dunigan's estate, initiated the present action against Bronson Methodist Hospital alleging that the hospital failed to comply with the mandates of the Emergency Medical Treatment and Active Labor Act (EMTALA). Defendant now moves for summary judgment.

## II.  Summary Judgment Standard

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006).

While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002). Where the moving party has the burden, "his showing must be sufficient for the court to hold that no reasonable trier of fact

3

could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561. Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

**III.     Analysis**

Pursuant to the Emergency Medical Treatment and Active Labor Act (EMTALA), hospitals which participate in Medicare and maintain an "emergency department," must satisfy two general requirements with respect to emergency care. *Moses v. Providence Hospital and Medical Cernters, Inc.*, 561 F.3d 573, 579 (6th Cir. 2009). First, if an individual "comes to the emergency department" and requests treatment, the hospital must "provide for an appropriate medical screening examination. . .to determine whether or not an emergency medical condition. . .exists." *Ibid.* (quoting 42 U.S.C. § 1395dd(a)). Second, if the hospital determines that the individual indeed suffers from an emergency medical condition, the hospital must either provide "such treatment as may be required to stabilize the medical condition" or provide "for transfer of the individual to another medical facility." *Ibid.* (quoting 42 U.S.C. § 1395dd(b)).

EMTALA defines an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in. . .placing the health of the individual. . .in serious jeopardy." *Ibid.* (quoting 42 U.S.C. § 1395dd(e)(1)(A)(i)).

4

For purposes of EMTALA, to "stabilize" an individual experiencing an emergency medical condition means "to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Ibid.* (quoting 42 U.S.C. § 1395dd(e)(3)(A). EMTALA defines "transfer" as including moving the individual to an outside facility or discharging him. *Ibid.* (citing 42 U.S.C. § 1395dd(e)(4)). However, EMTALA does not incorporate medical malpractice or negligence principles and is not a substitute for such claims. *See, e.g., Scott v. Memorial Health Care System, Inc.*, 660 Fed. Appx. 366, 372 (6th Cir., Aug. 22, 2016).

Plaintiff's claim implicates the latter obligation identified above which requires a hospital to either stabilize an individual's emergency medical condition or safely transfer him to another medical facility. Importantly, this obligation is not triggered unless the hospital possesses "actual knowledge" that the individual was experiencing an emergency medical condition. *See Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 786 (6th Cir. 2003); *Moses*, 561 F.3d at 585. However, when assessing whether the hospital possessed "actual knowledge" that an individual was experiencing an emergency medical condition, the actual knowledge of all agents and employees of the hospital is imputed to the hospital. *See Roberts*, 325 F.3d at 788 (the court rejected the argument that EMTALA's duty to treat applies only if a physician possesses actual knowledge of an emergency medical condition and, instead, noted that "[t]he language of EMTALA clearly implies that [the hospital] is responsible not only for the actions of its doctors, but also for the actions of its other employees. The EMTALA statute, in all its sections, refers to the obligations of hospitals, rather than physicians").

Plaintiff argues that Defendant transferred Dunigan, for purposes of EMTALA, when its agents or employees removed Dunigan from the emergency room and subsequently placed him in a police vehicle. Plaintiff argues further that when this transfer occurred Dunigan was actively experiencing an emergency medical condition which was, in fact, known to an agent or employee of Bronson. Plaintiff argues that Defendant's failure to treat Dunigan (or safely transfer him to another *medical facility*) violated EMTALA. Defendant argues that it is entitled to summary judgment because Plaintiff cannot establish that any Bronson agent or employee possessed actual knowledge that Dunigan was experiencing an emergency medical condition prior to his transfer to the custody of the Kalamazoo Police Department. When interpreted in a light most favorable to Plaintiff, the evidence before the Court compels the denial of Defendant's motion.

Plaintiff has submitted video footage secured from two different sources: (1) Bronson surveillance cameras and (2) a camera located inside the police vehicle into which Dunigan was placed and transported from the hospital. (ECF No. 68, Exhibits 1-2). The footage from the Bronson surveillance cameras reveals the following. Dunigan arrived at Bronson Methodist Hospital at 2:12 a.m., having been transported to the hospital via ambulance. At 4:26 a.m., Dunigan was escorted to the emergency department waiting room. At 6:09 a.m., a security officer approaches Dunigan and appears to speak with/to him for approximately two minutes after which the security officer exits the waiting room. At 6:16 a.m., the security officer returns to the waiting room and is soon joined by two additional security officers.[1]

---

[1] The identity of these three security officers is not entirely clear. It is likewise not entirely clear which of these individuals were security officials employed by Bronson and which (if any) were Kalamazoo Police Officers. For present purposes, this is not particularly relevant. As will be discussed below, however, there does not appear to be any dispute that one of these three individuals was Charles Shoemaker, a security officer employed by Bronson.

At 6:20 a.m., Dunigan is assisted to his feet by two of the security officers. Thirteen seconds later, Dunigan staggers forward. Eight seconds later, Dunigan falls forward and places his hands on a chair to steady himself. Eight seconds later, Dunigan collapses into this chair. Two of the security officers then grasp Dunigan by the arms and/or under the shoulders and attempt to get Dunigan to his feet. Dunigan appears to be unable to stand and instead appears to be "dead-weight." The security officers then attempt to assist Dunigan to a wheelchair, but this effort is hampered by Dunigan's apparent inability to remain on his feet. Nevertheless, Dunigan is placed in a wheelchair and rolled out of the emergency department.

After being removed from the emergency department, Dunigan is wheeled to what appears to be a patient pick-up and drop-off location directly outside the emergency department. At this point, there are four security officers standing in Dunigan's immediate vicinity.[2] Dunigan remains sitting in his wheelchair until 6:32 a.m. when two security officers attempt to assist Dunigan to his feet. Dunigan collapses to the ground. No attempt is made to assist Dunigan to his feet or even to place him back in his wheelchair. Instead, Dunigan simply remained laying on the ground. At 6:40 a.m., a marked Kalamazoo Police Department vehicle arrives and parks close to where Dunigan was laying. An officer exits the police vehicle and approaches the four security officers standing near Dunigan.

Two of the security officers assist Dunigan to his feet and attempt to lead him to the police vehicle. Dunigan takes several steps toward the police vehicle, but then collapses. What occurs at this juncture is not entirely clear because the police vehicle is blocking the camera's view. Nevertheless, it appears that the security officers once again attempt to assist Dunigan to

---

[2] Again, there does not appear to be any dispute that Charles Shoemaker was one of the security officers in this group.

his feet. After this proves unsuccessful, Dunigan appears to be lifted completely off the ground, in a horizontal orientation, at which point the security officers attempt to place Dunigan in the police vehicle via the passenger side rear door. One of the security officers then crawls into the police vehicle through the driver side rear door and appears to pull Dunigan into the police vehicle.

The video evidence recorded by Bronson surveillance cameras is certainly relevant, but the evidence crucial to resolving the present motion is that recorded by the camera inside the police vehicle into which Dunigan was placed. This police vehicle was equipped with a camera directed toward the rear seat of the police vehicle. This camera was also equipped to record sound. To provide the appropriate context for the contents of this video and audio evidence, an examination of Charles Shoemaker's deposition testimony is first appropriate.

Shoemaker testified that he was a licensed Emergency Medical Technician (EMT) and had worked for several years in this capacity. (ECF No. 68-3 at PageID.861-62). Shoemaker testified that if an individual is exhibiting "snoring respirations," such could be indicative of "respiratory failure" and possibly congestive heart failure. (ECF No. 68-3 at PageID.867-68). Shoemaker testified that a person exhibiting "snoring respirations" "should be checked out" and, moreover, that it would be "unreasonable" not to do so. (ECF No. 68-3 at PageID.868). Shoemaker testified that he was one of the individuals who helped place Dunigan into the police vehicle. (ECF No. 68-3 at PageID.868). Specifically, Shoemaker was holding Dunigan's feet as Dunigan was placed inside the police vehicle. (ECF No. 68-3 at PageID.868).

The video and audio recorded from inside the police vehicle reveals the following. At 6:41 a.m., Dunigan is placed onto the sill of the rear passenger side door of the police vehicle

while one of the security officers enters the vehicle through the rear driver side door.³ This latter officer grabs Dunigan's body under the shoulders and pulls him into the police vehicle while Shoemaker holds Dunigan's feet. While Shoemaker and this other officer are placing Dunigan inside the police vehicle, *and before the doors to the police vehicle are closed*, Dunigan can clearly be heard exhibiting multiple "snoring respirations." When Shoemaker was shown this video during his deposition, he acknowledged that Dunigan was, in fact, exhibiting the type of "snoring respirations" that he recognized as requiring immediate medical attention. (ECF No. 68-3 at PageID.870).

The evidence discussed herein, when interpreted in a light most favorable to Plaintiff, raises at least two genuine factual disputes which preclude granting Defendant's motion. First, while Shoemaker testified at his deposition that he did not hear Dunigan exhibiting "snoring respirations," the video evidence recorded from inside the police vehicle is sufficient to create a genuine issue of material fact on the question whether Shoemaker heard Dunigan exhibiting "snoring respirations." Second, if a jury finds that Shoemaker did, in fact, hear Dunigan exhibiting "snoring respirations," it must further be determined whether such fact is sufficient to constitute actual knowledge on the part of Shoemaker, and by extension Bronson, that Dunigan was presently experiencing an emergency medical condition as defined by EMTALA. Accordingly, Defendant's motion for summary judgment is denied.

---

³ At first glance, it appears that Dunigan was placed on the sill of *driver side* rear door, because of the orientation of the rear seat, but when viewed in conjunction with the Bronson surveillance footage, it appears instead that the rear seat of the police vehicle simply faces to the rear rather than the front.

## **CONCLUSION**

For the reasons articulated herein, <u>Defendant's Motion for Summary Judgment</u>, (ECF No. 62), is **denied**. An Order consistent with this Opinion will enter.

Date: September 20, 2018                                        /s/ Ellen S. Carmody
                                                                                                      ELLEN S. CARMODY
                                                                                                      United States Magistrate Judge